**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **TERRI YOLANDA LABLANCE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 4:19-cv-00693-BP** |
| **CORIZON HEALTH, INC. AND** | ) | |
| **MISSOURI DEPARTMENT OF** | ) | |
| **CORRECTIONS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

### DEFENDANT CORIZON HEALTH, INC.'S SUGGESTIONS
### SUPPORTING MOTION FOR SUMMARY JUDGMENT

---

Michael L. Matula     MO #47568
Claudia M. Tran        MO #70391
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
4520 Main Street, Suite 400
Kansas City, MO 64111
816.471.1301
816.471.1303 (*Facsimile*)
michael.matula@ogletree.com
claudia.tran@ogletree.com

**ATTORNEYS FOR DEFENDANT**
**CORIZON, LLC A/K/A CORIZON**
**HEALTH, INC.**

i

# TABLE OF CONTENTS

I.  INTRODUCTION AND SUMMARY OF THE CASE ................................................... 1

II.  STATEMENT OF UNCONTROVERTED MATERIAL FACTS ................................ 2

III.  ARGUMENT .................................................................................................... 6

    A.  Summary Judgment is Appropriate on Counts I and II:
    LaBlance's Claims of Race-Based Hostile Work Environment-
    Constructive Discharge. ................................................................................ 6

        1.  Applicable Legal Principles ................................................................. 6

        2.  LaBlance Cannot Establish a *Prima Facie* Case of Hostile
        Work Environment. .............................................................................. 7

        3.  LaBlance was not Constructively Discharged. ................................. 16

    B.  Summary Judgment is Appropriate on Count III and IV:
    LaBlance's Retaliation-Based Termination Claims ..................................... 19

        1.  Applicable Legal Principles ............................................................... 19

        2.  LaBlance Cannot Make a *Prima Facie* Case of
        Retaliation. ......................................................................................... 19

IV.  CONCLUSION ............................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anda v. Wickes Furniture Co., Inc.*,
    517 F.3d 526 (8th Cir. 2008) ..........................................................................16, 18

*Anderson v. Durham D & M, L.L.C.*,
    606 F.3d 513 (8th Cir. 2010) ...................................................................................13

*Bailey v. Runyon*,
    167 F.3d 466 (8th Cir. 1999) ...................................................................................15

*Carpenter v. Con-Way Cent. Express, Inc.*,
    481 F.3d 611 (8th Cir. 2007) .....................................................................................7

*Carter v. Chrysler Corp.*,
    173 F.3d 693 (8th Cir. 1999) ...................................................................................13

*Edwards v. PAR Elec. Contractors, Inc.*,
    No. 19-00126-CV-W-BP, 2019 WL 2745743 (W.D. Mo. July 1, 2019) ................6

*Elisero v. United Steelworkers of Am. Local 310*,
    398 F.3d 1071 ...........................................................................................................6

*Ellis v. Houston*,
    742 F.3d 307 (8th Cir. 2014) .....................................................................................6

*Feltman v. Sieben*,
    108 F.3d 970 (8th Cir. 1997) ...................................................................................21

*Gibson v. Concrete Equip. Co., Inc.*,
    960 F.3d 1057 (8th Cir. 2020) ..............................................................................9, 21

*Green v. Franklin Nat. Bank of Minneapolis*,
    459 F.3d 903 (8th Cir. 2006) ........................................................................14, 15, 16

*Hardage v. CBS Broadcasting, Inc.*,
    427 F.3d 1777 (9th Cir. 2007) .................................................................................17

*Harris v. Home Sav. Ass'n*,
    730 F.Supp. 298 (W.D. Mo. 1989) .......................................................................7, 13

*Helton v. Southland Racing Corp.*,
    600 F.3d 954 (8th Cir. 2010) ...................................................................................17

*Jackman v. Fifth Judicial Dist. Dept. of Correctional Servs.*,
    728 F.3d 800 (8th Cir. 2013) ................................................................................7, 14

*Jones v. City of St. Louis, Missouri*,
    825 F.3d 476 (8th Cir. 2016) ........................................................................20

*Kelleher v. Wal-Mart Stores, Inc.*,
    817 F.3d 624 (8th Cir. 2016) ..........................................................................7

*Minteer v. Auger*,
    844 F.2d 569 (8th Cir. 1988) ..........................................................................9

*O'Brien v. Dep't of Agric.*,
    532 F.3d 805 (8th Cir. 2008) ..........................................................................7

*Palesch v. Mo. Comm'n on Human Rights*,
    233 F.3d 560 (8th Cir. 2000) ........................................................................19

*Perkins v. Int'l Paper Co.*,
    936 F.3d 196 (4th Cir. 2019) ..................................................................11, 14

*Putman v. Unity Health Sys.*,
    348 F.3d 732 (8th Cir. 2003) ..................................................................12, 19

*Sayger v. Riceland Foods, Inc.*,
    735 F.3d 1025 (8th Cir. 2013) ......................................................................19

*Singletary v. Mo. Dept. of Corrections*,
    423 F.3d 886 (8th Cir. 2005) ........................................................................13

*Sowell v. Alumina Ceramics, Inc.*,
    251 F. 3d 678 (8th Cir. 2001) ................................................................16, 20

*Spencer v. Wal-Mart Stores, Inc.*,
    469 F.3d 311 (3d Cir. 2006).........................................................................16

*Stone v. McGraw Hill Fin., Inc.*,
    856 F.3d 1168 (8th Cir. 2017) ........................................................................8

*Twymon v. Wells Fargo & Co.*,
    462 F.3d 925 (8th Cir. 2006) ........................................................................12

*Wilkie v. Dep't of Health & Human Servs.*,
    638 F.3d 944 (8th Cir.2011) .....................................................................6, 20

## Statutes

42 U.S.C. § 1981 ..........................................................1, 6, 9, 14, 15, 19, 21

## I.    INTRODUCTION AND SUMMARY OF THE CASE

In this employment practices suit, Plaintiff Terri LaBlance ("LaBlance") accuses Corizon of violating Title VII and 42 U.S.C. § 1981 by allowing her to be allegedly subjected to a racially hostile work environment that ultimately resulted in her constructive discharge.

While LaBlance is quick to speculate without evidence that many of her interactions with co-workers were racial in nature, the undisputed facts show that was not the case and that she was not subjected to an actionable, race-based hostile work environment, much less that she was constructively discharged. For instance:

- During almost three years of working at Corizon, there was only one incident (occurring nearly 18 months before LaBlance quit) in which racial language was used. The language was not directed toward LaBlance and LaBlance did not report it, but another employee did immediately. The offender was fired the next day.

- The only time in which LaBlance herself reported something that she couched in terms of discrimination did not involve any facially racial conduct. Nevertheless, the incident was investigated. Multiple witnesses were interviewed. Management did not find any evidence of race-based harassment or discrimination. LaBlance was given the opportunity to discuss the results of the finding with her alleged offender, yet she refused.

- LaBlance has no evidence that Corizon management was aware of other employees discriminating or harassing her on the basis of her race.

- When she resigned, LaBlance did not say anything about discrimination or harassment—she said she had a new job with a much shorter commute. Nor did LaBlance mention anything during the three weeks she continued to work after submitting her resignation. During this time, Corizon management repeatedly tried to work out terms to get LaBlance to stay.

- On her last day, LaBlance went out of her way to tell her supervisors that "it was a pleasure" to have worked together and she felt "blessed" to have one of them as "a friend."

In light of these and other undisputed facts, Corizon moves for summary judgment on all claims.

## II.    STATEMENT OF UNCONTROVERTED MATERIAL FACTS

### Facts Relating to LaBlance's Employment at Corizon

1.    Defendant Corizon Health Inc. provides healthcare services at correctional facilities in Missouri, including the Chillicothe Correctional Center.  Exhibit 1, LaBlance Dep. 28:9-21.

2.    LaBlance, who is African-American, began working as an Advanced Registered Nurse Practitioner at the Corizon Chillicothe facility on June 12, 2017. LaBlance Amended Pet. ¶¶ 4, 10; Ex. 1, LaBlance Dep. 28:22-29:1.

3.    Dr. Karen Epperson worked for Corizon at the Chillicothe facility as the on-site Medical Director; throughout her employment, LaBlance thought she had a good relationship with Dr. Epperson and considered her a friend.   Ex. 1, LaBlance Dep. 61:7-10, 62:25-63:23.

4.    As with all Corizon employees, LaBlance completed and certified her participation in Corizon's Discrimination, Harassment, Retaliation and Unprofessional Conduct module training. Ex. 1, LaBlance Dep. 56:3-20.

### Facts Concerning the One and Only Time Racial Language was Used At Corizon

5.    On August 29, 2017, a co-worker used the phrase "n-word rigged" while LaBlance was present. Ex. 1, LaBlance Dep. 74:9-25; 75; 1-13.

6.    Another co-worker, not LaBlance, reported the offending co-worker to Corizon management. Ex. 1, LaBlance Dep. 205:12-17.

7.    Prior to this incident, LaBlance had never heard any racially inappropriate language at Corizon. Ex. 1, LaBlance Dep. 87:17-22.

8.    The same day, the Health Services Administrator at the time, Theresa McWhorter, investigated the claim and got statements from six employees, including LaBlance, and the offender.  Ex. 1, LaBlance Dep. 80:16-17

9.      The offending employee was terminated within a day of the incident, and according to LaBlance, "that was the end of it." Ex. 1, LaBlance Dep. 80:16-17.

10.     After the incident, LaBlance never again heard any racially inappropriate language at Corizon. Ex. 1, LaBlance Dep. 87:23-88:1.

### Facts Concerning the One and Only Time that LaBlance Documented Any Concern about Perceived Discrimination

11.     On June 6, 2018, LaBlance emailed Sterling Ream (Health Services Administrator), Dr. Karen Epperson (Medical Director), Dr. Jerry Lovelace (Regional Medical Director), Jenny Meehan (Director of Operations), and Valicia Kirby (Nurse Practitioner) regarding allegations of employee discrimination against a lab technician named Judy Harkins. Ex. 1, LaBlance Dep. 112:13-20.

12.     LaBlance alleged that in order to process specimens that she brought Harkins in the lab, Harkins required her to fill out requisition paperwork that she did not require of other, non-African-American medical providers. Exhibit 3, Meehan Dep. 62:6-12.

13.     Meehan investigated LaBlance's complaint, discussing the allegations with LaBlance, Harkins, and the other non-African-American medical providers at the facility. Ex. 3, Meehan Dep. 63:3-14.

14.      The other providers at the facility told Meehan that they too were required to complete the requisitions at times, in opposition to LaBlance's allegations that she was the only provider required to complete the forms. Ex. 3, Meehan Dep. 62:16-21.

15.     Meehan confirmed that other providers also filled out requisitions by reviewing past requisition forms, some of which had been completed by all three providers, including LaBlance and the other, non-African-American providers. Ex. 3, Meehan Dep. 66:10-16.

16.     Through Meehan's review of the past requisition forms, she also confirmed that

every request made by LaBlance had in fact been run by the lab technician in question. Ex. 3, Meehan Dep. 69:3-6.

17.     Meehan also noted that Harkins was a difficult personality, who when she believes she is correct about something does not always display the most professional behavior with all members of the team, including non-African-American co-workers. Ex. 3, Meehan Dep. 65:16-19; Exhibit 4, Declaration of Sterling Ream, ¶9.

18.     Based on the evidence that LaBlance was not signaled out and treated differently by Harkins, as other providers also filled out requisition paperwork, and because Harkins was considered a difficult personality, Meehan concluded that the dispute between LaBlance and Harkins was a communication issue, not a discrimination issue. Ex. 3, Meehan Dep. 65:9-14.

19.     Meehan informed LaBlance of her investigation conclusion, and offered LaBlance the opportunity to sit down with Harkins to discuss the situation, but LaBlance refused. Ex. 1, LaBlance Dep. 146:7-11.

**Facts Relating to LaBlance's Voluntary Resignation**

20.     On February 1, 2019, LaBlance tendered her resignation to Corizon, giving three-week's notice. Ex. 1, LaBlance Dep. 192:11-24.

21.     LaBlance gave the reason for her resignation as travel related, stating that the long drive between her home in Kansas City and the facility in Chillicothe was too much. Ex. 1, LaBlance Dep. 193:7-12.

22.     LaBlance also informed Corizon on February 1 that she had accepted another job at the time she turned in her resignation. Ex. 1, LaBlance Dep. 196:9-15.

23.     Corizon initiated conversations with LaBlance asking what they would need to do for her to stay at Corizon, and LaBlance provided conditions for which she would consider

rescinding her resignation. Ex. 1, LaBlance Dep. 198:5-13.

24.     A few days after her resignation, LaBlance called the Health Services Administrator and indicated that she felt she may have made the decision to quit too soon. Ex. 1, LaBlance Dep. 201:16-24.

25.     LaBlance's last day of work was February 22. On her last day, she sent an email to Meehan with the subject "Thank You" which read in part, "the endurance, perseverance, and triumph is due to the wonderful individuals who work diligently and it has been a pleasure to be a part of the team and to be of service. Thank you." Ex. 1, LaBlance Dep. 203:1-18; Exhibit 5, LaBlance E-Mail February 22, 2019.

26.     On February 22, LaBlance also left a voicemail for Dr. Epperson, her immediate medical supervisor, in which she said in part, "I will miss you. I will miss working with you and you are a friend. And so I'm not saying good-bye. I'm saying I will see you soon and I just appreciate you and I thank you. You have been a blessing to me…I love you." Ex. 1, LaBlance Dep. 218:5-22; 219: 1-15.

27.     Between the dates of February 1, 2019, the date of her resignation, and February 22, 2019, her last day of work, LaBlance never mentioned or had any discussions with Corizon regarding race discrimination, harassment, or retaliation. Ex. 1, LaBlance Dep. 194:22-25.

**Miscellaneous Facts**

28.     LaBlance was never physically threatened in any way while she worked at Corizon. Ex. 1, LaBlance Dep. 196:2-8.

### III. ARGUMENT

**A.     Summary Judgment is Appropriate on Counts I and II: LaBlance's Claims of Race-Based Hostile Work Environment-Constructive Discharge.**

**1.     Applicable Legal Principles**

LaBlance has asserted race discrimination claims under both Title VII and 42 U.S.C. § 1981. The elements of both claims are the same and can be evaluated together.[1] More specifically, LaBlance's Amended Complaint alleges two adverse employment actions: (1) that she was subjected to a racially hostile work environment; and (2) and that the environment was so intolerable that her resignation amounted to a constructive discharge.[2]

To avoid summary judgment, LaBlance must first establish a *prima facie* case of hostile work environment, and must establish that (1) she is a member of a protected group; (2) she was subject to race-based harassment; (3) the harassment was because of membership in the protected group; and (4) the harassment affected a term, condition, or a privilege of her employment[3]. To succeed against a motion for summary judgment, plaintiff must present sufficient evidence of intentional discrimination by defendant to create a genuine issue of fact for trial.[4] "The standard for demonstrating a hostile work environment under Title VII is "demanding," and "does not prohibit all verbal or physical harassment and it is not a general

---

[1]     *Elisero v. United Steelworkers of Am. Local 310*, 398 F.3d 1071, 1077 (8th Cir. 2005) (Title VII and § 1981 claims alleging a hostile work environment are analyzed under an identical standard.).

[2]     One of the (few) specific examples LaBlance pleads in support of her hostile environment claim is an incident involving a lab technician placing a biohazard bag on LaBlance's desk and ignoring her directive. Am. Pet. ¶12. LaBlance correctly does not contend that this incident—which in no way constituted a tangible change in working conditions—could possibly constitute something so significant as to be an actionable adverse employment action. *Wilkie v. Dep't of Health & Human Servs.*, 638 F.3d 944, 955 (8th Cir.2011). Accordingly, Corizon analyzes this incident within the context of LaBlance's hostile environment claims.

[3]     *Ellis v. Houston,* 742 F.3d 307, 319 (8th Cir. 2014) (*See also Edwards v. PAR Elec. Contractors, Inc*., No. 19-00126-CV-W-BP, 2019 WL 2745743, at *7 (W.D. Mo. July 1, 2019)).

[4]     *Id.*

civility code for the American workplace." [5]

## 2. LaBlance Cannot Establish a *Prima Facie* Case of Hostile Work Environment.

### a. *LaBlance Fails to Establish that She was Subject to Unwelcome Harassment on the Basis of Her Race.*

In order to show a hostile work environment, a plaintiff must be able to provide evidence that the environment was both objectively hostile to a reasonable person and subjectively hostile to the victim.[6] Relevant factors include the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with any employee's work performance."[7] It is well-settled that a plaintiff's "beliefs" or "feelings" cannot create a triable issue of discrimination.[8] The bar to showing a hostile work environment is high, and petty workplace disagreements and unprofessional behavior which do not rise to the level of affecting the terms or conditions of one's employment do not reach it.[9]

LaBlance cannot establish that the environment at Corizon was so objectively hostile that she subjectively perceived the alleged harassment as abusive.

For starters, LaBlance admits that while she worked at Corizon, she was never physically

---

[5]   *Jackman v. Fifth Judicial Dist. Dept. of Correctional Servs.*, 728 F.3d 800, 805 (8th Cir. 2013) (ruling that incidents that were insufficient and conduct that was not severe or pervasive enough to constitute actionable discrimination were not sufficient to support a hostile work environment claim).

[6]   *Id.*

[7]   *Id.*

[8]   *Harris v. Home Sav. Ass'n*, 730 F.Supp. 298, 304 (W.D. Mo. 1989).

[9]   *Kelleher v. Wal-Mart Stores, Inc.,* 817 F.3d 624, 634 (8th Cir. 2016) (unspecified discriminatory statements, random looks and eye rolls did not constitute adverse employment action); *O'Brien v. Dep't of Agric.,* 532 F.3d 805, 809 (8th Cir. 2008) (verbal harassment and increased scrutiny do not rise to the level of affecting the terms or conditions of one's employment); *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 617 (8th Cir. 2007) (workplace pranks, and a few racial epithets, by co-workers did not rise to the level of an adverse employment action).

7

threatened in any way. SOF 28. Moreover, during her years of employment, LaBlance was subjected to one—and only one—interaction that was facially racial in nature. In late August 2017, one of LaBlance's co-workers referred to something being "n-rigged" and after being asked about what she had said, the co-worker used the phrase "African-American engineered." SOF 5. LaBlance did not report this incident to anyone, but a co-worker did almost immediately. SOF 6. The same day, the Health Services Administrator at the time, Theresa McWhorter, investigated the claim and got statements from six employees, including LaBlance and the offender. SOF 8. Based on the evidence, Corizon managers agreed that the offending co-employee should be immediately fired, which she was the next day. SOF 9. LaBlance concedes that was "the end of it." SOF 9.

This was the only time the LaBlance ever heard any racially inappropriate language while employed with Corizon. SOF 7, 10. The Eighth Circuit has established that one race-related comment that a plaintiff has allegedly overheard does not constitute harassment sufficient severe enough and pervasive to support a hostile work environment claim[10].

The only other incident that LaBlance ever documented as being, in her opinion, potentially racial in nature involved a dispute with a lab tech. On June 6, 2018, LaBlance emailed Corizon management regarding allegations of employee discrimination against a lab technician named Judy Harkins. SOF 11. More specifically, LaBlance alleged that in order to process specimens that she brought Harkins in the lab, Harkins required her to fill out requisition paperwork that she did not require of other, non-African-American medical providers. SOF 12.

Meehan investigated LaBlance's complaint, discussing the allegations with LaBlance, and Harkins. She also spoke with the other non-African-American medical providers at the

_____

[10]     *Stone v. McGraw Hill Fin., Inc.*, 856 F.3d 1168, 1175 (8th Cir. 2017).

facility, who told Meehan that they too were required to complete the requisitions at times, conflicting with LaBlance's allegations that she was the only provider required to complete the forms. SOF 13-15. Meehan reviewed the past requisition forms and confirmed that (1) all providers, African-American and Caucasian, had filled out requisition requests, and (2) that every request made by LaBlance had in fact been run by the lab technician in question. SOF 16. Meehan also noted during the course of her investigation that Harkins was a difficult personality, who occasionally struggled with displaying professional behavior with all members of the team, including non-African-American co-workers. SOF 17; Ex. 4. Meehan determined this was a communication issue, not a discrimination issue, and shared her conclusion with LaBlance. SOF 18. Meehan also offered LaBlance the opportunity to sit down with Harkins to discuss the situation, yet LaBlance refused. SOF 19. The investigation concluded when Meehan had determined that there was no racial animus motivating the actions of the lab technician, and LaBlance's refused to discuss the situation further.[11] There is no reasonable basis to believe Harkins' conduct constituted race discrimination or possibly contributed to a race-based hostile work environment.

Courts have historically rejected claims of hostile work environment where plaintiffs fail to establish a genuine dispute of material fact as to the subjective component of her harassment claim.[12] Whatever disputes LaBlance had with others, LaBlance also testified that she had a good

_____

[11] Meehan's conclusion that Harkins' behavior was not race based is also consistent with (a) the fact that LaBlance and Harkins' had worked together for more than a year, and (b) there were only two instances in which Harkins had supposedly been insubordinate to LaBlance. Ex. 1, LaBlance Dep. 129:1-5; 6-15.

[12] *Gibson v. Concrete Equip. Co., Inc*., 960 F.3d 1057, 1064 (8th Cir. 2020) (Court took into consideration evidence of a letter plaintiff mailed to a corporate employee stating that she "loved it there," showed that there was no genuine dispute of material fact as to the subjective component of her harassment claim). *See also Minteer v. Auger*, 844 F.2d 569, 572 (8th Cir. 1988) (Title VII not a

working relationship with her superiors and co-workers, which is memorialized by her interactions with her supervisors on her last day of employment. LaBlance emailed Meehan a "thank you" email on her last day, telling her that it was "a pleasure to be part of the team." SOF 25; Ex. 5. LaBlance even went as far as to leave a voicemail for her supervising doctor, letting her know that she considered her a "friend" and that she "loved her." SOF 26. Not only did LaBlance consider Corizon's efforts to help her stay by providing employment conditions for which she would rescind her resignation, but LaBlance also engaged in unprompted expressions of gratitude and love for her Corizon co-workers as she left her last day of work after her voluntary resignation. SOF 25-26. These are not the actions of an individual who subjectively perceived any alleged harassment as abusive, and she falls far short of her *prima facie* burden, therefore summary judgment is appropriate.

### b. *Post-resignation Events are Immaterial to LaBlance's Hostile Work Environment Claim.*

Years before getting her nursing license, LaBlance had been convicted of several criminal offenses—including passing bad checks, and some substance-related crimes. When applying for her job with Corizon, LaBlance was forthright about her criminal history and Corizon determined that her convictions did not disqualify her from employment. Although LaBlance was apparently never incarcerated, at some point the Department of Corrections created an electronic medical record for her. The database in which such records are maintained is accessible to Corizon personnel for purposes of providing care to inmates.

LaBlance's Amended Complaint refers to a situation in which her supervisor Dr. Epperson accessed and mailed part of LaBlance's electronic medical record to LaBlance's

recovery tool for resolving all undesirable personnel practices or every sort of harsh or unfair treatment of employees.).

home, and alleges that the D.O.C. were working "in concert to question Plaintiff's employment status."[13] LaBlance does not date this event, but implies through her pleading that the letter Dr. Epperson sent led to LaBlance's resignation. Amend. Pet. ¶14-16. Further, based on how much time has been devoted to these issues during the discovery process, Corizon anticipates that LaBlance believes it is relevant to her legal claims. But that is not the case. The incident is an immaterial red herring.

The undisputed evidence conclusively shows that Dr. Epperson mailed the record on February 26, 2019, i.e., several days *after LaBlance's last day of employment.* Ex. 1, Dep. 213:20-214:10. Consequently, this event could not have contributed to LaBlance's work environment or her decision to leave. It is axiomatic and common sense that events a plaintiff is unaware of cannot contribute to a hostile work environment, and events that had not yet occurred certainly cannot do so.[14] Though LaBlance no longer worked for Corizon, once LaBlance reported what happened, Corizon looked into the matter, which resulted in Dr. Epperson and a nurse practitioner being fired and several other employees who improperly accessed LaBlance's Department of Corrections' records being issues disciplinary warnings. Ex. 3, Meehan Dep. 98:25-99:8.

Beyond the timing that makes it impossible for what Dr. Epperson did to be relevant, it is sheer speculation to suggest that Dr. Epperson's conduct was race-based, and LaBlance has no

---

[13] It is unclear what "to question Plaintiff's employment status" means, but LaBlance's allegation regarding the questioning of her employment status appears directed at D.O.C. officers rather than Corizon, and LaBlance never made Corizon aware of any issues with D.O.C. officers. Ex. 2, Lovelace Dep. 86:1-4; Ex. 3, Meehan Dep. 23:11-17.

[14] *See, e.g., Perkins v. Int'l Paper Co.*, 936 F.3d 196, 211 (4th Cir. 2019) ("Following our decisions and those of our sister circuits, we confirm that information about which a plaintiff is unaware cannot, by definition, be part of a plaintiff's work experience. Thus, such information is not proper for consideration in evaluating the severe or pervasive requirement of a hostile work environment claim.") (citing cases).

evidence to support such a contention.[15] Speculation is neither appropriate nor sufficient when considering summary judgment.[16]   Indeed, any suggestion that Dr. Epperson did this because LaBlance is African-American conflicts with LaBlance's testimony that she considered Dr. Epperson a friend and cannot be reconciled with LaBlance's goodbye message to Dr. Epperson. See SOF 26, and *infra.* The only reasonable inference from the mailing is that Dr. Epperson had recently found out about LaBlance's criminal history and was upset that LaBlance, her friend, had not told her when they worked together.

   c.   ***LaBlance Cannot Establish a Causal Nexus Exists Between Alleged Harassment and Her Race.***

   When deposed, LaBlance described several other interactions with co-workers which she now considers discriminatory—things like non-nursing staff talking to her patients during women's exams, people "whispering and murmuring" about her, no one congratulating her after a patient was successfully given CPR, and the like. LaBlance never bothered to document these in any manner or report them to anyone (including the EEOC in her Charge of Discrimination). Corizon will not delve into these specifically because the details are immaterial in that none are facially racial in nature or involve circumstances from which racial animus could be reasonably inferred, and, regardless, even considered collectively they do not meet the demanding standard to create an actionable work environment.

   A plaintiff is also required to show that a causal nexus exists between the harassment and her membership in the protected group; "relatively minor inconveniences or irritations which an

---

[15]   *Putman v. Unity Health Sys.*, 348 F.3d 732, 734 (8th Cir. 2003) (facially race-neutral context is not sufficient to support an assertion of race discrimination).

[16]   *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006) ("Facially race-neutral statements, without more, do not demonstrate racial animus on the part of the speaker…While we are required to make all reasonable inferences in favor of the nonmoving party in considering summary judgment, we do so without resort to speculation.")

employee 'suspects' relate to her race or sex simply are not actionable."[17] As a threshold matter, "for conduct to be considered in a race-based hostile work environment claim, the conduct must 'have a racial character.'"[18] And this racial component must be proved with "more than speculation and conjuncture."[19]

The basis of LaBlance's complaints regarding her alleged discrimination and harassment is predicated on her unsubstantiated belief that all her perceived differences and difficulties in the workplace were attributed simply to her race, despite the lack of evidence to support this conclusion.

### d. *LaBlance Fails to Show that Alleged Harassment Affected a Term, Condition or Privilege of Employment.*

Even if conduct is race-related, unless it is so severe or pervasive enough to alter the conditions of the employment, and the environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."[20] "Sporadic or causal comments are unlikely to support a hostile environment claim," and "the resulting harm cannot be measured by carving it 'into a series of discrete incidents.'"[21] "[R]ude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are not

---

[17] *Harris v. Home Sav. Ass'n.*, 730 F. Supp. 298, 307 (W.D. Mo. 1989) (No evidence in the record of any racial or sexual motivation underlying isolated and insignificant actions, therefore court found that plaintiff failed to establish an actionable case of sexual or race harassment due to an offensive work environment.)

[18] *Singletary v. Mo. Dept. of Corrections*, 423 F.3d 886, 893 (8th Cir. 2005) ("for conduct to be considered in a race-based hostile work environment claim, the conduct must "have a racial character or purpose to support a hostile work environment claim").

[19] *See Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 519 (8th Cir. 2010) (finding that the plaintiff offered "little more than speculation and conjecture" that supervisor's "nitpicking and ridicule" had anything to do with race).

[20] *Carter v. Chrysler Corp.*, 173 F.3d 693, 701 (8th Cir. 1999).

[21] *Id.*

actionable under Title VII."[22]

To find that the harassment affected a term or condition of employment, she must establish that the conduct was extreme and such that intimidation and ridicule permeated the workplace.[23] As discussed below in more detail regarding her alleged constructive discharge, LaBlance's behavior belies any such notion. LaBlance (1) called in the days following her resignation and indicated that she felt she may have made the decision to resign too hastily; (2) engaged in conversation with Corizon regarding opportunities for her to stay employed; (3) continued to work at Corizon for three weeks after her resignation; and, (4) in fact left very positive messages for her co-workers on her way out. Based upon these undisputed facts, no reasonable juror could believe that the environment at Corizon was hostile or abusive enough as to affect a term of her employment, as LaBlance herself even seemed reluctant to leave it. Incidents which are relatively infrequent nor of any such severity that a reasonable person would consider her work environment to be hostile or abusive are not enough to permeate the workplace and fail to reach the high *prima facie* standard.

### e. *LaBlance Fails to Show that Corizon did not take Proper Remedial Action.*

An employer can avoid liability by taking reasonable measures to prevent and address workplace discrimination, such as properly responding to an employee's complaint by taking prompt remedial action against an alleged offender.[24] Of course, firing a harasser can effectively

---

[22]   *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 208 (4th Cir. 2019) (internal quotation marks and citations omitted).

[23]   *Jackman*, 728 F.3d at 806 (8th Cir. 2013).

[24]   *Green v. Franklin Nat. Bank of Minneapolis*, 459 F.3d 903, 912 (8th Cir. 2006) (Court held that there was nothing in the record to support plaintiff's allegations that alleged workplace problems were the result of racial differences).

bar a plaintiff's claim.[25]  Title VII, however, does not require that the employer fire an alleged wrongdoer, and even in instances in which an alleged harasser remains employed, the employer can establish that it "took prompt remedial action reasonably calculated to end the harassment."[26]

Of LaBlance's three specific instances of alleged discrimination and harassment pled in her Amended Petition, the first had to do with the incident in August 2017 in which a co-worker used a racially insensitive term. Amend. Pet. ¶11. As LaBlance testified, the offender was immediately terminated within a day of the incident and "that was the end." SOF 9. It is undisputed that Corizon took swift action against the alleged offender after being alerted by an employee who was *not* LaBlance. SOF 6. Furthermore, LaBlance testifies that the incident was the *only* time she heard racially inappropriate language at the workplace, as she had never heard it before the incident or nor ever again following it. SOF 7, 10.

LaBlance's only documented complaint of discrimination is the situation with the lab technician. This incident, which was not facially racial, was reasonably investigated. The information provided by other witnesses did not support the allegations that LaBlance was being treated differently, must less because of her race. To the contrary, Meehan confirmed that other providers at times did the same thing that the lab technician had asked LaBlance to do and reasonably concluded this was an issue of miscommunications (consistent with the fact that the technician also at times had less-than-professional interactions with other, Caucasian, employees). SOF 15-17; Ex. 4. LaBlance admitted that she was given the opportunity to sit down with her co-worker after the investigation to discuss the situation, but LaBlance refused to do so. SOF 19. In this instance, Corizon took prompt action, and was willing to take further action to

---

[25]  *Id.*

[26]  *Bailey v. Runyon*, 167 F.3d 466, 468 (8th Cir. 1999).

rectify the situation, yet the investigation ended upon LaBlance's refusal to discuss it any further.

The undisputed facts show that Corizon, when presented with allegations about discrimination, has and will reasonably investigate and, based on the evidence, take prompt remedial measures[27].

### 3.     LaBlance was not Constructively Discharged.

To establish a constructive discharge claim, an employee must have evidence that is even more demanding than that required to establish an actionable hostile work environment. A constructive discharge only occurs when an employer renders the employee's working conditions so intolerable that she is forced to quit.[28] The employee's decision to resign must be reasonable in light of the circumstances, and the Eighth Circuit has repeatedly stressed that "to act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly."[29] Furthermore, "an employee must, however, grant [her] employer a reasonable opportunity to correct the intolerable conditions before [she] terminates [her] employment."[30]

As discussed above, LaBlance does not have sufficient evidence to make her hostile work environment claim viable.  Consequently, because of the more demanding burden required to

---

[27]     *Green*, 459 F.3d at 912 (8th Cir. 2006).

[28]     *Sowell v. Alumina Ceramics*, Inc., 251 F.3d 678, 685 (8th Cir. 2001). *Spencer v. Wal-Mart Stores, Inc*., 469 F.3d 311, 316 n.4 (3d Cir. 2006) (noting that proof of constructive discharge requires "a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment.") (internal quotation marks omitted).

[29]     *Id*.

[30]     *Anda*, 517 F.3d at 535 (8th Cir. 2008) (Defendant clearly did not know the full extent of plaintiff's complaints and plaintiff therefore did not give defendant a reasonable opportunity to correct the intolerable conditions detailed in plaintiff's deposition).

16

establish a constructive discharge claim that claim necessarily fails as well.[31]

Beyond the other evidence discussed above, undisputed facts concerning LaBlance's conduct during the resignation process further fatally undermine any suggestion that she was being subjected to "intolerable" work conditions or that she gave Corizon a reasonable opportunity to address them before leaving. Consider the following:

- On February 1, 2019 LaBlance tendered her resignation to Corizon, giving three-week's notice. **Neither when she resigned, nor during those three weeks did she say one word about any alleged discrimination, harassment, or retaliation.[32]**

- Rather than say anything about alleged discrimination—or even say anything about problems of any kind with co-workers—LaBlance stated that she was resigning because the long drive between her home in Kansas City and the facility in Chillicothe was too much. SOF 21.

- LaBlance also informed Corizon on February 1 that she had accepted another job at the time she turned in her resignation. SOF 22.

- Corizon management representatives spoke with LaBlance multiple times asking what they would need to do for her to stay at Corizon, and LaBlance provided conditions for which she would consider rescinding her resignation. SOF 23.

- A few days after her resignation, LaBlance called the Health Services Administrator and indicated that she felt she may have made the decision to quit too soon; there were discussions about whether her schedule could be amended, but Corizon could not met the terms that LaBlance said were necessary for her to stay. SOF 23-24.

- On February 22, 2019, her last day at Corizon, she emailed Meehan with the subject "Thank You" which read in part, "the endurance, perseverance, and triumph is due to the wonderful individuals who work diligently and it has been a pleasure to be a part of the team and to be of service. Thank you." SOF 25; Ex. 5.

---

[31] *See Helton v. Southland Racing Corp.*, 600 F.3d 954, 960 (8th Cir. 2010) (finding that where the plaintiff failed to show she was subjected to a hostile work environment it necessarily followed that she could not show she was constructively discharged).

[32] *Hardage v. CBS Broadcasting, Inc.*, 427 F.3d 1777, 1184 (9th Cir. 2007) (Plaintiff's constructive discharge claim unable to survive summary judgment because even if harassment created a hostile work environment, "such harassment ceased well in advance of [plaintiff's] resignation.")

- On February 22, LaBlance also left a voicemail for Dr. Epperson, her immediate medical supervisor, in which she said in part, "I will miss you. I will miss working with you and you are a friend. And so I'm not saying good-bye. I'm saying I will see you soon and I just appreciate you and I thank you. You have been a blessing to me…I love you." SOF 26.

LaBlance's conduct related to her resignation process is fundamentally at odds with the idea that she was subject to a hostile work environment, much less one having anything to do with her race, and certainly not one so "intolerable" that she was forced to quit. Going out of her way to tell Meehan "it was a pleasure" to work with the team and telling her friend Dr. Epperson that she would miss working together further undermines her constructive discharge claim all the more. Moreover, the undisputed fact that in response to her resignation notice, Corizon management initiated discussions with LaBlance trying to talk her out of quitting also negates this claim. SOF 23.[33]

While LaBlance is quick to identify actions and individuals in the workplace whom she disliked, she consistently failed to link any disagreement or actions to a racial animus, and even when given the opportunity to learn more about the motives behind actions she felt were discriminatory, she refused, preventing Corizon from taking any additional action in the face of her refusal to discuss. SOF 19. If at the time she quit LaBlance really believed that she was being subjected to a racially hostile workplace, could and should have make those concerns clear and given Corizon a reasonable opportunity to correct them. But she did not do that. Even while Corizon management was initiating meetings asking her what they might be able to do to keep her (SOF 23), she did not say one word about harassment or discrimination. SOF 27. To the

---

[33] *See, Anda v. Wickes Furniture Co., Inc.*, 517 F.3d 526, 534 (8th Cir. 2008) (affirming summary judgment on constructive discharge claim because plaintiff did not provide evidence that defendant intended plaintiff to quit; instead, evidence showed that when plaintiff gave her notice, defendant asked her not to quit.).

contrary, she engaged with Corizon in discussions regarding potential conditions for her to remain employed and ultimately left warm "goodbyes" to her supervisors (SOF 25-26) – all of which show that she did not give Corizon an opportunity to address problems, and further undermines any reasonable suggestion that those problems actually existed at all.

**B.      Summary Judgment is Appropriate on Count III and IV: LaBlance's Retaliation-Based Termination Claims**

   **1.      Applicable Legal Principles**

Turning to LaBlance's retaliation claims, the *McDonnell Douglas* test is applicable because there is no direct evidence of retaliatory-based intent.[34] To make a *prima facie* case of retaliation, LaBlance must first show that "she engaged in protected conduct, that she suffered an adverse action, and that the adverse action was causally linked to the protected conduct."[35] "A plaintiff's general, conclusory allegations and opinions, without more, are not sufficient to raise an inference of retaliation."[36] Summary judgment is appropriate on this claim because LaBlance fails to provide evidence that (1) she was subject to any adverse action at all, and (2) even in the event that the Court finds that she experienced an adverse employment action, there is no evidence suggesting a link between any alleged adverse actions to any protected activity.

   **2.      LaBlance Cannot Make a *Prima Facie* Case of Retaliation.**

      **a.      *LaBlance Fails to Identify any Adverse Employment Action Taken Against Her.***

In evaluating whether a plaintiff has made a *prima facie* retaliation claim, she must

---

[34]   As with LaBlance's racial discrimination claims, the elements of a retaliation claim under Title VII and § 1981 are the same and can be evaluated together. *See Sayger v. Riceland Foods, Inc.*, 735 F.3d 1025, 1030 (8th Cir. 2013) ("Although the wording of § 1981 differs from that of Title VII, the underlying retaliation analysis is the same and we may look to Title VII precedent to inform our analysis of the elements under § 1981."))

[35]   *Putman*, 348 F.3d. at 737 (8th Cir. 2003).

[36]   *Palesch v. Mo. Comm'n on Human Rights*, 233 F.3d 560, 570 (8th Cir. 2000).

identify an adverse employment action taken against her. "An adverse employment action is defined as a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge."[37] Certain employment actions cannot be adverse, including changes in terms, duties, or working conditions which cause no materially significant disadvantages to the employee.[38]

LaBlance simply did not experience any adverse employment action which produced a material employment disadvantage. Corizon regarded her as a strong and utilized member of the team, so much so that at the time of her resignation, Corizon attempted to negotiate with her to stay. SOF 23. LaBlance did not receive any corrective actions, nor was she subject to any cuts in pay or benefits. LaBlance voluntarily resigned, by her account due to the new position she took and the proximity of the new position with her home in Kansas City. SOF 21-22. Except for LaBlance's voluntary resignation to take a job closer to home, she provides no evidence of an adverse or even material change in her employment, making summary judgment appropriate on her retaliation claim.

   **b.    *LaBlance cannot Link any Alleged Adverse Employment Action to Protected Activity.***

Even if the court finds that LaBlance experienced an adverse employment action, "more than a temporal connection between protected activity and an adverse employment action is

---

[37]  *Jones v. City of St. Louis, Missouri*, 825 F.3d 476, 480 (8th Cir. 2016).

[38]  *Sowell*, 251 F.3d at 684 (8th Cir. 2001); *Wilkie v. Dep't of Health and Human Servs.*, 638 F.3d 944, 955 (8th Cir. 2011) ("minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action".).

required to show a genuine factual issue on retaliation exists."[39] It is well-established in the Eighth Circuit that even if able to provide an adverse employment action for which she experienced, which LaBlance cannot, she still does not allege a causal connection between any alleged action and her protected activity, much less a temporal one.[40] As LaBlance testified, she had accepted a new job at the time of her resignation, and she told Corizon her resignation was the result of her desire to no longer make the long commute between Kansas City and Chillicothe. SOF 21-22. LaBlance did not at any time between the day she gave notice of her resignation and her last day of work at Corizon mention racial discrimination or harassment, nor did she provide any alleged racial discrimination or harassment as the reason for her resignation. SOF 27.

Nor can LaBlance even point to any temporal proximity between her alleged protected activity and her resignation as evidence of retaliation. LaBlance's last recorded protected activity occurred in June 2018, and LaBlance resigned her position over *eight months later*, on February 1, 2019. SOF 11, 27. LaBlance has failed to make her retaliation and summary judgment is appropriate for Counts III and IV.

## IV.   CONCLUSION

For the above-stated reasons, the Court should grant Corizon's Motion for Summary Judgment.

---

[39]   *Gibson,* 960 F.3d at 1065 (Plaintiff's failed to offer causation evidence that gives rise to an "inference of retaliatory motive" for the adverse employment action).

[40]   *Feltman v. Sieben*, 108 F.3d 970, 977 (8th Cir. 1997) (in Title VII retaliatory discharge claim, plaintiff fired six months after complaint; without more, temporal proximity found to be insufficient to show causal link).

OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.

/s/ Michael L. Matula
Michael L. Matula        MO #47568
Claudia M. Tran          MO #70391
4520 Main Street, Suite 400
Kansas City, MO  64111
816.471.1301
816.471.1303 (Facsimile)
michael.matula@ogletree.com
claudia.tran@ogletree.com

**ATTORNEYS FOR DEFENDANT
CORIZON, LLC A/K/A CORIZON
HEALTH, INC.**

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 12th day of November 2020, the above and foregoing document was electronically filed and notice will be sent electronically to counsel for plaintiff, through the Court's electronic notification system.

/s/ Michael L. Matula
**ATTORNEYS FOR DEFENDANT
CORIZON, LLC A/K/A CORIZON
HEALTH, INC.**

44944830.1