# EXHIBIT 2

## Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF MISSOURI
 2                  WESTERN DIVISION
 3
 4   TERRI YOLANDA LABLANCE,     )
                                 )
 5           Plaintiff,    )
                                 )
 6   vs.              ) Case No.
                      ) 4:19-cv-00693-BP
 7
     MISSOURI DEPARTMENT OF    )
 8   CORRECTIONS AND CORIZON    )
     HEALTH,           )
 9                  )
             Defendants.    )
10
11
12
13
14
15
16
17
18        VIDEOTAPED DEPOSITION OF JERRY LOVELACE, MD
19           TAKEN ON BEHALF OF THE PLAINTIFF
20                JULY 21st, 2020
21
22
23
24
25
```

## Page 2

```
 1              INDEX OF EXAMINATION
 2
 3   Examination by Mr. Nugent          6
 4
 5              INDEX OF EXHIBITS
 6   EXHIBITS:
 7   Exhibit No. 8  (DOC Memo)          24
 8   Exhibit No. 15 (Lovelace Email 6/21/18)   69
 9   Exhibit No. 26 (Corizon Employee Success)   13
10   Exhibit No. 27 (Lablance ID Badge)     22
11   Exhibit No. 28 (DOCOTA Certificate)    25
12   Exhibit No. 29 (User Account Creation)    26
13   Exhibit No. 30 (License Verification)    37
14   Exhibit No. 31 (Org Chart Chillicothe)    41
15   Exhibit No. 32 (WFC Adjustment Form)      67
16   Exhibit No. 33 (Lovelace Email 3/1/19)    90
17   Exhibit No. 34 (Ford Email Packet 3/27/16) 109
18   Exhibit No. 35 (Auditing Log)       117
19
20   Reporter's Note:  The original exhibits were attached
21   to the original transcript.
22
23
24
25
```

## Page 3

```
 1      IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF MISSOURI
 2                WESTERN DIVISION
 3
     TERRI YOLANDA LABLANCE,    )
 4                              )
             Plaintiff,   )
 5                              )
     vs.             ) Case No.
 6                   ) 4:19-cv-00693-BP
 7   MISSOURI DEPARTMENT OF    )
     CORRECTIONS AND CORIZON    )
 8   HEALTH,           )
 9             Defendants.   )
10
11       VIDEOTAPED DEPOSITION OF JERRY LOVELACE, MD,
12   produced, sworn, and examined on the 21st day of July,
13   2020, between the hours of eight o'clock in the
14   morning and twelve o'clock in the afternoon of that
15   date at the offices of ALARIS LITIGATION SERVICES,
16   2511 Broadway Bluffs, Suite 201, Columbia, Missouri,
17   before LISA BALLALATAK, a Certified Court Reporter
18   within and for the State of Missouri, in a certain
19   cause now pending IN THE UNITED STATES DISTRICT COURT,
20   FOR THE WESTERN DISTRICT OF MISSOURI, WESTERN
21   DIVISION, wherein TERRI YOLANDA LABLANCE is the
22   Plaintiff and MISSOURI DEPARTMENT OF CORRECTIONS AND
23   CORIZON HEALTH are the Defendants.
24
25
```

## Page 4

```
 1              APPEARANCES
 2   For the Plaintiff:
 3   MR. IVAN NUGENT
     KRIGEL & KRIGEL, PC
 4   4520 Main Street, Suite 700
     Kansas City, Missouri 64111
 5   (816) 756-5800
     inugent@krigelandkrigel.com
 6
 7   For the Defendant Corizon Health:
 8   MR. MICHAEL MATULA
     Ogletree Deakins Nash
 9   Smoak & Stewart PC
     4520 Main Street, Suite 400
10   Kansas City, Missouri  64111
     (816) 471-1301
11   mike.matula@ogletree.com
12
     For the Defendant Missouri Department
13   of Corrections:
     (Appearing via Zoom Videoconference)
14
15   MS. RACHEL L. JAG
     MISSOURI ATTORNEY GENERAL OFFICE
16   615 East 13th Street, Suite 401
     Kansas City, Missouri 64106
17   (816) 889-5000
     rachel.Jag@ago.mo.gov
18
19   Also present:
20   Ms. Jenny Meehan
21   Ms. Rita Yencarelli, Legal Videographer
22   The Court Reporter:
23   MS. LISA BALLALATAK, CCR
     Kansas CSR No. 1670
     Missouri CCR No. 1336
24   ALARIS LITIGATION SERVICES
     2511 Broadway Bluffs, Suite 201
25   Columbia, Missouri 65201
```

1 (Pages 1 to 4)

## Page 5

1    (The deposition commenced at 8:34 a.m.)
2    VIDEOGRAPHER:  We are on the record.
3 Today's date is July 21st, 2020, and the time is
4 8:34 a.m.  This is the video-recorded deposition of
5 Dr. Jerry Lovelace in the matter of Terri Yolanda
6 Lablance v. Missouri Department of Corrections, et
7 al.  This deposition is being held at Alaris
8 Litigation in Columbia, Missouri.  The court
9 reporter's name is Lisa Ballalatak.  My name is Rita
10 Yencarelli, legal videographer, and we are with
11 Alaris Litigation.
12    Would the attorneys present please
13 identify yourselves and the parties you represent.
14    MR. NUGENT:  Good morning.  Ivan Nugent on
15 behalf of the plaintiff, Terri Lablance.
16    MR. MATULA:  Mike Matula on behalf of
17 defendant Corizon.  At the deposition with me is
18 corporate representative Jenny Meehan, as well.
19    MS. JAG:  Rachel Jag.  I am the attorney
20 defending Missouri Department of Corrections.
21    VIDEOGRAPHER:  Thank you.  Will the court
22 reporter please swear in the witness.
23    JERRY LOVELACE, MD,
24 of lawful age, being produced, sworn, and examined on
25 behalf of the plaintiff deposes, and says:

## Page 6

1    EXAMINATION
2 BY MR. NUGENT:
3    Q.  Good morning, Mr. Lovelace.  My name is
4 Ivan Nugent.  As previously stated, I represent
5 Terri Lablance, and we are here to take your
6 deposition in her case.
7    You have had your deposition taken before?
8    A.  Yes.
9    Q.  Okay.  About how many times?
10    A.  Numerous.
11    Q.  Okay.  Is that more than five?
12    A.  Yes.
13    Q.  All right.  Is it more than ten?
14    A.  Yes.
15    Q.  Okay.  So you're pretty familiar with the
16 process?
17    A.  Yes.
18    Q.  All right.  I'm going to be asking you a
19 bunch of questions.  If you need a break at any time
20 today, let me know.  All right?  If you don't
21 understand any of my questions, can I trust that
22 you'll say so?
23    A.  Yes.
24    Q.  All right.  And if you don't know the
25 answer, just tell me that.  I'm not here to trip you

## Page 7

1 up or anything like that.  All right?
2    A.  Yes.
3    Q.  Okay.  Have you taken any medications that
4 might impact your ability to remember?
5    A.  No.
6    Q.  And -- let's see.  What did you do to
7 prepare for today?
8    A.  We had a preparation with the attorney.
9    Q.  With your attorney?
10    A.  On Friday.
11    Q.  I don't want to know what you and your
12 attorney talked about, but I do want to know what
13 documents you reviewed.
14    A.  I don't recall reviewing documents.
15    Q.  Okay.
16    A.  Oh -- except emails.
17    Q.  Okay.  Emails that you sent?
18    A.  No.  I believe they were between Terri and
19 maybe Jenny.  I'm not sure.
20    Q.  Okay.  Is that Jenny Meehan?
21    A.  Yes.
22    Q.  All right.  Great.  And so just before we
23 got started, the court reporter swore you in.
24    A.  Uh-huh.
25    Q.  And you understand that you are under oath

## Page 8

1 to tell the truth?
2    A.  Yes.
3    Q.  And that truth is regardless of whether it
4 hurts or helps Corizon; right?
5    A.  Right.
6    Q.  And regardless of whether it hurts or
7 helps Ms. Lablance?
8    A.  Yes.
9    Q.  All right.  Let's talk a little bit about
10 who you are.  Can you give me your address?
11    A.  1200 East Walnut Street in Columbia,
12 Missouri.
13    Q.  Okay.  And who do you work for?
14    A.  Corizon Health.
15    Q.  What do you do for Corizon Health?
16    A.  Regional medical director for the state of
17 Missouri.
18    Q.  How long have you been in that role?
19    A.  Four years.
20    Q.  How long you have been with Corizon?
21    A.  Eight years.
22    Q.  And what did you do before your current
23 role?
24    A.  I was the associate regional medical
25 director in Alabama and a site medical director

## Page 9

1  before that in Alabama.
2      Q.  Was that the entire previous four years?
3      A.  Yes.
4      Q.  All right.  And why did you take the
5  current position?
6      A.  I guess the opportunity to effect change
7  at a different level.
8      Q.  Okay.  Let's talk about that change.  What
9  change were you hoping to -- or are you still hoping
10 to effect at a different level?
11     A.  Primarily, patient care.  As, you know,
12 site medical director, sometimes you wish your
13 opinion were heard, and so sometimes -- you want to
14 position yourself in a role where you can make those
15 changes.
16     Q.  Understood.  Do you feel like your opinion
17 is heard now?
18     A.  Yes.
19     Q.  Good.  Let's see, tell me what degrees you
20 have.
21     A.  Bachelor's of science in chemistry, PhD.
22 in biochemistry, and a medical doctorate.
23     Q.  Okay.  Is it okay if I call you
24 Dr. Lovelace?
25     A.  That's fine.

## Page 10

1      Q.  Okay.  If I slip up and don't refer to you
2  as "Doctor," don't take it personally.  I don't mean
3  any offense.  Okay?
4      A.  No.
5      Q.  Who is your direct supervisor?
6      A.  Pete Pal is actually chief medical
7  officer.
8      Q.  How long has Pete been in that role?
9      A.  I'm thinking 2018.
10     Q.  Okay.  And then do you supervise any
11 individuals?
12     A.  The physicians and the nurse practitioners
13 in the state.
14     Q.  Just a little bit more about that
15 reporting structure.  Do they all -- do all of the
16 doctors and nurses in the state report to you?
17     A.  The nurses do not.
18     Q.  Okay.
19     A.  The doctors do.
20     Q.  The doctors do.
21     A.  Yeah.
22     Q.  Okay.
23     A.  It's kind of a dual reporting.  They
24 report to the health service administrator at the
25 site and -- for administrative purposes and for me

## Page 11

1  for medical purposes.
2      Q.  So when you say "administrative purposes"
3  to the health site administrator -- is that what you
4  called it?
5      A.  Health service.
6      Q.  Health service administrator?
7      A.  Yes.
8      Q.  What type of admin responsibilities to do
9  the nurses report to the HSA?
10     A.  Providers?
11     Q.  Yes.
12     A.  So for things like time, PTO, those sort
13 of things.
14     Q.  Got it.  And then give me an example of
15 something a provider would report to you with regard
16 to a medical issue.
17     A.  So I would conduct their peer reviews
18 annually.  If there's an issue with care, I mean, I
19 might review that.  I review all of the deaths in
20 the state.
21     Q.  Okay.  Got it.
22         How long have you been a doctor?
23     A.  Twenty years.
24     Q.  Okay.  Prior to joining Corizon, what did
25 you do?

## Page 12

1      A.  My own private practice.
2      Q.  Okay.  All right.  Do you know
3  Terri Lablance?
4      A.  Yes.
5      Q.  How do you know Terri?
6      A.  As a nurse practitioner for Chillicothe.
7      Q.  Okay.  Were you a part of the interview
8  process for her onboarding or joining Corizon?
9      A.  Yes.
10     Q.  Okay.  Do you -- did she report to you in
11 the same way that we talked about providers
12 reporting to HSAs for admins and providers reporting
13 to you for medical issues?
14     A.  Correct.
15     Q.  Yes?
16     A.  Yes.
17     Q.  Okay.  And while Ms. Lablance was an
18 employee of Corizon, did you befriend her -- did
19 you-all become friends outside of the workplace?
20     A.  We were friendly, not friends.
21     Q.  Okay.  Friendly but not friends?
22     A.  Right.
23     Q.  Got it.  Did you ever socialize with her
24 outside of work?
25     A.  Yes.

## Page 13

1    Q.   Okay.  When's the last time you talked to
2  Ms. Lablance?
3    A.   I don't know.  It would probably be early
4  '19 maybe.
5    Q.   Early of 2019?
6    A.   Yes.
7    Q.   Okay.  I believe her last day of
8  employment was February 22nd of 2019.  Do you
9  believe that you talked to her after February 22nd?
10    A.   I did.
11    Q.   Okay.  Do you remember the substance of
12  that conversation?
13    A.   The initial one was -- I got a text with
14  the letter from Dr. Epperson to her.  And then
15  subsequent to that, she had follow-ups, what's going
16  on, what's going to happen about this now.
17    Q.   Okay.  And after the follow-ups, did you
18  have any other additional conversations?
19    A.   No.
20    Q.   Okay.  In preparation for today, did you
21  speak with Ms. Lablance?
22    A.   No.
23    Q.   Okay.
24     (Deposition Exhibit No. 26 was marked for
25  identification.)

## Page 14

1    Q.   (By Mr. Nugent)  Doctor, I'm handing you
2  what's been marked Deposition Exhibit 26.
3     MR. NUGENT:  And just for the record, we
4  are continuing the numbering from plaintiff's
5  deposition, to sort of stay in some sort of
6  sequential order.
7    Q.   (By Mr. Nugent)  Dr. Lovelace, Exhibit 26
8  is not the entire employee success guide.  I've
9  taken portions of it out.
10    A.   Okay.
11    Q.   But would you thumb through it for me and
12  generally tell me if this is a document you've seen
13  before -- or portions of a document that you've seen
14  before.
15    A.   It's been a while, but, yes.
16    Q.   Okay.  And for the record, and those that
17  are following along, this is Corizon Bates-labeled
18  541 through 545, 550, 552, 560, 561, 562, 563, and
19  564.
20     All right.  Tell me a little bit about the
21  role you play in onboarding medical providers.
22    A.   The first interview they have after --
23  they call it the "recruiter" -- is usually with me,
24  and from then, I'll recommend that we proceed or
25  not.  They usually talk to the chief medical

## Page 15

1  officer, and they come on to -- they visit a site to
2  see if this kind of environment is for them.  Then
3  they'll do -- we have an onboarding two-week
4  process -- or one-week process at the regional
5  office.  After that I'll spend some time with them,
6  and, generally, I will -- I like for them to shadow
7  me, so I'll have them shadow other people sometimes,
8  but I like them to shadow me because they can't say
9  they didn't hear it right the first time.
10    Q.   Sure.  That's fine.  And is this --
11  Exhibit 26, the portions that I've pulled out, is
12  this something that's reviewed with applicants or
13  new employees?
14    A.   In our onboarding but not with me.
15    Q.   Okay.  Great.  Do you know who is
16  responsible for that?
17    A.   For the onboarding?  We have several
18  educators.
19    Q.   Okay.
20    A.   Saundra Wheatley is one.
21    Q.   Okay.
22    A.   I think -- I'm not sure of the others.
23    Q.   Okay.  And do you know who specifically
24  was a part of onboarding Ms. Lablance?
25    A.   I don't.

## Page 16

1    Q.   Okay.  Turn with me to Corizon 552, and
2  it's in the bottom left-hand -- bottom right-hand
3  corner.
4    A.   Okay.
5    Q.   Are you there?
6    A.   Uh-huh.
7    Q.   Great.  I want to turn your focus to the
8  management and responsibility section of this.  And
9  do you see the paragraph that starts with "Internal
10  Complaint?
11    A.   Yes.
12    Q.   All right.  And then do you see the last
13  sentence in that paragraph?
14     "All managers must notify the human
15  resources department of any complaints they receive
16  as soon as possible."
17    A.   Yes.
18    Q.   All right.  Are you considered a manager?
19    A.   Yes.
20    Q.   Okay.  And is this a responsibility that
21  you own?
22    A.   Yes.
23    Q.   All right.  And do you understand why that
24  is your responsibility?
25    A.   Yes.

Page 17

1   Q.   Okay.  Can you tell me what your
2   understanding is?
3       A.   In terms of making the workplace
4   environment or helping to facilitate a workplace
5   environment being one that is harassment free and
6   comfortable for employees, it's incumbent upon the
7   managers to -- you know, if they see something, say
8   something.
9       Q.   Okay.  Is this a duty that you take
10  seriously?
11      A.   Yes.
12      Q.   Okay.  Have you -- or let me ask it a
13  different way.
14      With regard to Ms. Lablance, were you ever
15  a part of any investigation that took place
16  regarding her employment?
17      A.   I escalated the -- a couple of the issues.
18      Q.   Okay.
19      A.   But then I turned it over to our VPO and
20  human resources.
21      Q.   Okay.  And who was the VPO?
22      A.   Rhonda Almanza.
23      Q.   Okay.  Can you spell that last name?
24      A.   A-l-m-a-n-z-a.
25      Q.   Okay.  And then -- VOP, what's that stand

Page 18

1   for?
2       A.   Vice president of operations.
3       Q.   Okay.  And then you said you also
4   escalated things to the human resources department.
5       A.   Yeah.
6       Q.   Who in human resources specifically?
7       A.   Makisa Uptorn.
8       Q.   And do you know her title?
9       A.   No.
10      Q.   Did anyone follow up with you about your
11  escalations, what you reported?
12      A.   Occasionally, you know, I'd ask questions,
13  but, no.
14      Q.   Okay.  I want to make sure I heard you
15  right.  Did you say occasionally you asked
16  questions, or did they ask you questions?
17      A.   I was asked questions a couple of times.
18      Q.   Okay.
19      A.   But, generally, I asked where we stand.
20      Q.   Okay.  All right.  Were you satisfied?
21      A.   Yeah.  And they knew that Terri was asking
22  me.
23      Q.   Okay.  You said they knew Terri was asking
24  you?
25      A.   Yes.

Page 19

1       Q.   And who is "they"?
2       A.   Rhonda and Makisa.
3       Q.   Okay.  I'm going to come back to those
4   escalations, but we'll table those right now.
5       When you are working with new applicants,
6   do you have any interaction with the department of
7   corrections in facilitating new employees coming on?
8       A.   Rarely.
9       Q.   Rarely?  Okay.  Who handles that part?
10      A.   The recruiter.  My recruiters used to
11  be -- they're pretty hands-on.  Robin Brown, office
12  manager, Cindy Schupp.
13      Q.   Okay.  And I think part of your answer may
14  have been a bit muffled, but I believe I heard you
15  say something to the effect of the recruiters
16  handled some of that or whatnot.  Could you repeat
17  that for me?  I'm sorry.
18      A.   The recruiters handle quite a bit of it.
19  They handle making sure that the -- they have all of
20  the documentation -- because there's a ton of
21  documents that require them to be credentialed;
22  there's a ton of documents required for the -- the
23  department of corrections to accept them.
24      Q.   Okay.
25      A.   And so just to make sure that whole packet

Page 20

1   is there.
2       Q.   Got it.  And you mentioned that you rarely
3   have interactions with the department of corrections
4   when it comes time for a new employee to start.  Can
5   you tell me with regard to Ms. Lablance, did you
6   have any interaction with the department of
7   corrections?
8       A.   I did not.
9       Q.   Okay.  Do you recall a conversation or an
10  inquiry from the warden at the Chillicothe facility
11  about how Ms. Lablance was able to work at their
12  facility?
13      A.   To me, no.
14      Q.   To you.  Okay.  Was there -- are you aware
15  of any concern regarding Ms. Lablance going to the
16  Chillicothe facility coming from the department of
17  corrections?
18      A.   No, I am not.
19      Q.   Okay.  And when you interviewed
20  Ms. Lablance, did you talk to her about her
21  background?
22      A.   Yes.
23      Q.   Okay.  Did her criminal history come up?
24      A.   Yes.
25      Q.   Okay.  Were you responsible for vetting

## Page 21

1  any of her past or criminal history?
2      A.  That's part of the interview process, yes.
3      Q.  Okay.  And tell me what steps you took to
4  vet her history.
5      A.  Primarily, what, I guess, I'm concerned
6  with, and the credentialing committee -- we're
7  concerned that people are forthright, that you own
8  whatever it is that is there.
9      Q.  Yeah.
10     A.  And unless it's so egregious that it's
11 something that we can't say, you know -- that we
12 can't over -- that we can't say yeah to.
13     Q.  Okay.
14     A.  But if it's something in the past and you
15 own it -- just the honesty that we're looking for.
16     Q.  Okay.  And is that why you ultimately
17 recommended Ms. Lablance for employment with
18 Corizon?
19     A.  Yes.
20     Q.  Was she forthcoming with the issues?
21     A.  Yes.
22     Q.  And did she own those issues?
23     A.  Yes.
24     Q.  Okay.  Is it safe to say that you did not
25 feel that her background was egregious enough that

## Page 22

1  she should not be hired?
2      A.  Correct.
3      Q.  That was your opinion then.  Is it still
4  your -- is that still your opinion today?
5      A.  Yes.
6          (Deposition Exhibit No. 27 was marked for
7  identification.)
8      Q.  (By Mr. Nugent)  I'm going to hand you
9  what's being marked as Exhibit 27.  And,
10 Dr. Lovelace, you can take Exhibit 26 and just sort
11 of stack it to the side, if you don't mind.  Thank
12 you.
13         Dr. Lovelace, this is a photograph of
14 Terri Lablance's ID badge from the State of Missouri
15 Department of Corrections.  First, do you recognize
16 that to be Terri Lablance?
17     A.  Yes.
18     Q.  All right.  And do providers working in
19 the department of corrections receive a badge like
20 this that's in the photograph?
21     A.  Yes.
22     Q.  Do all providers receive credentials like
23 this?
24     A.  Yes.
25     Q.  Do you have credentials like this?

## Page 23

1      A.  Yes.
2      Q.  And do you know how employees get this
3  badge?
4      A.  I can only speak in my case.
5      Q.  Please do.
6      A.  So I think the first facility I entered
7  was Jefferson City Correctional, and while I was
8  there, they -- someone took me downstairs to the
9  office that handles that sort of thing, and they
10 took the photograph and made an ID for me.
11     Q.  Okay.  And are you required to carry that
12 ID when you enter the department of corrections
13 facilities?
14     A.  Yes.
15     Q.  Okay.  And for the record's sake, this is
16 Lablance 140.
17         In order to receive your badge, did the
18 department of corrections have to do a background
19 check on you?
20     A.  Yes.
21     Q.  Okay.  And you submitted information to
22 them?
23     A.  Yes.
24     Q.  All right.  And I assume it came back
25 clean, because you have your badge; correct?

## Page 24

1      A.  Yes.
2      Q.  All right.  Do you see on Exhibit 27 the
3  numbers under the department of corrections seal,
4  137889?
5      A.  Yes.
6      Q.  Do you have numbers like that on your
7  badge -- maybe not the exact numbers, but do you
8  recall?
9      A.  No.
10     Q.  Okay.
11     A.  I assume, I do.  I don't know.
12     Q.  Okay.  Do you know whether or not you have
13 an employee number with the department of
14 corrections?
15     A.  I don't.
16     Q.  You don't know?
17     A.  Yeah.
18     Q.  Okay.  Dr. Lovelace, I've handed you
19 what's been previously marked as Deposition
20 Exhibit 8.  And this is -- it's a letter from the
21 warden at Chillicothe -- acting warden, excuse me --
22 to Terri Lablance.  And then on the subsequent
23 pages, there's notification by Ms. Lablance to the
24 acting warden letting him know that she knows of an
25 inmate.

Page 25

1    Is this a procedure that you are familiar
2  with, with regards to providers being in facilities
3  that may know an inmate?
4    A.  Yes.
5    Q.  And is this a requirement of the
6  department of corrections?
7    A.  I believe it is.
8    Q.  Okay.
9    (Deposition Exhibit No. 28 was marked for
10  identification.)
11    Q.  (By Mr. Nugent)  Let me ask you generally,
12  does -- are Corizon providers working in department
13  of corrections facilities required to follow the
14  department of corrections' policies and procedures?
15    A.  Yes.
16    Q.  And are they, when they start in that
17  facility, required to review an employee handbook of
18  the department of corrections?
19    A.  I don't know.
20    Q.  You don't know that.  Okay.
21    Dr. Lovelace, I've handed you what's been
22  marked as Deposition Exhibit 28.  And this is a
23  certificate of achievement that was given to
24  Terri Lablance on May 3rd of 2018.  It's Corizon
25  111.

Page 26

1    Have you seen a certificate of achievement
2  like this before?
3    A.  I have not.
4    Q.  Okay.  And do you see in the right-hand
5  corner -- bottom right-hand corner of the
6  certificate it has the initials "DOCOTA" Online
7  Training Academy?
8    A.  Yes.
9    Q.  Have you done any trainings with DOCOTA,
10  or do you know what that is?
11    A.  I don't believe I have.
12    Q.  Okay.  Do you know what it is?
13    A.  Not other than what it says here,
14  Department of Corrections Online Training.
15    Q.  Okay.  That's all.  Thank you.
16    (Deposition Exhibit No. 29 was marked for
17  identification.)
18    Q.  (By Mr. Nugent)  Dr. Lovelace, I've handed
19  you what's been marked as Deposition Exhibit 29.  It
20  is Corizon 481.
21    Have you seen a document like this before?
22    A.  Yes.
23    Q.  Okay.  Can you tell me what this is?
24    A.  It basically gives her passwords to the
25  various EMR systems that we have.

Page 27

1    Q.  And what does "EMR" stand for?
2    A.  Electronic medical record.
3    Q.  And you said it gives her access.  Is the
4  "her" Terri Lablance?
5    A.  Yes.
6    Q.  And this is, in fact, her user account --
7  "her" being Terri Lablance's user account creation?
8    A.  Correct.
9    Q.  Okay.  I want to get some understanding as
10  to what these software systems are.  Okay?
11    A.  Uh-huh.
12    Q.  So at the very top it says "User Account
13  Creation.  User Terri Lablance has been entered into
14  the system and is ready for implementation.  User
15  sign-on is as follows."
16    Who created this documentation?  Do you
17  know?
18    A.  I think our IT person would submit it to
19  the department of corrections.  The department of
20  corrections would create those temporary IDs.
21    Q.  Got it.  And what is the email address
22  here that you see first?
23    A.  That is her department of corrections
24  email address.
25    Q.  Okay.  And who is "her"?

Page 28

1    A.  Terri.
2    Q.  Okay.  Is that email maintained by
3  Corizon?
4    A.  No.
5    Q.  All right.  And then do you see under
6  Ms. Lablance's department of corrections email, it
7  says "PC LAN ID"?
8    A.  Yes.
9    Q.  What is PC LAN?
10    A.  There -- so there's a sign-on screen
11  before you get to the actual EMR system --
12    Q.  Okay.
13    A.  -- and that would be that screen.
14    Q.  Okay.
15    A.  That's my understanding.
16    Q.  Okay.  Do you have a PC LAN ID and
17  password?
18    A.  Yes.
19    Q.  All right.  And so tell me if this is
20  accurate.  This PC LAN, is that what gets you into
21  the computer itself?
22    A.  Right.
23    Q.  Okay.  And then below that it says "AS400
24  ID and password."
25    A.  Yes.

ALARIS LITIGATION SERVICES
www.alaris.us                Phone: 1.800.280.3376                Fax: 314.644.1334

Page 29

1    Q.  What is AS400?
2    A.  That is the electronic medical record used
3  at the men's prisons.
4    Q.  All right.  And who maintains that
5  database of information?
6    A.  The department of corrections.
7    Q.  All right.  And then on the PC LAN ID and
8  password, who maintains that system?
9    A.  The department of corrections.
10    Q.  Okay.  All right.  Let's go down to the
11  next one.  It's "MARS ID and password."  What is
12  MARS ID?
13    A.  I've always thought the MARS and the AS400
14  were the same thing, so I don't know why they're
15  different.
16    Q.  Okay.  Why did you think they were the
17  same thing?
18    A.  We tend to use them interchangeably.
19    Q.  Okay.  So if I understand you correctly,
20  what you can access in AS400, you can also access in
21  MARS?
22    A.  That's been my understanding.
23    Q.  All right.  Do you know what MARS stands
24  for?
25    A.  No.

Page 30

1    Q.  All right.  Do you have a MARS ID and
2  password?
3    A.  Yes.
4    Q.  Do you have an AS400 password?
5    A.  Yes.
6    Q.  Who maintains the MARS system?
7    A.  Department of corrections.
8    Q.  Can you access female inmates through the
9  MARS system?
10    A.  Very limited data that -- when they were
11  on that system in the past.
12    Q.  Okay.  And then can you access female
13  inmates via the AS400 system?
14    A.  Same.  Very limited.
15    Q.  Okay.  When you say "limited," do you know
16  what they can access, if you have the credentials?
17    A.  I'm not sure what's all still there.
18    Q.  Okay.  When you say "still there," are
19  they not -- are you not using AS400 anymore?
20    A.  Not for the women's prison, no.
21    Q.  Understood.  Do you know when they stopped
22  using AS400?
23    A.  That's before me, so ...
24    Q.  So before eight years ago?
25    A.  No.  Before 2016.

Page 31

1    Q.  Thank you.
2    A.  In Alabama we used something else.
3    Q.  Okay.  Do they still use MARS?
4    A.  Yes.
5    Q.  So just to make sure I understand, they
6  stopped using AS400 before 2016?
7    A.  For women.
8    Q.  For women.  But they still currently use
9  it for men?
10    A.  Yes.
11    Q.  And then MARS, they use for women, as
12  well?
13    A.  No.  So that would be for men, too.
14    Q.  Okay.  So what do they use for women?
15    A.  MOCIS.
16    Q.  Great.  And what does MOCIS stand for?
17    A.  I don't know what it stands for.
18    Q.  Okay.  Do you have access to MOCIS?
19    A.  Yes.
20    Q.  And if we see here the access for
21  Ms. Lablance's was terri.lablance@doc.mo.gov; is
22  that right?
23    A.  Yes.
24    Q.  Okay.  And that is a system maintained by
25  who?

Page 32

1    A.  The department of corrections.
2    Q.  All right.  Do you know the difference
3  between the information for female inmates in MOCIS
4  as compared to AS400 or MARS?
5    A.  Yes.
6    Q.  Can you tell me what the difference is in
7  those systems?
8    A.  MOCIS is a web-based system.
9    Q.  All right.
10    A.  Probably allows a little more free text.
11  The AS400 is blue-green screens from 1990s.
12    Q.  I am not a tech whiz, but I think that's
13  sort of like a DOS-type setup?  Is that right?
14    A.  Yeah.
15    Q.  Okay.
16    A.  You get a lot of prompts to do this or to
17  do that.
18    Q.  Yeah.
19    A.  And MOCIS is just more free text.
20    Q.  I knew I should have paid more attention.
21    Okay.  And so is MARS the -- similar to
22  the AS4100, in terms of its functionality, or is it
23  more web-based?
24    A.  As I felt -- no.  I felt the AS400 and
25  MARS -- and so I could be incorrect, but I felt they

8 (Pages 29 to 32)

## Page 33

1  were the same.
2      Q.  Got it.
3      A.  Because we tend to use those
4  interchangeably.
5      Q.  Okay.  And so we were beginning to
6  outline how the information is different in MOCIS
7  versus AS400 and MARS.  And is it safe to say that
8  for the context of Ms. Lablance's and her
9  employment, she was at Chillicothe, which is a
10  womens' facility; correct?
11      A.  Yes.
12      Q.  And she would have primarily been using or
13  working out of MOCIS; is that right?
14      A.  Yes.
15      Q.  But she did have access to AS400 and MARS?
16      A.  Correct.
17      Q.  So then in talking about female inmates,
18  it seems like MOCIS is on one side, with the bulk of
19  the information, and then AS400/MARS systems are
20  over here with limited information.  Is that
21  accurate?
22      A.  Limited female information, yes.
23      Q.  Okay.  Limited female information.  So if
24  I'm a female inmate, in my MOCIS records is what?
25      A.  All of your health visits, all of your

## Page 34

1  site visits, just -- your medications you're taking,
2  referrals that have been placed for you -- just
3  anything that had to do with what a provider saw you
4  for or decided that you needed.
5      Q.  All right.
6      A.  Ordered for you.
7      Q.  If I'm a female inmate, what is in my
8  AS400 or MARS record?
9      A.  If you came in after 2016, nothing.  If
10  you came in before, there may be some basic
11  demographic information still there.
12      Q.  Like what?
13      A.  I haven't seen a female screen for -- in
14  the AS400 in a while, so ...
15      Q.  So you don't remember?
16      A.  Right.
17      Q.  All right.  With MOCIS being web-based,
18  can someone access that outside of a department of
19  corrections facility?
20      A.  No.  Well -- yes.  You have to have a
21  department of corrections VPN.
22      Q.  All right.
23      A.  And then once you access the department of
24  corrections with their VPN, there's safeguards for
25  that, then you can access the record.

## Page 35

1      Q.  And tell us what VPN is.
2      A.  I'm not a computer tech, either, but it's
3  some little -- you know, I guess one that allows you
4  to connect to the DOC computer.
5      Q.  Okay.  So let me try.  Is VPN something
6  that gives a user access to the department of
7  corrections records in the context that we're
8  talking about accessing MOCIS away from the
9  department of corrections?
10      A.  Yes.
11      Q.  Okay.  So if I'm going to access someone's
12  MOCIS record, I need a VPN access that's given to me
13  by the department of corrections?
14      A.  Uh-huh.
15      Q.  Yes?
16      A.  Yes.
17      Q.  And then I also need a user ID or MOCIS ID
18  to access MOCIS in this scenario?
19      A.  And you also need that initial password to
20  get on, and then you need to get on to your MOCIS
21  password.
22      Q.  All right.  So what I think I hear you
23  saying is you need VPN access first.  You then need
24  PC LAN access?
25      A.  Yes.

## Page 36

1      Q.  And then you also need MOCIS access?
2      A.  Yes.
3      Q.  All right.  And then if I have these three
4  things, I can access a MOCIS record from the comfort
5  of my home?
6      A.  Yes.
7      Q.  Is there a MOCIS password that I need?
8      A.  Yes.
9      Q.  Okay.  Do you know how far back MOCIS
10  goes?
11      A.  I don't.
12      Q.  Okay.  Do you know how far back the AS400
13  or MARS systems go?
14      A.  I believe that's 1993.
15      Q.  Okay.  In reviewing providers or
16  evaluating providers, do you access their MOCIS
17  records or entries?
18      A.  Yes.
19      Q.  Okay.  So you have access to see what
20  another provider has done in MOCIS?
21      A.  Correct.
22      Q.  Is that some sort of admin privilege given
23  to you, if you know?
24      A.  I believe that if you have access to
25  MOCIS, you could look at any record.

ALARIS LITIGATION SERVICES
www.alaris.us                Phone: 1.800.280.3376                Fax: 314.644.1334

Page 37

1    Q.  Okay.  So let me ask it a different way.
2  If I am Terri Lablance, can I access MOCIS to
3  determine what you, Dr. Lovelace, has done in MOCIS?
4    A.  Yes.
5    Q.  And tracking your movements in MOCIS --
6  let me ask -- what can you track when you're looking
7  at a provider's entries in MOCIS?
8    A.  For continuity of care, you're primarily
9  tracking what has been done and what hasn't been
10 done so that you're not starting from ground zero.
11   Q.  Okay.
12   A.  There may be history that the patient
13 hasn't given you or doesn't understand.
14   Q.  All right.
15     (Deposition Exhibit No. 30 was marked for
16 identification.)
17   Q.  (By Mr. Nugent)  Dr. Lovelace, I've handed
18 you what's been marked as Deposition Exhibit 30.
19 This is Corizon 336.  Have you seen a document like
20 this before?
21   A.  Yes.
22   Q.  And would you tell me what it is?
23   A.  A license verification for the state of
24 Missouri.
25   Q.  And who is the licensee?

Page 38

1    A.  Terri Lablance.
2    Q.  All right.  And does this go in
3  Ms. Lablance's personnel file?  Do you know?
4    A.  Yes.
5    Q.  Okay.  And this would have been done at
6  the time that she was employed by Corizon?
7    A.  In preparation for employment, yes.
8    Q.  Okay.  For all providers -- and let's
9  define "providers" first.  Can you define providers
10 at Corizon?
11   A.  So we have nurse practitioners, we have
12 physician assistants, and then physicians.
13   Q.  Okay.  So for those three categories of
14 folks, is a --
15   A.  And that's for medical.  I should clarify.
16 We also have psychiatrists, so that's not my
17 bailiwick; that's the psychiatric director.
18   Q.  You bring up a great point.  I appreciate
19 that.  And I just want to clarify for the jury that
20 Ms. Lablance was a nurse practitioner in the medical
21 division of Corizon.  Is that accurate?
22   A.  Yes.
23   Q.  And you are a doctor that oversees other
24 doctors, nurse practitioners, physician assistants
25 under the medical division of Corizon.  Is that

Page 39

1  accurate?
2    A.  Yes.
3    Q.  Okay.  And Corizon has other disciplines;
4  right?
5    A.  Yes.
6    Q.  Okay.  And I appreciate that
7  clarification.  I only want you to answer about
8  medical stuff.
9    A.  Okay.
10   Q.  I'm not worried about the psychiatric
11 things and --
12   A.  Dental.
13   Q.  Dental and all of that.  So I appreciate
14 that.
15     So for all medical providers which are,
16 again, doctors, nurse practitioners, and physician
17 assistants, is something done -- is a license
18 verification like we are looking at in Exhibit 30
19 done?
20   A.  Yes.
21   Q.  Okay.  So as an example, Dr. Epperson
22 would have had this done?
23   A.  Yes.
24   Q.  Val Kirby would have had this done?
25   A.  Yes.

Page 40

1    Q.  Okay.  At the beginning of their
2  employment?
3    A.  Yes.
4    Q.  And to confirm, Exhibit 30 is telling
5  Corizon that Terri Lablance has a license -- a
6  nursing license in the state of Missouri that is
7  active and has no discipline against it; right?
8    A.  Correct.
9    Q.  And has a specialty as what?  Do you see
10 that?
11   A.  I don't see a specialty, unless I'm
12 missing it.
13   Q.  Sure.  And maybe I'm missing it.  Look in
14 the middle documents where it says "advance practice
15 license recognition information."
16   A.  Okay.
17   Q.  And then the first bullet point is
18 "Focus/Specialty."
19   A.  Yes.
20   Q.  "Women's health gender-related."  What do
21 you --
22   A.  I interpret that more as a focus.
23   Q.  Okay.
24   A.  Not a specialty.
25   Q.  Great.  Thank you.  I appreciate the

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 41

1 clarification.
2     (Deposition Exhibit No. 31 was marked for
3 identification.)
4     Q. (By Mr. Nugent)  I've handed you what's
5 been marked as Exhibit 31.  And this is Bates
6 No. Corizon 985.
7     Dr. Lovelace, I'll represent to you that
8 this was provided by Corizon as an organizational
9 chart for Chillicothe going back to May of 2017.
10 Okay?
11     A. Uh-huh.
12     Q. Is that a "yes"?
13     A. Yes.
14     Q. All right.  And have you seen this
15 document before?
16     A. Not this particular document.  I've seen
17 other organizational ...
18     Q. You've seen other organizational?
19     A. Organizational charts to this effect.
20     Q. I see.  So when was the last time you saw
21 an organizational chart?
22     A. I don't know the -- the organizational
23 chart I've seen, it just talks about -- it's more
24 general.
25     Q. Okay.

## Page 42

1     A. And it'll have -- just say "DON" and
2 "reports to this person" and "reports to that
3 person" and so forth.
4     Q. Got it.  So what you've seen --
5     A. I haven't seen the name for each site.
6     Q. Understood.  And so what I am hearing you
7 say is that you have seen an organizational chart
8 that has job titles --
9     A. Right.
10     Q. -- versus something like Exhibit 31 that
11 has specific names?
12     A. Right.
13     Q. So I want to walk through this pretty
14 quickly and just make sure that I understand what's
15 being said here.  So let's start with May of 2017.
16 Ralf -- how do you pronounce the last name?
17     A. Salke.
18     Q. Salke?
19     A. Salke.
20     Q. Thank you.  Area vice president over
21 medical.
22     A. That's an operations position.
23     Q. Okay.  What does that mean?
24     A. So the -- like the HSA is an operation
25 position, then there's a director of operations

## Page 43

1 above that person, and then the vice president of
2 operations above that person, but they're all
3 operations and not medical.  That's the division we
4 have.
5     Q. Understood.  So on this org chart, if I
6 understand you right, we should break this out into
7 an operations side and a medical side.
8     A. Yes.
9     Q. All right.  Let's do that, if you don't
10 mind.  So.
11     Ralf goes under operations; is that right?
12     A. Correct.
13     Q. And the next name is Jenny Meehan.  Is she
14 also under operations?
15     A. Yes.
16     Q. I'm going to say the name, and you tell me
17 if it's operations or medical.  Okay?
18     A. Yes.
19     Q. Dr. Lovelace?
20     A. Medical.
21     Q. And would you be at the top?
22     A. Yes.
23     Q. Teresa McWhorter?
24     A. The HSA, that's an operations position.
25     Q. Edna DeCastro?

## Page 44

1     A. Medical position, but also has operations
2 duties.
3     Q. Okay.
4     A. So she would report to both myself and
5 Teresa McWhorter.
6     Q. Lou Corbin?
7     A. That person would report to -- the
8 director of nursing would report to
9 Teresa McWhorter, and it's more operations.
10     Q. Okay.  So for 2017 I have two names under
11 medical and four names under operations.
12     A. Okay.
13     Q. Is that accurate?
14     A. Yes.
15     Q. Thank you.  Let's do the same for 2018.
16     Ralf?  Operations?
17     A. Yes.
18     Q. Rhonda Almanza?
19     A. Almanza.
20     Q. Almanza.  Operations?
21     A. Yes.
22     Q. Jenny Meehan?
23     A. Operations.
24     Q. Jerry Lovelace?
25     A. Medical.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

1    Q.  Teresa McWhorter?
2    A.  Operations.
3    Q.  Lou Corbin?
4    A.  Operations.
5    Q.  And then --
6    A.  It's probably easier to pick out the
7    medical people.
8    Q.  Perfect.  Tell me who the medical people
9    are in 2018.
10   A.  That would be myself and Karen Epperson.
11   Q.  Thank you.  And 2019?
12   A.  Myself and the site medical director at
13   that time.
14   Q.  All right.  Within -- so if we're looking
15   at this from an operations side and a medical side,
16   you are the head of medical in the state, which I
17   believe you testified to earlier; right?
18   A.  Yes.
19   Q.  Then the head of operations in the state
20   has been Ralf Salke since 2017?
21   A.  He's a senior vice president of operations
22   for the state, so he has responsibility in more than
23   one state, so Rhonda Almanza is the head of the
24   operations for Missouri --
25   Q.  Thank you.

1    A.  -- during much of the time.
2    Q.  All right.  And then within operations in
3    the state of Missouri, everyone on the operations
4    side of what we've done, reported to Rhonda Almanza?
5    A.  Right.  So under Rhonda would be several
6    directors of operations that cover different parts
7    of the state.
8    Q.  Uh-huh.  Got it.  Okay.
9         Do you know who covered -- which director
10   covered the Chillicothe facility?
11   A.  Jenny Meehan.
12   Q.  Thank you.  Are you familiar with Cindy
13   Schupp?
14   A.  Yes.
15   Q.  Do you know her title off the top of your
16   head?
17   A.  Senior director of operations.
18   Q.  Where would she fit in on this
19   organizational chart?
20   A.  So I consider that position to be more
21   like the assistant vice president of operations, is
22   kind of the way to think about it.
23   Q.  Okay.  So should she be on this, as you
24   understand it?
25   A.  Yes.

1    Q.  Okay.  So Cindy Schupp should probably be
2    where?
3    A.  Between Rhonda Almanza and Jenny Meehan.
4    Q.  Okay.  And is that for 2017, '18, and '19?
5    A.  Correct.
6    Q.  Okay.  Thank you.
7         Is your supervisor an operations person or
8    a medical person?
9    A.  A medical person.
10   Q.  And that is -- remind me?
11   A.  Keith Pal -- Dr. Pal.
12   Q.  Dr. Pal, that's right.
13   A.  But I also have responsibilities to vice
14   president of operations, so ...
15   Q.  And that is Rhonda?
16   A.  Yes.
17   Q.  Okay.
18   A.  It was Rhonda.
19   Q.  Was Rhonda.  She's no longer?
20   A.  No.
21   Q.  Okay.  When did she leave?
22   A.  October of '19.
23   Q.  Okay.  Do you know why?
24   A.  No.
25   Q.  Okay.  Do you know if it was voluntary or

1    not?
2    A.  It was not.
3    Q.  It was not voluntary?
4    A.  No.
5    Q.  Do you know why?
6    A.  No.
7    Q.  I may have asked you that; I apologize.
8    Has someone taken her place?
9    A.  No, not yet.
10   Q.  What operations duties do you have in
11   reporting to that vice president of operations?
12   A.  Things in terms of my own PTO, in terms of
13   budget.  You know, we -- I would confer to her to
14   discuss pharmacy spending or outpatient referral
15   spending.
16   Q.  Okay.  And then outside of Rhonda and
17   Dr. Epperson, is there anyone else on this list that
18   you're aware of does not work for Corizon anymore?
19   A.  Ralf Salke does not.
20   Q.  Okay.  When did he leave?
21   A.  I don't know the date he left.
22   Q.  Okay.
23   A.  But late 2019.
24   Q.  Late 2019?  Do you know why?
25   A.  I don't.

Page 49

1      Q.   Voluntary or involuntary?
2      A.   I don't know that.
3      Q.   You don't know that?
4      A.   Correct.
5      Q.   Thank you.
6      A.   And Edna DeCastro.
7      Q.   Okay.  And --
8      A.   And I believe Teresa McWhorter no longer
9  works for us.
10      Q.   Okay.  Do you know when Teresa left?
11      A.   I don't.
12      Q.   Do you know whether it was voluntary or
13  involuntary?
14      A.   I don't.
15      Q.   Okay.
16      MR. NUGENT:  Dr. Lovelace, we've been
17  going for about an hour.  How about we take five?
18      THE WITNESS:  Great.
19      VIDEOGRAPHER:  We are off the record.  The
20  time is 9:38 a.m.
21      (A recess was taken.)
22      VIDEOGRAPHER:  We are back on the record.
23  The time is 9:53 a.m.
24      Q.  (By Mr. Nugent)  Dr. Lovelace, you
25  understand you're still under oath?

Page 50

1      A.   I do.
2      Q.   To tell the truth; right?
3      A.   Yes.
4      Q.   Where is your office?
5      A.   In Jefferson City.
6      Q.   Okay.  And approximately how many
7  employees work in your office?
8      A.   Somewhere between 20 and 30.
9      Q.   Okay.  And then how often do you travel to
10  the correctional centers?
11      A.   It varies, but probably around the average
12  of three to four times a month.
13      Q.   Have you been to the Chillicothe facility?
14      A.   No, I've never been there.
15      Q.   Never been there.  Are there others that
16  you haven't been to -- other facilities?
17      A.   Yes.
18      Q.   I'm curious, why haven't you been to the
19  one in Chillicothe?
20      A.   So I have an associate regional medical
21  director.  He's an OB/GYN, so he does the women's
22  health, and so those two are his responsibilities.
23      Q.   That makes has sense.  What's his name.
24      A.   Kevin Bredeman.
25      Q.   Kevin Bredeman.  And how long has he been

Page 51

1  a Corizon employee?
2      A.   I think since 2012, too, but all in
3  Missouri.
4      Q.   Okay.  Got it.
5      Do you have any knowledge as to the
6  general -- the general working environment at
7  Chillicothe as it pertains to Corizon employees?
8      A.   I don't understand the question.
9      Q.   Yeah, that's a terrible one.
10      Well, I guess what I want to know is,
11  what's your opinion of the Chillicothe office?
12      MR. MATULA:  Objection.  Vague.
13      Q.  (By Mr. Nugent)  If -- do you understand
14  the question?
15      A.   Yeah.  I'm -- I think the environment at a
16  lot of the facilities, they just undergo peaks and
17  valleys.  There's times when things are moving along
18  smoothly, and then there's some times when we need
19  to come and have a chat.
20      Q.   Okay.  But I guess I want to know
21  specifically about Chillicothe.  I appreciate that,
22  in terms of, you know, facilities in general, but,
23  specifically, Chillicothe.  What's your opinion?
24      MR. MATULA:  Same objection.  Vague.
25      Q.  (By Mr. Nugent)  You understand the

Page 52

1  question?
2      MR. MATULA:  In what way?
3      A.   Yeah.
4      Q.  (By Mr. Nugent)  Yeah, I mean, you
5  understand what I'm asking you?
6      A.   At this time, it runs smoothly.
7      Q.   At this time, it runs smoothly?
8      A.   Yes.
9      Q.   When has it not ran smoothly?
10      A.   There was some administration -- some of
11  the staff had issues with administration there at
12  one point.  I don't know what year that was
13  because -- I don't see the names on here, so ...
14      Q.   Okay.
15      A.   It was probably before then.
16      Q.   All right.  Was Ms. Lablance an employee
17  when it wasn't smooth?
18      A.   Yes.
19      Q.   Okay.  And do you remember when
20  Ms. Lablance started?
21      A.   I don't.
22      Q.   If I told you it was in approximately June
23  of 2017, would that -- would you have any reason to
24  disagree with that?
25      A.   No.

Page 53

1      Q.   Okay.  And then her last day of employment
2   was February 22nd, of 2019.  Any reason to disagree
3   with that?
4      A.   No.
5      Q.   Okay.  And so with regards to Chillicothe
6   not running smoothly, you -- I believe you indicated
7   some of that was when Ms. Lablance was there.  Is
8   that accurate?
9      A.   Yeah.  I want to correct "not running
10  smoothly."  I just mean there were some personality
11  conflicts at times.
12     Q.   That's fair.  Personality conflicts.
13  Okay.  What personality conflicts are you aware of
14  at Chillicothe?
15     A.   This one particular HS -- health service
16  administrator with the medical staff.
17     Q.   And who was the HSA?
18     A.   Hollie Hild.
19     Q.   And who -- which medical staff in
20  particular?
21     A.   All three providers.
22     Q.   What are their names?
23     A.   Epperson, Lablance, and Kirby.
24     Q.   And what was the conflict?
25     A.   They primarily felt micromanaged.

Page 54

1      Q.   Okay.  So the medical providers felt
2   micromanaged?
3      A.   Right.
4      Q.   Okay.  Did each of the providers,
5   Epperson, Lablance, and Kirby tell you that?
6      A.   Yes.
7      Q.   And is Hollie still with Corizon?
8      A.   No.
9      Q.   Do you know why?
10     A.   She resigned.
11     Q.   Okay.  Voluntarily?
12     A.   Yes.
13     Q.   Okay.  Do you know if she was forced to
14  resign?
15     A.   She was not.
16     Q.   Okay.  Any other personality conflicts
17  that you're aware of at Chillicothe?
18     A.   No.
19     Q.   Okay.  Thank you.
20          You mentioned that you escalated some
21  issues that were brought to you by Ms. Lablance.  Do
22  you remember saying that earlier?
23     A.   Yes.
24     Q.   Okay.  I want to get a list of all of
25  those things that you escalated.  Okay?  Can you

Page 55

1   start with the first one that you remember
2   escalating?
3      A.   The first one was the comment from -- I
4   think it was administrative assistant saying that
5   she had nigger-rigged a radio.
6      Q.   Okay.  We're going to dig into it.  Let's
7   move to the second one, if there is a second one.
8      A.   The second one would have been the
9   incident where she felt that the lab tech was
10  treating her differently.
11     Q.   Okay.  So we have two incidents that you
12  escalated.  One was a comment from what you called
13  an admin assistant; the second was an issue with a
14  lab tech.  Are there any others?
15     A.   The final one was the Epperson letter to
16  her home.
17     Q.   Okay.  Are there any others?
18     A.   No.
19     Q.   All right.  And then -- let me ask it a
20  different way.  Are there any others that you did
21  not escalate?
22     A.   No.
23     Q.   Okay.  Thank you.  All right.  Let's dig
24  into those three, if that's okay.
25     A.   Okay.

Page 56

1      Q.   Let's start with the comment from the
2   admin assistant.  Do you recall what year that was?
3      A.   I don't.
4      Q.   All right.  Tell me how you learned about
5   it.
6      A.   She called me in and told me at the
7   incident.
8      Q.   "She" is?
9      A.   Terri.
10     Q.   Okay.  So Terri Lablance called you and
11  told you about it.  Do you remember what she said?
12     A.   Just the conversation.  I don't remember
13  the exact words.
14     Q.   But you -- earlier you mentioned
15  nigger-rigged.
16     A.   Yes.
17     Q.   Was that a comment that was said to
18  Ms. Lablance?
19     A.   Yes.
20     Q.   And then she told you that's what was
21  said?
22     A.   Yes.
23     Q.   Did she tell you how she felt about it?
24     A.   Yes.
25     Q.   Okay.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 57

1    A.   She -- she was just really surprised and
2    taken aback that, you know, in today's time, that
3    somebody would say that to her.
4         Q.   Did Ms. Lablance tell you that the
5    individual said it twice?
6         A.   I don't recall.
7         Q.   Okay.  Did she also tell you that after
8    the individual said it twice, she then said, "Oh,
9    I'm sorry, 'Afro-engineered'"?
10        A.   Yes.
11        Q.   Okay.  What's your opinion of that?
12        A.   My opinion?
13        Q.   Of the incident.
14        A.   Of the statement -- oh, the incident?
15   Okay.
16             I thought it was something inappropriate
17   for someone that you're working with to say to you.
18        Q.   Uh-huh.  And what did you do after
19   Ms. Lablance told you about it?
20        A.   I talked to our vice president of
21   operations.
22        Q.   Which is who?
23        A.   Rhonda Almanza.
24        Q.   What's did Ms. Almanza tell you?
25        A.   She performed an investigation, and the

## Page 58

1    employee was terminated.
2         Q.   Okay.  Did Ms. Almanza interview you?
3         A.   No.  I just discussed it with her; that's
4    all.
5         Q.   Okay.  Do you feel like you should have
6    been interviewed?
7         A.   No.  I wasn't a part of the -- I wasn't
8    part of the incident.
9         Q.   Okay.  Has -- let me ask this:
10             The individual was terminated, I believe
11   you said.  In your opinion, was that enough?  And
12   let me ask it a different way.
13             Was there anything else that needed to be
14   done for the environment at Chillicothe after you
15   learned of this incident, in your opinion?
16        A.   Well, I wasn't aware of any other issues,
17   so I felt that was satisfactory.
18        Q.   Okay.  And today do you still share that
19   opinion?
20        A.   Correct.  Yes.  At that time, Terri did
21   not voice any concerns.
22        Q.   Okay.  You said Terri did not voice any
23   other concerns?
24        A.   Along those lines, no.
25        Q.   After the termination?

## Page 59

1    A.   After, during, yes.
2         Q.   Understood.  Okay.
3              Do you recall -- I may have asked you
4    this -- forgive me if I did -- when this happened.
5         A.   I don't.
6         Q.   You don't?  Okay.
7              I'm handing you -- this is Corizon 15, and
8    it was a part of -- it's Bates-labeled Corizon 15.
9    It was a part of Exhibit 12 from a previous
10   deposition, and it's specifically Ms. Barker's
11   statement in the incident.  And I want to get your
12   opinion on a couple of things.  Okay?
13        A.   Okay.
14        Q.   So do you see it's dated 8/29/17?
15        A.   Yes.
16        Q.   Okay.  Any reason to dispute that date?
17        A.   No.
18        Q.   All right.  So a couple of months after
19   Ms. Lablance started her employment; right?
20        A.   Yes.
21        Q.   Okay.  I want to go to the third line down
22   of the handwritten information, and towards the
23   right-hand side of the page, there's a sentence that
24   starts with "I replied."
25             "It is the antenna off my radio that I had

## Page 60

1    nigger-rigged up in my room so my radio would come
2    in."
3              And that's in quotes.  Do you see that?
4         A.   Yes.
5         Q.   The next sentence:  "Lablance said,
6    'What,'" and then Ms. Barker says that she repeated
7    it again.
8              What's your opinion of the fact that
9    Ms. Barker is telling the investigator -- or telling
10   Ms. McWhorter that she said it twice?
11        A.   Just blatant insensitivity.
12        Q.   Okay.  And then if you go to the next
13   sentence, "Lablance asked what else it is called.  I
14   replied" -- and she put in quotes --
15   "Afro-engineering."
16             What's your opinion of that coming after
17   the derogatory term?
18        A.   It's just my opinion, but I assume she's
19   making light of it -- having said it in the first
20   place.
21        Q.   Okay.  Do you have any concern about how
22   easy it was for a Corizon employee to say this in
23   the work environment?
24        A.   Yes.
25        Q.   Okay.  What -- tell me more about that

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us                                           Fax: 314.644.1334

## Page 61

1  opinion of yours.
2       A.  We have all had sensitivity training, and
3  you just expect that if we've done that and had
4  those conversations with employees, that employees
5  wouldn't think that that was an okay thing to do.
6       Q.  Okay.  Was -- at the time that
7  Ms. Lablance started, which this incident here is a
8  couple of months after, was Ms. Lablance the only
9  African-American working at Chillicothe?
10      A.  Medical -- a medical provider that I know
11  of.  I don't know about nurses and other staff
12  members.
13      Q.  Okay.  But on the medical side, your
14  understanding is she was?
15      A.  Yes.
16      Q.  And the medical side is doctors, nurses --
17      A.  No, I don't -- I'm not involved in hiring
18  of the nurses, so I don't know them.
19      Q.  Okay.  Thank you.  I appreciate that.  So
20  I want to make sure I've got the providers.  I want
21  to get it right.  It is doctors, nurse
22  practitioners, and doctors' assistants?
23      A.  Yes.
24      Q.  But you don't know one way or another
25  whether Ms. Lablance was the only African-American

## Page 62

1  working for Corizon in Chillicothe?
2       A.  I don't.
3       Q.  Okay.  I want to go to the last paragraph
4  written by Ms. Barker and get your opinion on it, as
5  well.  Specifically, the last sentence.
6            "I did not know that I could get in
7  trouble for what I said until I got called to your
8  office."
9            You talked about having the sensitivity
10  training.  What's your opinion, now having seen
11  Ms. Barker's seemingly unaware that she could get in
12  trouble for this phrase?
13      A.  I just don't understand how she could --
14  how she could think or believe that was the case.
15      Q.  Okay.  So do you believe Ms. Barker?
16      A.  No.
17      Q.  Okay.  Ms. Barker was recommended for
18  termination.  Are you aware of that?
19      A.  Yes.
20      Q.  And after seeing Ms. Barker's statement,
21  is it your opinion that her termination -- is it
22  still your opinion that her termination was all that
23  needed to happen?
24      A.  Yes.
25      Q.  Okay.  You mentioned that you and

## Page 63

1  Ms. Lablance were -- had visited socially outside of
2  the workplace.
3       A.  Uh-huh.
4       Q.  Did you and Ms. Lablance have a
5  conversation about this incident with Ms. Barker
6  outside of the workplace?
7       A.  I don't believe so, because it would have
8  been well after.
9       Q.  Tell me -- what does that mean?
10      A.  I occasionally go to Kansas City for
11  poker, and so -- on two occasions, and she said, Oh,
12  if you're in Kansas City, let me know, but -- and
13  she kept saying -- asking, When are you coming, when
14  are you coming?  I was like, Next time I'm playing
15  poker, so ...
16           And I knew it wasn't soon after she
17  started working; it was well after that.
18      Q.  Okay.  So if I understand you correctly,
19  you --
20      A.  This incident had passed by the time I had
21  gone to ...
22      Q.  That's what I was trying to get to.
23      A.  Yes.
24      Q.  I appreciate that.
25           And so even despite whatever social

## Page 64

1  interaction you had with Ms. Lablance, outside of
2  the workplace, you understood that it was still your
3  responsibility to escalate any concerns that she
4  brought to you?
5       A.  Yes.
6       Q.  Okay.  I want to ask you about this really
7  quick.  It was marked as Exhibit 13, and it is a
8  memo to file from Hollie Hild.  And you mentioned
9  earlier that there were some personality conflicts,
10  I think, is the phrase you used --
11      A.  Uh-huh.
12      Q.  -- between the medical providers in
13  Chillicothe and Ms. Hild.  This memo to file
14  references unprofessional behavior by Ms. Lablance,
15  and it's from Hollie Hild.  Do you see that?
16      A.  Yes.
17      Q.  Did you have an occasion to speak with
18  Ms. Lablance about this?
19      A.  Yes.
20      Q.  Okay.  What did she tell you?
21      A.  I don't remember a specific conversation,
22  because there were several conversations, and they
23  came from her and some came from Epperson and some
24  came from Kirby.
25      Q.  Okay.  Do you remember talking to

16 (Pages 61 to 64)

Page 65

1    Ms. Lablance specifically about this meeting
2    referenced in this memo to file?
3        A.   No.
4        Q.   Okay.  Do you recall Ms. Lablance telling
5    you about an incident of Ms. Kirby throwing a pen in
6    a meeting?
7        A.   No.
8        Q.   Okay.  Would -- do you have an opinion,
9    one way or another, on whether this memo to file is
10   a part of the personality conflict between
11   Ms. Lablance and Ms. Hild that you referenced?
12       A.   Yes, it is -- I would believe it.
13       Q.   So with regards to that personality
14   conflict, is your opinion -- what is your opinion
15   about whether this was warranted or not, if you have
16   one?
17       MR. MATULA:  I'm going to object to form.
18   It's incomplete as to "this."  You haven't
19   established a foundation or a background for this
20   witness to offer an opinion, but go ahead.
21       THE WITNESS:  Okay.
22       A.   So, overall, I felt this was an operations
23   issue, until, you know, there was some medical
24   issues that were involved.  But for the operations
25   issues, you deferred to Jenny and Rhonda to

Page 66

1    investigate, and we had conversations about them,
2    but ...
3        Q.   (By Mr. Nugent)  You said "we" -- I'm
4    sorry.
5        A.   They just weren't in my area to
6    investigate.
7        Q.   Okay.  You said "we talked about."  Who is
8    the "we"?
9        A.   Rhonda, Cindy, and Jenny.
10       Q.   Who is Cindy?
11       A.   Cindy Schupp.
12       Q.   Got it.  Thank you.
13       Did you, Ms. Schupp, and Ms. Meehan talk
14   about the interactions between medical providers and
15   Ms. Hild?
16       A.   Yes.
17       Q.   Okay.  And then within the specific
18   medical providers, did you talk to Ms. Meehan and
19   Ms. Schupp about Ms. Lablance and Ms. Hild?
20       A.   No.  The conversation was much more
21   general, because all three had similar complaints.
22       Q.   Understood.  Okay.  Do you know whether or
23   not Ms. Hild placed a memo to file in Ms. Epperson's
24   file?
25       A.   I don't.

Page 67

1        Q.   Do you know whether or not Ms. Hild placed
2    a memo to file in Ms. Kirby's file?
3        A.   I don't know.
4        Q.   Okay.  Who is Lou Corbin?
5        A.   The director of nursing.
6        Q.   Thank you.  Is she still employed with
7    Corizon?
8        A.   I don't know.
9        Q.   The date of this memo is April 27th of
10   2018.  We looked at the incident with Ms. Barker,
11   and that was in August of 2017.  Is that your
12   understanding of where we are in the timeline?
13       A.   Yes.
14       (Deposition Exhibit No. 32 was marked for
15   identification.)
16       Q.   (By Mr. Nugent)  I've handed you
17   Exhibit 32.  It's Corizon 449.  And have you seen a
18   document like this before?
19       A.   Yes.
20       Q.   Okay.  What's the title of it?
21       A.   Workforce -- WFC Adjustment Form.
22       Q.   Okay.  So it's -- there's initials, and
23   it's "WFC Adjustment Form," so workforce-something
24   adjustment form?
25       A.   Yeah.

Page 68

1        Q.   This is one of Ms. Lablance's adjustment
2    forms.  It is dated -- it's actually not dated, but
3    do you see towards the top where it says "Reason
4    in/out, punch missed," and then it says "Interview
5    with Dr. Lovelace"?
6        A.   Yes.
7        Q.   Do you know if this is 2017 or 2018?
8        A.   No, I don't.
9        Q.   Okay.  Do you recall an interview or, I
10   guess, meeting with Ms. Lablance from 10:30 a.m. to
11   noon on May 18th of 2018?
12       A.   What was her hire date?
13       Q.   It was in June of 2017.
14       MR. MATULA:  What was the number on that,
15   again?
16       MR. NUGENT:  449.
17       A.   Yeah, I don't know if this was the
18   original interview or not.  I don't know.
19       Q.   (By Mr. Nugent)  Okay.  And I'm not wanting
20   you to guess.  It's not indicated which year it is,
21   so I just wanted to make sure I asked about it.
22   It's entirely possible this could be from 2017, when
23   she was interviewing to be employed.
24       I guess my question now, though, is do you
25   know why she would have needed to do this for -- why

17 (Pages 65 to 68)

1  she would have needed to fill one of these
2  adjustment forms out for something before she became
3  an employee?
4      A.  Yeah, you wouldn't do it before you become
5  an employee.  This is just so that, you know, you
6  can be paid for times where you weren't actually
7  punched in.  You document what work-related thing
8  you were doing.
9      Q.  Okay.  So -- I guess I want to make sure
10  we either confirm or not what's going on here.
11      A.  It's difficult without a date.
12      Q.  Yeah.  Fair enough.  And so we don't know
13  if this is 2017 or 2018, basically?
14      A.  Right.
15      Q.  Is it possible it could be 2018?
16      A.  It's possible.
17      Q.  And it's possible it could be 2017?
18      A.  Yes.
19      Q.  But you don't specifically remember, you
20  know, an interview with Ms. Lablance, outside of her
21  onboarding in 2017, though; right?
22      A.  Correct.
23      Q.  Okay.  Thank you.  I've handed you what's
24  been marked as -- or previously marked as
25  Deposition Exhibit 15, and it's Bates-numbered

1  Corizon 20 through 24.
2      Dr. Lovelace, I want to start on Corizon
3  23.  So to provide some context, you mentioned three
4  incidents in which you escalated things or issues
5  brought to you by Ms. Lablance.
6      A.  Right.
7      Q.  And is this one of them?
8      A.  Yes.
9      Q.  This is, in fact, the second incident that
10  you referred to regarding a lab tech; is that right?
11      A.  Yes.
12      Q.  All right.  How did you become aware of an
13  issue with Ms. Lablance and the lab tech?
14      A.  I don't remember if it was email or by
15  telephone.  I don't remember which.
16      Q.  You don't remember which came first?
17      A.  No.
18      Q.  Okay.  We see here on Corizon 23 that you
19  did get an email about it.
20      A.  Yes.
21      Q.  Do you recall the substance of the
22  conversation between you and Ms. Lablance on the
23  phone?
24      A.  Yes.
25      Q.  Tell me about it.

1      A.  So in this particular case with this lab
2  tech, she felt that she was being singled out.  The
3  lab tech would do things for other providers and not
4  her, and she also felt that the lab tech talked to
5  her in an unprofessional way, taking the lab
6  assessment and throwing it on her desk.
7      Q.  Okay.  Do you recall whether the phone
8  conversation between you and Ms. Lablance happened
9  during work hours?
10      A.  Most -- yeah.  I'm pretty sure it did.
11      Q.  Okay.  And do you recall if it was your
12  cell phone or your office phone?
13      A.  Probably my cell phone.
14      Q.  Okay.  Do you recall if she called you
15  from her cell phone?
16      A.  I don't remember.
17      Q.  Okay.  Did you have -- while Ms. Lablance
18  worked for Corizon, did you have her cell phone
19  number?
20      A.  Yes.
21      Q.  Do you still have her cell phone number?
22      A.  Yes.
23      Q.  Okay.  Does she have your cell phone
24  number?
25      A.  Yes.

1      Q.  All right.  In the email at the bottom of
2  Corizon 23, it's from Terri Lablance dated
3  Wednesday, June 6, 2018, at 10:39 a.m.  And she sent
4  it to a bunch of people, and I want to ask you about
5  these people really quick.  All right?
6      Who is Sterling Ream?
7      A.  I believe she was the HSA at the time.
8      Q.  And that's health --
9      A.  -- service administrator.
10      Q.  Thank you.  And she also sent it to
11  directly to Karen Epperson.
12      A.  And that's the site medical director.
13      Q.  Okay.  So are these two individuals her --
14  Ms. Lablance's supervisors?
15      A.  Yes.
16      Q.  Okay.  And then she cc's or copies you,
17  Jenny Meehan and Val Kirby.
18      When you received this email, what were
19  your thoughts after you read it?
20      A.  This one had some gray area for me.
21      Q.  Okay.
22      A.  And so after talking with Jenny and Rhonda
23  about it, we decided to make an investigation at the
24  site.
25      Q.  Okay.  When -- or how soon after receiving

## Page 73

1    this e-mail did you speak with Jenny and Rhonda?
2        A.  I don't know.  Likely, the same day.  We
3    tend to be responsive to emails like that.
4        Q.  Okay.  And did the three of you-all get in
5    the same room and talk about it?
6        A.  No.  It was a telephone conversation.
7        Q.  Okay.  Did you email anyone outside of the
8    emails that are in this packet about this incident?
9        A.  No.
10       Q.  Okay.  And I want to ask that same
11   question for the first one we talked about with
12   Ms. Barker.  Did you email anyone outside of the --
13   or, I guess, let me ask -- how did you learn about
14   the comment said to Ms. Lablance?
15       A.  So she would have called me.
16       Q.  Okay.  She called you?
17       A.  Yes.
18       Q.  And then did you call somebody?
19       A.  No.  Then I would have spoken to Rhonda.
20       Q.  Okay.  Over email or verbally?
21       A.  Verbally.
22       Q.  Face to --
23       A.  We were next door.
24       Q.  Okay.  Did you get up and go over there?
25       A.  Yeah.

## Page 74

1        Q.  Okay.  And what was Rhonda's response when
2    you told her about the comment said to Ms. Lablance?
3        A.  That she initiated the investigation.
4        Q.  Okay.  Did Rhonda, in your opinion, seem
5    shocked?
6        A.  Yes.
7        Q.  Okay.  All right.  So picking back up with
8    this lab tech incident, when you -- you said that
9    this one created some gray area for you.  Tell me
10   what you mean by "gray area."
11       A.  Because this one is such completely one
12   side of the story.
13       Q.  Okay.
14       A.  And so, you know, as a manager, I need to
15   know both.
16       Q.  When you heard the comment that we talked
17   about earlier, you got one side of the story there;
18   right?
19       A.  Yes.
20       Q.  How is -- tell me the difference between
21   the gray area and this and why there wasn't -- I
22   guess, let me ask you, was there gray area about the
23   comment?
24       A.  No.
25       Q.  Okay.  Tell me why there's a difference.

## Page 75

1        A.  The first comment is inappropriate, and,
2    you know -- and if corroborated, and it was, it's --
3    it's just, on its face value, inappropriate.
4            This comment, where she feels like she's
5    being singled out, well, that's more -- that's more
6    of how I feel about a particular situation and not
7    necessarily what actually transpired.
8        Q.  Okay.
9        A.  Is that -- okay.
10       Q.  And so how would you know what actually
11   transpired?
12       A.  So then we would -- we generally get --
13   ask for corroborating statements from the lab tech
14   and anybody else around that heard the comment.
15       Q.  Okay.  Did anyone else see or hear the
16   exchange between Ms. Lablance and -- I believe the
17   lab tech's name is Judy Harkins?
18       A.  I don't recall if there was a witness in
19   this case.
20       Q.  Okay.  And so prior to hearing whether
21   there was a witness or corroboration of the
22   nigger-rigged comment, you knew once you heard it
23   from Ms. Lablance, that that was a problem?
24       A.  Right.
25       Q.  Okay.

## Page 76

1        A.  That one is not a perception.
2        Q.  Thank you.  That helps.
3        A.  Okay.
4        Q.  So your opinion of Ms. Lablance's email to
5    you -- where she copied you is that her perception
6    was this is happening --
7        A.  Right.
8        Q.  -- because of her race?
9        A.  Right.
10       Q.  Okay.  Turn to the first page.  And this,
11   would you agree, is your first email about the
12   incident and subsequent investigation?
13       A.  I don't know if it's my first, but it is
14   my email.
15       Q.  Okay.  Did you draft any other emails
16   about this incident?
17       A.  I don't recall.
18       Q.  Okay.  This is an email that you sent to
19   Jenny Meehan, Rhonda Almanza, and Heather Dale.  Who
20   is Heather Dale?
21       A.  She was our human resource business
22   partner at the time.
23       Q.  Is she no longer at Corizon?
24       A.  No.
25       Q.  Did she leave voluntarily or

ALARIS LITIGATION SERVICES
www.alaris.us     Phone: 1.800.280.3376     Fax: 314.644.1334

Page 77

1  involuntarily?
2      A.  I don't know.
3      Q.  And then you copy Sterling Ream and
4  Cindy Schupp.  These are all of the same individuals
5  that were made aware of the nigger-rigged comment;
6  right?
7      A.  Yes.
8      Q.  Okay.  Your email is, "I think awareness
9  alone will have a significant benefit.  People tend
10 to behave better when they think someone is
11 watching."
12     Let me ask you -- awareness of what?
13     A.  So this -- after Jenny had performed her
14 investigation and the conclusion was she felt like
15 it was a miscommunication between the two.
16     Q.  Jenny felt that way?
17     A.  Yes.  So my statement is just, Okay, if
18 that's what it is, then I think that because we put
19 some light on it and people know that there are
20 consequences or there could be consequences, you
21 know, if there is something going on, I don't think
22 there'll be an issue.  But, you know, I don't know
23 that there's anything going on.
24     Q.  Okay.  Who needs -- I guess I still don't
25 understand.  Who needs to be aware of -- or who

Page 78

1  needs awareness?
2      A.  So the fact that the lab tech has been
3  spoken to directly about the situation.
4      Q.  So it's your understanding that the lab
5  tech was spoken to or interviewed?  To me, those are
6  two different things.
7      A.  Well, interviewed.
8      Q.  Okay.  So the lab tech was interviewed as
9  a part of Jenny's investigation?
10     A.  Yes.
11     Q.  Do you know whether the lab tech was
12 counseled after the investigation was completed?
13     A.  There wasn't determined to be a reason to
14 counsel.
15     Q.  Okay.  So then the awareness alone will
16 have a significant benefit to who?
17     A.  To -- for the lab -- for the relationship,
18 period.
19     Q.  And an awareness -- I'm sorry.  It know
20 you answered, but I don't think I quite understand.
21 I want to make sure I get some clarity here.  If I
22 say this wrong, please tell me, because I don't want
23 you to adopt an answer that is not accurate.  Okay?
24     A.  Okay.
25     Q.  Ms. Lablance and the lab tech,

Page 79

1  Judy Harkins' relationship is what you're referring
2  to in this first sentence?
3      A.  Yes.
4      Q.  And because they were talked to, their
5  awareness should be heightened?
6      A.  So if they're both talked to, then they're
7  both aware that their supervisors are aware that
8  there's an issue -- a communication issue.
9      Q.  Okay.
10     A.  And as a result of that, they would --
11 should, you know, do better in trying to make that
12 communication better so we're not at the same spot
13 again.
14     Q.  Got it.  So that they can get along
15 better?
16     A.  Yes.
17     Q.  All right.  Second sentence.
18     "People tend to behave better when they
19 think someone is watching."
20     Why did you say that?
21     A.  That's just a continuation of what I'm
22 saying in the first part, that -- so -- our kids
23 behave better when they think we're watching.
24     Q.  Sure.
25     A.  It's just above line.

Page 80

1      Q.  Okay.
2      A.  It's nothing ...
3      Q.  And so who needed to behave better, in
4  your opinion?
5      A.  I believe "better" is probably not a good
6  choice of words, because I just mean interact
7  better.
8      Q.  So are you saying that the people that
9  you're referring to are both Ms. Lablance and the
10 lab tech, Judy Harkins?
11     A.  Yes.
12     Q.  All right.  What did, in your opinion,
13 Ms. Lablance do wrong?
14     A.  Well, I didn't think that either did
15 anything wrong; I just think -- or my -- you know,
16 my take from this was somebody may have had a bad
17 morning, somebody -- you know, I don't know.  But
18 for some reason on this particular day, because I
19 don't know of other incidents -- some reason on this
20 particular day, this kind of got a little blown
21 maybe a little bigger than it should have been.
22     Q.  Okay.  And Ms. Lablance --
23     A.  And I don't think anybody was wrong in
24 that incident.
25     Q.  That's fair.  But it's Ms. Lablance's

20 (Pages 77 to 80)

## Page 81

1  complaint, and so I believe I'm hearing you say
2  Ms. Lablance blew this out of proportion?
3      A.  I believe she -- no.  I believe -- so I
4  believe she felt singled out, and I believe -- you
5  know, the way she interpreted -- you know, I believe
6  she believed that, if that makes sense.
7      Q.  It does.
8      A.  Okay.  In the same way that I believe that
9  the lab tech didn't see the issue with the
10  interaction -- didn't feel that same way.
11      Q.  Okay.  And so --
12      A.  I don't think people are wrong in how they
13  feel.
14      Q.  Uh-huh.
15      A.  That's-- you just sometimes need some
16  respect.
17      Q.  That's fair.  And is it your opinion
18  that -- or I guess tell me your opinion on whether
19  Ms. Lablance's perspective on this was misguided.
20      A.  I have one concern, perhaps, and -- I'm
21  not used to having to have someone fill out a
22  requisition for myself.  It doesn't mean I can't do
23  it.  You know, I'm not used to having to take my
24  blood pressure for myself, but there's times when
25  I've had to do it, but -- you know?  So -- you know,

## Page 82

1  I don't feel singled out when I have to do it, and
2  so in this particular case, that was the only
3  thing -- I've never had to do that kind of thing for
4  myself, and so I could see how she might have felt
5  that way.
6      Q.  That's helpful, thank you.
7          Are you familiar with the responsibilities
8  of lab techs?
9      A.  Yes.
10      Q.  All right.  And in your professional
11  experience, have you had to deal and interact with
12  lab techs?
13      A.  Very little.
14      Q.  Very little?  Okay.  Who supervises lab
15  techs for Corizon?
16      A.  That would be the HSA at the site.
17      Q.  And the HSA at the site in June of '18 was
18  who?  Do you recall?
19      A.  Sterling, since she's copied on here.
20      Q.  Thank you.
21          Are you aware of any personality conflicts
22  between Ms. Lablance and Sterling Ream?
23      A.  No.
24      Q.  In Ms. Lablance's description of what
25  happened, and understanding, you know, your recent

## Page 83

1  testimony about, you know, having to take blood
2  pressure as an example, Ms. Lablance describes a
3  scenario or situation where the lab tech took a
4  sample and put it in Ms. Lablance's office.  Do you
5  recall that in her email?
6      A.  Yes.
7      Q.  What's your opinion of that behavior by
8  the lab tech?
9          MR. MATULA:  Object to form.  It's an
10  incomplete example for that incident, but go ahead.
11      Q.  (By Mr. Nugent)  You can answer.  Do you
12  understand the question?
13      A.  I believe so.
14      Q.  Well, let's just be more specific.  Okay?
15      A.  Okay.
16      Q.  Let's go to Corizon 24.  It's the last
17  page in the packet that you just received.  Do you
18  see "I have asked other coworkers"?  Do you see
19  that?
20      A.  Yes.
21      Q.  Okay.  I'm going to read it so that
22  it's -- we all are on the same page.
23          "I've asked other coworkers, providers,
24  and the medical director, Dr. Epperson, if they
25  complete lab requisitions when ordering lab, and

## Page 84

1  they have all denied having a problem with this
2  individual completing requisitions and processing
3  specimens for testing when ordering lab."
4          And then I want to go earlier in the
5  email, which is on Corizon 23.  "I happened to be
6  the one."  Do you see where I'm reading, on the end
7  of the first line?
8      A.  Yes.
9      Q.  All right.
10          "I happened to be the one available to
11  retrieve the specimen from the patient and took it
12  to the lab tech to be processed for evaluation.  The
13  lab tech refused to complete the requisition and
14  took the specimen to my office and sat it on my desk
15  while stating, 'I told you not to set that on my
16  desk.'"
17          Have you been following where I've been
18  reading?
19      A.  Yes.
20      Q.  Give me your opinion of the lab tech's
21  actions right there.
22          MR. MATULA:  Objection.  It's still
23  incomplete from all of the facts concerning what
24  this witness knows and doesn't know, but he can
25  speak to what his understanding is from that email.

## Page 85

1    Q. (By Mr. Nugent)  Yeah.  You can answer it.
2    A.  Okay.  So based on that statement, you
3  know, for me that would be inappropriate, but I
4  would deal with it right then.
5    Q.  Okay.
6    A.  And this doesn't -- you know, I don't --
7  this doesn't rise to the level of, you know, that
8  somebody has been racist; this is somebody just
9  being inappropriate to me, and I need to tell them
10  no.
11    Q.  Okay.  And why is it inappropriate, in
12  your opinion?
13    A.  You don't go and -- you don't take a
14  specimen and throw it on somebody's desk and say, I
15  told you not to put this on my desk.  You can say,
16  you know, this -- perhaps you should fill this out,
17  or whatever you want to say -- you know, it's just
18  not professional.
19    Q.  Forgive me if I asked you this
20  already, but do you recall if the lab tech was
21  reprimanded in any way?
22    A.  I do not.
23    Q.  You don't know?
24    A.  I don't think -- no, she was not.
25    Q.  She was not?  Okay.

## Page 86

1        Did Ms. Lablance ever talk to you about
2  the treatment she received at the hands of the
3  department of corrections officers?
4    A.  No.
5    Q.  Okay.  Did she ever talk to you about her
6  experience when she —
7    A.  I'd like to correct that.  I'm sorry.
8    Q.  Yes, please.
9    A.  After she received the letter, then she
10  brought up some of the -- some things that had
11  happened.
12    Q.  When you say "after she received the
13  letter" —
14    A.  From Dr. Epperson.
15    Q.  Okay.  So after she received the letter
16  from Dr. Epperson, she brought up some -- what?  I'm
17  sorry.
18    A.  Just some feelings that she had where --
19  that made sense to her now -- you know, Oh, this is
20  why they treated me like this; this is why -- but
21  never before then.
22    Q.  Okay.  So it was almost like after she got
23  away, all of this stuff sort of came together in her
24  mind?  Is that what I hear you saying?
25    A.  Yes.

## Page 87

1    Q.  Okay.  What's your opinion of that?
2    A.  I don't know.  I'm -- because it's after
3  the fact, I think it goes contemporaneous, then
4  something I could have looked into, but now, after
5  the fact, it's not something I can even investigate
6  or escalate.
7    Q.  Why is that?
8    A.  One, she's no longer an employee, and we
9  don't supervise the department of corrections.  I
10  have no supervisory capacity over those.  So I could
11  bring something to them, but I think it would have
12  needed to be when it occurred --
13    Q.  I see.
14    A.  -- in order for them to investigate.
15    Q.  Okay.  What about to possibly just help
16  with the work environment, even though it's after
17  the fact?
18    A.  It's still the issue of how much -- we
19  like to say that, you know, we're in their house,
20  okay, and so we have to behave like guests, and we
21  do.
22    Q.  Okay.  After hearing of Ms. Lablance's
23  realizations after she left, did you feel that
24  Corizon should look into them to help with the
25  Chillicothe work environment?

## Page 88

1    A.  There was no particular officer mentioned,
2  no particular name that was given, just general,
3  this is what -- I've been treated like this, that
4  kind of thing.
5    Q.  Okay.
6    A.  So there's nothing -- I can't say, you
7  know, Officer Timothy over here did this or
8  Officer Cindy did that; I -- you know, so there's
9  nothing to press in that respect.
10    Q.  Uh-huh.  And in Ms. Lablance's
11  realizations, after she had left Corizon, did she
12  speak to, you know, realizations she had about
13  Corizon's and Corizon staff?
14    A.  Yes.
15    Q.  Okay.  What did she say?
16    A.  She felt betrayed by Kirby and Epperson.
17    Q.  Okay.
18    A.  She felt that they shared information with
19  other Corizon employees and other DOC employees.
20    Q.  Okay.  Did they?
21    A.  Yes.
22    Q.  Okay.  And when you say "yes," I want to
23  make sure I understand.  Did they share that
24  information with other Corizon employees?
25    A.  Yes.

## Page 89

1  Q.  Did they share it with other DOC
2  employees?
3  A.  Yes.
4  Q.  How do you know?
5  A.  We did an investigation of who all went
6  into records -- or the department of corrections did
7  that for us, and, you know, there was admissions by
8  Val Kirby at the time.
9  Q.  Okay.
10  A.  So which specific employees, I don't know.
11  Q.  Okay.  And did those actions by Epperson
12  and Kirby happen before Ms. Lablance was
13  terminated -- or not terminated -- before
14  Ms. Lablance's employment ended?
15  A.  Yes.
16  Q.  Okay.
17  A.  And there we had a specific complaint
18  against two individuals, and that is actionable.
19  Q.  Okay.  I think what I hear you saying is
20  because you had a complaint from Ms. Lablance, you
21  had something that was actionable to go on?
22  A.  A specific complaint, correct.
23  Q.  Okay.  Even though it was a complaint by
24  an ex-employee?
25  A.  Well -- yes.  Because in this case, that

## Page 90

1  type of violation doesn't matter.  If you're an
2  employee, ex-employee, or, you know -- the HIPAA law
3  is reportable, so ...
4  Q.  Got it.  So it's -- it wasn't even the
5  fact that she was an employee.  Is that what I hear
6  you saying?
7  A.  That is correct.
8  Q.  Got it.  Hmm.  Okay.
9  (Deposition Exhibit No. 33 was marked for
10  identification.)
11  Q.  (By Mr. Nugent)  Let's look at Exhibit 33.
12  This is Corizon 487.  And tell us what this is.
13  A.  So this is the letter that Dr. Epperson
14  sent to Terri, and Terri texted it to me, and I then
15  uploaded that to my email and sent it to Rhonda.
16  Q.  Okay.  And so this is your email,
17  lovelace0420@icloud.com?
18  A.  Yes.  I guess that's what my iPhone uses.
19  That's not an email that I recognize, but ...
20  Q.  So is it your email?
21  A.  Yeah.
22  Q.  Okay.
23  A.  My normal email is a Gmail, so -- but I
24  guess the way I sent it, it sent it through the
25  iCloud.

## Page 91

1  Q.  Yeah.  That's fair.  No worries there.
2  And then there's a picture in the email.
3  And is this the picture that was texted to you?
4  A.  Yes.
5  Q.  Were there additional pictures?
6  A.  The envelope from Dr. Epperson --
7  Q.  Okay.
8  A.  -- was also attached.
9  Q.  And did you forward a picture of the
10  envelope?
11  A.  Yes.
12  Q.  Okay.  Via email?
13  A.  Yes.
14  Q.  Okay.  In this email or a separate email?
15  A.  It looks like it's a separate email, but I
16  can't be sure.
17  Q.  Okay.  Any other emails that you sent
18  about this?
19  A.  Oh, any others?  I'm sorry.  I missed the
20  question.
21  Q.  Yeah.  No worries.
22  A.  Okay.  No.  This started the ball rolling
23  with human resources and Rhonda, our vice president
24  of operations.
25  Q.  With two emails; right?

## Page 92

1  A.  Right.
2  Q.  Because I only have one, that's why I'm
3  wanting to make sure I have the universe as it comes
4  to the communications.
5  A.  Uh-huh.
6  Q.  All right.  Did you text Ms. Lablance back
7  after you received this?
8  A.  I'm pretty sure we had a conversation.
9  Q.  Do you know?
10  A.  No.  But I'm -- I can't say if it was by
11  text or by telephone.
12  Q.  Do you still have your text message string
13  with Ms. Lablance?
14  A.  That was probably -- no.  That was another
15  phone ago.
16  Q.  Okay.  Did anyone ask you to preserve that
17  text message string?
18  A.  No.
19  Q.  All right.
20  A.  But I lost the phone in Germany, so ...
21  Q.  When?
22  A.  That would have been April.  It was my
23  birthday, yeah.
24  Q.  April of 2019?
25  A.  Yes.

23 (Pages 89 to 92)

## Page 93

1    Q.   So a month after you got this?
2    A.   Yes.
3    Q.   Do you recall Ms. Lablance filing a charge
4    of discrimination with the Equal Employment
5    Opportunity Commission, EEOC?
6    A.   No.
7    Q.   Okay.
8    A.   She asked me about filing a report with
9    the board, and that was it.
10   Q.   Okay.  So you get this text message, and
11   you don't know if you had a verbal conversation or a
12   text conversation with Ms. Lablance; right?
13   A.   No.  But -- you know, I can say that in
14   general, I don't.  I'm not going to spend a lot of
15   time texting you back and forth.  You know, I'm
16   not -- I'm not one to do that, so ...
17   Q.   Old school, huh?
18   A.   I'm just going to pick up the phone and
19   have a conversation.
20   Q.   Ain't nothing wrong with that.
21       All right.  Why did you send this to
22   Rhonda?
23   A.   Rhonda and our business partner would
24   be -- business HR partner would be the next step in
25   the escalating.  So this would be -- that would be

## Page 94

1    my duty.
2    Q.   Why did you feel you needed to escalate
3    it?
4    A.   Because she is clearly in Terri's
5    record -- in her health record.
6    Q.   Okay.
7    A.   And she has no right to be in that record,
8    so ...
9    Q.   Why doesn't she have a right to be in it?
10   A.   If you're not viewing a record for the
11   purposes of taking care of a patient, then you
12   really don't have a right to be in that particular
13   record.
14   Q.   Okay.
15   A.   Or maybe you were viewing the file, as I
16   often do, for peer reviews or death or something
17   like that.
18   Q.   Okay.
19   A.   But we charge for not doing -- just
20   looking use.
21   Q.   I'm going to hand you what has been
22   previously marked in a prior deposition as -- two
23   exhibits, 20 and 4.  All right?  I'm going to give
24   you that.  And Exhibit 20 is the first three pages
25   of the packet you have, and it is Lablance 1, 2, and

## Page 95

1    3.
2    A.   Okay.
3    Q.   And then Exhibit 4 is Lablance 4, 5, 6, 7,
4    and 8.  Okay?
5        It's my understanding -- and I'll
6    represent to you that this is the -- the first page
7    is the envelope or photocopy of the envelope.
8    A.   Yes.
9    Q.   And then the subsequent pages are all what
10   was in the envelope mailed to Ms. Lablance.  If you
11   look at Lablance 2, it appears to be the page that
12   you emailed in Exhibit 33.
13   A.   Yeah.  So that -- this is the letter that
14   I talked about.
15   Q.   Got it.  I want to make sure we keep the
16   record clean.  When you say "this is the letter that
17   I talked about," you're referring --
18   A.   The envelope.
19   Q.   -- Bates-labeled page Lablance 1, the
20   envelope?
21   A.   Yes.
22   Q.   All right.  And -- do you see a stamp on
23   the envelope dated 26 February 2019?
24   A.   Yes.
25   Q.   Is it your understanding that's the

## Page 96

1    postmarked date?
2    A.   Yes.
3    Q.   Dr. Epperson was still an employee of
4    Corizon at that time?
5    A.   Yes.
6    Q.   All right.  And the return, or whatever
7    they call it in the upper left-hand corner, is
8    Karen Epperson, MD, and there's an address there of
9    604 Southeast 125th Road, Warrensburg, Missouri
10   64093.  Do you see that?
11   A.   Yes.
12   Q.   What's your understanding of that?
13   A.   That is her personal address.
14   Q.   Okay.  I want to look at page 2 -- or
15   Lablance 2.  I'm sorry.  And at the bottom there's a
16   URL.  Do you recognize that URL, at least the first
17   part of it that's web.doc.state.mo.us?
18   A.   Yes.
19   Q.   What is that?
20   A.   So -- and it continues on with MOCIS.
21   Q.   Oh.
22   A.   So it's from MOCIS.
23   Q.   Got it.
24   A.   Which is the web-based system.
25   Q.   Which is what we were looking at earlier

Page 97

1  when we were talked about female inmates' medical
2  information being in there?
3      A.  Right.
4      Q.  All right.  Let's look at the top.  First,
5  are you generally familiar with these types of
6  records?
7      A.  Yes.
8      Q.  All right.  So I'm going to ask you to
9  identify some things for me.  At the top it says
10  "Offender Information," and then there's -- it looks
11  to be a printer and a question mark.  What would
12  those two icons do if we were sitting at a computer
13  screen?
14      A.  You could print that page off.  And I
15  believe the question would take you to a help.
16      Q.  Okay.  And then the name of this person's
17  record is Lablance, Terri Yolanda; correct?
18      A.  Yes.
19      Q.  What is the DOC ID?  What information is
20  that?
21      A.  DOC ID number.  So it would be her inmate
22  number.
23      Q.  Okay.  How would one find this record if
24  they were sitting at the MOCIS screen?
25      A.  Generally, two ways.  So one, I have a

Page 98

1  case that I'm going to look at or somebody -- an
2  offender that I'm going to see, and so they would
3  come to me with a DOC number, and I can punch that
4  in.  I can also do a name search.
5      Q.  Okay.  And then what is "cycle," and then
6  it has some numbers in there.
7      A.  That just looks like a year, date, and
8  month.
9      Q.  Okay.  Of the record?
10      A.  I'm assuming.  I'm not sure.
11      Q.  All right.  Do you see under that it says
12  "Program," and then -- what is the N?  Do you know?
13      A.  I don't.
14      Q.  Okay.  All right.
15      MR. NUGENT:  We're going to take a break.
16      VIDEOGRAPHER:  Thank you.
17      We are off the record.  The time is
18  11:06 a.m.
19      (A recess was taken.)
20      VIDEOGRAPHER:  We are back on the record.
21  The time is 11:10 a.m.
22      Q.  (By Mr. Nugent)  And, Dr. Lovelace, you
23  understand you're still under oath?
24      A.  Yes.
25      Q.  To tell the truth?

Page 99

1      A.  Yes.
2      Q.  All right.  We are looking at Deposition
3  Exhibit 20 and Deposition Exhibit 4.  We are --
4      MR. MATULA:  Are you looking at 20 or 21?
5  Do you have a sticker on that?  I just want to -- I
6  had in my notes that this email was 21, but that was
7  just from my notes, and I might have numbered it
8  differently when -- we were before.
9      MR. NUGENT:  Can we go off the record?
10      MR. MATULA:  Sorry.
11      MR. NUGENT:  You're fine.
12      VIDEOGRAPHER:  We're off the record.  The
13  time is 11:11 a.m.
14      (Discussion off the record.)
15      VIDEOGRAPHER:  We are back on the record.
16  The time is 11:13 a.m.
17      Q.  (By Mr. Nugent)  All right.  Dr. Lovelace,
18  we are looking at previously marked deposition
19  Exhibits 20 and No. 4.  And I will just note for the
20  record that the attorneys want to double-check to
21  ensure that the numbering of Lablance 1 through 8
22  consists of Exhibits 20 and 4, or if they are to be
23  Exhibit 21.
24      In trying to understand what Lablance 2
25  is.  I want to have you turn to it, if you don't

Page 100

1  mind.
2      Do you see the back there in the box?
3      A.  Yes.
4      Q.  If you were to hit that button, where
5  would it take you?
6      A.  Just back to the last screen that you were
7  at.
8      Q.  Okay.  And so is the previous screen -- is
9  it possible that the previous screen of what we're
10  looking at could be the search results?
11      A.  It could be.
12      Q.  Okay.  Is this the first screen of an
13  individual's record in MOCIS?
14      A.  Yes.
15      Q.  Okay.  At the bottom we've identified the
16  URL as coming from the MOCIS software; correct?
17      A.  Yes.
18      Q.  And this is software that's maintained by
19  the department of corrections?
20      A.  Yes.
21      Q.  And I believe earlier you testified that
22  you had to have a user name and password that was
23  provided by the department of corrections; right?
24      A.  Yes.
25      Q.  Okay.  On the right-hand side of the URL

25 (Pages 97 to 100)

Page 101

1    is a date.  Can you tell me what that date is?
2         A.   2/18/19.
3         Q.   All right.  Is that the date that this was
4    printed or the date that it was accessed?
5         A.   The date that it was printed.
6         Q.   All right.  Turn to Lablance 3, which is
7    the next page.  Do you see at the top it says
8    "page 1 of 1"?
9         A.   Yes.
10        Q.   And on Lablance 2, which is the previous
11   page, it also says "page 1 of 2."  In order to print
12   these, do you have to click the print icon each
13   time?
14        A.   Yes.
15        Q.   Okay.  So if I'm on Lablance -- if I'm on
16   the screen that is Lablance 2, I've got to hit the
17   print icon, the printer will start working, out
18   comes what I'm looking at on Lablance 2?
19        A.   Right.
20        Q.   And then follow the same procedure for
21   printing Lablance 3?
22        A.   Right.
23        Q.   All right.  How do you get to the screen
24   that is Lablance 3?
25        A.   On 2, all of these are clickable files, so

Page 102

1    to speak --
2         Q.   Okay.
3         A.   -- that will take you -- I don't know
4    which one would take you to additional information,
5    but everything under those profiles are searchable.
6         Q.   Okay.  So everything next to
7    Ms. Lablance's photo is something that you can click
8    on?
9         A.   Yes.
10        Q.   And then it will take you to another
11   screen?
12        A.   Yes.
13        Q.   All right.  Do you know when the
14   department of corrections assigns a record like this
15   to an individual?
16        A.   I don't.
17        Q.   Okay.  Is what we're looking at in this
18   MOCIS software accessible by the department of
19   corrections?
20        A.   If they have a sign-on, yes.
21        Q.   Okay.  And do you know whether
22   correctional officers have a sign-on?
23        A.   I don't know if they do or not.
24        Q.   You don't know.  All right.
25        In the upper left-hand corner of the -- of

Page 103

1    Lablance 2, can you tell us what that is or what it
2    says, actually?
3         A.   The medical profile?
4         Q.   Yes.
5         A.   Yes.
6         Q.   Are there other types of profiles in
7    MOCIS?
8         A.   Yes.  There's some things that are -- a
9    few things that aren't medical-related.
10        Q.   I see.  So does the presence of the words
11   "medical profile" in the upper left-hand corner
12   indicate that this was printed from Ms. Lablance's
13   medical screen in MOCIS?
14        A.   Yes.
15        Q.   And if -- if there were information in
16   this medical record, would I have to click on, for
17   example, "allergies" to determine if there were
18   allergies present?
19        A.   Yes.
20        Q.   All right.  And is that the same for every
21   other clickable word that you reference next to the
22   photo?
23        A.   Yes.
24        Q.   Okay.  So earlier when we were talking
25   about the software options PC LAN, AS400, and MARS,

Page 104

1    you mentioned that AS400 and MARS were before 2016.
2    Do you recall?
3         A.   Yes.
4         Q.   All right.  If you look at the cycle on
5    Lablance 2, you mentioned that that's a date.
6         A.   Yes.
7         Q.   And that is April 11th of 2012; is that
8    right?
9         A.   Yes.
10        Q.   Okay.  Would you expect to find
11   information in the AS400 software and the MARS
12   software?
13        A.   Yes.
14        Q.   Okay.  Did the investigation include a
15   search of those databases?
16        A.   I don't know if they did or not.
17        Q.   Okay.  Should it have?
18        A.   I can't answer that.
19        Q.   Why not?
20        MR. MATULA:  It's vague.  Should it have
21   for -- I mean ...
22        To what end?  It's vague.
23        Q.   (By Mr. Nugent)  Do you understand the
24   question?
25        A.   Yeah.  I don't -- I don't know that they

## Page 105

1  would have gotten more information by going, you
2  know, back to MARS, as well, so I don't know if it
3  needed to be included.
4      Q.  Okay.  Would looking at MARS and looking
5  at the AS400 systems tell you who accessed records?
6      A.  Yes.
7      Q.  Would it tell you when they accessed them?
8      A.  Yes.
9      Q.  Okay.  So for those reasons, would it be,
10  in your opinion, prudent?
11      A.  I think that the -- the bulk of the
12  information was in MOCIS, and that's where people
13  would look.  You know, so I think -- that's my
14  opinion, that if the same people -- if someone went
15  from -- actually to MARS to check, they would have
16  checked MOCIS first.  I don't think you would view
17  additional people.
18      Q.  Hmm.  Okay.
19          Oh, Dr. Lovelace -- Dr. Epperson wrote
20  some stuff on there.  Do you see that?
21      A.  Yes.
22      Q.  She says, "Please do not contact me.  I
23  was not aware until recently, and I should have been
24  made aware."
25          In your opinion, should she have been made

## Page 106

1  aware?
2      A.  No.
3      Q.  Why?
4      A.  Because once I vetted her and once the
5  credentialing committee vets her, that should be
6  acceptable to Dr. Epperson.
7      Q.  She says --
8      A.  And the DOC vetted her, so ...
9      Q.  Okay.  And then she also says "until
10  recently."  Do you know when Ms. -- or when
11  Dr. Epperson became aware?
12      A.  No.
13      Q.  Okay.  In your opinion, did this
14  information have any bearing on the physician-nurse
15  practitioner relationship?
16      A.  No.
17      Q.  Okay.  Are you aware of whether
18  Dr. Epperson reported any concerns about
19  Ms. Lablance?
20      A.  She did not.
21      Q.  She did not to you?
22      A.  Correct.
23      Q.  Do you know if she did to anyone else?
24      A.  No.
25      Q.  Okay.  Was the relevance of Dr. -- excuse

## Page 107

1  me.
2          Was the relevance of Ms. Lablance's Kansas
3  nursing license relevant to the physician-nurse
4  practitioner relationship?
5      A.  No.
6      Q.  Why is that, in your opinion?
7      A.  Because I'd already reviewed it, the
8  credentialing committee reviewed it, as well as the
9  department of corrections.  This was all known
10  prior.
11      Q.  When physicians start at Corizon, and
12  they're working with nurse practitioners, is it
13  common practice for them to fill out an agreement to
14  allow the nurse practitioner to use the doctor's or
15  physician's license?
16      A.  They don't really use their license; it's
17  more a physician saying that I'm willing to
18  supervise this person.
19      Q.  Okay.
20      A.  And doing requirements therein.
21      Q.  Yeah.  You, as a doctor, have you had a
22  nurse practitioner that you've had to sign an
23  agreement like this for?
24      A.  Yes.
25      Q.  And in your experience, what information

## Page 108

1  do you need to feel comfortable signing that
2  agreement?
3      A.  On my own -- in prior practice, I'll take
4  that, because I think that's most relevant.
5          I need to feel comfortable with their body
6  of knowledge, review that they've not had
7  disciplinary action from the board, and those are
8  pretty much the basic -- but that -- but the comfort
9  level with their skill set, that's probably the
10  biggest thing.
11      Q.  Okay.  And then have you had to sign one
12  of those agreements as an employee of Corizon?
13      A.  Yes.
14      Q.  Okay.  The same standards that you just
15  discussed apply, even in your employment at Corizon?
16      A.  Yes.
17      Q.  Do you get any say on whether you can sign
18  that document in?
19      A.  Yes.
20      Q.  Okay.  What happens if you refuse?
21      A.  That nurse practitioner can't be assigned
22  to me.
23      Q.  Okay.  Have you seen an occasion like that
24  where a physician refuses?
25      A.  Yes.

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us                    Fax: 314.644.1334

## Page 109

1    Q.   Okay.  Did any physician refuse the
2  agreement in relation to Ms. Lablance?
3    A.   No.
4    Q.   Okay.  Did any physician object to or
5  raise concerns about signing the agreement with
6  Ms. Lablance?
7    A.   No.
8    Q.   Okay.  I'm going to hand you what's been
9  marked as Exhibit 34.
10         (Deposition Exhibit No. 34 was marked for
11  identification.)
12    Q. (By Mr. Nugent)  Exhibit 34 is
13  Bates-labeled Corizon 167 through 205.
14    A.   Okay.  Where do you want to start?
15    Q.   I want to start with Carol Bates' email on
16  the first page --
17         MR. MATULA:  What was the first number
18  there?  You said 16-?
19         MR. NUGENT:  Seven.
20    Q. (By Mr. Nugent)  Do you know Carol Bates?
21    A.   I do not.
22    Q.   All right.  The subject is "CCC
23  Preemployment Notification-Corizon."
24         And then the following pages,
25  specifically, Corizon 168 is a document entitled

## Page 110

1  "Wanted person check MULES/NCIC."
2         Are you familiar with that -- with a
3  document like that?
4    A.   Yes.
5    Q.   What is it, in your opinion?
6    A.   So this is when the department of
7  corrections, they're doing their check -- you know
8  they're checking for warrants, they're looking for
9  past criminal history, and so forth.  This is
10  separate from -- Corizon does the same thing, but
11  the department of corrections does their own.
12    Q.   Okay.
13    A.   Where they pull from databases.
14    Q.   Okay.  Do you see at the bottom of Corizon
15  168 -- and Corizon 168, I believe, was also
16  Exhibit 6 in a previous deposition, but it says "Did
17  not serve time at CCC."
18         Do you see that?
19    A.   Yes.
20    Q.   In order for an inmate or a person who has
21  come into contact with the department of corrections
22  to have a medical record, do they have to have been
23  an inmate?
24    A.   I don't know.
25    Q.   You don't know.  Okay.  What we do know is

## Page 111

1  Ms. Lablance has a medical record?
2    A.   Yes.
3    Q.   We also know that she did not serve time
4  at CCC?
5    A.   Correct.
6    Q.   Okay.
7    A.   Or Vandalia.
8    Q.   What's Vandalia?
9    A.   The other women's prison.
10    Q.   There are only two?
11    A.   Yes.
12    Q.   So she did not serve time at either of
13  them?
14    A.   No.
15    Q.   Okay.  Turn to 169.  Have you seen a
16  report like this before?
17    A.   No.
18    Q.   Okay.  And then turn to Corizon 170.  Do
19  you see that picture there?
20    A.   Yes.
21    Q.   Who is that?
22    A.   Terri Lablance.
23    Q.   Do you know when this picture is?
24    A.   I do not.
25    Q.   Okay.  And then do you know what system

## Page 112

1  this picture resides?
2    A.   No.
3    Q.   Is this the syntax or format of the AS400
4  system?
5    A.   No.  Because it -- there are no pictures
6  in there.
7    Q.   Thank you.  Is it the syntax or format of
8  the MARS system?
9    A.   No.
10    Q.   Okay.  And then lastly, Dr. Lovelace, do
11  you know if this is a report that the department of
12  corrections prints or searches to do their
13  background check?
14    A.   Yes.
15    Q.   It is?
16    A.   It is.
17    Q.   Okay.  And does this report go into a
18  Corizon employee's personnel file?
19    A.   No, I do not believe it does.
20    Q.   You don't believe it does.  Okay.
21         And then -- sorry.  One more question
22  about this.
23         Is the check done by the department of
24  corrections required before employees can report to
25  a correctional center?

Page 113

1    A.  Yes.
2    Q.  Okay.  I've handed you what's been
3  premarked as Deposition Exhibit 11.  It was used in
4  a prior deposition.  It is the collaborative
5  practice agreement between Ms. Lablance and
6  Dr. Epperson.
7        MR. NUGENT:  And so that everyone is on
8  the same page, Dr. Lovelace has Exhibit 11, but he
9  only has Bates-labeled pages Corizon 317 through
10  325.
11    Q.  (By Mr. Nugent)  And, Dr. Lovelace, 325 is
12  the signature page of this agreement.  Do you see
13  that?
14    A.  I do.
15    Q.  All right.  The remaining pages of this
16  Exhibit 11 are Corizon 326 through 335, and they are
17  attachments and appendices of the agreement.
18        Dr. Lovelace, have you seen an agreement
19  like this before?
20    A.  Yes.
21    Q.  And have you also signed an agreement like
22  this before?
23    A.  Yes.
24        MR. MATULA:  Do you have extra copies to
25  send over to Jen?

Page 114

1        MR. NUGENT:  I -- with the camera being
2  right there, I didn't want to go over --
3        MR. MATULA:  Okay.  All right.
4        MR. NUGENT:  -- and beyond.
5        MR. MATULA:  That's fine.  It's not a --
6        MR. NUGENT:  Do you want to sit here?
7  I --
8        MR. MATULA:  It's up to you, Jenny.  I was
9  just offering, in case you wanted to see it.  If
10  you -- if it's no big deal, you're free to sit
11  wherever you're most comfortable.
12        MS. MEEHAN:  I'm fine for now.
13        MR. NUGENT:  Okay.
14    Q.  (By Mr. Nugent)  Dr. Lovelace, at the
15  beginning of provider's employment are they on,
16  like, a 30-day probationary period?
17    A.  Not that I'm aware of.
18    Q.  Okay.  So is there any reason to delay the
19  signing of a collaborative practice agreement
20  between a physician and nurse practitioner?
21    A.  It has to be done before they can
22  practice.
23    Q.  Okay.  Perfect.  This one is dated
24  July 31st of 2017.  Would you agree?
25    A.  Yes.

Page 115

1    Q.  And so Dr. Epperson would have been the
2  physician at Chillicothe when Ms. Lablance started
3  her employment; is that right?
4    A.  No.
5    Q.  Okay.  What's wrong about that statement?
6    A.  I believe Dr. DeCastro was there at that
7  time.  I think Dr. Epperson was at another facility
8  close by.
9    Q.  Okay.  Why is Dr. Epperson signing this,
10  if she's close by and not at Chillicothe?
11    A.  The requirement used to be 50 miles.
12    Q.  Okay.
13    A.  But I think it's 75 now.  But -- so nobody
14  within that 50-mile radius could do it.  And she
15  spent some of her time at the other facility.  It
16  was a men's facility.  I believe it was Crossroads.
17    Q.  "She" being Dr. Epperson?
18    A.  No.  Terri.
19    Q.  So Terri split time between Crossroads
20  and --
21    A.  Initially.
22    Q.  -- Chillicothe, initially.  All right.
23        At the time of signing this, did -- are
24  you -- do you facilitate the signing of this, or
25  does someone else?

Page 116

1    A.  Sometimes I may ask a provider; other
2  times, the HSA will ask.
3    Q.  And who was the HSA at the time this was
4  signed?
5    A.  I don't know.  Sometimes it could be a
6  director of operations that would be asked.
7    Q.  Okay.  We're going to our org chart, if
8  you --
9    A.  To --
10    Q.  The exhibit that was the makeshift org
11  chart that we went through.  It's Exhibit 31, which
12  is Corizon 985.
13    A.  I have it.
14    Q.  Okay.  So I believe that the H- -- is it
15  HIS?
16    A.  HSA.
17    Q.  HSA.  Thank you.
18    A.  It's auto correct.
19    Q.  It was.  Teresa McWhorter, when she --
20  Ms. Lablance started; right?
21    A.  Yes.
22    Q.  Okay.  And then when did it -- at some
23  point we talked about Ms. Hild.  Do you remember
24  what her title was?
25    A.  She was the HSA for awhile.

1    Q.  Okay.  I don't see her on Exhibit 31, do
2  you?
3    A.  No.
4    Q.  Okay.  When would Ms. Hild be the HSA so
5  that we can insert her into Exhibit 31?
6    A.  I don't know the dates.
7    Q.  Okay.
8    A.  But likely between Teresa McWhorter and
9  Sterling.
10    Q.  Okay.  So sometime between February of '18
11  and September of '18?
12    A.  Yes.
13    Q.  How long was Ms. Hild there?  Do you know?
14    A.  No.
15    Q.  Less than a year?
16    A.  Yes.
17    Q.  Do you know where Ms. Hild came from?
18    A.  No.  She was at another facility, but I
19  don't remember the name -- which one.
20    Q.  So she transferred over to Chillicothe?
21    A.  Yes.
22    Q.  Got it.
23      (Deposition Exhibit No. 35 was marked for
24  identification.)
25    Q.  (By Mr. Nugent)  Dr. Lovelace, I'm handing

1  you what's been marked as Deposition Exhibit 35.  It
2  is Corizon 488 through 489.  Have you seen a
3  document like this before?
4    A.  No.
5    Q.  Okay.  Have you -- so you probably haven't
6  seen this one before?
7    A.  No.
8    Q.  All right.  Do you see where it says in
9  the middle of Corizon 488 "CCC" in handwriting?
10    A.  Yes.
11    Q.  And then it says,
12  karenepperson@doc.mo.gov.  And then under the "gov,"
13  it says "CIS."  Any idea what that could be?
14    Q.  Okay.
15    Q.  Okay.
16    A.  Hmm.
17    Q.  Any thoughts?
18    A.  No.
19    Q.  All right.  So, Dr. Lovelace, I want to
20  get back into the third issue that you escalated.
21  It was after you received the text from Ms. Lablance
22  about the things she received.  All right?
23      So looking back on now those three
24  incidents, do you have -- what's your opinion on the
25  totality of the three?  Looking at them as a whole,

1  what's your opinion?
2    A.  In terms?
3    Q.  Of -- if you have any thoughts.  If you
4  don't, that's fine.
5    A.  I really see them as three separate
6  incidents.  I mean, these aren't connected.
7    Q.  Okay.  Three separate incidents not
8  connected.  Are you aware of the motive or
9  motivation behind Dr. Epperson accessing
10  Ms. Lablance's records?
11    A.  I am not.
12    Q.  Okay.  What about Ms. Kirby's motive or
13  motivation?
14    A.  I'm not.
15    Q.  Okay.  Have you -- or are you aware of any
16  other instances where a provider inappropriately
17  accessed another employee's records?
18    A.  No.
19    Q.  Okay.  And then are you aware that
20  Ms. Lablance complained with the Missouri Division
21  of Professional Registration about Dr. Epperson and
22  about Dr. Kirby?
23    A.  I thought she complained about
24  Dr. Epperson.
25    Q.  Okay.  So do you know one way or another

1  if she complained about Ms. Kirby?
2    A.  I don't.
3    Q.  Okay.  But you are aware of the complaint
4  she made against Dr. Epperson?
5    A.  Yes.
6    Q.  Were -- did you interview or did they
7  interview you -- did the state interview you about
8  that?
9    A.  No.
10    Q.  Okay.  Do you know whether or not Corizon
11  audits MOCIS use?
12    A.  We're not able to.
13    Q.  Okay.  Why not?
14    A.  Because it's a DOC-owned entity, so we can
15  ask them, but we can't ourselves.
16    Q.  Understood.  Do you know whether the DOC
17  audits MOCIS use?
18    A.  I don't.
19    Q.  Are you aware of Corizon ever asking the
20  DOC to audit use?
21    A.  In this one particular case.
22    Q.  Any other times outside of this?
23    A.  No.
24    Q.  All right.  Hmm.  Are you aware of whether
25  or not Dr. Epperson informed Cindy Schupp about

Page 121

1  Ms. Lablance's criminal history?
2     A.  Yes.
3     Q.  Okay.  She did?
4     A.  Yes.
5     Q.  Okay.  When did that happen?
6     A.  I believe it was after -- right around the
7  time she was -- not terminated, but she left.
8     Q.  So you believe that Dr. Epperson
9  informed Cindy Schupp around the time that
10  Ms. Lablance's employment ended?
11     A.  Yes.
12     Q.  Okay.  Do you know if it was before
13  Ms. Lablance's last day or after?
14     A.  I'm not sure.
15     Q.  Okay.  Would you have handled this
16  differently if Ms. Lablance was still an employee
17  when you received notice?
18     A.  No.
19     Q.  Okay.  You still would have forwarded it
20  to Ms. Almanza?
21     A.  Yes.
22     Q.  Okay.
23     A.  And the human resources partner.
24     Q.  Okay.  Do you know why it took
25  Ms. Lablance's complaint to investigate it instead

Page 122

1  of Ms. Schupp looking into it?
2     A.  I don't know when she looked at it, so I
3  don't know.
4     Q.  That's fair.
5     A.  Yeah.
6     Q.  Yeah.
7     A.  And wouldn't she have called Cindy, so ...
8     Q.  Uh-huh.
9     A.  But I'm certain that I was the first
10  person, so -- that she had looked into the record.
11     Q.  Say that again.
12     A.  I'm certain that I'm the first person to
13  know.
14     Q.  Why -- how are you certain?
15     A.  Because it was news when I brought it to
16  the group.
17     Q.  And the group was?
18     A.  Rhonda, Makisa, and Cindy.
19     Q.  Okay.
20     A.  And Jenny.
21     Q.  So when you found out, you told Cindy?
22     A.  I told Rhonda first.
23     Q.  You told Rhonda first?
24     A.  And Cindy was probably there, too.  It's a
25  tight little office space, so we tend to have

Page 123

1  impromptu meetings.
2     Q.  Yeah.  And so in observing Cindy's
3  reaction, she acted like that was the first time she
4  had heard it, in your opinion?
5     A.  Yes.
6     MR. MATULA:  And I'm going to object to
7  the form of the question as vague as to "it," to
8  make sure that's clear what "that" is being referred
9  to.
10     MR. NUGENT:  I think he's answered it
11  already, but thanks.
12     Q.  (By Mr. Nugent)  So you received it on
13  March 1st -- is that right -- from Terri?  You
14  received the letter or the text from Terri?
15     A.  I don't know if it was March 1st.  That
16  was the next -- my next day back at work, though.
17     Q.  March 1st was your next day back at work?
18     A.  Yeah.
19     Q.  Okay.  So do you know whether you received
20  it a day or two before March 1st or not?
21     A.  If it was the weekend before March 1st,
22  then, yes.
23     Q.  Okay.  That's fair.
24     And so then part of your certainty in that
25  you were the first person to find out is that the

Page 124

1  people you told seemed surprised?
2     A.  Yes.
3     Q.  All right.  Forgive me if I've asked you
4  this, but do you know, outside of Dr. Epperson and
5  Ms. Kirby, who else saw Ms. Lablance's medical
6  record or medical history in the MOCIS software?
7     A.  No.
8     Q.  You're not?
9     A.  No.
10     Q.  You don't know?
11     A.  No.  These audit things would --
12     Q.  Yeah.  And all I have are audit forms for
13  Epperson and Kirby, but if there's others, I'd like
14  to know; that's why I'm asking.
15     A.  Yeah, I haven't seen any others.
16     Q.  Okay.  All right.  Do you think it would
17  be difficult to work in an environment like what
18  Ms. Lablance went through, in your opinion?
19     MR. MATULA:  Objection.  Vague and
20  overbroad.  What part?
21     Q.  (By Mr. Nugent)  You can answer, if you
22  know -- or do you understand the question?
23     A.  Yeah, I understand the question.
24     I'm not certain, because she didn't know.
25     Q.  Who didn't know?

31 (Pages 121 to 124)

## Page 125

1    A.  Lablance.
2    Q.  Didn't know what?
3    A.  Didn't know what was going on in the
4  background, in terms of people searching --
5  searching her record.  So if you're unaware that
6  this has happened, I don't know what the environment
7  would have been like.
8    Q.  If you're unaware that it's happening, in
9  other words, how can it harm you?
10    A.  No.  I don't know what the environment
11  would look like.
12    Q.  Okay.  Dr. Lovelace, I'm about finished,
13  so just give me one second here.
14    I want to go back to something I asked you
15  about earlier, just to maybe ask a different
16  question.  But at Ms. Lablance's deposition, she
17  testified that the warden at Chillicothe invited her
18  to a meeting when she first started, and that in
19  that meeting -- or after that the meeting -- I'm
20  sorry -- he expressed some sort of concern or
21  confusion about how Ms. Lablance was able to start
22  work or be employed there or what have you.
23    Does any of that ring a bell to you?
24    A.  Not at all.
25    Q.  Okay.  Ms. Lablance also said that the

## Page 126

1  warden reached out to you and that you subsequently
2  then reached out to her.  Any of that ring a bell?
3    A.  No.
4    Q.  Okay.  Dr. Lovelace, have you experienced
5  any treatment that you would classify as
6  discrimination or harassment?
7    A.  No.
8    Q.  Okay.  Have you filed any complaints
9  internally with Corizon?
10    A.  No.
11    Q.  Okay.  About -- I guess let me ask it this
12  way:  How many conversations -- how many other
13  conversations -- I know you've told me about
14  Ms. Lablance raising the race issue to you, and she
15  emailed you about the lab tech, and then she texted
16  you about the packet she received from Dr. Epperson.
17  Outside of those three instances, did you have any
18  conversations with Ms. Lablance about her
19  perceptions of her work environment there at
20  Chillicothe?
21    A.  Yes.  It wasn't specific to Chillicothe.
22    Q.  Okay.
23    A.  At the time her mother had died, and --
24  like she told me, she left work and went home --
25  left work crying one day.

## Page 127

1    Q.  Okay.
2    A.  But she didn't talk about them, in terms
3  of something that happened at Chillicothe, so I
4  assumed that this was personal.
5    Q.  You assumed what was personally related?
6    A.  The fact that she was upset and left work.
7    Q.  I see.  Okay.  Any other conversations
8  that you had with Ms. Lablance?
9    A.  No.  Most of them were about her mother
10  or -- or just something that happened on our
11  eleven o'clock call or something.  Nothing regarding
12  the environment.
13    Q.  What about any conversations about her
14  observations about what she was seeing at
15  Chillicothe?
16    A.  No.
17    Q.  No?  Okay.
18    A.  Those came afterwards.
19    Q.  After --
20    A.  After she left.
21    Q.  Okay.  All right.  So during her
22  employment, we have the three communications that
23  we've already talked about?
24    A.  Right.
25    Q.  We also have her talking to you about her

## Page 128

1  mom passing.  Random conversations about the
2  eleven o'clock call?
3    A.  Yes.
4    Q.  And then -- now, after her separation or
5  resignation, however you want to phrase it, from
6  Corizon, were there additional conversations?
7    A.  Yes.
8    Q.  All right.  Tell me about those.
9    A.  I think I characterized those before, but
10  that's when she got this letter from Dr. Epperson,
11  she began to say -- or feel like there was signs
12  that she should have picked up on.
13    Q.  Did she say that specifically, or are you
14  paraphrasing?
15    A.  I'm paraphrasing.
16    Q.  Okay.  Can you give me any other substance
17  of any other conversations you had with her after
18  she was no longer working with Corizon?
19    A.  Should I file a complaint with the nursing
20  board.
21    Q.  Okay.
22    A.  What's the next step in -- you know,
23  what's the next step in this process?
24    Q.  What's "this process"?
25    A.  The process with Epperson and Kirby.

ALARIS LITIGATION SERVICES
www.alaris.us                Phone: 1.800.280.3376                Fax: 314.644.1334

## Page 129

1    Q.   And what was -- what process was she
2  referring to, if you know?
3    A.   The length of time to some action
4  occurring.
5    Q.   Okay.  Any other conversations or
6  substantive conversations?
7    A.   In general, she felt violated.
8    Q.   In your opinion, was that feeling
9  justified?
10   A.   Yes.
11   Q.   What was your response to whether she
12 should file a complaint with the nursing board?
13   A.   In my experience, those processes take so
14 long, and very little comes of them, that I didn't
15 know if it was worth pursuing.
16   Q.   Is that the advice you shared with her?
17   A.   Yes.
18   Q.   And what was her response?
19   A.   She just felt like I have to do something,
20 I have to do something.  But that particular
21 thing -- you know, I didn't know that that was the
22 right thing.
23   Q.   In your opinion, what was the right thing?
24   A.   To let this play out the way it did, with
25 Epperson and Kirby losing their positions.  I mean,

## Page 130

1  that -- that would be the immediate and, you know, I
2  guess, gratification that you could get from that
3  sort of the thing.  Board complaints often take more
4  than two years.
5    Q.   So the gratification of Epperson and Kirby
6  losing their jobs?
7    A.   Yes.  In terms of justice for her.
8    Q.   Hmm.  Any other conversations after
9  Ms. Lablance was no longer working for Corizon?
10   A.   That's about -- no.  That's about it.
11   Q.   Okay.  Have you understood all of my
12 questions?
13   A.   Yes.
14   Q.   And are there any answers you want to
15 revisit or any questions you want to revisit?
16   A.   No.
17   Q.   Have you told the truth today?
18   A.   Yes.
19      MR. NUGENT:  Thanks.  I've got nothing
20 else.
21      VIDEOGRAPHER:  We are off the record.  The
22 time is 12:09 p.m.
23      (Discussion off the record.)
24      MR. NUGENT:  So I've concluded my
25 questions.

## Page 131

1       Do you, Rachel, have any questions for
2  this witness?
3       MS. JAG:  No, I do not have any questions
4  for this witness at this time.
5       MR. NUGENT:  Okay.
6       MR. MATULA:  No questions at this time.
7  We'll read and sign.
8       (The deposition concluded at 12:10 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 132

1         CERTIFICATE OF REPORTER
2
3       I, Lisa Ballalatak, a Certified Court
4  Reporter for the State of Missouri, do hereby certify
5  that the witness whose testimony appears in the
6  foregoing deposition was duly sworn by me; the
7  testimony of said witness was taken by me to the best
8  of my ability and thereafter reduced to typewriting
9  under my direction; that I am neither counsel for,
10 related to, nor employed by any of the parties to the
11 action in which this deposition was taken, and further
12 that I am not a relative or employee of any attorney
13 or counsel employed by the parties thereto, nor
14 financially or otherwise interested in the outcome of
15 the action.
16
17
18 _____
19 Lisa Ballalatak
20 Missouri Supreme Court
21 Certified Court Reporter
22
23
24
25

## Page 133

ALARIS LITIGATION SERVICES
1608 Locust Street
Kansas City, Missouri 64108
Phone: (816) 221-1160

August 2nd, 2020
MR. MICHAEL MATULA
Ogletree Deakins Nash
Smoak & Stewart PC
4520 Main Street, Suite 400
Kansas City, Missouri  64111

TERRI YOLANDA LABLANCE v. MISSOURI DEPARTMENT OF CORRECTIONS AND CORIZON HEALTH

Dear Mr. Matula:

Please find enclosed your copy of the deposition of Jerry Lovelace, MD, taken on July 21st, 2020, in the above-referenced case.  Also enclosed is the original signature page and errata sheet.

Please have the witness read your copy of the transcript, indicate any changes and/or corrections desired on the errata sheet, and sign the signature page before a notary public.

Please return the executed signature page and errata sheet to the Alaris Litigation production department within 30 days after receiving the transcript.

Thank you for your attention to this matter.

Sincerely,


Lisa Ballalatak

cc: Mr. Nugent

## Page 134

ERRATA SHEET

Witness:  Jerry Lovelace, MD

TERRI YOLANDA LABLANCE v. MISSOURI DEPARTMENT OF CORRECTIONS AND CORIZON HEALTH

Date Taken:  July 21st, 2020

Page #_____ Line #_____

Should read: _____

Reason for change: _____


Page #_____ Line #_____

Should read: _____

Reason for change: _____


Page #_____ Line #_____

Should read: _____

Reason for change: _____


Page #_____ Line #_____

Should read: _____

Reason for change: _____


Page #_____ Line #_____

Should read: _____

Reason for change: _____


Witness Signature:  _____

## Page 135

STATE OF          )
                          )
COUNTY OF        )

I, Jerry Lovelace, MD, do hereby certify:

That I have read the foregoing deposition;

That I have made such changes in form and/or substance to the within deposition as might be necessary to render the same true and correct;

That having made such changes thereon, I hereby subscribe my name to the deposition.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this _____ day of _____, 20___, at _____.


_____
Notary Public

My commission expires: _____


_____
Jerry Lovelace, MD

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334