# EXHIBIT 3

## Page 1

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE WESTERN DISTRICT OF MISSOURI
2            WESTERN DIVISION
3
4  TERRI YOLANDA LABLANCE,      )
                               )
5        Plaintiff,     )
                               )
6  vs.              ) Case No.
                    ) 4:19-cv-00693-BP
7                              )
8  MISSOURI DEPARTMENT OF      )
   CORRECTIONS AND CORIZON      )
   HEALTH,              )
9                     )
        Defendants.    )
10
11
12
13
14
15
16
17
18      VIDEOTAPED DEPOSITION OF JENNY MEHAN
19      TAKEN ON BEHALF OF THE PLAINTIFF
20            JULY 21st, 2020
21
22
23
24
25

## Page 3

1   IN THE UNITED STATES DISTRICT COURT
    FOR THE WESTERN DISTRICT OF MISSOURI
2            WESTERN DIVISION
3
4  TERRI YOLANDA LABLANCE,    )
                             )
5        Plaintiff,     )
                             )
6  vs.             ) Case No.
                   ) 4:19-cv-00693-BP
7                            )
8  MISSOURI DEPARTMENT OF    )
   CORRECTIONS AND CORIZON    )
   HEALTH,          )
9                   )
        Defendants.    )
10
11      VIDEOTAPED DEPOSITION OF JENNY MEEHAN,
12   produced, sworn, and examined on the 21st day of July,
13   2020, between the hours of twelve o'clock in the
14   afternoon and five o'clock in the evening of that date
15   at the offices of ALARIS LITIGATION SERVICES, 2511
16   Broadway Bluffs, Suite 201, Columbia, Missouri, before
17   LISA BALLALATAK, a Certified Court Reporter within and
18   for the State of Missouri, in a certain cause now
19   pending IN THE UNITED STATES DISTRICT COURT, FOR THE
20   WESTERN DISTRICT OF MISSOURI, WESTERN DIVISION,
21   wherein TERRI YOLANDA LABLANCE is the Plaintiff and
22   MISSOURI DEPARTMENT OF CORRECTIONS AND CORIZON HEALTH
23   are the Defendants.
24
25

## Page 2

1        INDEX OF EXAMINATION
2
3  Examination by Mr. Nugent        6
4  Cross-Examination by Ms. Jag       122
5  Redirect Examination by Mr. Nugent    133
6
7        INDEX OF EXHIBITS
8  EXHIBITS:
9  Exhibit No. 36  (Termination Checklist)     10
10 Exhibit No. 37  (Answers to Interrogatories)    13
11 Exhibit No. 38  (Terminate Employee Listing)    25
12 Exhibit No. 39  (Upton Email 3/13/19)      97
13 Exhibit No. 40  (Auditing Log)     106
14 Exhibit No. 41  (Upton Email 3/13/19)    111
15 Exhibit No. 42  (Auditing Log)     111
16
17 Reporter's Note:  The original exhibits were attached
18 to the original transcript.
19
20
21
22
23
24
25

## Page 4

1        APPEARANCES
2  For the Plaintiff:
3  MR. IVAN NUGENT
   KRIGEL & KRIGEL, PC
4  4520 Main Street, Suite 700
   Kansas City, Missouri 64111
5  (816) 756-5800
   inugent@krigelandkrigel.com
6
7  For the Defendant Corizon Health:
8  MR. MICHAEL MATULA
   Ogletree Deakins Nash
9  Smoak & Stewart PC
   4520 Main Street, Suite 400
10 Kansas City, Missouri  64111
   (816) 471-1301
11 mike.matula@ogletree.com
12
   For the Defendant Missouri Department
13 of Corrections:
   (Appearing via Zoom Videoconference)
14
   MS. RACHEL L. JAG
15 MISSOURI ATTORNEY GENERAL OFFICE
   615 East 13th Street, Suite 401
16 Kansas City, Missouri  64106
   (816) 889-5000
17 rachel.Jag@ago.mo.gov
18
   Also present:
19
   Ms. Rita Yencarelli, Legal Videographer
20
   The Court Reporter:
21 MS. LISA BALLALATAK, CCR
   Kansas CSR No. 1670
22 Missouri CCR No. 1336
23 ALARIS LITIGATION SERVICES
   2511 Broadway Bluffs, Suite 201
24 Columbia, Missouri 65201
   (573) 449-0561
25

1 (Pages 1 to 4)
ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 63-3   Filed 11/12/20   Page 2 of 36

## Page 5

1     (The deposition commenced at 12:52 p.m.)
2     VIDEOGRAPHER:  We are on the record.
3  Today's date is July 21st, 2020.  The time is
4  12:52 p.m.  This is the video-recorded deposition of
5  Jennifer Meehan in the matter of Terri Yolanda
6  Lablance v. Missouri Department of Corrections, et
7  al.  This deposition is being held at Alaris
8  Litigation in Columbia, Missouri.  The court
9  reporter's name is Lisa Ballalatak.  My name is
10  Rita Yencarelli, legal videographer, and we are with
11  Alaris Litigation.
12     Would the attorneys present please
13  introduce yourselves and the parties you represent.
14     MR. NUGENT:  Good afternoon.  Ivan Nugent
15  on behalf of the plaintiff, Terri Lablance.
16     MR. MATULA:  Mike Matula on behalf of
17  defendant Corizon.
18     MS. JAG:  Rachel Jag on behalf of
19  defendant Missouri Department of Corrections.
20     VIDEOGRAPHER:  Thank you.  Will the court
21  reporter please swear in the witness.
22          JENNY MEEHAN,
23  of lawful age, being produced, sworn, and examined on
24  behalf of the plaintiff, deposes, and says:
25     THE WITNESS:  May I make one comment for

## Page 6

1  the record?  My legal name is "Jenny," not
2  "Jennifer."
3     VIDEOGRAPHER:  Oh.  Got it.
4          EXAMINATION
5  BY MR. NUGENT:
6     Q.  Good morning, Ms. Meehan.  Am I
7  pronouncing that right, Meehan?
8     A.  Yes.
9     Q.  All right.  You are here for a deposition
10  in the case involving Ms. Lablance, Department of
11  Corrections and Corizon.  Is that your
12  understanding?
13     A.  Yes.
14     Q.  All right.  I've got a bunch of questions.
15  You have been present for plaintiff's deposition;
16  right?
17     A.  Yes.
18     Q.  And for Dr. Jerry Lovelace's deposition;
19  right?
20     A.  Yes.
21     Q.  So you've heard both of their testimonies
22  as we go through today.  I just wanted to make
23  sure -- because I did not see Zoom last week, so --
24  or two weeks ago.  Thank you.
25     Tell me your address.

## Page 7

1     A.  12040 Southeast State Route A, St. Joseph,
2  Missouri.
3     Q.  Thank you for driving down here today.
4  Appreciate that.
5     A.  You're welcome.
6     Q.  Is your office near St. Joe?
7     A.  I am a remote employee, so, technically,
8  my office is in Jefferson City at the regional
9  office for Corizon, but I work remotely out of my
10  home and the facilities that I oversee.
11     Q.  Were you working remotely prior to
12  COVID-19?
13     A.  Yes.
14     Q.  Okay.  You were sworn in by the court
15  reporter to tell the truth.  You understand that;
16  right?
17     A.  Yes.
18     Q.  And are you here to tell the truth today?
19     A.  I am.
20     Q.  Great.  With regards to your job title,
21  tell me what that is, please.
22     A.  I'm the director of operations for
23  Missouri's west region.
24     Q.  All right.  And as you know, I was talking
25  to Dr. Lovelace about operations and medical side.

## Page 8

1  Are you on the operations side?
2     A.  I am an operational manager for the
3  medical department.
4     Q.  Okay.  Do you have any medical training?
5     A.  I'm a nurse.
6     Q.  Okay.  How long were you a nurse?
7     A.  I graduated nursing school in 1999 and
8  obtained my license in 2000.
9     Q.  Okay.  Is that license still current?
10     A.  It is.
11     Q.  And do you have any job duties that
12  require you to serve as a nurse?
13     A.  I don't have any job duties that require
14  me to serve as a nurse, except for our contract with
15  the Missouri Department of Corrections states that
16  someone in my position will be a registered nurse.
17     Q.  Okay.  That makes sense to me.  I get it.
18     How many people do you supervise?
19     A.  Directly, I supervise five individuals.
20  I'm the direct supervisor for the health services
21  administrators, and then I subsequently supervise
22  anybody that reports to them.
23     Q.  Makes sense.  How many correctional
24  centers are you responsible for?
25     A.  Currently, I am over seven.

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP    Document 63-3    Filed 11/12/20    Page 3 of 36

## Page 9

1    Q.   And is that the most it has ever been?
2    A.   Yes.
3    Q.   Okay.  And while Ms. Lablance was an
4  employee, was the number seven?
5    A.   The number was seven.  The facilities were
6  different.
7    Q.   Okay.  Was Chillicothe one of them?
8    A.   It was.
9    Q.   All right.  How long have you been an
10 employee with Chillicothe?
11   A.   Since 2004.
12   Q.   And has the onboarding and vetting process
13 changed from the time you were employed until now?
14   A.   The onboarding process has.  As far as the
15 vetting process, I only have knowledge of that since
16 I have been in an administration role, which would
17 have been 2006.  I believe it to be the same.
18   Q.   Okay.  And you started with Corizon in
19 2004; is that right?
20   A.   Yes.
21   Q.   And what was your title when you started
22 in 2004?
23   A.   Staff nurse.
24   Q.   And how long were you a staff nurse?
25   A.   Until 2006.

## Page 10

1    Q.   Then you became a --
2    A.   Director of nursing.
3    Q.   For how long?
4    A.   In 2007 I became the health services
5  administrator.  And then 2014, my current role.
6    Q.   Got it.  Thank you.
7       I think that's all of the background
8  questions for now.  I may have some later, but let's
9  start talking about some documents.
10      (Deposition Exhibit No. 36 was marked for
11 identification.)
12   Q.   (By Mr. Nugent)  I'm handing you what's
13 been marked as Deposition Exhibit 36.  We're
14 continuing numbers from previous depositions, and it
15 is Bates-labeled Corizon 33.
16      Have you seen a document like this before?
17   A.   I have.
18   Q.   Would you tell us what it is.
19   A.   It's a terminated employee files
20 checklist.
21   Q.   Okay.  And the use of the word
22 "terminated" at the top, is that signifying that the
23 employee was involuntarily terminated or that their
24 employment has been terminated?
25   A.   That their employment has been terminated.

## Page 11

1    Q.   Okay.  And who -- which employee is this
2  for?
3    A.   Terri Lablance.
4    Q.   Were you responsible for doing any
5  investigations while Ms. Lablance was employed with
6  Corizon?
7    A.   I was.
8    Q.   And when you did your investigations, did
9  you take notes?
10   A.   I don't believe I did.
11   Q.   Okay.  The reason I'm asking is if you
12 look at "file contents to be included and returned,
13 termination files," one of the items is an
14 investigation folder.  We know there were some
15 investigations done.  It says "N/A."  I just wanted
16 to understand if there was a file created and it got
17 lost or if there wasn't one created, and so that's
18 why it says "N/A."  Do you have any understanding as
19 to why it says "N/A"?
20   A.   I just know that I did not have any notes
21 from the investigation that I conducted.
22   Q.   Okay.  How many investigations did you
23 conduct with regards to Ms. Lablance?
24   A.   I believe there were three.
25   Q.   Okay.  And would you tell me the substance

## Page 12

1  of each of those three?
2    A.   Yes.  One of them involved an incident
3  with a patient where a nurse had -- the patient was
4  crawling on the floor, and the nurse -- some -- a
5  nurse was actively engaging with the patient, and
6  Ms. Lablance was witness to the incident.
7    Q.   Okay.  And the second investigation?
8    A.   Was when Ms. Lablance notified myself and
9  some other regional leadership and her site
10 leadership that she felt discriminated against.
11   Q.   Was this the bio bag incident?
12   A.   The lab tech?
13   Q.   Yes.  Involving a lab tech?
14   A.   Yes.
15   Q.   Okay.  And you investigated that.  And
16 what was the third investigation that you did in
17 relation to Ms. Lablance?
18   A.   The third, I actually was not -- I was
19 part of the investigation only because I was over
20 the facility.  The investigation was actually done
21 by my supervisor and the HR department, and that was
22 in regards to the HIPAA violation into Ms.
23 Lablance's medical record.
24   Q.   Okay.  And who was your supervisor at that
25 time?

3 (Pages 9 to 12)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 63-3   Filed 11/12/20   Page 4 of 36

## Page 13

1    A.  At that time Rhonda Almanza.
2    Q.  All right.  And if -- do you know whether
3  Rhonda took notes about that investigation?
4    A.  I do not.
5    Q.  Okay.  If she had, would they be in this
6  investigation folder that's referenced in
7  Exhibit 36?
8    A.  I don't feel I can speak to that.  If she
9  took notes, I'm not sure what she would have done
10  with them.
11    Q.  What's the purpose of this line on
12  Exhibit 36 that says "File contents to be included
13  and returned, termination files, investigation
14  folder."
15    A.  I would say any investigation regarding an
16  employee that had documentation.
17    Q.  Okay.  Those three incidents, I do want to
18  dive into, but I will come back to those.  All
19  right?
20    A.  Okay.
21      (Deposition Exhibit No. 37 was marked for
22  identification.)
23    Q. (By Mr. Nugent)  I'm handing you what's
24  been marked as Deposition Exhibit 37.  This is
25  defendant Corizon, LLC's answers and objection to

## Page 14

1  plaintiff's first interrogatories.
2      Ms. Meehan, are you familiar with this
3  document?
4    A.  Yes.
5    Q.  How are you familiar with it?
6    A.  I have reviewed it before.
7    Q.  Okay.  And did you also provide some of
8  the content for various answers?
9    A.  I did.
10    Q.  Which ones?
11    A.  Well, I believe that I reviewed the entire
12  document and advised on any of the answers that I
13  felt needed further information or correcting.
14  There aren't any that stand out to me that I made
15  any corrections to.
16    Q.  Okay.  So then did you -- is it more
17  accurate to say that you provided general
18  information related to the interrogatories here in
19  Exhibit 37 or not?
20    A.  I'm sorry.  Can you repeat that?
21    Q.  Sure.  I just want to make sure -- if you
22  go to Interrogatory No. 1, that's really what I'm
23  wanting to make sure we get some clarity on.  The
24  answer to whether -- or to who -- excuse me --
25  provided information in answering interrogatories

## Page 15

1  lists two names, Jenny Meehan, director of
2  operations, Corizon Health, and Makisa Upton, HR
3  business partner, Corizon.  Is that accurate?
4    A.  Yes.
5    Q.  Okay.  What'd you do to prepare for your
6  deposition today?
7    A.  I had a meeting with my attorney and
8  reviewed some documents.
9    Q.  Which documents did you review?
10    A.  I looked at some emails, I looked at
11  Ms. Lablance's charge -- I don't know if that's the
12  correct term or not -- her -- the document that
13  she -- with her allegations in it.
14    Q.  Oh, the actual -- the lawsuit itself?
15    A.  Yes.
16    Q.  Got it.  Any other documents?
17    A.  I don't believe so.
18    Q.  Okay.  Have you given deposition testimony
19  previously?
20    A.  I have.
21    Q.  About how many times?
22    A.  Once.
23    Q.  Oh, okay.  Was it an employment-related
24  matter?
25    A.  No.  It was patient-related.

## Page 16

1    Q.  Thank you.
2      Let's look in Exhibit 37.  And I want
3  to -- actually, give me one second, Ms. Meehan.  I'm
4  sorry.
5      I want to go to Interrogatory 11.  And the
6  question was:
7      "Identify any supervisor files that relate
8  to plaintiff's employment, including disciplinary
9  files, employment-related files, and any files
10  maintained in the ordinary course of business
11  related to plaintiff."
12      The answer by Corizon Health, LLC was,
13  "Defendant's files for plaintiff include plaintiff's
14  personnel file and application for employment," and
15  then "see response to Request for Production No. 5."
16      Are you aware of any investigation file
17  that exists about any of the incidents in
18  Ms. Lablance's employment?
19    A.  Regarding the three that I stated?
20    Q.  Let's start there, yeah.
21    A.  I believe there is a department of
22  corrections investigative file on the incident with
23  the patient.
24    Q.  Okay.
25    A.  And in regards to the two other, I did not

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP    Document 63-3    Filed 11/12/20    Page 5 of 36

## Page 17

1  take notes during the discrimination investigation,
2  and as I said, I was just kind of involved in the
3  third investigation because of my title.
4      Q.  Fair enough.  Okay.
5      So I think the answer is, you don't know
6  if there's an investigation file on, for instance,
7  the issue involving the lab technician?
8      A.  No, there is not.
9      Q.  Okay.  And then there isn't one involving
10  the HIPAA violation?
11      A.  Not that I'm aware of.
12      Q.  Okay.  Turn to Interrogatory No. 15.
13  "Identify the policies and procedures for
14  safeguarding specimen samples, proper storage of
15  specimen samples, and proper discarding of specimen
16  samples."
17          Subpart A "Identify Corizon employees who
18  have been reprimanded for specimen-related
19  violations and refractions."
20          Subpart B "Identify any Corizon employees
21  that have been reprimanded for specimen-relation
22  violations or infractions while supervised by
23  plaintiff."
24          The answer there is, "No individuals have
25  been reprimanded for specimen-related violations or

## Page 18

1  infractions, nor were they reprimanded while
2  supervised by plaintiff, because plaintiff was not
3  in a supervisory role."
4          Have I read all of that correctly?
5      A.  Yes.
6      Q.  All right.  What are the policies and
7  procedures for safeguarding specimen samples?
8      A.  I don't have the specific policy names.  I
9  know that personal protective equipment is
10  utilized -- the appropriate personal protective
11  equipment is utilized when handling specimens.
12  There's training done regarding labeling of
13  specimens and completion of paperwork for specimens.
14  Those two things are more on-the-job training than
15  written in a policy or procedure to show someone how
16  to properly do those things.
17      Q.  So with regards to any policy that Corizon
18  has, is it your testimony that one does not exist
19  for safeguarding specimen samples?
20      A.  I don't believe that one doesn't exist.  I
21  can't think off of the top of my head of what the
22  name of that would be.  We have an infection control
23  manual that I believe would have something about
24  specimen handling.  I know it talks about biohazard
25  and blood and bodily fluids or tissue for a sample

## Page 19

1  would be biohazardous that we would have training
2  on.
3      Q.  Okay.  And then would what you just
4  described also encompass storage of specimen
5  samples?
6      A.  No.  I don't believe that that would.  I
7  believe that that -- storage of specimen samples
8  would go along with on-the-job training and
9  reference from our lab company that we use, if
10  somebody were to have a question --
11      Q.  Okay.
12      A.  -- on how to store them.
13      Q.  All right.  And then what about how
14  employees are either informed or told or given
15  training on discarding of specimen samples?
16      A.  That would be part of the infection
17  control policies, because it would be biohazard.
18      Q.  Okay.  Are all medical staff trained on
19  this topic of specimen samples and safety?
20      A.  No.  Only people that would have that --
21      Q.  Come in contact?
22      A.  -- have the possibility of doing that
23  through their job duties.
24      Q.  And so would the -- would Judy Harkins, a
25  lab tech, be given that training?

## Page 20

1      A.  Yes.
2      Q.  And also that expectation to follow that
3  training?
4      A.  Yes.
5      Q.  Would Terri Lablance been given that
6  training?
7      A.  Yes.
8      Q.  And also expected to follow that training?
9      A.  Yes.
10      Q.  Okay.  Is it your understanding that
11  Judy Harkins was not reprimanded in relation to the
12  complaint that Ms. Lablance made about their
13  interaction?
14      A.  Yes.
15      Q.  Okay.  And Ms. Lablance was also not
16  reprimanded; is that right?
17      A.  Correct.
18      Q.  Okay.  Turn to Interrogatory No. 17.
19      A.  Okay.
20      Q.  The interrogatory reads:  "Identify any
21  complaints of race, harassment, or discrimination,
22  and describe the nature of such complaints received
23  as a result of the sharing of plaintiff's medical
24  records amongst Corizon staff."
25          The answer by Corizon was, "Plaintiff

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 21

1  complained to Corizon regarding access to medical
2  records on March 13th, 2019, after her employment
3  had already ended, and Corizon immediately
4  investigated and disciplined multiple employees
5  involved in the incident, which included discharging
6  Dr. Epperson and Ms. Kirby."
7       Have I read all of that accurately?
8    A.  Yes.
9    Q.  Okay.  With regards to the question, while
10  inartful, the answer appears to be related to the
11  second half of the question.  And I'm labeling the
12  second half of the question as what starts as
13  "Discrimination."  Do you see that?
14    A.  Yes.
15    Q.  Okay.  I'm sorry.  It starts with "And."
16       Have there been any complaints by
17  Ms. Lablance of race harassment or discrimination?
18    A.  Yes.
19    Q.  Okay.  How many?
20    A.  To my knowledge, one.
21    Q.  Okay.  And which one is that?
22    A.  That is of the incident with the lab tech.
23    Q.  Okay.  And that is the one that you
24  investigated; right?
25    A.  Yes.

## Page 22

1    Q.  Okay.
2    A.  I'd like to add to my direct knowledge.
3    Q.  Please.
4    A.  I've heard other -- by sitting in other
5  depositions, I'm aware of other incidents that she
6  states were reported.
7    Q.  Okay.  And what are the other ones that
8  you're aware of now?
9    A.  I recall her -- I apologize --
10  Ms. Lablance speaking about an incident with
11  security when she came in, questioning what she had
12  in her bag.  Another incident I recall her stating
13  was an officer opening her door while she was in
14  with a patient without knocking.
15    Q.  Any others?
16    A.  And I'm aware of the incident with
17  Anna Barker, the clerk.
18    Q.  Any others?
19    A.  Nothing I can think of at this time.
20    Q.  I believe we -- I believe you just listed
21  off four, one being an incident involving
22  Anna Barker; another being an incident involving a
23  security officer and the searching of her bag; the
24  third incident being an officer opening the door
25  while she was in with a patient, and then the one

## Page 23

1  that you do have direct knowledge of, because you
2  investigated it, the incident with her and the lab
3  tech?
4    A.  Yes.
5    Q.  All right.  Of the first three I
6  mentioned, Ms. Barker, security officer and her bag,
7  security officer and the opening of a door, do you
8  know whether or not those were investigated?
9    A.  I know that Anna Barker incident was
10  investigated.
11    Q.  Okay.  What about the -- do you know
12  whether or not the security -- the two security
13  incidents were investigated?
14    A.  I do not.
15    Q.  Okay.  Who would I talk to to find that
16  out?
17    A.  I don't know if they were reported.
18    Q.  Okay.  In the answer to Interrogatory
19  No. 17, it's noted that in parentheses there,
20  Ms. Lablance's complaint about the access of her
21  medical records came after her employment had
22  already ended.  Do you see that there?
23    A.  Yes.
24    Q.  Does that matter?
25    A.  No.

## Page 24

1    Q.  Okay.  Can you give me your opinion on why
2  it doesn't matter?
3    A.  It was a HIPAA violation, and HIPAA is --
4  it doesn't -- it's a federal law.  It doesn't matter
5  regarding employment.
6    Q.  Does Corizon have procedures in place to
7  protect against that type of violation?
8    A.  We have annual training regarding HIPAA.
9    Q.  Anything else?
10    A.  The medical records are password
11  protected, as far as you have to have credentials to
12  access the medical records, so not anybody could
13  just come in and look at a medical record.
14    Q.  And then in your opinion -- do you have
15  any cause for concern that that type of behavior has
16  happened to any other individuals?
17    A.  Can you repeat that?
18    Q.  Sure.  Do you have any cause for concern
19  or any reason to be concerned that Dr. Epperson and
20  Ms. Kirby accessing a record in violation of HIPAA
21  is occurring to anyone else or being done by anyone
22  else employed by Corizon?
23       If you don't understand, tell me.
24    A.  I'm just trying to think how to answer it.
25  Do I have a concern that this is happening?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 25

1    Q.  Yeah.
2    A.  Well, I'm aware that it has happened, but
3  I don't believe, routinely, that our employees
4  access medical records that they shouldn't be
5  accessing.
6    Q.  Okay.  Does this incident make you think
7  that maybe there's some broader questions that need
8  to be asked?
9    MR. MATULA:  Objection.  Vague.
10    Q.  (By Mr. Nugent)  Do you understand the
11  question?
12    A.  I understand that since this was brought
13  forward, do I think that other people are probably
14  doing the same thing?  Is that --
15    Q.  Yup.
16    A.  -- what you're asking me?
17    Q.  Absolutely.
18    A.  No, I don't believe so.
19    Q.  Thank you.  But do you know?
20    A.  No, I don't know.
21    Q.  Okay.  Ms. Meehan, I've handed you what's
22  been marked as Deposition Exhibit 38.
23    (Deposition Exhibit No. 38 was marked for
24  identification.)
25    Q.  (By Mr. Nugent)  Can you tell me what this

## Page 26

1  is?
2    A.  It appears to be a list of employees that
3  work or have worked at Chillicothe Correctional
4  Center.
5    Q.  Okay.  Did you put this together?
6    A.  No.
7    Q.  Who did?
8    A.  I don't know.
9    Q.  Okay.  At the top -- I'm sorry -- and for
10  the record, this is Corizon 986 through 988.
11    Tell me what "rehire date" means.
12    A.  That they were previously employed with us
13  and left employment and then returned.
14    Q.  And then "term date," do you know whether
15  that is voluntary or involuntary or both?
16    A.  It's all separation from the company.
17    Q.  Thank you.  And do you see action?
18    A.  Yes.
19    Q.  What is that?
20    A.  I do not know.
21    Q.  Who do I ask to find that out?
22    A.  Our HR business partner, Makisa Upton, may
23  know.
24    Q.  So is action referring to an HR-related
25  issue?

## Page 27

1    A.  I don't know.
2    Q.  Do you see "action date"?
3    A.  Yes.
4    Q.  What is that?
5    A.  I don't know.
6    Q.  Let's go to Terri Lablance's line.  She's
7  on Corizon 987.  Do you see her name there?
8    A.  I do.
9    Q.  All right.  And start date June 12, 2017;
10  right?
11    A.  Yes.
12    Q.  And then the term date and the action date
13  are different.  Does that give you any insight as to
14  what those two dates are?
15    A.  I still don't know what the action date
16  is.
17    Q.  Okay.  What is "type"?  Do you see that
18  column?
19    A.  "H" is for hourly and "S" is for salary.
20    Q.  Thank you.  And then what is "contract"
21  referring to?
22    A.  Which of Corizon's contract the employee
23  works under.
24    Q.  Is that -- so when it says "Missouri
25  contract," does that mean the contract that Corizon

## Page 28

1  has with the Missouri Department of Corrections?
2    A.  Yes.
3    Q.  Thank you.  What's "org relation"?
4    A.  How the person is categorized.  "EMP" is
5  employee.  Other relations might be a subcontractor.
6    Q.  And what would the acronym be for a
7  subcontractor?
8    A.  "SUB."
9    Q.  Okay.  I want to ask you about some of the
10  codes in here.  Do you see on the same page as
11  Ms. Lablance, Bailey Ratliff?
12    A.  Yes.
13    Q.  And it says "LPN" as a job title?
14    A.  Yes.
15    Q.  What is that?
16    A.  Licensed practical nurse.
17    Q.  Are they different than nurse
18  practitioners?
19    A.  They are.
20    Q.  Okay.  Do they have more schooling or less
21  schooling than --
22    A.  Less.
23    Q.  Less?  Okay.
24    A.  Yes.
25    Q.  Sorry for the rudimentary question.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 29

1  A.  That's okay.
2  Q.  And do you see where it says "Dismissed
3  violate rules policy"?
4  A.  Yes.
5  Q.  Do you know what rules or policy
6  Ms. Bailey violated?
7  A.  I don't recall.
8  Q.  But you do recall that employee?
9  A.  I don't.
10  Q.  Okay.  Do you know why Rebekah Shermuly
11  was dismissed?
12  A.  I don't.
13  Q.  If you would go to the first page for me.
14  Do you see Anna Barker there?
15  A.  I do.
16  Q.  What rule or policy did she violate?
17  A.  I would say harassment.
18  Q.  And then what about Joyce Gilgour?
19  A.  Hers was a performance issue.
20  Q.  And then what -- like, what type of
21  performance issue, if you remember?
22  A.  She was a clerk, and it was regarding
23  scheduling of patient care.
24  Q.  And what about Carol Holloway?
25  A.  Falsifying time records.

## Page 30

1  Q.  And Valicia Kirby?
2  A.  HIPAA violation.
3  Q.  Do you see Dr. Epperson on here -- there
4  she is.  Is that -- is that her name, Brooke?
5  A.  No.  That is not her.  I do not see her
6  name on here.
7  Q.  She should be on here; right?
8  A.  Yes.
9  Q.  And --
10  A.  Let me clarify that.
11  Q.  Okay.
12  A.  I don't know where this report came from
13  or how it was ran regarding the parameters that was
14  used to run it.  Since I believe this to be
15  employees who have worked at Chillicothe or
16  currently work at Chillicothe, I would presume she
17  should be on this list.
18  Q.  And that's fair.  And there's been some
19  talk at some point, employees can maybe go between
20  two facilities.  I think Ms. Lablance was one who,
21  in the beginning of her employment, was bouncing
22  between Crossroads and Corizon.  Does that sound
23  right?
24  A.  Crossroads and Chillicothe?
25  Q.  Yes.  Sorry.  Crossroads and Chillicothe.

## Page 31

1  A.  She may have gone to Crossroads to
2  orientate some with another nurse practitioner.
3  Q.  Okay.
4  A.  I do not recall she saw patients there on
5  her own.
6  Q.  Okay.
7  A.  To the best of my recollection.
8  Q.  And that's fair.  I guess my point was
9  really trying to get at -- I don't know who ran this
10  report, I don't know how they ran it; I just want to
11  confirm if Dr. Epperson should be on here.  It seems
12  like she should be to me, as somebody who was
13  reporting to Chillicothe.  Would you agree with
14  that?
15  A.  I would agree with that.
16  Q.  Okay.  So then are there other names that
17  aren't on here that should be?
18  A.  That's hard for me to answer, because I
19  don't know the time frame of when this report is
20  supposed to have captured individuals.
21  Q.  Let's talk about Dr. Epperson.  If she
22  were on here, what would her job title be?
23  A.  Medical director.
24  Q.  Okay.  And what would her term date be?
25  A.  The same as Ms. Kirby, so 3/25 of '19.

## Page 32

1  Q.  And what would the description be?
2  A.  Dismissed, violate rules policy.
3  Q.  And which policy and/or rule?
4  A.  HIPAA violation.
5  Q.  And what is her ethnic group?
6  A.  White.
7  Q.  The only African-American on this list is
8  Ms. Lablance; is that right?
9  A.  Yes.
10  Q.  Thank you.
11  Ms. Meehan, let's do this.  I want to dig
12  into the three incidents that you investigated, and
13  I'm going to have a bunch of questions about each
14  specific incident, just trying to go keep it in
15  order.
16  A.  Okay.
17  Q.  Before doing that, help me understand, how
18  did you learn how to do the investigation that you
19  were tasked with doing?  And, in particular, the one
20  that you did in this case for the incident with the
21  lab tech.  How did you learn how to do
22  investigations?
23  A.  When I was first a manager, we went to our
24  St. Louis office.  We had a corporate office in
25  St. Louis, and as new managers, you would go there

## Page 33

1   for a week, and we would get different aspects of
2   orientation, and one of them was HR-related issues
3   and corrective action and investigating and ...
4       Q.  So that was something put on by Corizon?
5       A.  Yes.
6       Q.  Okay.  Have you -- you became a manager or
7   supervisor in 2010?
8       A.  2006.
9       Q.  'Six.
10      A.  Uh-huh.
11      Q.  So that training happened for you in 2006,
12  approximately?
13      A.  Yes.
14      Q.  Okay.  And have you had reinstallments of
15  that training since 2006?
16      A.  No.
17      Q.  Okay.  What do you remember about that
18  training on how to do investigations?
19      A.  We did role-playing where the HR person
20  was the employee and we were the manager and learned
21  how to ask them questions about different scenarios.
22  They had scenarios set up, and what we were supposed
23  to try and find out.  And they would also coach
24  us -- you know, if we weren't getting to the right
25  information, then they would coach us through how to

## Page 34

1   ask more questions -- you know, open-ended questions
2   to get more information and to use HR as a resource
3   for investigating things that -- if we needed to.
4       Q.  Okay.  And then what types of training did
5   you receive in 2006 about documenting your
6   investigative process?
7       A.  I don't recall any specifics about
8   documenting as we investigated, just that if there
9   was an investigation that produced documentation,
10  then we would put that in a folder and it would be
11  labeled whatever the investigation was.
12      Q.  Okay.  All right.  So then in starting
13  with the first incident you investigated that
14  involved Ms. Lablance -- it's got my notes on it, so
15  don't --
16      A.  Oh, okay.
17      Q.  You're fine, though.
18          First in your list to me was patient -- a
19  patient who was crawling, and Ms. Lablance witnessed
20  it?
21      A.  Yes.
22      Q.  Okay.  Do you recall when this happened or
23  approximately when?
24      A.  I believe it would have been before
25  February of 2018, only because I recall who the

## Page 35

1   administrator was.
2       Q.  And the administrator was?
3       A.  Teresa McWhorter.
4       Q.  And so if it's before February of '18,
5   it's also after June 1 of '17?
6       A.  Yes.
7       Q.  And do you recall who the Corizon employee
8   was interacting with the patient?
9       A.  It was a nurse, Judy Davis.
10      Q.  Okay.  How did this incident come to your
11  attention?
12      A.  I believe the administrator brought it to
13  my attention, that she called me.
14      Q.  So Ms. McWhorter called you?
15      A.  Yes.
16      Q.  And what were you asked to investigate?
17      A.  What had occurred, why the patient was
18  crawling on the floor.  And, really, again, this is
19  more an investigation where I was involved by --
20  because of my title.  Once the DOC was made aware of
21  the incident, they did the actual investigation.
22      Q.  You say "involved because of your title."
23  Your title puts you in a position to kind of be that
24  person at times; is that right?
25      A.  Yes.

## Page 36

1       Q.  All right.  And was it an investigation
2   because the patient had complained or someone else?
3       A.  I don't recall if the patient complained
4   and then they -- that we started the investigation
5   or if a staff member had come and said, This is
6   going on, and the investigation started from there.
7       Q.  Okay.  And was the -- from your role in
8   the investigation, was it -- were you looking into
9   the care given to the patient, or were you looking
10  into the conduct of a Corizon employee?  I guess I
11  don't understand what you were tasked with.
12      A.  It would have been the conduct of the
13  employee --
14      Q.  Okay.
15      A.  -- regarding the care of the patient.  I
16  mean, kind of both.
17      Q.  Was the patient African-American?
18      A.  I don't believe so.
19      Q.  Okay.  Was the -- do you recall how the
20  investigation resolved itself or what the outcome
21  was?
22      A.  The department of corrections did the
23  formal investigation.  I know Corizon terminated
24  Judy Davis, the nurse who was the primary person
25  taking care of the patient.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 63-3   Filed 11/12/20   Page 10 of 36

Page 37

1      Q.  Why?
2      A.  I'm sorry?
3      Q.  Why?
4      A.  Because the patient was crawling on the
5   floor, and she wasn't doing anything to assist the
6   patient.  And I believe she threw a shoe at her, as
7   well.
8      Q.  Was the patient crawling because of
9   something Judy had done?
10      A.  No.
11      Q.  Okay.
12      A.  There were other medical staff who also
13   received corrective action for being witness to the
14   incident and not acting on the incident.
15      Q.  Who was that?
16      A.  I believe Ms. Lablance was one involved
17   who received corrective action for that.  I believe
18   there was another medical staff, but I can't recall
19   who that was.  There was a couple -- two officers, I
20   believe, also, but I don't know anything about their
21   disposition after the fact.
22      Q.  That's fair.  Do you recall what
23   corrective action Ms. Lablance received?
24      A.  I believe for not intervening in the
25   situation.

Page 38

1      Q.  And then what level of discipline?
2      A.  I believe it was a final written warning.
3      Q.  Given to Ms. Lablance?
4      A.  I believe so.
5      Q.  Okay.  Did the other medical staff person
6   receive a final written warning?
7      A.  Since I can't recall who that was, I
8   can't --
9      Q.  You don't know?
10      A.  Yes.
11      Q.  That's all right.
12        I haven't seen a final written warning
13   given to Ms. Lablance.  Would it be something that
14   should have been in her personnel file?
15      A.  Yes.
16      Q.  Okay.  Were you a part of the team that
17   assessed what level of reprimand should be given to
18   the medical staff?
19      A.  Yes, I would have been part of that
20   discussion.
21      Q.  And was it your recommendation that she
22   should receive a final written warning?
23      A.  I would say, yes, it most likely was my
24   recommendation that she receive a final written
25   warning.

Page 39

1      Q.  Okay.  Do you recall the other medical
2   staff person's name who was -- name or names that
3   were witnesses?
4      A.  I don't without --
5      Q.  Okay.
6      A.  -- looking back at the report.
7      Q.  How do you remember that Ms. Lablance was
8   involved, though?
9      A.  I believe it was in my review of
10   preparation.
11      Q.  Okay.  Which document?  Do you remember?
12      A.  I thought it was the corrective action
13   itself.
14      Q.  Okay.
15        MR. MATULA:  We've been going about an
16   hour, if you want to take a break.  I can also try
17   to get to the bottom of this document issue, because
18   I don't -- I'm not sure of the testimony, either.
19   If you want to finish up something, I just -- we've
20   been going about an hour.
21        MR. NUGENT:  How are you doing?  Do you
22   need a break?
23        THE WITNESS:  I could take a break.
24        MR. NUGENT:  Then let's take a break.
25        VIDEOGRAPHER:  We are off the record.  The

Page 40

1   time is 12:54 p.m.
2        (A recess was taken.)
3        VIDEOGRAPHER:  We are back on the record.
4   The time is 2:00 p.m.
5      Q.  (By Mr. Nugent)  Ms. Meehan, we are back on
6   the record after a short break.  You understand that
7   you are still under oath; right?
8      A.  Yes.
9      Q.  To tell the truth?
10      A.  Yes.
11      Q.  All right.  And I forgot to ask you this,
12   but you're not taking any medication that could
13   impact your ability to remember, are you?
14      A.  No.
15      Q.  Okay.  So you're of clear mind?
16      A.  Yes.
17      Q.  All right.  I know that we were diving
18   into the investigations that you've done, and we
19   were wrapping up with regard to the investigation
20   involving a patient and Ms. Davis that Ms. Lablance
21   witnessed.  What I want to confirm, did you take
22   notes in that investigation?
23      A.  I did not.
24      Q.  Okay.  Would you grab the exhibit with all
25   of the names of Chillicothe employees.  Is that 38?

10 (Pages 37 to 40)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 63-3   Filed 11/12/20   Page 11 of 36

## Page 41

1   A.  Yes.
2   Q.  And is Judy Davis's name on there?
3   A.  Yes.
4   Q.  Okay.  And what's the reason for her
5   termination?
6   A.  Dismiss, client lockout.
7   Q.  What does that mean?
8   A.  That DOC revoked her clearance to enter
9   the facility.
10  Q.  Is that a reprimand of the DOC or a
11  reprimand of Corizon?
12  A.  If their clearance is revoked to enter the
13  facility, they can no longer be employed with us
14  because they can't enter the facility.
15  Q.  So you need one --
16  A.  Yes.
17  Q.  -- with the other?
18  A.  (Witness nods.)
19  Q.  Okay.  Under her is Edna DeCastro, was
20  also dismissed, client lockout.  What did Edna do?
21  A.  To the best of my recollection, the site
22  administration had concerns regarding her patient
23  care.
24  Q.  And then the DOC said she couldn't come?
25  A.  Correct.

## Page 42

1   Q.  Which meant Corizon had to let her go?
2   A.  Correct.
3   Q.  Do you recall how the DOC found out?
4   A.  I don't.
5   Q.  Okay.  Do you know whether or not the
6   department of corrections in their investigation
7   took notes?
8   A.  I do not.
9   Q.  And what I mean by "took notes," I'm
10  referring to the incident involving Judy Davis.  Let
11  me ask it again.  We like to keep that clear.
12      Do you know if the department of
13  corrections, in investigating the incident involving
14  an inmate/patient and Judy Davis was -- there were
15  notes taken by the department of corrections?  Do
16  you know whether or not there were?
17  A.  I do not know if there were.
18  Q.  Thank you.  We're going to depart for just
19  a little bit from the three incidents you
20  investigated, and we're going to talk about
21  Ms. Barker.  All right?
22  A.  Okay.
23  Q.  But prior to that, when you concluded your
24  investigation involving Judy Davis and Ms. Lablance,
25  did you, like, draft a conclusion document with a

## Page 43

1   recommendation?
2   A.  No.
3   Q.  Okay.  Why not?
4   A.  The investigation was conducted by DOC.
5   Q.  Understood.  Let's talk about Ms. Barker.
6   The documents are going to be in this stack, and it
7   should have 12 in the bottom corner.  Do you have
8   one?  Because I've got it --
9   A.  Thank you.
10  Q.  There you go.
11      How did you first become aware of the
12  conversation between Ms. Lablance and Ms. Barker?
13  A.  The health service administrator contacted
14  me.
15  Q.  And that was Teresa McWhorter?
16  A.  Yes.
17  Q.  All right.  Did she contact you by phone
18  or email?
19  A.  I don't not recall.
20  Q.  What did you do after that conversation
21  with Ms. McWhorter?  What is the next thing you did?
22  A.  I would have advised her to give -- get
23  statements of witnesses.
24  Q.  Okay.  So let's look at page -- it says
25  Corizon 4.  It's the second page.

## Page 44

1      This is an email from Teresa McWhorter to
2   Heather Dale and Jenny Meehan.  Who is Heather Dale?
3   A.  HR.
4   Q.  And --
5   A.  I don't recall her exact title.
6   Q.  That's fine.  And there's an attachment
7   that says -- or that is RFT.  What's RFT?
8   A.  Recommended for termination.
9   Q.  Okay.  So who is making the
10  recommendation?
11  A.  Teresa.
12  Q.  All right.  Do you have any say in that
13  recommendation?
14  A.  Yes.
15  Q.  What say is that?
16  A.  I'm -- at the time, I was one of the final
17  approvers for termination.
18  Q.  Okay.  Who were the final approvers for
19  termination?
20  A.  It would have been Heather Dale, myself,
21  and it looks like Cindy Schupp.
22  Q.  And where do you see that -- or how do you
23  know that?
24  A.  When Heather sent the final form, her
25  email here that she concurs with the RFT for

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 63-3   Filed 11/12/20   Page 12 of 36

## Page 45

1   Anna Baker, use this as an official copy.  She asked
2   for mine and Cindy's concurrence.
3        Q.   Thank you.  Do you know if Cindy
4   concurred?
5        A.   I believe so.
6        Q.   Okay.  Why do you believe so?
7        A.   Because Anna Barker was terminated.
8        Q.   Did it take all three of you?
9        A.   It did.
10       Q.   Okay.  If one of you objected, what
11   happens?
12       A.   There would be further discussion on why
13   that person doesn't agree that termination is the
14   appropriate avenue.
15       Q.   Okay.  And then as a result of that
16   conversation, what happens?  Let me ask it a
17   different way.
18        Who is the trump card?  Who gets to say it
19   happening, even if there's dissent?
20       A.   The vice president of operations.
21       Q.   Which is who?
22       A.   I don't recall if in August of 2017 if
23   Ralf Salke was still the vice president of
24   operations or if Rhonda Almanza was.  I can't
25   recall.

## Page 46

1        Q.   Okay.
2        A.   Who was the VPO at that time?
3        Q.   But, ultimately, if Heather Dale, Jenny
4   Meehan, and Cindy Schupp don't all agree --
5        A.   Uh-huh.
6        Q.   -- the three of you take the issue to
7   either Ralf Salke or -- the other name?
8        A.   Rhonda Almanza.
9        Q.   Rhonda Almanza.  Is that right?
10       A.   Yes.
11       Q.   Okay.  Have you had situations where that
12   has had to occur?
13       A.   Not that I can recall.
14       Q.   Okay.  Why did you recommend termination?
15       A.   Because her comments violated the
16   harassment policy.
17       Q.   Prior to making that recommendation, did
18   you review all of the statements?
19       A.   Yes.
20       Q.   Which includes Ms. Barker's statement,
21   which is the last document in that packet.  Do you
22   see that?
23       A.   Yes.
24       Q.   Do you see where the subject says "Words
25   out of context"?

## Page 47

1        A.   Yes.
2        Q.   Do you know if she was told to write that
3   or not?
4        MR. MATULA:  Vague.  As to the statement
5   entirety or that specific line?
6        Q.   (By Mr. Nugent)  Do you know what I'm
7   talking about?
8        A.   Are you referring to the subject?
9        Q.   Great question.  The subject "words out of
10   context" in that phrase right there, do you know if
11   that was what she was told to put down, or did she
12   write that herself -- come up with that on her own?
13       A.   I don't know.
14       Q.   You don't know.  Fair enough.
15        What's your opinion of her statement?
16       A.   Awful.
17       Q.   Her statement is awful or what she said
18   was awful?
19       A.   Oh.  What she said was awful.
20       Q.   Okay.  I want to get your synopsis of what
21   happened.  What's your opinion of that?
22        MR. MATULA:  I'm going to object as vague.
23   There's some aspect of that that I think is vague,
24   but go ahead.  Do your best.
25       Q.   (By Mr. Nugent)  Do you understand my

## Page 48

1   question?  If you don't, tell me.  I'm not trying to
2   trick you, really.
3        A.   Can you repeat it, please?
4        Q.   Yeah.  She -- this is Ms. Barker's account
5   of what happened.  I'm asking you, in general,
6   what's your opinion of her account?
7        MR. MATULA:  It's -- you do your best.
8   It's still vague.  I mean, aspects of -- I don't
9   want to get in your record with a speaking
10   objection, but it's vague in a lot of ways.
11        MR. NUGENT:  Thank you.
12       A.   Her opinion -- my opinion of her account?
13       Q.   Let's do it this way -- it's okay.  It
14   doesn't have to be harder than it is.
15        Follow along with me.  All right?
16       A.   Okay.
17       Q.   I am towards the top where it says "I
18   replied."
19        "I replied, 'It is the antenna off my
20   radio that I had nigger-rigged up in my room so my
21   radio would come in.'"
22        That's the first time she says it right
23   there.  What's your opinion of that?
24       A.   That she's reporting what she said.
25       Q.   Okay.  She's reporting it.  All right.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 4:19-cv-00693-BP   Document 63-3   Filed 11/12/20   Page 13 of 36

## Page 49

1  And then "Lablance said, 'What,' so I repeated it
2  again."
3        Earlier while you were in here,
4  Dr. Lovelace said he didn't believe Ms. Barker's
5  statement because there had been training, and, in
6  particular, the part at the end where it says "I did
7  not know that I could get in trouble for what I said
8  until I got called to your office."
9        Do you believe Ms. Barker is telling the
10  truth?
11        MR. MATULA:  Objection.  Vague.  On what
12  exact part?
13        MR. NUGENT:  I just read it.
14        MR. MATULA:  Why do you want it?
15        MR. NUGENT:  "I didn't know I could get in
16  trouble for what I said until I got called to your
17  office."
18        MR. MATULA:  Okay.  Well, a couple of
19  things.  That accurately summarizes Dr. Lovelace's
20  testimony, and in your last question, you're
21  referring to other parts of the statement that
22  included but was not limited to that one sentence.
23  So you're asking her a different question than you
24  asked Lovelace in referring to his answer.
25        MR. NUGENT:  Thank you.

## Page 50

1        Q. (By Mr. Nugent)  Ms. Meehan, do you believe
2  that Ms. Barker didn't know she could get in
3  trouble?
4        A.  No, I do not.
5        Q.  Why?
6        A.  Because we provide training regarding
7  harassment.
8        Q.  Do you believe that -- well -- I'm not
9  going to ask that.
10        Were you -- what was your role in
11  reviewing -- or did you review what Ms. Meehan had
12  done to investigate this?
13        A.  I reviewed the statements that she
14  obtained, and there was a discussion with Teresa and
15  myself and HR regarding the incident.
16        Q.  Okay.  Were you satisfied with what
17  Ms. McWhorter had done to investigate this?
18        A.  Yes.
19        Q.  All right.  As we discussed, the three of
20  you -- you, Ms. Dale, and Ms. Schupp -- all agreed
21  on the recommendation for termination; right?
22        A.  Yes.
23        Q.  And I believe that that is on Corizon 5.
24  Will you turn to that for me?
25        Do you see where it says "Date of previous

## Page 51

1  corrective action"?
2        A.  Yes.
3        Q.  And there are a couple of items there.
4  "Date of first written counseling, N/A."  Is that
5  not applicable?
6        A.  It is.
7        Q.  And then also for -- it's not applicable
8  for "Second written counseling or a final written
9  warning."
10        Does Corizon have a progressive discipline
11  model?
12        A.  We do.
13        Q.  And can you skip steps?
14        A.  You can.
15        Q.  Was this one that warranted skipping
16  steps?
17        A.  Yes.
18        Q.  In the middle of the paragraph below where
19  we just were, it says, "This personal misconduct is
20  detrimental to the rights and safety of herself,
21  coworkers, institutional employees, and inmates."
22        What rights?
23        A.  To be treated respectfully and
24  professionally in the workplace.
25        Q.  Okay.  Were you present for Ms. Barker's

## Page 52

1  termination?
2        A.  I don't believe so.
3        Q.  Okay.  Do you know if statements -- do you
4  know if that particular phrase had been used
5  before -- before this?
6        A.  Not to my knowledge.
7        Q.  Okay.  After the termination of
8  Ms. Barker, were you satisfied that that was all
9  that needed to be done for this incident?
10        A.  Yes.
11        Q.  Okay.  Were there any other -- was there
12  discussion about any other steps or actions to be
13  taken outside of the termination?
14        A.  Not that I recall.
15        Q.  Did anyone discuss whether training should
16  happen as a result of this?
17        A.  Not that I recall.
18        Q.  Okay.  If it had -- if that discussion had
19  happened, would you remember it?
20        A.  I believe if that discussion had happened,
21  the training would have happened, and we would have
22  documentation that that occurred.
23        Q.  Were you a part of Ms. Lablance's
24  interview process?
25        A.  No.

13 (Pages 49 to 52)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP    Document 63-3    Filed 11/12/20    Page 14 of 36

## Page 53

1      Q.   Okay.  What about her on-boarding process?
2      A.   No.
3      Q.   Okay.  When did you become aware that she
4   was an employee?  When's the first time you became
5   aware?
6      A.   I am copied on email correspondence from
7   the recruiters to the sites, so I would have been
8   aware that they were pursuing her and getting her
9   ready for employment.
10     Q.   Understood.  At the time that the
11  Anna Barker incident and Ms. Lablance's conversation
12  happened, did you have any concerns about the timing
13  of it, in that it's in August of '17, and
14  Ms. Lablance started in June of '17?
15     A.   No.
16     Q.   Okay.  Let's talk about, Ms. Meehan --
17  Hollie Hild.  I believe this is in there -- this
18  exhibit is in there at 13.
19          Are you familiar with Hollie Hild?
20     A.   I am.
21     Q.   And is that through your employment at
22  Corizon?
23     A.   Yes.
24     Q.   She still employed with Corizon?
25     A.   No.

## Page 54

1      Q.   When did she leave?
2      A.   May of '18, maybe the first week of June
3   of '18.  It was ...
4      Q.   Okay.  So not long after Exhibit 13 was
5   created?
6      A.   Correct.
7      Q.   This is a memo in a file done by Ms. Hild.
8   And in regards to issue, as Ms. Hild says,
9   "Unprofessional behavior during a provider meeting
10  on 4/26 of '18."
11          Did you speak with Ms. Hild about this?
12     A.   Not that I recall, this incident.
13     Q.   Okay.  Was there another incident that you
14  talked to Ms. Hild with regarding Ms. Lablance?
15     A.   No.
16     Q.   Okay.  Did you talk with Ms. Lablance at
17  all about Ms. Kirby throwing a pen or a pencil in a
18  meeting?
19     A.   No.
20     Q.   Are you aware of whether or not Ms. Kirby
21  threw a pen or pencil in a meeting?
22     A.   No.
23     Q.   Lastly on Exhibit 13, do you see there's
24  handwriting towards the bottom right-hand corner?  I
25  think that's "LC."  Is that what you would take away

## Page 55

1   as --
2      A.   Yes.
3      Q.   Okay.  And then what's the one under that?
4   Do you know?
5      A.   HH.
6      Q.   And what is that?
7      A.   Hollie Hild.
8      Q.   Got it.  Okay.  Thank you.
9          All right.  If you would grab Exhibit 15.
10  All right.  And Exhibit 15 is in relation to the
11  incident or report by Ms. Lablance about her
12  interactions with the lab tech, and I believe the
13  lab tech's name is Judy Harkins.  Does that ring a
14  bell?
15     A.   Yes.
16     Q.   All right.  And is Judy Harkins still
17  employed with Corizon?
18     A.   Yes.
19     Q.   Okay.  As a lab tech?
20     A.   No.
21     Q.   What is her title?
22     A.   Clerk.
23     Q.   What is a clerk?
24     A.   She does filing in the medical records.
25     Q.   Oh.  Why did she change jobs?  Do you

## Page 56

1   know?
2      A.   We eliminated the lab tech position at the
3   Chillicothe Correctional Center.
4      Q.   Why?
5      A.   Declining patient population.
6      Q.   Okay.  Did you eliminate lab techs
7   anywhere else?
8      A.   Not at any of my facilities.
9      Q.   Okay.  Are you aware of whether lab techs
10  were eliminated anywhere else in Missouri?
11     A.   I'm not aware.
12     Q.   And your facilities are seven; is that
13  right?
14     A.   Yes.
15     Q.   And how many total are there?
16     A.   Twenty-two.
17     Q.   Who made that decision to eliminate the
18  lab tech position?
19     A.   The directors of operation each reviewed
20  their staffing documents and looked at -- we were
21  tasked with looking at where we might be able to
22  decrease staffing, and we provided input of the
23  positions that we thought we could maintain our
24  productivity but not have, and then the decision was
25  made at a higher level -- I'm not sure if it was our

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 57

1 higher regional office level or the higher corporate
2 level. I'm not sure about that.
3     Q. Got it. Who does Judy's duties now?
4     A. The X-ray tech.
5     Q. Okay. So the X-ray tech serves as the lab
6 tech, as well?
7     A. Correct.
8     Q. Did Ms. Harkins receive a reduction in
9 pay?
10     A. I do not believe so.
11     Q. Okay. Was there a special training
12 required to be a clerk -- I'm sorry -- a clerk;
13 right?
14     A. Clerk, yes. No.
15     Q. What about -- is there special training to
16 be a lab tech?
17     A. Yes.
18     Q. In an organizational chart, with a
19 hierarchy, would the lab tech be above the clerk?
20     A. No.
21     Q. Okay. Are they on the same line?
22     A. Yes.
23     Q. Thank you.
24     Turn to Corizon 23 of Exhibit 15. Do you
25 see the sentence that starts with "The lab tech

## Page 58

1 refused"?
2     A. Yes.
3     Q. All right. "The lab tech refused to
4 complete the requisition and took the specimen to my
5 office and sat it on my desk while stating, 'I told
6 you not to set that on my desk.'"
7     Have I read that correctly?
8     A. Yes.
9     Q. With regards to the training and
10 infectious disease policies we talked about earlier,
11 is that action by the lab tech something that would
12 fall in that conversation?
13     A. I don't believe so. Sorry.
14     Q. No, you're fine. You're fine.
15     You said you don't believe so. Could you
16 tell me why?
17     A. The specimens are contained in a tube or
18 in a specimen cup, depending on what it is, so I
19 don't think setting a vial or a specimen cup would
20 be an infection control issue.
21     Q. Do specimens need to be stored somewhere?
22 Do you know?
23     A. They do, depending on the specimen, but we
24 don't typically store them. The lab picks them up
25 Monday through Friday, so they're collected,

## Page 59

1 prepared, and picked up all in the same day,
2 generally.
3     Q. I see. Who is the company that picks them
4 up?
5     A. I don't know the company. It's a courier
6 service that the lab contracts with.
7     Q. Okay. And so if a specimen is taken, it's
8 put into a tube or a cup, and then between the time
9 it's taken and the time it's picked up by this
10 company, where does it go or what should happen with
11 it?
12     A. They're in a lab room.
13     Q. In a lab room?
14     A. Uh-huh.
15     Q. Okay. Do specimens in a cup or a tube
16 need to be put into a refrigerator or anything?
17     A. Some do.
18     Q. Okay. Some do; some don't?
19     A. Yes.
20     Q. Is that fair?
21     A. Yes.
22     Q. I'm not trying to trip you up, I just
23 don't know.
24     A. Yes.
25     Q. So I appreciate that.

## Page 60

1 Do you know whether the specimen that
2 Ms. Lablance is talking about in this email needed
3 to be in a refrigerator or not?
4     A. I do not.
5     Q. Okay. As a part of your investigation,
6 did you ask that question?
7     A. No.
8     Q. Okay. Is that something that, in your
9 opinion, would be relevant to your investigation?
10     A. No.
11     Q. Okay. Skip down a couple of lines. I'm
12 still on page 23.
13     "I asked her to fill out the requisition
14 and prepare the specimen for processing. She walked
15 out of the lab, passed me directly to my office, and
16 basically refused to do her job."
17     Did you have this email at your disposal
18 when you were doing the investigation?
19     A. Yes.
20     Q. Okay. Did you ask the lab tech about this
21 part of the email that I just read?
22     A. I don't recall.
23     Q. And you don't have notes, so we can't look
24 there; right?
25     A. Correct.

ALARIS LITIGATION SERVICES
www.alaris.us      Phone: 1.800.280.3376      Fax: 314.644.1334

## Page 61

1    Q.   Okay.  On the next page at the top, which
2    is Corizon 24, it says:
3         "I, unfortunately, have had this issue
4    with this lab tech in the past and have previously
5    asked that it be addressed."
6         Did you ask Ms. Lablance about this part
7    of the e-mail?
8    A.   Yes.
9    Q.   And did she indicate to you who she asked
10   that it be addressed?
11   A.   Yes.
12   Q.   Who was that?
13   A.   Hollie Hild.
14   Q.   And what was Ms. Lablance's response
15   regarding what Ms. Hild did or did not do?
16   A.   I don't believe she thought it had been
17   addressed.
18   Q.   Ms. --
19   A.   I don't believe that Terri thought the
20   issue had been addressed --
21   Q.   Understood.
22   A.   -- by Hollie.
23   Q.   Okay.  Was Hollie still employed at this
24   time with Corizon?
25   A.   No.

## Page 62

1    Q.   Okay.  What impact did the information
2    about Ms. Lablance telling Hollie Hild have on you
3    as the investigator?
4    A.   That Terri is and Judy had had a previous
5    issue.
6    Q.   The next sentence says:  "I have asked
7    other coworkers, providers, and the medical
8    director, Dr. Epperson, if they complete lab
9    requisitions when ordering lab, and they have all
10   denied having a problem with this individual
11   completing requisitions and processing specimens for
12   the testing when ordering lab."
13        Did you talk to Ms. Lablance about that
14   sentence?
15   A.   I did.
16   Q.   Okay.  Tell me what or how that part of
17   the conversation went.
18   A.   I spoke with Dr. Epperson and Ms. Kirby
19   about the requisitions, and they advised that they,
20   at times, did complete the requisitions, and so I
21   had shared that with Ms. Lablance.
22   Q.   Okay.  Do you remember the order in which
23   you talked to individuals in this investigation?
24   A.   I don't.
25   Q.   Okay.  Do you know or recall if

## Page 63

1    Ms. Lablance was the first person you talked to?
2    A.   No.  I don't recall.
3    Q.   Okay.  Do you recall if Ms. Lablance was
4    the last person you talked to about this and your
5    investigation -- or during your investigation?
6    A.   During the investigation?
7    Q.   Yes.
8    A.   I don't believe so.
9    Q.   Okay.
10   A.   I don't recall the order, but I believe I
11   spoke with Terri and Judy first to get the
12   information regarding what occurred and then spoke
13   with the other two providers, but I don't recall an
14   exact order.
15   Q.   Okay.  Did you write any conclusion?
16   A.   I did.
17   Q.   And where is that?
18   A.   I believe it's in this email chain on
19   Corizon 22.  There's an email that I wrote to
20   Heather Dale, who is HR; Sterling Ream, who was the
21   health services administrator; Jeffrey Lovelace, who
22   was the regional medical director; Cindy Schupp is
23   the senior director of operations; and Rhonda
24   Almanza was the vice president of operations.  And
25   all of those people were included on the email

## Page 64

1    because that's who Ms. Lablance had written her
2    email to, except for Heather Dale, who was HR.
3    Q.   Okay.  And where in your conclusion email
4    dated June 11th, 2018, at 10:12 a.m. do you discuss
5    the actions of the lab tech?
6    A.   I don't have specifics in there regarding
7    that.
8    Q.   Okay.  After your email, there is an email
9    from Rhonda Almanza that's the next day, June 12th,
10   at 9:55 a.m. to the same group of individuals, and
11   she says "Have we talked with the employee who made
12   the claim?"
13        Tell me, in your opinion -- why did you --
14   or what impression did you have by that question
15   coming from Rhonda Almanza?  Because you responded;
16   right?
17   A.   Yes.
18   Q.   Why did you feel the need to respond?
19   A.   Because she asked a question.
20   Q.   Okay.  Was her question directed to you?
21   A.   That was my belief, yes.
22   A.   All right.  I'm just a little confused by
23   her question, though, because your first sentence of
24   your conclusion email says "I have discussed this
25   with Ms. Lablance."

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 63-3   Filed 11/12/20   Page 17 of 36

Page 65

1    So forgive my confusion, I just want to
2 get some understanding.
3    What gives you the impression that
4 Ms. Lablance was not satisfied with your
5 investigation?
6    A.  I believe she was convinced she was the
7 only provider the lab tech was having write the
8 requisitions, even after the investigation.
9    Q.  Okay.  And you say in your response to
10 Ms. Almanza that you believe the situation is a
11 communication issue between Terri and the lab tech,
12 not a discrimination issue.  Have I read that
13 correctly?
14    A.  Yes.
15    Q.  Can you tell me why you believe that?
16    A.  Because Judy is -- can be a difficult
17 personality, and if she believes that she is correct
18 about something, she doesn't always display the most
19 professional behavior.
20    Q.  Okay.
21    A.  And so I believe with Ms. Lablance taking
22 the lab to her and her belief that Judy should
23 process the lab, but Judy's belief that Ms. Lablance
24 should process the lab requisition, that the
25 communication was not there.

Page 66

1    Q.  Okay.  Has Judy been disciplined for
2 her -- I'm forgetting the phrase you used, but has
3 she been disciplined for her conduct?
4    A.  I don't get every corrective action on
5 every employee, so I'm not sure if she's been
6 addressed regarding her conduct.
7    Q.  Okay.  Does Judy fall under your
8 supervision?
9    A.  Indirectly, yes -- or removed.
10    Q.  You say that you reviewed about a 5- to
11 6-inch stack of requisitions.  What conclusion did
12 you have as a result of reviewing that 5- to 6-inch
13 stack?
14    A.  That most of the requisitions, Judy
15 completed, and there were some that had been
16 completed by all three providers.
17    Q.  How many?
18    A.  I don't have an exact number.
19    Q.  Did you write that down anywhere?
20    A.  No.
21    Q.  On the first page of Exhibit 15, which is
22 Corizon 20, in response to your email, Dr. Lovelace
23 says -- it looks like at 9:46, so six minutes
24 later -- no, four minutes later:
25    "I think awareness alone will have a

Page 67

1 significant benefit.  People tend to behave better
2 when they think someone is watching."
3    What did you think when you received his
4 email?  What did you think -- what -- yeah.  What
5 did you think?
6    A.  That the investigation was complete.
7 There was nothing further to do.
8    Q.  Did you understand who he was talking
9 about when you received it?
10    A.  I believed at the time he was talking
11 about the two employees, Judy and Ms. Lablance.
12    Q.  How did Judy and Ms. Lablance get along
13 after this incident?
14    A.  I was not made aware of any further
15 issues.
16    Q.  Okay.  Do you know if Ms. Lablance --
17 excuse me.  Do you know if Judy is one of the
18 employees who reviewed Ms. Lablance's medical
19 record?
20    A.  Not to my recollection.
21    Actually, I'd like to restate my answer.
22    Q.  Please.
23    A.  No, Judy Harkins was not one of the
24 employees who accessed Ms. Lablance's medical
25 record.

Page 68

1    Q.  Do you know whether she saw it?
2    A.  That, I do not know.
3    Q.  Okay.  So I want to look at Exhibit 37,
4 which is Corizon's interrogatory answers that you
5 helped with.  And, specifically, Interrogatory
6 No. 7.
7    Look at the answer, and specifically I
8 want to start at the sentence that says, "The
9 results of the investigation."  Do you see that?
10    A.  Yes.
11    Q.  All right.  "The results of the
12 investigation did not suggest that there were
13 inappropriate conduct, much less discriminatory
14 animus."
15    When it says "inappropriate conduct," are
16 they referring to the -- who is that referring to?
17    A.  I would say Judy.
18    Q.  Okay.  The next sentence:
19    "To the contrary, a thorough review of
20 requisitions indicated" -- with regards to that view
21 of requisition, do we know the date range?
22    A.  I don't have the date.
23    Q.  Okay.  It says that "Every request made by
24 Ms. Lablance had been run by the lab tech."
25    How do you know that?

17 (Pages 65 to 68)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 63-3   Filed 11/12/20   Page 18 of 36

## Page 69

1      A.  That the lab results were present in the
2  medical records of the patients.
3      Q.  And so you found out through your
4  investigation that every request made by
5  Ms. Lablance had been run by the lab technician?
6      A.  Yes.  That the results were in the medical
7  record.
8      Q.  Okay.  And then it says, 2 -- No. 2:
9      "The paperwork requested was routine
10  paperwork necessary for medical providers to fill
11  out prior to lab tests, because it included
12  information that only the provider making the
13  request would know; i.e., Ms. Lablance in this
14  situation."
15      Can you explain that to me?
16      A.  The lab requisition has to have
17  information on -- like where the -- how the specimen
18  was obtained.  And since Ms. Lablance was the one
19  who obtained the specimen, she would have been the
20  one with that information.
21      Q.  And is that -- at the time that
22  Ms. Lablance goes to give the sample to the lab
23  technician, is that information required?
24      A.  Yes.  The lab requisition should be with
25  the sample.

## Page 70

1      Q.  Okay.  The answer goes on to state that
2  the review also showed that Ms. Lablance should have
3  been familiar with the paperwork, having completed
4  it for other requests.
5      Was there a concern of yours that
6  Ms. Lablance did not know how to fill out the
7  paperwork or do the process?
8      A.  No.
9      Q.  Did you confirm with Judy whether she took
10  the sample to Ms. Lablance's desk and placed it
11  there?
12      A.  I believe I did.
13      Q.  But you don't know?
14      A.  I can't recall for sure.
15      Q.  Is that important information in your
16  analysis?
17      A.  I don't think her placing the sample back
18  on Terri's desk was important in regards to the
19  discrimination that Terri was saying was occurring.
20  I believe that the piece of that that was important
21  was that Terri believed she -- Judy was only having
22  her complete the requisitions because of her color,
23  instead of the other providers, as well, so that was
24  my focus, that she wasn't just making Terri fill out
25  the requisitions.

## Page 71

1      Q.  What did Ms. Lablance say about Judy
2  putting the sample on her desk when you talked to
3  her?
4      A.  I believe just the fact that she had done
5  that, and that that was part of her behavior,
6  bringing the lab into her -- taking the lab in to
7  her officer, and setting it on her desk was just
8  part of her, I'm not going to do it.
9      Q.  You said you believe.  Do you know?
10      A.  It is hard to recall a conversation that
11  happened over a year ago, but -- so I don't know
12  100 percent.
13      Q.  That's fair.  I appreciate that.
14      You mentioned that during your
15  investigation of this incident involving Judy and
16  Ms. Lablance, that Ms. Lablance told you had
17  spoken to Ms. Hild previously.  Was there a file
18  that Ms. Hild kept or an email that Ms. Hild sent
19  that you're aware of?
20      A.  Not that I'm aware of.
21      Q.  Okay.  Do you know -- did you talk to
22  Ms. -- did you talk to Judy about that piece -- and
23  what I'm referring to is, did you ask -- let me ask
24  it a better way.
25      Did you ask Judy about the prior incident

## Page 72

1  that Ms. Lablance was referring to?
2      A.  No.
3      Q.  Okay.  Why not?
4      A.  Because the investigation that I was
5  looking at was what had just occurred and what
6  was -- if it was a discrimination issue.
7      Q.  Is -- I'm sorry.  Go ahead, if you have
8  more.
9      A.  I don't recall that Ms. Lablance indicated
10  that the previous issue she felt was a
11  discrimination issue or just a "I'm not going to do
12  that" issue.
13      Q.  Okay.  In your training in 2006, did the
14  trainers discuss other incidents, you know, playing
15  a part or playing a role in investigations?
16      A.  Did we role play investigation?
17      Q.  No.  I'm sorry.  Let me ask it a different
18  way.
19      When you were training in 2006, was there
20  any training on how other instances or other prior
21  interactions could play a role in what you're
22  currently investigating?
23      A.  I don't recall that being part of the
24  training.
25      Q.  Okay.  As you sit here today, do you think

18 (Pages 69 to 72)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP    Document 63-3    Filed 11/12/20    Page 19 of 36

## Page 73

1  it would have been relevant to ask Ms. Judy about
2  that prior incident that Ms. Lablance was referring
3  to?
4      A.  I don't believe so.
5      Q.  Okay.  Why not?
6      A.  I -- due to my knowledge of Judy's
7  personality, I just believe that that wouldn't have
8  had an impact on our investigation.
9      Q.  Okay.
10         MR. NUGENT:  Let's take a break.
11         VIDEOGRAPHER:  We are off the record.  The
12  time is 3:01 p.m.
13         (A recess was taken.)
14         VIDEOGRAPHER:  We're back on the record.
15  The time is 3:12 p.m.
16      Q.  (By Mr. Nugent)  Ms. Meehan, we are back
17  from a short break.  You understand you're still
18  under oath?
19      A.  I do.
20      Q.  And to tell the truth?
21      A.  Yes.
22      Q.  Okay.  Were there -- we were looking at
23  Exhibit 15, I believe.  Is that the packet about the
24  lab tech incident?
25      A.  Yes.

## Page 74

1      Q.  And my question is, are there emails
2  outside of that packet that you remember sending or
3  receiving about the lab tech incident?
4      A.  There was an email Terri forwarded me that
5  she had sent Hollie about the previous incident, but
6  nothing regarding this incident.
7      Q.  Okay.  When Terri forwarded you the email
8  you just referenced, was that during the
9  investigation for your investigation?
10      A.  Yes.  Because she had brought it up that
11  this wasn't the first time, and she had reported to
12  me that she had told Hollie, and I asked her if she
13  had that, and she provided it to me.
14      Q.  Okay.  Did she give you that email --
15  like, when in your investigation?  Beginning,
16  middle, end?  Do you recall?  Because I don't have
17  it, either.
18      A.  I don't recall.
19      Q.  And I think it sounds pretty relevant to
20  the issue at hand, so ...
21         In the email that Ms. Lablance forwarded
22  you, did Ms. Hild respond?  Do you recall seeing a
23  response?
24      A.  I don't recall seeing a response.  I
25  believe it was Ms. Lablance's email to Hollie that

## Page 75

1  she sent me.
2      Q.  (By Mr. Nugent)  Thank you.
3         Did Ms. Lablance indicate one way or
4  another if Hollie had a conversation with
5  Judy Harkins as a result of Terri's email?
6      A.  I don't recall more saying one way or the
7  other.
8      Q.  Are you aware of any other complaints from
9  Corizon staff about Judy?
10      A.  No.  I can't think of any that have -- no.
11      Q.  Okay.  Turn to Interrogatory 13, please.
12  This interrogatory says "Identify the policies and
13  procedures regarding medical records including which
14  employees have access to medical records, the
15  determination of who, when an individual becomes a
16  patient of defendant Corizon, and a list of
17  defendant Corizon's acceptable uses of patient and
18  nonpatient medical records."
19         The answer:  "All Corizon health staff at
20  the DOC Chillicothe facility have access to inmate
21  records pursuant to the successful completion of
22  HIPAA training and the post training test.  See
23  Corizon 495 to 523."
24         Is there a specific policy for which
25  employees have access to medical records?

## Page 76

1      A.  There is a policy on medical records.  I
2  believe it speaks more to who shouldn't have access,
3  such as DOC staff, than to who can have access.
4      Q.  Does that policy speak to when an
5  individual becomes a patient of Corizon?
6      A.  No, it does not.
7      Q.  Okay.  When does an individual become a
8  patient of Corizon?
9      A.  When they enter a DOC facility.
10      Q.  Regardless of if they have been seen by a
11  Corizon provider or not?
12      A.  Once they are sentenced to prison, they're
13  brought into an intake center and they are seen by a
14  nurse within 12 hours, and so that's what I mean
15  by --
16      Q.  Got it --
17      A.  -- when they come into prison.
18      Q.  That's helpful.  Thank you.
19         When does Corizon get access to the
20  medical record?
21      A.  It's right about that time.  The records
22  department of DOC has to do something on their end
23  for us to be able to -- well -- for us to be able to
24  enter information.  However, if someone has
25  previously been incarcerated, their record is still

19 (Pages 73 to 76)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 63-3   Filed 11/12/20   Page 20 of 36

## Page 77

1  available, accessible.  Is that ...
2      Q.  I think I understand what you're saying.
3      Is the last scenario you just mentioned
4  how Dr. Epperson and Ms. Kirby were able to access
5  Ms. LaBlance's records?
6      A.  I am not 100 percent proficient on MOCIS,
7  which is the computer system that the female
8  institutions use.  Corizon only -- my understanding
9  is Corizon obviously has medical records of those
10  incarcerated or who have been incarcerated.  And my
11  understanding is Ms. Lablance has never been
12  incarcerated, so I'm not sure why she has a medical
13  record in MOCIS.  I'm just not familiar enough with
14  all aspects of MOCIS.  It's not just the health
15  record -- the MOCIS system isn't.  It's -- they use
16  it for, I believe, probation and patrol and visiting
17  and canteen -- different aspects of DOC use the
18  system.  So I'm not sure how she has a medical
19  record, if that -- if I'm explaining myself --
20      Q.  I'm tracking.  Surprisingly.
21      A.  -- correctly.
22      Q.  Who can tell me that from Corizon?
23      A.  I don't know if anybody from Corizon could
24  tell you that.
25      Q.  Safe to say Makisa Upton can't tell me

## Page 78

1  that?
2      A.  I would say that's safe to say, yes.
3      Q.  She's in HR; right?
4      A.  Yes.  I would think if anyone in Corizon
5  might be able to explain, it would be Christina
6  Bolton, who is our IT person in our office, but I'm
7  just not sure about that.
8      Q.  Do you know -- so we were just talking
9  about when an individual becomes a patient and also
10  when you -- Corizon, not you -- when Corizon has
11  access.  Based on what you just said, how would
12  Dr. Epperson know to look at Terri Lablance's record
13  in the system?
14      A.  How would she know?
15      Q.  Yeah.
16      A.  I don't think I can answer that.
17      Q.  That's fair.  Do you know how she stumbled
18  upon it?
19      A.  I'm aware of how she says she stumbled
20  upon it.  I do not know the actual way she came
21  upon it, no.
22      Q.  Well, what did she say?
23      A.  Dr. Epperson says that she entered numbers
24  of a patient that she was going to chart on and
25  accidently Ms. Lablance popped up.

## Page 79

1      Q.  Do you have the numbers of that patient
2  that she was originally trying to access?
3      A.  I do not.
4      Q.  Who does?
5      A.  I'm not sure if she might -- Dr. Epperson.
6  I don't know.
7      Q.  Okay.  But --
8      A.  That's not information I have.
9      Q.  Okay.  And who did the investigation
10  regarding Dr. Epperson's accessing of Ms. Lablance's
11  records?
12      A.  I believe -- I know Makisa Upton, and I
13  don't know how much of investigating Rhonda Almanza
14  did.  And then the information pull -- was pulled
15  from someone on the DOC side to see what was
16  actually accessed.
17      Q.  Okay.  Have you seen the investigation
18  file?
19      A.  No.
20      Q.  Is there one?
21      A.  I don't know.
22      Q.  As a part of the analysis on how
23  Dr. Epperson says she accessed Ms. Lablance's
24  record, in your opinion, is it relevant to know the
25  number of the inmate she was trying to use and

## Page 80

1  correlate that to Ms. Lablance's number?
2      A.  It would be helpful to know.
3      Q.  Maybe she transposed numbers?
4      A.  Yes.
5      Q.  Do you know if that was done?
6      A.  I don't know if that was done.
7      Q.  Would I ask Makisa Upton that?
8      A.  She would be --
9      Q.  She'd be the person?
10      A.  -- a person who may know the answer.
11      Q.  Are you familiar with the AS400 software?
12      A.  Yes.
13      Q.  Are you proficient in that?
14      A.  No.
15      Q.  Okay.  What about the MARS database?
16      A.  Yes.
17      Q.  Are you proficient in MARS?
18      A.  I would say so, yes.
19      Q.  All right.  Is MARS what you primarily
20  used when you were employed as a nurse?
21      A.  Yes.
22      Q.  Okay.  Turn to Interrogatory 18, please.
23  "Identify whether Corizon staff at the DOC
24  Chillicothe facility have access to inmate records
25  that are maintained by defendant DOC.  If defendant

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 63-3   Filed 11/12/20   Page 21 of 36

## Page 81

1  Corizon employees have access to DOC prisoner
2  records, identify which Corizon staff have access
3  and to what types of records access is given, and
4  which Corizon staff access plans records the dates
5  the records were accessed and for what purpose."
6      In looking at subpart B, which Corizon
7  staff accessed plaintiff's -- Ms. Lablance's medical
8  records?
9      A.  Her medical record was Karen Epperson and
10  Val Kirby.
11      Q.  Was there another type of record that was
12  accessed?
13      A.  Her -- Ms. Lablance's face sheet was
14  accessed.
15      Q.  Face sheet?
16      A.  Yes.
17      Q.  Okay.  Who accessed that?
18      A.  I can recall some of them but not all of
19  them.
20      Q.  Sure.
21      A.  Sterling Ream, Tammy Christopher -- that's
22  all I can recall at this time.
23      Q.  Are there others?
24      A.  There are others.
25      Q.  Approximately how many more?

## Page 82

1      A.  Approximately two to four more, I believe.
2      Q.  What's the face sheet?
3      A.  The -- you have -- it was the page that
4  Dr. Epperson printed and mailed to Ms. Lablance.
5      Q.  Let's grab it and look at it.  That's
6  probably an easier route.
7      I believe it is Exhibit -- or Exhibits 20
8  and 4.  Correct?
9      A.  Yes.
10      Q.  Okay.  And these are -- this is the packet
11  that Dr. Epperson sent to Ms. Lablance?
12      A.  Yes.
13      Q.  All right.  And so the face sheet is
14  what's on Lablance 2?
15      A.  Correct.
16      Q.  Okay.  And this is the one where you think
17  a maximum of six people accessed?
18      A.  Correct.
19      Q.  All right.  When did these six people
20  access the face sheet?
21      A.  I don't recall that information.
22      Q.  Okay.  Is that in the investigation?
23      A.  It was part of the investigation.
24      Q.  Okay.  Were you a part of the recommending
25  team with regards to the investigation into

## Page 83

1  accessing the face sheet?
2      A.  No.
3      Q.  Okay.  Were you part of the team -- were
4  there two investigations or, you know, one into the
5  face sheet, one into the medical record, or was it
6  all one big investigation?
7      A.  It was one investigation.
8      Q.  Okay.
9      A.  You can run who accessed the record and
10  see what they accessed.
11      Q.  Yeah.  So where -- in the answer to the
12  interrogatory question, it says "See Corizon 485 to
13  528."  I've looked at 485 to 528, but I have not
14  seen a record that indicates that Sterling Ream or
15  Tammy Christopher accessed the face sheet.  Do you
16  know where that record is?
17      A.  I do not.
18      Q.  All right.  I do have records of
19  Dr. Epperson and Dr. Kirby accessing the medical
20  records, but I don't have the face sheet.  Okay?
21      Why was accessing the face sheet a part of
22  the investigation?  Do you know?
23      A.  My understanding, when you do an -- when
24  an audit of the record is done, it shows everybody
25  that's accessed it.

## Page 84

1      Q.  I see.  Do you know how Sterling Ream and
2  Tammy Christopher came to know that they could
3  search for Ms. Lablance?
4      A.  I don't.
5      Q.  Okay.  And I think you may have answered
6  this already, forgive me if you have, but do you
7  know when they accessed Ms. Lablance's face sheet?
8      A.  I don't know the exact date.  I know it
9  was prior to them becoming managers.
10      Q.  When did they become managers?
11      A.  Sterling became a manager in, I believe,
12  June of 2018, and Tammy was a few months later --
13  maybe a month later.  Maybe it was July.
14      Q.  So Sterling became a manager in June of
15  '18?
16      A.  Yes.
17      Q.  And Tammy became a manager in
18  approximately July of '18?
19      A.  July or August of '18.
20      Q.  And if I understand what you just said
21  right, they accessed the face sheet prior to June or
22  July of 2018?
23      A.  Yes.
24      Q.  Does that concern you at all, that they
25  accessed the face sheet prior to becoming managers?

21 (Pages 81 to 84)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 63-3   Filed 11/12/20   Page 22 of 36

## Page 85

1    A.  Yes.  That's why corrective action was
2  issued.
3    Q.  Corrective action of Sterling and Tammy?
4    A.  Yes.
5    Q.  What corrective action did They receive?
6    A.  Final written warnings.
7    Q.  When --
8    A.  I believe.
9    Q.  Okay.
10    A.  I believe they were final written
11  warnings.
12    Q.  Do you know?
13    A.  I don't.
14    Q.  Okay.  But you do know that they were
15  reprimanded?
16    A.  I do know that written corrective action
17  was issued to the two of them and the others that
18  accessed the face sheet.
19    Q.  When did the reprimands of Sterling and
20  Tammy happen?
21    A.  Some date between March 13th of 2019 to
22  early April of 2019.
23    Q.  That's fair.  I get it.
24    A.  I don't have exact dates.  I just know it
25  was -- at the conclusion of the investigation,

## Page 86

1  around the time of the termination of the other two
2  employees.
3    Q.  That is helpful.  I didn't need the exact
4  date, just the time frame, so I appreciate you
5  clarifying.
6       Why were they reprimanded?
7    A.  For accessing the face sheet of somebody
8  they didn't need to.
9    Q.  And so that's a violation of what policy?
10    A.  I'm not sure what policy that that
11  violates.  I believe it's part of our computer
12  access form that we have to sign that says we're not
13  going to access records of people we aren't
14  providing care to.
15    Q.  Okay.  Why weren't they terminated?
16    A.  They were not terminated in -- where the
17  other two were because the other two violated HIPAA,
18  and these employees did not.
19    Q.  Okay.  And then these employees we're
20  talking about are Sterling Ream and Tammy
21  Christopher; right?
22    A.  Yes.
23    Q.  They knew about Ms. Lablance's record in
24  the MOCIS system for approximately nine months?
25    A.  Yes.

## Page 87

1    Q.  And that nine months was also when
2  Ms. Lablance was still an employee of Corizon?
3    A.  Yes.
4    Q.  That nine months also includes
5  Ms. Lablance's complaint to you about Judy Harkins?
6    A.  Yes.
7    Q.  That nine months also includes the email
8  that Ms. Lablance sent to you about her prior
9  interaction with Ms. Hild?
10    A.  Yes.
11    Q.  That nine months also includes Ms. Hild's
12  memo to file?
13    A.  Yes.
14    Q.  Were the other four -- or -- and I know
15  you don't know if it was four total, but the other
16  individuals that were reprimanded, were they given
17  final written warnings?
18    A.  I believe everybody that received
19  corrective action for accessing the face sheet
20  received the same level of corrective action.
21    Q.  Did the others who accessed the face sheet
22  access it with their login user name and password?
23    A.  Yes.
24    Q.  Do you have -- or does Corizon have the
25  number of times in which these individuals who

## Page 88

1  accessed the face sheet accessed the face sheet?
2    A.  I don't have that information.
3    Q.  You don't, but somebody has got to know
4  it.
5    A.  I'm not sure of the time frame that the
6  report was ran that was received from the department
7  of corrections.
8    Q.  Okay.
9    A.  I don't know the time frame.
10    Q.  All right.  Do you know --
11    A.  But -- I'm sorry.
12    Q.  Go ahead.  Please.
13    A.  But it would show within the time frame
14  how many times that person accessed the record.
15    Q.  Uh-huh.  Was how many times individuals
16  accessed the record a part of the analysis in
17  assessing discipline?
18    A.  I wasn't part of the discipline decision,
19  just implementation.
20    Q.  You're right.  That's my mistake.  I
21  apologize.
22       Do you know how Sterling Ream or
23  Tammy Christopher came to know that there was a face
24  sheet?
25    A.  I don't have firsthand knowledge of how

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP    Document 63-3    Filed 11/12/20    Page 23 of 36

## Page 89

1   they know.
2      Q.  Okay.  What knowledge do you have?
3      A.  That it was reported that the previous
4   HSA, Teresa McWhorter, had shared Ms. Lablance's
5   history with some staff.
6      Q.  Do you have any knowledge of which staff
7   that was?
8      A.  No.
9      Q.  Do you have any knowledge of when that
10  was?
11      A.  No.
12      Q.  Was Ms. McWhorter disciplined for that?
13      A.  Once I was aware of it, she was already
14  gone.
15      Q.  And Ms. McWhorter was the HSA?
16      A.  Yes.
17      Q.  Does she have a medical license of any
18  kind?
19      A.  A nurse.
20      Q.  She's a nurse?
21      A.  Yes.
22      Q.  So -- go ahead.
23      A.  She was at the time.  I don't know if she
24  still is.
25      Q.  That's fair.

## Page 90

1      A.  When she was employed, she was a nurse.
2      Q.  So while she was employed as an HSA, she
3   also had a nursing license?
4      A.  Yes.
5      Q.  And she was trained on what records should
6   be accessed and not?
7      A.  Yes.
8      Q.  Do you know who she told?
9      A.  No, I don't.
10      Q.  You don't?  Does it concern you that
11  Teresa McWhorter accessed the face sheet?
12      A.  I don't know that Teresa McWhorter did
13  access the face sheet.
14      Q.  Okay.  Do you have any knowledge as to how
15  Teresa McWhorter came into knowledge that there was
16  a face sheet?
17      A.  I know Teresa McWhorter was aware of
18  Terri's background, but I don't -- I don't know if
19  she knew there was a face sheet.
20      Q.  That's fair.  And Teresa McWhorter was the
21  HSA when Ms. Lablance was hired?
22      A.  Yes.
23      Q.  All right.  So for Ms. Lablance's entire
24  time working for Corizon, someone in the office at
25  Chillicothe knew she had a face sheet?

## Page 91

1      A.  They knew she had a criminal background.
2      Q.  Okay.  Going back to the Sterling Ream and
3  Tammy Christopher issues -- or access, excuse me --
4  do you know if there were others standing around
5  Sterling or Tammy when they accessed the face sheet?
6      A.  I don't.
7      Q.  Do you know whether or not that question
8  was asked in the investigation?
9      A.  I do not know.
10      Q.  Okay.  One way or the other?
11      A.  One way or the other.
12      Q.  Okay.  Does any of that concern you that
13  Corizon employees, Sterling Ream and
14  Tammy Christopher accessed it -- the face sheet in
15  2018?
16      A.  Yes.  That's why they were given
17  corrective action.
18      Q.  Okay.  The medical record is something
19  different; right?
20      A.  Yes.
21      Q.  Okay.  And that was accessed only by
22  Dr. Epperson and Dr. Kirby; is that right?
23      A.  Ms. Kirby, yes.
24      Q.  Okay.  I may have misspoke.  Let me clear
25  that up.  Sorry.  There's so many names floating

## Page 92

1   around today.
2         The medical record of Ms. Lablance was
3   accessed by Dr. Epperson and Ms. Kirby?
4      A.  Correct.
5      Q.  Okay.  Thank you.  Sorry.
6         Do you know if others were standing around
7   Dr. Epperson or Ms. Kirby when they accessed the
8   medical record?
9      A.  I do not.
10      Q.  Do you know if that was a part of the
11  investigation?
12      A.  I do not.
13      Q.  You don't know one way or the other?
14      A.  I don't know one way or the other if that
15  was part of the investigation.
16      Q.  Thank you.
17         Do you know how Dr. Epperson and Dr. Kirby
18  learned of the medical record?
19      A.  No.
20      Q.  Okay.  And forgive me if I asked that.
21  It's been a long day.
22         Do you know one way or another if the
23  AS400 and MARS system were audited by the DOC in
24  conjunction with this investigation?
25      A.  I do not know one way or the other.

ALARIS LITIGATION SERVICES
www.alaris.us      Phone: 1.800.280.3376      Fax: 314.644.1334

## Page 93

1  Q.  Based on what we know about how many
2  people accessed the face sheet and Dr. Epperson and
3  Ms. Kirby accessing the medical record, do you think
4  it's relevant to know if AS400 or MARS was accessed?
5      A.  I think it would have given more
6  information for the termination, but I -- the
7  violation was a HIPAA violation, so we already
8  proved that they did it with MOCIS, so I don't know
9  how significant that they maybe also accessed
10  anything in MARS would have been.
11      Q.  Uh-huh.  But what about the timing of the
12  access?  Any relevance there, in your opinion, if
13  you looked at AS400 and MARS?
14          MR. MATULA:  Vague.  Relevance to what?
15  Do you understand the question?
16      A.  I don't.  The timing of?
17      Q.  (By Mr. Nugent)  Yeah.  The timing of when
18  Ms. Lablance's records were accessed.
19      A.  I guess I still don't understand.  I'm
20  sorry.
21      Q.  That's okay.  We'll come back to it.
22          Do you know if there is medical
23  information of Ms. Lablance's in the AS400 or MARS
24  systems?
25      A.  No.

## Page 94

1      Q.  You don't know?
2      A.  No.
3      Q.  Okay.  If -- what medical information did
4  Dr. Epperson or Ms. Kirby view?
5      A.  They viewed different aspects of the
6  record.  I do not recall specifically what those
7  were besides the charting guide, which is one of
8  these links here on this face sheet --
9      Q.  On Lablance 2?
10      A.  Yes.
11      Q.  Okay.
12      A.  I believe medication orders.  Outside of
13  those two things, I do not recall what the two of
14  them accessed.
15      Q.  Okay.  And do you know -- let me ask it
16  this way.  Does the AS400 system or the MARS system
17  have charting guides in it?
18      A.  MARS is set up different.
19      Q.  Okay.
20      A.  Now, AS400 is the system itself, and
21  there's different aspects in there, like custody
22  reports and -- so it's the whole computer system for
23  the DOC.
24      Q.  Understood.
25      A.  Then MARS is the medical record that is

## Page 95

1  within that system.  So MARS has what we call
2  progress notes instead of charting guides.  So
3  progress notes in MARS is the same as charting
4  guides in MOCIS.
5      Q.  Say that one more time.  Charting guides
6  is the same as?
7      A.  Charting guides in MOCIS is the same as
8  progress notes in MARS.
9      Q.  Thank you.  Is medication orders in MOCIS
10  also in MARS?
11      A.  Yes.  There's medication orders in MARS.
12      Q.  Do you see on Lablance 2 there, right-hand
13  column it says "Offender Medical Summary"?
14      A.  Yes.
15      Q.  Do you know if that was accessed by
16  Epperson or Kirby?
17      A.  I do not recall if it was or was not.
18      Q.  And is there an offender medical summary
19  in MARS?
20      A.  No.
21      Q.  Okay.  Is there some sort of summation of
22  the medical history at all in MARS that you're aware
23  of?
24      A.  No, there's not.
25      Q.  Is MARS a bit antiquated?

## Page 96

1      A.  Well, you see on here there's two columns?
2  In MARS there's 24 different items to access.
3      Q.  Okay.  Is one of those 24 in MARS
4  diagnoses?
5      A.  A problem list.
6      Q.  Okay.  What about physical?
7      A.  Yes.
8      Q.  Okay.  Can -- so MOCIS is the department
9  of corrections, but then you have, like, county
10  jail, municipal jail, that sort of thing.  Do you
11  know if county jails and municipal jails enter
12  information into MOCIS, as well?
13      A.  They do not.
14      Q.  They do not.  What do they use, if you
15  know?
16      A.  Every place is different, so I don't know.
17      Q.  That's fair.  I appreciate that.
18          So in order to have a MOCIS record, you
19  had to have come in contact with a MOCIS facility?
20  Is that a fair statement?
21      A.  My understanding is if you are under the
22  supervision of the department of corrections, so if
23  you're incarcerated, if you're on probation or
24  parole, then you have a number, which can be found
25  in the system, MOCIS or AS400, is my understanding.

24 (Pages 93 to 96)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 63-3   Filed 11/12/20   Page 25 of 36

## Page 97

1     Q.   Thank you for that.  It sheds some light
2  for me.  Did Sterling Ream or Tammy Christopher
3  receive any training at the time of their final
4  written reprimand?
5     A.  I don't believe so.
6     Q.   Okay.  Did Chillicothe -- did the center
7  there at Chillicothe, after Dr. Epperson and
8  Ms. Kirby were terminated, and then also
9  Sterling Ream and Tammy Christopher disciplined, was
10 there a meeting amongst staff from, you know,
11 higher-ups or management about this and what
12 happened and whatnot?
13    A.  There wouldn't have been anything
14 specific, and I do not recall that any additional
15 training or meeting was held.
16    Q.  Okay.  All right.  All right.
17       So in going back to Interrogatory 18,
18 it -- should that answer also have included that
19 Sterling Ream, Tammy Christopher, and others
20 accessed the face sheet?
21    A.  I would say yes.
22    Q.  All right.  Do you know a Dr. Schaefer?
23    A.  No.
24    Q.  Okay.  All right.
25       (Deposition Exhibit No. 39 was marked for

## Page 98

1  identification.)
2     Q.  (By Mr. Nugent)  Ms. Meehan, that is
3  Deposition Exhibit 39.  This is an email with an
4  attachment; it's Corizon 490 and Corizon 491.
5       You are copied on this email -- actually,
6  sent to.  Do you see that?
7     A.  Yes.
8     Q.  All right.  And below -- or the second
9  email on the page is from you to Makisa Upton.
10    A.  Yes.
11    Q.  Why are you sending it to Makisa for her
12 review and approval?
13    A.  So she could review and approve the
14 termination.
15    Q.  Okay.  I'm a little confused, though,
16 because this -- this is at the end of the
17 investigation; right?
18    A.  Yes.
19    Q.  And you are part of the recommending team;
20 right?
21    A.  Yes.
22    Q.  Okay.  But earlier you said Makisa did the
23 investigation.
24    A.  Yes.
25    Q.  Okay.  So did she do the investigation --

## Page 99

1  give you the materials, then you and the team
2  reviewed it?
3     A.  Makisa and, I believe, Rhonda did the
4  investigation.
5     Q.  Okay.
6     A.  And then they determined what the outcome
7  of the investigation was going to be, such as the
8  termination of Dr. Epperson and Ms. Kirby.
9     Q.  Okay.
10    A.  And since I am the director over the site,
11 I was the one who wrote up the termination request.
12    Q.  Thanks.  That's helpful.
13       Why didn't you do the investigation?
14    A.  I can't answer that.  It wasn't brought to
15 me to investigate.  It was -- Dr. Lovelace received
16 the letter that Dr. Epperson had sent Ms. Lablance,
17 and he shared it with, I believe, Rhonda and
18 Cindy Schupp, and it was already being taken above
19 my level, so they are the ones that did the
20 investigation.
21    Q.  Okay.  When's the first time you found out
22 about the communication between Dr. Lovelace and
23 Ms. Lablance regarding the packet from Dr. Epperson?
24    A.  Yes.
25    Q.  I'm sorry.  When was the first time?

## Page 100

1     A.  Oh, I thought you said "was the first
2  time."
3       When -- after Dr. Lovelace received the
4  information from Ms. Lablance, I was notified -- I
5  don't know.  Relatively --
6     Q.  Quickly?
7     A.  -- soon.  I don't know if it was that same
8  day or the next day, but in a timely fashion, since
9  it was my site that had been involved.
10    Q.  And was -- who made the decision -- who
11 determined the investigator?
12    A.  I don't know.
13    Q.  Okay.  Is that -- was it odd that you
14 didn't investigate it, in your opinion?
15    A.  No.
16    Q.  Okay.  Has that happened before?
17    A.  Yes.
18    Q.  Okay.  Fair enough.  So how did you come
19 to know that Ms. Kirby accessed the medical records?
20    A.  During the investigation.
21    Q.  Okay.  And so do you know how Corizon
22 became aware that Ms. Kirby had accessed the medical
23 records?
24    A.  To my knowledge, it was the audit of
25 Ms. Lablance's record that showed who all accessed

25 (Pages 97 to 100)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP    Document 63-3    Filed 11/12/20    Page 26 of 36

## Page 101

1    the record.
2         Q.   That's the audit that shed some light on
3    it.  Because that -- does that same audit include
4    who accessed the face sheet?
5         A.   Yes.
6         Q.   Okay.  And does that audit also include
7    the number of times that they accessed either the
8    medical record or the face sheet?
9         A.   My understanding of the audit is within
10   the time frame that you run it, it'll show who
11   accessed the record, every time they accessed, and
12   what they accessed.
13        Q.   Yeah.  Now, would -- because this is a
14   HIPAA violation, as you and Dr. Lovelace have
15   mentioned, is it something that would have gone in
16   Ms. Lablance's DOC medical records as a record
17   contact?
18        Am I making any sense?
19        A.   I don't understand -- especially the last
20   part.
21        Q.   Yeah, that's fair.  Let me tell you what I
22   think is in the system, and you tell me whether I'm
23   right or wrong.
24        A.   Okay.
25        Q.   Because I simply just don't know.

## Page 102

1         The software can track who accesses the
2    medical record and when; right?
3         A.   Yes.
4         Q.   And that information of who accessed it
5    and when is saved or stored in the MOCIS software or
6    servers.  Do you know?
7         A.   I don't know.
8         Q.   Okay.  All right.  All right.
9         The audit that was ran, is that something
10   that was printed?  Do you know?
11        A.   Yes.
12        Q.   Okay.  It was printed.  And where is it
13   stored?
14        A.   The printed copy?
15        Q.   Yes.
16        A.   Makisa Upton is the person I know who had
17   the copy.
18        Q.   Okay.
19        A.   I don't know where it is stored.
20        Q.   Okay.  So what I'm trying to understand
21   is -- you know, earlier when we first started
22   talking -- you and I started talking, we looked at
23   the inventory of Ms. Lablance's personnel file.  Do
24   you remember that document?
25        A.   Yes, I do.

## Page 103

1         Q.   I'm trying to understand if the
2    information involved in this investigation is
3    something that should be stored or a copy put in her
4    personnel file or a copy put in her medical record
5    file or both?
6         A.   Her medical record, as in her MOCIS DOC
7    medical record, or her employee medical record.
8         Q.   That's -- you are going exactly where I am
9    trying to get to.  Do employees have -- do Corizon
10   employees have a medical record?
11        A.   Yes.
12        Q.   Okay.  And so with regards to
13   Ms. Lablance's DOC medical record and her employee
14   medical record, should either of those files or both
15   have the contents of this investigation or audit or
16   anything like that?
17        A.   I know her Corizon employee medical file
18   would not have anything like that in it.
19        Q.   Okay.  Why?
20        A.   Because it's not for investigations.  It
21   has vaccination history and TB test ratings.
22        Q.   Got it.
23        A.   And it's not even an all-inclusive --
24        Q.   File?
25        A.   -- medical history --

## Page 104

1         Q.   Okay.
2         A.   -- it's what we do while the person is
3    employed with us.
4         Q.   That -- okay -- makes sense.  Let's talk
5    about Ms. Lablance's DOC medical record.  Should it
6    be in there?
7         A.   I don't have an answer for that.
8         Q.   Okay.
9         A.   The department of corrections owns the
10   medical record, and I'm not sure if that's something
11   they would do or not.
12        Q.   Okay.
13        A.   Or if just simply the fact that they can
14   audit it at any time, it's there.  I don't have an
15   answer for that.
16        Q.   And that, lastly, what about
17   Ms. Lablance's personnel file?
18        A.   Regarding?
19        Q.   Regarding the investigation and the
20   complaint.
21        A.   I don't believe so.
22        Q.   And why do you have that opinion?
23        A.   She was no longer employed at the time, so
24   I don't think that information would go into her
25   employee file.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 63-3   Filed 11/12/20   Page 27 of 36

Page 105

1    Q.  Okay.
2    A.  That's just my --
3    Q.  Yeah.  I don't know --
4    A.  -- my answer.  I don't know if that's --
5    Q.  I don't know if there's an answer or
6  not --
7    A.  Yeah.
8    Q.  -- I just want to get some understanding
9  as to the process for something like this where that
10  information should be stored, if at all.
11    A.  Uh-huh.
12    Q.  So that's why I was asking.  I hope that
13  makes some sense.
14    A.  Yeah.
15    Q.  Thank you for answering those questions
16  and bearing with me.
17       So before that little jaunt, I was asking
18  you some questions about how Ms. Kirby came to know
19  or at least look at the medical record and
20  Dr. Epperson, and so I want to look at the auditing
21  log for Ms. Kirby.  Okay?
22    A.  Okay.
23    Q.  And this was produced to us by Corizon,
24  and it was Bates-labeled Corizon 492 through 493,
25  and it is marked as Deposition Exhibit 40.

Page 106

1       (Deposition Exhibit No. 40 was marked for
2  identification.)
3    Q.  (By Mr. Nugent)  Have you seen this log
4  before?
5    A.  I believe I was briefly shown this log,
6  yes.
7    Q.  All right.  And is this what was printed
8  by the DOC in searching Ms. Kirby's medical record
9  contacts?
10    A.  I believe this is the audit that was
11  produced when looking to see who accessed
12  Ms. Lablance's record.
13    Q.  Okay.  How do we know that this is who
14  accessed Ms. Lablance's record?
15    A.  Well, I see on here it does not have a
16  name; it has a DOC number.  I cannot verify if that
17  is the number that was assigned to Ms. Lablance or
18  not.
19    Q.  Who can?
20    A.  I would say -- the best person to identify
21  if that was her DOC number would be somebody with
22  the DOC.
23    Q.  Fair enough.
24    A.  Could I access that number?  I could if
25  I -- if I entered that number, it would tell me

Page 107

1  whose name that belonged to.
2    Q.  Okay.
3    A.  But ...
4    Q.  So if you look above the first
5  Valicia Kirby entry, that looks like it says
6  "Karen Epperson."  Do you see that?
7    A.  I do.
8    Q.  And then there are also some entries above
9  that that have been crossed out.
10    A.  Yes.
11    Q.  So there were other -- does this mean that
12  there are other people that accessed Ms. Lablance's
13  medical record?
14    A.  Again, I don't know how the audit was
15  pulled.  My understanding was the audit was pulled
16  to show who accessed her record in MOCIS.
17    Q.  All right.  And this audit would tell me
18  who from Corizon and who from the DOC accessed
19  Ms. Lablance's record; right?
20    A.  I believe that would be true.
21    Q.  Okay.  Do you know why this was given to
22  me or to us with these items crossed out?
23    A.  No, I don't.
24    Q.  Okay.  Do you know who crossed those items
25  out?

Page 108

1    A.  No, I don't.
2    Q.  If we are to assume that this is
3  Ms. Lablance's record, the one right above Ms. Kirby
4  says "2/18/19."  Is that what you see?
5    A.  It's definitely a 2.
6    Q.  Okay.
7    A.  And then a 1, and it's hard for me to tell
8  if that's a 6 or an 8.
9    Q.  Yeah.  That's fine.
10       Do you know -- let's look at the top of
11  the audit and identify some of these categories.
12       What's the cycle number?
13    A.  The cycle number, I understand that to be
14  the date of the current supervision of DOC.
15    Q.  Okay.  And then what's "log date and
16  time?"
17    A.  That, to my understanding, would be the
18  date and time the record was accessed.
19    Q.  All right.  And then "employee ID."  Whose
20  employee ID would be there?
21    A.  The person who accessed the record.
22    Q.  Okay.  And I don't see any employee IDs
23  here, do you?
24    A.  For MOCIS to log in to MOCIS, you utilize
25  your DOC email address, so I would say the employee

27 (Pages 105 to 108)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 63-3   Filed 11/12/20   Page 28 of 36

## Page 109

1   ID here of the ones not crossed out is
2   Valicia Kirby.
3       Q.  Okay.  And then do you see screen name on
4   the --
5       A.  Yes.
6       Q.  What would that be?
7       A.  I don't know.
8       Q.  Okay.
9       A.  If I go across, it says "IP address,
10  application name, screen name," then I would say
11  that screen name is on that first line of Valicia
12  Kirby "charting guide list page," and then the next
13  one, "appointment list page."  So the page that
14  they're looking at.
15      Q.  Oh.  And so in looking at Exhibit 20, and,
16  in particular, Lablance 2, the second page, the two
17  columns in the middle of the page, am I
18  understanding you to say that the screen name there
19  would correspond to one of the options in these two
20  columns?
21      A.  Yes.
22      Q.  All right.  So for instance,
23  Valicia Kirby, "charting guide list page" is also
24  listed in Exhibit 20 on page 2 as charting guide.
25  Is that accurate?

## Page 110

1       A.  Yes.
2       Q.  All right.  Do you recall which shift
3   Ms. Kirby worked in February of 2019?
4       A.  Day shift.
5       Q.  Okay.  And that day shift was
6   approximately what to what?
7       A.  She worked ten-hour shifts.  I don't
8   recall exactly what time she worked.
9       Q.  Okay.  So was she --
10      A.  I mean, it would have been 8:00 to 4:30
11  with some time one way or the other to make a
12  ten-hour day.  I don't recall her exact schedule.
13      Q.  All right.  So at 5:30, would she have
14  been in the office still?
15      A.  It's a possibility.
16      Q.  All right.  So does an audit of who
17  accessed the face sheet -- should it look very
18  similar to what we're looking at in Exhibit 40, or
19  do you know?
20      A.  I don't know that for sure.
21      Q.  Okay.  Does an audit report indicate how
22  long Ms. Kirby was on a page?
23      A.  I don't see that information in here.
24      Q.  Okay.  When employees are new to Corizon,
25  are they informed that their contact with medical

## Page 111

1   records can be tracked?  Do you know?
2       A.  I don't know for sure one way or the
3   other.
4       Q.  Okay.  Fair enough.  And then do you see
5   report date there on the first page of Exhibit 40?
6       A.  Yes.
7       Q.  3/8/2019.  Is that your understanding of
8   when the report was generated?
9       A.  Yes.
10      Q.  All right.
11      MR. NUGENT:  We'll take a break.
12      VIDEOGRAPHER:  We are off the record.  The
13  time is 4:21 p.m.
14      (A recess was taken.)
15      VIDEOGRAPHER:  We're back on the record.
16  The time is 4:23.
17      A.  Ms. Meehan, I'm going to hand you what's
18  been marked as Deposition Exhibit 41 and 42.
19      (Deposition Exhibit No. 41 and 42 were
20  marked for identification.)
21      Q.  (By Mr. Nugent)  Forty-one is an email
22  exchange between you and Makisa Upton, and then 42
23  is, I believe, an audit report of Dr. Epperson.  Is
24  that what you are seeing as Exhibits 41 and 42?
25      A.  Yes.

## Page 112

1       Q.  Okay.  Let's start --
2       MR. MATULA:  Do you have 42 for me?
3       MS. JAG:  I'm sorry, Ivan.  What are the
4   Bates stamps on those?
5       MR. NUGENT:  Yeah, the Bates stamps on 41
6   are Corizon 485 through 86 and 42 is 4- -- Corizon
7   488 through 489.
8       Q.  (By Mr. Nugent)  Ms. Meehan, Exhibit 41 is
9   the email -- and this is very similar to an email
10  and exchange that Ms. Kirby that we've
11  already looked at.  Would you agree?
12      A.  Yes.
13      Q.  And this one is in regards to
14  Ms. Epperson; is that right?
15      A.  Yes.
16      Q.  All right.  You talked about being a
17  part -- being on the recommendation team for
18  Ms. Kirby because it was your facility.  Is that the
19  same logic as to why you did one for Dr. Epperson?
20      A.  Yes.
21      Q.  Okay.  And did everyone concur with the
22  recommendation for termination on Dr. Epperson?
23      A.  Yes?
24      Q.  And also for Ms. Kirby?
25      A.  Yes.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 63-3   Filed 11/12/20   Page 29 of 36

Page 113

1     Q.  Okay.  I want to look at the second page,
2  which is Corizon 486.  And the summation there says:
3  "On 3/13 the DOO" -- who is the DOO?
4     A.  That would be me.  Director of operations.
5     Q.  Okay.
6        "Was notified Dr. Epperson had accessed a
7  former employee's MO DOC medical record."
8        Is the "MO DOC medical record," is it the
9  same thing as the MOCIS record?
10    A.  Yes.
11    Q.  Okay.  And did you -- were you notified on
12 3/13, or were you notified sometime before then?
13       Let me ask it a different way.  Did you
14 find out on the same day that you wrote this?
15    A.  I don't recall the day that I found out
16 this -- the 13th would have been the day that I was
17 advised of findings in the investigation.
18    Q.  Got it.  Okay.  That -- that helps me.
19 Thank you.
20       I want to get some clarity behind the part
21 of your summation here where you say the use and
22 disclosure of PHI.  First, what is "PHI"?
23    A.  Personal health information.
24    Q.  Okay.  So what was the use by
25 Dr. Epperson?

Page 114

1     A.  Accessing the parts of Ms. Lablance's
2  medical record.
3     Q.  Okay.  So that's the use.  What's the
4  disclosure?
5     A.  Disclosure would be if anybody else was
6  notified by Dr. Epperson of what she found.
7     Q.  Okay.  Well, it's here in your
8  recommendation, so did she disclose it to someone?
9     A.  Not to my knowledge.
10    Q.  Okay.
11    A.  I was using the wording of the HIPAA
12 privacy rule, which is to -- the wording is to take
13 reasonable steps to limit the use and disclosure of
14 PHI.  It's the rule.
15    Q.  Got it.  Okay.  And are you -- do you know
16 one way or another whether Dr. Epperson disclosed
17 any personal health information?
18    A.  I do not know one way or the other.
19    Q.  Is -- the same question for Ms. Kirby.
20    A.  I do not know one way or the other.
21    Q.  Thank you.
22       Is the signature on the line HR's approval
23 Makisa Upton's signature, if you know?
24    A.  I don't know.  I can't read who it says.
25    Q.  Neither can I.

Page 115

1        Let's look at the audit, which is
2  Exhibit 42.  And the results that are, I guess,
3  supposed to be identified on this document are those
4  of Dr. Epperson's.  Would you -- is that your
5  understanding?
6     A.  Yes.
7     Q.  All right.  And we can see that they also
8  cross through other entries, just like they did on
9  the log that was Ms. Kirby's log; right?
10    A.  Yes.
11    Q.  But if we look hard enough, does it appear
12 that there are Valicia Kirby entries on this
13 Exhibit 42?
14    A.  Yes.
15    Q.  All right.  Did you review this prior to
16 making your recommendation -- "this" being
17 Exhibit 42.  Sorry.
18    A.  I believe I did see this, yes.
19    Q.  All right.  What -- there's some
20 handwriting in the middle of the first page.  It
21 says "CCC" -- and then can you read what that -- is
22 under that?
23    A.  I believe it is "DR," which would stand
24 for doctor, is what I believe it to be.
25    Q.  Okay.  Do you know one way or another who

Page 116

1  wrote that?
2     A.  I do not.
3     Q.  What about on the next page?  There's some
4  additional handwriting.  What does that say?
5     A.  CCC physician.
6     Q.  And that's next to an entry that is
7  Karen Epperson; is that correct?
8     A.  Correct.
9     Q.  Okay.  Do you see at the bottom of the
10 first page it says "1 of 4"?
11    A.  I do.
12    Q.  Where are pages 3 and 4?
13    A.  I do not have that information.
14    Q.  What are pages 3 and 4?
15    A.  I do not have that information.
16    Q.  Okay.  How would I find out what are pages
17 3 and 4?
18    A.  From the person that provided the log.
19    Q.  Okay.  Well, they were provided to me by
20 Corizon.  You and Ms. Upton signed off on the
21 interrogatories.
22    A.  I would say maybe Makisa would be able to
23 provide that information.
24    Q.  All right.
25    A.  I cannot.

29 (Pages 113 to 116)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 63-3   Filed 11/12/20   Page 30 of 36

## Page 117

1    Q.  But you don't know?
2    A.  I do not know if she can provide it or
3  not.
4    Q.  If she -- let me ask it this way:  Does it
5  appear from Exhibit 42 -- which is the log
6  represented as Dr. Epperson's contact with
7  Ms. Lablance's medical record -- does it appear that
8  pages 3 and 4 are additional contacts of
9  Ms. Lablance's medical record?
10    A.  I would presume pages 3 and 4 to be two
11  more pages of the audit.  I can't speak to what
12  might be on the audit.
13    Q.  That's fair.  That's fair.  That's really
14  fair.  Thank you.
15        In order for Dr. Epperson to perform the
16  functions of her job as -- medical director?  Is
17  that right?
18    A.  Yes.
19    Q.  Did she need to be aware of Ms. Lablance's
20  DOC medical history?
21    A.  No.
22    Q.  Did she need to be aware of Ms. Lablance's
23  criminal history?
24    A.  No.
25    Q.  Okay.  In order for Ms. Ream and

## Page 118

1  Ms. Christopher to do their jobs there for Corizon,
2  did they need to be aware of the face sheet that
3  Ms. Lablance has?
4    A.  No.
5    Q.  What are Tammy -- what's
6  Tammy Christopher's title now?
7    A.  At this time she's a registered nurse.
8    Q.  Okay.  Prior to becoming a registered
9  nurse, what was her title?
10    A.  I believe initially she was hired as an
11  LPN with Corizon and then was an RN.  She was a
12  director of operation -- or, I apologize -- director
13  of nursing for a time period, and then is now a
14  staff nurse RN.
15    Q.  When did she move from director to staff
16  nurse?  Do you recall?
17    A.  I believe she stepped down as director of
18  nursing in the summer of '19.
19    Q.  After she was reprimanded?
20    A.  Yes.
21    Q.  Okay.  Do you know why she stepped down?
22    A.  She didn't like being a manager.
23    Q.  Okay.  And what about Sterling Ream?
24  What's her title now?
25    A.  Director of nursing.

## Page 119

1    Q.  What was it prior to being promoted to
2  director of nursing?
3    A.  Health services administrator.
4    Q.  And remind me -- generally, what does the
5  health services administrator do?
6    A.  They are fully responsible for the entire
7  medical department.
8    Q.  Was she the health services administrator
9  when Ms. Lablance was there?
10    A.  Sterling?
11    Q.  Yes.  I'm sorry.
12    A.  Yes.
13        MR. MATULA:  One of them.
14        THE WITNESS:  Correct.
15        MR. MATULA:  I mean, you've already had
16  all-day testimony that Hollie Hild was the health
17  service administrator when Lablance was there, too,
18  so ...
19        MR. NUGENT:  I can't give you a hard time,
20  Mike?
21        MR. MATULA:  You can.
22        MR. NUGENT:  Relax, big guy.
23        MR. MATULA:  Belated objection.  The
24  question says "the."  It's misleading, since there's
25  already preexisting testimony there's more than one.

## Page 120

1    Q.  (By Mr. Nugent)  Are you aware of any
2  reason why a Corizon employee should access
3  Ms. Lablance's medical records?
4    A.  No.
5    Q.  What about her face sheet?
6    A.  No.
7    Q.  Okay.
8        MR. NUGENT:  One second.  Let me make sure
9  I'm done.
10    Q.  (By Mr. Nugent)  One question I had --
11  Dr. Lovelace talked about sending the email to
12  Ms. -- Rhonda Alman- --
13    A.  Almanza.
14    Q.  Almanza.  Rhonda Almanza.  And that email
15  was a picture that he received from Ms. Lablance of
16  her face sheet.  Do you recall that testimony
17  earlier today?
18    A.  Yes.
19    Q.  Okay.  And he mentioned that he was the
20  first to be notified or to know.  Do you remember
21  that testimony?
22    A.  I do.
23    Q.  Okay.  So then is it safe to say that that
24  date that Dr. Lovelace became aware, that is the
25  date that Ms. Lablance complained about it?  Is that

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 4:19-cv-00693-BP   Document 63-3   Filed 11/12/20   Page 31 of 36

## Page 121

1  how you interpret that interaction?
2      A.  Can you repeat the first part?
3      Q.  Yeah.  Don't worry about it.
4          Did -- after your recommendation on
5  Dr. Kirby and Ms. -- I'm sorry -- Ms. Kirby and
6  Dr. Epperson was made and the decision was to
7  terminate, did you follow up with Ms. Lablance?
8      A.  I did not.
9      Q.  Okay.  Do you know if anyone did?
10     A.  I do not.
11     Q.  In your opinion, should anyone have, if
12  they didn't -- because I don't know.  I'm just
13  trying to get your opinion on it.
14     A.  My opinion is the patient whose record was
15  accessed, yes, she should have been notified of
16  action taken.
17     Q.  Okay.  Look at Exhibit 26 for me really
18  quick.
19         Can you tell me what was the -- what was
20  the policy -- let me ask it a different way.
21         What was the reason Sterling Ream,
22  Tammy Christopher -- what was the reason they were
23  reprimanded?  Do you know that?  What was the
24  official reason given in their discipline document?
25     A.  In regards to accessing Ms. Lablance's

## Page 122

1  face sheet?
2      Q.  Face sheet, yes.
3      A.  Without reviewing those documents, I can't
4  recall what exactly was in them.  It had to do with
5  accessing a record that you didn't need to access.
6      Q.  Got it.  That's helpful.
7          Are there any questions that you need me
8  to review or state again?
9      A.  I don't think so.
10     Q.  Okay.  Any answers that you need to
11  revisit?
12     A.  I don't think so.
13     Q.  Okay.  Have you told the truth today?
14     A.  I have.
15     Q.  Okay.  I have nothing further.
16         MR. MATULA:  Rachel?
17         MS. JAG:  Yes, sir, I'm here.  I have just
18  a few questions for you, Ms. Meehan.
19              CROSS-EXAMINATION
20  BY MS. JAG:
21     Q.  Earlier you testified about an employee
22  who was dismissed because of a client lockout.  Is
23  that right?
24     A.  Yes.
25     Q.  And, obviously, they worked for Corizon

## Page 123

1  but within the Chillicothe facility; correct?
2      A.  Correct.
3      Q.  And is it your understanding that having
4  members of the public have access to the prison can
5  be dangerous for everybody involved?
6      A.  Yes.
7      Q.  And that would include the prisoners, the
8  officers who work there, and the Corizon employees
9  who work there?
10     A.  Yes.
11     Q.  And so the DOC does security clearance
12  checks for people who enter the prison, and that's
13  everyone; right?
14     A.  Yes.
15     Q.  And this would include people who were not
16  employed by the DOC but who have access to the
17  prison; correct?
18     A.  Yes.
19     Q.  Even volunteers who entered the DOC
20  facility have to pass a security clearance; is that
21  right?
22     A.  That's my understanding.
23     Q.  And visitors have to have a security
24  clearance, as well?
25     A.  Visitors that come to visit the offenders

## Page 124

1  or ...
2      A.  Yes, ma'am.  Whether they come to visit
3  the offenders or they're just visiting the site.
4  Anyone who has maybe a visitor pass on the -- with
5  them.
6      A.  I can't speak to clearances regarding
7  visitors who come to visit offenders, like, to the
8  visiting room.  I'm not familiar with that process.
9  I know if, say, Corizon has a vendor that's coming
10  on-site would be considered a visitor, and that
11  individual would have to get a clearance conducted
12  before they could come in.
13     Q.  Okay.  That's helpful.  Thank you.
14         So, basically, anybody entering the
15  prison, to your understanding, would just have to
16  have some sort of security clearance?
17     A.  Yes.
18     Q.  And the DOC doesn't have any skin in the
19  game as to whether a certain employee keeps working
20  for Corizon once they've had a client lockout;
21  right?
22         MR. NUGENT:  Object to the form.  You can
23  answer, if you know.
24     A.  Would you mind repeating that?
25         MS. JAG:  Of course.  Do you have any

31 (Pages 121 to 124)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 63-3   Filed 11/12/20   Page 32 of 36

## Page 125

1  reason to believe that DOC would have any skin in
2  the game as to whether a Corizon employee was locked
3  out?
4      MR. NUGENT:  Same objection.
5      A.  If DOC --
6      Q.  (By Ms. Jag)  Do you need me to rephrase?
7  I can rephrase.
8      A.  I'm not understanding "skin in the game."
9  I'm sorry.
10     Q.  No, that's completely okay.  I can
11 rephrase.  This is just some notes I jotted down.
12     Is it your understanding that DOC doesn't
13 benefit or detriment whether a certain employee
14 keeps working for Corizon once they've been locked
15 out of a DOC facility?
16     MR. NUGENT:  Same objection.
17     A.  I'm just trying to understand the
18 question.  The DOC --
19     Q.  (By Ms. Jag)  Okay.  Let me see if I can --
20     A.  I'm sorry.
21     Q.  I might be able to rephrase.
22     No, it's okay, Ms. Meehan, I appreciate
23 it. I want to just make sure the question comes out
24 clearly.
25     Is it your understanding -- and correct me

## Page 126

1  if it's not -- that the department of corrections
2  wouldn't care or wouldn't have any benefit or
3  detriment if a Corizon employee kept working for
4  Corizon once they've been locked out of a DOC
5  facility?
6      MR. NUGENT:  Same objection.
7      Do you know what benefits the department
8  of corrections or not?
9      THE WITNESS:  I don't know what benefits
10 the department of corrections.
11     A.  My understanding, though, would be once a
12 Corizon employee is locked out from Missouri DOC,
13 they cannot reenter the facility; therefore, they
14 could not continue to be employed.
15     I don't know if -- I don't think I'm
16 answering your question.
17     Q.  (By Ms. Jag)  You're getting there,
18 absolutely.
19     What I'm getting at here is -- in other
20 words, the DOC wouldn't have a say if Corizon
21 transferred that person to their central office to
22 let them continue working there; is that right?
23     A.  Correct.
24     Q.  And Corizon could let that person be
25 transferred to work at a different facility that

## Page 127

1  they're employing their services through; is that
2  right?
3      A.  My understanding would be not within a
4  Missouri Department of Corrections facility.
5      Q.  Okay.  That's exactly what I was asking.
6  Could Corizon let that employee work from home,
7  rather than work at the department of corrections?
8      A.  If they were in a job where that was
9  appropriate.
10     Q.  And I apologize if this line of
11 questioning seems confusing; I'm just trying to
12 clarify that when the previous employee we were
13 discussing earlier was locked out of the DOC and
14 they were terminated, that was basically the DOC
15 saying, Hey, this person can't work in this
16 facility.  Is that right?
17     A.  That's what the lockout -- what the client
18 lockout says, yes.
19     Q.  And I'm guessing that there's some sort of
20 Corizon policy that states that in order to work in
21 a Corizon location within a prison, among other
22 qualifications, that the employee has to have DOC
23 security clearance to work at that location; is that
24 right?
25     A.  Yes.

## Page 128

1      Q.  But this would be a Corizon policy;
2  correct?
3      A.  Yes.
4      Q.  And not a DOC policy; right?
5      MR. NUGENT:  Object to the form.
6      You can answer, if you know.
7      A.  I don't know if it's in a DOC policy that
8  you have to have a clearance to be able to work
9  within a facility.
10     Q.  (By Ms. Jag)  Because, again, the DOC
11 doesn't determine who Corizon ultimately hires or
12 fires; they just want to make sure that all Corizon
13 people entering the building have the ability to
14 work there; is that right?
15     MR. NUGENT:  Object to the form.
16     You can answer, if you know.
17     A.  I'm not trying to be difficult; I just am
18 not understanding -- a Corizon employee has to have
19 a clearance from DOC to be able to enter into a
20 facility and work.
21     Q.  (By Ms. Jag)  That's helpful.
22     And does the DOC determine who Corizon
23 ultimately hires and fires?
24     A.  Hires, yes.  Our contract states that DORS
25 has final approval on hiring candidates.  As far as

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 63-3   Filed 11/12/20   Page 33 of 36

Page 129

1  termination, no.
2      Q.  And when you say "hiring candidates," do
3  you mean candidates who work just in the DOC
4  facilities?
5      A.  My understanding is any Corizon employee
6  in Missouri.  So even if we hired somebody to only
7  work in the regional office in Jefferson City, they
8  still have to have a clearance and still have to be
9  approved by DORS.
10      Q.  And can you, for the record, explain what
11  DORS is, if we haven't yet?
12      A.  DORS is the Department of Rehabilitative
13  Services, and it's the umbrella of department of
14  corrections, which medical services falls under.
15      Q.  Okay.  And going off just one more tangent
16  of questions here, would it be correct to say that
17  in your role with Corizon, you don't do IT work?  Is
18  that right?
19      A.  That's correct.
20      Q.  And I know we briefly touched on the email
21  addresses earlier regarding employees who have DOC
22  addresses.
23      A.  We touched on it in regards to what?
24      Q.  I'm sorry.  We looked through some
25  documents earlier that were email chains; is that

Page 130

1  right?
2      A.  Yes.
3      Q.  And some of them involved Corizon
4  employees with DOC email addresses, and some of them
5  had Corizon employees that did not have DOC email
6  addresses.  Is that right?
7      A.  I don't recall reviewing any that had DOC
8  email addresses.
9      Q.  Let me see if I can find the exact
10  document.
11          If I can direct your attention to Corizon
12  Bates document 21 -- or I'm sorry -- Bates document
13  206.
14      A.  I do see that now, that Sterling Reams'
15  DOC email was utilized in part of this
16  communication.
17      Q.  So there are Corizon employees that have
18  DOC email addresses, and there are some that have
19  Corizon email addresses; is that right?
20      A.  That's correct.  I apologize for that.
21      Q.  That's completely okay.  It's an easy
22  mistake.
23          And I'm assuming that you wouldn't have
24  personal knowledge of the reason behind Corizon
25  staff having a DOC address; is that right -- I'm

Page 131

1  sorry -- a DOC email address.  Let me clarify.
2      A.  I know a DOC email address is required to
3  access MOCIS.
4      Q.  And that's what is required so that the
5  Corizon employees can basically access these records
6  to do their jobs; is that right?
7      A.  Correct.
8      Q.  But Corizon doesn't have its own server
9  situation on this DOC site or on any DOC site.  Is
10  that your understanding?
11          MR. NUGENT:  Object to the form.
12      Q.  (By Ms. Jag)  Is it your understanding
13  that -- or I'm sorry.  Let me rephrase that.
14          You aren't aware of any email server
15  situation on a DOC site; is that right?
16      A.  I don't really understand what a DOC --
17  what an email server is.
18      Q.  Basically, the reason why there would be
19  employees with a DOC email address being able to
20  access those programs using that DOC email address
21  could possibly be for safety and security, as far as
22  you know; is that right?
23          MR. NUGENT:  Object to the form.
24      Q.  (By Ms. Jag)  Could the reason that Corizon
25  employees have a DOC email address be for safety and

Page 132

1  security?
2          MR. NUGENT:  Unfortunately, same
3  objection.  I don't know how this witness is
4  supposed to know that.  She hasn't testified to any
5  established knowledge, so -- you can answer, if you
6  know.
7      Q.  (By Ms. Jag)  As far as your knowledge
8  goes, Ms. Meehan.
9      A.  I would say patient safety would be my
10  understanding.  We have a DOC email in order to
11  access the medical record, which provides our
12  patient information, which would be patient safety.
13      Q.  And like we've established, Corizon
14  employees also have Corizon e-mail addresses; is
15  that right?
16      A.  Some of them.
17      Q.  Is there any rhyme or reason to who gets a
18  Corizon email address?
19      A.  Mostly those in management positions,
20  provider positions, and some ancillary staff, but
21  not all.
22      Q.  And personnel information regarding
23  Corizon employee issues would go through that email
24  address; is that right?
25      A.  Through the Corizon email address?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 133

1  Q.  Yes, ma'am.
2  A.  Yes.
3  Q.  And my last question, I believe, is to
4  your knowledge, how does DOC get involved or
5  notified of any disciplinary incidents involving
6  Corizon employees?
7  A.  To my knowledge --
8  Q.  If they -- I'm sorry.  I'm going to say if
9  they get involved at all, how would DOC get involved
10  or notified of any disciplinary incidents involving
11  Corizon employees?
12  A.  To my knowledge, the director of
13  operations of each region send their corrective
14  action for all of their sites of responsibility each
15  month to the assistant division director of DORS.
16  MS. JAG:  And I believe that's all of the
17  questions I have at this time.  Thank you very much,
18  Ms. Meehan.
19  MR. NUGENT:  I've got some brief
20  follow-up.  We won't be long?
21  THE WITNESS:  Okay.
22  REDIRECT EXAMINATION
23  BY MR. NUGENT:
24  Q.  In -- going back to the investigation of
25  Dr. Epperson, Ms. Kirby, Sterling Ream, and

## Page 134

1  Tammy Christopher, were you made aware of whether or
2  not department of correction employees accessed
3  Ms. Lablance's face sheet or medical record?
4  A.  To my recollection, I was not advised of
5  that information.
6  Q.  Okay.  Have you heard that information
7  secondhand?
8  A.  No.
9  MR. NUGENT:  Okay.  That's all I've got.
10  Thank you.
11  MR. MATULA:  I have no questions at this
12  time.
13  VIDEOGRAPHER:  That concludes the
14  deposition.  We're off the record.  The time is
15  5:02 p.m.
16  MR. MATULA:  We'll read and sign.
17  (The deposition concluded at 5:02 p.m.)
18
19
20
21
22
23
24
25

## Page 135

1  CERTIFICATE OF REPORTER
2
3  I, Lisa Ballalatak, a Certified Court
4  Reporter for the State of Missouri, do hereby certify
5  that the witness whose testimony appears in the
6  foregoing deposition was duly sworn by me; the
7  testimony of said witness was taken by me to the best
8  of my ability and thereafter reduced to typewriting
9  under my direction; that I am neither counsel for,
10  related to, nor employed by any of the parties to the
11  action in which this deposition was taken, and further
12  that I am not a relative or employee of any attorney
13  or counsel employed by the parties thereto, nor
14  financially or otherwise interested in the outcome of
15  the action.
16
17
18  _____
19  Lisa Ballalatak
20  Missouri Supreme Court
21  Certified Court Reporter
22
23
24
25

## Page 136

1  ALARIS LITIGATION SERVICES
   1608 Locust Street
2  Kansas City, Missouri 64108
   Phone: (816) 221-1160
3
4  August 2nd, 2020
5  MR. MICHAEL MATULA
   Ogletree Deakins Nash
6  Smoak & Stewart PC
   4520 Main Street, Suite 400
7  Kansas City, Missouri  64111
8
   TERRI YOLANDA LABLANCE v. MISSOURI DEPARTMENT OF
9  CORRECTIONS AND CORIZON HEALTH
10  Dear Mr. Matula:
11  Please find enclosed your copy of the deposition of
   Jenny Meehan, taken on July 21st, 2020, in the
12  above-referenced case.  Also enclosed is the original
   signature page and errata sheet.
13
   Please have the witness read your copy of the
14  transcript, indicate any changes and/or corrections
   desired on the errata sheet, and sign the signature
15  page before a notary public.
16  Please return the executed signature page and errata
   sheet to the Alaris Litigation production department
17  within 30 days after receiving the transcript.
18  Thank you for your attention to this matter.
19
   Sincerely,
20
21
   Lisa Ballalatak
22
   cc: Mr. Nugent
23
24
25

ALARIS LITIGATION SERVICES
www.alaris.us            Phone: 1.800.280.3376            Fax: 314.644.1334

## Page 137

1      ERRATA SHEET
2    Witness:  Jenny Meehan
3    TERRI YOLANDA LABLANCE v. MISSOURI DEPARTMENT OF
     CORRECTIONS AND CORIZON HEALTH
4    Date Taken:  July 21st, 2020
5    Page #_____  Line #_____
6    Should read: _____
7    Reason for change: _____
8
9    Page #_____  Line #_____
10   Should read: _____
11   Reason for change: _____
12
13   Page #_____  Line #_____
14   Should read: _____
15   Reason for change: _____
16
17   Page #_____  Line #_____
18   Should read: _____
19   Reason for change: _____
20
21   Page #_____  Line #_____
22   Should read: _____
23   Reason for change: _____
24
25      Witness Signature: _____

## Page 138

1      STATE OF        )
                       )
2    COUNTY OF         )
3    I, Jenny Meehan, do hereby certify:
4         That I have read the foregoing deposition;
5         That I have made such changes in form and/or
6         substance to the within deposition as might
7         be necessary to render the same true and
8         correct;
9         That having made such changes thereon, I
10        hereby subscribe my name to the deposition.
11        I declare, under penalty of perjury, that
12        the foregoing is true and correct.
13        Executed this _____ day of _____,
14        20____, at _____.
15
16        _____
               Notary Public
17
18        My commission expires: _____
19
20        _____
               Jenny Meehan
21
22
23
24
25

**ALARIS LITIGATION SERVICES**
www.alaris.us      Phone: 1.800.280.3376      Fax: 314.644.1334