EXHIBIT
2

# In The Matter Of:

*TERRI YOLANDA LaBLANCE v.*
*CORIZON HEALTH, INC., ET AL.*

---

*TERRI YOLANDA LaBLANCE*
*July 8, 2020*
*Video Deposition*

---

*iReport Solutions LLC*
*#297 - 7111 West 151st Street*
*Overland Park, Kansas 66223*
*816.223.3156 or 913.972.2029*
*admin@ireportsolutions.com*

Original File 07082020TerriLaBlance.txt
Min-U-Script® with Word Index

1    IN THE CIRCUIT COURT OF DEKALB COUNTY, MISSOURI

2                   DIVISION I

3

4   TERRI YOLANDA LABLANCE,

5                 Plaintiff,

6   vs.                 Case No.

7   CORIZON HEALTH, INC. AND     4:19-CV-00693-BP

8   MISSOURI DEPARTMENT OF

9   CORRECTIONS,

10                Defendants.

11

12

13       VIDEOTAPED AND ZOOM VIDEO TELECONFERENCE

14  DEPOSITION OF TERRI YOLANDA LABLANCE, the Plaintiff,

15  taken on behalf of the Defendant Corizon Health, Inc.

16  before Laurel A. Woodbridge, Missouri CCR No. 898 and

17  Kansas CCR No. 1327, RPR, CSR, and CRR, pursuant to

18  Notice To Take Videotaped Deposition on the 8th day

19  of July 2020, at the LaBlance offices of Krigel &

20  Krigel, P.C., Suite 700, 4520 Main Street, Kansas

21  City, Missouri.

22

23

24

25

1                    APPEARANCES

2    APPEARING FOR THE PLAINTIFF:

3         Mr. Ivan L. Nugent
          Krigel & Krigel, P.C.
4         Suite 700
          4520 Main Street
5         Kansas City, Missouri 64111
          816.756.5800
6         inugent@krigelandkrigel.com

7    APPEARING FOR THE DEFENDANT CORIZON HEALTH, INC.:

8         Mr. Michael L. Matula
          Ms. Claudia M. Tran (VIA ZOOM TELECONFERENCE)
9         Ogletree Deakins
          400 Twentieth Century Tower
10        4520 Main Street
          Kansas City, Missouri 64111
11        816.471.1301
          michael.matula@ogletree.com
12        claudia.tran@ogletree.com

13   APPEARING FOR THE DEFENDANT MISSOURI DEPARTMENT OF
     CORRECTIONS (VIA ZOOM TELECONFERENCE):
14
          Ms. Rachel Louise Jag
15        Missouri Department of Corrections
          Suite 401
16        615 East 13th Street
          Kansas City, Missouri 64106
17        816.889.5012
          rachel.jag@ago.mo.gov
18
     VIDEOGRAPHER:
19
          Mr. Nate Bogert
20        iReport Solutions
          Suite 297
21        7111 West 151st Street
          Overland Park, Kansas 66223
22
     ALSO PRESENT:
23
          Ms. Jenny Meehan - VIA ZOOM VIDEOCONFERENCE
24

25

INDEX

WITNESS:                                        PAGE

TERRI YOLANDA LaBLANCE

  Examination By Mr. Matula                        9

  Examination By Ms. Jag                         247

  Examination By Mr. Nugent                      270

  Further Examination By Mr. Matula              280

  Further Examination By Ms. Jag                 287


EXHIBITS

| EXHIBIT NUMBER | DESCRIPTION | PAGE REFERENCED |
|---|---|---|
| 1 | Complaint For A Civil Case w/Attachments No Bates Numbers Pages 1 through 15 | 17 |
| 2 | Plaintiff's Answers to Defendant Corizon, Inc.'s First Interrogatories | 18 |
| 3 | Quick Confirm License Verification Report Bates Number LaBlance 0050 | 294 |
| 4 | Summary Order of the Kansas State Board of Nursing Bates Numbers LaBlance 0004 - 8 | 33 |
| 5 | Corizon Health Contents of the Application Packet Bates Numbers LaBlance 0039 - 47 | 34 |

EXHIBITS

| EXHIBIT NUMBER | DESCRIPTION | PAGE REFERENCED |
|---|---|---|
| 6 | State of Missouri Department of Corrections Wanted Person Check Bates Number CORIZON 000168 ** CONFIDENTIAL ** | 47 |
| 7 | Section X Acknowledgment and Receipt of Employee Handbook Form w/Attachments Bates Numbers CORIZON 000231, 737, 229, 542, 550 - 552, 242, 243, 638 - 641, 728 - 736, 67 and 111 ** CONFIDENTIAL ** | 49 |
| 8 | Memorandum From Darin Morgan to Terri LaBlance June 20, 2017 Bates Numbers CORIZON 0000478 - 480 ** CONFIDENTIAL ** | 67 |
| 9 | Hughes Letter to LaBlance July 26, 2017 Bates Number CORIZON 000469 ** CONFIDENTIAL ** | 68 |
| 10 | Corrective Action Form July 31, 2017 Bates Number CORIZON 000474 ** CONFIDENTIAL ** | 70 |

1                           EXHIBITS

2   EXHIBIT                                    PAGE
    NUMBER      DESCRIPTION                    REFERENCED
3

4     11        Collaborative Practice            71
                Agreement Advanced Practice
5               Registered Nurse State
                of Missouri
6               July 31, 2017
                Bates Numbers
7               CORIZON 000317 - 335
                ** CONFIDENTIAL **
8
      12        Emails/Inter-Office               73
9               Communications - August 2017
                Bates Numbers
10              CORIZON 000003 - 15
                ** CONFIDENTIAL **
11
      13        Hild Memo To File                 89
12              April 27, 2018
                Bates Number CORIZON 000471
13              ** CONFIDENTIAL **

14    14        Provider Peer Review             229
                Questionnaire
15              Bates Numbers
                LaBlance 0010 - 09
16
      15        Various Emails - June 2018       112
17              Bates Numbers
                CORIZON 000020 - 24
18              ** CONFIDENTIAL **

19    16        LaBlance-Ream Email Exchange     294
                January 2, 2019
20              Bates Number CORIZON 000989
                ** CONFIDENTIAL **
21

22

23

24

25

1                          EXHIBITS

2    EXHIBIT                                          PAGE
     NUMBER      DESCRIPTION                     REFERENCED
3

4     17         Ream-Meehan Email Exchanges        192
                 February 2019
5                Bates Numbers
                 CORIZON 000991 - 994
6                ** CONFIDENTIAL **

7     18         Meehan Email w/No Quit             199
                 Discussion Tracking Form
8                Attached
                 Bates Numbers
9                CORIZON 000016, 18 and 19
                 ** CONFIDENTIAL **
10

      19         LaBlance Email to Meehan           202
11               February 22, 2019
                 Bates Numbers
12               CORIZON 000001 - 2
                 ** CONFIDENTIAL **
13

      20         Offender Information               213
14               Medical Profile
                 Bates Numbers
15               LaBlance 0001 - 3

16    21         State of Missouri Division         222
                 of Professional Registration
17               Complaint
                 Bates Numbers
18               LaBlance 0110 - 111

19    22         State of Missouri Division of      222
                 Professional Registration
20               Complaint Report
                 Bates Numbers
21               LaBlance 0106 - 109 and 0095

22    23         LaBlance W-2 Statements            294
                 Bates Numbers
23               LaBlance 0134 - 139

24

25

```
 1                          EXHIBITS

 2   EXHIBIT                                        PAGE
     NUMBER     DESCRIPTION                      REFERENCED
 3

 4     24       Petition For Damages               225
               Epperson v Corizon
 5             No Bates Numbers

 6     25       Petition For Damages               225
               Kirby v Corizon
 7             No Bates Numbers

 8     26       Plaintiff's Answers to             262
               Defendant Missouri Department
 9             of Corrections First
               Interrogatories
10

11

12
            NOTE:  Original Exhibits were attached
13                  to the original transcript

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    (Whereupon, LaBlance Deposition Exhibit

2                    Numbers 1 through 25 were marked for

3                    identification by the reporter.)

4                            THE VIDEOGRAPHER:  Stand by.

5                    (Deposition commenced at 9:50 a.m.)

6                            THE VIDEOGRAPHER:  Good morning.  My

7    name is Nate Bogert.

8                            Today is July 8, 2020 and we will go

9    on the record at approximately 9:50 a.m.

10                           We are here to take a video deposition

11   in Case Number 4:19-CV-00693-BP for the Circuit Court

12   of DeKalb -- I don't know how to pronounce that --

13   County, Missouri.

14                           Would Counsel state their name and

15   affiliation for the record, please.

16                           MR. NUGENT:  Good morning.

17                           It's Ivan Nugent on behalf of the

18   Plaintiff, Terri LaBlance.

19                           MR. MATULA:  Mike Matula on behalf of

20   Defendant Corizon Health, Incorporated.

21                           Also Claudia Tran from our office is

22   participating remotely through Zoom.

23                           MS. JAG:  This is Rachel Jag, and I am

24   here on behalf of Defendant Missouri Department of

25   Corrections.  And I am participating on Zoom.

1          THE VIDEOGRAPHER:  Laurel, will you

2   swear the witness, please.

3          TERRI YOLANDA LaBLANCE,

4   of lawful age, having been first duly sworn to tell

5   the truth, the whole truth, and nothing but the

6   truth, testified as follows:

7          EXAMINATION

8   BY MR. MATULA:

9          Q.    Ma'am, we've met before the

10  proceedings today started, but again, my name is Mike

11  Matula.  I'm an attorney for Corizon Health, and I'm

12  here today to take your sworn testimony in connection

13  with a lawsuit that you filed against Corizon and the

14  Missouri Department of Corrections and a couple

15  things before we get going.

16          First, the term deposition is just an

17  overblown lawyer word for taking a sworn statement.

18          My goal today is to ask you some

19  questions so that I can find out what you know about

20  certain issues related to your legal claims.  Find

21  out things that you don't know, and what you'll be

22  able to testify in court as the case goes forward.

23          Do you have that general

24  understanding?

25          A.    Yes, I do.

1          Q.     And I am guessing that you've had the

2     opportunity to get some more information about how

3     the deposition process goes through Mr. Nugent.  But

4     I want to go over a few ground rules just to make

5     things hopefully go easier today and get us all out

6     of here faster.

7                    Seem fair?

8          A.     Yes.

9          Q.     First, have you ever had to give sworn

10    testimony before?

11         A.     No.

12         Q.     Well, first, the testimony you're

13    giving today, even though we're in a semiformal

14    setting in your attorney's conference room, it's just

15    as if you're testifying before a judge or a jury in

16    court.

17                    Do you have that understanding?

18         A.     Yes.

19         Q.     And in fact, it is probable that at

20    least some parts of the testimony that you give today

21    will be used -- will be presented to the court or to

22    the jury at some point in later proceedings.

23                    Do you understand that?

24         A.     Yes.

25         Q.     And so because of the importance of

1    your testimony today, my goal is simply to

2    communicate, and so if I ask a question that is at

3    all confusing or for whatever reason you just don't

4    think that you and I are on the same page about what

5    I'm trying to find out, that's fine.  Just let me

6    know and I will do my best to ask a better question.

7            A.    Okay.

8            Q.    Seems fair?

9            A.    Uh-huh.

10           Q.    If you don't stop me, though, then

11   we're going to go forward in the legal proceedings,

12   and the record that we get here today, both through

13   the court reporter and through the videographer,

14   everyone's going to rely on your testimony and assume

15   that the questions seemed clear enough for you to

16   give answers without qualification?

17           A.    Okay.

18           Q.    Fair enough?

19           A.    Yes.

20           Q.    Also, this is not an endurance

21   contest.  If at any point you need a break, just let

22   us know, and we'll get you a break right away.  If I

23   have a question pending, I might want to get an

24   answer to my question before we go off the record,

25   but other than that, just let us know if you need a

1  break for any reason.

2            Will you do that?

3       A.    Yes.

4       Q.    Sitting here today, is there any

5  reason you don't believe you would be in a position

6  to give your best, most complete, accurate testimony

7  this morning?

8       A.    No.

9       Q.    Okay.  Also, to make sure we get a

10 good record, a couple things.  If I ask you a

11 question and you nod or you shrug your shoulders, I

12 might understand exactly what you're telling me, but

13 we need audible responses so we can get a record, a

14 written record.

15           So if I say is that a "yes," or is

16 that a "no," I promise I'm not trying to be rude or

17 anything like that, I'm just -- that's kind of my way

18 of reminding, hey, we need a yes-or-no answer for the

19 court reporter.

20           Fair enough?

21      A.    Yeah, I understand that.

22      Q.    Also today we have a very mean court

23 reporter, and so it's really important that we don't

24 talk over one other because that will just make her

25 all the meaner.

1        A.     Okay.

2        Q.     All right?

3        A.     Yes.

4        Q.     More seriously, it does make Laurel's

5 job a lot harder if we're talking over one another,

6 so I will do my very best to not start a new question

7 until you are done with your answer, and if you could

8 do your very best to wait until the complete end of

9 my question to start your answer, even if you know

10 where I'm going, that will make her job a lot easier.

11             Fair enough?

12        A.     Okay.

13        Q.     Okay.  With that, ma'am, are you

14 currently employed?

15        A.     Yes, I am.

16        Q.     And where is that?

17        A.     I currently work for the Grand

18 Pavilion Rehabilitation Center --

19        Q.     And where is that?

20        A.     -- in Kansas City.

21        Q.     Okay.  And how long have you held that

22 job?

23        A.     Since the 4th of January.

24        Q.     2020?

25        A.     Yes, that's correct.

1        Q.    And how do you like it?

2        A.    It's nursing and I enjoy taking care

3 of people.

4        Q.    Do you like the people you work with?

5        A.    Yeah.

6        Q.    Have you --

7        A.    We're good.

8        Q.    All right.  Fair enough.  Since

9 working at Grand Pavilion, have you felt that you

10 have been harassed or discriminated based on your

11 race or for any other reason?

12       A.    At the Grand Pavilion?

13       Q.    Yes.

14       A.    Yes.

15       Q.    Okay.  And have you submitted any sort

16 of complaints to supervisors about whatever conduct

17 that you're alluding to?

18       A.    Yes.

19       MR. NUGENT:  For the record, I'm going

20 to object to form.  The answer's been stated.

21 BY MR. MATULA:

22       Q.    And you -- have you gone so far as to

23 file a charge of discrimination or take any type of

24 legal action for the conduct that you've experienced

25 at Grand Pavilion?

1          MR. NUGENT:  Same objection.  And I'm

2   just going to make it a continuing one for all the

3   questions related to perceived discrimination at

4   Grand Pavilion that are not stated or alleged in the

5   current case.

6          You can answer.

7      A.     Can you repeat the question?

8   BY MR. MATULA:

9      Q.     Sure.  Have you initiated any type of

10  complaint external to Grand Pavilion?  For example, a

11  charge of discrimination, as you did prior to filing

12  this lawsuit?

13     A.     Have I issued a complaint?

14     Q.     Let me -- let me try again.  First, I

15  don't want to get too deep in the weeds if we don't

16  have to, but I'm going to need to know, can you tell

17  me the gist of what the nature of the conduct is that

18  you've experienced at Grand Pavilion that you believe

19  is racially discriminatory or harassing?

20     A.     I -- I can do that.  I did not know

21  that that case was relevant to this, or that

22  situation was relevant to this case.

23          This is a situation that I incurred

24  with another employee which I took to management and

25  when I took that to management there was a

1  conversation that was had regarding the statement
2  that was made, and it has been resolved.
3          Q.      Okay.  What I'm gathering from what
4  you just told us is that someone you work with said
5  something that you found inappropriate, you went to a
6  manager or supervisor, raised the issue, there was a
7  meeting or talking to, and as far as you're
8  concerned, it's --
9          A.      Yes.
10         Q.      -- been resolved to your satisfaction?
11         A.      Yes, because the individual was
12  educated and confirmed that they understood why what
13  they said was not appropriate and it was resolved.
14         Q.      Okay.  And is that the -- the incident
15  that you just described is that the only situation
16  while you worked at Grand Pavilion where you felt you
17  were discriminated or harassed based on your race?
18         A.      Yes.
19                 MS. JAG:  Hey, Mike, I'm sorry to
20  interrupt.  But I -- I think your voice is kind of
21  echoing, is there a way that you can speak a little
22  bit more -- like closer to the speaker if possible.
23  Sorry about that.
24                 MR. MATULA:  Rachel, that's going to
25  be a little hard.  I will -- I will do my best.

1          MR. NUGENT:  Do you want to go off the

2    record?

3          MR. MATULA:  Yeah.  Let's go off the

4    record for a second to see if we can clean it up.

5          THE VIDEOGRAPHER:  We'll go off the

6    record at 10:00 a.m.

7               (Off-the-record discussion.)

8          THE VIDEOGRAPHER:  Stand by.  We are

9    back on the record at 10:07 a.m.

10   BY MR. MATULA:

11        Q.    Ms. LaBlance, continuing with your

12   testimony.

13        MR. MATULA:  Laurel, if you could hand

14   Ms. LaBlance the first two exhibits.  And I've got

15   spares in there for Ivan.

16   BY MR. MATULA:

17        Q.    Ma'am, you've been handed two

18   documents.

19             The first, Exhibit 1, is a copy of the

20   -- the lawsuit papers as this was originally filed

21   back in September.  And it also includes some

22   additional documents, the right to sue notice, the

23   charge of discrimination, it contains a -- in the

24   dismissal, it contains a three-page single space

25   typewritten section that's entitled Discrimination

1   Complaint?

2               Do you see all that?

3         A.    Yes.

4         Q.    And the second document, Exhibit 2, is

5   entitled Plaintiff's Answers to Defendant Corizon's

6   First Interrogatories.

7         A.    Uh-huh.

8         Q.    And I don't -- when I made my copy, I

9   don't think I attached a verification page, which I

10  think we have from you, but my question first is with

11  regard to Exhibit 2, you've seen that document in

12  this form before, have you not?

13        A.    Yes.

14        Q.    And you had a chance to look over your

15  responses before they were submitted to the other

16  parties through your attorney, did you not?

17        A.    Correct.

18        Q.    And at that time, did everything

19  appear true and accurate to your best knowledge?

20        A.    Yes.

21        Q.    And then also with regard to

22  Exhibit 1, and this -- I believe this was prepared

23  and filed before you had representation; is that

24  correct?

25        A.    That's correct.

1      Q.     Is there any -- is there anything in
2  Exhibit 1 that you believe is inaccurate or
3  materially incomplete, any of the information?
4      A.     Not that I believe is inaccurate or
5  incomplete, no.
6      Q.     Fair -- fair enough.  I want to ask
7  you some questions about the portion of Exhibit 1
8  that's several pages in.  I think it's Page 7 -- it
9  starts with Page 7 of 15, the single-spaced section
10  that's titled Discrimination Complaint.
11          Just let me know when you're there.
12      A.     I'm here.
13      Q.     Okay.  All right.  And it's -- it's
14  got a date at the top of March 30, 2019.  Is that
15  when you submitted it to the Equal Employment
16  Opportunity Commission?
17      A.     On or about, yeah.
18      Q.     Sure.  And that was just about four or
19  five weeks after your last day at Corizon; correct?
20      A.     That is correct.
21      Q.     And what was -- inputting this
22  section -- this document -- when I say this document,
23  I'm talking about Pages 7 through 9, the
24  single-spaced letter that -- ish section that you
25  signed.  When you put that together, what was your

1  understanding of what it would be used for?

2          A.      For my complaint at the EEOC, and --

3  yeah, to file my complaint there.

4          Q.      Sure.  And did you -- did you prepare

5  this at home, like on a home computer or something?

6          A.      Yes, I did.

7          Q.      Did you -- did you put this

8  discrimination complaint, was it something you did

9  all in one sitting or did you put some input as you

10 could, maybe revised it before it was finalized?

11         A.      I did revise it before I submitted it.

12         Q.      Sure.  And I assume you did that

13 because you wanted to make sure that everything in

14 there was as accurate and complete as you could?

15         A.      At that time, absolutely.

16         Q.      Right.  And you knew this would be

17 submitting something as a discrimination complaint.

18 It sounds like you took your time over at least a --

19 a couple different settings over a couple days at

20 home to try to get all the important stuff in there

21 that you could think of at the time; is that fair?

22         A.      Well, yeah, I can't tell you how many

23 days, but yeah, I did try to make sure that I did not

24 leave out -- that I -- that I was able to capture

25 what I was trying to convey.

1          Q.      Absolutely.  And --

2          A.      To the best of my ability at that

3    time.

4          Q.      Sure.  And at that time was much

5    closer to the events of -- of what happened at

6    Corizon than, for example, today; right?

7          A.      Yes, in -- in time-wise.  Yeah.

8          Q.      Yes.  Did you have any notes or any

9    written materials that you referred to or that you

10   were looking at as you prepared this material?

11         A.      No, I did not.

12         Q.      And if you can switch gears and look

13   at Exhibit 2 for just a second and in particular on

14   Page 10, Question 16, just let me know when you're

15   there.

16         A.      Okay.

17         Q.      The question -- I'm paraphrasing, the

18   question was asked of you generally if, while you

19   worked at Corizon, did you have any notes, diaries,

20   other types of records that might have been a source

21   of some, you know, memorializing things that

22   happened.

23              And -- and your answer was, "Plaintiff

24   states that in the wake of her traumatic termination

25   via constructive discharge, that she did not keep any

1  notes, diaries, journals, calendars, or other records

2  of any events or conversations that relate to her

3  termination."

4          Do you see where I'm reading?

5      A.    Uh-huh.  Yes.

6      Q.    Thank you.  You're way ahead of me.

7  Thanks.  Okay.  I just want to make sure my

8  understanding is correct.

9          Did -- did you ever have any such

10  notes, diaries, journals, calendars or other records

11  of -- of things that were going on at Corizon, but

12  just no longer had them or did you just never keep

13  them at all?

14      A.    I never kept them.

15      Q.    Okay.  Total time that you believe you

16  put into preparing the -- the three-page single

17  spaced narrative of discrimination complaint that we

18  were looking at Exhibit 1, any idea?

19      A.    The total time I spent preparing this,

20  I would guess to say, it took place during that

21  four-week span of time from when I -- after I left

22  from my last day there to the date that it was

23  submitted.

24      Q.    Okay.

25      A.    And that's roughly about four weeks.

1    And I say that because it -- as I wrote it, of

2    course, I did revise it, and try to make sure that

3    what I was trying to convey was complete -- as

4    complete as possible and concise to make sure that my

5    message was -- that my complaint was understood.

6         Q.    And I think I did -- I think you did a

7    very good job with that purpose.  Ballpark, a few

8    hours total?  More than -- and if you can't give me

9    the precise number, I get that, but over a span of

10   four weeks, how much total time before the first

11   words you started typing out and when you signed off

12   on it?

13        A.    How much total time?  I think that

14   would be hard to estimate.  I mean, this was sort of

15   consuming at that time because of the things that had

16   occurred.

17        Q.    Sure.

18        A.    So there was -- you know, there were

19   conversations and questions with -- you know, and

20   thinking and thoughts and....

21        Q.    It looked -- and I don't know, you

22   were there not me.  I mean, three pages single

23   spaced, it has -- it's obviously very -- a lot of

24   thought was put into this.  It seems like something

25   that would take at least several hours of time at a

1  minimum to put together --

2       A.     Yes.

3       Q.     -- is that a fair -- okay.  All right.

4  Fair enough.

5            While you were putting together -- you

6  mentioned you didn't have any notes or records, did

7  you talk to anyone, interview anyone, call someone to

8  try to refresh your memory or get information from

9  them as you put that document together?

10      A.     No, not -- no, I did not.  It was more

11 so with my spouse and family members who I had spoke

12 with during my course of employment with Corizon and

13 the Department of Corrections.  Yeah.

14      Q.     All right.  Fair enough.  Let me

15 switch gears.  We're going to come back to that in a

16 little bit.  But switching gears.

17            To prepare you for your testimony

18 today, can you tell me what you did, and I'm going to

19 preface -- I should have said this before.

20            At no time in any of my questions

21 today, do I think I will ever ask you something to --

22 that's designed for you to share the substance or

23 details of any conversations you've had with

24 Mr. Nugent or anyone on his staff, or -- or any of

25 your legal representation.  I'm not trying to get

1    those details.

2                With that disclaimer, I'll start my

3    question again.  Can you tell me what at all, if

4    anything, did you do to prepare yourself to give your

5    testimony today?  Talk with people, look at -- look

6    at documents.  Anything, you tell me.

7         A.     I did look at the documents that have

8    been submitted on my behalf.  Just to make sure that

9    they are correct.  And honestly, prayer.

10        Q.     Fair enough.

11        A.     Prayer.  Yeah.  There was, you know,

12   there was no -- there's really no one to speak with.

13   I just, you know, I have spoken with my attorney,

14   and, of course, I'm coming in to be -- to bring to

15   you the things that I endured, that I experienced,

16   that happened to me while I was there, and that's

17   just an honest recollection of the events that took

18   place that led to my discharge.

19        Q.     Understood.  Your last day of

20   employment with Corizon was February 22, 2019?

21        A.     That is correct.

22        Q.     Who -- since -- since your employment

23   ended, who, if anyone, associated with Corizon, have

24   you communicated with in any way?  Stayed in touch

25   with, anything like that.

1          A.     There is one individual that called

2    me, maybe three or four months out, or maybe a couple

3    months out, and I may have spoken with her twice

4    since I have left.

5          Q.     Who's that?

6          A.     Her name is Shannon.

7          Q.     Is that Shannon Burris?

8          A.     Yes.

9               MS. JAG:  I'm sorry.  Who did you say?

10    Shannon who?

11               MR. MATULA:  Burris.  I believe that's

12    B-u-r-r-i-s.

13               MS. JAG:  Thank you.

14    BY MR. MATULA:

15          Q.     Ma'am, we're going to go through a

16    full who's who in just a little bit.

17          A.     Okay.

18          Q.     But with regard to Shannon, how -- how

19    do you know Shannon?  How did you guys work together?

20          A.     We worked together at Corizon with --

21    at Chillicothe with Corizon and the DOC there in the

22    medical department.  I was a nurse practitioner

23    there, and she was a licensed practical nurse who

24    worked nights particularly -- I mean, specifically.

25          Q.     And when you say "worked nights," can

1    -- what -- were there different shifts or what was

2    the standard, if someone was working days, versus

3    mids, versus nights, what does all of that mean?

4          A.      Yeah.   She worked the third shift

5    which is from -- I guess she would come in -- I don't

6    know what time she came in, but she was getting off

7    as I was coming in in the morning, most of the time.

8          Q.      What were your regular hours?

9          A.      From 8:00 to 4:00.

10         Q.      And would that be considered the first

11   shift or the second shift?

12         A.      Well, I wasn't a staff nurse, I was a

13   provider there, and so my schedule was different from

14   the staff nurses.

15         Q.      Gotcha.   Okay.

16                 If you're telling me -- it doesn't

17   sound as if, though, that your typical schedule

18   overlapped with Shannon's very much, in terms of the

19   hour -- the hour overlap, is that correct, or not?

20         A.      Not a lot.   It did not overlap a lot.

21   However, I usually saw her almost every morning that

22   she -- you know, most of the mornings that she got

23   off, and I was coming in.

24         Q.      Okay.   So she'd be headed out

25   somewhere maybe around the 8 o'clock hour, and that's

1  when you would be typically coming in, so that's how

2  you would see her?

3      A.    Yes.  Or if she worked a different

4  shift.

5      Q.    Understood.  And also, because you

6  happen to be the first witness giving testimony in

7  this particular case, just some -- some background

8  for the record.

9            Can you tell us what -- what does

10 Corizon do?  In particular, what does Corizon do at

11 the Chillicothe Correctional Facility?

12     A.    Corizon is actually in partnership

13 with the Department of Corrections and they staff

14 the -- or help to staff the medical clinic on the

15 Department of Corrections prison site -- or sites

16 here in the State of Missouri.

17     Q.    They're a provider of healthcare

18 services at correctional facilities in Missouri,

19 including the Chillicothe Correctional Center.  Fair

20 summary?

21     A.    Fair summary.

22     Q.    And your employment with Corizon

23 started in June of 2017, you were hired on as a

24 physician's assistant/advanced registered nurse

25 practitioner; correct?

1          A.      Correct.

2          Q.      Where -- in what states are you

3    presently licensed as a nurse?

4          A.      In the State of Missouri and the State

5    of Kansas.  And I also have my Compact license which

6    allows me to practice in all the states that are a

7    part of the Compact which are the majority.

8          Q.      And the -- I was a little unclear from

9    some of the paperwork I saw.  When were you first

10   licensed to -- when -- your Missouri nursing license

11   first become in effect?

12         A.      In 2011.

13         Q.      It looks like something happened in

14   2015 in Missouri, is that a special certification or

15   something?  We can look at the paperwork, but do you

16   know what I'm talking about?

17         A.      Yeah, that was when I became

18   certified -- board certified by the NCC as a women's

19   health nurse practitioner.

20         Q.      Okay.  So you got your license in

21   2011, and then you had some sort of board

22   certification that kicked in in 2015?

23         A.      Yeah, I maintained my master's

24   specializing in women's health, which I completed in

25   2014, and in 2015, I was board certified by the

1  National Certification Committee as a women's health

2  nurse practitioner.

3       Q.    And where did you get your nursing

4  degree, your original nursing degree?

5       A.    My original nursing degree is

6  Rockhurst Research.

7       Q.    And what years was that?

8       A.    Pardon me?

9       Q.    What year period?

10      A.    That was 2011.  August of 2011.

11      Q.    Okay.  So -- but how long were you in

12  nursing school?

13      A.    I was in nursing school -- it was a

14  12-month accelerated program because I previously had

15  a bachelor's degree in biology from Cameron

16  University out of Oklahoma, so....

17      Q.    So you already -- the -- you were able

18  to complete your nursing degree in a year because of

19  your background?

20      A.    Because of my previous background and

21  experience.

22      Q.    Gotcha.

23      A.    Previous bachelor's degree in biology.

24      Q.    And when did you get your Kansas

25  license?

1          A.     My Kansas license, 2018.  '19 -- wait.

2     '19.

3          Q.     I had it '19, but I wasn't sure.

4          A.     '19.  '19.

5          Q.     I want to talk about the process --

6     the hiring process, about how you joined up with

7     Corizon.  First, how did you hear about the job

8     opportunity at Corizon?

9          A.     I -- I was contacted by a recruiter.

10          Q.     All right.  And so walk me through the

11     steps as you remember them from the time that you

12     were contacted by a recruiter until the time you

13     physically started working at the Chillicothe

14     facility.

15          A.     I received a phone call from the

16     recruiter for Corizon, he described the position and

17     what they were looking to fill.  He, you know, of

18     course, told me where it was located, and asked me if

19     I was interested.  And I shared with him, yes, I am.

20               It's my understanding that at that

21     time, if I remember correctly, I resubmitted an -- a

22     resumé to him, because he had seen it online, Indeed

23     or something of that nature, and I authorized a

24     background check.

25               After getting those things returned to

1 him, I believe that he contacted Corizon's corporate

2 office out of Jeff City, told them that he had

3 someone that he thought would be a fit for the job

4 that they needed to fill, and I was invited for an

5 interview to Jeff City.

6                    I went to Jeff City, I met with the

7 regional medical director, and then --

8        Q.     Do you remember who that was?

9        A.     His name is Jerry Lovelace.

10                   And I met the assistant regional

11 medical director at that time, who is Dr. Bredeman.

12        Q.     Sorry.  Can you --

13        A.     Dr. Bredeman.  B-r-e-d-e-m-a-n.

14 Bredeman.

15                   During that interview, I actually sat

16 in on a provider meeting where some of the practices

17 were being reviewed with the prisons in the region,

18 and was sort of briefed on what would be my -- what

19 would be sort of my way of going about handling these

20 situations if I were working in that setting.

21                   Later I was -- I was offered to take a

22 tour at Chillicothe, which I drove to Chillicothe, I

23 met the recruiter there, went in, met with one of the

24 ladies that worked in the medical department, as the

25 -- in the administrative part.  Took a tour of the

1   medical facility there, and was later offered the

2   position, which I accepted.

3           Q.      Do you remember who you met with when

4   you did your preemployment tour?

5           A.      If you hadn't -- I do.  I'm trying to

6   remember her name.  At that time, she was -- I can't

7   remember her name off the top of my head.  But she

8   was the executive assistant to the medical site

9   administrator, Tere- -- no, it's not Teresa.  I can't

10  remember her name.

11              I also met the site administrator, the

12  physician that was the medical -- the site medical

13  director at that time.

14          Q.      As you give me those titles, if you

15  remember their names for the record that would be

16  great too, but if you don't then titles are fine.

17              Do you remember any of the names, the

18  site administrator, the medical director?

19          A.      And site administrator was Teresa

20  McWhorter.  And the physician, I can't believe I

21  don't remember her name, but I do not.  She had been

22  there for quite some time.  And it will come to me

23  later, I'm sure.

24              MR. MATULA:  Go to 4, Exhibit 4.

25              Rachel and Claudia, I realized that I

1   started talking about exhibits without really

2   identifying them very well for you.  I'm going to try

3   to do a better job of that.  In fact, I'm going to

4   really get fancy and try to do my screen share.  I

5   don't like doing it when I only have one monitor.

6   I'll see how it goes.

7   BY MR. MATULA:

8          Q.    Ma'am, you've --

9                MS. JAG:  I appreciate that, Mike.

10  Thank you.

11               MR. MATULA:  Five.  You can keep --

12  keep that one.  We'll use it in a moment.  Five is

13  what I meant.  I apologize.  We'll use both.  It

14  should be the application packet.

15               I'm going to try to do the screen

16  share, but -- Exhibit 5 has Bates Numbers LaBlance 39

17  through 47.  Those are the Plaintiff's Bates Numbers.

18  So that's another reference.  So let's see how I do

19  here.

20               MR. NUGENT:  Mike, I'm looking at

21  what's -- what appears to be Exhibit 5, and I have

22  LaBlance 11.

23               MR. MATULA:  You know what, I had a

24  copy issue.  Actually, if you want to go ahead and

25  just take off the first page of where it picks up at

1   39.  I apologize for that.  I amended the exhibit.

2              MS. JAG:  So what pages were that

3   again?  I'm sorry, Mike.

4              MR. MATULA:  It's going to be -- it

5   should be 39 through 47.

6              Ma'am, can I steal that back from you

7   one second.

8              (Off-the-record discussion.)

9              MR. MATULA:  Rachel, did that come up

10  on the feed?

11             MS. JAG:  Yep.  Looks perfect.  I can

12  see it.  Thank you.

13  BY MR. MATULA:

14       Q.    Okay.  Ma'am, in Exhibit 5, I just

15  want to confirm that that is the application packet

16  that you submitted in connection with your employment

17  with Corizon, and that's your handwriting, and in

18  particular that's your signature on the last page?

19       A.    Yes, it is.

20       Q.    It looks like you signed off on this

21  on May 4, 2017?

22       A.    Yes.

23       Q.    And was everything -- all the

24  information that you affirmed in this application

25  accurate at the time you submitted it?

1          A.     Yes.

2          Q.     There was something in your narrative,

3   which is part of Exhibit 1, that also pertains to

4   kind of the hiring process background, where I think

5   you -- at some point you mentioned you needed to get

6   clearance from the Department of Corrections as well

7   as part of the hiring process.

8                 Do you remember that?

9          A.     Yes.

10         Q.     Okay.  Tell me about -- tell me about

11  that.  And if you need to -- if you want to look

12  back, I'm looking on the third paragraph of that

13  discrimination complaint, a document we looked at

14  earlier.

15                MR. MATULA:  Which Rachel and Claudia,

16  I'll try to bring up again.

17         A.     Tell --

18  BY MR. MATULA:

19         Q.     I'll tell you what, go to Exhibit 1,

20  on that Page 7 of 15, and it's the third -- I guess,

21  the third paragraph down.

22         A.     Okay.

23         Q.     Is -- hang on a second here.  There's

24  others.  The paragraph that starts, "Following

25  clearance from the Missouri Department of

1    Corrections."

2              Do you see that?

3         A.    Uh-huh.

4         Q.    Okay.  First tell me what -- what was

5    your understanding of what clearance from the

6    Department of Corrections needed to take place before

7    you could start work with Corizon?

8         A.    Well, I had already started work at

9    Corizon, at the Department of Corrections.  This took

10   place following my first day on the job and I

11   received notification that there was a question by

12   the warden, whom I had met that morning, as to my

13   being there.  The information that I submitted in my

14   application was there.  So I'm not sure why there was

15   confusion or whatever the issue was.  All I know that

16   it was resolved.

17        Q.    Let me break it down this way:

18              The way the narrative wrote -- you

19   wrote, says, "Following clearance by the Missouri

20   Department of Corrections, I began my employment?"

21              Do you see that?

22        A.    Yes.

23        Q.    Okay.  I -- reading that, I had it in

24   my head that -- that your employment with Corizon

25   began after the clearance from the Department of

1  Corrections, but I think what you were saying a

2  moment ago, your -- let me back up.

3           Was it your understanding that you had

4  been cleared by the Department of Corrections before

5  your employment started with Corizon or not?

6       A.    That is correct.

7       Q.    Okay.

8       A.    And before I was to work with the

9  Department of Corrections.

10       Q.    Right.  And that makes sense.  The

11  Department of Corrections, you understand, ultimately

12  has the authority about who can come on its premises

13  and so anyone working at Corizon, the Department of

14  Corrections has to approve of that?  You understood

15  that; right?

16       A.    Yes, anyone that comes on to the

17  grounds has to be --

18       Q.    Makes sense.

19       A.    Right.  Right.  Before you're allowed

20  to come on to the grounds.

21       Q.    Gotcha.

22           Okay.  So I think what you're telling

23  me is at the end of your first day, your first day on

24  the job, and at the end of the day or some part of

25  the day, you get notified that the warden had

1    some questions about --

2         A.    Correct.

3         Q.    One, who -- who notified you, do you

4    remember?

5         A.    The medical director.

6         Q.    Who's that, at the time?

7         A.    Dr. Lovelace.

8         Q.    Now, Dr. Lovelace is not in

9    Chillicothe, he's in Jeff City; right?

10        A.    Correct.

11        Q.    So he -- it must have been a

12   notification by phone or --

13        A.    Correct.  Request -- yes.

14        Q.    Lovelace gives you a call, and says,

15   "Hey, the warden has some questions for you,"

16   something to that effect?

17        A.    Something to that effect.

18        Q.    All right.  So tell me what you

19   remember about how -- what you did in light of

20   Mr. Lovelace giving you that information?

21        A.    I believe I sent him a narrative

22   explanation of my background so that there could be a

23   clear understanding.

24        Q.    All right.  Did -- before you sent the

25   narrative did you speak with the warden to find out

1   the specifics of what his -- what his concerns were,

2   what he was trying to find out?

3           A.     No, I did not.  He did not approach me

4   directly.

5           Q.     Okay.  Well, do you remember anything

6   else about what Mr. Lovelace told you about what

7   additional information or what questions the warden

8   had?

9           A.     It was nonspecific other than just

10  needed more -- I guess -- I'm not sure if the -- I'm

11  not exactly sure if the warden requested more

12  information or if more information was needed to make

13  sure that there was clarity, or if he felt that way

14  or if the warden felt that way, I don't recall.

15  However, it was requested and submitted and resolved.

16          Q.     Right.  And I'm just -- and if you

17  don't recall the specifics, that's fine.  I'm just

18  trying to think of like in order for you to even know

19  what additional information might be helpful for the

20  warden, someone's got to tell you what the problem

21  is, what the issue is, so you know, like, "Hey.

22  Okay.  I need to provide more about my employment

23  history, or my criminal history background or clarify

24  something," somebody's got to give you an idea of

25  what the issue is so that you know what to -- to

1    submit to try to get it clarified; right?

2          A.    Yes.

3          Q.    Okay.  And if you don't recall the

4    specifics, just tell me, but do you recall any

5    specifics either given from Mr. Lovelace or anyone

6    else as to what it was that was the question that

7    needed to be further addressed?

8          A.    I don't recall a specific question,

9    other than a question regarding my background.

10         Q.    And then you believe you -- the way

11   you're -- the typewritten document on the subject

12   reads, you say, "I was asked to provide additional

13   explanation of my background.  Sufficient explanation

14   was provided and my employment continued without

15   disruption."

16               Do you see that?

17         A.    Yes.

18         Q.    Okay.  And so you think you submitted

19   something in -- some further information in writing

20   or did you call the warden or how did that happen?

21         A.    I have always been honest and upfront

22   about mistakes I've made in the past because it is --

23   I take full responsibility for bad decisions, as well

24   as good decisions that I've made in the past.

25               So when I -- just to sort of give you

1   a little bit of information, when I decided to go to
2   nursing school, when I applied for my license, when I
3   decided to go to graduate school, when I applied for
4   my license, when I applied to take boards, these
5   explanations have been given on numerous occasions.
6             So I do have a statement that I have
7   made in the past that explains things that happened
8   in my past that is sufficient, I think, to -- for
9   anyone that reads it to know who I was and who I am.
10  And I think that -- I believe that that's what I have
11  submitted to him as well, and where it went from
12  there and how it was resolved, I have no knowledge.
13         Q.    Gotcha.
14            So your best memory is, you think that
15  in response to this issue that Mr. Lovelace made you
16  aware that the warden wanting some additional
17  information, you think you submitted this -- it
18  sounds like a statement you prepared for multiple
19  sources at times to kind of explain some further
20  background, and that's what you think you submitted
21  and then didn't hear anything further, everything,
22  seemed like it was resolved?
23         A.    Uh-huh.
24         Q.    Is that a fair summary?
25         A.    Uh-huh.

1              MR. NUGENT:  Is that "yes"?

2       A.     Oh.  Yes.

3            And it wasn't new information, it

4 wasn't new to anyone to my knowledge, because it

5 wasn't something that was hidden or over -- you

6 know -- or you know, there was no deception or

7 anything of that nature.

8 BY MR. MATULA:

9       Q.     And I see in your application packet

10 we looked at before, you -- you identified some

11 aspects of some instances you've had in the past.

12       A.     Uh-huh.

13       Q.     And I haven't seen the statement that

14 you -- something you prepared for this that you might

15 have used, but it sounds like it tries to capture

16 kind of that history and provide some further

17 explanation?

18       A.     Absolutely.

19       Q.     Okay.

20       A.     Can I add to that a little bit?

21       Q.     Sure.

22       A.     I will say that when I met with the

23 warden, I don't know if that is a standard practice

24 or if that occurred because of who I am -- okay? --

25 and I just want to say that he at that time did not

1  ask me any direct questions.  So I'm not sure how it

2  came about and I'm not sure if that's standard

3  practice, but I did willingly meet with him at that

4  time.

5       Q.    Sure.  Had -- when you met with the

6  Corizon folks in Jeff City --

7       A.    Yes.

8       Q.    -- was there any specific discussion

9  about the -- your criminal history, kind of that

10  whole deal during those meetings?

11      A.    Yes.

12      Q.    Okay.  Tell me about what you remember

13  about those discussions covering.

14      A.    About that discussion.  I usually

15  preface -- well, I'm sure that I prefaced our

16  interview with these things are in -- are here.  You

17  will find them.

18            "And so before I waste your time,

19  before I take up your time, if that is something that

20  will keep me from this position, we can just -- let

21  me tell you up front."

22      Q.    Right.  Sure.

23      A.    "So that I'm not wasting your time if

24  you feel that you need to find someone else for this

25  position."

1          Q.     Gotcha.

2                 And just to recap, because there's

3     a -- this is, I think, summarized in interrogatory

4     responses, but just to kind of list this here, I've

5     seen a couple different forms, and the chronology is

6     a little wonky to me, but in terms of the instance

7     you're referring to in the past, can you just quickly

8     go through kind of the list and the year and some

9     description, so we can get a little boat list so we

10    can use that for the rest of the testimony today.

11         A.     So you're asking me to list to you the

12    things in my background that's in where?

13         Q.     Well, I guess --

14         A.     Because I'm -- I'm a little confused,

15    because this all took place prior to me becoming a

16    nurse, prior to me going to work at Corizon and the

17    Department of Corrections and not to -- you know, I'm

18    trying to kind of figure out how this connects to why

19    we're here today.  Because --

20         Q.     If -- if -- I understand.  If you want

21    to talk to Mr. Nugent about that, or if he thinks

22    some question is improper, we can sort that out.

23                I am just trying to get factual

24    information so that later on the judge can decide,

25    and there's some -- I know there's issues with regard

1  to the materials that Ms. Epperson sent you after

2  your employment, you left that might tie into this.

3  We can -- someone else can sort that out.

4            I'm just trying to get an accurate

5  summary so I understand what the facts are.  That's

6  all I'm trying to do.  Okay?

7            And if --

8       A.    A summary of --

9       Q.    If it's helpful we can do it this way.

10  If you look back at Exhibit 2, starting on Page 2,

11  Question 4, that -- there's a written question that

12  kind of covers this, and maybe we can use that just

13  to get through it and we can take a break.

14            MR. NUGENT:  At -- at this point I'll

15  -- I'll object to the form and also state a

16  continuing objection related to Ms. LaBlance's

17  criminal background.

18  BY MR. MATULA:

19       Q.    Have you found that on Page 2?

20       A.    Yes, I have.

21       Q.    Okay.  All right.  Is your answer to

22  Question 4, is it complete and accurate?

23       A.    It looks pretty complete.  It looks

24  pretty complete.  Yeah.

25            MR. MATULA:  Why don't we go ahead and

1    take a break.  We've been going about an hour.

2                    MR. NUGENT:  Sure.

3                    THE VIDEOGRAPHER:  Going off the

4    record at 10:55 a.m.

5                        (Brief recess taken.)

6                    THE VIDEOGRAPHER:  Stand by.

7                    We are back on the record at

8    11:14 a.m.

9    BY MR. MATULA:

10           Q.    Ma'am, we're continuing your testimony

11   after a short break.  You realize you're still under

12   oath, all the other previous admonitions still apply

13   for the rest of your testimony even after breaks?

14           A.    Yes.

15           Q.    Will you pull out Exhibit 6.

16   Exhibit 6, I doubt you've seen this before; maybe you

17   have.  It was a record in -- that was part of Corizon

18   records in connection with the background to your

19   employment.  And let me pull this up for Rachel

20   again.  It's on pause.  Zoom share.

21                    The only question I have is, it seems

22   to also capture the substance of some of the history

23   here.  There is a -- and it's pretty faint, but

24   there's, it looks like, some handwriting towards the

25   -- the bottom, if I'm reading it correctly.  It looks

1   like it says, "Did not serve time at CCC."

2                   Do you see that?

3           A.      Yes, I do.

4           Q.      Okay.  I'm assuming that CCC, that is

5   also an abbreviation commonly for the Chillicothe

6   Correction Center?

7           A.      That is correct.

8           Q.      All right.  Is -- is that accurate or

9   inaccurate.  Did ever serve any -- or were you ever

10  incarcerated at the CCC?

11          A.      No.

12          Q.      Okay.  So the note is accurate?

13          A.      The note is accurate.

14          Q.      Okay.  Also, not to spend too much

15  time on this, I -- the way I was reading the

16  background information, it didn't look like you were

17  ever incarcerated, you had some suspended sentences

18  and a probation deal or whatever, but is that

19  correct?

20          A.      That is correct.

21          Q.      Okay.  That's what I thought.

22                  All right.  Now, also, in connection

23  with you -- your employment at Corizon, there were a

24  number of training and all sorts of things.  I'm

25  going to focus my questions on issues related to

1  discrimination, harassment, reporting and that sort

2  of thing.

3          Do you remember what all Corizon, or

4  the Department of Corrections for that matter, did in

5  terms of either training or policies or anything that

6  was shared with you as an employee during your

7  employment?

8          A.    I do remember a module that we were

9  required to complete on the computer on our own time

10  that did have a deadline, and the module was on

11  harassment and discrimination.

12          Q.    Was that part of --

13          A.    It may have been seven minutes long.

14          Q.    Does that -- was that part of your

15  onboarding orientation or was it something separate?

16          A.    It was something separate.

17          Q.    Was it done as -- was it done at the

18  outset of your employment or was it something done

19  after you had been working there a while?

20          A.    After I had been working there.

21          Q.    Okay.  Go to Exhibit 7.

22          MR. MATULA:  And Rachel, I'm going to

23  have to pull this up piecemeal because actually

24  Exhibit 7 is a conglomeration of a few documents that

25  I have as separate files so I can't share it all in

1  one place, but I'll try to find some of the things if

2  we need to get into them.

3  BY MR. MATULA:

4        Q.    Ma'am, Exhibit 7 is a conglomeration

5  of materials I put together of things I found through

6  the employment records that seem to deal with this

7  subject and I just kind of want to walk through it

8  here.

9              On the first page of Exhibit 7, it's

10 entitled Acknowledgment Receipt of Employee Handbook

11 Form, is that -- that is your signature?

12       A.    Yes, it is.

13       Q.    Okay.  And the date of June 12th,

14 that's pretty much right when you started; right?

15       A.    Yes.

16       Q.    Okay.

17             MS. JAG:  Hey, Mike, if you -- if you

18 indicate the Bates Numbers at the bottom of any of

19 these pages, that's very easy for me to follow that

20 too.

21             MR. MATULA:  Sure.  Okay.  It will

22 jump around a little bit, but the first page of

23 Exhibit 7 is numbered Corizon 231.

24             MS. JAG:  Perfect.  Thank you.

25             MR. MATULA:  And then I'm going to

1   skip Page 2 and come back, because I think I put it

2   out of order.  But the third page of Exhibit 7 is

3   numbered Corizon 229.

4   BY MR. MATULA:

5           Q.     And that's also another

6   acknowledgment, it looks like, you signed on June

7   12th.

8                  Do you recognize that, your signature,

9   ma'am?

10          A.     Say that again.  On 2- --

11          Q.     Third -- third page.

12          A.     Yes.  I signed that.

13          Q.     And that is referring to an Employee

14  Success Guide?

15          A.     Yes.

16          Q.     All right.  And then if we -- if you

17  go to the next pages in the document, which I've done

18  some excerpting, but -- but there are 540- -- Corizon

19  542, then continuing at Corizon 550 through 552.

20                 Do you see those?

21          A.     Yes.

22          Q.     Okay.  I'll tell you those are

23  excerpts from Corizon Employee Success Guide that

24  have some reference to employment policies,

25  harassment policies, and whatnot.

1              My question to you is, looking at

2    these materials, does this look generally familiar

3    with the materials that you had been provided with,

4    and were -- acknowledged receiving during your

5    employment?

6         A.    Yes, it does.

7         Q.    And then going further at Corizon 242

8    and 243, which I believe are the next two pages.

9    Those are a couple pages of actually materials from

10   the Missouri Department of Corrections.  The first

11   page looks like something also with your signature

12   this time, signed on June 13th of 2017.

13             Do you see that?

14        A.    Yeah, I see it.

15        Q.    That is your signature; correct?

16        A.    Yes.

17             MS. JAG:  What page is this?  I'm

18   sorry.

19             MR. MATULA:  242.  It's entitled

20   Discrimination, Harassment, Retaliation and

21   Unprofessional Conduct Information Acknowledgement,

22   on what I would characterize as the Missouri

23   Department of Corrections letterhead, and it's --

24             MS. JAG:  Okay.

25   BY MR. MATULA:

1      Q.     And -- and it's indicating that your

2   signature -- you were indicating that you had

3   received a copy of D2-11.4 document.

4      A.     Okay.

5      Q.     Do you see that?

6      A.     Yes, I do.

7      Q.     Then if you turn to the next page to

8   Corizon 243, it -- the way I'm looking at it, it

9   appears that 243 is actually the -- maybe the

10  document that you were presented with that you

11  acknowledged receiving on the previous page.

12             Does that look right?

13     A.     Yes, it does.

14     Q.     And then going further into Exhibit 7,

15  we flip to some more Corizon documentation, Pages 638

16  through -- it goes to 641 which, I think, there's

17  kind of a summary of the -- kind of the table of

18  contents, and then it continues with Corizon 728 to

19  736, which they look like slides of maybe a

20  PowerPoint presentation or something like that.

21             Do you see that?

22     A.     Yes, I do.

23     Q.     Do you think that those -- those

24  pages, the ones that look like they have slides, is

25  that the same or different than the computer module

1   that you referred to a moment ago, or do you know?

2          A.    This looks like -- actually it looks

3   like the module.  Yeah.

4          Q.    And the content of those pages -- and

5   I'm summarizing here, but the substance of those

6   slides all deals with issues relating to harassment,

7   what to -- what it might be, how to report it, how

8   people have to -- or should respond if they believe

9   there's inappropriate conduct going on and so forth;

10  correct?

11         A.    Yes.

12         Q.    On -- towards the -- on Page 2 -- I'm

13  sorry.

14               It's Bates Numbered 640, towards the

15  front, the instructions, there's -- and I'll let you

16  get there, but there's something -- a paragraph

17  called Shadow Objectives?

18         A.    Uh-huh.  I see it.

19         Q.    Talking about a guy demonstrating

20  something.  I'm -- I'm pointing that out, because

21  then if we flip towards the back there is -- on Page

22  Corizon 67, and you've got to slip back through the

23  slides, I know we're going back and forth.

24         A.    Uh-huh.

25         Q.    But there's another acknowledgment

1    page with your signature on it, that refers to

2    Harassment Shadow Objectives.

3              Do you see that page?

4         A.    Uh-huh.

5         Q.    Okay.  And it -- it looks like you're

6    signing off and you were acknowledging that whatever

7    this shadow objectives or -- or the guided

8    demonstrations it looked like you're acknowledging

9    having been exposed to that?

10        A.    Uh-huh.

11        Q.    Is that accurate?

12        A.    Yes.

13        Q.    Okay.  And so in terms of -- it looks

14   like all these documents, the Corizon materials, are

15   dated the 12th, which is your first day, and the

16   Missouri Department of Correction's pages were the --

17   with acknowledgments on the 13th, which is the next

18   day --

19        A.    Uh-huh.

20        Q.    -- those were all various materials

21   and whatnot that you were provided with and exposed

22   to right at the outset of your employment; fair?

23        A.    Correct.

24        Q.    Okay.  Then on the last page of

25   Exhibit 7 there's something -- it's entitled -- and

1    it's numbered Corizon 111.

2           A.     Uh-huh.

3           Q.     It's entitled Certificate of

4    Achievement.   "This is to certify Terri LaBlance has

5    completed the course 2018 Discrimination, Harassment,

6    Retaliation, and Unprofessional Conduct."

7                  Do you see that?

8           A.     Yes.

9           Q.     Okay.  Do you remember what it was

10   that you had done to -- to get the certificate?

11          A.     Yes.

12          Q.     What was it?

13          A.     It was completing the lesson on the

14   computer module.

15          Q.     So that was like some supplemental

16   training or education or whatnot beyond what you had

17   been provided with at the outset of your employment?

18          A.     I believe it was the same thing.

19          Q.     Okay.  Well, maybe a refresher?

20          A.     Well, it was the same.

21          Q.     The content might have been the same,

22   but it was something that occurred in 2018 as opposed

23   to 2017 when you started?

24          A.     Correct.

25          Q.     Got it.  All right.

1             Let's switch gears and do a little bit
2    of who's who.
3             What was your understanding as to
4    Jenny Meehan's role and responsibilities with regard
5    to the Chillicothe Correctional Center?
6        A.     She was the regional clinical
7    director, so she over -- she was -- she oversaw the
8    clinical operations for the region.  Yeah.
9        Q.     And Ms. Meehan would sometimes be
10   onsite at Chillicothe, but she was not there every
11   day?
12       A.     Correct.
13       Q.     What was -- what was Hollie Hild's
14   role?  Do you remember Hollie?
15       A.     Hollie Hild had come in as onsite
16   administrator for a brief period of time.
17       Q.     How did you get along with Hollie?
18       A.     I don't -- nothing stands out positive
19   or negative with Hollie.
20       Q.     How did you get along with Ms. Meehan?
21       A.     Professionally we had a working
22   relationship.
23       Q.     All right.  You mentioned Mr. Lovelace
24   who you met in connection with your hiring, how --
25   he's in Jeff City?

1        A.     This is correct.

2        Q.     How much interaction did you have with

3 Mr. Lovelace during your employment of Corizon, if

4 any?

5        A.     During my time at Corizon when I was

6 with the DOC in Chillicothe, my -- I would say,

7 because he was the regional medical director, that

8 was who I contacted if I had questions about

9 patients, referrals, you know, what direction I

10 should go in treatment or diagnoses, that kind -- or

11 suggest a follow-up, as a medical professional.

12        Q.     Other than your interview, have you

13 ever met Mr. Lovelace in person?

14        A.     Yes, I have.

15        Q.     And -- and was he onsite at

16 Chillicothe or how did that come up?

17        A.     Actually, I gave an invitation to him

18 for a cookout on a holiday.

19        Q.     And when was that?

20        A.     Not long after my hire date.  I can't

21 tell you exactly which holiday it was.

22        Q.     Gotcha.  And was that in Kansas City?

23        A.     Yes.

24        Q.     And did Mr. Lovelace attend?

25        A.     Yes, he did.

1        Q.      He came up from Jeff City and attended
2    your cookout?
3        A.      Yeah, I don't -- yes.  I can't say he
4    came just for the cookout, but he was in Kansas City
5    and did come.
6        Q.      Gotcha.  Other than the interview and
7    the cookout, ever been with Mr. Lovelace in person?
8        A.      Yes.
9        Q.      Okay.  What else?
10       A.      I had -- we had a family quinceañera
11   that I invited him to.  It was for my niece.
12       Q.      And was this during your employment or
13   after?
14       A.      During.
15       Q.      And did he attend?
16       A.      Yes, he did.  He's -- yes.  He's --
17   he's a family friend now.
18       Q.      Did you know Mr. Lovelace at all
19   before your employment started with Corizon?
20       A.      No.
21       Q.      If I understand your testimony, you
22   didn't know Jerry before, but in connection with your
23   employment and whatnot, he has -- he did become a
24   family friend and it looks like he's attended at
25   least two family events, the -- the deal with your

1 niece and then also the cookout?

2          A.     Yes.

3          Q.     Any -- any other times other than

4 those two -- I guess, those three, counting the

5 interview, that you've met with Jerry or been with

6 Jerry in person?

7          A.     There may have been one other time.

8 He is friends with my husband and I think they may

9 have at one other time had some outing that they

10 participated in together.  And I may have seen him

11 briefly -- or I did see him briefly at that time.

12          Q.     He was doing something with your

13 husband, but you might have seen him --

14          A.     Briefly at that time, yes.

15          Q.     Okay.  All right.  Have you -- maybe

16 -- has your family stayed in contact with

17 Mr. Lovelace since your employment with Corizon

18 ended?

19          A.     No.

20          Q.     Why not?

21          A.     I did not want to jeopardize or

22 involve him in this situation directly.

23          Q.     Sterling Ream.  What was Sterling's

24 role?

25          A.     Sterling initially was a staff nurse

1    that worked on an as-needed basis, I believe.  And

2    she later took the position as the facility admin --

3    or yeah, the facility administrator.

4           Q.    How did you and Sterling get along?

5           A.    I thought we had a workable -- you

6    know, mutually respected working relationship.

7           Q.    And what was Karen Epperson's role

8    while she was there?

9           A.    She was the onsite medical director.

10          Q.    So would the hierarchy on the medical

11   side in terms of clinical -- or clinicians, would

12   you -- would she also report to Jerry?

13          A.    Yes.

14          Q.    And did -- was -- and she's a

15   physician, a doctor?

16          A.    She would -- she would actually report

17   to Bredeman first, and then Dr. Lovelace.

18          Q.    Okay.  But in terms of -- I know it's

19   kind of a little scrambled because you've got people

20   onsite, and then you have different reporting

21   structures in terms of being onsite and then also

22   through the different functions, clinical or

23   otherwise; right?

24          A.    Correct.

25          Q.    Did -- I guess, did you have -- did

1   you consider yourself to have some type of reporting

2   relationship to Dr. Epperson?

3          A.     Yes.

4          Q.     Okay.  And -- and Dr. Epperson was

5   onsite at the facility?

6          A.     Correct.

7          Q.     And so she was kind of like you, on

8   the clinician side, your first supervisor?

9          A.     Yes, but I will point out that

10  oftentimes due to the nature of my specialty, she was

11  not able to guide me in -- in manners of, you know,

12  clinical diagnosis or treatment, that kind of thing

13  when it comes to women's health, because that was not

14  her expertise, so oftentimes, I would just speak with

15  the person that could help me.

16         Q.     And so who would that have been?

17         A.     That would have been Dr. Bredeman.

18         Q.     Got it.  How did you get along with

19  Dr. Bredeman?

20         A.     It was a working relationship.  He was

21  available to help me in my practice when needed, via

22  telephone, and to help guide me in the decisions that

23  I had questions about that needed to be made

24  regarding patient care.

25         Q.     And at least through the end of your

1    employment with Corizon, you and Dr. Epperson had a

2    very good relationship; true?

3         A.    I would say that that's probably not

4    true.  I thought we had a good relationship.  That is

5    my being naive, apparently.

6         Q.    You considered yourself to have a good

7    relationship with Dr. Epperson at least up until the

8    end of your employment?  I mean, while you were

9    working there, you were tight with her, you were

10   friends?

11        A.    I wouldn't say "tight."  I would say

12   that we -- I believed that we shared a similar

13   belief, a similar faith, and we spoke on those things

14   on numerous occasions so with that being the case, we

15   worked together, you know, five days a week and that

16   was our relationship.  I did extend myself as a

17   friend and a co-worker and -- because that's who I

18   am.

19        Q.    Just so I understand what you're

20   saying there.  I mean -- I mean, while you worked

21   with her, did you consider Dr. Epperson a friend or

22   not?

23        A.    I considered myself a friend to her.

24        Q.    All right.  What was Vali Kirby's

25   role?

1      A.      She was a nurse practitioner.

2      Q.      So how would her job duties interact

3 with yours, if at all?

4      A.      We both were providers there at

5 Chillicothe, and we worked together four days a week.

6 We would sometimes confer on different cases that

7 we -- that, you know, were presented to us and

8 different aspects.

9      Q.      How did you get along with Ms. Kirby?

10      A.      I -- we had a working relationship.

11 Our personalities were a little bit different, but it

12 was -- I was respectful and kind.

13              There were some things I chose not to

14 engage in when it came to our relationship, my

15 relationship with her.  But for the most part, it was

16 a -- amicable.

17      Q.      Friendly enough?

18      A.      So I thought.

19              Yeah.

20      Q.      You described a moment ago as you and

21 she having different personalities, can you give me

22 any more examples or in a mind's eye view what you

23 mean by that?

24      A.      I try not to engage in gossip, and,

25 you know, the shop talk kind of thing.  It's just not

1   my thing.  So I don't huddle and do that sort of

2   thing, and I don't receive it when it comes.  It was

3   kind of that kind of catty thing.  Where you wanted

4   to bring things to me about other employees that

5   worked there, whether that's on a professional level

6   or a personal level, and you know, my thing is, if

7   you don't -- if a dog will bring a bone, he'll take a

8   bone, so I don't engage in that type of thing, so....

9           Q.    You felt she was a little bit more of

10  a gossip?

11          A.    Yes.

12          Q.    Fair enough.

13                You used the term "providers" and --

14  and we'll see that in some of the documentation here,

15  so -- but I want to make sure I have a correct

16  understanding, in terms of the terminology of

17  providers at the Center, we're talking about a

18  medical provider, someone who is licensed to provide

19  medical assistance in some way; is that accurate?

20          A.    A clinician, yes.

21          Q.    Right.  So that would be Dr. Epperson

22  in terms -- let me back up.

23                In terms of people who were onsite in

24  Chillicothe, providers during your time there would

25  be Dr. Epperson?

1      A.    Yes.

2      Q.    Her predecessor?

3      A.    Yes.

4      Q.    Whenever -- okay.

5            You?

6      A.    Yes.

7      Q.    Ms. Kirby?

8      A.    Yes.

9      Q.    Who else would be a provider?

10     A.    We had the dental department, so there

11  were two dentists -- well, sometimes -- there was a

12  part-time or -- dentist.  A couple of them, actually.

13  Yeah.

14     Q.    Okay.  All right.  Let's go back,

15  again, to Exhibit 1, and we'll discuss more of the

16  events that you refer to in your single-spaced

17  narrative.

18     A.    Okay.

19     Q.    Actually, I'm going to forge ahead and

20  maybe try and do some chronological -- before we get

21  there.  I apologize.

22            MR. MATULA:  Let's do this:

23            If we can have the next exhibit,

24  Laurel, 8.

25  BY MR. MATULA:

Video Deposition

67

1        Q.    Ma'am, Exhibit 8, which is Bates

2  Numbered 478 through 480.  That is entitled a

3  Memorandum on DOC letterhead dated June 20th to you

4  from Darin Morgan who is the acting warden.  That's

5  in the -- that's the first page.

6                And then the next two pages look like

7  -- are what I think are your handwritten notes, where

8  you're --

9                 MS. JAG:  Can you, please -- oh, I'm

10  sorry, Mike.  Could you please repeat the page

11  numbers of that again.

12                 MR. MATULA:  Sure.  478 through 480.

13  BY MR. MATULA:

14        Q.    And the gist here, it looks like

15  you're just letting someone know that you happen to

16  know one of the inmates at the facility, and then the

17  acting warden writes back, is that the gist of that

18  documentation, Exhibit 8?

19        A.    Yes.  As we were required to do.

20        Q.    Right.  And --

21                 MR. MATULA:  Rachel, look at me go,

22  I'm screen sharing.  Maybe.  Anyhow --

23                 MS. JAG:  If you're sharing your

24  screen I can see it.

25  BY MR. MATULA:

1    Q.    All right.  In any event, how did you
2  know this one inmate?
3    A.    I met her through who is now my
4  husband at the time.  He was my significant other.
5  She was a friend of his.
6    Q.    Okay.  And it sounds like at some
7  point, you had some interaction and realized that she
8  was at the CCC, and so consistent with the
9  expectation, you made someone aware of that, and the
10  acting warden acknowledged it, and that's basically
11  all this means?
12    A.    Correct.
13    Q.    Okay.  All right.
14          MR. MATULA:  The next exhibit, please.
15  This is 469.
16  BY MR. MATULA:
17    Q.    Ma'am, this is a Corizon document
18  dated July 26th.  It looks like from Timothy Hughes,
19  regional medical director and the credentialing
20  committee chairperson to you.
21          Do you see that?
22    A.    Yes, I do.
23    Q.    And he -- he is pleased to inform you
24  that your credentialing status is complete.  What
25  does this mean, or what did you understand it to

1    mean?

2           A.    That they verified my education,
3    licensure, and background.

4           Q.    And now this is --

5           A.    Work history.

6           Q.    You've been on the job for about a
7    month and a half?

8           A.    Correct.  As -- according to the date
9    on this letter that's when this was created, this
10   document was created, apparently.

11          Q.    Right.  And -- and you're not -- I'm
12   going to rely on the date being accurate, unless you
13   tell me that you have some specific memory that
14   that's -- hey, that can't be right or whatever.

15                Does that sound right?

16          A.    I -- I assume that this was the date
17   that this was generated.

18          Q.    And on the -- there's -- on the third
19   paragraph down, it does state that "Based on your
20   application, you have not been granted privileges to
21   prescribe controlled substances."

22                Do you see that?

23          A.    Yes, I do.

24          Q.    All right.  And did you have any -- do
25   you know if that was normal or -- or was there any

1  discussion about that limitation in your

2  credentialing?

3          A.     No, there was -- there was no

4  discussion.  It was -- it wasn't necessary for the

5  role that I was serving in.

6          Q.     Gotcha.  And --

7          A.     And I do actually now have that

8  ability.

9          Q.     Gotcha.

10          MR. MATULA:  Let's go to Exhibit 10.

11  BY MR. MATULA:

12          Q.     Exhibit 10, which is Bates Number 474.

13  It looks like a Corizon corrective action dated --

14                 Oh, this is your version.  I'm sorry.

15  My bad.

16                 It looks like a corrective action just

17  for some -- maybe some unscheduled absences that you

18  had had that month in July of 2017.

19          A.     Yes.

20          Q.     Do you remember that?

21          A.     Yes, I do.

22          Q.     And you signed this corrective action?

23          A.     Yes, I did.

24          Q.     I mean, did you have any problem with

25  it?  Was it fair, or anything you thought was unfair

1  about getting this, given the absences or whatnot?

2          A.    I don't -- how do I say this?  At that

3  time, this was shortly after I accepted the position

4  that these dates were missed because I did not have a

5  caregiver on those dates unexpectedly.  So that I was

6  not able to go in to work.  That was explained.

7              The absences were understood, but per

8  policy, this was necessary and this is what I was

9  explained by Mrs. McWhorter, that this was necessary

10 per policy and that it would come off or out of my

11 file after six months, barring no other problems.

12         Q.    I mean, I guess let me put it another

13 way.

14             I mean, given the policy, the

15 attendance expectation, whatever circumstances you

16 were not able to be at work on certain days, do you

17 have any problem with getting this?  I mean --

18         A.    No, I did not have a problem with

19 getting this.

20         Q.    Fair enough.  Let's go to --

21         A.    I believed it to be consistent with

22 policy and procedure.

23             MR. MATULA:  Fair enough.  Let's go to

24 Exhibit 11.

25 BY MR. MATULA:

1          Q.     Ma'am, Exhibit 11, which is Bates

2   Numbered Corizon 317 through 335.  It's entitled

3   Collaborative Practice Agreement Advanced Practice

4   Registered Nurse State of Missouri and you and

5   Dr. Epperson are the -- the respective parties.

6                 Do you see that?

7          A.     Yes, I do.

8          Q.     What was your understanding of what a

9   Collaborative Practice Agreement is and -- and why it

10  is -- why it was being used?

11         A.     A Collaborative Practice Agreement is

12  an agreement that is between a practicing physician

13  in the State of Missouri, as well as myself as a

14  nurse practitioner.

15                And that -- that physician is, in

16  short, agreeing to, sort of oversee my practice, be

17  available for questions, guidance, and to maybe

18  follow patients that may exceed my scope of practice,

19  and because she was onsite, she was the onsite

20  medical director, you have to have a physician within

21  a certain number of miles in the State of Missouri in

22  order to be able to see patients, and someone to

23  actually review 10 percent of your charts on a

24  regular basis, scheduled basis, and as medical

25  director that was part of actually her responsibility

1    onsite.

2         Q.    During your employment at Corizon, did

3    Dr. Epperson ever say or do anything that suggested

4    to you that she was uncomfortable with being in the

5    Collaborative Practice Agreement with you?

6         A.    No, she did not.

7         Q.    Did you ever see or hear anything from

8    somebody else that suggested that Dr. Epperson had

9    any problem being in the collaborative practice

10   agreement with you?

11        A.    No, I did not.  As I said, I think

12   that with this situation, it was a requirement as

13   part of her -- her role there as medical -- onsite

14   medical director.

15        Q.    All right.  Now, let's flip back to

16   Exhibit 1 and you can go to that narrative.

17             MR. MATULA:  And also, Laurel, if you

18   want to pull out the next exhibit and have it handy

19   because we're going to go back and forth on that.

20             MS. JAG:  Did you say we're going back

21   to Exhibit 1?  I'm sorry.

22             MR. MATULA:  Yes.  And also, we are

23   going to -- I'm going to have questions about

24   Exhibit 1, but I'm also distributing Exhibit 12,

25   which is Bates Numbered Corizon 3 through 15.

1  BY MR. MATULA:

2      Q.    All right.  Ma'am, in your narrative

3  on -- in Exhibit 1, Page 7 of 15, at the last

4  paragraph you refer to the initial discrimination

5  event occurring on or around September 1st.

6            Do you see that?  The very bottom

7  of -- of --

8      A.    Yes, I do.

9      Q.    Okay.  And that was a situation where

10 a co-worker had -- was referring to an antenna or

11 piece of equipment and -- and used racially

12 inappropriate language in that situation; true?

13     A.    Yes.

14     Q.    And if we -- just to clarify our

15 timeline, I think if you look at Exhibit 12, and look

16 at the materials in there, you'll see that it appears

17 that maybe the -- the date of the incident was

18 actually August 29th.  So very close, but if you look

19 at, for example, all the statements and whatnot that

20 are part of Exhibit 12, can we agree that the

21 incident that is being referred to here, it looks

22 like it actually took place on August 29, 2017?

23     A.    According to the emails here that were

24 sent following the incident, it appears that it was

25 August the 29th.

1          Q.     Right.  And Exhibit 12, is -- it's --
2    it's a conglomeration of documents going all the way
3    to what I believe you're referring to here.  It's got
4    some emails, it's got several -- in addition, it's
5    got several statements from various witnesses, one of
6    them is from you.  That's toward the end.  Corizon
7    13, I think it's maybe the third to the last page.
8               Do you see that?  It's numbered
9    Corizon 13.
10         A.     Yes.
11         Q.     Okay.  And now, this is typewritten,
12   but I mean, it's -- it purports to be from you on
13   August 29, 2017.
14               Do you see that?
15         A.     Uh-huh.
16         Q.     And did you in fact write this -- or
17   type out this statement?
18         A.     Yes, I did.
19         Q.     Okay.  And does it accurately capture
20   what happened that day?
21         A.     Yes.
22         Q.     And again, I know this might not be a
23   transcript, but when you were submitting this
24   statement you wanted to be accurate and complete as
25   to the -- what you felt were the important pieces of

1   what happened; true?

2          A.     Yes.

3          Q.     All right.  And do you know who you

4   submitted the -- this statement to?

5          A.     Teresa McWhorter.

6          Q.     Okay.  I -- I believe that's accurate.

7   And in fact, it was -- as I understand, correct me if

8   I'm wrong, but as I understand it, looking through

9   the paperwork, that this incident where -- where this

10  co-employee whose name was Anna Barker, apparently --

11         A.     Uh-huh.

12         Q.     -- the incident actually was initially

13  that same day reported by someone else who was there,

14  and Teresa had reached out to you to find out what

15  you knew about it; is that correct?

16         A.     Yes.

17         Q.     All right.  And the punch line is

18  Ms. Barker was fired; true?

19                MR. NUGENT:  Object to form.

20                You can answer.

21         A.     As -- she was let -- yeah, she was

22  terminated.

23  BY MR. MATULA:

24         Q.     Yeah, she didn't -- within a day or so

25  of this occurring, she didn't work at Corizon

1   anymore, did she?

2           A.      That is correct.

3           Q.      Okay.  And if we look at -- and -- and

4   I'm guessing that either prior to today or certainly

5   prior to the lawsuit, you might not have seen other

6   parts -- or other components of the documents in

7   Exhibit 12, other than your own statement, but, if we

8   look -- if we kind of work from back to forward,

9   ma'am.

10          A.      Uh-huh.

11          Q.      It looks like that Anna Barker herself

12  had to write out a statement on that very day and the

13  first word of her statement on the very last page is

14  "Today."

15          A.      Okay.

16          Q.      Do you see that?

17          A.      Uh-huh.

18          Q.      And then, I'm working back to front,

19  next we have a statement from Joyce Gilgour,

20  G-i-l-g-o-u-r, a medical clerk, it looks like she was

21  also -- someone approached her to get information and

22  she wrote out a statement that same day; right?

23          A.      Yes.

24          Q.      Then we have yours; it looks like it

25  was collected the same day.

1              Next, I think, is Jennifer Preston,

2    typewritten communication, also dated the 29th --

3         A.    Yes.

4         Q.    -- about the incident?

5              We've got Chandra Tipton, another

6    statement about the incident; right?

7         A.    Uh-huh.

8         Q.    We've got Teresa McWhorter -- I'm

9    sorry -- Jennifer Horton.  It doesn't sound like she

10   saw anything firsthand, but someone was -- she was

11   submitting a statement saying what she had learned

12   that day?

13        A.    Uh-huh.

14        Q.    We've got Sterling Ream --

15        A.    Uh-huh.

16        Q.    -- giving her account of how she

17   became aware of it and what she did to check into it;

18   right?

19        A.    Uh-huh.

20        Q.    Then we've got a memo from Teresa to

21   Heather Dale and Jenny Meehan also that very same day

22   that's -- kind of summarizing some of the events of

23   the day, including Teresa mentioning that she had

24   spoken with -- with you.

25              Do you see that?  This is Page 8.

1   Corizon 8.

2           A.      Yes.

3           Q.      Then Corizon 5, we've got, it looks

4   like this is the final version, but it was a draft

5   for request for termination and on the front page of

6   Exhibit 12, Heather Dale, who is in human resources

7   is concurring with the RFT, which is the request for

8   termination, and that's on August 30, 11:29 a.m.

9                   Do you see that?

10          A.      I was looking at this.

11          Q.      Sure.  No, take your time.  Let's --

12          A.      What -- what -- 11:20- -- yes, I see

13   it.

14          Q.      Okay.  So, I mean, it looks from the

15   materials we have here, it looks like what happened

16   is, this Anna on August 29th, at some point, had this

17   interaction in front of you and some others.  It gets

18   reported, several people, I think maybe six or so are

19   -- at least six or so are interviewed that very same

20   day, and the next day, human resources is okaying

21   Anna being fired for what she did?

22          A.      That is correct, to my -- to the best

23   of my knowledge.  I have not, yeah -- I had not seen

24   these statements previously.

25          Q.      Sure.  And I -- that's why I wanted to

1 show you because I knew you probably didn't know the

2 ins and outs.

3            But looking at this here and just what

4 did you know of the timeline of when it happened and

5 when you were talked to and Mrs. Barker being let go

6 very shortly thereafter, would you agree that Corizon

7 when this incident was reported, looks like, they did

8 a prompt investigation as to what happened?

9            MR. NUGENT:  Object to form.

10            You can answer.

11       A.    It -- it looks like they addressed it.

12 I guess -- I don't know if that's an investigation

13 or --

14 BY MR. MATULA:

15       Q.    I -- I don't know.  When you --

16       A.    But -- and she was terminated on the

17 following day, and that was the end of it.

18       Q.    Right.  Did you -- I mean, based on

19 what happened, did you want or expect Ms. Barker to

20 be fired?

21       A.    I don't know if I had any

22 expectations.

23       Q.    Okay.  Was -- and based on what she

24 had done, do you think that it was appropriate for

25 her to be fired?

1          A.      Yes, I do.

2          Q.      And in terms of Corizon, what -- I

3    guess, what did you expect Corizon to do when the

4    Barker incident was reported?

5          A.      As I said, I don't know if I had any

6    expectations.  This situation, this incident, really

7    did sort of catch me off guard.  It was not expected.

8    This was not -- and so I don't know what expectations

9    I could have had, because I didn't expect this to

10   occur.

11             Once it did occur, and she was

12   terminated, I would have expected, or I did expect,

13   that it wouldn't have just stopped right there at

14   that time.  Because this was the first real tangible

15   incident or behavior -- witnessed behavior of the

16   culture that was present that I had just walked into,

17   if that makes sense to you.  Because anyone that

18   would feel this comfortable to say that around anyone

19   of color or not, says something about the culture

20   that is there.

21         Q.      Well, one, you'd been -- at this time,

22   you had been working there a few months.

23         A.      Uh-huh.

24         Q.      This was the first, as you put in your

25   own writing -- this is the first incident --

1  discrimination incident -- that you had been exposed

2  to?

3       A.    This is the first verbal -- outright

4  verbal.

5       Q.    Well, let's go back to what you wrote

6  in your discrimination complaint in your

7  single-spaced paper, the first paragraph.

8       A.    Uh- huh.  Uh-huh.

9       Q.    You wrote, "the initial discrimination

10  event."  All right.  Now, when you say "initial" --

11       A.    Okay.  Yes, I did say that.

12       Q.    -- there's nothing in your description

13  anywhere in here that you prepared even back in March

14  of 2019, where you mentioned anything of any kind

15  happening before the -- the Anna Barker situation.

16       A.    Okay.

17       Q.    Is that accurate?

18       A.    Well, that is accurate, as far as this

19  letter goes, but as a black female, as an

20  African-American in America, in Missouri, at

21  Chillicothe, you know, I can safely tell you that

22  verbally, nonverbally, overtly, covertly, the

23  incidents are there.

24            As someone who has been black all of

25  my life, unfortunately there are many times that

1   things occur that may not be said that I have to be

2   very careful and pick and choose, and decide which

3   fights to fight. Because I can't fight them all, all

4   the time. Those types of things can potentially

5   stifle my career, my employment, my -- my plans, per

6   se.

7           There's no such thing as the squeaky

8   wheel gets the grease, you know, it's -- because of

9   the way the culture is, the way that things have

10   been, where I was at specifically. You -- you have

11   to -- you have to, in my shoes, sort of go on as if,

12   anyway, if that makes any sense.

13           Unfortunately, we do live in a world

14   where these thought processes and beliefs and

15   disparities exist. Okay? And unfortunately, because

16   I am black -- not that its unfortunate that I'm

17   black, but unfortunately this -- this whole thing is

18   even a part of American culture.

19           Does that -- does that kind of clarify

20   why I say the initial discrimination event? So it

21   was the initial overt event where someone actually

22   felt like it was okay to use that verbiage

23   irregardless of who's standing around, and what that

24   tells me is this is not an uncommon occurrence about

25   how you feel and how you do things, because you

1  actually -- there was no filter.  There was no

2  filter.  It just sort of rolled off your tongue, and

3  you know, I -- I don't believe that it would have

4  been a shock to anyone there if I had not been

5  present.  Does that make sense?

6                     It's an inappropriate statement

7  irregardless of who was there, but it's an okay

8  statement as long as someone who looks like me is not

9  present in this particular culture at that particular

10 time.  And unfortunately in many other places that

11 I've, you know, been at.

12                     MR. MATULA:  I'm going to object to

13 the answer as being nonresponsive after her first

14 sentence.

15 BY MR. MATULA:

16       Q.     You gave me a lot of information that

17 I don't think I asked you about yet.

18                     Do you remember what my last question

19 was?

20       A.     You said was there any other events

21 prior to this one, was this the initial

22 discrimination event, is that the question?

23                     MR. MATULA:  Laurel -- Laurel, can you

24 find my last question and reread it, please.

25       (Whereupon, the requested portion of the

1    record was read by the reporter as follows:
2    "QUESTION?  You wrote, 'the initial
3    discrimination event.'  Now, when you say
4    'initial' there's nothing in your
5    description anywhere in here that you prepared
6    even back in March of 2019, where you
7    mentioned anything of any kind happening
8    before the Anna Barker situation.  Is that
9    accurate?")
10        A.    And I did say that was, yes --
11   BY MR. MATULA:
12        Q.    Okay.  All right.
13        A.    -- there's nothing written.
14        Q.    All right.  The -- I want to -- I'm
15   going to go ahead and jump ahead based on some things
16   you did mention.
17            With regard to racially inappropriate
18   language, the only thing I've seen in -- in any
19   materials you've ever prepared that refers to
20   inappropriate racial language related to the Anna
21   Barker situation, is there any other times while you
22   worked at Corizon that anyone used racially
23   inappropriate language?
24        A.    Not that I heard.
25        Q.    Was there any other incidents that you

1    believe occurred that you were made aware of

2    secondhand, hearsay stuff, that someone told you

3    about?

4              A.    Not to my recollection.

5              Q.    Because I would -- I would assume that

6    if -- had you been aware of any such incidents that

7    would have been something that would have been

8    significant enough to memorialize here and it's not

9    here.  So in terms of racially inappropriate

10   language, that -- we're dealing with the Barker

11   situation, and that's it?

12                   MR. NUGENT:  Object to the form.

13                   You can answer.

14             A.    I think that in addition to your

15   assumption we can also assume that once Anna Barker

16   was terminated for inappropriate language, that most

17   folks would -- that were there did not want to follow

18   suit, meaning that I can't say that it didn't happen,

19   I can say I wasn't aware of it.

20   BY MR. MATULA:

21             Q.    You have no evidence that it did

22   happen?

23             A.    And I have no evidence that it didn't.

24             Q.    Well, I mean, you worked there for

25   another couple years.  You went to work full-time?

1           A.      Uh-huh.

2           Q.      You never heard it and no one ever --

3    else ever told you that it occurred.  So sitting here

4    today, you have no evidence that while you worked

5    there anybody else used racially inappropriate

6    language?

7                   MR. NUGENT:  Object to form.

8                   You can answer.

9           A.      Not that anyone used racially

10   inappropriate language, but going back to the culture

11   of the environment and the way that that incident

12   occurred, the way that things are set up, the way

13   that the environment is, the experience that I had,

14   although she was fired, just indicates to me that

15   that is a prevalent behavior.

16   BY MR. MATULA:

17          Q.      Well, I don't want to belabor this too

18   much, because it's getting close to lunch.  But, I

19   mean, these are the facts; right?  Prior to Anna

20   Barker, while working at Corizon, you had not heard

21   any racially inappropriate language; true?

22          A.      That is correct.

23          Q.      After Anna Barker was fired, you

24   didn't hear any racially inappropriate language;

25   true?

1          A.     True.

2                 MR. MATULA:  Probably good time for a

3    break.  You want to do it now?

4                 MR. NUGENT:  If you want.

5                 MR. MATULA:  Yeah, let's do it.

6                 THE VIDEOGRAPHER:  Going off the

7    record at 12:14 p.m.

8                      (Noon recess taken.)

9                 THE VIDEOGRAPHER:  Stand by.

10                We are back on the record at

11   12:52 p.m.

12   BY MR. MATULA:

13         Q.     Ms. LaBlance, we've had a short break

14   for lunch, and we're resuming your testimony.

15                Are you ready to go?

16         A.     Yes.

17         Q.     All right.  You had testified earlier

18   that you had invited Jerry Lovelace to a couple

19   family events, is there anybody else from -- who

20   worked at Corizon that you also asked -- invited to

21   similar events?

22         A.     No.  I invited Mr. Lovelace, I knew

23   that he was -- or Dr. Lovelace, he was out of town

24   without family in the immediate area and had not had

25   an opportunity to see much of Kansas City at all, and

1  that was why the invitation was extended to him

2  specifically.

3      Q.    All right.  Going to Exhibit 13.

4  Which is Bates Number Corizon 471.

5            Ma'am, you've got Exhibit 13, it's a

6  Memo to File from Hollie Hild dated 4-27-18,

7  purporting to memorialize a conversation with you

8  about something that happened during a provider

9  meeting.

10            Do you see that?

11      A.    Yes, I do.

12      Q.    Do you remember the incident that

13  Ms. Hild is referring to?

14      A.    Yes, I do.

15      Q.    I guess, what happened at the meeting?

16      A.    During a meeting we were having a

17  conversation, I was expressing my viewpoint on the

18  matter.  I don't remember what the specific topic of

19  this particular meeting was, and I kept getting

20  interrupted and not allowing to complete my thought

21  or my state- -- my statement and I raised my voice

22  and asked them to please not interrupt me.  And I

23  proceeded to finish my statement.

24            The following day -- morning --

25      Q.    Let me stop you right there, just so I

1    understand.  Who's all in the room?  Who's all in

2    this meeting?

3              A.    Oh, goodness.  Well, let's see here.

4    These three that are named here, I believe Nurse

5    Practitioner Kirby was there, Hollie was there.

6              Q.    Hollie?

7              A.    Yes, the -- the lady that actually

8    authored this statement.

9              Q.    Oh, Hollie.  I'm sorry.

10             A.    Hollie Hild.  And I, at this time,

11   don't remember who else was in the room.

12             Q.    So I've got my list.  We've got in

13   terms of people who were in the provider meeting --

14             A.    Uh-huh.

15             Q.    -- you believe that there's

16   Dr. Epperson, Director of Nursing Corbin, yourself,

17   Ms. Kirby, Hollie Hild, and that's all you can

18   remember?

19             A.    That's all I remember, correct.

20             Q.    Okay.  Let me ask you:

21                   Who -- were all of the people

22   interrupting you, or was there one person

23   interrupting you, who was doing the interrupting and

24   cutting you off where you got frustrated and raised

25   your voice?

1        A.        There -- I don't remember exactly who
2   it was.  They kept interrupting me; I raised my
3   voice.  I proceeded to finish my statement.
4                  The following morning I was called in
5   to the administrator's office.  Dr. Epperson, I
6   believe, Val and Hollie were there and the concern
7   was that they had never seen me so upset and they
8   were afraid that I was going to hit someone.
9                  Now, this was alarming to me, as I
10  never left my seat.  I never said anything or
11  indicated -- made any movement whatsoever that would
12  indicate that I would strike out violently,
13  physically.  I just wanted to be able to speak and be
14  heard as I have allowed others to speak and be heard.
15                 And the situation is such that it was
16  alarming to me, because just the previous week -- or
17  thereabout, we had a small meeting in the
18  administrator's office, and Nurse Practitioner Kirby
19  threw a pen across the room, she was so frustrated,
20  she threw a pen, but that didn't alarm anyone as
21  being threatening, but when I raised my voice, they
22  felt threatened, so they said, and that was just
23  another indication of -- or another time that I would
24  say that race made a difference, that you know,
25  raising my voice is -- is reason to have a meeting,

1 but throwing a pencil has no consequences or

2 reprimand or -- at all.

3        Q.    Sitting here today, do you know if

4 Ms. Kirby was ever talked to about that?

5        A.    No, I do not.

6        Q.    Right.  Because you would not

7 necessarily know whether someone said, Hey, you can't

8 be throwing stuff around a meeting or not?

9        A.    So it wasn't anything formal?  It

10 would have just been --

11        Q.    I'm just asking you, sitting here

12 today, you don't know one way or the other, whether

13 Ms. Kirby was talked to or whether the incident where

14 she threw the pencil was addressed?

15        A.    But I do know that --

16        Q.    Ma'am --

17        A.    I've answered that question and I'll

18 answer it again.  No, I do not know.

19              But I do know that Ms. Kirby has a

20 tendency to gossip and -- and -- and talk quite a

21 bit.  And had something like that occurred at that

22 time, I'm pretty -- 95, 98 percent sure that she

23 would have verbalized it, because obviously she

24 didn't think it was offensive or threatening to throw

25 a pen across the room.

1          Q.     Okay.  You've answered a couple

2    questions that I haven't asked yet.

3          A.     Okay.

4          Q.     And -- and I apologize if this already

5    got established on the record, but I -- I want to

6    just try to get some real clear -- because maybe I

7    missed how the exact Q&A went.

8                 Ma'am, sitting here today, you don't

9    know one way or the other, whether anyone addressed

10   Ms. Kirby about throwing the pencil in the meeting

11   that you just described.  True statement?

12         A.     That is a true statement, as I said

13   before.

14         Q.     Okay.  When -- okay.  So we've covered

15   what happened in the provider meeting.  You -- you

16   started telling me what happened at this follow-up

17   meeting that lead to this Exhibit 13 where someone

18   tells you they've never seen you that upset, you were

19   alarmed by their reaction, because you never left

20   your seat, you -- you mentioned the situation with

21   Kirby the previous week.

22                Is there anything else you remember

23   being said in the meeting on the 27th, other than --

24   let me back up.

25                In the meeting on the 27th, you were

1    told that people have never seen you that upset

2    before, they thought you might hit someone or words

3    to that effect, and you found this alarming because

4    you never -- you never raised -- or never even got

5    out of your seat or did anything that you thought

6    would make someone think that there was a safety

7    issue.

8              Anything else that you remember being

9    said in the meeting?

10       A.    In this particular meeting, I don't

11   recall -- I don't remember anything specific being --

12   anything else specifically being said, but what I do

13   remember is that I was called in for asking people

14   not to talk over me, and it was an issue because I

15   had to raise my voice to be heard, and as a black

16   woman, for some reason, they think that raising my

17   voice is an automatic -- or a correlation with

18   violence.

19              But violence --

20       Q.    Did they -- did they say that?

21       A.    No, it's -- it's -- it's being said by

22   the actions that they took.  They don't have to say

23   things.  Sometimes -- well, the actions are just as

24   relevant and I'm in a room where three other people

25   are there as a panel, which was a little unnerving in

1 and of itself, to address me as an African-American

2 woman raising my voice asking to be heard, as if I

3 did not have the right to do that.

4     Q.    Did you -- did you say that to them in

5 this meeting on the 27th?

6     A.    I told -- no, I did not.  What I did

7 tell them, because I wanted to assure them that I am

8 not a violent individual, and that raising my voice

9 does not constitute a violent act, I had to make sure

10 that I reassured them that I didn't mean anything

11 threatening, because at this point I'm trying to

12 preserve my job, my reputation, and -- and my working

13 relationship with the people that are there.

14          And so I can't be hostile or defensive

15 because of their perception, all be it lacking any

16 type of basis whatsoever.

17     Q.    During this -- the meeting on the

18 26th, where you were being interrupted, did anyone

19 else raise their voice or were they just interrupting

20 you?

21     A.    It was a -- a -- I'm not -- it was

22 a --

23     Q.    Do you remember, ma'am?

24     A.    Specifically raising your voice, I --

25 I -- I don't remember.  But it was a conversation

1  where many people were involved and talking.

2          Q.    And now, at the time, you mentioned

3  earlier in your testimony, you -- you believe that

4  the meeting and the conversation that's memorialized

5  here in Exhibit 13, you believe that those

6  interactions were -- I'm sorry -- you said race made

7  a difference in how your other Corizon employees

8  interacted with you; is that accurate?

9                  MR. NUGENT:  Object to the form.

10                 You can answer.

11         A.    Yes.

12  BY MR. MATULA:

13         Q.    Okay.  And now, did you feel that way

14  at the time, or have you come to that conclusion

15  later?

16         A.    I can say that I felt that way at the

17  time, because that is a fact, it is evident, it is

18  known, and it's a -- it's a -- it's unfortunate, but

19  it's a fact.

20         Q.    Well, I want to make sure I understand

21  your testimony.

22         A.    Yeah.

23         Q.    When you say that's a fact and it is

24  known --

25         A.    Yes.

1    Q.    -- what specifically is the "it" that
2  you're referring to?
3    A.    That -- that race makes a difference
4  in the United States, in Kansas City, Missouri, in
5  Chillicothe, at the prison, in rural America.
6         Unfortunately, that's what I -- that
7  we deal with.  It's not right.  It's not fair.  It's
8  not just.  It doesn't take into account the effort
9  that I have put in to become educated, to become
10  trained, to give and to serve others.  It takes none
11  of that into account.  What it takes into account is
12  that I am African-American.
13    Q.    Let's -- I want to keep a running list
14  here since we've gone to this topic.  The -- if I
15  understand your testimony correctly, you are
16  believing that everybody on this list, from Epperson,
17  Corbin, Kirby and Hild, the other people in the
18  meeting and then those among them that were part of
19  the -- the follow-up meeting on the 27th, all of
20  those folks were, you believe, treating you
21  differently because of your race?
22    A.    What --
23    Q.    Is that accurate or inaccurate?
24    A.    That was accurate.
25    Q.    Okay.  So --

1          A.        And I say that -- and I say that

2    because embedded in our society, embedded in the

3    Caucasian culture in itself is unfortunately an

4    innate discriminatory racist superiority-type belief

5    that stems from however far back you would like to

6    go.  And that doesn't mean --

7          Q.        And that --

8          A.        -- that doesn't mean that everyone is

9    particularly vengeful or hateful or -- or trying to

10   deliberately to hurt someone, but the thought process

11   and the culture is there.  It's there.

12         Q.        I want to make sure I understand, kind

13   of your frame of reference, and your thought process

14   in drawing these conclusions.

15              I mean, is -- are you telling me that

16   you believe that every Caucasian in the United States

17   is a racist?

18              MR. NUGENT:  Object to form.

19   Misstates the witness' testimony.

20         A.        I did not say that.

21   BY MR. MATULA:

22         Q.        Okay.  Well, I'm losing -- I mean, I'm

23   trying to understand like -- you're -- you're

24   explaining all of these things about the culture,

25   which I -- I get, kind of, but I'm trying to ask

1    about certain people in a particular situation.

2         A.    Uh-huh.

3         Q.    And you've already testified that you

4    believe that Epperson, Corbin, Hild, and Kirby, at

5    least in connection with this interaction, all were

6    treating you differently because you're

7    African-American.  You testified to that.

8               Did I hear it correctly?

9         A.    In this situation, that is correct.

10        Q.    Right.  And then we're kind of going

11   on that if it was a fact and whatnot --

12        A.    Yeah, because --

13              MR. NUGENT:  Let him -- let him finish

14   his question.

15   BY MR. MATULA:

16        Q.    So I'm just trying to understand what

17   the "it" was of one thing that there being a

18   potential for having the racial discrimination in

19   America at large, and how you conclude -- and why you

20   conclude that various interactions in connection with

21   folks at Corizon or other places were in fact -- race

22   was a play in their motivation, that's what I'm just

23   trying to understand.

24        A.    Okay.  So, I'll see if I can help you.

25        Q.    And -- yeah, and because what you said

1    before in terms of the culture and you said something

2    about not everyone is like deliberately trying to

3    hurt people, but I must have misunderstood, because

4    you were seeming to make some very broad statements

5    suggesting that it's a fact that in America,

6    Chillicothe, the prison system, that people are being

7    mistreated based on their race.

8            A.      Uh-huh.

9            Q.      And I'm just trying to figure out

10   where -- like, the parameters of that.  Whether we

11   can -- does that apply to everybody, everybody in

12   American society, everybody in the prison, everybody

13   in Chillicothe, or -- or how you know it affects just

14   these people based on what happened here.

15           A.      Okay.

16           Q.      Does that make sense?

17           A.      Yes, it does.

18           Q.      All right.  Tell me about that.

19           A.      And so in answer to that question, I

20   would say that systemic racism exists.  Okay?

21   Institutional racism exists.  Consciously or

22   subconsciously it's there.

23                   And unless you are the victim, unless

24   you are the target of that particular behavior, you

25   won't see it, you won't understand it.  It's normal

1    for you because it's not something that you had to

2    deal with.  It's not something that you had to battle

3    against or try and strive in the face of, or thrive

4    in the face of.  It's not something you've had to

5    deal with, because what would make a person

6    automatically think that I'm going to become violent

7    if I raise my voice, but someone else can be violent

8    and they don't perceive it as violence.  And the only

9    difference between she and I is the color of our

10   skin.  So the only conclusion I can come to is that

11   because of who you are, you automatically have an

12   idea about who I am and that's based on what they

13   have been taught, what they see, and what they

14   believe to be true, and consciously or

15   subconsciously, and that's why we're -- we're -- I'm

16   -- I'm here today.  That's why I'm here today.

17                   You know, I can't say that, you know,

18   you -- you -- you called me any direct name at this

19   particular time, but you didn't have to verbally

20   express yourself to express yourself.  Because your

21   actions speak as well as your words.

22        Q.    But for the situation --

23                   MS. JAG:  Hey, Mike.  I'm really sorry

24   to interrupt.  Claudia just mentioned to me that she

25   actually can't hear anything.  You have to let her

1   into the room.  I think she can, like, see what's
2   going on, but she can't hear.  She wanted me to
3   mention something to you.
4               MR. MATULA:  All right.  Okay.  Thank
5   you.
6   BY MR. MATULA:
7        Q.     Had -- had the situation at the other
8   meeting where Ms. Kirby had not thrown the pencil, if
9   you had not been aware of that situation, would you
10  have formed the same conclusion that the meeting on
11  the 27th was, I guess, race mattered, and -- and race
12  made a difference in how you were treated, if the
13  pencil incident hadn't occurred?
14       A.     Sure.  Absolutely.
15       Q.     And -- and that's --
16       A.     I wasn't the first person that's
17  raised their voice in a meeting.
18       Q.     There was -- the only thing you told
19  me about before was the pencil throwing from
20  Ms. Kirby.
21       A.     Uh-huh.
22       Q.     So are there -- what other situations
23  specifically are you referring to?  I mean, I need
24  the details, because they're not written down in any
25  paper that you've ever prepared.  And so this is the

1   first time ever that I'm hearing about that.

2          A.     Okay.  And -- and just sort of to

3   speak to that.  When I prepared this statement that

4   you are referring to, that statement was prepared to

5   go to the EEOC, to give them the incidents that --

6   that spoke out verbally.  Okay?  There are nonverbal

7   incidents as well, and I believe that --

8          Q.     All right.  Keep going.

9          A.     -- and I believe that because of the

10  culture -- I'll go back to that once again.  I will

11  go back to that once again.  We can go back to the

12  incident with Ms. Barker when she was terminated.

13  Yes, she was terminated.  You asked me what my

14  expectations were.  Well, you know, really, you would

15  think -- you know, I don't know what expectations I

16  had at the time, but looking at it, you would think

17  that there would have been some type of reaching out

18  to me, implementing of a program, talking to the rest

19  of the staff, doing something to ensure that I wasn't

20  retaliated against, or that this behavior was

21  addressed and that -- that the employees knew how the

22  company felt about this, but it was just terminated.

23  That's it.

24         Q.     And do you think that --

25         A.     And so really what I believe happened

1   at that time after her termination is it actually

2   made my situation worse.  It was like I was left on

3   a -- on a -- on a island, because they did not come

4   in and address the rest of the staff.  They did not

5   come in and say, "Hey, we need to talk about this."

6           They didn't reach out to me.

7   Personally.

8           Q.    Okay.  Couple things --

9           MR. MATULA:  Laurel, can you read back

10  my last question.

11      (Whereupon, the requested portion of the

12       record was read by the reporter as follows:

13       "QUESTION:  The only thing you told me about

14        before was the pencil throwing from Ms. Kirby.

15        What other situations specifically are you

16        referring to?  I need the details, because

17        they're not written down in any paper that

18        you've ever prepared.  And so this is the

19        first time ever that I'm hearing about that.")

20  BY MR. MATULA:

21          Q.    Can you answer that question, please?

22          A.    So in addition to the pencil throwing?

23  We can -- we can go back to -- we can go back to

24  surveillance.  We can go -- where would you like to

25  go?

1           We can go back to when we did CPR on
2      the custody officer that -- over in the treatment
3      area, and I was the first provider on the scene, and
4      initiated CPR, when it was all said and done, I'm
5      standing there with the other providers and
6      everyone's congratulating everyone but me.  Why do
7      you think that occurred?  That didn't occur because I
8      didn't participate.  That didn't occur because I
9      wasn't there and couldn't be seen.  There's something
10     underlying that.  There's something underlying that.
11     And these are the types of behaviors that I dealt
12     with that were not necessarily verbally explicit, but
13     they were in the behavior and action that was
14     presented to me.
15          MR. NUGENT:  Ms. LaBlance, I want to
16     make sure that we are being mindful of -- of the
17     question specifically.
18          And my understanding of the question
19     was to provide a list to Mr. Matula of other examples
20     related to things you two have been discussing.
21          If -- if my understanding of the
22     question is different, I apologize, but that's what
23     I'm hearing.  And so I think he's looking for a list
24     of those things, things like the pencil incident
25     where you believe race was involved.  So I've got a

1   couple, but I just want to make sure.

2                    MR. MATULA:  That's fine.

3   BY MR. MATULA:

4        Q.     I've got CPR and surveillance.  And

5   actually I'm going to switch subjects so we can keep

6   on track and we're going to come back to that.

7   Because I will -- we will not conclude the testimony

8   today until I have a completely exhaustive list of

9   everything that you say was, you know, racial

10  discrimination toward you.  So you'll get the

11  opportunity to explain all that.  I promise.

12                    I am going to switch gears though,

13  because I want to get back on track on my planned

14  questioning, but before we do, going back to the --

15  your statement, which now you've said a couple

16  times you -- I think you said the purpose of this

17  limited to catch the verbal incidents of racial

18  discrimination that you could identify for the EEOC,

19  is that -- did I understand your testimony right,

20  about how you were saying this identified verbal

21  incidents?

22       A.     Maybe I -- I'm not sure I said that,

23  perhaps I did say that.  I would -- I would say at

24  that time it was asked the specific incidents that I

25  could recall.  I forget how he asked -- how it was

1   asked when I spoke with them.

2           Q.      When you say "them," you're talking

3   about the EEOC investigator?

4           A.      Yeah.  Yes.  Because I was asked to --

5   this is by no means an exhaustive list, let me start

6   by saying that.

7           Q.      Well, see that's -- I want to get

8   clarification of this because we spent --

9           A.      Uh-huh.  Yes.

10          Q.      -- considerable --

11                  Please let me finish my question.

12          A.      Uh-huh.

13          Q.      We spent a considerable amount of

14  testimony at the outset of your testimony going

15  through this, and you talked about how you spent

16  upwards of a month and many hours, and you -- you got

17  in several times and you tried to be exhaustive and

18  the record will speak for itself.

19          A.      Uh-huh.

20          Q.      So what I just want to make sure if

21  you're wanting to clarify that earlier testimony, and

22  tell me that there was some type of filter or

23  limitations that you were employing when you decided

24  what to put in your charge versus those that you did

25  not bother to put in your charge, what were the

1  parameters?

2          A.      Okay.   Okay.

3          Q.      What were the guidelines that you were

4  using as you put this pen to paper figuratively?

5          A.      The way that I wrote this was to try

6  and paint a picture of a -- some incidents that

7  occurred that were examples of some of the things

8  that I experienced when I was there.

9                  And to summarize that, to give a

10  picture of why I am saying this time that I spent I

11  encountered discrimination, and racism, and here are

12  some events that occurred while I was there.  And try

13  to wrap that up in a nice little bow, so that folks

14  can say, "Oh, well, if this is like anything -- if

15  these are suggestive of what she was experiencing on

16  a daily basis, yeah, there was discrimination there."

17          Q.      Okay.

18          A.      "Yes, there was racial discrimination

19  there.  Yes, there was retaliation.  Yes, there was

20  harassment.  Yes, it was there."

21                  Now, you know, I mean when I say by no

22  means exhaustive, when you deal with something, you

23  know, five days out of the week, you know, 12 months

24  out of the year, some of the more subtle incidents

25  that occurred, that's what I was sort of sharing with

1    you earlier, because of the way things are,

2    unfortunately, oftentimes you just walk on.

3                    Even this incident with Ms. Barker.  I

4    left her presence and went to my office to not

5    further engage in that encounter.

6                    Does that make sense?

7        Q.    I don't think I fully understand

8    everything that you're trying to say, but we'll just

9    forge ahead.

10                   With regard to going back to the --

11   your narrative.  You -- you -- at the top of the

12   second page, Page 8 of 15, you refer to "a" second

13   incident?

14       A.    Uh-huh.

15       Q.    Do you see that?

16       A.    Uh-huh.

17       Q.    Okay.  And that's this deal with the

18   lab tech and take the specimen sample and whatnot?

19       A.    Uh-huh.  Uh-huh.

20       Q.    Okay.  At least in your narrative that

21   you spent weeks preparing, the -- the initial

22   discrimination was the Barker deal, and now the

23   second one --

24       A.    No, not the second.  A second.

25       Q.    Was -- can there be more than one

1 second?

2          A.     Yeah, there can.

3          Q.     How so?

4          A.     Because there was probably something

5  that occurred in between, but the -- a second one

6  that I am sharing with you.  That's what this is.  A

7  second incident that I am sharing with you.  I'm not

8  saying that there's, you know, nothing else that ever

9  occurred.  And I think that where we're -- where

10  we're not understanding one another, is that I don't

11  believe in any way that this could be all inclusive

12  of every act that I -- or every discriminatory

13  incident that I could possibly cite while I was

14  there, because some of them, I may not recall.  So

15  this is a second.

16          Q.     I -- I will agree if you can't recall

17  it, then it's not going to be something you can write

18  down, I get it.

19          A.     Uh-huh.

20          Q.     But I'm just going by the words that

21  you choose to --

22          A.     I know you are.

23                 MR. NUGENT:  Let him finish.

24  BY MR. MATULA:

25          Q.     And you -- I've tried to do my best to

1    give you the courtesy to finish your answers, if you

2    can give me the courtesy --

3              A.    No disrespect.

4              Q.    -- I would appreciate it.

5              A.    No disrespect.

6              Q.    I'm just looking at the words that you

7    chose on the paper and the way it reads.  I mean,

8    regardless of your intention --

9              A.    Uh-huh.

10             Q.    -- would you at least agree with me

11   that the way this reads, it is a reasonable reading

12   to suggest that what you -- as of the time of the

13   biohazard bag, that those had been the only two

14   situations of racial discrimination that you had

15   perceived as of that time?

16             MR. NUGENT:  I'm going to object to

17   form.  The document speaks for itself.

18             You can answer.

19             A.    I -- I would say that that would be a

20   naive assumption.

21   BY MR. MATULA:

22             Q.    Okay.  All right.  Let's talk about

23   this a little bit, then.  With regard to the

24   situation and the biohazard bag.  I want to get the

25   timeline correct, because your narrative says

1    January 15th.  And I haven't seen paperwork that

2    relates to that, but if you look at -- let's pull out

3    15.

4                    MR. MATULA:  Can you find 15, Laurel.

5    That's 15, so I'm skipping one.

6    BY MR. MATULA:

7        Q.      Exhibit 15 is several documents put

8    together and they're Bates Numbered Corizon 20

9    through 24, that I think all relate to this incident

10   you're describing and to orient you, if you look on

11   the last two pages, Corizon 23 and 24 --

12       A.      Uh-huh.

13       Q.      -- that's an email from you to

14   Sterling Ream, Karen Epperson, Jerry Lovelace, Jenny

15   Meehan and Valicia Kirby, where you say Employee

16   Discrimination.

17                   And -- and you go on to describe an

18   incident where a lab tech took a specimen from her

19   work area and took it back to your desk and -- and

20   whatnot.

21                   My question is, is the incident that

22   you were talking about in this exhibit on Pages 23

23   and 24, that's the same incident you're trying to

24   describe in the top of your narrative on Page 8 of

25   15; correct?

1          A.      That is correct.

2          Q.      Okay.  So if we look at the date of

3     your email --

4          A.      Uh-huh.

5          Q.      -- that is June 6th?

6          A.      Yes.  And I'll just point --

7          Q.      Let me just -- I'm just going to ask a

8     couple questions.

9                  You say, "Once again today."  So the

10    incident occurred on June 6th; right?

11         A.      Uh-huh.

12         Q.      So in terms of your narrative, just so

13    we're on the same page, literally, the -- instead of

14    January 15th, looking at this paperwork, can we agree

15    that was just a mismemory and June 6th would be the

16    more appropriate date to fill in?

17         A.      You can use that date, but if I can

18    point out, that I said "once again," because this was

19    not the first time that she had behaved this way.

20    And so I -- yes.  This was the second time.

21         Q.      I'm just trying to get the dates

22    correct.

23         A.      Okay.

24         Q.      And the date what you're describing at

25    the top of Page 8 of 15 of Exhibit 1, says

1    January 15th, but when we're looking at the substance

2    of what you've written, that should be June 6th, and

3    I acknowledge that on June 6th you say there had been

4    a previous incident, are we on the same page?

5         A.    Correct.

6         Q.    Okay.  All right.  So -- and in fact

7    as I read through your email of June 6th, the way I

8    read it, there had been one previous incident with

9    this lab tech, and I am looking at the, I guess, on

10   the last page, Corizon 24, you write, "Ms. Ream is

11   aware of the past incident, similar in nature and can

12   attest to the apparent discrimination exhibited by

13   this Corizon employee."

14              Do you see where I'm looking at?

15        A.    Yes, I do.

16        Q.    Okay.  So first, who is the lab tech,

17   let's put a name?

18        A.    Her name is Judy Harkins.

19        Q.    Okay.  And is it -- I mean, first when

20   you say "Ms. Ream -- Ms. Ream is aware of the past

21   incident," meaning something before June 6th?

22        A.    Correct.

23        Q.    As of June 6th, you had two incidents

24   of a similar nature with Judy about how these

25   specimens and the requisitions were being handled;

1  correct?

2          A.     Two blatant incidents regarding

3  specimens.

4          Q.     Okay.  I'm just saying that you chose

5  to say "the past incident," which is singular, so

6  I've got the past incident and the June 6th incident,

7  those are the only ones that at least you

8  memorialized; true?

9          A.     Yes.

10         Q.     Okay.  All right.  And --

11         A.     But I do think that that indicates a

12 pattern of behavior.

13         Q.     I -- I didn't ask you about that, but

14 I appreciate that.

15         A.     Okay.

16         Q.     What -- and I don't want to replow

17 ground, but now having clarified and corrected the

18 date of this situation with Judy, as being June, I

19 guess, I do have to ask you this:

20                If you felt that the meeting in which

21 you were confronted about raising your voice in

22 April, that we've discussed, if you felt that that

23 was some type of race discrimination, or race had

24 made a difference in April, why did you not

25 memorialize that or refer to that meeting as -- as

1  your belief it was somehow racial in your EEOC

2  discrimination complaint?

3          A.    I don't -- I can't answer that --

4  I....

5          Q.    All right.  Well, then we'll move on

6  to --

7          A.    It was not intentional.

8          Q.    We'll move on.  Let's talk about the

9  lab incident and this business of what was going on

10  with Judy.

11              Tell -- first tell me what the -- what

12  the -- I guess, what is the process, or describe for

13  me kind of what is going on at Corizon with your

14  interaction with Judy or any other lab techs.

15          A.    Okay.  Judy is the only lab tech -- or

16  was the only lab tech there.  So any -- on this

17  particular occasion, I had a -- I believe it was a

18  tissue biopsy that I had taken from a patient that

19  needed to be processed for possible malignancy.  I

20  filled out the container, I did the biopsy, you know,

21  sutured it.  Put it in the formalin, put the

22  patient's information on it, put it in a bag and I

23  took it to her office and sat it in front of the

24  refrigerator.

25              I didn't have the requisitions -- I

1  don't believe I had a requisition, and so she's the

2  lab person.  So she comes in, she draws the blood,

3  she fills out the requisitions, all of the lab

4  equipment is in her office.  And --

5          Q.      Okay.  And I apologize for

6  interrupting, but to keep up with you, I need to slow

7  you down so I just understand the process.  Because

8  you're using some terminology that I -- I want to

9  make sure I understand.

10         A.      Okay.

11         Q.      Okay?

12         A.      Okay.

13         Q.      And so when -- for example, maybe

14  taking a step back out from the specific incident,

15  but just how the situations come up generically or

16  generally.

17                 When you say "requisitions," what do

18  you mean by a requisition?

19         A.      The requisition is a form that is

20  completed that actually -- that goes to the lab that

21  tells them what test I'm ordering on the specimen.

22         Q.      Okay.  And --

23         A.      Gives the patient information, the

24  date, the time, the site, where the specimen came

25  from, what type of specimen it is, and what tests I'm

1    requesting be ran on the specimen.

2              Q.      All right.  Okay.  And so as I

3    understand the process is a patient comes in, has --

4    it's identified that they need something that is

5    going to involve lab work being done; correct?

6              A.      Uh-huh.  Uh-huh.

7              Q.      The practitioner would do whatever

8    procedure necessary to get the sample, so to speak,

9    whether it's a biopsy -- I don't know what else you

10   might have -- I'm assuming maybe urine sample,

11   something?

12             A.      Uh-huh.

13             Q.      Right?  Is that correct?

14             A.      Uh-huh.

15                     MR. NUGENT:  "Yes"?

16             A.      Oh.  Yes.  I'm saying "uh-huh,"

17   because there are some specimens that I can order

18   that nursing will obtain, so, say, I say I want a

19   patient to have a particular test, that patient would

20   be put on a schedule, called up at a later date to

21   have that specimen collected.  They would fill out

22   the requisition -- they would take the specimen to

23   the lab, the lab person would process it, fill out

24   the requisition and prepare it to be sent to

25   processing.

1   BY MR. MATULA:

2          Q.      So sometimes, depending on the nature

3   of the medical need, you could have a situation where

4   the provider is in a position to obtain the -- the

5   sample right there at the time of the visit?

6          A.      Correct.

7          Q.      And there are other times where the

8   provider may give some sort of direction that the

9   sample is going to be obtained at a -- at a different

10  time, have the nurse do it, provider's not involved;

11  is that --

12         A.      Correct.

13         Q.      And it just depends on the nature of

14  the -- the medical need?

15         A.      Yes.

16         Q.      So sometimes these specimens are, as

17  what sounds like was the case involving this one,

18  specimens obtained right there while the provider is

19  with the -- the patient?

20         A.      Correct.

21         Q.      And then it's kind of pushed

22  downstream towards the lab?

23         A.      Correct.

24         Q.      And after this -- after the specimen

25  is obtained, there's information that needs to go

1  with it as it heads towards the lab?

2        A.     Correct.

3        Q.     And so now where does the requisition

4  come into play?  Where -- and sticking with the

5  example of a sample being taken by a provider at the

6  time of the visit.

7               Are you with me?

8        A.     Yes.

9        Q.     Okay.  So where does the requisition

10 come into play, then?

11       A.     The requisition must be completed to

12 be sent with the -- the specimen for processing.

13       Q.     And is it the -- and are these

14 requisitions, are these things that are a handwritten

15 document on a form, is it something that's typed in

16 the computer?  What -- what physically creates the

17 requisition?

18       A.     Well, there's a -- a form that has a

19 carbon copy, and it just needs to be -- it's -- put

20 the patient's name, date of birth, date and time, and

21 check the box of the specimen site, and -- you know,

22 because it would say for pathology, or cytology, or

23 hematology.  That kind of thing.  So this is a

24 pathological specimen, I want pathology on it, so

25 that box would be checked.  Uh-huh.

1          Q.     So there's definitely a hard copy

2    paper of --

3          A.     Yes.  Yes.  And then I'm not sure

4    what -- I'm not aware of what -- how she processes

5    it -- processes it after that.

6          Q.     Okay.  All right.  And -- and how long

7    had Judy been working there?  Had she been onboard

8    since you joined or did she start her employment

9    after you started?

10          A.     She had -- she was there when I

11    joined.

12          Q.     And so tell me -- okay.  Tell me the

13    situation again, like you've drawn -- it's a sample

14    like this one where you've drawn the sample right

15    there at the visit, you've gotten the container, or

16    whatever's physically going to go to the lab, and we

17    need some additional paperwork filled out to go with

18    the sample so the lab people can do the right thing.

19          A.     Uh-huh.  Uh-huh.

20          Q.     Okay.  In a situation where the sample

21    is -- is not going to be taken at the time, like

22    you're just giving direction, hey, so-and-so needs to

23    come back in a day or week or whatever and take, I

24    don't know, a urine test or some other thing, some

25    other sample.  I'm not going to do it right now at

1    this visit, but we're going to set you up.

2              What directions or paperwork or how

3    does -- how does whoever's going to take that sample

4    at a later date know what to do?

5         A.    I order the test in my plan of care at

6    the time of the visit.  So this is my plan.  Okay.

7    So this is what the patient came in for, and what I

8    would like to do, is my plan, and so I would like to

9    get the urine, I would like to get, you know, some

10   blood work and I'd like to see you back in two weeks.

11   And I'm going to start her on this medication or that

12   medication.

13             And that -- then they print that off

14   at the end of the night, it goes to the secretary and

15   she puts the person on the schedule --

16        Q.    To come back in --

17        A.    -- at a later day.

18        Q.    -- and have blood drawn or urine

19   taken --

20        A.    Yes.

21        Q.    -- or whatever that you've put in your

22   plan of care?

23        A.    Correct.

24        Q.    All right.

25        A.    In that situation.

1          Q.     So that's -- so that's kind of -- it

2    gets documented in the plan of care and goes through

3    the process.

4                Okay.  Going back to the situation

5    where the sample is taken during the visit.  How does

6    that differ if at all when you were right there to

7    take the sample?

8          A.     Okay.  So I'll start by saying that I

9    typically don't do procedures the first time that I'm

10   seeing the patient.  I've done an exam, I've seen

11   something that needs to be further investigated.  I

12   schedule -- I talk to the patient, I schedule them to

13   come back.

14               So in my plan on that first visit, I

15   say, I'm going to bring them back, and this is what

16   I'm going to do.  I'm going to do this procedure to

17   retrieve this specimen.  Okay?  That's in my plan.

18   So the patient then will go on a schedule, on my

19   schedule, to come back to do this procedure to obtain

20   this specimen.  I do the procedure, I fill out the --

21   on the formalin containers, which formalin is a -- is

22   a preservative, that is used to preserve tissue to

23   send to the lab to be evaluated.  Okay?  The

24   information, the patient's name, date, date of birth,

25   site of specimen and what you're looking -- what

1    you're sending it for all goes on the label that goes

2    on the specimen.

3         Q.    Okay.  Let me stop you there.  So how

4    is the label different than the requisition in this

5    situation?

6         A.    The requisition is -- it goes with the

7    specimen, there's a sticker that identifies the

8    number, it has a number that identifies the

9    requisition, you take the sticker and you put it on

10   the specimen, you put the patient's name on the

11   requisition, and so that you have two different

12   things that should match when it gets to the lab.  So

13   I can identify this by name.  I can identify this by

14   number, requisition number.

15        Q.    All right.  So let's go back to Judy

16   and June 6, 2018.  What was the -- I've read the

17   narrative, but I guess you had obtained the biopsy,

18   got it in the container, left it by Judy's work area,

19   then she comes back and brings it back to you?

20        A.    Well, actually she was there when I

21   took it, and I sat it by the refrigerator that's next

22   to her desk that the specimens go in.  And I left it

23   there because it needs a requisition, and it needs to

24   be put wherever she puts things that she takes up to

25   the front to be taken to the lab.  That's what I did.

1  Which is the way things are done when they come in

2  for an appointment with the nurses to obtain a urine

3  or something of that nature.  They collect the urine,

4  they put the information on the container, they put

5  in it a bag, you take it to the lab, the lab person

6  handles the rest of it.

7          Q.    Okay.  So you put it in the

8  refrigerator near the lab, and so Judy comes back

9  and --

10         A.    No, Judy was there.

11         Q.    I guess I'm trying to walk through it.

12  Okay.

13               You happened to be available to

14  retrieve the specimen from the patient, then you took

15  it to the lab tech to be processed for evaluation;

16  true?

17         A.    Uh-huh.

18         Q.    Lab tech refused to complete the

19  requisition --

20         A.    Uh-huh.

21         Q.    -- and took the specimen to your -- to

22  your office and sat at your desk and said, "I told

23  you not to sit that on my desk."

24               Okay.  And that was -- you're saying

25  that's inaccurate.  It wasn't on her desk, it was on

1  the counter in front of the specimen refrigerator

2  area?

3          A.      Uh-huh.

4          Q.      And you sat down and she picked it up

5  and attempted to hand it back to you?

6          A.      Uh-huh.  I --

7          Q.      And then you told her, "No, you need

8  to fill out the requisition and prepare the specimen

9  for processing"?

10          A.      Uh-huh.

11          Q.      And then she walked out of the lab

12  passed you, directly to your office, and refused your

13  direction?

14          A.      Yes, she did.

15          Q.      Did she say anything at -- at --

16  during that, because it's not in your email if she

17  did?

18          A.      I -- she -- I don't recall

19  specifically.

20          Q.      Okay.  How many -- and you've

21  mentioned the one incident previously with her,

22  similar deal.  At this --

23                  Right?

24          A.      Yes.

25          Q.      You and Judy had been working together

1    for about a year as of this time; right?  June to

2    June?

3         A.    Uh-huh.

4         Q.    How many total times had there been a

5    situation where you had, you know, left something or

6    given direction for Judy to do the requisition where

7    there was no problem?

8         A.    I don't know.

9         Q.    To make sure -- I'm just trying to get

10   an idea of how common this comes up.  And we've got

11   two situations where she didn't do what you've told

12   her to do, and I'm trying to think of how many times

13   were there situations where it wasn't an issue.  Can

14   you give us any ballpark about how many times Judy

15   just did what you wanted?

16        A.    What I will say, is typically because

17   of the nature of the exams that I performed, I had

18   someone that I had trained, so you know, whoever that

19   was, that would come in and help me to process those

20   specimens at that time.  So say I'm doing Pap

21   smears -- okay?  The person that is assisting me, may

22   fill out the requisition and take 'em.  Not a

23   problem.

24             So I don't know -- or I don't recall

25   how many times I had actually asked her in the past

1    to process something that she refused to process.

2    However, I do know of one other such occasion for

3    sure.

4          Q.    I'm just trying to make sure I

5    understand your testimony.  You had been working with

6    Judy a year, and I understand given the nature of

7    some of the procedures, there was somebody else, not

8    Judy, was with you.

9                But I mean, you're not telling the

10   jury in this case, that there were no other times

11   where Judy just did what you expected her to do;

12   right?

13               I mean, there were times where she was

14   there, you asked her to do the requisition and there

15   was no problem, there are at least some occasions of

16   that; true?

17         A.    I would guess so.

18         Q.    Well, I would guess so too if you had

19   been working there a year, but you were there, not

20   me.  So I'm just trying to see what you can -- can

21   say.

22         A.    I would assume so.

23         Q.    Okay.

24         A.    But I don't know.  There were --

25         Q.    If there were --

1        A.    There was -- there was no other

2  occasion that she acted like this.

3        Q.    Sure.

4        A.    Specifically.  Other than that one

5  other occasion.

6        Q.    Right.  We know we have two problem

7  incidents, I'm just trying to get an idea if there's

8  any way to kind of figure it out how many would be in

9  the nonproblem incident situation.  And it sounds

10  like you just can't say, other than there had to be

11  some since you'd been working there a year together;

12  fair?

13        A.    I said there were two that were

14  blatant.  Two that were blatant, where she

15  blatantly --

16        Q.    I under- -- I understand that --

17        A.    Oh.  Okay.

18        Q.    -- we definitely have two, I get it.

19        A.    Okay.

20        Q.    There were two where Judy did

21  something that you didn't think was right.

22        A.    Okay.  It wasn't right.  It's not that

23  I didn't think it was right [sic].

24        Q.    Hold on.  All right.  Okay.

25        So, now, moving on from what happened

1   with Judy on June 6th and what happened thereafter.

2   What -- I guess what became of your email complaint

3   about Judy and not doing the requisition?

4         A.     Essentially, nothing.

5         Q.     Well, did anyone ever talk to you

6   about the situation?

7         A.     I made a complaint a couple of weeks

8   later, a week to two later, Jenny Meehan came to my

9   office.

10         She said, "We finished our

11   investigation, and we have found this to be a

12   misunderstanding."

13         And I -- that's all I've heard.  I

14   wasn't interviewed.  I wasn't asked.  I wasn't part

15   of the investigation.  Did not know there was an

16   investigation.  And I was later told that it was a

17   misunderstanding.

18         Q.     What -- now, when Ms. -- when

19   Ms. Meehan came back to you and said we've finished

20   this investigation, and we looked into it, we think

21   there's a misunderstanding not discrimination, was

22   she on the phone or was she there with you in person?

23         A.     She came to my office.  She happened

24   to be onsite that day.

25         Q.     And so -- and do you know if

1    Ms. Meehan had been physically onsite in Chillicothe

2    any days between the time you made your complaint and

3    the time she came to meet with you in person?

4              A.    I don't recall.

5              Q.    Okay.  Sitting here today, as far as

6    you know, the date when Ms. Meehan came and -- and

7    met with you in person, that might have been the

8    first time that she was physically in Chillicothe

9    since you made the complaint?

10             A.    I don't recall.

11             Q.    As far as you --

12             A.    I don't know.

13             Q.    Maybe, maybe not?

14             A.    Maybe, maybe not.

15             Q.    Okay.  But in any event, she now is

16   physically in person with you, and she shares this

17   information.  I guess, how long -- how long did this

18   meeting last?

19             A.    Two minutes.  Minute and a half.

20             Q.    And what did you say in response?

21             A.    I --

22             Q.    Do -- do you remember?

23             A.    No.

24             Q.    You were not satisfied with what she

25   had told you; correct?

1                    MR. NUGENT:  Object to form.

2                    You can answer.

3          A.     No, I was not satisfied with what she

4    had told me.

5    BY MR. MATULA:

6          Q.     All right.  And why not?

7          A.     Because that behavior was not a

8    misunderstanding.  It was a blatant insubordinate

9    act, for whatever reason, only one reason I can come

10   up with, and that's because the only difference

11   between me and the other providers is that I'm black.

12   I'm African-American.  And I had actually gone to the

13   other two providers --

14         Q.     Being who?

15         A.     Meaning Epperson and Kirby, and I went

16   to one of the nurses that work in the sick call area,

17   I can't remember which one it was, and I asked them

18   about -- I asked all of these people, do they ever

19   have any problems getting her to process specimens,

20   and all of them told me no, they never have any

21   problems getting her to process specimens.  The only

22   person that had problems getting her to process

23   specimens, which was part of her job, was me.

24         Q.     Gotcha.  All right.

25         A.     And so I was not satisfied.

1       Q.      Fair enough.  Did you tell Epperson,

2   Kirby, or the sick call nurse, or anyone other than

3   the -- the people in your email complaint that you

4   believed Judy was acting differently towards you

5   because you were African-American?

6       A.      I don't think anyone outside of the

7   people you just mentioned.

8       Q.      Okay.  Well, the people I mentioned,

9   either the people I mentioned on the email list or

10  the -- the -- well, I guess hold on a second.  Kirby.

11  Wait.

12          Let me -- you do have Kirby.

13      A.      Lovelace.

14      Q.      I guess the only other person would be

15  the sick call nurse, that's the only other person you

16  checked with to get -- to see their experiences.  Got

17  it.  Okay.  All right.

18          Did you --

19      A.      I shared this with all of these people

20  on this email here.

21      Q.      Okay.  Did you ever talk to Karen

22  Epperson or Val Kirby about what information they

23  told Jenny Meehan about the situation?

24      A.      No.

25      Q.      Did you -- did you ever have a

1  conversation or a communication with Epperson or

2  Kirby, either confirming whether or not they were

3  even talked to or not?

4          A.      No.

5          Q.      Sitting here today, is it true that

6  you don't know whether Jenny Meehan spoke with Kirby,

7  Epperson or anyone else in response to your

8  complaint?

9          A.      That is correct.

10         Q.      You would have -- I assume you would

11 have expected that she would have also checked in

12 with the other providers to kind of see how their

13 experience -- or what they had to say about their

14 experience with Judy and how it compared to yours?

15                 MR. NUGENT:  Object to -- object to

16 form.

17                 You can answer.

18         A.      Yes, and she didn't check in with me

19 during the investigation either.

20 BY MR. MATULA:

21         Q.      Well, I mean, she did have your email,

22 right, so she knew some information about where you

23 were coming from; true?

24                 MR. NUGENT:  Object to form.

25         A.      She did an investigation and I wasn't

1  part of it.

2  BY MR. MATULA:

3       Q.    Well, you -- ma'am -- ma'am, you were

4  at least in --

5       A.    I was the complainant.  I apologize.

6  That's a bad habit of mine.  Go ahead.

7       Q.    You were at least a part of it,

8  because you wrote this email that -- to them to --

9  that kind of got it started, right, so you at least

10  that part of that; true?

11      A.    I was part of the complaint, not the

12  investigation.

13      Q.    Okay.  Okay.  Sitting here today, can

14  you tell me what information you would have provided

15  to Ms. Meehan or anyone else in this investigation if

16  you had been included, that is not in your email?

17                 MR. NUGENT:  Object to form.

18      A.    Can you please repeat the question?

19                 MR. MATULA:  Laurel, could you read

20  that one back, please?

21     (Whereupon, the requested portion of the

22       record was read by the reporter as follows:

23       "QUESTION:  Sitting here today, can you tell me

24       what information you would have provided to

25       Ms. Meehan or anyone else in this

1    investigation if you had been involved that is

2    not in your email?")

3    A.  No, I can't, I wasn't involved.

4      MR. MATULA:  All right.

5 BY MR. MATULA:

6    Q.  And was there any specific information

7 that you felt Ms. Meehan should consider beyond what

8 was in your email here that you were thinking of but

9 did not share with her when she met with you in

10 person?

11      MR. NUGENT:  Object to form.

12    A.  Those were two separate incidents, two

13 separate encounters, I believe, is what you're

14 asking.

15 BY MR. MATULA:

16    Q.  Well, I'm just trying to -- you keep

17 saying you weren't involved in the investigation and

18 -- and I guess I am inartfully asking questions.

19     I don't know -- if you had been

20 involved in the investigation, what other information

21 do you think you would have shared that might have

22 made a difference on how things would have come out?

23     Is there something else that you think

24 Ms. Meehan or someone else needed to know that you

25 didn't -- that you never shared with her?

1          A.      I believe --

2                    MR. NUGENT:   Hang on.   That's the

3     reason for the objection, Counsel, is that you're

4     asking her to speculate.

5                    MR. MATULA:   I -- then she can say

6     that.   But if -- if there's -- I just -- if that's

7     her answer:   I don't know what it might have been.

8     That's a fair answer.

9                    But if she's saying, Hey, I was

10    excluded from the investigation and so the

11    investigators didn't get all the necessary or

12    important information that they should have gotten, I

13    want to know what that is.

14         A.      Well, I believe a thorough

15    investigation would have involved speaking with me as

16    well.   Whether I can specifically tell you right at

17    this time if there was something particular that I

18    would have included in addition to what I -- I put in

19    the email, I cannot say.   However, speaking with me

20    personally would have probably given someone a better

21    idea of what actually occurred in addition to the --

22    the statement that I made, and failure to include me

23    in the investigation, I think is just negligent.

24    BY MR. MATULA:

25         Q.      Okay.   But there's not something

1  specific -- piece of information that you can

2  identify for me right now that you would have shared

3  to Ms. Meehan or in the investigation had you been

4  interviewed?

5          A.      I don't know.

6          Q.      All right.  If you can look at the --

7  Page -- it's Corizon Page 22, it's Page -- it's got a

8  Bates Number label right under that of Page 3 --

9  where it's Ms. Meehan's email to Heather Dale and --

10  and various other people.

11          A.      Yes.

12          Q.      And she is saying, "I have discussed

13  this with Ms. LaBlance, Judy Harkins, and the two

14  other two providers at the site."

15                  She said, "I don't believe this to be

16  a discrimination issue.  I believe this is a

17  communication issue between the two employees?"

18                  Going on, Ms. Meehan writes, "When lab

19  orders are entered into the provider plan, the orders

20  are given to the lab tech and she completes these

21  requisitions."  Now, that, based on what you told me

22  before, is accurate, is it not?

23          A.      Yeah.  Yeah, for the most part.

24  Meaning that if they come up on a lab schedule --

25  because if I order a lab, the lab goes -- the order

1    goes on to the lab schedule.  The patient is called

2    up, the specimen is obtained, I don't have to be a

3    part of that situation.

4              Q.    Correct.  And that -- we discussed

5    that ten minutes ago when you were describing the

6    processes; right?

7              A.    Okay.

8              Q.    I mean, that's -- that's the same

9    thing.  That's why I said --

10             A.    I just want to make sure we're saying

11   the same thing.

12             Q.    Okay.  So the first sentence of that

13   second paragraph, that's accurate?  The second

14   sentence, Ms. Meehan writes, "The issue at hand has

15   occurred when the provider is seeing a patient in

16   their office and conducts a test at the time of the

17   visit."

18                   Do you see that?

19             A.    Yes I do.

20             Q.    And at least with regard to the

21   June 6th situation, that was such a situation because

22   you were seeing a patient in the office and you did

23   the test to get the specimen at the time of the

24   visit; true?

25             A.    Correct.

1    Q.    Okay.  Ms. Meehan says, "These

2  requisitions" -- referring to that situation -- "are

3  to be completed by the provider because they are the

4  ones with the information for the test; location/test

5  to be run."

6              Now, is that accurate or inaccurate?

7  That third sentence.

8    A.    Just like when I ordered the -- any

9  other tests, the information is in the order and if

10  this is what she has said, I have not seen this

11  email.  This email did not come to me.  It says

12  here --

13    Q.    All right.  I want to look at what it

14  says --

15    A.    Yeah.

16    Q.    -- and I want you to tell me

17  whether --

18    A.    Yeah, I -- I -- I -- that's what she

19  said.

20    Q.    Okay.

21    A.    But that's -- you know, I mean -- I

22  have not seen this.

23    Q.    Well, I mean --

24    A.    It wasn't sent to me.

25    Q.    Regardless of whether this was sent to

1   you or not, the -- it is true that the provider in

2   that situation or the -- the -- where the provider is

3   seeing a patient in their office, the provider has

4   the information for the test, the location and the

5   test to be run.  That's true?

6           A.      Correct.  That's true.

7           Q.      All right.  And so --

8           A.      On every test that I order.

9           Q.      Now, Ms. Meehan goes on to say that

10  she reviewed about a four-inch stack of lab

11  requisitions, and most of them were completed by the

12  lab tech.

13                  Do you see that?

14          A.      Uh-huh.

15          Q.      And -- and from your perspective,

16  that's what you would expect because of the process,

17  you expect the lab tech to do the requisition?

18          A.      Correct.

19          Q.      Now, she goes on to say, "There were

20  instances I found requisitions which were complete by

21  the provider; all three site providers including

22  Ms. LaBlance."

23                  Now, I -- I'm not going to ask you

24  whether that's accurate or not, because you have no

25  way of knowing what she did or didn't do.

1          A.       Uh-huh.

2          Q.       But if I understood your earlier

3     testimony, it was your impression from talking to the

4     other providers that there would not be any

5     requisitions whatsoever that were completed by the

6     provider because they all should have been done by

7     the lab techs?

8                    MR. NUGENT:  Object to form.

9     BY MR. MATULA:

10         Q.       Am I -- is that right?

11         A.       That there shouldn't have been any

12    requisitions --

13         Q.       Completed by providers.

14         A.       I -- I would say not necessarily --

15    that's not necessarily a true statement.  If your

16    schedule is -- if my schedule's not -- it's not part

17    of -- we have a lab technician to do those things,

18    and so maybe perhaps on days that she was not there,

19    those days were -- did happen.  There were -- she

20    usually went home -- her schedule was different than

21    ours, so she may not be in the lab, during those

22    times you may -- you may need to fill out the

23    requisitions yourself, because no one is there.

24         Q.       Okay.  Were there times where you

25    yourself completed requisitions?

1    A.    Sure.  And I don't think that that

2  takes into account the entire situation, because it

3  wasn't just about the requisition, it was about the

4  fact that she refused to do the requisition after a

5  directive was given.  And not only did she refuse to

6  do it, she took the specimen, stormed past me and

7  went and put it on my desk.

8    MR. MATULA:  And I object to the

9  answer as being nonresponsive after the word "sure."

10 BY MR. MATULA:

11   Q.    The next sentence in the email,

12 Ms. Meehan writes, "I will be having Dr. Epperson

13 speak with me" -- excuse me.  Let me start over.  I

14 misread.  New question.

15   "I will be having Dr. Epperson with me

16 to speak with Ms. LaBlance about the requisitions and

17 the expectations.  I will encourage productive

18 communication between the two employees."

19   Do you see that?

20   A.    Yes.

21   Q.    Did that ever happen?

22   A.    No.

23   Q.    All right.  Going on to the -- one

24 page earlier, which is Corizon 21.  And then this is

25 -- we've got an email from Jenny Meehan furthering

1   the chain, where she says, "I have spoken with Terri.

2   I do not believe she is satisfied with my

3   investigation."

4           So she -- she did also get the

5   perception that you were not satisfied, it appears.

6           Question.  The next sentence she

7   writes, "I explained to her I spoke with the lab tech

8   and the other providers and reviewed about a five to

9   six-inch stack of requisitions."

10          You know, is -- is that -- is what she

11   wrote there true, did she explain to you that she

12   spoke with the lab tech and other providers and

13   reviewed a stack of documents, requisitions?

14      A.    She told me she had completed her

15   investigation.

16      Q.    So is it your testimony that

17   Ms. Meehan did not tell you specifically that she had

18   talked to other providers or looked at requisitions?

19      A.    I don't remember her telling me that

20   specifically.

21      Q.    All right.  And -- and certainly we

22   are talking about something that occurred more than

23   two years ago now.

24      A.    Okay.

25      Q.    But so that I understand the

1   confidence of your testimony, it could be one of two

2   things:  I don't remember that happening versus oh, I

3   know for sure that did not happen.  And -- because I

4   will tell you consistent with this email, I expect

5   Jenny Meehan to testify consistently with this email

6   and I need to know whether you're going to say, no,

7   she is wrong or you're saying, I don't think that

8   happened, but I can't be a hundred percent sure?

9                  MR. NUGENT:  Object to form.

10  Argumentative.

11                 You can answer.

12       A.    I don't remember that specifically

13  happening.

14  BY MR. MATULA:

15       Q.    It may or may not have happened, you

16  just don't remember specifically; is that fair?

17       A.    I don't remember that specifically

18  happening.

19       Q.    All right.  She goes on to the next

20  sentence, "I explained to her I believe the situation

21  is a communication issue between Terri and the lab

22  tech not a discrimination issue."

23                 Now, I think from your earlier

24  testimony you do remember that part being said?

25       A.    She said it was a misunderstanding.

1      Q.     Misunderstanding, all right.

2          The next sentence, "I offered Terri to

3 have the two of them to sit down and discuss the

4 situation and Terri declined."

5          Did that happen?

6      A.     That is correct.

7      Q.     Okay.  So you do remember Ms. Meehan

8 offering to try to get you and Judy together to -- in

9 the same room to talk about the situation, but you

10 declined; fair?

11     A.     Yes, I did.

12     Q.     Okay.  All right.

13     A.     And I made that decision because this

14 was not the first time this had -- had occurred and

15 there was no misunderstanding if her job is to

16 process lab specimens.  She's in the lab, her job is

17 to process lab specimens.  I'm the provider, I gave

18 her a directive, she blatantly ignored that, refused

19 to do it, and went a step further and to put the

20 specimen on my desk as a form of disrespect.  So it

21 was -- there was nothing to be talked about.

22     Q.     You felt that was the best way to try

23 to resolve that workplace dispute with the lab tech,

24 was that you were sure you were right, and so you

25 were not going to even meet with her to discuss it?

1                    MR. NUGENT:  Object to form.

2          A.     It was a miscommunication, she said,

3    and so this had happened before.  They were aware

4    that this had happened before.  It was not a

5    miscommunication, and if that's what they chose to

6    call it, what am I going to discuss.

7    BY MR. MATULA:

8          Q.     You were so confident that this is

9    actually race discrimination, that you weren't going

10   to meet with the lab tech, because you knew what was

11   really going on.  That's why you declined the

12   meeting; right?

13         A.     Those are your words, not mine.

14         Q.     Well, I'm -- I'm still not

15   understanding why when Ms. Meehan offered to have a

16   meeting between you and the lab tech to address this

17   issue, why you would not have accepted that meeting.

18   Do you have anything else further to say on that?

19         A.     I'll reiterate again:  This was not

20   the first time that this had occurred.  It happened

21   before.  Her job as the lab technician, it is her job

22   to process specimens, that's what they pay her for.

23                She chose to defy a directive that I

24   gave her.  She was insubordinate.  It was not a

25   misunderstanding.  It was a blatant act of

1  disrespect.  And that was solidified or galvanized

2  when she stormed past me and put the specimen on my

3  desk.

4            Q.      Sitting here today, do you know what

5  Judy's side of the story is?

6            A.      Do I know what Judy's side of the

7  story is?  I don't remember if that was shared with

8  me.

9            Q.      Continuing on with Ms. Meehan's email,

10 she wrote, "I told her" -- meaning you -- "I told her

11 if there are any further incidents she believes to be

12 discriminatory to let me know, she agreed she would."

13            Now, did that happen in your meeting

14 with Ms. Meehan or not?

15            A.      I don't remember her saying that

16 specifically.

17            Q.      Are you -- are you confident that it

18 did not or do you just, like, I don't remember it, so

19 I can't say "yes" or "no."

20            A.      I remember being a little

21 disenchanted, disheartened when she said to me that

22 her investigation was complete and it was a

23 misunderstanding.  And knowing that she had not

24 interviewed me, how could that be.  And so I don't

25 remember her saying that.

1                    MR. MATULA:  How long have we been

2    going?

3                    THE VIDEOGRAPHER:  Hour and twenty.

4                    MR. MATULA:  Let's take a break.

5                    THE VIDEOGRAPHER:  We'll go off the

6    record at 2:12 p.m.

7                    (Brief recess taken.)

8                    THE VIDEOGRAPHER:  Stand by.

9                    We are back on the record at 2:23 p.m.

10   BY MR. MATULA:

11        Q.    Ma'am, continuing to walk through your

12   discrimination complaint.  The -- the second page,

13   the next section that starts, "As the Women's Health

14   Nurse Practitioner."  Let me know when you're there.

15   Take your time.

16        A.    On which page?

17        Q.    It's 8 of 15, within Exhibit 1.

18        A.    Okay.

19        Q.    On that second full paragraph, you're

20   -- you're talking about people who would be assisting

21   you during examinations; correct?

22        A.    Yes.

23        Q.    And it looks like sometimes when

24   there's staffing shortages, there weren't -- exams

25   would be regularly scheduled and there's no staff to

1    assist.  But when staff became available, "I was

2    provided non-nursing, untrained, administrative

3    personnel to assist with medical exams."

4                    MR. NUGENT:  Mike, where are you?

5                    MR. MATULA:  I'm sorry.  I'm on --

6    it's the -- if you go to the middle of the page, the

7    second paragraph, starting about -- a little bit

8    higher, about three lines up.  Like the third line of

9    the second paragraph.

10                   MR. NUGENT:  "When staff did"?

11                   MR. MATULA:  "When staff did become

12   available I was provided non-nursing, untrained,

13   administrative personnel to assist with medical

14   exams."

15   BY MR. MATULA:

16        Q.    Do you see that, ma'am?

17        A.    Yes, I do.

18        Q.    Okay.

19                   MS. JAG:  What was the Bates Number of

20   that?  I'm sorry.

21                   MR. MATULA:  It's -- it's -- it's in

22   Exhibit 1.  It's still in the -- the -- Page 8 of 15.

23   It's the second page of the EEOC discrimination

24   complaint narrative that we've been using.

25                   MS. JAG:  Okay.  Gotcha.  Thank you.

1  BY MR. MATULA:

2       Q.     All right.  My first question, in

3  terms of -- when you say "I was provided

4  administrative personnel," who decided that?  In

5  situations where there -- who would have decided who

6  was going to assist you?

7       A.     That would be the site administrator,

8  because she also handles the staffing.

9       Q.     So remind me who that was?

10      A.     When I first began it was Teresa

11  McWhorter and later it became Sterling Ream.

12      Q.     Now, if -- the way I'm reading this,

13  and you certainly can correct me.  It sounds like in

14  these situations where you have the administrative

15  personnel who because of staffing issues or whatnot

16  had to serve as your assistant for these women's

17  exams that they behaved in ways that you did not

18  think was appropriate in terms of interjecting,

19  interrupting, explaining the diagnosis and other

20  things that you have here.  Is that kind of the gist

21  of the problem that you're trying to express in this

22  document?  Or this portion of the document?

23      A.     This portion of the document.  Yes.

24      Q.     And if I understand -- if I'm reading

25  this correctly, the idea is like you believe that you

1    -- that these same administrative personnel did not

2    act the same way when they were assisting other

3    providers?

4          A.    That is correct.

5          Q.    Okay.  And it looks like you talk

6    about -- it sounds like maybe you ask the physician

7    and nurse practitioner, and you question about them,

8    so you kind of wanted to ask someone, Hey, what's

9    your experience with these -- these folks when

10   they're helping you out, and -- and is that kind of

11   what you're saying there?

12         A.    Uh-huh.

13         Q.    And first, the physician and nurse

14   practitioner, I think I know who you're referring to,

15   but let's put names to these titles.

16               Physician, is that Epperson?

17         A.    Yes.

18         Q.    Nurse practitioner?

19         A.    Kirby.

20         Q.    Okay.  And so you're -- you're saying,

21   Hey, when you talk to Epperson and Kirby about this,

22   they said, "No, those people don't act the same way

23   when they're helping us out with our exams"?

24         A.    That's what it's saying.

25         Q.    Can you give me the names of the -- of

1  the people here, the assistants -- the administrative

2  assistants who you felt were interrupting,

3  explaining, interjecting, all those sorts of things

4  when they were helping you?

5          A.      Barker was one and then there --

6                  MR. NUGENT:  I'm sorry.  I missed

7  that.

8                  THE WITNESS:  Huh?

9                  MR. NUGENT:  Who was that?

10                  THE WITNESS:  Who was assisting?

11                  MR. NUGENT:  Yeah.  What was the name

12  you said?

13                  THE WITNESS:  Barker.

14                  MR. NUGENT:  Barker.

15          A.      Barker.

16  BY MR. MATULA:

17          Q.      Are you talking about Anna?

18          A.      Yes.

19          Q.      Who got fired the day after the --

20          A.      Yes.  Yes.

21          Q.      Okay.

22          A.      So initially she was one, and then

23  Crystal and I don't know her last name, and the last

24  person was April and I don't remember her last name.

25          Q.      And do you know specifically what

1    Crystal or April's titles were?

2          A.    Crystal was -- I don't know her

3    specific title.  April was a radiology tech.

4          Q.    So also in terms of our -- kind of the

5    running list of other people you believe treated you

6    differently because you're African-American, we can

7    add Crystal and April to the list?

8          A.    Oh, yes.

9          Q.    All right.  And I have not seen any

10   emails or other documentation that relates to the

11   concern that you have spelled out in the first part

12   of this paragraph.  I found it for the first two

13   incidents, but I haven't seen anything on this.  Did

14   you -- did you ever write an email about it, to your

15   knowledge, did you generate documentation, your

16   concerns you had, or no?

17         A.    I did not write an email.  My concerns

18   were, I took personally to Sterling Ream made her

19   aware -- made her aware that I was going to address

20   the -- my concern professionally, individually with

21   the individual -- or individuals.

22         Q.    Crystal -- Crystal and April?

23         A.    Yes, when it -- when it occurred

24   again.  And I also made Dr. Lovelace aware of it.

25         Q.    And when you went to Sterling to

1   provide her with that information, how did she

2   respond?

3           A.    She agreed with me and noted that she

4   was aware that I would attempt to correct this on my

5   own, by making it known to them that that wasn't

6   appropriate behavior.

7           Q.    With regard to how Ms. Ream received

8   your concern and responded, do you -- do you have any

9   criticism of her for your interactions with Sterling

10  Ream about this?

11          A.    Yes, I do.  I -- I believe that it

12  should have been memorialized as a complaint.  That I

13  had a verbal complaint to her.

14          Q.    Okay.  And why was it again that you

15  didn't bother to memorialize it yourself with an

16  email or something like you had on the -- at least

17  the concerns about the specimen?

18          A.    I'm not -- I don't recall if there was

19  a specific reason that I chose not to do that.  Other

20  than I had made her aware verbally.

21          Q.    Okay.  And -- well, in any event

22  when -- did you in fact follow-up on what you told

23  her and bring your concerns to Crystal and April at

24  that time?

25          A.    Yes, I did.

1        Q.    How'd that go?

2        A.    On -- I will -- I will sum it up to

3 say not so well.

4        Q.    Okay.  Did you talk with them

5 individually or together?

6        A.    Individually.

7        Q.    All right.  Let's start with Crystal.

8 How did your -- tell me the -- who said what when you

9 met with Crystal to discuss this concern?

10        A.    I don't remember the exact words, but

11 there was a -- I do recall a nonchalant-type, "Oh,

12 well.  Whatever."

13        Q.    Okay.  Regardless of her demeanor or

14 attitude after you brought this to your attention --

15 brought this to her attention, did her behavior

16 change going forward, Crystal?

17        A.    No.

18        Q.    Okay.  And at that point, did you --

19 why didn't you send an email or follow-up with

20 Sterling, "Hey, Sterling, I talked to Crystal like I

21 told you, but things haven't changed"?  Why would you

22 not do that?

23        MR. NUGENT:  Object to form.

24        You can answer.

25        A.    Shortly thereafter there was someone

1  else assigned to assist me.  She was put into a

2  different position, and someone else was assigned.

3  BY MR. MATULA:

4       Q.     All right.  How about -- okay.  So the

5  problem at least with regard to Crystal, that seemed

6  to resolve itself because of changeover in positions

7  even though it didn't seem like Crystal took it to

8  heart, is that a fair summary?

9       A.     I won't say that it resolved itself.

10 I will say that that situation with her specifically

11 was no longer taking place, so....

12      Q.     Right.  You --

13      A.     Well, then we had other issues, so....

14      Q.     Okay.  Well, at least with regard

15 to -- and I'm just looking again at what you put in

16 your narrative.  And you said, hey, Crystal is one of

17 these people who, you know, interjected and -- and

18 talked disrespectfully while helping me out, and I

19 just want to cover what your interactions with

20 Crystal were, at least on that situation.

21             You went to her, she was nonchalant,

22 didn't look like she was going to change her

23 behavior, but before you needed do anything else, she

24 was moved to a different position?

25      A.     Correct.

1    Q.    Okay.  What about April?  How'd that

2    go with April?

3    A.    With April, there was a -- she was

4    pleasant in her acceptance of what I said to her, but

5    there was not a change in that particular behavior,

6    and then there was retaliation.  I call it -- it was

7    -- there was retaliation that I began to experience

8    after that.

9    Q.    Okay.  Well, let's stop there.  Like

10   when -- when -- the next time April acted in this way

11   that you didn't think was right, the next time she

12   did that, what'd you do?

13   A.    I asked her to leave the exam room.

14   Q.    Okay.  And -- and so, who then

15   assisted you?

16   A.    Well, I was -- at that point, so when

17   I'm finished with the patient then you can come back

18   and assist me, and then you can leave.  Again, so

19   that when I'm educating a patient or talking to a

20   patient or getting a history from a patient, I don't

21   necessarily need you there for that part, because

22   you're not sure how not to interject.

23   Q.    Okay.  So you began asking April to

24   leave during -- when you're giving patient advice and

25   come back for afterwards, whenever she would be

1  needed again?

2       A.     Uh-huh.

3       Q.     Is that how you handled it?

4       A.     Yeah.

5       Q.     Okay.  And again, did you -- did you

6  go back to Sterling or anyone else for that matter,

7  and say, "Hey, this problem is not resolved.  April's

8  still doing it"?

9       A.     Yes, I did, and I went back because my

10  patient load, my schedule began to be altered where I

11  was originally scheduled, you know, 20 to 25 patients

12  a day, now I'm down to ten patients a day.  And you

13  know the number of patients that I see determines my

14  productivity which determines, you know, my need to

15  be in that position to have that job, and so that

16  became an issue and I believe that was retaliation.

17       Q.     Why don't you say one word about that

18  in your narrative?

19       A.     That's a good question.  Once again --

20       Q.     Any explanation you'd like to offer

21  about that?

22       A.     Yeah.  Yeah.

23       Once again, when I wrote this, I was

24  giving sort of a synopsis, sort of a summary of the

25  things that had happened, and so -- while I was

1    there, and what I was asked to do by the folks at the

2    EEOC, was to give him basically some -- to sort of

3    point out some specific -- a few specific situations

4    on paper in a summary to give him -- so I -- really I

5    wasn't asked at the time to write down every specific

6    situation and honestly when you're doing this, and I

7    don't know if you've experienced -- when you're doing

8    this, some things come to mind as you're doing it,

9    and I tried to include it in a more general or broad

10   picture and so maybe I wasn't as detailed as I should

11   have been.

12              Q.    I just -- I mean, we can agree that

13   there's not one word in here about you having

14   concerns about your patient load changing; right?

15              A.    Yeah, there is if you read further.

16              MR. NUGENT:  Object to form.  It's

17   been asked and answered.

18              A.    There is if you read further.

19   BY MR. MATULA:

20              Q.    Where is it?

21              A.    I talk about the affect of my ability

22   to practice and take care of my patients.  How it

23   affected -- well -- perhaps that was the statement on

24   the actual complaint form that I wrote in addition to

25   this statement.  So where I addressed that my ability

1    to perform my job was compromised because of the

2    behavior, and the treatment that I was receiving and

3    I can find it if you would like.

4             Q.    Hold on.  You've had a few minutes to

5    review this section that we're talking about right

6    here.  And I just want to make sure.  Having taken a

7    few minutes to read through it again, there's nothing

8    in this document, at least the pages of your

9    single-spaced narrative, that specifically refers to

10   your patient load decreasing, is there?

11            A.    I have not come across it.  I just

12   sort of perused it.  I don't see it.

13            Q.    Well, here's the deal, we have some

14   time limitations.

15            A.    Okay.

16            Q.    I've read this pretty exhaustively to

17   get ready for the testimony.  And you obviously spent

18   some time studying it on the record.  If you see it

19   later or something, we'll come back to it, but I'm

20   going to move on --

21            A.    Okay.

22            Q.    -- on some of this.

23            A.    Okay.

24            Q.    Putting aside what's in this document,

25   you know, this is another situation where in terms of

1    being retaliated against with regard to work

2    schedule, whatnot, I have -- I have not seen any

3    emails, or any documentation memorializing that you

4    brought those concerns up during your employment, is

5    there anything that you can think of that I -- that

6    I'm missing during --

7          A.     No, there's nothing I can think of

8    that you're missing.

9          Q.     Okay.  Finishing off that --

10          MS. JAG:  I'm sorry.  There's some --

11    I think I hear like typing maybe.  Or, I don't know.

12    There's somebody that's not on mute, and I just

13    couldn't hear a little bit there for the last minute.

14    Sorry.

15          Thank you.

16          MR. MATULA:  Sorry.

17    BY MR. MATULA:

18          Q.     Okay.  The last half of the paragraph,

19    you refer to another incident, specifically June 1st,

20    when a layperson, an unlicensed staff member

21    dispensed inaccurate and potentially harmful

22    medicine.

23          MR. NUGENT:  Counsel, I think that's

24    medical advice.

25          MR. MATULA:  Oh, gotcha.  I misspoke.

1  Okay.  Let me try this again.

2  BY MR. MATULA:

3          Q.     Same page.  Talking about the June 1,

4  2018 incident where a layperson, an unlicensed staff

5  member, dispensed inaccurate and potentially harmful

6  medical advice.

7                 Do you see that?

8          A.     Uh-huh.

9          Q.     Now -- okay.  I think we can shorten

10 this up.  I guess I'm confused.  With regard to this

11 June 1st incident, how does it relate to issues of

12 race discrimination?

13         A.     Okay.

14         Q.     If at all.

15         A.     Okay.  Because this particular

16 behavior I did not witness in regard to other

17 practitioners or clinicians.  They did not go to --

18 go to patients that were Dr. Epperson's client care

19 patients or -- or Nurse Practitioner Kirby's patients

20 and say, "Well, you know, let me explain to you what

21 she meant by that, and this is what you need to do

22 for it."  That did not occur.

23                 And I think I can make the distinction

24 for you.  Because I am women's health, although I did

25 some general practice here as well.  So specific

1   conversations that I have heard regarding women's

2   health, that would relate -- that would be

3   specifically me.  Okay.  And I don't --

4        Q.    Just so I can understand better I'm

5   going to have to get some names here.

6        A.    Okay.

7        Q.    On June 1st, you witnessed a

8   layperson, unlicensed staff members dispensing

9   inaccurate and potentially harmful medical advice.

10   Who's the layperson you're referring to?

11        A.    That was Crystal.

12        Q.    And who are the unlicensed staff

13   members you're referring to?

14        A.    That's Crystal.

15        Q.    Well, it says "layperson and

16   unlicensed staff members."  The "and" made me think

17   there might be more than one person.

18        A.    That's just a -- a logistical type....

19             Yeah.

20        Q.    All right.  So just clarifying that,

21   maybe, lack of precision, the June 1, 2018 incident,

22   we're really just talking about Crystal?

23        A.    Well, yeah, that was the incident that

24   I actually witnessed.  That I actually heard.

25        Q.    Okay.  And so what was it that you

1    heard Crystal doing that caused some concern for you?

2         A.    She was counseling someone on an

3    issue, on a female issue.

4         Q.    Was this during an appointment or like

5    -- let's put Crystal into context.  Where is this

6    happening?

7         A.    I believe it was -- she may have been

8    helping -- I'm -- I'm not a hundred percent sure

9    exactly.  It was within the medical department.

10         Q.    Was she assisting someone else or was

11    she just seeing a person -- a patient on her own or

12    how does that work?

13         A.    No, she wasn't seeing a patient on her

14    own.  She may have been doing vitals, which, you

15    know, putting the blood pressure cuff on them,

16    hitting the button to go start and then writing down

17    the numbers that come at the end.

18         Q.    Okay.  She's doing whatever she's

19    doing as part of her normal job, and she starts

20    talking about some women's issue that you think she's

21    giving inaccurate and bad medical advice?

22         A.    Correct.

23         Q.    And so then you -- do you remember

24    what the specific advice was?

25         A.    No, I do not.

1          Q.      But in any event, you say you reported
2     the inappropriate unwelcomed behavior -- first, how
3     do you know it was unwelcomed?
4          A.      Because it's inaccurate.
5          Q.      Okay.  Well, there's -- I agree it
6     might be inappropriate for someone who's not
7     qualified to give medical advice to be doing so.
8     That, I understand, but, I mean, if the -- if the
9     patient -- do you know if the patient asked for --
10    did the patient like -- how do you know it was
11    unwelcomed to the patient?
12         A.      I don't know that it was unwelcomed to
13    the patient.
14         Q.      Okay.  In any event, you reported this
15    to the site administrator -- again, that's Sterling;
16    correct?
17         A.      Yes.  It was unwelcomed to me as a
18    provider.  As the person with the training, the
19    certification and the licensure, it's unwelcomed by
20    me for you to educate my patients or give medical
21    advice to my patients when you don't have the
22    knowledge and information, credentials, license,
23    education to do so.  It was unwelcomed by me.
24         Q.      Okay.  In any event -- so you then
25    reported this to the site administrator, and I'm

1    assuming that's another oral report because I haven't

2    seen any documentation on that, is that a correct

3    assumption?

4            A.      That's correct.

5            Q.      Okay.  So you go to Sterling, and say,

6    "Hey, Crystal was giving some medical advice that she

7    shouldn't have been giving," and then -- and that's

8    the gist of what you told her; right?

9            A.      Uh-huh.

10           Q.      And then you tell -- you're going to

11   go on and personally address this behavior with the

12   individuals privately -- and individuals, I guess

13   that's another kind of, maybe, just we need to change

14   that to individual, because we're talking about

15   Crystal.  So you say you're going to address it with

16   Crystal; is that correct?

17           A.      Well, I would keep it "individuals,"

18   because at this time this is when I -- I spoke to

19   both of them on separate occasions because the

20   behavior was the same.

21           Q.      Who's "them"?

22           A.      April and Crystal, the people that

23   were assisting me periodically.

24           Q.      Okay.  I'm try trying to keep up, but

25   I thought you very specifically made clear with

1    regard to this giving inappropriate medical device,

2    that was just something involving Crystal.

3            A.    On that particular day, but the

4    behavior had been displayed by both of the ladies.

5            Q.    Okay.  All right.  So June 1st we're

6    talking about Crystal, but there's some other things

7    that we don't have specifically mentioned here where

8    April did it as well, so you're going to talk with

9    both of them?

10           A.    Correct.

11           Q.    All right.  So how did that go?

12           A.    Okay.  As I said before, Crystal was

13   kind of nonchalant, like, "Whatever."

14                 April was pleasant in her acceptance,

15   but then things began to happen.

16           Q.    Such -- okay.  I think that goes into

17   the next paragraph here.  Where you're talking about

18   there's -- "Began subtle behavior changes and

19   response of DOC personal -- staff personnel," is that

20   what you're referring to?

21           A.    Yes.

22           Q.    Okay.  Tell me what were the

23   behavioral changes that you began to notice after

24   June 1st, when you brought this situation to April

25   and Crystal's attention?

1       A.    Well, one was the person who's keeping

2 my schedule.  My schedule begins to change, and that

3 can be confirmed and verified through the office

4 there.  How many people were on my docket, you know,

5 this month versus this month.  Or how many patients I

6 was seeing on a monthly basis this month versus this

7 month.

8       Q.    Okay.  So I'm just trying to figure

9 out how -- what the behavioral changes were.  One

10 behavioral change you're saying was --

11       A.    Is you're not -- you're not --

12       Q.    -- is --

13       A.    -- you're not booking my schedule.

14 You're not booking my schedule.

15       Q.    So your -- your schedule is not as

16 full, you noticed that, and that's something that

17 Sterling's in charge of assigning; right?

18       A.    No.

19       Q.    Who's in charge of that -- that -- I

20 mean, who's to blame -- who's doing the bad thing

21 with your schedule?  I'm confused.

22       A.    It was April.  Because April was

23 assigned to work with me.  Making my schedule became

24 her job, because the way that it worked is really --

25 it sounds confusing, but the way that it works, they

1  come to sick call.  They come in to sick call with a

2  complaint, if the complaint --

3       Q.    And I don't mean to interrupt you, but

4  I don't need -- I didn't need all that.

5       A.    Okay.

6       Q.    Let's just take it in baby steps here.

7       A.    Okay.

8       Q.    April is the person who you say starts

9  jacking with your schedule?

10      A.    Yes.

11      Q.    Anybody else?

12      A.    No, not with my schedule.

13      Q.    Okay.  What -- other than your

14  schedule changing, which April is now messing with

15  it, you believe, what are the other behavioral

16  changes or retaliation that now starts after you've

17  confronted Crystal and April about their behaviors?

18      A.    I have custody offers -- officers

19  standing outside my door in the medical facility.

20  There was one time --

21      Q.    Okay.  That's -- that's fair.  I just

22  want to break these down.  So who's -- who's to blame

23  for that?

24      A.    I believe that because this community,

25  this culture that we're in here at Chillicothe, there

1    is a small community and the surrounding rural

2    communities, most of the people are related or

3    related by marriage, or they went to school together,

4    or they live down the street from one another, so

5    they are very much involved with one another's lives.

6                    And I know for a fact that it was her

7    aunt or uncle that had worked there, and had worked

8    there for 20 some years or something of that nature,

9    and that's when things began to happen.

10        Q.    So again, with regard to the fact that

11   the officers start showing up at these visits, your

12   belief is that's because of April?

13        A.    That's because I reprimanded April.

14        Q.    Okay.  I'm trying to just make sure I

15   know who all the list of people who are responsible

16   for the bad things that you say happened to you, and

17   it sounds like you're saying, April -- you confront

18   April, and then officers start coming around more

19   during your -- your visits and -- because April is --

20   has a relationship with one of the correctional

21   officers, you think that must be because she's

22   putting it into motion?

23        A.    She has family there that may not take

24   kindly to someone correcting her behavior.

25        Q.    Okay.  All right.  So what else?  I

1  mean, we've -- we've got the schedule changes?

2          A.      Uh-huh.

3          Q.      We've got officers being more watchful

4  of you, which you attribute to April.  What else?

5          A.      I had an office- -- I was in the

6  middle of an exam and an officer barged into the exam

7  room and the patient is on the table in stirrups, and

8  the officer comes in without -- without regard to the

9  fact that this was a -- an exam that involved

10 someone --

11         Q.      Who was the officer?

12         A.      I couldn't -- I don't remember.

13         Q.      Well, did you get his name to report

14 him?

15         A.      No, I did not.

16         Q.      Why not?

17         A.      Because at the time I believe I knew

18 his name and I did tell the administrator that this

19 had happened.

20         Q.      Okay.  And again, you told the

21 administrator --

22         A.      And I also told Dr. Epperson.  I'm

23 sorry.

24         Q.      But apparently, though, Epperson and

25 the administrator, didn't generate any documentation

1  that you're aware of, certainly not from your end?

2       A.    Correct.

3       Q.    Okay.  And again, I want to kind of --

4  well, when the officer came in, did you ask him what

5  are you doing in here?

6       A.    Did I ask him what are you doing in

7  here?  No, I answered his question, which was who is

8  the patient.

9       Q.    Okay.  All right.  When you spoke with

10 Sterling Ream about this situation when the officer

11 came in in an exam, what'd she say?

12      A.    I don't remember the specific words,

13 but her response was surprised.

14      Q.    Do you recall whether there was any

15 discussion about whether there's anything else to be

16 done, what she was going to do, what -- what's -- do

17 you remember anything about how that went?

18      A.    No, I do not.

19      Q.    Okay.  Any other retaliatory behavior

20 or behavioral changes that you refer to here that

21 relate to the actions of Corizon employees?  And I'm

22 limiting my question very specifically, because

23 you've also sued the Missouri Department of

24 Corrections.  There's a chunk of this narrative that

25 seems to be more directed, as I read it, to the

1    behaviors of what you say people associated with the

2    Department of Corrections did.

3         A.    Uh-huh.

4         Q.    And I'm -- I'm going to try in the

5    interest of time to focus my questions just on the

6    things that you are saying that someone that worked

7    at Corizon did.

8         A.    Uh-huh.

9         Q.    All right.  You with me?

10        A.    Uh-huh.

11        Q.    Does that make since?

12        A.    Uh-huh.  Yes.

13        Q.    Okay.  Thank you.  Anything else in

14   here that relates to things that Corizon employees

15   did that you contend were race discrimination or

16   harassment?

17        A.    I will say that what was happening to

18   my schedule affected my ability to do my job.  The

19   information that they were giving, affected -- that

20   Corizon employees had the opportunity to do, even

21   after I asked them not to, that affects my ability to

22   do what I do, and they didn't do that to other

23   members of the medical personnel.

24        Q.    And again, "they" is April and

25   Crystal?

```
 1            A.      Yes.

 2            Q.      Okay.  All right.  So, but again that

 3      relates to the reporting of information about your

 4      patients; right?  I guess I'm trying to just see --

 5            A.      Well, and it may not be so much what

 6      they did as what they did not do when they were asked

 7      to change their behavior and they were asked and --

 8      and -- and administration was made aware that this

 9      was a problem and it continued.  And it got worse.

10            Q.      It got worse meaning your schedule?

11            A.      Meaning the behavior.

12            Q.      Well, okay.  I'm confused again.  What

13      behaviors are we talking about?

14            A.      We're talking about, "I asked you to

15      not dispense information or education that you have

16      no background in.  Two patients that are under my

17      care, I've asked you to not interject or interrupt

18      when I am counseling a patient, taking a history,

19      educating a patient.  I've asked you to not do that."

20            Q.      Right.  And we've covered that, and

21      we --

22            A.      Yes.

23            Q.      -- talked about it at some length?

24            A.      Yes.

25            Q.      And that relates to things that
```

1   Crystal and April were doing --

2          A.     Uh-huh.

3          Q.     -- right?  And at least with regard to

4   Crystal, that behavior, while she didn't have a

5   really good attitude about it, because there was some

6   staffing changes insofar as it relates to Crystal's

7   ongoing conduct, that got resolved without having to

8   dig deeper into it; right?  We've covered that; true?

9   With regard to Crystal.

10         A.     Crystal did go into a different

11  position.

12         Q.     All right.  So that at least Crystal

13  is in a different position, so she's not in a

14  position to where you have to have these bad

15  encounters with her with regard to that topic?

16         A.     Correct.

17         Q.     Okay.  Now, so that leaves April, and

18  so you've had the conversation with April about,

19  "Hey, I don't want you interjecting or talking to my

20  patients that way," and then, as I understand it, you

21  believe there's changes such as you're not getting

22  staffed with as many patients, and you see some more

23  of the correctional officers around during your --

24  while you're performing your duties, and then one

25  time -- at least one time, a correctional officer

1    barges into an examination.  Okay?

2                    We've covered all of those, have we

3    not?

4         A.    And there was nothing done by

5    administration.

6         Q.    Okay.  All right.  What -- I want to

7    go and just see on this list, anything else from

8    Corizon that you feel is something -- something

9    Corizon employees did, as opposed to the Department

10   of Correction facility employees?

11        A.    Regarding this particular situation?

12        Q.    With regard to anything else here in

13   your -- your claims, because I'm not seeing it, but

14   if there's something else, what?

15        A.    In regard to my claim -- okay.

16   So I --

17        Q.    And if it's in your narrative

18   somewhere, highlight it for me.

19        A.    Okay.

20               MR. NUGENT:  If I understand what's

21   going on, Counsel, you want to know an entire list of

22   things that the witness feels happened that were

23   discriminatory -- that she believes were

24   discriminatory; is that right?

25               MR. MATULA:  That relate to Corizon

1   employees, because there's --

2                   MR. NUGENT:  I understand.

3                   MR. MATULA:  I'm going through -- I'm

4   working off of that, and so we're at the point where

5   we have exhausted everything that -- as I read the

6   document, that is seemingly related to Corizon

7   employees.  So -- so that -- because I'm not seeing

8   anything else here, I need to know if there's

9   anything --

10          A.     I do.

11                  MR. NUGENT:  Thank you.

12          A.     On Page 9 of 15 in the second

13  paragraph, I -- I tell you here about the things that

14  were happening, and what Corizon employees did do, is

15  they used their access to the Department of

16  Correction's computer to find information -- why

17  they're seeking this information, I do not know.  Did

18  they do this to every employee or was it just me?

19                  And so that was an act that went

20  against policy -- Corizon's policy and against the

21  Department of Corrections' policy -- and the things

22  that transpired before I knew what had actually been

23  done.  So I mean, you know, you can go into the

24  behaviors.  How it -- how it -- how it got worse

25  with, you know, the skepticism, my patient load, over

1    talking me, overriding my decisions, the blatant

2    disrespect.  All of these things that were taking

3    place, they took place because of -- that was a

4    discrimination.  That was a discrimination.  It was a

5    discrimination when you chose to make the decision to

6    look this up in the first place.

7    BY MR. MATULA:

8           Q.     Sitting here today --

9           A.     Uh-huh.

10          Q.     -- what is -- do you have an

11   understanding of the date when there were Corizon

12   employees who accessed your Department of Correction

13   records against policy?

14          A.     This was --

15          Q.     When they would have basically found

16   out the information.  Do you have a -- do you know

17   when that happened?

18          A.     The specific date?  No, I do not.

19   I've been given -- I've been told a couple of

20   different things, but I don't have a specific date.

21          Q.     All right.  What have you been told

22   and from whom have you been told?

23          A.     Well, this sheet that you just showed

24   me shows that Teresa McWhorter knew when I came

25   onboard, which is not a big deal.  There's a sheet

1    here that says that my record -- and so she was aware

2    of it.  But she wasn't there very long.

3                    And then I was told verbally by

4    Ms. Burris when she called me in April or May of

5    2019, that had it had been, at least, I don't know,

6    eight or ten months previously that this information

7    had been circulating and conversations were being

8    had.

9          Q.    Eight or ten months?

10          A.    At least, yeah.

11          Q.    That's a -- do you know any

12    information about what investigation Corizon

13    management did to look at and determine when your

14    records were actually accessed?

15          A.    No, they would not allow me to have

16    that information.

17          Q.    Okay.  But you -- you were proceeding

18    under the impression and understanding that it went

19    back at least eight to ten months before your

20    employment ended; correct?

21          A.    Yes.

22          Q.    All right.  Other than Ms. Burris,

23    what is your source of information or evidence as to

24    when your records were first inappropriately

25    accessed?

1          A.      I don't have a source of

2    information on when they were -- any other source of

3    information.   I can only correspond overt changes in

4    blatant behavior with that time frame.

5          Q.      Gotcha.  Okay.  So I'm going to put

6    that in the category of -- the discriminatory event

7    being the improper accessing of your records and

8    sharing information about you, is that a good way to

9    bullet mark that type of discrimination?

10         A.      Yeah.

11         Q.      Okay.  And then anything else that we

12   haven't discussed already that you attribute to

13   actions of Corizon employees?

14         A.      Anything else -- you would have to be

15   more specific than that, so at this time I'm going to

16   say I'm sure there is, there were many such

17   situations where I felt scrutinized.

18         Q.      And if you recall -- if you recall the

19   specifics, I do want to get the list.  I'm just --

20   it's hard for me to be more specific, because I don't

21   see them referred to specifically in either this

22   piece of paper or any of the other many papers that

23   I've read to get ready for your testimony.

24         A.      Okay.

25         Q.      So I've tried to ask you questions

1    about specific instances of the things that I kind of

2    can flag for myself because I see some documentation

3    based on what you wrote or somebody else wrote, but

4    it's really hard for me to be more specific about if

5    there's anything else out there when I don't see

6    anything else.

7          A.    Okay.

8          Q.    Are you with me?  So, but that said,

9    if there's other things then I want to give you the

10    opportunity for us to get them listed and talk

11    through them as we have been.

12          A.    Okay.  Well, let me say on that note,

13    that in this particular situation with Corizon, there

14    were -- after the episode -- or after the situation

15    with Brandy [sic] -- or what was her name?  Barker,

16    in the beginning that overt discrimination was not

17    one of those things that -- people weren't going

18    around calling me names.  Okay?  But the more

19    subtle -- the subtleties of the behaviors I would

20    characterize as discriminatory, and they made me feel

21    uncomfortable, they made me feel singled out, they

22    made me fear for my license -- okay? -- they -- they

23    caused me to lose sleep at night because I have this

24    stuff happening to me every day, on a daily basis.

25    The -- the secrecy, the murmuring, the whispering,

1   the -- and -- and you know, it's because this is -- I
2   will go back to institutional racism.  I will go back
3   to white privilege.  I will go back to the fact that
4   this is the way it is in rural America, because
5   they're not used to me being there.  They don't know
6   any different -- well, maybe they do and don't care,
7   I'm not sure, but it was a daily struggle.  It was a
8   daily struggle.
9           Q.     When did it become a daily struggle?
10  What was the first day of the daily struggle?
11          A.     I -- probably the first day I drove
12  into town and that's sort being of a little, you
13  know -- you know, exaggerating, because I usually
14  look at people and give them the benefit of the doubt
15  in the beginning.  Okay?  But when -- when I'm
16  questioned, as if I am not qualified or the
17  implication is made, or the -- I mean, it's -- it's
18  kind of your -- your -- the implication is made that
19  I do not deserve to be in that position, and that
20  folks who don't have the training that I have are
21  overriding things that I'm telling patients and the
22  work that I'm trying to do to -- to help provide
23  excellent care to the people that are under my -- my
24  charge, then that tells me that the overall
25  disrespect that I see towards me and it's not towards

1    other people, it has to be due to -- to race.

2         Q.    Okay.  You've -- there's a lot to

3    unpackage from what you just told me.

4         A.    Yeah.

5         Q.    I'm trying to get specific instances

6    of actions.  And -- and what you just said, the ones

7    I noted were that there was whispering and murmuring.

8         A.    Uh-huh.

9         Q.    Okay.  Those are specific actions

10   that, it sounds like, you saw, people whispering or

11   murmuring that you attribute to being some product of

12   race discrimination, and -- those are the actions.

13              So in terms of whispering, I mean, who

14   all was the whispering, who all was the murmuring?

15        A.    Okay.  So if we go back and look at

16   the whole picture -- okay? -- because you're

17   talking about --

18        Q.    I'm just asking for names.  I'm asking

19   for names.

20        A.    Yeah, well, we can talk about staff.

21   We can talk about staff.  It was the staff.

22        Q.    Can you give me the names of any of

23   the staff members to whom you're referring to with

24   regard to these other types of discriminatory

25   incidents that are not in your narrative specifically

1   which include, apparently, whispering and murmuring?

2          A.     Okay.

3          Q.     Can you give me the names?

4          A.     Okay.  And so maybe I should have --

5   whispering and murmuring is a term that I'm using to

6   try and convey to you the things that were happening

7   around me, about me because of a decision that

8   someone made to -- to research some documents, and

9   you know, try and assassinate my character because of

10  whatever reason they had for that.

11         MR. NUGENT:  Mrs. LaBlance, let me

12  step in for just a second.  So you're -- you're

13  providing context behind your answer again.

14         THE WITNESS:  Okay.  I apologize.

15         MR. NUGENT:  I understand that.  I

16  understand that.  But what Mr. Matula is asking you

17  specifically, because of you listing murmuring and

18  whispering, he's asking who did you observe

19  specifically murmuring about you or whispering about

20  you; is that accurate?

21         MR. MATULA:  Yeah.

22         MR. NUGENT:  He's just -- he's just

23  wanting a list of names.

24         A.     Oh.  Okay.  The -- the sick call

25  nurse, Shelby, I think was her name.  And then there

1  was Tammy Christopher.  Her name was Tammy

2  Christopher, and then there was the red-headed girl.

3  What is her name?  I can't think of her name right

4  now.  Rachel Stuever that worked days.

5  BY MR. MATULA:

6       Q.    She's the -- she's the red-headed

7  girl --

8       A.    No, Rachel Stuever is not the

9  red-headed girl.

10      Q.    -- or somebody else?  Because I've got

11 the sick call nurse is one, Tammy --

12      A.    Christopher.

13      Q.    -- Christopher is Number 2?

14      A.    Uh-huh.

15      Q.    Three, red-headed girl.  Four was --

16      A.    Stuever is her last name.

17      Q.    Ms. Stuever?

18      A.    Uh-huh.

19      Q.    Okay.  And these are people who you at

20 times observed in the workplace whispering and

21 murmuring and you believed they were whispering and

22 murmuring about you?

23      A.    Yes, because sometimes -- yes.  Yes.

24      Q.    Okay.  And you were anticipating my

25 next question.  What specifically was the reason you

1   believe they were talking about you?

2         A.      This --

3         Q.      Let me ask first:  Could you hear --

4         A.      Yeah.

5         Q.      -- what they were saying?

6         A.      Yeah.

7         Q.      Okay.  Tell me what they were saying.

8   And when I say "they" can you be specific because I

9   need to know whose mouth you're putting these words

10  in.

11        A.      The question was that I overheard.

12               "Well, I wonder what she did."  And

13  that, I am positive, was in reference to the

14  information that was found on the -- the computer.

15        Q.      And who said that?

16        A.      I believe it was Shelby.

17        Q.      And do you know when this was and if

18  you can be approximate in terms of how far out from

19  the end of your employment that might be a reference?

20        A.      Maybe in December I heard this

21  conversation.

22        Q.      All right.  Anything else that you

23  specifically heard that you kind of put into these

24  categories of murmuring and whispering?

25        A.      A comment was -- was made to me, "I

1  can find anything on the Internet."

2          Q.      And who said that?

3          A.      Kirby.

4          Q.      And when did Ms. Kirby say this?

5          A.      That was probably in December as well.

6          Q.      And what did you -- when she said

7  that, what did you take her to be referring to?

8          A.      Information about me.

9          Q.      And why -- did you ask her what she

10  was referring to?

11          A.      No, I did not.

12          Q.      And I guess, why not?  If it's that

13  upsetting -- you're describing something that's very

14  upsetting, you're losing sleep, it's affecting you,

15  Kirby in December, supposedly says, "I can look up

16  anything on the Internet."  You draw the conclusion

17  that she's talking about you?

18          A.      Well, she was talking to me.

19          Q.      Okay.  I mean, tell me, what was --

20  did she come out of the blue and say that, or what

21  was the previous, you know, minute and a half

22  conversation before and after she said that?

23          A.      You know, I don't remember.

24          Q.      All right.  Fair enough.  Okay.

25                  Anything else in terms of specifics

1   about the whispering and murmuring that you believe

2   went back several months, and you believe must be

3   related to the fact that someone had looked up your

4   correctional records inappropriately?  Anything else?

5           A.      There was one specific day that I --

6   it was probably in November or December, where

7   several of the ladies that -- the employees, the

8   nurses, one after another, came to my office, opened

9   my door, looked at me, didn't say anything, and then

10  went away.

11                  I heard out in the hallway, Sterling

12  Ream say, "Well, I'll be able to tell."  She opened

13  the door, she looked at me and she backed up, closed

14  the door and walked away.

15                  And I believe at that time, what they

16  were doing was comparing my face to what they had

17  printed off of the computer.  Which was later

18  confirmed when I received the documents from

19  Dr. Epperson in the mail that that had been

20  disseminated throughout the facility.

21          Q.      Gotcha.  And that happened in November

22  or December?

23          A.      Yes.

24          Q.      Okay.  Back when all of these people

25  just kind of oddly opened the door to your office,

1   poked in, Sterling comes in, you just kind of -- when

2   you confronted Ms. Ream about it, what'd she say?

3         A.    I did not confront her about it.

4         Q.    Did you -- did you report this to

5   anyone?

6         A.    I did not.

7         Q.    Why not?

8         A.    It's sort of like I'm feeling right

9   now.  Like reporting it to who, for what?  I mean --

10  I mean, that may sound odd, but that's what it feels

11  like, what am I recording, that several people poked

12  their head in, and looked at me and walked away.

13  They didn't say anything.  They didn't let me in on

14  whatever -- what reason they were doing this.

15        Q.    And you didn't -- and in fairness, you

16  didn't ask them?

17        A.    Well, I was at work and I was seeing

18  patients and I did have things to do.

19        Q.    Okay.  Because whatever reasons, the

20  bottom line was either right then, nor any other time

21  did you actually go ask any of these people what was

22  going on, did you?

23        A.    No, I did not.  But I know it made me

24  feel uncomfortable.

25        Q.    I under- -- I get it.  I mean, I just

1   want to understand the facts about what happened or

2   what you did or what you didn't do.

3                Okay.  And did you ever report any of

4   the whispering/murmuring comments, I know what she

5   did, or I wonder what she did or these deals with

6   people coming in and looking at you in the office,

7   anything of the things that we discussed in this

8   category, did you report those situations to anybody?

9        A.      No, I did not.

10       Q.      All right.  Have we now exhausted

11  everything you can provide in terms of specifics as

12  to any conduct of racial discrimination or a

13  harassing nature that you attribute to Corizon

14  employees?

15       A.      I don't have any other incidents

16  documented.

17       Q.      Well, if you have any other ones that

18  are -- that you're thinking of whether they're

19  documented or not, I would like to hear about them,

20  unless -- well, let me put it this way:

21               If there's something that you plan on

22  sharing with the jury at trial, I want to hear about

23  it today.  And I think that's -- that's fair.  If you

24  can't provide more specifics, that's fair too, but

25  anything we're going to hear about at trial, this is

1    my opportunity to ask you questions about it, so if

2    there's something that's not documented, such as the

3    whispering, murmuring, the other things you've talked

4    about, anything else, let me know.  Otherwise we'll

5    move on to some other topics.

6            A.    We can move on.

7            Q.    Okay.

8                  MR. MATULA:  Let's go to what is

9    probably marked as Exhibit 17.  One second.

10   BY MR. MATULA:

11           Q.    The next series of questions I'm going

12   to ask before we get into that is your resignation.

13   It looks like you informed Sterling Ream that you

14   were resigning on -- the beginning of February,

15   February 1st or 2nd; does that sound right?

16           A.    Correct.

17           Q.    And tell me about that meeting.  Was

18   it in person?  Was it on the phone?  How did you

19   inform Ms. Ream that you were resigning?

20           A.    I typed up a statement that said I'm

21   resigning as of this date.

22           Q.    And you agreed to go ahead and work

23   out your three weeks of notice period; right?

24           A.    Uh-huh.

25                 MR. NUGENT:  "Yes"?

1          A.     Oh.  Yes.

2    BY MR. MATULA:

3          Q.     And had you prior to tendering your

4    resignation letter, had you told anyone at Corizon

5    that you were thinking of resigning?

6          A.     I don't believe so.

7          Q.     And in terms of the reasons that you

8    gave Corizon, what did you tell Corizon why you were

9    leaving?

10         A.     I told them that it was too exhausting

11   with, you know, coming there, driving there, being

12   there and I needed to make a change.

13         Q.     And in particular, you did have a

14   pretty good commute.  How long did it take you to get

15   from your home in Kansas City up to the facility?

16         A.     About an hour and a half.

17         Q.     And at any point during any of the

18   communications related to your resignation, during

19   that period of time, you never said anything to

20   anyone that it had anything to do with race

21   discrimination or feeling harassed, did you?

22         A.     Yes, I did.

23         Q.     Who did you tell that to?

24         A.     I told that to them with the incident

25   with Judy Harkins.  I told them that I felt

1   discriminated against then, when I filed a complaint.

2   I shared that with Dr. Epperson.

3         Q.     Yeah, right now I'm focusing really on

4   a particular time frame.

5         A.     Oh.  Okay.

6         Q.     I'm talking about, like, okay, here's

7   my resignation, February 1st.

8         A.     Oh.  Okay.

9         Q.     February 22nd, we know is your last

10   day of employment.

11         A.     Okay.  I get it.  I get it.

12         Q.     And we're going to talk about a couple

13   other things that happened in there, the papers and

14   this, but I'm just trying to short-circuit this.

15   From the time you first gave you were resigning to

16   your last day on the job, there was never any

17   discussion about race discrimination, harassment,

18   retaliation?

19         A.     No.

20         Q.     And I asked a bad question, that comes

21   with a double negative.

22         There was never any discussion about

23   race discrimination, harassment, or retaliation;

24   correct?

25         A.     During that time, that is correct.

1          Q.    Yeah.  Perfect.  Thank you for making
2    my question better than I originally articulated it.
3              Now, you did have some communications
4    in between there, where there's some discussions at
5    times going back and forth about maybe you'd stay,
6    maybe some of the job duties or assignments could be
7    changed around, maybe you could take FMLA and rescind
8    your resignation and those sorts of things, and we'll
9    look at those in a second.  But there was this
10   dialogue from resignation until the last day; right?
11         A.    Correct.
12              MR. MATULA:  How long have we been
13   going on this one?  Should I plow ahead or....
14              MR. NUGENT:  It's up to you.
15              MR. MATULA:  Are you -- would you like
16   to take another break now or keep going?
17              THE WITNESS:  No, I'm fine.
18   BY MR. MATULA:
19         Q.    Okay. Question.  Why during that
20   process -- well, I guess, why did you quit your job?
21         A.    The reason why I quit the job is
22   because I felt uneasy about continuing to stay.
23              There -- there was an atmosphere in
24   the environment that caused me to be fearful because
25   I did not know all of the specifics that were taking

1  place around me, about me.

2         Q.    I mean, now, in terms of fearful, I

3  mean -- and I understand the idea that if you --

4  you're seeing these behaviors, and you're

5  uncomfortable about it, but I mean you were never

6  physically threatened in any way while you worked at

7  Corizon, were you?

8         A.    No.

9         Q.    On the first page of Exhibit 17,

10 that's an email from Sterling Ream to Jenny Meehan,

11 Friday, February 1st.  It talks about the resignation

12 letter day.  She also says -- the way she described

13 it here, "Due to the commute and she has accepted

14 another job."  Had you accepted another job at the

15 time you turned in your resignation?

16        A.    Yes, I had.

17        Q.    And who was that with?

18        A.    That was with Wound Care Plus.

19        Q.    And that's in Kansas City?

20        A.    Yes.  Well, Lee's Summit.

21        Q.    All right.  There was -- if you go to

22 the last page of the -- Exhibit 17, that's

23 Numbered 993.

24             MR. MATULA:  And Rachel, Exhibit 17 is

25 numbered 991 through 994.  I'm sorry, I guess it's

1    not the last page.  But it's --

2                    MS. JAG:  I'm sorry.  991.

3                    MR. MATULA:  991 to 994.

4    BY MR. MATULA:

5            Q.    There's an email that starts at the

6    bottom of 993 from Sterling Ream to Ms. Meehan,

7    that's -- in which Sterling is recounting a

8    conversation that you and she had about possibly

9    consider staying?  Do you see that?

10           A.    Do I see that?

11           Q.    Yeah, at the bottom of 9- --

12           A.    Yes, I do.

13           Q.    Okay.  And this is capturing the fact

14   that there had been some discussions about maybe

15   changing your work schedule to four days a week with

16   eight-hour shifts, giving you flexible -- flexibility

17   with your scheduling to vary each week, but no salary

18   change, those were the substance of what you were

19   asking for; is that right?

20           A.    Yes.

21           Q.    And I just want to make sure

22   there's -- how it got memorialized in these emails,

23   if there's something inaccurate, I'm just trying to

24   confirm that, but it looks like Sterling correctly

25   captured what you -- your idea of, hey, maybe I'll

1  stay if we can do these things?

2          A.     Yeah.  However, the first step in this

3  encounter, this is not correct.

4          Q.     What?

5          A.     I came to her office upon her request.

6  I didn't just come out of the blue to give her

7  conditions on when -- that I would -- conditions

8  under which I would stay.  I had been asked what they

9  would need to do for me for me to consider staying.

10         Q.     All right.  So Corizon actually

11 initiated the conversation about, hey, is there

12 something we can do to keep you?

13         A.     Yes.

14         Q.     Let's look at --

15         A.     But I think --

16         Q.     -- Exhibit 18.

17         A.     If I can go on to say, I think that

18 was just sort of for show.

19         Q.     Is there any specific thing you can

20 point to me to, that's the basis for your belief that

21 Corizon's efforts to try and see if they could keep

22 you from quitting were not genuine --

23         A.     The fact that they didn't --

24         Q.     -- or is that just speculation?

25         A.     The fact that when I gave them

1   conditions under which I would stay, it was just an

2   absolute, "Well, no, we won't do that."  No

3   compromise.  No other consideration.  No other

4   suggestion.

5           Q.     You were asking to cut your hours and

6   keep your same salary?

7           A.     Well, they didn't say, "We'll cut your

8   hours, but we're going to cut your pay," they didn't

9   give that option.

10           Q.     And you didn't propose it either, did

11   you?

12           A.     No, I did not.

13           Q.     Okay.  Let's look at 18.  Exhibit 18,

14   you probably haven't seen this before.  There's some

15   internal emails and some internal Corizon documents

16   both are entitled No Quit Discussion Tracking Form.

17           MR. MATULA:  And these are numbered,

18   Rachel, Corizon 16 through 19 [sic].

19           MS. JAG:  Can you read those Bates

20   Numbers to me once more?  Sorry.

21           MR. MATULA:  Corizon 16 through 19

22   [sic].

23   BY MR. MATULA:

24           Q.     And there's -- it probably makes sense

25   to maybe look at the second page.  The one that's the

1  -- Corizon 19 first.

2            It's -- it's filled out and says, Date

3  of Interview, 2-1 and 2-4-19.

4            Do you see that?

5       A.    Yes, I do.

6       Q.    And then at least it says, that

7  Sterling Ream was the interviewer.  And at least

8  February 1st, that was the day you tendered your

9  resignation and discussed your resignation with

10 Ms. Ream; right?

11      A.    Yes.

12      Q.    And again, I'm just trying to confirm

13 that the documentation captures what was actually

14 communicated.

15      A.    Okay.

16      Q.    That's -- there might be some other

17 things or things that were not said or whatever, but

18 first, I just want to make sure that I know whether

19 you're going to say, Hey, this is not what happened.

20 All right.  Are you with me?

21      A.    (Nodding head.)

22      Q.    Okay.  So the first -- or the second

23 page, she talks about reasons for resignation, salary

24 and other and then refers to driving to Kansas City

25 five days a week.  She recorded the Number 1 issue is

1    the commute.  "Terri also said she would like money,

2    and she's still thinking about the decision to

3    resign."

4              Does this document -- is it accurate

5    in capturing the things you discussed with Ms. Ream?

6         A.    Yes.

7         Q.    All right.  Going back to the previous

8    page.  The same thing, this looks like something that

9    was filled out by Ms. Meehan and it's got a date of

10   2-5, and it's -- appears to refer to the possible

11   schedule changes that we saw on the other email, it

12   says, "will think about that and advise by the end of

13   the week.  Discussed possible schedule changes."

14             This is accurate in that there was at

15   least some discussion about possible scheduling

16   changes; true?

17        A.    Yes.

18        Q.    At some point did you -- my

19   understanding is that you actually called maybe a few

20   days after this and had indicated that maybe you made

21   the decision to quit too soon.  You'd been talking

22   with your doctor, and wanted to know if you could

23   instead take FMLA leave.  Does that ring any bells?

24        A.    Yes.

25        Q.    Okay.  And -- and that was a call that

1  you -- who did you make that call to?

2          A.    I'm not sure.  I don't remember, but I

3  believe it was Sterling.

4          Q.    I don't have a piece of paper to help

5  us out, so -- but anyway, you recall the call.  What

6  happened with that?  Did you actually turn in FMLA

7  paperwork or what did -- how did that work out on

8  your final decision?

9          A.    They would -- no.  No, I didn't.  They

10  would not allow me to rescind my resignation.

11          Q.    Did you -- but did you request the

12  FMLA paperwork?

13          A.    I don't remember.

14          Q.    Maybe, maybe not?

15          A.    (Nodding head.)

16          Q.    Is that a --

17          A.    I don't remember.

18          Q.    All right.  What was Sterling's

19  reaction when you first talked to her about the

20  resignation, what'd she say, other than try to find

21  out why?

22          A.    That was pretty much it, trying to

23  find out why.

24          Q.    Let's go to Exhibit 19.  Exhibit 19

25  looks like it's an email from you to Ms. Meehan on

1  February 22nd, which was your last day of work;

2  right?

3           A.      Uh-huh.  Yes.

4           Q.      And the subject is Thank You.  Could

5  you read for me the -- the content of your email as

6  you left Corizon?

7           A.      Yes.

8                   "Ms. Jenny, I appreciate your

9  leadership.  I have been watchful and learned much

10  from your style of management.  Chillicothe medical

11  department has weathered a few storms during my brief

12  time here, but the endurance, perseverance, and

13  triumph is due to the wonderful individuals who work

14  diligently and it has been a pleasure to be a part of

15  the team and to be of service.  Thank you."

16           Q.      And when you wrote those words, did

17  you mean them?

18           A.      Completely.  I would probably say --

19  no, I wouldn't probably say -- I would say this is

20  the proper way to exit a position.  I guess, the

21  answer to that would be no -- or the answer to that

22  is no.

23           Q.      And in particular, with regard to

24  Ms. Meehan.  My understanding is she is one of the

25  many people who you believe treated you in a racially

1    discriminatory manner while you worked there; right?

2         A.    Yes.

3         Q.    We talked about earlier in your

4    testimony some of the materials, the orientation

5    materials, the harassment materials, all of that --

6    and we can pull out the paperwork again, but do you

7    recall that in those materials, Corizon provided a

8    compliance number where you could report issues of

9    discrimination and harassment?

10        A.    Do I recall that there was a

11   compliance number?

12        Q.    Yeah.

13        A.    I did not recall that there's a

14   compliance number.  It was quite a thick packet.

15        Q.    Well, let's look at it.  If you could

16   go to Exhibit 7.

17        A.    You mean do I recall now looking at it

18   just now, is that what you're asking me?  Maybe I

19   misunderstood your question.

20        Q.    I'll ask you.  You never called anyone

21   in HR or the compliance -- the Corizon compliance

22   number to report any thing that you thought was

23   harassment, discrimination or retaliation; correct?

24        A.    Correct.  I went to my immediate

25   supervisors.

1        Q.    And we've already covered what was in

2  the document and what wasn't in the document.  But at

3  any time, did you think if you were unsatisfied with

4  how your immediate supervisors were handling the

5  situation that maybe you could or should reach out to

6  someone else to see if they would help, like HR or

7  the compliance line?  Did you ever think that?

8        A.    No.

9        Q.    Why not?

10       A.    I didn't receive help, so I just

11  figured that's the way it is.

12       Q.    Okay.  Well, you did -- I mean,

13  although you actually weren't the one who reported

14  the Anna Barker situation --

15       A.    Uh-huh.

16       Q.    -- somebody else had reported that --

17       A.    Uh-huh.

18       Q.    But you were there.  And I mean, at

19  least on that situation, there -- I mean, action was

20  taken.

21       A.    Okay.

22       Q.    Right?  So that's one incident where

23  there was a report, action taken; right?

24       A.    Okay.

25       Q.    So, there -- we've discussed the --

1            MR. NUGENT:  What's the question?

2            MR. MATULA:  Well, she said no action

3    was taken, and that's just the way it is.  And I want

4    to make sure that we're talking about things that

5    happened with regard to -- it wasn't just the way it

6    was when someone reported what Anna Barker had done.

7            MR. NUGENT:  Okay.  I'm going to

8    object to form.  Argumentative.

9    BY MR. MATULA:

10           Q.    And in terms of anything that we've

11   seen in writing, the only other report or complaint

12   of discrimination, harassment that exists in writing

13   during your employment was your email related to

14   Judy, the lab tech, right, and we've discussed that?

15           A.    Yes, we've discussed that.

16           Q.    And so in terms of that was just the

17   way it is and you didn't think you'd get any help, at

18   least there's no other documented situations and

19   there's no situations that you had ever gone outside

20   of the facility and had an issue that was not

21   addressed?

22           A.    I did not go outside the facility.

23   The issue was not addressed within the people that

24   have been put in -- in charge, so....

25           Q.    Did you believe that Karen Epperson

1    was the appropriate person to maybe take some action

2    in response to the concerns you had?

3              A.    No.

4              Q.    Did you ever specifically couch any

5    concerns you had with what was going on at Corizon

6    other than the lab tech situation, as being racially

7    discriminatory, harassing in any of your

8    conversations with Ms. Epperson, Dr. Epperson?

9              A.    Yes.

10             Q.    Okay.  But do you know what action, if

11   any, that she did to help you out?

12             A.    I don't know any action that she took.

13             Q.    Did you expect your -- someone with

14   whom you were friendly with like Dr. Epperson to take

15   action?

16             A.    I expected -- yes, I spoke with her, I

17   had spoke with the administrator, I spoke with the

18   regional medical director and no actions were taken

19   that I know about.

20             Q.    Okay.  Is there any way -- sitting

21   here today is there any way to recreate exactly when

22   you had these alleged conversations with the regional

23   director or any of these people?  Is there any way to

24   figure out when those happened?

25             A.    Sure.  When I had the -- when I spoke

1    with Sterling Ream about the assistants and their

2    behavior, when I spoke with them, I also spoke with

3    the regional medical director at that time.

4           Q.    That's Jerry Lovelace --

5           A.    Yes.

6           Q.    -- your family friend?

7           A.    Yes.

8           Q.    Okay.  And how did Mr. Lovelace, your

9    family friend, who's been over to your house on a

10   couple of occasions, what did -- how did those

11   conversations go?

12               MR. NUGENT:  Object to form.

13   Argumentative.  He works for Corizon.

14               You can answer.

15          A.    What was the question?

16   BY MR. MATULA:

17          Q.    How did -- like when you supposedly

18   reported these things to Jerry --

19          A.    I'm not sure what steps he took

20   following my report either.

21          Q.    Did you ever follow-up with him, say,

22   "Hey, Jerry, what's going on?  Are you doing

23   anything"?

24          A.    No, I did not.

25          Q.    Why not?

1          A.     I made him aware of what was going on,

2     and I -- I don't know why not.

3          Q.     What specifically did you tell Jerry

4     Lovelace as to what was going on?

5          A.     Regarding the assistants and their

6     behavior when I am taking care of patients.  That --

7     those episodes, I did share that with him.

8          Q.     And -- and in fairness, he is copied

9     on some of the emails relating to the issue with

10    Judy --

11         A.     Yes.

12         Q.     -- the lab tech?

13         A.     Yes.

14         Q.     But other than lab tech situation, and

15    the assistants and how they're behaving, anything

16    else that you say you reported to Mr. Lovelace?

17         A.     I -- I -- I don't recall.  But I don't

18    know how many incidents are enough incidents.  One is

19    too many.

20         Q.     How many times did you speak to --

21              MS. JAG:  I'm sorry to interrupt, but

22    the video feed just went out.  I just wanted to point

23    that out.  I can't see the Plaintiff.  Sorry.

24              THE REPORTER:  Can we go off the

25    record?

1          MR. MATULA:  Let's go off the record.

2          THE VIDEOGRAPHER:  We'll go off the

3  record at 3:44 p.m.

4                (Off-the-record discussion.)

5          THE VIDEOGRAPHER:  We're back on the

6  record at 4:00 p.m.

7  BY MR. MATULA:

8      Q.    Ma'am, before we went back on the

9  record, the court reporter advised me we had

10  something get cut off as we were going off the record

11  last time, so I'm just -- I'm not trying to be

12  redundant, but I want to make sure we get it.

13          I was asking you about your

14  communications with Mr. Lovelace -- your

15  communication with Mr. Lovelace.

16          And I think I was asking you how many

17  times you have spoken with Mr. Lovelace about any of

18  your concerns and I'm not sure what you told me, I

19  think you were saying you broached the issue at least

20  once with him concerning the -- how the assistants

21  were behaving and acting towards you, were there

22  other -- other conversations other than the one on

23  that subject or not?

24      A.    Yes, there were.  The -- the one

25  regarding Judy Harkins, I did speak with him

1    regarding that one and I can't recall specifically

2    the other occasions that I spoke with him, but

3    those -- at least three times regarding -- three or

4    four times regarding those incidents.

5         Q.    The lab tech and then some

6    additional -- two, three additional times about the

7    treatment and behavior of the administrative

8    assistants during examinations?

9         A.    Yes.  And I spoke with him twice

10   regarding the lab tech -- lab tech because this was

11   not the first --

12        Q.    On both occasions?

13        A.    -- incident.

14              Yeah.

15        Q.    All right.  And you've told me that

16   you didn't know what Jerry did or didn't do, but what

17   did he tell you during those conversations that he

18   was going to do or what did he say when you reported

19   all those?

20        A.    I don't recall him telling me anything

21   specific, that he was going to do anything

22   specifically.  I -- I don't recall the specifics, if

23   -- if anything at all.

24        Q.    Are you -- are you critical of

25   Mr. Lovelace on how he responded to your

1   communications?

2         A.     Critical?

3         Q.     Yeah.

4         A.     I'm not sure how he responded or

5   didn't respond, that's what I'm saying.  I don't know

6   how he followed up on these complaints that I had.

7         Q.     And that's because you never asked him

8   and he never proactively told you?

9         A.     Correct.

10        Q.     Did you think about reaching out to

11  Mr. Lovelace to let him know that you were

12  considering resigning?  I mean that was -- you could

13  have done that; right?

14           MR. NUGENT:  Which question are we

15  wanting to ask?

16           MR. MATULA:  Yeah, that's fair enough.

17  BY MR. MATULA:

18        Q.     You could have reached out to

19  Mr. Lovelace, and said, "Hey, I'm thinking about

20  turning my resignation in, unless something changes.

21  Help me out, Jerry," something like that?

22        A.     That possibility, I -- I imagine, was

23  there.

24        Q.     Let's look at Exhibit 20.

25           Ma'am, Exhibit 20, which is Bates

Numbered with Plaintiff's Bates Numbers, LaBlance 1
through 3.  Is -- well, the front page is a photocopy
of an envelope, and then inside is some -- a printout
of some thing, some type of offender information.
And after I made these copies, I saw something that
suggested that there was some additional materials
that were in the package when this was sent to you,
including a summary order relating to your Kansas
nursing license.

                    Anyway, Exhibit 20 is part of what
Karen Epperson mailed to you that you received
shortly after your employment ended?

          A.     This is correct.

          Q.     And I apologize, if I had caught this,
I would have photocopied it together.

                    MR. MATULA:  Laurel, can you pull out
what I think is Exhibit 4.  It might already be out,
it's the summary order.

BY MR. MATULA:

          Q.     Okay.  So -- so the record's clear,
Exhibit 20 as well as Exhibit 4 came together?

          A.     Yes.

          Q.     Okay.  And on the -- this looks like
it was postmarked the 26th of February on that -- on
the letter and then the contents, at least, of

1    Exhibit 20, it's got what appears to be a person's

2    handwriting, it says, "Please do not contact me.  I

3    was not aware until recently and I should have been

4    made aware, Karen Epperson."

5                    And she's got this printout that looks

6    like it comes from some -- it's got an Internet

7    printout at the bottom, web.doc.state.mo -- I'm not

8    going to read the whole thing.  It there has a date

9    of 2-18-2019.

10                   Do you see that?

11        A.      Uh-huh.

12        Q.      All right.  And are you familiar with

13   the -- the -- this kind of printout or this

14   information on where it says Medical Profile,

15   Offender Information, kind of the things that we have

16   here?

17        A.      Yes.

18        Q.      Is this something that in connection

19   with your work at Corizon you would have to look up

20   various information about patients that would be

21   contained in the same database?

22        A.      Yes.

23        Q.      So you know what it takes to get in

24   and pull out the records we're looking at here?

25        A.      Yes.

1        Q.    Okay.  The -- on the top right,

2  there's something that says, "Cycle:  20120411."

3              Do you see that?  The top right of the

4  second page.  I'm sorry.  It's Page 1 of 1 of the

5  printout.

6        A.    Oh.  Yes, I do.

7        Q.    Do you know what that is?

8        A.    No.

9        Q.    Okay.  What are the steps that would

10  -- that would be required to -- for someone, maybe

11  Ms. Epperson or anyone else, to pull up this

12  information?

13        A.    You have to have a login.  You have to

14  be -- have access to MOCIS, which is the EMR for the

15  State.

16        Q.    That's the electronic medical record.

17        A.    Yes.

18        Q.    EMR?

19        A.    Yes.  And it's the EMR that is used in

20  the women's -- the Missouri women's institutions

21  only.

22        Q.    And have you had any communications

23  with Ms. Epperson since she sent this to you?

24        A.    No, I have not.

25        Q.    I'm going to play an audio recording

1  of what's -- a voicemail that I think is a voicemail

2  message that you left on Ms. Epperson's phone.  I

3  presume a cell phone, I don't know.  And I'm going

4  to -- trying to figure out when you would have left

5  this message.  It sounds like around the time you

6  resigned.  But after you listen to it maybe you can

7  clarify that for me.

8            MR. MATULA:  And in terms of marking

9  this, I don't how best to identify it is as an

10  exhibit, other than I know we'll know what the file

11  is.

12            MR. NUGENT:  Can we go off the record

13  for just a second?

14            THE VIDEOGRAPHER:  Go off the record?

15            MR. MATULA:  (Nodding head.)

16            THE VIDEOGRAPHER:  We'll go off the

17  record at 4:10 p.m.

18            (Off-the-record discussion.)

19            MR. MATULA:  All right.  Let's go back

20  on the record then.

21            THE VIDEOGRAPHER:  Stand by.

22            We are back on the record at 4:15 p.m.

23            MR. MATULA:  We've had an

24  off-the-record discussion amongst counsel and just to

25  memorialize a couple things.

1          I'm about to play an audio file, which

2   has been previously been made available to

3   Mr. Nugent, and that we will also more formally make

4   available through a production with a Bates Number

5   that we'll send to Mr. Nugent, as well Ms. Jag who I

6   forgot to send this to yesterday.

7          But my plan will be, we will somehow

8   give that a Bates Number of Corizon 9999 just so it's

9   kind of got its own unique deal.  And the intent is

10  that what we are playing today, for the record

11  purposes, I don't know if we need to call it an

12  exhibit, Laurel, or just say that the file is being

13  retained by Mike -- okay, well, that's the plan.

14         So without further adieu, I'm going to

15  -- I'm going to play this and then I will have a

16  couple questions about it.  I'm going to try to play

17  it.

18              THE VIDEOGRAPHER:  Your speakers maybe

19  turned down from earlier?

20              MR. NUGENT:  Do you want to use mine?

21  I can use mine.

22              MR. MATULA:  If you have it.  Do you

23  mind?  I'm getting an error message.  That's fine.

24              MR. NUGENT:  As long as you preserve

25  that copy.

1          MR. MATULA:  If you're able to play
2   it, Ivan, that would be great.  I don't know what's
3   wrong with this.
4          Go ahead.
5          "Hey, Dr. Epperson -- Karen -- I'm
6          calling because you might be, like, why did
7          she not say something.  I just really
8          didn't want to lose it.  Because I will miss
9          you.  I will miss working with you and
10         you are a friend.  And so I'm not saying
11         good-bye.  I'm saying I will see you soon
12         and I just appreciate you and I thank you.
13         You have been a blessing to me.  And I do
14         value your friendship and hang in there.
15         You know, don't be overwhelmed.  You can
16         only do so much.  You're only one person.  I
17         love you.  I'm going to pray and continue to
18         pray for you and me and all of us.  And you
19         know, there's still that opportunity to come
20         be the second token white person.  Hey, give
21         me a call when you get a chance.  And thanks
22         for everything, Dr. Epperson.  Bye."
23   BY MR. MATULA:
24         Q.    First, that is your voice leaving the
25   message?

1        A.    It sounds like my sister.  No, I'm

2  just kidding.  Yeah, it's me.  Yeah.

3        Q.    All right.  Am I right, that's a

4  message you left for Dr. Epperson?

5        A.    Yes, I did.

6        Q.    Do you know on what date you --

7        A.    That was on February the 22nd.

8        Q.    Okay.  So that would have been your

9  last day?

10       A.    Yes.

11       Q.    I couldn't tell whether it was your

12  last day or whether it was like when you turned in

13  your resignation earlier in February.  But you're

14  pretty confident that it was on the 22nd?

15       A.    Yes.

16       Q.    The content of your message where

17  you're talking about her being a friend, and you

18  know, hang in there, I love you, it's not good-bye,

19  etcetera, did you mean all of those things when you

20  said them?

21       A.    When I said them.

22       Q.    And that was, of course, before you

23  received the mail from her that we were looking at in

24  the last exhibit?

25       A.    Yes.

1    Q.    All right.  Did you ever request of --
2  of Dr. Epperson that she do more to try to address
3  the problems that you were having with your -- your
4  fellow workers?
5              "Dr. Epperson, hey, is there anything
6  that you can do for me?  Can you talk to someone?
7  Can you help me out?"
8              Did you ever have those -- that type
9  of conversation with her?
10     A.    No, I did not.
11     Q.    Did you ever consider having that type
12  of conversation with her?
13     A.    I made her aware of what was going on.
14  I did not specifically say what can you do to fix
15  this.
16     Q.    And when you made her aware of what
17  was going on, how did she respond?
18     A.    She said, "It sounds like
19  discrimination to me."
20     Q.    Do you remember her saying anything
21  else?
22     A.    I should make a complaint.
23     Q.    Did she ever -- did you ever talk
24  about, like, what happened?  I mean, she was -- her
25  name is on the emails with Judy the lab tech?

1          A.      Uh-huh.

2          Q.      Presumably she knows that situation

3    and -- and did you have any additional conversations

4    with her about that specific issue, what Judy's

5    doing?

6          A.      After I was told that it was a

7    misunderstanding, I did share that information.

8          Q.      And -- and what was Miss -- what was

9    Dr. Epperson's response when you shared her with what

10   Jenny Meehan had -- had told you?

11         A.      I don't recall.

12         Q.      Fair enough.  Towards the end of the

13   message you make some comment to the effect of

14   "There's still an opportunity be a second token white

15   person"?

16         A.      Yes.

17         Q.      It sounds -- what do you mean by that?

18   It sounds like it was an inside joke of some kind.

19         A.      It was.

20         Q.      What -- what are you talking about

21   there.

22         A.      I had invited her to come and

23   fellowship at my church.  And we had -- it's -- she

24   had made the comment that it's an all

25   African-American church in urban Kansas City, and --

1   but I did share with her that we do have one

2   consistent member, so....

3        Q.    Gotcha.  All right.  So you were just

4   still kind of extending that joke if she still wanted

5   to show up at church sometime she was welcome?

6        A.    Yes.

7        Q.    All right.  Exhibits 21 and 22.

8        Ma'am, you have Exhibits 21 and 22.

9   Twenty-one is a complaint on a complaint form that

10   you submitted to the Missouri State Board of

11   Registration of the Healing Arts where you're

12   reporting Dr. Epperson for what she did in terms of

13   apparently looking to your offender record through

14   the Department of Correction system.

15        And Exhibit 22 is a similar deal.

16   It's a complaint that you had made about Ms. Kirby

17   and her conduct and the last page of Exhibit 22 is a

18   letter you got back concerning Ms. Kirby.

19        Do -- do you see those?

20        A.    Yes.

21        Q.    Okay.  Have you -- did you get a

22   result or anything back from the State concerning

23   Ms. Epperson?  I see the -- I'm aware of the -- the

24   response you got to Kirby, which is the last page,

25   but I don't -- I didn't know if you ever got anything

1  back from the State relating to Epperson.

2          A.      Everything I received I turned over to

3  my attorney.

4          Q.      Okay.  All right.  It sounds like you

5  don't recall one way or the other whether they

6  responded about Epperson?

7          A.      Everything I received, I turned over

8  to my attorney.

9          Q.      All right.  I get that.  You know, and

10  I can --

11          A.      So I haven't received a statement from

12  them regarding Dr. Epperson.

13          Q.      Okay.  I didn't know if you

14  independently remembered it, and somehow maybe I

15  missed a document or something.  So that's just -- I

16  just wanted to make sure.  So it sounds like you --

17  you did not get something back on Epperson?

18          A.      Correct.  That's what it appears to

19  be.

20          Q.      Okay.  Are you aware that Ms. Epperson

21  and Ms. Kirby have filed separate lawsuits against

22  Corizon relating to the end of their employment with

23  Corizon?

24          A.      No, I wasn't.  I was aware that

25  Dr. Epperson had; I don't believe I was aware that

1  Kirby had.

2           Q.     You were aware prior to today, though,

3  that Ms. Epperson and Ms. Kirby were -- their

4  employment ended at Corizon as a result of you

5  providing information that they had accessed your

6  records by -- I'm sorry -- they had accessed your

7  records as evidenced by what Ms. -- or

8  Dr. Epperson had emailed you?

9                   MR. NUGENT:  Object to form.

10                  MR. MATULA:  That was a horrible

11  question.  Gosh, it's late.  That's horrible.

12  BY MR. MATULA:

13          Q.     You know Epperson and Kirby both got

14  fired; right?

15          A.     Yes, I'm aware of that.

16          Q.     What's your understanding as to why

17  they were fired?

18          A.      That there was an investigation,

19  and -- regarding my complaint and they were

20  terminated.

21          Q.     The details of that, you don't know

22  the details of that?

23          A.     I was not allowed to have the details.

24  I did request them.

25          Q.      Here's the deal, and I mean, I'm time

1    sensitive, and I'm -- and I don't want to waste time

2    today on what is really maybe more appropriate in --

3    in case you are a -- you have to testify as a witness

4    in either of those two lawsuits.

5                    But there's a -- just a couple things

6    that are alleged in the lawsuit that relate to your

7    relationship with those women and -- that I want to

8    see if you know what they're talking about.  I

9    will --

10                   MR. MATULA:  Let's go ahead and just

11   pull out -- go with Exhibits 24 and 25, Laurel.

12                   (Off-the-record discussion.)

13                   MR. MATULA:  Hey, Rachel, these are

14   documents that I only gave Ivan.  Although she may or

15   may not have them.

16                   MS. JAG:  What did you say?  I'm

17   sorry.  I was on mute.

18                   MR. MATULA:  I'm sorry.  I'm starting

19   to use documents I only gave Ivan, which is not on

20   purpose.  Although you might have them because they

21   are the petitions in both the Epperson and Kirby

22   lawsuits, and since the Department of Corrections is

23   also a defendant in both of them, I don't know if

24   they're on -- where they're at, on your desk or

25   whatnot.  But anyway that's what I'm referring, so I

1  don't have Bates Numbers for you.

2               MS. JAG:  Oh.  Okay.  Yeah, I -- I --

3  those are not cases that are assigned to me.  If

4  there's any way that you could send them over to me.

5  If not, not a problem.  I'm sure I can probably ask

6  around and find them.

7               MR. MATULA:  Fair enough.  I -- I

8  apologize, Rachel.

9               MS. JAG:  No, that's okay.

10  BY MR. MATULA:

11      Q.    All right.  With regard to Exhibit 24,

12  ma'am, that's -- I'll tell you that's a -- the

13  lawsuit papers that initiated a lawsuit filed by

14  Karen Epperson against Corizon Health and the

15  Department of Corrections.

16            And she does have some allegations she

17  makes about you, and so I'm just going to quickly

18  just see if you know what she's talking about or what

19  you have a say on this.

20            If can you turn to Page 5 of that

21  exhibit.

22      A.    Uh-huh.

23      Q.    Paragraph 20, the lawsuit states that

24  around the end of January 2019, Epperson noticed that

25  you began to exhibit unusual extremes of emotional

1    behaviors and rapidly have a change in your demeanor

2    during the day from one day to the next.  Some days

3    you're able to complete your scheduled patients --

4    I'm sorry -- unable to complete your scheduled

5    patients, which was unusual.

6              Do you see that?  Exhibit --

7    Paragraph 20.

8         A.    Yes, I do see that.

9         Q.    Do you have any idea what this

10   allegation is referring to?

11             MR. NUGENT:  And I just want to state

12   an objection for the record.  We'll object to

13   questioning about -- excuse me -- Exhibits 24 and 25,

14   to the extent that they are not relevant to

15   Ms. LaBlance's allegations and claims against Corizon

16   and the DOC.

17             And then also further state that there

18   will likely be an opportunity for counsel to depose

19   Ms. LaBlance as it pertains to those matters in those

20   cases.

21             But I'm not instructing her to not

22   answer, I'm just stating my objection.

23             MR. MATULA:  That's fine.  And -- I'm

24   not -- I don't intend to take advantage of this, but

25   there's just a couple since we've got --

1    BY MR. MATULA:

2         Q.    I mean, ma'am, I know technically this

3    was filed by her attorney, but Ms. Epperson is saying

4    that she observed behavioral changes for the end of

5    January, do you know what she's talking about, was

6    that -- were you going through behavioral changes or

7    things of that sort during that time?

8         A.    Behavioral changes?  My mother passed

9    away on December the 30th, so I probably had some

10    mood changes.  I don't know about behavioral changes,

11    and there was one day that was particularly difficult

12    that I did go home.

13         Q.    And I think that might be referred to

14    in Paragraph 22.  And at least as the way this

15    lawsuit alleges, it says, "On or about February 8th,"

16    she says that you exhibited strange and erratic

17    behaviors towards Sterling Ream that supposedly

18    caused Epperson to have concerns about personal

19    safety and your well being and that you suddenly left

20    the department and went home, is that the day you're

21    talking to -- about?

22         A.    I don't remember it that way, but

23    perhaps that's what she's trying to describe.

24         Q.    What happened on this one difficult

25    day that you were mentioning, like what happened

1    there?

2          A.    I came to work and I could not stop

3    crying so I went to the HSA's office and told her

4    that I did not feel I should be at work that day, and

5    please cancel my patients and I was going home.

6                And it didn't appear to be a problem

7    with the administrator.  She was aware that I had

8    just recently lost my mother.

9          Q.    Sure.  And I imagine that was a --

10   understandably, a very difficult time.

11               As I understand at no time during your

12   employment did Ms. Kirby or Dr. Epperson ever say

13   anything to you suggesting they were concerned about

14   your ability to provide competent professional care

15   to patients?

16         A.    No.

17         Q.    All right.  And that was a double

18   negative.  They never -- they never said anything

19   like that while they worked with you, did you -- or

20   did they?

21         A.    No.

22         Q.    And in fact, and I know this is

23   completely unfair going backwards, but Exhibit 14.  I

24   forgot to ask you about the peer review, I think,

25   that Karen Epperson gave you.

1                    Do you recognize that, ma'am?

2         A.       Yes, I do.

3         Q.       And it's entitled Provider Peer Review

4    Questionnaire.  I mean, it's kind of an evaluation of

5    sorts, and it looks like Karen Epperson wrote this

6    out on June 14, 2018.

7         A.       Uh-huh.

8         Q.       And do you remember receiving this or

9    talking it over with Ms. Epperson?

10        A.       Yes, I do.

11        Q.       Okay.  I just want to make sure that

12   that's your -- you didn't dispute that was what your

13   review was.

14                 Tell me what -- you mentioned Shannon

15   Burris a couple times, and I think you indicated she

16   called you at some point after you had left, but we

17   never got into what those conversations consisted of.

18   Can you tell me about that?

19        A.       She called me and said that -- that

20   Dr. Epperson and Val Kirby had been terminated, and

21   removed from the premises at the Department of

22   Corrections, and that she thought that I should know

23   why.  And what had been going on around me, about me,

24   for quite some time.  And she told me about the

25   information they had downloaded and printed off, and

1    disseminated with the entire medical staff and

2    whoever else, I guess, would stand still long enough

3    to look at it.  And she said she just felt that I

4    needed to know.

5         Q.    All right.  And -- and I think you did

6    tell me something, that you talked to Burris and she

7    had said there were some things going on for awhile.

8    But have we now covered everything that you discussed

9    with Shannon Burris as it relates to any of the

10   claims in your lawsuit?

11        A.    Yeah.  Yes, I would say so.

12        Q.    And if there's more specifics, let me

13   now, otherwise, I think I've got the gist.

14        A.    Okay.

15        Q.    Is there anything else that you

16   remember?

17        A.    No.  No.

18        Q.    You had your job at the wound care

19   business, I guess, lined up when you left, how long

20   did you stay employed with them?

21        A.    I resigned day three.

22        Q.    And why did you do that?

23        A.    That particular position required a

24   lot of travel outside of the Kansas City area that I

25   was not aware of and that was travel on a daily basis

1   to multiple different facilities.  And --

2        Q.    And they didn't tell you that ahead of

3   time?

4        A.    No, not that I was going to be

5   traveling that far out of the city.

6        Q.    Okay.  In terms of other employment

7   you've had since your -- I think this is in your

8   interrogatory, but -- but after the wound care job,

9   what -- where did you work next?

10        A.    I went to work as an interim director

11   of nursing in a home health agency in Beth- -- at

12   Bethlehem Home Health Agency, and I also went to work

13   as a part-time nurse practitioner in a private

14   practice clinic.

15        Q.    And why did -- what were the

16   circumstances of your employment with Bethlehem

17   ended?

18        A.    When they -- they no longer needed me.

19        Q.    Was it like a layoff or how would you

20   describe it?  What were you told?

21        A.    Yeah, they were going to discontinue

22   that particular part of their -- their company, so

23   they were no longer going to need someone in that

24   position over the Medicare part.

25        Q.    And then you did some work for the

1    Center for Women's Health and Wellness?

2              A.      Yes.

3              Q.      What's that?

4              A.      It's an OB-GYN clinic, a women's

5    health clinic.

6              Q.      And -- and then what -- why did you

7    move -- how did that employment end?

8              A.      He temporarily lost his license to

9    practice.

10             Q.      Oops.

11             A.      Oops.

12             Q.      So the provider you were working with

13   lost his license, and so then was your next

14   employment after that the Grand Pavilion?

15             A.      Yes.

16             Q.      Okay.  Ma'am, I know this is going to

17   be kind of an opened-ended question, just do the best

18   you can in describing it.

19                     You are seeking monetary damages as

20   part of this lawsuit for not just economic pieces but

21   you say your lost salary from your job change and

22   whatnot but also various noneconomic things.

23                     And so I'm going to ask you, in terms

24   of how -- working at Corizon and -- and the

25   circumstances of all of that, how -- what do you want

1　the jury to know in evaluating your claim for

2　monetary damages beyond wages?

3　　　　　　　MR. NUGENT:  I'll object to form.

4　　　　　　　MR. MATULA:  I'll try it again.

5　BY MR. MATULA:

6　　　　　Q.　　You're seeking recovery for mental and

7　emotional stress damages, you understand that, right,

8　that's part of the lawsuit claim?

9　　　　　A.　　Yes.

10　　　　　Q.　　Okay.  Tell me what -- to you what

11　those are, and what you want the jury to know as they

12　decide whether and how much money to award to you for

13　that?

14　　　　　A.　　Okay.  The depression.  The fear.

15　There was a fear of -- because I saw things changing

16　and getting worse, and not quite sure what was going

17　on, what the motivation was, other than why -- why

18　all of a sudden did things get worse.  You know, it

19　was one way, it got worse, and then it just continued

20　to get worse.

21　　　　　　　　And so I suffer from depression, that

22　fear, mistrust of others in other situations.  I've

23　had to be -- to, you know, take medications to sleep

24　and, you know, anxiety medications and, you know,

25　I've gained 30 pounds.  I -- it affects my

1  relationships with new co-workers and new

2  relationships that I am trying to cultivate.  It has

3  affected the -- I would say, like the pace of my

4  career path.

5              And I -- I -- the lasting effects of

6  this, I think, are surprising even to me.  That it's

7  damaging even today.  Because of the things that I

8  went through.

9        Q.    When you say in terms of the

10 depression, fear, affecting your sleep, everything

11 else you described, would you say it is better, worse

12 or the same today as it was when you resigned in

13 February of 2019?

14       A.    I don't know if I would classify it as

15 either better or worse.  I'm learning to manage it a

16 little bit better.  I'm learning to manage it a

17 little bit better.

18             I feel a little hypersensitive to

19 different situations when I'm around -- you know,

20 other folks and co-workers, in different situations,

21 you know.  Because I don't feel like I can trust

22 things at face value and that's a hard way to deal

23 with things on a day-to-day basis.

24       Q.    Well, do you think that -- that some

25 of the emotional affect that you've described in

1    terms of either depression, sleep, whatever,

2    especially around the time of your resignation and

3    immediately thereafter, do you think some of that

4    might have been the lingering effects of losing your

5    mother?

6         A.    I can't discount that, but I don't

7    think that's the root cause.  I mean, I worked -- my

8    mother was my mother.  But I worked for years to

9    obtain an education, to go to college, you know, to

10   -- to go back, get a nursing degree.  To go back, get

11   a master's degree.  To get a certification.  I did

12   the training.  I did the work.  I put in the time to

13   turn my life around from what it had been, and this

14   situation has been very difficult.  To be treated

15   less than, to be plotted against, and to fear going

16   to work because of what might transpire that could

17   potentially damage my ability to make a living,

18   because someone doesn't like the color of my skin.

19   That -- that was a real fear.

20        Q.    What's -- do you have something --

21        A.    For instance --

22        Q.    -- specific in mind --

23        A.    Yeah, I do.

24        Q.    -- in terms of the damaging situation?

25             Okay.  Tell me.

1           A.      And it was towards the end, maybe

2      in -- maybe this was December as well, December or

3      January.  We have to get sharps from the nurses,

4      because they're locked up.  And I needed a scalpel

5      and a suture kit to do a procedure.  And I didn't

6      have an assistant, I didn't need one, I was removing

7      Implanon out of someone's arm.  So just a little

8      birth control device, you just, you know, remove it.

9                   And so when I asked for the supplies

10     and the scalpel, she brought them to me, and

11     unbeknownst to me, apparently she left the entire box

12     of scalpels on my desk, pushed back into my books

13     where they weren't sitting out where I could see

14     them.

15                  She comes back later when I take her

16     the instruments and said, "Oh, I came.  I knocked on

17     the door."  I didn't hear anything.  It was just me

18     and the patient in there.  She didn't knock.  I

19     didn't hear it.  She said the door was locked.  No,

20     it wasn't.  See, I checked the handle.  It wasn't.

21                  And then there was a little comment

22     made between her and Dr. Epperson about "She doesn't

23     have a clue."  And this was in my presence.  And I

24     spoke not a word, but that was a situation I believe

25     that was intentional, because something like that

1   could have gotten me fired.  When you're fired, you

2   turned into the board.  Okay.  And that is

3   jeopardizing my ability to make money.  And I should

4   not have to work like that.

5         Q.    Who was this person again?

6         A.    That was Megan -- not Megan Rex, Megan

7   Brown and Dr. Epperson.

8         Q.    You thought Dr. Epperson was part of a

9   scheme to set you up to maybe --

10        A.    Dr. Epperson is the one who said "she

11   doesn't have a clue."

12            The girl is behind me,

13  Dr. Epperson is in front of me.  Dr. Epperson is

14   looking over me at her.

15         Q.    If you really thought someone was

16   setting you up to where you could lose your job and

17   -- and any other career things that would, you know,

18   stem from that, why wasn't that reported to anyone?

19         A.    I resigned.  I -- I couldn't stay.

20   They made it such that I had to leave because I was

21   fearful.  I had made -- I had shared the issues that

22   were at hand with the people that I thought were

23   going to do what needed to be done to rectify that.

24   And it wasn't done.  And the situation continued to

25   escalate.

1        Q.    I mean, you just described a situation

2   where I think for the first time you've indicated

3   that while you were employed, Dr. Epperson was

4   involved in an incident that you felt that she's

5   trying to jeopardize your career and get you unfairly

6   fired.

7              That's the -- I think that's the first

8   time I've heard anything about you saying

9   Dr. Epperson -- that you were aware of Dr. Epperson

10  doing anything while you were employed.  Have I

11  missed anything else with regard to Dr. Epperson's

12  conduct that you had -- that you attribute to her

13  doing something while you still worked there?

14             I mean, that -- that seems like pretty

15  strong.  We listened to that voicemail message, where

16  you tell her you have a friendship and you love her,

17  and you're inviting her to church.

18       A.    Uh-huh.

19       Q.    I mean, if you really felt that

20  Dr. Epperson had not that long ago set you up to lose

21  your job and professional license, why go through the

22  trouble of leaving her that voicemail message?

23       A.    One, because she would be a reference

24  for me for future employment; two, because it's the

25  professional thing to do; three, because there was --

1  I did believe -- I did not want to believe that she
2  was part of this situation, and after looking at this
3  that you've given me here in Exhibit Number 24,
4  everything that came to pass is here.
5              And these things were intentionally --
6  the -- the force behind them was intentionally
7  left -- what's the word I'm looking for? -- hidden,
8  shall we say.  Does -- do you understand what I'm --
9  how I'm answering this question?  So --
10      Q.    I'm not exactly sure, but I got the
11  gist that I think -- I think the substance of your
12  answer is, you left the voicemail message because you
13  thought it was the professional thing to do and you
14  might need her for a reference down the road?
15      A.    That's one reason.  You don't burn
16  bridges when you may need help or you may need a
17  reference.
18      Q.    There's a difference between burning a
19  bridge, and saying, yeah, I appreciate working with
20  you, etcetera, and telling somebody that your
21  friendship, I love ya and come to church.
22              I mean, that seems like -- that's a
23  little bit different.  And I guess I was just -- I
24  was just seeing if there was anything else that you
25  wanted to tell the jury about why you left that

1  message if, you know, you really thought that

2  Epperson was trying to set you up?

3      A.    I didn't want to admit that she was

4  part of that.  And I'll reiterate that again.  I

5  didn't want to admit that she was part of it.  And --

6  until I had to.

7      Q.    Do you entertain the possibility that

8  there's maybe any chance whatsoever that the -- the

9  interactions you had with some of your co-workers,

10  the administrative assistants or the lab tech or this

11  person with the sharps, any of that, do you allow for

12  the possibility that whatever the problem was, it was

13  maybe something other than race?

14          MR. NUGENT:  Object to form.

15          You can answer.

16      A.    Initially, I -- I wanted to try and

17  find another reason, but I could not and so I -- I

18  don't enter -- I don't try to think that it could be,

19  because I'm doing the same thing as my colleagues.  I

20  come to work, I do my job, I take care of people.

21  I'm -- you know.  And so the only thing left is --

22  the one difference was -- is -- is the color of my

23  skin.

24  BY MR. MATULA:

25      Q.    Is there anything else with regard to

1  the -- your emotional stress for which you're seeking

2  damages that you'd like the jury to know that you

3  haven't already told us?

4             MR. NUGENT:  Object to form.

5             You can answer.

6       A.     Just the stress that this has caused

7  in my life, in my marriage, in my home, in my

8  finances, in my personal and professional life.

9  BY MR. MATULA:

10       Q.     There's a couple more details there I

11  have to ask about more specifics.  In terms of your

12  difficulty in your home and your finances, what do

13  you mean by that?

14       A.     Well, I went from making a salary that

15  afforded me to be able to do some things to making

16  half that salary.  And, you know, that affects things

17  when you're finances are affected.

18       Q.     Any other details that you'd like the

19  jury to know about your finances being affected or

20  any more specifics other than what you just said?

21              MR. NUGENT:  Object to form.

22             You can answer.

23       A.     Any other -- I'm sorry.

24  BY MR. MATULA:

25       Q.     Again, I'm just trying to see if

1  there's more details that you intend to share with

2  the jury on this.  If there are, I'd like to hear

3  about them now; if -- if -- if not, or that's a

4  sufficient description, then that's fine.

5            MR. NUGENT:  Same objection.

6       A.    I don't -- I don't believe there's

7  anything else.

8  BY MR. MATULA:

9       Q.    In terms of emotional distress and

10  those -- and that -- let me back up.

11            In terms of emotional distress for

12  which you're seeking recovery, do you have an idea in

13  terms of what an appropriate dollar value is to

14  compensate you for those injuries?

15            MR. NUGENT:  Object to form.

16       A.    I believe that it's listed -- or

17  actually it's been presented by my attorney.

18  BY MR. MATULA:

19       Q.    Do you know what specific document

20  that you're referring to?

21       A.    Let's try Exhibit 1.

22            THE VIDEOGRAPHER:  Do you want to go

23  off the record?

24            MR. MATULA:  No.  It won't take that

25  long.

1          THE VIDEOGRAPHER:  Do you have your
2    mic?
3    BY MR. MATULA:
4          Q.     How about we do this, if you don't
5    have a number that you're comfortable to give me
6    here, but you're going to defer whatever's in the
7    papers that might have been submitted by attorney --
8          A.     Yeah, that's fine.
9          Q.     -- can I rely on that?
10          A.     That's fine.
11          Q.     Okay.  And just wrapping up my list.
12          I'm trying to get a list of, again,
13    everybody who you associate with Corizon, that you
14    believe mistreated you or did something wrong towards
15    you based on race, discrimination or retaliation.
16          Epperson, Corbin, Hild, Kirby,
17    Sterling Ream, Crystal, April, whoever was with
18    Dr. Epperson with the sharps incident.
19          A.     Megan Brown.
20          Q.     Megan Brown.  I actually have Anna
21    Barker.  Who else am I missing?  Is there anybody by
22    name --
23          A.     Tammy Christopher.
24          Q.     -- that you can give by name?
25          Wait.  Okay.  Yeah.  You gave me

1    another list.

2                    The sick call nurse, Tammy

3    Christopher, the -- the red-headed girl, I think that

4    was your language.  Stuever?

5           A.    Stuever.

6           Q.    Stuever?

7           A.    Rachel Stuever.

8           Q.    Rachel Stuever.  Jenny Meehan.

9           A.    And Shelby.

10          Q.    And Shelby.  Okay.

11                Anybody else on the list of bad guys,

12   so to speak?

13          A.    Not that I can recall at this time.

14          Q.    Was there -- was there anybody in a

15   management position that you interacted with that you

16   don't feel in some way treated you unfairly because

17   of your race?

18          A.    That I interacted with, no.

19          Q.    Okay.  I appreciate your patience.  I

20   know it's been a long day.  I know Ms. Jag has some

21   additional questions, but before I conclude my part

22   of the record, I would just ask, is there anything

23   else that -- is there any changes you'd like to make

24   based on -- about any part of the testimony you've

25   given?

1          A.      No, not at this time.

2          Q.      Well, this is kind of the best time.

3   It's going to happen -- it -- it better happen now

4   than later.  I'm not fishing for anything, I'm just

5   saying before I end my part of the proceedings,

6   anything else that you can think of that you want to

7   change, correct, expand on?  Anything?

8          A.      No, I -- I don't believe so at this

9   time.

10          MR. MATULA:  I appreciate your

11   patience and that's all the questions I have at this

12   time.

13                  One question.  Did we ever get medical

14   record authorizations back?

15                  MR. NUGENT:  We can talk about it off

16   the record.

17                  MR. MATULA:  Okay.  I would just put

18   on the record I want to talk to Mr. Nugent about,

19   we'd sent some medical record authorizations.  I

20   don't know if we've had time to get those back yet.

21   I don't know if that would be grounds for further

22   questions or not until I see something, but I'm

23   noting that subject to that notation that we might

24   have to discuss, I don't have any further questions

25   at this time.

1          Thank you.

2               MR. NUGENT:  Let's -- let's take a

3     break.  Rachel -- I'm sorry.

4               THE VIDEOGRAPHER:  Go off the record?

5               MR. NUGENT:  Yeah.

6               THE VIDEOGRAPHER:  We'll go off the

7     record at 5:02 p.m.

8                    (Brief recess taken.)

9               THE VIDEOGRAPHER:  Stand by.

10              We are back on the record at 5:12 p.m.

11                    EXAMINATION

12    BY MS. JAG:

13         Q.    Okay.  Mrs. LaBlance, my name is

14    Rachel Jag, and as I said earlier today, I am

15    representing the Defendant, the Missouri Department

16    of Corrections in this lawsuit.

17              And just to recap on a few things you

18    discussed today, which by the way, I thank you very

19    much for your time and your patience today with all

20    of our questions that we have.

21              Could you please repeat the title of

22    your position that you had while you worked with

23    Corizon?

24         A.    I was a nurse practitioner, women's

25    health nurse practitioner there at Corizon.

1    Q.    And --

2    A.    Assigned to Chillicothe.

3    Q.    Chillicothe?

4    A.    Yes.

5    Q.    Okay.  And had you worked at any other

6  facility other than Chillicothe?

7    A.    No, ma'am.

8    Q.    And had you been a nurse practitioner

9  anywhere else prior to working with Corizon at the

10  Chillicothe Correctional Center?

11    A.    No, ma'am.

12    Q.    And I believe you said earlier that

13  you were recruited for this position.  Who was it

14  that recruited you?

15    A.    Michael -- I want to say his last name

16  was Carter?  Michael -- his first name was Michael.

17  He was a recruiter.

18    Q.    Okay.  And -- and do you know who he

19  was a recruiter with?

20    A.    He was a recruiter with Corizon, I

21  believe.

22    Q.    And do you know roughly when it was

23  that he had reached out to recruit you?

24    A.    The first of May, in 2017.  Around the

25  first -- end of April, first of May.

1          Q.     Okay.  And then you started working

2     roughly in June of 2017; is that right?

3          A.     That is correct.

4          Q.     And who were your superiors and --

5     and/or supervisors, I guess, while you worked at

6     Chillicothe?

7          A.     The onsite medical director is

8     Karen -- was Karen Epperson, the regional medical --

9     assistant director was Mr. --  Dr. Bredeman, and the

10    regional medical director was Dr. Jerry Lovelace, and

11    then, of course, we had Jerry -- Jenny Meehan who was

12    the regional clinical director.

13         Q.     So did you have to verify or confirm

14    any course of treatment that you were pursuing for

15    any of your patients with these supervisors?

16         A.     I did not have to verify treatments,

17    no.

18         Q.     Did you ever have to report treatment

19    to anyone who was employed by DOC?

20         A.     I didn't have to report treatment

21    decisions that I made on a daily basis, but my charts

22    were to be reviewed, approximately 10 percent on a

23    monthly basis.

24         Q.     And before going to work at this

25    facility, you had received a degree or a

1  certification to become a nurse practitioner; is that

2  right?

3          A.      Yes.  Both of those, a degree and a

4  certification.

5          Q.      And would you agree that this

6  profession allows you to work in a variety of

7  settings and not just correctional centers?

8          A.      That is correct.

9          Q.      And when you were hired to be a nurse

10 practitioner at Chillicothe Correctional Center, were

11 you provided with any training on your day-to-day

12 work?

13         A.      On my -- I'm sorry.  Can you repeat

14 that?

15         Q.      Your day-to-day work.

16         A.      I would say that is no.  No, I was

17 not.

18         Q.      You weren't provided any training

19 working there?

20         A.      On my day-to-day?  No.

21         Q.      Yes, ma'am.

22         A.      I -- no.  Not on my day-to-day.  No.

23 Not -- not there onsite that's what you're asking me,

24 if I understand correctly.  Is that --

25         Q.      Yes, ma'am.  Sorry.

1          A.      Was there someone onsite that gave me

2     training how to be a nurse practitioner while I was

3     onsite at Chillicothe, that's what you're asking me?

4          Q.      Correct.

5          A.      No.

6          Q.      Yes, ma'am.

7               So when you first started your

8     position there, how did you know what to do every

9     day?

10         A.      Because I am a nurse practitioner and

11    I have been trained.

12         Q.      Well, I mean -- what I mean -- I'm

13    sorry.

14               What I mean by that is, how did you

15    know where to go to get medical equipment or to go

16    see patients or where to put test results, etcetera?

17         A.      I would ask.  Okay.  Let me --

18         Q.      So who did you first -- who did you

19    first report to on your first day?

20         A.      Okay.  So the medical -- the onsite

21    medical director and for some reason her name escapes

22    me.  She wasn't there very long.  I think she left in

23    August.  So the medical director that was there, I

24    spent -- I did spend my first 30 days watching her

25    interactions with patients, is that what you're

1    asking me?

2              Q.      Yes, ma'am.

3              A.      Okay.

4              Q.      And was she also an employee of

5    Corizon?

6              A.      Yes.

7              Q.      Did you ever have to shadow anyone who

8    was an employee of DOC?

9              A.      No.

10             Q.      Did your work --

11             A.      Well -- well, let me back up on that.

12   I did not have to shadow, however, one of the

13   sergeants did come and take me on a tour of the

14   grounds, yes.

15             Q.      Okay.  And did you ever -- did your

16   work ever interact with the -- did your day -- I'm

17   sorry.  Strike that.

18                     Let me rephrase here.  To your

19   knowledge, who provided you with the medical

20   equipment that you needed to use on your job each

21   day?

22             A.      The Department of Corrections supplied

23   me with my badge, my badge number and the keys that

24   were issued to me upon entering the facility and gave

25   me access to the medical department, that was the

1  Department of Corrections and if it's -- if I'm not

2  mistaken, it's the Department of Corrections that

3  also supplied all of the supplies that I used on

4  pretty much a daily basis to see patients, the

5  equipment, the supplies.  You know, cotton swabs,

6  Band-Aids®, whatever, as well as the facility itself.

7       Q.     So that's your knowledge -- to your

8  knowledge --

9       A.     Yes, to my knowledge.

10      Q.     -- it's the Department of Corrections

11 that supplies all that?

12      A.     Yes.

13      Q.     Okay.  And you said earlier that you

14 -- to begin -- to begin your employment, there had to

15 be a background check before you could enter the

16 grounds; is that right?

17      A.     Yes, that's my understanding.

18      Q.     And could you elaborate a little bit

19 more on what you mean by "background check"?

20      A.     I mean checking my credentials and

21 checking my background as far as a criminal history,

22 anything like that, my educational history, my work

23 history, those types of things, and my licensure

24 history.

25      Q.     And -- and do you know who evaluated

1    this?

2              A.    No, I do not.

3              Q.    And then you also had to go through

4    scanners each day to enter the facility, did you not?

5              A.    Yes, I did.

6              Q.    And everyone had to go through the

7    scanners to enter into the facility; right?

8              A.    To my knowledge, that is correct.

9              Q.    And when you were paid, where did your

10   paycheck come from?

11             A.    I -- it came from Corizon.

12             Q.    Okay.  And who were your employment

13   benefits through?

14             A.    Through Corizon.

15             Q.    And whenever you needed to ask off

16   work who did you have to request this from?

17             A.    From the administrator of the clinic

18   which is Corizon.

19             Q.    And I remember you said earlier that

20   your scheduling was controlled by a woman named

21   April; is that right?

22             A.    For a period of time, yes, that is

23   correct.  My patient's schedule.

24             Q.    And what was her -- what was her

25   title?

1     A.     She was actually the x-ray technician.

2     Q.     And she was a medical provider or

3 someone who was also employed with Corizon?

4     A.     Yes, she was employed with Corizon.

5     Q.     Okay.  Now, I wanted to look back at

6 Exhibit 1, your original complaint if we could go

7 there briefly.

8            Referring back to, I believe it was 7

9 through 9, was your draft of your complaint.

10           MR. NUGENT:  Rachel, I want to make

11 sure we're talking about the same thing.  Pages 7

12 through -- 7, 8, and 9.

13           MS. JAG:  Oh, I'm sorry.  Yeah --

14 Exhibit -- Exhibit 1, I believe, isn't it 15 pages?

15           MR. NUGENT:  The exhibit may be, but

16 specifically I think you're referring to her

17 discrimination complaint; is that right?

18           MS. JAG:  Yeah, that is right.  I'm

19 sorry.

20           MR. NUGENT:  That's okay.

21 BY MS. JAG:

22     Q.     And going down roughly to -- I think

23 we're at the top of Page 8, beginning there -- or I'm

24 sorry.  I want to go down to the last paragraph,

25 Page 8.

1          You said you began to feel uneasy and

2   you felt that there was unwarranted watchfulness; is

3   that right?

4          A.     That is correct.

5          Q.     And this came from DOC custody

6   officers?

7          A.     That is correct.

8          Q.     Do you know the identity of any of

9   these DOC custody officers?

10          A.     One such officer would be Officer

11   Ellis, who was the first officer that I would see

12   upon entering the facility.

13          Q.     Were there any other officers or was

14   it just Officer Ellis?

15          A.     No, there were other officers, but I

16   do not recall their names.  They were the officers

17   primarily assigned to medical during the day, and

18   there were one or two in ASAG that were assigned to

19   administrative segregation unit, where I saw patients

20   once a week or once every other week.

21          Q.     And what did they do that made you

22   feel like they were unwarrantedly watching you?

23          A.     I -- as I would bring my belongings in

24   to set them through the scanner, there was quite a

25   bit of attention paid to what was in my -- in my bag

1  to the point in calling out the items that show up on

2  x-ray.

3          However, I personally witnessed and

4  I'm sure it's on video somewhere, if someone would

5  like to pull it up, that during the same time there

6  was another Caucasian female that usually arrived at

7  work about the same time I did.  And he would

8  literally turn his back to the scanner as her

9  belongings went through.  That's a little

10  discriminatory -- or no, that is discriminatory, let

11  me correct that.

12        Q.    Did you see them -- on any other day

13  that you were working there, did you see them look

14  through anyone else's purses when they were going

15  through the security scanner?

16        A.    Not -- no.

17        Q.    You never saw the security officers

18  looking through anyone else's purses or bags as they

19  were entering the facility?

20        A.    Looking through?  I mean, everything

21  went through the scanner.  How much attention they're

22  paying to the scanner is the question.  That was the

23  difference that I noticed, and calling out the items

24  that were in my bag such as one particular time there

25  was an umbrella and all he could see was spike from

1    the -- the spikes and didn't know what that was, and

2    definitely made it a point to call that out.

3          Q.    And when he looked at your umbrella,

4    did -- was there any follow-up reaction?

5          A.    When he discovered it was an umbrella,

6    then he -- you know, we continued on -- I continued

7    on.

8          Q.    And so that was one instance, were

9    there any other instances like that?

10          A.    It was a routine practice to make sure

11    that there was close attention paid to the -- to my

12    belongings.  The lady that usually entered the

13    facility approximately the same time I did every day,

14    I watched -- I watched this go on, where her bags

15    just kind of went through, while he's having

16    conversations with other people, but when it's time

17    for my bag to go through, he is intent and alert, and

18    focused on the x-ray machine.

19          Q.    Do you know the identity of the woman

20    who you said goes through regularly -- or did go

21    through regularly every day?

22          A.    She was one of the -- she was one of

23    the folks that worked over in the mental health area.

24    I don't remember her name.

25          Q.    Did you ever report when you felt

1    uneasy or that you felt watched, did you ever report

2    that to anyone?

3              A.     No, I did not.

4              Q.     Why not?

5              A.     I -- I don't have an answer.

6              Q.     Did you -- or at one point -- I'm

7    sorry.  I'm moving back to the paragraph on

8    Exhibit 1.  You discussed that in the final months of

9    your employment, you watched some of the officers

10   huddle together and spying on you.  Could you

11   elaborate a little bit further about that incident?

12             A.     I'm not sure which incident -- are you

13   referring to an incident on the complaint?

14             Q.     Yes, ma'am.  On Page 8, the last

15   paragraph, and it's kind of in the middle.

16             A.     That particular day, I was seeing

17   patients in ASEG, in administrative segregation, and

18   there were -- and I -- which I had done for some time

19   during my employment there.  This particular day

20   there were five or six, what they call, white shirts

21   right outside the exam room, and there was one right

22   at the doorway, and if I moved to listen to my

23   patient's lungs, they moved where they could see.

24   They were -- it was -- it was made obvious that they

25   were watching every move that I made.  It was just

1    obvious, but I was there to do a job.

2            Q.    And your patient was an inmate; is

3    that right?

4            A.    That is correct.

5            Q.    And moving further down into the

6    paragraph, you -- and you also discussed this

7    earlier, I believe.  You discussed some custody

8    officers coming in to patient appointments sometimes

9    when the door was closed.  Roughly how often did that

10   happen?

11           A.    The time that I'm referring to

12   specifically here, this particular time, there was no

13   knock, no warning.

14                 If it was count time, they would, of

15   course, knock and open the door, or crack the door,

16   but this particular day, I guess they just felt that

17   they -- that wasn't -- that did not happen, I'll put

18   it that way.  That did not happen.

19                 And before I knew it, there was a

20   custody officer standing in the office almost next to

21   me while the patient is disrobed and I'm in the

22   middle of an exam.

23           Q.    And did he say why he was there?

24           A.    I believe he wanted to know -- I don't

25   specifically recall, but I believe he wanted to know

1    what the patient's name was.

2           Q.     And you said he came in without

3    knocking?

4           A.     Correct.

5           Q.     Okay.  Now, during your employment

6    with Corizon at the Chillicothe Correctional Center,

7    did you make friends or have any type of friendly

8    relationship with any of the Department of

9    Corrections employees?

10          A.     I was cordial.  I don't know -- I

11   mean, it was a working relationship.

12          Q.     Did you have to interact with them

13   often, other than just them bringing the patients to

14   you, the inmate patients or you going through

15   security?

16          A.     Ask that question again, please.

17          Q.     Other than walking through security in

18   the morning or the officers bringing patients to you,

19   did you ever have to work with or interact with those

20   individuals?

21          A.     There were individuals assigned to

22   medical that I interacted with on a daily basis.  I

23   don't remember their names, but....

24          Q.     Okay.  Well, we can move on to our

25   discovery.  Do you have responses to our discovery

1  requests and I would like to label that, I guess,

2  Exhibit --

3            MS. JAG:  What was the highest number

4  that we went to?

5            THE REPORTER:  We marked up to 25, so

6  do you want me to mark this 26?

7            MS. JAG:  That'd be great, if you

8  don't mind.

9            THE REPORTER:  No problem.

10       (Whereupon, LaBlance Deposition Exhibit

11        Number 26 was marked for identification

12        by the reporter.)

13 BY MS. JAG:

14       Q.    I just briefly want to touch on this.

15 Going back to your responses to our interrogatories.

16 I just wanted to clarify, to Question 8, when we

17 asked if you could identify any and all individuals

18 whose actions subjected you to discrimination based

19 on your race, a hostile work environment based on

20 your race, and retaliated against you and with

21 respect -- and with respect to such individuals state

22 the following.

23            And we asked for the name of the

24 individual, the date of any action or statement that

25 subjected you to such racial discrimination, racial

1  harassment and retaliation, and identify any

2  documents related to the action.

3          You mentioned in here that you were

4  subject to systematic targeting and suffered

5  treatment at the hands of DOC staff, can you

6  elaborate a little bit more as to what you mean on

7  that?

8      A.    Well, one such example is -- of the

9  targeting is when I speak of coming through the x-ray

10  that was such targeting.

11         There were -- then there's the -- you

12  know, the incidents of sort of -- not sort of, but

13  where there was an increased watchfulness of what I

14  was doing during appointments with patients in my

15  office, or if I was in my office alone.

16         There were times -- there was one

17  particular time that one of the officers brought by a

18  new hire that was a custody offer -- officer, and

19  pointed to me -- they were standing in the hall and

20  said, "that's her right there."

21         I never looked up from my computer,

22  but I heard what they said.  So it was like I was on

23  display or something of that nature.

24         Making sure that if I was leaving,

25  that I was not leaving the facility without being

1  escorted.  All of a sudden just somebody would appear
2  out of nowhere walking on the same sidewalk.  I don't
3  know where they came from.
4              Out in the yard where everything else
5  had been shut down, you know, there was no one else
6  on the yard but me leaving the facility.  Things like
7  that would occur.
8        Q.    There's a little bit to unpack there,
9  that I wanted to discuss first, in regards to the
10  scanner incident, that happened one time with the
11  umbrella, was there any other time or how often, if
12  it happened multiple times, would you say that you
13  had that incident with the scanner and with officers
14  as you entered the facility?
15        A.    I would say, not necessarily calling
16  out what was in my bag, but the watchfulness with
17  which my bag was examined under x-ray was a
18  deliberately more intent -- more intensive or -- I
19  would say intensive than it was others, because I
20  could watch them if they went in front of me, I can
21  watch how things were happening and then what
22  happened as -- as I went through.
23        Q.    Do you normally carry a big purse or
24  is it a small purse?
25        A.    I carried a bag, it was a see-through

1    bag which we were required to have to carry my

2    personal items in and out of the facility.

3            Q.    And everyone has to put their items on

4    the scanner; is that right?

5            A.    That's my understanding, yes.

6            Q.    Okay.  And moving on to what you were

7    saying before about when they were showing a new hire

8    around, and you said that they pointed you out at

9    some point when you were sitting behind a computer;

10    is that right?

11            A.    Yes.

12            Q.    And did you ask for clarification as

13    to why they were pointing at you?

14            A.    No, I did not.  There wasn't --

15            Q.    Did you know the -- the officer that

16    was walking the new hire around?

17            A.    It was one of the officers that had

18    been there.  I couldn't tell you exactly which one it

19    was at this time, but it wasn't a situation where,

20    "Oh, I want to introduce you to this person"; it was

21    more or less "that's the one we're talking about."

22    Yeah.

23            Q.    And did you hear him say those exact

24    words?

25            A.    Yeah.

1              "That's her there."

2       Q.      And lastly, you mentioned someone

3  walking you out to your car, is that -- you

4  mentioned, you said, people were watching you as you

5  exited the building?

6       A.      Not out to my car, but from medical to

7  the airlock, while I was on the grounds.  It just

8  seemed like someone just always appeared.

9       Q.      Would you agree that maybe they were

10  doing that for your safety?

11      A.      No.  There was no one else out.  And

12  they didn't say they were doing that for my safety.

13      Q.      Did they -- did they ever speak to you

14  when they came and walked outside with you?

15      A.      No.

16      Q.      Then I'd like to go back to your

17  interrogatories and move down to Number 16, if you

18  will.  In this question we asked you to identify

19  every other person who you believe that the

20  Defendant, being us, the Missouri Department of

21  Corrections, or our agents/employees discriminated

22  against, retaliated against, or created a hostile

23  work environment for, and to talk about the details

24  of these alleged incidents, when they occurred and

25  any witnesses that you know witnessed those events.

1          You said there were individuals who
2   worked in the kitchen area of the facility where you
3   worked, you suffered the same treatment; is that
4   right?
5          A.    What I know about the female -- the
6   African-American female officer that worked in the
7   kitchen and she was the only one.
8          Q.    And what about her treatment was the
9   same as your treatment?
10          A.    She was the only one.
11          Q.    The only one what?
12          A.    African-American.
13          Q.    Okay.  And did you talk with her
14   often?
15          A.    No, I did not.
16          Q.    Did she express to you that she had
17   been feeling discriminated against?
18          A.    I can say that -- that those words
19   were not -- were not used.
20          Q.    And you said that you're aware of
21   further employees -- or I'm sorry.
22          You were aware of other employees at
23   other DOC sites who have suffered racial injustice,
24   and I then -- and then I think maybe there was a
25   break in the sentence there, but could you elaborate

1    on that a little more?

2            A.      Those were situations that I had read

3    about or had been told about on others -- at other

4    facilities that were related to the Missouri

5    Department of Corrections.  Which just sort of

6    bolstered or reaffirmed that there is a culture in

7    the Missouri Department of Corrections that is

8    consistent with systemic racism and discrimination.

9            Q.      Okay.  And -- but did you know any of

10   these individuals personally?

11           A.      Personally, no.

12           Q.      Did they ever work with you at any

13   point at the Chillicothe Correctional Center?

14           A.      No.

15           Q.      And do you remember roughly a timeline

16   of when you saw that these events occurred?

17           A.      You know, it was -- I'm not a hundred

18   percent sure of that timeline, I would have to go

19   back and find that information for you.

20           Q.      And you said you believed you saw it

21   from the news; is that right?

22           A.      That I -- yeah.  Yeah.

23           Q.      And I'm going to be wrapping up here

24   shortly.  I just have a couple quick follow-up

25   questions.

1               When you mentioned earlier that you

2     resigned, who did you turn your resignation in to?

3          A.     I turned it in to Sterling Ream.

4          Q.     Did you ever have to give a copy of

5     that resignation letter to anyone at DOC?

6          A.     No, I did not.  I don't believe I did.

7          Q.     And you reviewed and signed off on

8     your responses to our interrogatories; is that right?

9          A.     Yes.

10         Q.     And is there anything that you would

11    like to clarify that I have previously already asked

12    about at this point in time?

13         A.     Not at this point in time.

14               MS. JAG:  Then I think I don't have

15    any further questions for now.  Ivan -- or if we

16    could discuss possibly at a later date, if needed

17    after other witnesses, if we could follow-up with

18    additional time I would appreciate it if we could

19    discuss that.

20               But other than that, I will pass along

21    the opportunity to Ivan.

22               MR. NUGENT:  Great.  If it's okay with

23    everybody I'd like to take just 30 seconds to make

24    sure I've got all of my questions in -- in order.

25               THE VIDEOGRAPHER:  We'll go off the

1    record at 5:44 p.m.

2                         (Brief recess taken.)

3                    THE VIDEOGRAPHER:  Stand by.

4                    We are back on the record at a 5:53

5    p.m.

6                         EXAMINATION

7    BY MR. NUGENT:

8         Q.    Ms. LaBlance, it's now my opportunity

9    to ask you some follow-up questions based on

10   questions of Mr. Matula, who represents Corizon

11   Health, and also Ms. Jag who represents the DOC.

12                    Are you understanding what's now

13   happening in terms of your deposition?

14        A.    Yes.

15        Q.    Okay.  Great.  Well, I'm going to work

16   backwards.  I'm going to start with some follow-up

17   questions about what Ms. Jag asked you about, and

18   then trans- -- transfer into, if you will, questions

19   related to Mr. Matula's examination.  All right?

20                    I need for you to pull Exhibits 7 and

21   8 for me.  And so that Ms. Jag understands where we

22   are, and the record's clear, Exhibit 7 is a packet of

23   documents consisting of acknowledgements by you of

24   various policies of Corizon, and then in the middle

25   of it, specifically, Corizon 242 and Corizon 243, are

1   documents referring to policies and acknowledgments

2   related to the Department of Corrections.

3           Do you see that?

4       A.     Yes, I do.

5       Q.     All right.  Specifically, Corizon 242,

6   whose letterhead is that at the top?

7       A.     That's the State of Missouri,

8   Department of Corrections.

9       Q.     And what is the title of this

10  document?

11      A.     Discrimination, Harassment,

12  Retaliation and Unprofessional Conduct Information

13  Pack -- or Acknowledgment.

14      Q.     Were you required to sign this

15  document?

16      A.     Yes, I was.

17      Q.     And then the substance of it says,

18  "I acknowledge on this date, I have received a copy

19  of the 'D2-11.4 Discrimination Harassment,

20  Retaliation and Unprofessional Conduct Information.'"

21  Whose policy is D2-11.4?

22      A.     That's the Missouri -- the State of

23  Missouri, Department of Corrections' policy.

24      Q.     And so conversely, that is not

25  Corizon's policy, is it?

1         A.     No.

2         Q.     This is not Corizon's document, is it?

3         A.     No, it is not.

4         Q.     Okay.  That's your signature at the

5 bottom?

6         A.     Yes, it is.

7         Q.     Who is Linda Smith, do you know?

8         A.     I -- I do not know.

9         Q.     Fair enough.  And I think this was

10 established, but I want to confirm, June 13th was the

11 beginning of your employment; is that correct?

12         A.     That is correct.

13         Q.     Let's turn to Corizon 243.  This is

14 Discrimination, Harassment, Retaliation and

15 Unprofessional Conduct Information.  And I believe

16 this was also established earlier that this is likely

17 referring to the D2-11.4 referenced on Corizon 242.

18             Do you see that?

19         A.     Yes, I do.

20         Q.     And if you look at the first paragraph

21 under Notification there, would you read that

22 sentence for me?  And I'm going to ask you to read it

23 at a pace that will allow the court reporter to -- to

24 keep up with you.

25             All right?

1          A.     Okay.  "Notification.  This is to

2     notify you that you are covered by the Department of

3     Corrections Procedure D2-11.4, Discrimination,

4     Harassment, Retaliation and Unprofessional Conduct

5     and are expected to be familiar with and adhere to

6     the contents of that procedure.  Violation of this

7     procedure will lead to disciplinary action."

8          Q.     Disciplinary action of you?

9          A.     Correct.

10          Q.     This document goes on to list specific

11     prohibited behaviors.

12               Do you see that?

13          A.     Yes, I do.

14          Q.     It has various responsibilities that

15     you are to follow; right?

16          A.     Yes, it does.

17          Q.     To who you should report those to;

18     correct?

19          A.     Yes, it does.

20          Q.     Was there a chief administrative

21     officer present at the Chillicothe facility that was

22     a Department of Corrections employee that you're

23     aware -- if you know?

24          A.     I am not aware of who that would be.

25          Q.     Okay.  Turn with me to Exhibit 8.  And

1    Exhibit 8 is Bates Number Corizon 478 through 480.

2    Do you see that?

3         A.    Yes, I do.

4         Q.    And this is a memorandum from who?

5         A.    The State of Missouri, Department of

6    Corrections.

7         Q.    Okay.  And then do you see who from at

8    the top, or --

9         A.    Darin Morgan, the acting warden at

10   Chillicothe Correctional Center.

11        Q.    Okay.  And I believe this is related

12   to you disclosing to the Department of Corrections

13   that you knew of an inmate; correct?

14        A.    That is correct.

15        Q.    All right.  The subsequent pages,

16   let's start with the last page and this is your

17   handwriting; is that correct?

18        A.    Yes, it is.

19        Q.    And whose letterhead is that?

20        A.    This is the State of Missouri,

21   Department of Corrections Interoffice Communication

22   Form.

23        Q.    Was it your understanding that this

24   was something that you needed to fill out on their

25   letterhead?

1        A.     Yes.

2        Q.     And how did you come to know that?

3        A.     I was instructed to do so by the

4 administrator, the clinical administrator, Teresa

5 McWhorter.

6        Q.     Okay.  Great.  And we see that you

7 then turn it in to her; is that right?

8        A.     That is correct.

9        Q.     Okay.  And if we look at the next

10 page, which is Corizon 479.

11         Do you see that there?

12        A.     Yes, I do.

13        Q.     What is stamped in the middle of that

14 document?

15        A.     It says "Received," and then there's a

16 date that is hard to read, and then it says, "Office

17 of the warden, Chillicothe Correctional Center."

18        Q.     All right.  And then the first page,

19 which we've already identified as Corizon 478 is in

20 fact the memorandum from the acting warden at the

21 time; correct?

22        A.     That is correct.

23        Q.     And if you look in the second

24 paragraph of his memo, it says, "I am acknowledging

25 that you have acted in accordance with Departmental

1   Policy D2-11.10 Staff Member Conduct by reporting

2   this issue."

3                   And is that policy there, a policy

4   that you were bound to abide by?

5           A.      Yes, it is.

6           Q.      And you were the staff member who

7   reported it; correct?

8           A.      That is correct.

9           Q.      All right.  And he is thanking you for

10  keeping you -- for keeping him informed; is that

11  right?

12          A.      That is correct.

13          Q.      Let's look at the bottom of it, it

14  says "cc" and then read those names for us.

15          A.      "Teresa McWhorter, has; Central Office

16  Personnel/Official File; Personnel/Institutional

17  Working File; File."

18          Q.      Great.  And continuing with this

19  conversation about onboarding, if you will, do you

20  recall Mr. Matula asking you about the -- the warden

21  having concerns about you working at the correctional

22  facility?

23          A.      Yes.

24          Q.      Okay.  And if I recall, to put some

25  context behind it, Mr. -- or the warden at that time

1 contacted Dr. Lovelace and wanted to know essentially

2 how you were authorized to work there; is that a fair

3 assumption?

4          A.     That's correct.  That's my

5 understanding.

6          Q.     Okay.  Dr. Lovelace followed up with

7 you; is that right?

8          A.     Yes, he did.

9          Q.     What did you tell Dr. Lovelace?

10          A.     I sent him a more detailed explanation

11 of the findings of the background report.

12          Q.     Okay.  After you provided those

13 details to Dr. Lovelace, was there any additional

14 questioning of your ability to work at the facility?

15          A.     No.

16          Q.     Okay.  Do you know what Dr. Lovelace

17 did with that information?

18          A.     No, I do not.

19          Q.     Okay.  Is it your understanding that

20 your ability to work in the facility had to be signed

21 off on by the warden?

22          A.     Yes.

23          Q.     All right.  There's been discussion

24 about whether you put certain complaints in writing,

25 whether you talked to somebody orally, and I want to

1   confirm who at Corizon knew that you were having

2   concerns about your employment?

3         A.    The administrator, the clinical

4   administrator, the regional clinical director, so

5   that would be Sterling Ream and Meehan, and then

6   Dr. Lovelace as well.

7         Q.    Okay.  I want to make sure we put a

8   cleaner answer out there.

9         A.    Okay.

10        Q.    The -- let's do it this way:

11              What was Jenny Meehan's title?

12        A.    She was -- she was the regional

13  clinical manager -- or director.

14        Q.    Okay.  And it's your understanding

15  that she knew of your concerns about your employment?

16        A.    Regarding this first issue, is that

17  what you're asking?

18        Q.    I'm not asking you about any

19  particular issue.  I am asking you in general, is it

20  -- is it your understanding that Jenny Meehan knew of

21  your employment concerns?

22        A.    Yes.

23              MR. MATULA:  The question's out there,

24  but I'm going to just try get out in front of other

25  questions like this.

1              Given all the different concerns and

2    incidents that have been testified to, I think it's

3    vague to say that whether someone was aware of

4    employment concerns as to -- to which ones -- I've

5    created a list of specific incidents.  Anyway, just

6    preempting I'm probably going to have a concern with

7    the vagueness of that, if you want to tighten it up

8    or not.

9    BY MR. NUGENT:

10            Q.    And -- and I'll tell you without

11   having to regurgitate everything that Mr. Matula went

12   through, I just want to know -- let's ask it this

13   way:

14              Who did you tell?  I want to get a

15   list of people that you talked to and that you have

16   knowledge of that know that you said, hey, you know,

17   whether it's the scalpel incident or whether it's the

18   -- any of the incidents that you've listed with

19   Mr. Matula, I'm just trying to get an understanding

20   of who knew of any of those.  All right?  And I want

21   you to put their titles behind it.

22              MR. MATULA:  So your question is who

23   knew of any, maybe meaning just one, of anything

24   we've talked about?

25              MR. NUGENT:  Yep.

1              MR. MATULA:  Okay.

2         A.    McWhorter.

3    BY MR. NUGENT:

4         Q.    What's her -- what's her full name?

5         A.    Oh.  Teresa McWhorter.

6         Q.    And what's her title?

7         A.    She was the former has.

8         Q.    Anyone else?

9         A.    Sterling Ream, the has; Jenny Meehan,

10   the regional clinical director; of course, Dr. Jerry

11   Lovelace, the regional medical director; Karen

12   Epperson, the onsite medical director.  Gosh, I can't

13   think of her name.  There was -- I'm bad with

14   names -- then, of course, family, friends,

15   physicians.  Yeah.

16              MR. NUGENT:  Nothing further.

17                 FURTHER EXAMINATION

18   BY MR. MATULA:

19        Q.    I have a couple punch list items.

20   This is Mike Matula again.

21              You were just asked questions about

22   people who knew about concerns regarding your

23   employment, and gave a list of several people.  You

24   -- is it your testimony that you expressed to each of

25   the people on that list all of your concerns that you

1   ever had?

2         A.     Not all of my concerns that I ever

3   had.

4         Q.     Okay.  And I'm talking about concerns

5   about your employment.  And we've been here all day,

6   and we've got a record of who -- I tried to get a

7   record of who you told about what specific incidences

8   and what things were told to certain people.

9               I just wanted to clarify, you weren't

10   suggesting you told every single person on the list

11   every single thing we've talked about today?

12         A.     No.

13         Q.     Do you -- do you still have a copy of

14   your resignation letter?  Electronically on a

15   computer somewhere?

16               MR. NUGENT:  I'm going to object to

17   form.

18         A.     Yes.

19   BY MR. MATULA:

20         Q.     In terms of the -- one of the

21   employment concerns that you had, was how various

22   people acted towards you which you -- you now believe

23   were because information concerning your -- your

24   criminal history got out and then people started

25   looking at you and acting differently towards you.

1  Is that -- is that one of the concerns you have --

2  had?

3          A.     The biggest concern in that was that

4  someone deliberately took the time to try and find

5  information or dug up dirt, shall we say, for lack of

6  a better term, on me specifically.  It was an

7  intentional act against me.

8                  They didn't ask me about it.

9          Q.     And I guess, you don't know exactly

10 how the genesis of what happened to -- that led up to

11 whoever accessing those records or how that word got

12 out; right?

13                 MR. NUGENT:  Object to form.

14         A.     I -- I am not a hundred percent sure,

15 but it has been told to me that one of the custody

16 officers is married to a nurse, gave this information

17 to the nurse whenever that occurred, and things went

18 from there.

19 BY MR. MATULA:

20         Q.     And which custody officer was that?

21         A.     That was Stuever.  I don't know his

22 first name.

23         Q.     And would you have any idea about how

24 Officer Stuever would have known about anything about

25 your criminal past?

1        A.        I don't know how he knew.

2        Q.        Who told you that?

3        A.        Who shared that information with me, I

4   believe, was Shannon Burris.

5        Q.        I think earlier today, and then also

6   in Ms. Jag's testimony, at -- at some point, you used

7   the term "systemic racism."  And I just want to make

8   sure we're on the same page, what is your definition

9   of systemic racism?  When you use that term what do

10  you mean to convey?

11                 MR. NUGENT:  Object to the form.

12                 You can answer.

13       A.        When I use that term, what I mean, I'm

14  referring to the -- the embedded or innate policies,

15  procedures, beliefs and actions of those who would

16  make things difficult for people of color in areas of

17  employment, education, you know, it creates

18  disparities in healthcare, and it's just a system

19  that is not pro diversity.

20                 And it seems to -- no, it's not that

21  it seems to be.  It is a -- an American cultural

22  travesty that we as African-Americans have had to

23  deal with.  It's there.

24                 What it does in addition to creating

25  more disparities --

1          MR. MATULA:  I -- I don't want to cut

2     you off.

3          MR. NUGENT:  You asked, Mike.

4          MR. MATULA:  I didn't ask what it

5     does.  She can go on and on.  I'm just asking for her

6     definition.  If she wants to tell me what it is, I

7     guess we can take up more of the record, but it's

8     beyond my question.  But if you want to --

9          A.     Well, I think that -- I think that,

10    just that in there, that particular reaction is part

11    of the reason why it -- it continues to exist today.

12    Is because people don't want to understand what it

13    does, how it manifests and how it affects those that

14    it's targeted -- that it's directed towards.  It's --

15    it's -- it's bad.  It's really, really bad.  I said

16    that to be -- but it is -- it can be devastating.  It

17    can be devastating.

18    BY MR. MATULA:

19         Q.     You referred in your answer a moment

20    ago, "that particular reaction," what are you -- when

21    you said "that particular reaction," what are you

22    referring to?

23         A.     Well, you put your hand up like this,

24    as if I don't want to hear what you have to say; that

25    was my perception of what you just did.

```
 1         Q.      Do you think when I did that that I
 2    was acting in a racist manner towards you, Ma'am?
 3                  MR. NUGENT:  Objection to the form.
 4         A.      I think it was dis- --
 5                  MR. NUGENT:  We've gotten -- we've
 6    gotten out of bounds now.
 7                  MR. MATULA:  No.  No.  No.  She just
 8    accused me of my mannerism, Ivan.  She just said that
 9    particular reaction was part of the problem, so I
10    think I'm entitled to explore what she meant by that,
11    and it might also play into how she perceived actions
12    at work, frankly.
13                  MR. NUGENT:  I'll object to form.
14    BY MR. MATULA:
15         Q.      Ma'am, I'm going to ask -- I'm going
16    to ask you this:
17                  Whether -- well, let's start with
18    that.
19                  Do you believe that me trying to stop
20    your answer that was beyond the scope of my question
21    at 6:15 tonight, by doing that, that I was acting in
22    some sort of racially inappropriate manner towards
23    you?
24         A.      I did not say that.
25                  MR. NUGENT:  Object to form.
```

1    Continuing objection.

2                    MR. MATULA:   That's fine.

3          A.    I didn't say that.

4    BY MR. MATULA:

5          Q.    So what did you mean by "that

6    reaction"?  You're talking about the gesture that I

7    did.

8          A.    Yeah, that you did not want to hear

9    what I had to say.

10          Q.    Right.

11          A.    Yes.

12          Q.    So was that some -- how did that tie

13    into systemic racism?

14          A.    Because -- because oftentimes what I

15    have encountered is people don't want to hear what

16    you have to say, that's how I was tying that in.  It

17    wasn't a personal attack on you.  It was a statement

18    of my experience that I've had.  It wasn't a personal

19    attack on you.

20          Q.    Okay.  Because I have -- I know it's

21    been a long day, but --

22          A.    Yeah.

23          Q.    -- I hope I --

24          A.    It was not a personal attack.

25          Q.    -- I have not done anything through my

1    questions or anything else that you have taken as

2    some sort of attack on you.  That's not my intent.

3           A.    And I can assure you that I have not

4    felt your questions were an attack on me or racist.

5           Q.    Fair enough.

6           A.    Yes.

7                 MR. MATULA:  I don't have any further

8    questions at this time.

9                 MR. NUGENT:  Ms. Jag?

10                MS. JAG:  Yes.  Mike, are you

11   finished?

12                MR. MATULA:  I am.

13                MS. JAG:  Okay.

14                  FURTHER EXAMINATION

15   BY MS. JAG:

16          Q.    I only have just a couple questions.

17                You agreed earlier, Ms. LaBlance, that

18   your profession allows you to work in a variety of

19   settings; is that right?

20          A.    That is correct.

21          Q.    And by working at a prison, your --

22   would you agree that you're in a position of

23   authority over some inmates in what you're doing?

24   Let me rephrase.

25                Would you -- would you say that you

1    are in a special position as a nurse practitioner in

2    your day-to-day duties when you are doing your work

3    with the inmates?

4            A.      I don't know what you quite mean by "a

5    special position."

6            Q.      Meaning it's not like you're in a

7    normal hospital environment, would you agree?

8            A.      My interact- --

9            Q.      The patients -- I'm sorry.  Go ahead.

10           A.      My interaction with my patients -- my

11   goal -- my goal there, my job there, was to address

12   their health issues as that would be my goal and my

13   job in any setting that I'm -- that I'm in.  And I --

14   that was what I did, and that did not change for me

15   whether I'm in that setting or another setting.  My

16   purpose is to provide quality care to those who need

17   it.

18           Q.      Okay.  And would you say that any

19   Department of Corrections' custody officers, did they

20   do the same duties that you did in taking care of

21   these inmates?

22           A.      No.  It was not the same job.

23           Q.      And you said that when you were hired

24   you were hired through Corizon; is that correct?

25           A.      I was recruited through Corizon,

1  offered the job and cleared through the State and the
2  Department of Corrections.
3      Q.    Okay.  And you mentioned before, I
4  believe, it was in Exhibit 7, that there were some
5  policy acknowledgments that the Department of
6  Corrections asked you to sign off on; is that right?
7      A.    Yes.
8      Q.    Other than that, during your tenure at
9  Chillicothe Correctional Center, were you issued
10 anything else by the Department of Corrections that
11 controlled your daily actions as a nurse
12 practitioner?
13     A.    Yes.
14     Q.    Would you elaborate on that?
15     A.    Yeah.  I was issued my badge, my I'd
16 badge, that allowed me entrance into the facility, I
17 was assigned an employee number, which allowed me
18 entrance into the lockbox where the keys to my office
19 doors and the medical department overall, those were
20 issued to me on a daily basis, with that I'd number
21 that I was given from the Department of Corrections.
22 My employee I'd number.
23     Q.    I'm -- I'm sorry.  What did you say?
24 You cut out there.
25     A.    I said my employee I'd number issued

1  by the Department of Corrections.

2          Q.    Okay.  And you also discussed that

3  there was a memo sent to you from the acting warden,

4  Darin Morgan, regarding an inmate named Teresa

5  McWhorter; is that right?

6          A.    No, that is not correct.

7          Q.    Not Teresa McWhorter.  There was

8  another inmate.  I'm looking at the name.  I'm sorry.

9  Could you -- could you refresh my memory on the name?

10         A.    The name here, Annette Davis.  I

11 believe is who you're referring to.

12         Q.    Yes.

13         A.    Okay.

14         Q.    And what is your understanding of the

15 reason why you were issued this memo?

16         A.    I was issued this memo as receipt of

17 the correspondence that I sent in compliance with the

18 policy that states if any inmate is known to you, you

19 must make them aware of this -- this -- who this

20 person is.

21         Q.    Okay.  And would you agree that

22 following that policy is likely out of concern for

23 public safety?

24               MR. NUGENT:  Objection to the form.

25               You can answer if you know.

1      A.    I -- I don't know.  How would -- ask

2   that question again, or no?

3   BY MS. JAG:

4      Q.    Would you agree that having to follow

5   such policy is based out of concern for public

6   safety?

7           MR. NUGENT:  Same objection.

8      A.    Concern for public safety?  I don't

9   know if that is -- I don't know if that is the

10  reason.

11  BY MS. JAG:

12     Q.    Okay.  Well, we can just move on from

13  that, then.  And then lastly you said it was your

14  understanding that the warden had to sign off on you

15  working at that facility; right?

16     A.    That is correct.

17     Q.    And you said it wasn't brought up

18  again after that?

19     A.    Not directly to -- no, not to my

20  knowledge.

21     Q.    And what was the reason that you

22  believe this was brought up to the warden?

23           MR. NUGENT:  Object to form.  Calls

24  for speculation.

25  BY MS. JAG:

1        Q.    Your understanding that the warden had

2 to sign off on you working there, why did you think

3 someone had to ask the warden for permission to have

4 you work at that site?

5        A.    Because he's the warden.

6        Q.    Did they have to do that all with

7 other employees?

8        A.    I do not have -- I -- I don't know.  I

9 would assume so.

10        Q.    You stated -- you stated earlier that

11 you have a criminal record; is that right?

12        A.    That is correct.

13        Q.    Would you agree that there is a

14 possibility the warden needed to sign off on you

15 working at the Chillicothe Correctional Center due to

16 that record?

17        MR. NUGENT:  Object to form.  Calls

18 for speculation.

19        THE WITNESS:  Do you want me to answer

20 that?

21        MR. NUGENT:  If you know.

22        A.    I -- I don't agree with that.  I would

23 think that he would need to sign off on everyone that

24 came in to work there.  I would think.

25 BY MS. JAG:

1    Q.    But you don't know the process of

2 which --

3    A.    No, I do not.

4    Q.    -- that anyone in -- okay.

5         Do you know the process of -- I'm

6 sorry.  Let me scratch that.  I'll rephrase.

7         Do you know the hiring processes of

8 the warden to allow any of the medical practitioners

9 to work at Chillicothe Correctional Center?

10    A.    No, that wasn't part of my job

11 description.

12    Q.    Okay.

13         MS. JAG:  And I believe I have no

14 further questions at this time.

15         MR. MATULA:  I don't have any more

16 questions for the witness.

17         MR. NUGENT:  Neither do I.

18         THE VIDEOGRAPHER:  That will conclude

19 this deposition at 6:26 p.m.

20         (Off video record.)

21         MR. MATULA:  I had previously marked

22 Exhibits 3, 16, and 23, I did not have any questions

23 for the witness about them, but rather than retaining

24 them, or withdrawing them, Mr. Nugent and I have

25 discussed just including them in the deposition

1  record, so that we can keep the record without holes
2  in the numbering, and they can be identified or used
3  by other later witnesses if need be.
4                    And Rachel, for your record, Exhibit 3
5  is Bates Numbered Plaintiff LaBlance 50.
6                    Exhibit 16 is Corizon 989.
7                    And Exhibit 23 is a conglomeration of
8  Ms. LaBlance's W-2 statements, and I can't even read
9  all the Bates Numbers, you'll just have to see it on
10  the exhibit.
11                    THE REPORTER:  Do you want her to read
12  and sign?
13                    MR. NUGENT:  Yes, please.  Read and
14  sign.  Thank you.
15                    (Deposition concluded at 6:28 p.m.)
16
17               S T I P U L A T I O N
18
19                    It is hereby stipulated and agreed by
20  the parties hereto through their respective counsel,
21  that the presentment of this deposition to the
22  witness for examination and reading, as provided in
23  Rule 57.03, Missouri Rules of Civil Procedure, is
24  hereby expressly waived.
25

_____

TERRI YOLANDA LaBLANCE

Subscribed and Sworn to
before me this _____ day of _____, 2020.

_____

Notary Public

County of _____

State of _____

TERRI YOLANDA LABLANCE vs. CORIZON HEALTH, INC. AND
MISSOURI DEPARTMENT OF CORRECTIONS

1                           ERRATA SHEET

2    RE:  TERRI YOLANDA LABLANCE vs. CORIZON HEALTH, INC.
     AND MISSOURI DEPARTMENT OF CORRECTIONS
3
     DEPOSITION OF:  TERRI YOLANDA LABLANCE
4
     PG/LN NO.     CORRECTION        REASON FOR CHANGE
5
6    :_____:_____:_____

7    :_____:_____:_____

8    :_____:_____:_____

9    :_____:_____:_____

10   :_____:_____:_____

11   :_____:_____:_____

12   :_____:_____:_____

13   :_____:_____:_____

14   :_____:_____:_____

15   :_____:_____:_____

16   :_____:_____:_____

17   :_____:_____:_____

18   :_____:_____:_____

19   :_____:_____:_____

20   _____ I certify that I have read my deposition in
     the above case and I request that no changes be made.
21   _____ I certify that I have read my deposition in
     the above case and I request that the above changes
22   be made.

23                      SIGNATURE OF DEPONENT:
                         _____
24
                         DATED: _____
25

1                    C E R T I F I C A T E

2

3          I, Laurel A. Woodbridge, a Certified Court

4    Reporter, do hereby certify:

5          That prior to being examined the witness was

6    by me duly sworn;

7          That said deposition was taken down by me in

8    shorthand at the time and place hereinbefore stated

9    and was thereafter reduced to writing under my

10   direction;

11         That I am not a relative or employee or

12   attorney or counsel of any of the parties, or a

13   relative or employee of such attorney or counsel, or

14   financially interested in the action.

15         WITNESS my hand and seal this 9th day of

16   August 2020.

17

18

19         _____

20         Laurel A. Woodbridge RPR-CRR-CSR

21         CCR No. 898 and CCR No. 1327

22

23

24

25

```
 1      IN THE CIRCUIT COURT OF DEKALB COUNTY, MISSOURI

 2                      DIVISION I

 3

 4   TERRI YOLANDA LABLANCE,

 5                    Plaintiff,

 6   vs.                            Case No.

 7   CORIZON HEALTH, INC. AND       4:19-CV-00693-BP

 8   MISSOURI DEPARTMENT OF

 9   CORRECTIONS,

10                    Defendants.

11

12            CERTIFICATE OF REPORTER AND
                  STATEMENT OF FEES DUE
13            FOR THE VIDEOTAPED DEPOSITION OF
                  TERRI YOLANDA LABLANCE
14                TAKEN ON  JULY 8, 2020

15

16   FEES DUE iREPORT SOLUTIONS LLC:

17   $_____ ATTORNEY FOR PLAINTIFF

18   $_____ ATTORNEY FOR DEFENDANT CORIZON

19   $_____ ATTORNEY FOR DEFENDANT DOC

20

21        Upon delivery of transcripts, the above
     charges had not yet been paid.  It is anticipated
22   that all charges will be paid in the normal course
     of business.
23

24
                     Laurel A. Woodbridge RPR-CRR-CSR
25                   CCR No. 898 and CCR No. 1327
```

**[**

**[sic] (4)**
129:23;182:15;
199:18,22

**A**

**abbreviation (1)**
48:5
**abide (1)**
276:4
**ability (11)**
21:2;70:8;160:21,
25;174:18,21;229:14;
236:17;238:3;277:14,
20
**able (12)**
9:22;20:24;30:17;
62:11;71:6,16;72:22;
91:13;189:12;218:1;
227:3;242:15
**absences (3)**
70:17;71:1,7
**absolute (1)**
199:2
**absolutely (4)**
20:15;21:1;43:18;
102:14
**accelerated (1)**
30:14
**acceptance (2)**
158:4;168:14
**accepted (5)**
33:2;71:3;147:17;
196:13,14
**access (3)**
178:15;215:14;
252:25
**accessed (5)**
179:12;180:14,25;
224:5,6
**accessing (2)**
181:7;282:11
**accordance (1)**
275:25
**according (2)**
69:8;74:23
**account (5)**
78:16;97:8,11,11;
143:2
**accurate (27)**
12:6;18:19;20:14;
35:25;46:4,22;48:8,
12,13;55:11;65:19;
69:12;75:24;76:6;
82:17,18;85:9;96:8;
97:23,24;138:22;
139:13;140:6;141:24;
185:20;201:4,14
**accurately (1)**
75:19

**accused (1)**
285:8
**Achievement (1)**
56:4
**acknowledge (2)**
114:3;271:18
**acknowledged (3)**
52:4;53:11;68:10
**Acknowledgement (1)**
52:21
**acknowledgements (1)**
270:23
**acknowledging (3)**
55:6,8;275:24
**Acknowledgment (4)**
50:10;51:6;54:25;
271:13
**acknowledgments (1)**
55:17;271:1;289:5
**across (3)**
91:19;92:25;161:11
**act (8)**
95:9;110:12;132:9;
147:25;152:2,22;
178:19;282:7
**acted (4)**
129:2;158:10;
275:25;281:22
**acting (11)**
67:4,17;68:10;
133:4;210:21;274:9;
275:20;281:25;285:2,
21;290:3
**action (16)**
14:24;70:13,16,22;
105:13;205:19,23;
206:2;207:1,10,12,15;
262:24;263:2;273:7,8
**actions (13)**
94:22,23;101:21;
173:21;181:13;184:6,
9,12;207:18;262:18;
283:15;285:11;
289:11
**actual (1)**
160:24
**actually (42)**
28:12;32:15;34:24;
49:23;52:9;53:9;54:2;
58:17;61:16;66:12,
19;70:7;72:23,25;
74:18,22;76:12;
83:21;84:1;90:7;
101:25;104:1;106:5;
117:20;124:20;
127:25;132:12;
137:21;147:9;164:24,
24;178:22;180:14;
190:21;198:10;
200:13;201:19;202:6;
205:13;243:17;
244:20;255:1
**add (2)**

43:20;154:7
**addition (7)**
75:4;86:14;104:22;
137:18,21;160:24;
283:24
**additional (13)**
17:22;40:7,19;
41:12;42:16;121:17;
211:6,6;213:6;221:3;
245:21;269:18;
277:13
**address (8)**
95:1;104:4;147:16;
154:19;167:11,15;
220:2;288:11
**addressed (8)**
41:7;80:11;92:14;
93:9;103:21;160:25;
206:21,23
**adhere (1)**
273:5
**adieu (1)**
217:14
**admin (1)**
61:2
**administration (2)**
175:8;177:5
**administrative (12)**
32:25;150:2,13;
151:4,14;152:1;
153:1;211:7;241:10;
256:19;259:17;
273:20
**administrator (19)**
33:9,11,18,19;
57:16;61:3;151:7;
166:15,25;172:18,21,
25;207:17;229:7;
254:17;275:4,4;
278:3,4
**administrator's (2)**
91:5,18
**admit (2)**
241:3,5
**admonitions (1)**
47:12
**Advanced (1)**
72:3
**advantage (1)**
227:24
**advice (7)**
158:24;162:24;
163:6;164:9;165:21,
24;166:7,21;167:6
**advise (1)**
201:12
**advised (1)**
210:9
**affect (2)**
160:21;235:25
**affected (6)**
160:23;174:18,19;
235:3;242:17,19

**affecting (2)**
188:14;235:10
**affects (5)**
100:13;174:21;
234:25;242:16;
284:13
**affiliation (1)**
8:15
**affirmed (1)**
35:24
**afforded (1)**
242:15
**afraid (1)**
91:8
**African-American (10)**
82:20;95:1;97:12;
99:7;132:12;133:5;
154:6;221:25;267:6,
12
**African-Americans (1)**
283:22
**afterwards (1)**
158:25
**again (46)**
9:10;15:14;25:3;
35:3;36:16;47:20;
51:10;66:15;67:11;
75:22;92:18;103:10,
11;113:9,18;121:13;
147:19;154:24;
155:14;157:15;
158:18;159:1,5,19,23;
161:7;163:1;166:15;
171:10;172:20;173:3;
174:24;175:2,12;
185:13;200:12;204:6;
234:4;238:5;241:4;
242:25;244:12;
261:16;280:20;291:2,
18
**against (17)**
9:13;101:3;103:20;
162:1;178:20,20;
179:13;194:1;223:21;
226:14;227:15;
236:15;262:20;
266:22,22;267:17;
282:7
**age (1)**
9:4
**agency (2)**
232:11,12
**agents/employees (1)**
266:21
**ago (7)**
38:2;54:1;64:20;
139:5;144:23;239:20;
284:20
**agree (15)**
74:20;80:6;110:16;
111:10;113:14;
160:12;166:5;250:5;
266:9;287:22;288:7;

290:21;291:4;292:13,
22
**agreed (5)**
148:12;155:3;
192:22;287:17;
294:19
**agreeing (1)**
72:16
**Agreement (6)**
72:3,9,11,12;73:5,
10
**ahead (14)**
22:6;34:24;46:25;
66:19;85:15,15;
109:9;135:6;192:22;
195:13;218:4;225:10;
232:2;288:9
**airlock (1)**
266:7
**alarm (1)**
91:20
**alarmed (1)**
93:19
**alarming (3)**
91:9,16;94:3
**alert (1)**
258:17
**allegation (1)**
227:10
**allegations (2)**
226:16;227:15
**alleged (4)**
15:4;207:22;225:6;
266:24
**alleges (1)**
228:15
**allow (5)**
180:15;202:10;
241:11;272:23;293:8
**allowed (5)**
38:19;91:14;
224:23;289:16,17
**allowing (1)**
89:20
**allows (3)**
29:6;250:6;287:18
**alluding (1)**
14:17
**almost (2)**
27:21;260:20
**alone (1)**
263:15
**along (6)**
57:17,20;61:4;
62:18;64:9;269:20
**altered (1)**
159:10
**although (5)**
87:14;163:24;
205:13;225:14,20
**always (2)**
41:21;266:8
**amended (1)**

35:1
America (5)
82:20;97:5;99:19;
100:5;183:4
American (3)
83:18;100:12;
283:21
amicable (1)
64:16
among (1)
97:18
amongst (1)
216:24
amount (1)
107:13
and/or (1)
249:5
Anna (14)
76:10;77:11;79:16,
21;82:15;85:8,20;
86:15;87:19,23;
153:17;205:14;206:6;
244:20
Annette (1)
290:10
another's (1)
171:5
answer (41)
11:24;12:18;13:7,9;
15:6;21:23;46:21;
76:20;80:10;84:13;
86:13;87:8;92:18;
96:10;100:19;104:21;
111:18;116:3;132:2;
134:17;137:7,8;
143:9;145:11;156:24;
185:13;203:21,21;
208:14;227:22;
240:12;241:15;242:5,
22;259:5;278:8;
283:12;284:19;
285:20;290:25;
292:19
answered (4)
92:17;93:1;160:17;
173:7
answering (1)
240:9
answers (3)
11:16;18:5;111:1
answer's (1)
14:20
antenna (1)
74:10
anticipating (1)
186:24
anxiety (1)
234:24
anymore (1)
77:1
apologize (10)
34:13;35:1;66:21;
93:4;105:22;117:5;

135:5;185:14;213:14;
226:8
apparent (1)
114:12
apparently (7)
63:5;69:10;76:10;
172:24;185:1;222:13;
237:11
appear (3)
18:19;229:6;264:1
appeared (1)
266:8
appears (8)
34:21;53:9;74:16,
24;144:5;201:10;
214:1;223:18
application (6)
34:14;35:15,24;
37:14;43:9;69:20
applied (3)
42:2,3,4
apply (2)
47:12;100:11
appointment (2)
125:2;165:4
appointments (2)
260:8;263:14
appreciate (9)
34:9;111:4;115:14;
203:8;218:12;240:19;
245:19;246:10;
269:18
approach (1)
40:3
approached (1)
77:21
appropriate (8)
16:13;80:24;
113:16;151:18;155:6;
207:1;225:2;243:13
approve (1)
38:14
approximate (1)
187:18
approximately (3)
8:9;249:22;258:13
April (35)
115:22,24;153:24;
154:3,7,22;155:23;
158:1,2,3,10,23;
167:22;168:8,14,24;
169:22,22;170:8,14,
17;171:12,13,17,18,
19;172:4;174:24;
176:1,17,18;180:4;
244:17;248:25;
254:21
April's (2)
154:1;159:7
area (9)
88:24;105:3;
112:19;124:18;126:2;
132:16;231:24;

258:23;267:2
areas (1)
283:16
Argumentative (3)
145:10;206:8;
208:13
arm (1)
237:7
around (22)
27:25;50:22;74:5;
81:18;83:23;92:8;
171:18;176:23;
182:18;185:7;195:7;
196:1;216:5;226:6,
24;230:23;235:19;
236:2,13;248:24;
265:8,16
arrived (1)
257:6
articulated (1)
195:2
Arts (1)
222:11
ASAG (1)
256:18
ASEG (1)
259:17
aside (1)
161:24
as-needed (1)
61:1
aspects (2)
43:11;64:8
assassinate (1)
185:9
assigned (9)
157:1,2;169:23;
226:3;248:2;256:17,
18;261:21;289:17
assigning (1)
169:17
assignments (1)
195:6
assist (6)
150:1,3,13;151:6;
157:1;158:18
assistance (1)
65:19
assistant (5)
32:10;33:8;151:16;
237:6;249:9
assistant/advanced (1)
28:24
assistants (8)
153:1,2;208:1;
209:5,15;210:20;
211:8;241:10
assisted (1)
158:15
assisting (6)
127:21;149:20;
152:2;153:10;165:10;
167:23

associate (1)
244:13
associated (2)
25:23;174:1
assume (8)
11:14;20:12;69:16;
86:5,15;128:22;
134:10;292:9
assuming (3)
48:4;118:10;167:1
assumption (4)
86:15;111:20;
167:3;277:3
assure (2)
95:7;287:3
atmosphere (1)
195:23
attached (1)
18:9
attack (5)
286:17,19,24;
287:2,4
attempt (1)
155:4
attempted (1)
126:5
attend (2)
58:24;59:15
attendance (1)
71:15
attended (2)
59:1,24
attention (6)
156:14,15;168:25;
256:25;257:21;
258:11
attest (1)
114:12
attitude (2)
156:14;176:5
attorney (8)
9:11;18:16;25:13;
223:3,8;228:3;
243:17;244:7
attorney's (1)
10:14
attribute (5)
172:4;181:12;
184:11;191:13;
239:12
audible (1)
12:13
audio (2)
215:25;217:1
August (8)
30:10;74:18,22,25;
75:13;79:8,16;251:23
aunt (1)
171:7
authored (1)
90:8
authority (2)
38:12;287:23

authorizations (2)
246:14,19
authorized (2)
31:23;277:2
automatic (1)
94:17
automatically (2)
101:6,11
available (7)
62:21;72:17;
125:13;150:1,12;
217:2,4
award (1)
234:12
aware (39)
42:16;68:9;78:17;
86:1,6,19;102:9;
114:11,20;121:4;
147:3;154:19,19,24;
175:8;180:1;209:1;
214:3,4;220:13,16;
222:23;223:20,24,25;
224:2,15;229:7;
231:25;239:9;267:20,
22;273:23,24;279:3;
290:19
away (5)
11:22;189:10,14;
190:12;228:9
awhile (1)
231:7

B

baby (1)
170:6
bachelor's (2)
30:15,23
back (94)
17:9,21;24:15;35:6;
36:12;38:2;46:10;
47:7;51:1;54:21,22,
23;65:22;66:14;
67:17;73:15,19,20;
77:8,18;82:5,13;85:6;
87:10;88:10;93:24;
98:5;103:10,11,11;
104:9,23,23;105:1;
106:6,13,14;109:10;
112:19;117:14;
121:23;122:10,16;
123:4,13,15,19;
124:15,19,19;125:8;
126:5;130:19;135:20;
149:9;158:17,25;
159:6,9;161:19;
180:19;183:2,2,3;
184:15;189:2,24;
195:5;201:7;210:5,8;
216:19,22;222:18,22;
223:1,17;236:10,10;
237:12,15;243:10;

246:14,20;247:10;
252:11;255:5,8;
257:8;259:7;262:15;
266:16;268:19;270:4
**backed (1)**
189:13
**background (20)**
28:7;30:19,20;
31:24;36:4;39:22;
40:23;41:9,13;42:20;
45:12;46:17;47:18;
48:16;69:3;175:16;
253:15,19,21;277:11
**backwards (2)**
229:23;270:16
**bad (12)**
41:23;70:15;135:6;
165:21;169:20;
171:16;176:14;
194:20;245:11;
280:13;284:15,15
**badge (4)**
252:23,23;289:15,
16
**bag (11)**
111:13,24;116:22;
125:5;256:25;257:24;
258:17;264:16,17,25;
265:1
**bags (2)**
257:18;258:14
**Ballpark (2)**
23:7;127:14
**Band-Aids® (1)**
253:6
**barged (1)**
172:6
**barges (1)**
177:1
**Barker (24)**
76:10,18;77:11;
80:5,19;81:4;82:15;
85:8,21;86:10,15;
87:20,23;103:12;
109:3,22;153:5,13,14,
15;182:15;205:14;
206:6;244:21
**barring (1)**
71:11
**based (17)**
14:10;16:17;69:19;
80:18,23;85:15;
100:7,14;101:12;
138:21;182:3;244:15;
245:24;262:18,19;
270:9;291:5
**basically (3)**
68:10;160:2;179:15
**basis (15)**
61:1;72:24,24;
95:16;108:16;169:6;
182:24;198:20;
231:25;235:23;

249:21,23;253:4;
261:22;289:20
**Bates (21)**
34:16,17;50:18;
54:14;67:1;70:12;
72:1;73:25;89:4;
112:8;138:8;150:19;
199:19;212:25;213:1;
217:4,8;226:1;274:1;
294:5,9
**battle (1)**
101:2
**became (7)**
29:17;78:17;130:2;
150:1;151:11;159:16;
169:23
**become (8)**
29:11;59:23;97:9,9;
101:6;150:11;183:9;
250:1
**becoming (1)**
45:15
**began (12)**
37:20,25;151:10;
158:7,23;159:10;
168:15,18,23;171:9;
226:25;256:1
**begin (2)**
253:14,14
**beginning (5)**
182:16;183:15;
192:14;255:23;
272:11
**begins (1)**
169:2
**behalf (4)**
8:17,19,24;25:8
**behaved (2)**
113:19;151:17
**behaving (2)**
209:15;210:21
**behavior (28)**
81:15,15;87:15;
100:24;103:20;
105:13;115:12;132:7;
155:6;156:15;157:25;
158:5;161:2;163:16;
166:2;167:11,20;
168:4,18;171:24;
173:19;175:7,11;
176:4;181:4;208:2;
209:6;211:7
**behavioral (9)**
168:23;169:9,10;
170:15;173:20;228:4,
6,8,10
**behaviors (10)**
105:11;170:17;
174:1;175:13;178:24;
182:19;196:4;227:1;
228:17;273:11
**behind (6)**
185:13;238:12;

240:6;265:9;276:25;
279:21
**belabor (1)**
87:17
**belief (5)**
63:13;98:4;116:1;
171:12;198:20
**beliefs (2)**
83:14;283:15
**believes (2)**
148:11;177:23
**believing (1)**
97:16
**bells (1)**
201:23
**belongings (3)**
256:23;257:9;
258:12
**benefit (1)**
183:14
**benefits (1)**
254:13
**best (14)**
11:6;12:6;13:6,8;
16:25;18:19;21:2;
42:14;79:22;110:25;
146:22;216:9;233:17;
246:2
**Beth- (1)**
232:11
**Bethlehem (2)**
232:12,16
**better (11)**
11:6;34:3;137:20;
164:4;195:2;235:11,
15,16,17;246:3;282:6
**beyond (5)**
56:16;136:7;234:2;
284:8;285:20
**big (2)**
179:25;264:23
**biggest (1)**
282:3
**biohazard (2)**
111:13,24
**biology (2)**
30:15,23
**biopsy (4)**
116:18,20;118:9;
124:17
**birth (3)**
120:20;123:24;
237:8
**bit (21)**
16:22;24:16;26:16;
42:1;43:20;50:22;
57:1;64:11;65:9;
92:21;111:23;150:7;
162:13;235:16,17;
240:23;253:18;
256:25;259:11;263:6;
264:8
**black (6)**

82:19,24;83:16,17;
94:15;132:11
**blame (2)**
169:20;170:22
**blatant (7)**
115:2;129:14,14;
132:8;147:25;179:1;
181:4
**blatantly (2)**
129:15;146:18
**blessing (1)**
218:13
**blood (4)**
117:2;122:10,18;
165:15
**blue (2)**
188:20;198:6
**board (5)**
29:18,21,25;
222:10;238:2
**boards (1)**
42:4
**boat (1)**
45:9
**Bogert (1)**
8:7
**bolstered (1)**
268:6
**bone (2)**
65:7,8
**booking (2)**
169:13,14
**books (1)**
237:12
**both (12)**
11:12;34:13;64:4;
167:19;168:4,9;
199:16;211:12;
224:13;225:21,23;
250:3
**bother (2)**
107:25;155:15
**bottom (9)**
47:25;50:18;74:6;
190:20;197:6,11;
214:7;272:5;276:13
**bound (1)**
276:4
**bounds (1)**
285:6
**bow (1)**
108:13
**box (3)**
120:21,25;237:11
**Brandy (1)**
182:15
**break (14)**
11:21,22;12:1;
37:17;46:13;47:1,11;
88:3,13;149:4;
170:22;195:16;247:3;
267:25
**breaks (1)**

47:13
**Bredeman (7)**
32:11,13,14;61:17;
62:17,19;249:9
**B-r-e-d-e-m-a-n (1)**
32:13
**bridge (1)**
240:19
**bridges (1)**
240:16
**Brief (7)**
47:5;57:16;149:7;
203:11;247:8;270:2
**briefed (1)**
32:18
**briefly (5)**
60:11,11,14;255:7;
262:14
**bring (7)**
25:14;36:16;65:4,7;
123:15;155:23;
256:23
**bringing (2)**
261:13,18
**brings (1)**
124:19
**broached (1)**
210:19
**broad (2)**
100:4;160:9
**brought (8)**
156:14,15;162:4;
168:24;237:10;
263:17;291:17,22
**Brown (3)**
238:7;244:19,20
**building (1)**
266:5
**bullet (1)**
181:9
**burn (1)**
240:15
**burning (1)**
240:18
**Burris (8)**
26:7,11;180:4,22;
230:15;231:6,9;283:4
**B-u-r-r-i-s (1)**
26:12
**business (2)**
116:9;231:19
**button (1)**
165:16
**Bye (1)**
218:22

---

**C**

**calendars (2)**
22:1,10
**call (21)**
24:7;31:15;39:14;
41:20;132:16;133:2,

15;147:6;158:6;
170:1,1;185:24;
186:11;201:25;202:1,
5;217:11;218:21;
245:2;258:2;259:20
**called (12)**
26:1;54:17;91:4;
94:13;101:18;118:20;
139:1;180:4;201:19;
204:20;230:16,19
**calling (5)**
182:18;218:6;
257:1,23;264:15
**Calls (2)**
291:23;292:17
**came (27)**
27:6;44:2;59:1,4;
64:14;117:24;122:7;
130:8,19,23;131:3,6;
173:4,11;179:24;
189:8;198:5;213:21;
229:2;237:16;240:4;
254:11;256:5;261:2;
264:3;266:14;292:24
**Cameron (1)**
30:15
**can (165)**
9:19;12:13;15:6,7,
16,20;16:21;17:4;
21:12;24:18;25:3;
26:25;28:9;29:15;
32:12;34:11;35:6,11;
38:12;43:20;44:20;
45:7,9,10,22,24;46:3,
3,9,12,13;64:21;
66:23;67:9,24;73:16;
74:20;76:20;80:10;
82:21;83:4;84:23;
86:13,15,19;87:8;
90:17;96:10,16;
99:24;100:11;101:7,
10;102:1;103:11;
104:9,21,23,23,24;
105:1;106:5;108:14;
109:25;110:2,17;
111:2,18;112:4;
113:14,17,17;114:11;
118:17;121:18;
124:13,13;127:13;
128:20,20;132:2,9;
134:17;135:13,18,23;
137:5,16;138:1,6;
145:11;151:13;
152:25;154:6;156:24;
158:17,18;160:12;
161:3;162:5,7;163:9,
23;164:4;169:3;
178:23;181:3;182:2;
184:20,21,22;185:3;
187:8,18;188:1,15;
191:11;192:6;198:1,
12,17,19;199:19;
204:6;208:14;209:24;

213:16;216:6,12;
217:21;218:15;220:6,
6,7,14;223:10;226:5,
20;230:18;233:18;
235:21;241:15;242:5,
22;244:9,24;245:13;
246:6,15;250:13;
261:24;263:5;264:20;
267:18;283:12;284:5,
7,16,17;287:3;
290:25;291:12;294:1,
2
**cancel (1)**
229:5
**capture (4)**
20:24;43:15;47:22;
75:19
**captured (1)**
197:25
**captures (1)**
200:13
**capturing (2)**
197:13;201:5
**car (2)**
266:3,6
**carbon (1)**
120:19
**care (18)**
14:2;62:24;122:5,
22;123:2;160:22;
168:18;175:17;183:6,
23;196:18;209:6;
229:14;231:18;232:8;
241:20;288:16,20
**career (4)**
83:5;235:4;238:17;
239:5
**careful (1)**
83:2
**caregiver (1)**
71:5
**carried (1)**
264:25
**carry (2)**
264:23;265:1
**Carter (1)**
248:16
**Case (10)**
8:11;9:22;15:5,21,
22;28:7;63:14;
119:17;128:10;225:3
**cases (3)**
64:6;226:3;227:20
**catch (2)**
81:7;106:17
**categories (1)**
187:24
**category (2)**
181:6;191:8
**catty (1)**
65:3
**Caucasian (3)**
98:3,16;257:6

**caught (1)**
213:14
**cause (1)**
236:7
**caused (5)**
165:1;182:23;
195:24;228:18;242:6
**cc (1)**
276:14
**CCC (4)**
48:1,4,10;68:8
**cell (1)**
216:3
**Center (15)**
13:18;28:19;48:6;
57:5;65:17;233:1;
248:10;250:10;261:6;
268:13;274:10;
275:17;289:9;292:15;
293:9
**centers (1)**
250:7
**Central (1)**
276:15
**certain (6)**
9:20;71:16;72:21;
99:1;277:24;281:8
**certainly (4)**
77:4;144:21;
151:13;173:1
**Certificate (2)**
56:3,10
**certification (7)**
29:14,22;30:1;
166:19;236:11;250:1,
4
**certified (3)**
29:18,18,25
**certify (1)**
56:4
**chain (1)**
144:1
**chairperson (1)**
68:20
**chance (3)**
18:14;218:21;241:8
**Chandra (1)**
78:5
**change (13)**
156:16;157:22;
158:5;167:13;169:2,
10;175:7;193:12;
197:18;227:1;233:21;
246:7;288:14
**changed (2)**
156:21;195:7
**changeover (1)**
157:6
**changes (19)**
168:18,23;169:9;
170:16;172:1;173:20;
176:6,21;181:3;
201:11,13,16;212:20;

228:4,6,8,10,10;
245:23
**changing (4)**
160:14;170:14;
197:15;234:15
**character (1)**
185:9
**characterize (2)**
52:22;182:20
**charge (9)**
14:23;15:11;17:23;
107:24,25;169:17,19;
183:24;206:24
**charts (2)**
72:23;249:21
**check (6)**
31:24;78:17;
120:21;134:18;
253:15,19
**checked (4)**
120:25;133:16;
134:11;237:20
**checking (2)**
253:20,21
**chief (1)**
273:20
**Chillicothe (37)**
26:21;28:11,19;
31:13;32:22,22;39:9;
48:5;57:5,10;58:6,16;
64:5;65:24;82:21;
97:5;100:6,13;131:1,
8;170:25;203:10;
248:2,3,6,10;249:6;
250:10;251:3;261:6;
268:13;273:21;
274:10;275:17;289:9;
292:15;293:9
**choose (2)**
83:2;110:21
**chose (7)**
64:13;111:7;115:4;
147:5,23;155:19;
179:5
**Christopher (6)**
186:1,2,12,13;
244:23;245:3
**chronological (1)**
66:20
**chronology (1)**
45:5
**chunk (1)**
173:24
**church (5)**
221:23,25;222:5;
239:17;240:21
**Circuit (1)**
8:11
**circulating (1)**
180:7
**circumstances (3)**
71:15;232:16;
233:25

**cite (1)**
110:13
**City (18)**
13:20;32:2,5,6;
39:9;44:6;57:25;
58:22;59:1,4;88:25;
97:4;193:15;196:19;
200:24;221:25;
231:24;232:5
**Civil (1)**
294:23
**claim (3)**
177:15;234:1,8
**claims (4)**
9:20;177:13;
227:15;231:10
**clarification (2)**
107:8;265:12
**clarified (2)**
41:1;115:17
**clarify (8)**
40:23;74:14;83:19;
107:21;216:7;262:16;
269:11;281:9
**clarifying (1)**
164:20
**clarity (1)**
40:13
**classify (1)**
235:14
**Claudia (4)**
8:21;33:25;36:15;
101:24
**clean (1)**
17:4
**cleaner (1)**
278:8
**clear (6)**
11:15;39:23;93:6;
167:25;213:20;
270:22
**clearance (5)**
36:6,25;37:5,19,25
**cleared (2)**
38:4;289:1
**clerk (1)**
77:20
**client (1)**
163:18
**clinic (5)**
28:14;232:14;
233:4,5;254:17
**clinical (11)**
57:6,8;61:11,22;
62:12;249:12;275:4;
278:3,4,13;280:10
**clinician (2)**
62:8;65:20
**clinicians (2)**
61:11;163:17
**close (2)**
74:18;87:18;258:11
**closed (2)**

189:13;260:9
**closer (2)**
16:22;21:5
**clue (2)**
237:23;238:11
**co-employee (1)**
76:10
**Collaborative (5)**
72:3,9,11;73:5,9
**colleagues (1)**
241:19
**collect (1)**
125:3
**collected (2)**
77:25;118:21
**college (1)**
236:9
**color (5)**
81:19;101:9;
236:18;241:22;
283:16
**comfortable (2)**
81:18;244:5
**coming (10)**
25:14;27:7,23;28:1;
134:23;171:18;191:6;
193:11;260:8;263:9
**commenced (1)**
8:5
**comment (4)**
187:25;221:13,24;
237:21
**comments (1)**
191:4
**Commission (1)**
19:16
**Committee (2)**
30:1;68:20
**common (1)**
127:10
**commonly (1)**
48:5
**communicate (1)**
11:2
**communicated (2)**
25:24;200:14
**communication (7)**
78:2;134:1;138:17;
143:18;145:21;
210:15;274:21
**communications (5)**
193:18;195:3;
210:14;212:1;215:22
**communities (1)**
171:2
**community (2)**
170:24;171:1
**commute (3)**
193:14;196:13;
201:1
**Compact (2)**
29:5,7
**company (2)**

103:22;232:22
**compared (1)**
134:14
**comparing (1)**
189:16
**compensate (1)**
243:14
**competent (1)**
229:14
**complainant (1)**
135:5
**complaint (38)**
15:10,13;18:1;
19:10;20:2,3,8,17;
22:17;23:5;36:13;
82:6;116:2;130:2,7;
131:2,9;133:3;134:8;
135:11;149:12;
150:24;155:12,13;
160:24;170:2,2;
194:1;206:11;220:22;
222:9,9,16;224:19;
255:6,9,17;259:13
**complaints (3)**
14:16;212:6;277:24
**complete (18)**
12:6;13:8;20:14;
23:3,4;30:18;46:22,
23,24;49:9;68:24;
75:24;89:20;125:18;
141:20;148:22;227:3,
4
**completed (10)**
29:24;56:5;117:20;
120:11;140:3;141:11;
142:5,13,25;144:14
**completely (3)**
106:8;203:18;
229:23
**completes (1)**
138:20
**completing (1)**
56:13
**compliance (7)**
204:8,11,14,21,21;
205:7;290:17
**components (1)**
77:6
**compromise (1)**
199:3
**compromised (1)**
161:1
**computer (11)**
20:5;49:9;53:25;
56:14;120:16;178:16;
187:14;189:17;
263:21;265:9;281:15
**concern (11)**
91:6;154:11,20;
155:8;156:9;165:1;
279:6;282:3;290:22;
291:5,8
**concerned (2)**

16:8;229:13
**concerning (4)**
210:20;222:18,22;
281:23
**concerns (23)**
40:1;154:16,17;
155:17,23;160:14;
162:4;207:2,5;
210:18;228:18;
276:21;278:2,15,21;
279:1,4;280:22,25;
281:2,4,21;282:1
**concise (1)**
23:4
**conclude (5)**
99:19,20;106:7;
245:21;293:18
**concluded (1)**
294:15
**conclusion (4)**
96:14;101:10;
102:10;188:16
**conclusions (1)**
98:14
**concurring (1)**
79:7
**conditions (3)**
198:7,7;199:1
**conduct (15)**
14:16,24;15:17;
52:21;54:9;56:6;
176:7;191:12;222:17;
239:12;271:12,20;
272:15;273:4;276:1
**conducts (1)**
139:16
**confer (1)**
64:6
**conference (1)**
10:14
**confidence (1)**
145:1
**confident (3)**
147:8;148:17;
219:14
**confirm (6)**
35:15;197:24;
200:12;249:13;
272:10;278:1
**confirmed (3)**
16:12;169:3;189:18
**confirming (1)**
134:2
**confront (2)**
171:17;190:3
**confronted (3)**
115:21;170:17;
190:2
**confused (4)**
45:14;163:10;
169:21;175:12
**confusing (1)**
11:3;169:25

**confusion (1)**
37:15
**conglomeration (4)**
49:24;50:4;75:2;
294:7
**congratulating (1)**
105:6
**connection (9)**
9:12;35:16;47:18;
48:22;57:24;59:22;
99:5,20;214:18
**connects (1)**
45:18
**Consciously (2)**
100:21;101:14
**consequences (1)**
92:1
**consider (6)**
62:1;63:21;136:7;
197:9;198:9;220:11
**considerable (2)**
107:10,13
**consideration (1)**
199:3
**considered (3)**
27:10;63:6,23
**considering (1)**
212:12
**consisted (1)**
230:17
**consistent (5)**
68:8;71:21;145:4;
222:2;268:8
**consistently (1)**
145:5
**consisting (1)**
270:23
**constitute (1)**
95:9
**constructive (1)**
21:25
**consuming (1)**
23:15
**contact (2)**
60:16;214:2
**contacted (5)**
31:9,12;32:1;58:8;
277:1
**contained (1)**
214:21
**container (4)**
116:20;121:15;
124:18;125:4
**containers (1)**
123:21
**contains (2)**
17:23,24
**contend (1)**
174:15
**content (4)**
54:4;56:21;203:5;
219:16
**contents (3)**

53:18;213:25;273:6
**contest (1)**
11:21
**context (3)**
165:5;185:13;
276:25
**continue (1)**
218:17
**continued (6)**
41:14;175:9;
234:19;238:24;258:6,
6
**continues (2)**
53:18;284:11
**continuing (10)**
15:2;17:11;46:16;
47:10;51:19;148:9;
149:11;195:22;
276:18;286:1
**control (1)**
237:8
**controlled (3)**
69:21;254:20;
289:11
**conversation (14)**
16:1;89:7,17;95:25;
96:4;134:1;176:18;
187:21;188:22;197:8;
198:11;220:9,12;
276:19
**conversations (13)**
22:2;23:19;24:23;
164:1;180:7;207:8,
22;208:11;210:22;
211:17;221:3;230:17;
258:16
**conversely (1)**
271:24
**convey (4)**
20:25;23:3;185:6;
283:10
**cookout (5)**
58:18;59:2,4,7;60:1
**copied (1)**
209:8
**copies (1)**
213:5
**copy (10)**
17:19;18:8;34:24;
53:3;120:19;121:1;
217:25;269:4;271:18;
281:13
**Corbin (4)**
90:16;97:17;99:4;
244:16
**cordial (1)**
261:10
**Corizon (136)**
8:20;9:11,13;19:19;
21:6,19;22:11;24:12;
25:20,23;26:20,21;
28:10,10,12,22;31:7,
8,16;35:17;37:7,9,24;

38:5,13;44:6;45:16;
47:17;48:23;49:3;
50:23;51:3,18,19,23;
52:7;53:8,15,18;
54:22;55:14;56:1;
58:3,5;59:19;60:17;
63:1;68:17;70:13;
72:2;73:2,25;75:6,9;
76:25;79:1,3;80:6;
81:2,3;85:22;87:20;
88:20;89:4;96:7;
99:21;112:8,11;
114:10,13;116:13;
138:7;143:24;173:21;
174:7,14,20;177:8,9,
25;178:6,14;179:11;
180:12;181:13;
182:13;191:13;193:4,
8,8;196:7;198:10;
199:15,18,21;200:1;
203:6;204:7,21;
207:5;208:13;214:19;
217:8;223:22,23;
224:4;226:14;227:15;
233:24;244:13;
247:23,25;248:9,20;
252:5;254:11,14,18;
255:3,4;261:6;
270:10,24,25,25;
271:5;272:13,17;
274:1;275:10,19;
278:1;288:24,25;
294:6;295:22
**Corizon's (6)**
18:5;32:1;178:20;
198:21;271:25;272:2
**corporate (1)**
32:1
**corrected (1)**
115:17
**correcting (1)**
171:24
**Correction (4)**
48:6;177:10;
179:12;222:14
**Correctional (19)**
28:11,18,19;57:5;
171:20;176:23,25;
189:4;248:10;250:7,
10;261:6;268:13;
274:10;275:17;
276:21;289:9;292:15;
293:9
**Corrections (46)**
8:25;9:14;24:13;
28:13,15;36:6;37:1,6,
9,20;38:1,4,9,11,14;
45:17;49:4;52:10,23;
173:24;174:2;225:22;
226:15;230:22;
247:16;252:22;253:1,
2,10;261:9;266:21;
268:5,7;271:2,8;

273:3,22;274:6,12,21;
289:2,6,10,21;290:1;
295:23
**Corrections' (3)**
178:21;271:23;
288:19
**Correction's (2)**
55:16;178:16
**corrective (3)**
70:13,16,22
**correctly (7)**
31:21;47:25;97:15;
99:8;151:25;197:24;
250:24
**correlation (1)**
94:17
**correspond (1)**
181:3
**correspondence (1)**
290:17
**cotton (1)**
253:5
**couch (1)**
207:4
**Counsel (7)**
8:14;137:3;162:23;
177:21;216:24;
227:18;294:20
**counseling (2)**
165:2;175:18
**count (1)**
260:14
**counter (1)**
126:1
**counting (1)**
60:4
**County (2)**
8:13;295:17
**couple (28)**
9:14;12:10;20:19,
19;26:2;45:5;52:9;
66:12;86:25;88:18;
93:1;104:8;106:1,15;
113:8;130:7;179:19;
194:12;208:10;
216:25;217:16;225:5;
227:25;230:15;
242:10;268:24;
280:19;287:16
**course (11)**
23:2;24:12;25:14;
31:18;56:5;219:22;
249:11,14;260:15;
280:10,14
**Court (9)**
8:11;9:22;10:16,21;
11:13;12:19,22;
210:9;272:23
**courtesy (2)**
111:1,2
**cover (1)**
157:19
**covered (7)**

93:14;175:20;
176:8;177:2;205:1;
231:8;273:2
**covering (1)**
44:13
**covers (1)**
46:12
**covertly (1)**
82:22
**co-worker (2)**
63:17;74:10
**co-workers (3)**
235:1,20;241:9
**CPR (3)**
105:1,4;106:4
**crack (1)**
260:15
**created (4)**
69:9,10;266:22;
279:5
**creates (2)**
120:16;283:17
**creating (1)**
283:24
**credentialing (3)**
68:19,24;70:2
**credentials (2)**
166:22;253:20
**criminal (7)**
40:23;44:9;46:17;
253:21;281:24;
282:25;292:11
**critical (2)**
211:24;212:2
**criticism (1)**
155:9
**crying (1)**
229:3
**Crystal (35)**
153:23;154:1,2,7,
22,22;155:23;156:7,9,
16,20;157:5,7,16,20;
164:11,14,22;165:1,5;
167:6,15,16,22;168:2,
6,12;170:17;174:25;
176:1,4,9,10,12;
244:17
**Crystal's (2)**
168:25;176:6
**cuff (1)**
165:15
**cultivate (1)**
235:2
**cultural (1)**
283:21
**culture (13)**
81:16,19;83:9,18;
84:9;87:10;98:3,11,
24;100:1;103:10;
170:25;268:6
**current (1)**
15:5
**currently (2)**

13:14,17
**custody (10)**
105:2;170:18;
256:5,9;260:7,20;
263:18;282:15,20;
288:19
**cut (6)**
199:5,7,8;210:10;
284:1;289:24
**cutting (1)**
90:24
**Cycle (1)**
215:2
**cytology (1)**
120:22

## D

**D2-11.10 (1)**
276:1
**D2-11.4 (5)**
53:3;271:19,21;
272:17;273:3
**daily (12)**
108:16;182:24;
183:7,8,9,10;231:25;
249:21;253:4;261:22;
289:11,20
**Dale (3)**
78:21;79:6;138:9
**damage (1)**
236:17
**damages (4)**
233:19;234:2,7;
242:2
**damaging (2)**
235:7;236:24
**Darin (3)**
67:4;274:9;290:4
**database (1)**
214:21
**date (33)**
19:14;22:22;50:13;
58:20;69:8,12,16;
74:17;113:2,16,17,24;
115:18;117:24;
118:20;120:20,20;
122:4;123:24,24;
131:6;179:11,18,20;
192:21;200:2;201:9;
214:8;219:6;262:24;
269:16;271:18;
275:16
**dated (6)**
55:15;67:3;68:18;
70:13;78:2;89:6
**dates (3)**
71:4,5;113:21
**Davis (1)**
290:10
**day (66)**
19:19;22:22;25:19;
37:10;38:23,23,24,25;

55:15,18;57:11;
75:20;76:13,24;
77:12,22,25;78:12,21,
23;79:20,20;80:17;
89:24;121:23;122:17;
130:24;153:19;
159:12,12;168:3;
182:24;183:10,11;
189:5;194:10,16;
195:10;196:12;200:8;
203:1;219:9,12;
227:2,2;228:11,20,25;
229:4;231:21;245:20;
251:9,19;252:16,21;
254:4;256:17;257:12;
258:13,21;259:16,19;
260:16;281:5;286:21;
295:11
**days (16)**
20:19,23;27:2;
63:15;64:5;71:16;
108:23;131:2;142:18,
19;186:4;197:15;
200:25;201:20;227:2;
251:24
**day-to-day (6)**
235:23;250:11,15,
20,22;288:2
**deadline (1)**
49:10
**deal (18)**
44:10;48:18;50:6;
59:25;97:7;101:2,5;
108:22;109:17,22;
126:22;161:13;
179:25;217:9;222:15;
224:25;235:22;
283:23
**dealing (1)**
86:10
**deals (2)**
54:6;191:5
**dealt (1)**
105:11
**December (8)**
187:20;188:5,15;
189:6,22;228:9;
237:2,2
**deception (1)**
43:6
**decide (3)**
45:24;83:2;234:12
**decided (5)**
42:1,3;107:23;
151:4,5
**decision (6)**
146:13;179:5;
185:7;201:2,21;202:8
**decisions (5)**
41:23,24;62:22;
179:1;249:21
**declined (3)**
146:4,10;147:11

**decreasing (1)**
161:10
**deep (1)**
15:15
**deeper (1)**
176:8
**Defendant (6)**
8:20,24;18:5;
225:23;247:15;
266:20
**defensive (1)**
95:14
**defer (1)**
244:6
**definitely (3)**
121:1;129:18;258:2
**definition (1)**
283:8;284:6
**defy (1)**
147:23
**degree (10)**
30:4,4,5,15,18,23;
236:10,11;249:25;
250:3
**DeKalb (1)**
8:12
**deliberately (4)**
98:10;100:2;
264:18;282:4
**demeanor (2)**
156:13;227:1
**demonstrating (1)**
54:19
**demonstrations (1)**
55:8
**dental (1)**
66:10
**dentist (1)**
66:12
**dentists (1)**
66:11
**Department (62)**
8:24;9:14;24:13;
26:22;28:13,15;
32:24;36:6,25;37:6,9,
20,25;38:4,9,11,13;
45:17;49:4;52:10,23;
55:16;66:10;165:9;
173:23;174:2;177:9;
178:15,21;179:12;
203:11;222:14;
225:22;226:15;
228:20;230:21;
247:15;252:22,25;
253:1,2,10;261:8;
266:20;268:5,7;
271:2,8,23;273:2,22;
274:5,12,21;288:19;
289:2,5,10,19,21;
290:1;295:23
**Departmental (1)**
275:25
**depending (1)**

119:2
**depends (1)**
119:13
**depose (1)**
227:18
**Deposition (11)**
8:1,5,10;9:16;10:3;
262:10;270:13;
293:19,25;294:15,21
**depression (4)**
234:14,21;235:10;
236:1
**describe (5)**
112:17,24;116:12;
228:23;232:20
**described (8)**
16:15;31:16;64:20;
93:11;196:12;235:11,
25;239:1
**describing (5)**
112:10;113:24;
139:5;188:13;233:18
**description (5)**
45:9;82:12;85:5;
243:4;293:11
**deserve (1)**
183:19
**designed (1)**
24:22
**desk (10)**
112:19;124:22;
125:22,23,25;143:7;
146:20;148:3;225:24;
237:12
**detailed (2)**
160:10;277:10
**details (12)**
24:23;25:1;102:24;
104:16;224:21,22,23;
242:10,18;243:1;
266:23;277:13
**determine (1)**
180:13
**determines (2)**
159:13,14
**devastating (2)**
284:16,17
**device (2)**
168:1;237:8
**diagnoses (1)**
58:10
**diagnosis (2)**
62:12;151:19
**dialogue (1)**
195:10
**diaries (3)**
21:19;22:1,10
**differ (1)**
123:6
**difference (11)**
91:24;96:7;97:3;
101:9;102:12;115:24;
132:10;136:22;

240:18;241:22;
257:23
**different (28)**
20:19;27:1,13;28:3;
45:5;53:25;61:20,22;
64:6,8,11,21;105:22;
119:9;124:4,11;
142:20;157:2,24;
176:10,13;179:20;
183:6;232:1;235:19,
20;240:23;279:1
**differently (5)**
97:21;99:6;133:4;
154:6;281:25
**difficult (5)**
228:11,24;229:10;
236:14;283:16
**difficulty (1)**
242:12
**dig (1)**
176:8
**diligently (1)**
203:14
**direct (2)**
44:1;101:18
**directed (2)**
173:25;284:14
**direction (5)**
58:9;119:8;121:22;
126:13;127:6
**directions (1)**
122:2
**directive (3)**
143:5;146:18;
147:23
**directly (4)**
40:4;60:22;126:12;
291:19
**director (28)**
32:7,11;33:13,18;
39:5;57:7;58:7;61:9;
68:19;72:20,25;
73:14;90:16;207:18,
23;208:3;232:10;
249:7,9,10,12;251:21,
23;278:4,13;280:10,
11,12
**dirt (1)**
282:5
**dis- (1)**
285:4
**discharge (2)**
21:25;25:18
**disciplinary (1)**
273:7,8
**disclaimer (1)**
25:2
**disclosing (1)**
274:12
**discontinue (1)**
232:21
**discount (1)**
236:6

**discovered (1)**
258:5
**discovery (2)**
261:25,25
**discriminated (5)**
14:10;16:17;194:1;
266:21;267:17
**discrimination (64)**
14:23;15:3,11;
17:23,25;19:10;20:8,
17;22:17;36:13;49:1,
11;52:20;56:5;74:4;
82:1,6,9;83:20;84:22;
85:3;99:18;106:10,
18;108:11,16,18;
109:22;111:14;
112:16;114:12;
115:23;116:2;130:21;
138:16;145:22;147:9;
149:12;150:23;
163:12;174:15;179:4,
4,5;181:9;182:16;
184:12;191:12;
193:21;194:17,23;
204:9,23;206:12;
220:19;244:15;
255:17;262:18,25;
268:8;271:11,19;
272:14;273:3
**discriminatory (13)**
15:19;98:4;110:12;
148:12;177:23,24;
181:6;182:20;184:24;
204:1;207:7;257:10,
10
**discuss (9)**
66:15;146:3,25;
147:6;156:9;246:24;
264:9;269:16,19
**discussed (18)**
115:22;138:12;
139:4;181:12;191:7;
200:9;201:5,13;
205:25;206:14,15;
231:8;247:18;259:8;
260:6,7;290:2;293:25
**discussing (1)**
105:20
**discussion (16)**
17:7;35:8;44:8,14;
70:1,4;173:15;
194:17,22;199:16;
201:15;210:4;216:18,
24;225:12;277:23
**discussions (3)**
44:13;195:4;197:14
**disenchanted (1)**
148:21
**disheartened (1)**
148:21
**dismissal (1)**
17:24
**disparities (3)**

83:15;283:18,25
**dispense (1)**
175:15
**dispensed (2)**
162:21;163:5
**dispensing (1)**
164:8
**display (1)**
263:23
**displayed (1)**
168:4
**dispute (2)**
146:23;230:12
**disrespect (6)**
111:3,5;146:20;
148:1;179:2;183:25
**disrespectfully (1)**
157:18
**disrobed (1)**
260:21
**disruption (1)**
41:15
**disseminated (2)**
189:20;231:1
**distinction (1)**
163:23
**distress (2)**
243:9,11
**distributing (1)**
73:24
**diversity (1)**
283:19
**DOC (13)**
26:21;58:6;67:3;
168:19;227:16;
249:19;252:8;256:5,
9;263:5;267:23;
269:5;270:11
**docket (1)**
169:4
**doctor (2)**
61:15;201:22
**document (30)**
18:4,11;19:22,22;
24:9;36:13;41:11;
51:17;53:3,10;68:17;
69:10;111:17;120:15;
151:22,22,23;161:8,
24;178:6;201:4;
205:2,2;223:15;
243:19;271:10,15;
272:2;273:10;275:14
**documentation (10)**
53:15;65:14;67:18;
154:10,15;162:3;
167:2;172:25;182:2;
200:13
**documented (5)**
123:2;191:16,19;
192:2;206:18
**documents (18)**
17:18,22;25:6,7;
49:24;55:14;75:2;

77:6;112:7;144:13;
185:8;189:18;199:15;
225:14,19;263:2;
270:23;271:1
**dog (1)**
65:7
**dollar (1)**
243:13
**done (21)**
13:7;49:17,17,18;
51:17;56:10;80:24;
105:4;118:5;123:10;
125:1;142:6;173:16;
177:4;178:23;206:6;
212:13;238:23,24;
259:18;286:25
**door (10)**
170:19;189:9,13,
14,25;237:17,19;
260:9,15,15
**doors (1)**
289:19
**doorway (1)**
259:22
**double (2)**
194:21;229:17
**doubt (2)**
47:16;183:14
**down (21)**
36:21;37:17;69:19;
102:24;104:17;
110:18;117:7;126:4;
146:3;159:12;160:5;
165:16;170:22;171:4;
217:19;240:14;
255:22,24;260:5;
264:5;266:17
**downloaded (1)**
230:25
**downstream (1)**
119:22
**Dr (62)**
32:11,13;39:7,8;
61:17;62:2,4,17,19;
63:1,7,21;65:21,25;
72:5;73:3,8;88:23;
90:16;91:5;143:12,
15;154:24;163:18;
172:22;189:19;194:2;
207:8,14;218:5,22;
219:4;220:2,5;221:19;
222:12;223:12,25;
224:8;229:12;230:20;
237:22;238:7,8,10,13,
13;239:3,9,9,11,20;
244:18;249:9,10;
277:1,6,9,13,16;
278:6;280:10
**draft (2)**
79:4;255:9
**draw (1)**
188:16
**drawing (1)**

98:14
**drawn (3)**
121:13,14;122:18
**draws (1)**
117:2
**driving (2)**
193:11;200:24
**drove (2)**
32:22;183:11
**due (5)**
62:10;184:1;
196:13;203:13;
292:15
**dug (1)**
282:5
**duly (1)**
9:4
**during (43)**
22:20;24:12;32:15;
44:10;49:6;52:4;58:3,
5;59:12,14;65:24;
73:2;89:8,16;95:17;
123:5;126:16;134:19;
142:21;149:21;
158:24;162:4,6;
165:4;171:19;176:23;
193:17,18;194:25;
195:19;203:11;
206:13;211:8,17;
227:2;228:7;229:11;
256:17;257:5;259:19;
261:5;263:14;289:8
**duties (5)**
64:2;176:24;195:6;
288:2,20

## E

**earlier (21)**
36:14;88:17;96:3;
107:21;109:1;142:2;
143:24;145:23;204:3;
217:19;219:13;
247:14;248:12;
253:13;254:19;260:7;
269:1;272:16;283:5;
287:17;292:10
**easier (2)**
10:5;13:10
**easy (1)**
50:19
**echoing (1)**
16:21
**economic (1)**
233:20
**educate (1)**
166:20
**educated (2)**
16:12;97:9
**educating (2)**
158:19;175:19
**education (6)**
56:16;69:2;166:23;

175:15;236:9;283:17
**educational (1)**
253:22
**EEOC (7)**
20:2;103:5;106:18;
107:3;116:1;150:23;
160:2
**effect (5)**
29:11;39:16,17;
94:3;221:13
**effects (2)**
235:5;236:4
**effort (1)**
97:8
**efforts (1)**
198:21
**eight (3)**
180:6,9,19
**eight-hour (1)**
197:16
**either (13)**
41:5;49:5;77:4;
133:9;134:2,19;
181:21;190:20;
199:10;208:20;225:4;
235:15;236:1
**elaborate (5)**
253:18;259:11;
263:6;267:25;289:14
**electronic (1)**
215:16
**Electronically (1)**
281:14
**Ellis (2)**
256:11,14
**else (73)**
40:6;41:6;44:24;
46:3;59:9;66:9;73:8;
76:13;87:3,5;88:19;
90:11;93:22;94:8,12;
95:19;101:7;110:8;
118:9;128:7;134:7;
135:15,25;136:23,24;
147:18;157:1,2,23;
159:6;165:10;170:11;
171:25;172:4;173:15;
174:13;177:7,12,14;
178:8;181:11,14;
182:3,5,6;186:10;
187:22;188:25;189:4;
192:4;205:6,16;
209:16;215:11;
220:21;231:2,15;
235:11;239:11;
240:24;241:25;243:7;
244:21;245:11,23;
246:6;248:9;264:4,5;
266:11;280:8;287:1;
289:10
**else's (2)**
257:14,18
**em (1)**
127:22

**email (32)**
112:13;113:3;
114:7;126:16;130:2;
133:3,9,20;134:21;
135:8,16;136:2,8;
137:19;138:9;140:11,
11;143:11,25;145:4,
5;148:9;154:14,17;
155:16;156:19;
196:10;197:5;201:11;
202:25;203:5;206:13
**emailed (1)**
224:8
**emails (8)**
74:23;75:4;154:10;
162:3;197:22;199:15;
209:9;220:25
**embedded (1)**
98:2,2;283:14
**emotional (6)**
226:25;234:7;
235:25;242:1;243:9,
11
**employed (7)**
13:14;231:20;
239:3,10;249:19;
255:3,4
**employee (14)**
15:24;49:6;50:10;
51:13,23;112:15;
114:13;118:18;252:4,
8;273:22;289:17,22,
25
**employees (21)**
65:4;96:7;103:21;
138:17;143:18;
173:21;174:14,20;
177:9,10;178:1,7,14;
179:12;181:13;189:7;
191:14;261:9;267:21,
22;292:7
**employing (1)**
107:23
**Employment (59)**
19:15;24:12;25:20,
22;28:22;35:16;
37:20,24;38:5;40:22;
41:14;46:2;47:19;
48:23;49:7,18;50:6;
51:24;52:5;55:22;
56:17;58:3;59:12,19,
23;60:17;63:1,8;73:2;
83:5;121:8;162:4;
180:20;187:19;
194:10;206:13;
213:12;223:22;224:4;
229:12;232:6,16;
233:7,14;239:24;
253:14;254:12;259:9,
19;261:5;272:11;
278:2,15,21;279:4;
280:23;281:5,21;
283:17

**EMR (3)**
215:14,18,19
**encounter (2)**
109:5;198:3
**encountered (2)**
108:11;286:15
**encounters (2)**
136:13;176:15
**encourage (1)**
143:17
**end (20)**
13:8;38:23,24;
62:25;63:8;75:6;
80:17;122:14;165:17;
173:1;187:19;201:12;
221:12;223:22;
226:24;228:4;233:7;
237:1;246:5;248:25
**ended (6)**
25:23;60:18;
180:20;213:12;224:4;
232:17
**endurance (2)**
11:20;203:12
**endured (1)**
25:15
**engage (4)**
64:14,24;65:8;
109:5
**enjoy (1)**
14:2
**enough (23)**
11:15,18;12:20;
13:11;14:8;19:6;24:4,
14;25:10;64:17;
65:12;71:20,23;86:8;
133:1;188:24;209:18;
212:16;221:12;226:7;
231:2;272:9;287:5
**ensure (1)**
103:19
**enter (4)**
241:18;253:15;
254:4,7
**entered (3)**
138:19;258:12;
264:14
**entering (3)**
252:24;256:12;
257:19
**entertain (1)**
241:7
**entire (4)**
143:2;177:21;
231:1;237:11
**entitled (11)**
17:25;18:5;50:10;
52:19;55:25;56:3;
67:2;72:2;199:16;
230:3;285:10
**entrance (2)**
289:16,18
**envelope (1)**

213:3
**environment (6)**
87:11,13;195:24;
262:19;266:23;288:7
**episode (1)**
182:14
**episodes (1)**
209:7
**Epperson (78)**
46:1;62:2,4;63:1,7,
21;65:21,25;72:5;
73:3,8;90:16;91:5;
97:16;99:4;112:14;
132:15;133:1,22;
134:1,7;143:12,15;
152:16,21;172:22,24;
189:19;194:2;206:25;
207:8,8,14;213:11;
214:4;215:11,23;
218:5,22;219:4;
220:2,5;222:12,23;
223:1,6,12,17,20,25;
224:3,8,13;225:21;
226:14,24;228:3,18;
229:12,25;230:5,9,20;
237:22;238:7,8,10,13,
13;239:3,9,9,20;
241:2;244:16,18;
249:8;280:12
**Epperson's (5)**
61:7;163:18;216:2;
221:9;239:11
**Equal (1)**
19:15
**equipment (5)**
74:11;117:4;
251:15;252:20;253:5
**erratic (1)**
228:16
**error (1)**
217:23
**escalate (1)**
238:25
**escapes (1)**
251:21
**escorted (1)**
264:1
**especially (1)**
236:2
**Essentially (2)**
130:4;277:1
**established (3)**
93:5;272:10,16
**estimate (1)**
23:14
**etcetera (3)**
219:19;240:20;
251:16
**evaluated (2)**
123:23;253:25
**evaluating (1)**
234:1
**evaluation (2)**

125:15;230:4
**even (16)**
10:13;13:9;40:18;
47:13;82:13;83:18;
85:6;94:4;109:3;
134:3;146:25;157:7;
174:20;235:6,7;294:8
**event (12)**
68:1;74:5;82:10;
83:20,21;84:22;
131:15;155:21;166:1,
14,24;181:6
**event' (1)**
85:3
**events (12)**
21:5;22:2;25:17;
59:25;66:16;78:22;
84:20;88:19,21;
108:12;266:25;
268:16
**everybody (7)**
97:16;100:11,11,
12,12;244:13;269:23
**everyone (6)**
98:8;100:2;105:6;
254:6;265:3;292:23
**everyone's (2)**
11:14;105:6
**evidence (4)**
86:21,23;87:4;
180:23
**evidenced (1)**
224:7
**evident (1)**
96:17
**exact (3)**
93:7;156:10;265:23
**exactly (9)**
12:12;40:11;58:21;
91:1;165:9;207:21;
240:10;265:18;282:9
**exaggerating (1)**
183:13
**exam (8)**
123:10;158:13;
172:6,6,9;173:11;
259:21;260:22
**EXAMINATION (8)**
9:7;177:1;247:11;
270:6,19;280:17;
287:14;294:22
**examinations (2)**
149:21;211:8
**examined (1)**
264:17
**example (6)**
15:10;21:6;74:19;
117:13;120:5;263:8
**examples (3)**
64:22;105:19;108:7
**exams (6)**
127:17;149:24;
150:3,14;151:17;

152:23
**exceed (1)**
72:18
**excellent (1)**
183:23
**excerpting (1)**
51:18
**excerpts (1)**
51:23
**excluded (1)**
137:10
**excuse (2)**
143:13;227:13
**executive (1)**
33:8
**exhausted (2)**
178:5;191:10
**exhausting (1)**
193:10
**exhaustive (4)**
106:8;107:5,17;
108:22
**exhaustively (1)**
161:16
**Exhibit (99)**
8:1;17:19;18:4,11,
22;19:2,7;21:13;
22:18;33:24;34:16,
21;35:1,14;36:3,19;
46:10;47:15,16;
49:21,24;50:4,9,23;
51:2;53:14;55:25;
66:15,23;67:1,18;
68:14;70:10,12;
71:24;72:1;73:16,18,
21,24,24;74:3,15,20;
75:1;77:7;79:6;89:3,
5;93:17;96:5;112:7,
22;113:25;149:17;
150:22;192:9;196:9,
22,24;198:16;199:13;
202:24,24;204:16;
212:24,25;213:10,17,
21,21;214:1;216:10;
217:12;219:24;
222:15,17;226:11,21,
25;227:6;229:23;
240:3;243:21;255:6,
14,14,15;259:8;262:2,
10;270:22;273:25;
274:1;289:4;294:4,6,
7,10
**exhibited (2)**
114:12;228:16
**exhibits (8)**
17:14;34:1;222:7,8;
225:11;227:13;
270:20;293:22
**exist (2)**
83:15;284:11
**exists (3)**
100:20,21;206:12
**exit (1)**

203:20
**exited (1)**
266:5
**expand (1)**
246:7
**expect (8)**
80:19;81:3,9,12;
141:16,17;145:4;
207:13
**expectation (2)**
68:9;71:15
**expectations (6)**
80:22;81:6,8;
103:14,15;143:17
**expected (6)**
81:7,12;128:11;
134:11;207:16;273:5
**experience (7)**
30:21;87:13;
134:13,14;152:9;
158:7;286:18
**experienced (5)**
14:24;15:18;25:15;
108:8;160:7
**experiences (1)**
133:16
**experiencing (1)**
108:15
**expertise (1)**
62:14
**explain (4)**
42:19;106:11;
144:11;163:20
**explained (4)**
71:6,9;144:7;
145:20
**explaining (3)**
98:24;151:19;153:3
**explains (1)**
42:7
**explanation (6)**
39:22;41:13,13;
43:17;159:20;277:10
**explanations (1)**
42:5
**explicit (1)**
105:12
**explore (1)**
285:10
**exposed (3)**
55:9,21;82:1
**express (4)**
101:20,20;151:21;
267:16
**expressed (1)**
280:24
**expressing (1)**
89:17
**expressly (1)**
294:24
**extend (1)**
63:16
**extended (1)**

89:1
**extending (1)**
222:4
**extent (1)**
227:14
**external (1)**
15:10
**extremes (1)**
226:25
**eye (1)**
64:22

**F**

**face (4)**
101:3,4;189:16;
235:22
**facilities (3)**
28:18;232:1;268:4
**Facility (33)**
28:11;31:14;33:1;
61:2,3;62:5;67:16;
170:19;177:10;
189:20;193:15;
206:20,22;248:6;
249:25;252:24;253:6;
254:4,7;256:12;
257:19;258:13;
263:25;264:6,14;
265:2;267:2;273:21;
276:22;277:14,20;
289:16;291:15
**fact (23)**
10:19;34:3;75:16;
76:7;96:17,19,23;
99:11,21;100:5;
114:6;143:4;155:22;
171:6,10;172:9;
183:3;189:3;197:13;
198:23,25;229:22;
275:20
**facts (3)**
46:5;87:19;191:1
**factual (1)**
45:23
**failure (1)**
137:22
**faint (1)**
47:23
**fair (38)**
10:7;11:8,18;12:20;
13:11;14:8;19:6,6;
20:21;24:3,4,14;
25:10;28:19,21;
42:24;55:22;65:12;
70:25;71:20,23;97:7;
129:12;133:1;137:8;
145:16;146:10;157:8;
170:21;188:24;
191:23,24;212:16;
221:12;226:7;272:9;
277:2;287:5
**fairness (2)**

190:15;209:8
**faith (1)**
    63:13
**familiar (3)**
    52:2;214:12;273:5
**family (12)**
    24:11;59:10,17,24,
    25;60:16;88:19,24;
    171:23;208:6,9;
    280:14
**fancy (1)**
    34:4
**far (9)**
    14:22;16:7;82:18;
    98:5;131:5,11;
    187:18;232:5;253:21
**faster (1)**
    10:6
**fear (7)**
    182:22;234:14,15,
    22;235:10;236:15,19
**fearful (3)**
    195:24;196:2;
    238:21
**February (13)**
    25:20;192:14,15;
    194:7,9;196:11;
    200:8;203:1;213:24;
    219:7,13;228:15;
    235:13
**feed (2)**
    35:10;209:22
**feel (14)**
    44:24;81:18;83:25;
    96:13;177:8;182:20,
    21;190:24;229:4;
    235:18,21;245:16;
    256:1,22
**feeling (3)**
    190:8;193:21;
    267:17
**feels (2)**
    177:22;190:10
**fellow (1)**
    220:4
**fellowship (1)**
    221:23
**felt (26)**
    14:9;16:16;40:13,
    14;65:9;75:25;83:22;
    91:22;96:16;103:22;
    115:20,22;136:7;
    146:22;153:2;181:17;
    193:25;195:22;231:3;
    239:4,19;256:2;
    258:25;259:1;260:16;
    287:4
**female (5)**
    82:19;165:3;257:6;
    267:5,6
**few (10)**
    10:4;23:7;49:24;
    81:22;160:3;161:4,7;

201:19;203:11;
247:17
**fight (2)**
    83:3,3
**fights (1)**
    83:3
**figuratively (1)**
    108:4
**figure (6)**
    45:18;100:9;129:8;
    169:8;207:24;216:4
**figured (1)**
    205:11
**file (10)**
    14:23;20:3;71:11;
    89:6;216:10;217:1,
    12;276:16,17,17
**filed (7)**
    9:13;17:20;18:23;
    194:1;223:21;226:13;
    228:3
**files (1)**
    49:25
**filing (1)**
    15:11
**fill (10)**
    31:17;32:4;113:16;
    118:21,23;123:20;
    126:8;127:22;142:22;
    274:24
**filled (4)**
    116:20;121:17;
    200:2;201:9
**fills (1)**
    117:3
**filter (3)**
    84:1,2;107:22
**final (3)**
    79:4;202:8;259:8
**finalized (1)**
    20:10
**finances (4)**
    242:8,12,17,19
**find (20)**
    9:19,20;11:5;39:25;
    40:2;44:17,24;50:1;
    76:14;84:24;112:4;
    161:3;178:16;188:1;
    202:20,23;226:6;
    241:17;268:19;282:4
**findings (1)**
    277:11
**fine (11)**
    11:5;33:16;40:17;
    106:2;195:17;217:23;
    227:23;243:4;244:8,
    10;286:2
**finish (6)**
    89:23;91:3;99:13;
    107:11;110:23;111:1
**finished (4)**
    130:10,19;158:17;
    287:11

**Finishing (1)**
    162:9
**fired (12)**
    76:18;79:21;80:20,
    25;87:14,23;153:19;
    224:14,17;238:1,1;
    239:6
**first (85)**
    9:4,16;10:9,12;
    15:14;17:14,19;18:6,
    10;23:10;27:10;28:6;
    29:9,11;31:7;34:25;
    37:4,10;38:23,23;
    50:9,22;52:10;55:15;
    61:17;62:8;67:5;
    77:13;81:14,24,25;
    82:3,7;84:13;102:16;
    103:1;104:19;105:3;
    113:19;114:16,19;
    116:11;123:9,14;
    131:8;139:12;146:14;
    147:20;151:2,10;
    152:13;154:11,12;
    166:2;179:6;180:24;
    183:10,11;187:3;
    194:15;196:9;198:2;
    200:1,18,22;202:19;
    211:11;218:24;239:2,
    7;248:16,24,25,25;
    251:7,18,19,19,24;
    256:11;264:9;272:20;
    275:18;278:16;
    282:22
**firsthand (1)**
    78:10
**fishing (1)**
    246:4
**fit (1)**
    32:3
**five (8)**
    19:19;34:11,12;
    63:15;108:23;144:8;
    200:25;259:20
**fix (1)**
    220:14
**flag (1)**
    182:2
**flexibility (1)**
    197:16
**flexible (1)**
    197:16
**flip (3)**
    53:15;54:21;73:15
**FMLA (4)**
    195:7;201:23;
    202:6,12
**focus (2)**
    48:25;174:5
**focused (1)**
    258:18
**focusing (1)**
    194:3
**folks (10)**

44:6;86:17;97:20;
99:21;108:13;152:9;
160:1;183:20;235:20;
258:23
**follow (5)**
    50:19;72:18;86:17;
    273:15;291:4
**followed (2)**
    212:6;277:6
**Following (10)**
    36:24;37:10,19;
    74:24;80:17;89:24;
    91:4;208:20;262:22;
    290:22
**follows (4)**
    9:6;85:1;104:12;
    135:22
**follow-up (11)**
    58:11;93:16;97:19;
    155:22;156:19;
    208:21;258:4;268:24;
    269:17;270:9,16
**force (1)**
    240:6
**forge (2)**
    66:19;109:9
**forget (1)**
    106:25
**forgot (2)**
    217:6;229:24
**form (46)**
    14:20;18:12;46:15;
    50:11;76:19;80:9;
    86:12;87:7;96:9;
    98:18;111:17;117:19;
    120:15,18;132:1;
    134:16,24;135:17;
    136:11;142:8;145:9;
    146:20;147:1;156:23;
    160:16,24;199:16;
    206:8;208:12;222:9;
    224:9;234:3;241:14;
    242:4,21;243:15;
    274:22;281:17;
    282:13;283:11;285:3,
    13,25;290:24;291:23;
    292:17
**formal (1)**
    92:9
**formalin (3)**
    116:21;123:21,21
**formally (1)**
    217:3
**formed (1)**
    102:10
**former (1)**
    280:7
**forms (1)**
    45:5
**forth (4)**
    54:9,23;73:19;
    195:5
**forward (4)**

9:22;11:11;77:8;
156:16
**found (9)**
    16:5;46:19;50:5;
    94:3;130:11;141:20;
    154:12;179:15;
    187:14
**four (8)**
    19:18;22:25;23:10;
    26:2;64:5;186:15;
    197:15;211:4
**four-inch (1)**
    141:10
**four-week (1)**
    22:21
**frame (3)**
    98:13;181:4;194:4
**frankly (1)**
    285:12
**Friday (1)**
    196:11
**friend (10)**
    59:17,24;63:17,21,
    23;68:5;208:6,9;
    218:10;219:17
**Friendly (3)**
    64:17;207:14;261:7
**friends (4)**
    60:8;63:10;261:7;
    280:14
**friendship (3)**
    218:14;239:16;
    240:21
**front (12)**
    44:21;54:15;77:18;
    79:5,17;116:23;
    124:25;126:1;213:2;
    238:13;264:20;
    278:24
**frustrated (2)**
    90:24;91:19
**full (5)**
    26:16;41:23;
    149:19;169:16;280:4
**full-time (1)**
    86:25
**fully (1)**
    109:7
**functions (1)**
    61:22
**further (27)**
    41:7,19;42:19,21;
    43:16;52:7;53:14;
    109:5;123:11;146:19;
    147:18;148:11;
    160:15,18;217:14;
    227:17;246:21,24;
    259:11;260:5;267:21;
    269:15;280:16,17;
    287:7,14;293:14
**furthering (1)**
    143:25
**future (1)**

239:24

## G

**gained (1)**
234:25
**galvanized (1)**
148:1
**gathering (1)**
16:3
**gave (15)**
58:17;84:16;
146:17;147:24;193:8;
194:15;198:25;
225:14,19;229:25;
244:25;251:1;252:24;
280:23;282:16
**gears (5)**
21:12;24:15,16;
57:1;106:12
**general (4)**
9:23;160:9;163:25;
278:19
**generally (3)**
21:18;52:2;117:16
**generate (2)**
154:15;172:25
**generated (1)**
69:17
**generically (1)**
117:15
**genesis (1)**
282:10
**genuine (1)**
198:22
**gesture (1)**
286:6
**gets (4)**
79:17;83:8;123:2;
124:12
**Gilgour (1)**
77:19
**G-i-l-g-o-u-r (1)**
77:20
**girl (6)**
186:2,7,9,15;
238:12;245:3
**gist (7)**
15:17;67:14,17;
151:20;167:8;231:13;
240:11
**given (14)**
41:5;42:5;71:1,14;
127:6;128:6;137:20;
138:20;143:5;179:19;
240:3;245:25;279:1;
289:21
**gives (2)**
39:14;117:23
**giving (13)**
10:13;28:6;39:20;
78:16;121:22;158:24;
159:24;165:21;167:6,

7;168:1;174:19;
197:16
**goal (5)**
9:18;11:1;288:11,
11,12
**goes (19)**
9:22;10:3;34:6;
53:16;82:19;117:20;
122:14;123:2;124:1,
1,6;138:25;139:1;
141:9,19;145:19;
168:16;258:20;
273:10
**Good (14)**
8:6,16;12:10;14:7;
23:7;41:24;63:2,4,6;
88:2;159:19;176:5;
181:8;193:14
**good-bye (2)**
218:11;219:18
**goodness (1)**
90:3
**Gosh (2)**
224:11;280:12
**gossip (3)**
64:24;65:10;92:20
**Gotcha (15)**
27:15;30:22;38:21;
42:13;45:1;58:22;
59:6;70:6,9;132:24;
150:25;162:25;181:5;
189:21;222:3
**graduate (1)**
42:3
**Grand (9)**
13:17;14:9,12,25;
15:4,10,18;16:16;
233:14
**granted (1)**
69:20
**grease (1)**
83:8
**great (7)**
33:16;218:2;262:7;
269:22;270:15;275:6;
276:18
**ground (2)**
10:4;115:17
**grounds (6)**
38:17,20;246:21;
252:14;253:16;266:7
**guard (1)**
81:7
**guess (39)**
22:20;27:5;36:20;
40:10;45:13;60:4;
61:25;71:12;80:12;
81:3;89:15;102:11;
114:9;115:19;116:12;
124:17;125:11;
128:17,18;130:2;
131:17;133:10,14;
136:18;163:10;

167:12;175:4;188:12;
195:20;196:25;
203:20;231:2,19;
240:23;249:5;260:16;
262:1;282:9;284:7
**guessing (2)**
10:1;77:4
**guidance (1)**
72:17
**Guide (4)**
51:14,23;62:11,22
**guided (1)**
55:7
**guidelines (1)**
108:3
**guy (1)**
54:19
**guys (2)**
26:19;245:11

## H

**habit (1)**
135:6
**half (6)**
69:7;131:19;
162:18;188:21;
193:16;242:16
**hall (1)**
263:19
**hallway (1)**
189:11
**hand (5)**
17:13;126:5;
139:14;238:22;
284:23
**Handbook (1)**
50:10
**handed (1)**
17:17
**handle (1)**
237:20
**handled (2)**
114:25;159:3
**handles (2)**
125:6;151:8
**handling (2)**
32:19;205:4
**hands (1)**
263:5
**handwriting (4)**
35:17;47:24;214:2;
274:17
**handwritten (2)**
67:7;120:14
**handy (1)**
73:18
**hang (4)**
36:23;137:2;
218:14;219:18
**happen (17)**
28:6;41:20;67:15;
86:18,22;142:19;

143:21;145:3;146:5;
148:13;168:15;171:9;
246:3,3;260:10,17,18
**happened (45)**
21:5,22;25:16;
29:13;42:7;75:20;
76:1;79:15;80:4,8,19;
89:8,15;93:15,16;
100:14;103:25;
125:13;129:25;130:1,
23;145:8,15;147:3,4,
20;159:25;171:16;
172:19;177:22;
179:17;189:21;191:1;
194:13;200:19;202:6;
206:5;207:24;220:24;
228:24,25;264:10,12,
22;282:10
**happening (12)**
82:15;85:7;145:2,
13,18;165:6;174:17;
178:14;182:24;185:6;
264:21;270:13
**harassed (3)**
14:10;16:17;193:21
**harassing (3)**
15:19;191:13;207:7
**harassment (20)**
49:1,11;51:25;
52:20;54:6;55:2;56:5;
108:20;174:16;
194:17,23;204:5,9,23;
206:12;263:1;271:11,
19;272:14;273:4
**hard (7)**
16:25;23:14;121:1;
181:20;182:4;235:22;
275:16
**harder (1)**
13:5
**Harkins (4)**
114:18;138:13;
193:25;210:25
**harmful (3)**
162:21;163:5;164:9
**hateful (1)**
98:9
**head (6)**
33:7;37:24;190:12;
200:21;202:15;
216:15
**headed (1)**
27:24
**heads (1)**
120:1
**Healing (1)**
222:11
**Health (19)**
8:20;9:11;29:19,24;
30:1;62:13;149:13;
163:24;164:2;226:14;
232:11,12;233:1,5;
247:25;258:23;

270:11;288:12;
295:22
**healthcare (2)**
28:17;283:18
**hear (20)**
31:7;42:21;73:7;
87:24;99:8;101:25;
102:2;162:11,13;
187:3;191:19,22,25;
237:17,19;243:2;
265:23;284:24;286:8,
15
**heard (16)**
85:24;87:2,20;
91:14,14;94:15;95:2;
130:13;164:1,24;
165:1;187:20,23;
189:11;239:8;263:22
**hearing (3)**
103:1;104:19;
105:23
**hearsay (1)**
86:2
**heart (1)**
157:8
**Heather (3)**
78:21;79:6;138:9
**held (1)**
13:21
**help (15)**
28:14;62:15,21,22;
99:24;127:19;183:22;
202:4;205:6,10;
206:17;207:11;
212:21;220:7;240:16
**helpful (2)**
40:19;46:9
**helping (5)**
152:10,23;153:4;
157:18;165:8
**hematology (1)**
120:23
**hereby (1)**
294:19,24
**here's (3)**
161:13;194:6;
224:25
**hereto (1)**
294:20
**herself (1)**
77:11
**hey (28)**
12:18;16:19;39:15;
40:21;50:17;69:14;
92:7;101:23;104:5;
121:22;137:9;152:8,
21;156:20;157:16;
159:7;167:6;176:19;
197:25;198:11;
200:19;208:22;
212:19;218:5,20;
220:5;225:13;279:16
**hidden (2)**

43:5;240:7
**hierarchy (1)**
   61:10
**higher (1)**
   150:8
**highest (1)**
   262:3
**highlight (1)**
   177:18
**Hild (8)**
   57:15;89:6,13;
   90:10,17;97:17;99:4;
   244:16
**Hild's (1)**
   57:13
**hire (4)**
   58:20;263:18;
   265:7,16
**hired (4)**
   28:23;250:9;
   288:23,24
**hiring (5)**
   31:6;36:4,7;57:24;
   293:7
**history (13)**
   40:23,23;43:16;
   44:9;47:22;69:5;
   158:20;175:18;
   253:21,22,23,24;
   281:24
**hit (2)**
   91:8;94:2
**hitting (1)**
   165:16
**Hold (3)**
   129:24;133:10;
   161:4
**holes (1)**
   294:1
**holiday (2)**
   58:18,21
**Hollie (12)**
   57:13,14,15,17,19;
   89:6;90:5,6,9,10,17;
   91:6
**home (12)**
   20:5,5,20;142:20;
   193:15;228:12,20;
   229:5;232:11,12;
   242:7,12
**honest (2)**
   25:17;41:21
**honestly (2)**
   25:9;160:6
**hope (1)**
   286:23
**hopefully (1)**
   10:5
**horrible (2)**
   224:10,11
**Horton (1)**
   78:9
**hospital (1)**

288:7
**hostile (3)**
   95:14;262:19;
   266:22
**hour (6)**
   27:19,19,25;47:1;
   149:3;193:16
**hours (6)**
   23:8,25;27:8;
   107:16;199:5,8
**house (1)**
   208:9
**How'd (2)**
   156:1;158:1
**HR (2)**
   204:21;205:6
**HSA's (1)**
   229:3
**huddle (2)**
   65:1;259:10
**Hughes (1)**
   68:18
**huh (2)**
   82:8;153:8
**human (2)**
   79:6,20
**hundred (4)**
   145:8;165:8;
   268:17;282:14
**hurt (2)**
   98:10;100:3
**husband (3)**
   60:8,13;68:4
**hypersensitive (1)**
   235:18

---

**I**

**idea (12)**
   22:18;40:24;
   101:12;127:10;129:7;
   137:21;151:25;196:3;
   197:25;227:9;243:12;
   282:23
**identification (2)**
   8:3;262:11
**identified (5)**
   43:10;106:20;
   118:4;275:19;294:2
**identifies (1)**
   124:7,8
**identify (8)**
   106:18;124:13,13;
   138:2;216:9;262:17;
   263:1;266:18
**identifying (1)**
   34:2
**identity (2)**
   256:8;258:19
**ignored (1)**
   146:18
**imagine (2)**
   212:22;229:9

**immediate (3)**
   88:24;204:24;205:4
**immediately (1)**
   236:3
**Implanon (1)**
   237:7
**implementing (1)**
   103:18
**implication (2)**
   183:17,18
**importance (1)**
   10:25
**important (4)**
   12:23;20:20;75:25;
   137:12
**impression (2)**
   142:3;180:18
**improper (2)**
   45:22;181:7
**inaccurate (12)**
   19:2,4;48:9;97:23;
   125:25;140:6;162:21;
   163:5;164:9;165:21;
   166:4;197:23
**inappropriate (17)**
   16:5;54:9;74:12;
   84:6;85:17,20,23;
   86:9,16;87:5,10,21,
   24;166:2,6;168:1;
   285:22
**inappropriately (2)**
   180:24;189:4
**inartfully (1)**
   136:18
**INC (1)**
   295:22
**incarcerated (2)**
   48:10,17
**incidences (1)**
   281:7
**incident (56)**
   16:14;74:17,21,24;
   76:9,12;78:4,6;80:7;
   81:4,6,15,25;82:1;
   87:11;89:12;92:13;
   102:13;103:12;
   105:24;109:3,13;
   110:7,13;112:9,18,21,
   23;113:10;114:4,8,11,
   21;115:5,6,6;116:9;
   117:14;126:21;129:9;
   162:19;163:4,11;
   164:21,23;193:24;
   205:22;211:13;239:4;
   244:18;259:11,12,13;
   264:10,13;279:17
**incidents (26)**
   82:23;85:25;86:6;
   103:5,7;106:17,21,24;
   108:6,24;114:23;
   115:2;129:7;136:12;
   148:11;154:13;
   184:25;191:15;

209:18,18;211:4;
   263:12;266:24;279:2,
   5,18
**include (3)**
   137:22;160:9;185:1
**included (2)**
   135:16;137:18
**includes (1)**
   17:21
**including (5)**
   28:19;78:23;
   141:21;213:8;293:25
**inclusive (1)**
   110:11
**incomplete (2)**
   19:3,5
**Incorporated (1)**
   8:20
**increased (1)**
   263:13
**incurred (1)**
   15:23
**Indeed (1)**
   31:22
**independently (1)**
   223:14
**indicate (2)**
   50:18;91:12
**indicated (4)**
   91:11;201:20;
   230:15;239:2
**indicates (2)**
   87:14;115:11
**indicating (2)**
   53:1,2
**indication (1)**
   91:23
**individual (6)**
   16:11;26:1;95:8;
   154:21;167:14;
   262:24
**individually (3)**
   154:20;156:5,6
**individuals (11)**
   154:21;167:12,12,
   17;203:13;261:20,21;
   262:17,21;267:1;
   268:10
**inform (2)**
   68:23;192:19
**information (69)**
   10:2;19:3;24:8;
   35:24;37:13;39:20;
   40:7,12,12,19;41:19;
   42:1,17;43:3;45:24;
   48:16;52:21;77:21;
   84:16;116:22;117:23;
   119:25;123:24;125:4;
   131:17;133:22;
   134:22;135:14,24;
   136:6,20;137:12;
   138:1;140:4,9;141:4;
   155:1;166:22;174:19;

175:3,15;178:16,17;
   179:16;180:6,12,16,
   23;181:2,3,8;187:14;
   188:8;213:4;214:14,
   15,20;215:12;221:7;
   224:5;230:25;268:19;
   271:12;272:15;
   277:17;281:23;282:5,
   16;283:3
**Information' (1)**
   271:20
**informed (2)**
   192:13;276:10
**initial (8)**
   74:4;82:9,10;83:20,
   21;84:21;85:2;109:21
**initial' (1)**
   85:4
**initially (4)**
   60:25;76:12;
   153:22;241:16
**initiated (4)**
   15:9;105:4;198:11;
   226:13
**injuries (1)**
   243:14
**injustice (1)**
   267:23
**inmate (7)**
   68:2;260:2;261:14;
   274:13;290:4,8,18
**inmates (4)**
   67:16;287:23;
   288:3,21
**innate (2)**
   98:4;283:14
**input (1)**
   20:9
**inputting (1)**
   19:21
**ins (1)**
   80:2
**inside (2)**
   213:3;221:18
**insofar (1)**
   176:6
**instance (3)**
   45:6;236:21;258:8
**instances (5)**
   43:11;141:20;
   182:1;184:5;258:9
**instead (2)**
   113:13;201:23
**Institutional (2)**
   100:21;183:2
**institutions (1)**
   215:20
**instructed (1)**
   275:3
**instructing (1)**
   227:21
**instructions (1)**
   54:15

**instruments (1)**
237:16
**insubordinate (2)**
132:8;147:24
**intend (2)**
227:24;243:1
**intensive (2)**
264:18,19
**intent (4)**
217:9;258:17;
264:18;287:2
**intention (1)**
111:8
**intentional (3)**
116:7;237:25;282:7
**intentionally (2)**
240:5,6
**interact (4)**
64:2;252:16;
261:12,19
**interact- (1)**
288:8
**interacted (4)**
96:8;245:15,18;
261:22
**interaction (6)**
58:2;68:7;79:17;
99:5;116:14;288:10
**interactions (6)**
96:6;99:20;155:9;
157:19;241:9;251:25
**interest (1)**
174:5
**interested (1)**
31:19
**interim (1)**
232:10
**interject (2)**
158:22;175:17
**interjected (1)**
157:17
**interjecting (3)**
151:18;153:3;
176:19
**internal (2)**
199:15,15
**Internet (3)**
188:1,16;214:6
**Interoffice (1)**
274:21
**Interrogatories (4)**
18:6;262:15;
266:17;269:8
**interrogatory (2)**
45:3;232:8
**interrupt (6)**
16:20;89:22;
101:24;170:3;175:17;
209:21
**interrupted (2)**
89:20;95:18
**interrupting (8)**
90:22,23,23;91:2;

95:19;117:6;151:19;
153:2
**interview (8)**
24:7;32:5,15;44:16;
58:12;59:6;60:5;
200:3
**interviewed (4)**
79:19;130:14;
138:4;148:24
**interviewer (1)**
200:7
**into (38)**
22:16;23:24;46:2;
50:2;53:14;78:17;
81:16;97:8,11,11;
102:1;120:4,10;
130:20;138:19;143:2;
157:1;165:5;168:16;
171:22;172:6;176:8,
10;177:1;178:23;
183:12;187:23;
192:12;230:17;
237:12;238:2;254:7;
260:5;270:18;285:11;
286:13;289:16,18
**introduce (1)**
265:20
**investigated (1)**
123:11
**investigation (22)**
80:8,12;130:11,15,
16,20;134:19,25;
135:12,15;136:1,17,
20;137:10,15,23;
138:3;144:3,15;
148:22;180:12;
224:18
**investigator (1)**
107:3
**investigators (1)**
137:11
**invitation (2)**
58:17;89:1
**invited (6)**
32:4;59:11;88:18,
20,22;221:22
**inviting (1)**
239:17
**involve (2)**
60:22;118:5
**involved (11)**
96:1;105:25;
119:10;136:1,3,17,20;
137:15;171:5;172:9;
239:4
**involving (2)**
119:17;168:2
**irregardless (2)**
83:23;84:7
**ish (1)**
19:24
**island (1)**
104:3

**issue (28)**
16:6;34:24;37:15;
40:21,25;42:15;94:7,
14;127:13;138:16,17;
139:14;145:21,22;
147:17;159:16;165:3,
3,20;200:25;206:20,
23;209:9;210:19;
221:4;276:2;278:16,
19
**issued (8)**
15:13;252:24;
289:9,15,20,25;
290:15,16
**issues (10)**
9:20;45:25;48:25;
54:6;151:15;157:13;
163:11;204:8;238:21;
288:12
**items (5)**
257:1,23;265:2,3;
280:19
**Ivan (8)**
8:17;17:15;218:2;
225:14,19;269:15,21;
285:8

**J**

**jacking (1)**
170:9
**Jag (48)**
8:23,23;16:19;26:9,
13;34:9;35:2,11;
50:17,24;52:17,24;
67:9,23;73:20;
101:23;150:19,25;
162:10;197:2;199:19;
209:21;217:5;225:16;
226:2,9;245:20;
247:12,14;255:13,18,
21;262:3,7,13;
269:14;270:11,17,21;
287:9,10,13,15;291:3,
11,15;292:25;293:13
**Jag's (4)**
283:6
**January (7)**
13:23;112:1;
113:14;114:1;226:24;
228:5;237:3
**Jeff (7)**
32:2,5,6;39:9;44:6;
57:25;59:1
**Jennifer (2)**
78:1,9
**Jenny (16)**
57:4;78:21;112:14;
130:8;133:23;134:6;
143:25;145:5;196:10;
203:8;221:10;245:8;
249:11;278:11,20;
280:9

**jeopardize (2)**
60:21;239:5
**jeopardizing (1)**
238:3
**Jerry (16)**
32:9;59:22;60:5,6;
61:12;88:18;112:14;
208:4,18,22;209:3;
211:16;212:21;
249:10,11;280:10
**job (41)**
13:5,10,22;23:7;
31:7;32:3;34:3;37:10;
38:24;64:2;69:6;
95:12;132:23;146:15,
16;147:21,21;159:15;
161:1;165:19;169:24;
174:18;194:16;195:6,
20,21;196:14,14;
231:18;232:8;233:21;
238:16;239:21;
241:20;252:20;260:1;
288:11,13,22;289:1;
293:10
**joined (3)**
31:6;121:8,11
**joke (2)**
221:18;222:4
**journals (2)**
22:1,10
**Joyce (1)**
77:19
**judge (2)**
10:15;45:24
**Judy (28)**
114:18,24;115:18;
116:10,14,15;121:7;
124:15;125:8,10;
126:25;127:6,14;
128:6,8,11;129:20;
130:1,3;133:4;
134:14;138:13;146:8;
193:25;206:14;
209:10;210:25;
220:25
**Judy's (4)**
124:18;148:5,6;
221:4
**July (3)**
8:8;68:18;70:18
**jump (2)**
50:22;85:15
**June (30)**
28:23;50:13;51:6;
52:12;67:3;113:5,10,
15;114:2,3,7,21,23;
115:6,18;124:16;
127:1,2;130:1;
139:21;162:19;163:3,
11;164:7,21;168:5,
24;230:6;249:2;
272:10
**jury (10)**

10:15,22;128:10;
191:22;234:1,11;
240:25;242:2,19;
243:2

**K**

**Kansas (14)**
13:20;29:5;30:24;
31:1;58:22;59:4;
88:25;97:4;193:15;
196:19;200:24;213:8;
221:25;231:24
**Karen (13)**
61:7;112:14;
133:21;206:25;
213:11;214:4;218:5;
226:14;229:25;230:5;
249:8,8;280:11
**keep (18)**
21:25;22:12;34:11,
12;44:20;97:13;
103:8;106:5;117:6;
136:16;167:17,24;
195:16;198:12,21;
199:6;272:24;294:1
**keeping (3)**
169:1;276:10,10
**kept (3)**
22:14;89:19;91:2
**keys (2)**
252:23;289:18
**kicked (1)**
29:22
**kidding (1)**
219:2
**kind (58)**
12:17;16:20;36:4;
42:19;43:16;44:9;
45:4,8,18;46:12;50:7;
53:17,17;58:10;
61:19;62:7,12;64:12,
25;65:3,3;77:8;78:22;
82:14;83:19;85:7;
98:12,25;99:10;
116:13;119:21;
120:23;123:1;129:8;
134:12;135:9;151:20;
152:8,10;154:4;
167:13;168:13;173:3;
182:1;183:18;187:23;
189:25;190:1;214:13,
15;217:9;221:18;
222:4;230:4;233:17;
246:2;258:15;259:15
**kindly (1)**
171:24
**Kirby (39)**
64:9;66:7;90:5,17;
91:18;92:4,13,19;
93:10,21;97:17;99:4;
102:8,20;104:14;
112:15;132:15;133:2,

10,12,22;134:2,6;
152:19,21;188:3,4,15;
222:16,18,24;223:21;
224:1,3,13;225:21;
229:12;230:20;
244:16
**Kirby's (2)**
63:24;163:19
**kit (1)**
237:5
**kitchen (2)**
267:2,7
**knew (19)**
20:16;76:15;80:1;
88:22;103:21;134:22;
147:10;172:17;
178:22;179:24;
260:19;274:13;278:1,
15,20;279:20,23;
280:22;283:1
**knock (3)**
237:18;260:13,15
**knocked (1)**
237:16
**knocking (1)**
261:3
**knowing (2)**
141:25;148:23
**knowledge (13)**
18:19;42:12;43:4;
79:23;154:15;166:22;
252:19;253:7,8,9;
254:8;279:16;291:20
**known (5)**
96:18,24;155:5;
282:24;290:18
**knows (1)**
221:2

## L

**lab (58)**
109:18;112:18;
114:9,16;116:9,14,15,
16;117:2,3,20;118:5,
23,23;119:22;120:1;
121:16,18;123:23;
124:12,25;125:5,5,8,
15,18;126:11;138:18,
20,24,25,25;139:1;
141:10,12,17;142:7,
17,21;144:7,12;
145:21;146:16,16,17,
23;147:10,16,21;
206:14;207:6;209:12,
14;211:5,10,10;
220:25;241:10
**label (4)**
124:1,4;138:8;
262:1
**LaBlance (23)**
8:1,18;9:3;17:11,
14;34:16,22;56:4;

88:13;105:15;138:13;
141:22;143:16;
185:11;213:1;227:19;
247:13;262:10;270:8;
287:17;294:5;295:5,
22
**LaBlance's (3)**
46:16;227:15;294:8
**lack (2)**
164:21;282:5
**lacking (1)**
95:15
**ladies (3)**
32:24;168:4;189:7
**lady (2)**
90:7;258:12
**language (11)**
74:12;85:18,20,23;
86:10,16;87:6,10,21,
24;245:4
**large (1)**
99:19
**last (36)**
19:19;22:22;25:19;
35:18;55:24;74:3;
75:7;77:13;84:18,24;
104:10;112:11;
114:10;131:18;
153:23,23,24;162:13,
18;186:16;194:9,16;
195:10;196:22;197:1;
203:1;210:11;219:9,
12,24;222:17,24;
248:15;255:24;
259:14;274:16
**lasting (1)**
235:5
**lastly (2)**
266:2;291:13
**late (1)**
224:11
**later (20)**
10:22;32:21;33:1,
23;45:24;61:2;96:15;
118:20;122:4,17;
130:8,8,16;151:11;
161:19;189:17;
237:15;246:4;269:16;
294:3
**Laurel (12)**
9:1;17:13;66:24;
73:17;84:23,23;
104:9;112:4;135:19;
213:16;217:12;
225:11
**Laurel's (1)**
13:4
**lawful (1)**
9:4
**lawsuit (13)**
9:13;15:12;17:20;
77:5;225:6;226:13,
13,23;228:15;231:10;

233:20;234:8;247:16
**lawsuits (3)**
223:21;225:4,22
**lawyer (1)**
9:17
**layoff (1)**
232:19
**layperson (5)**
162:20;163:4;
164:8,10,15
**lead (2)**
93:17;273:7
**leadership (1)**
203:9
**learned (2)**
78:11;203:9
**learning (2)**
235:15,16
**least (36)**
10:20;20:18;23:25;
59:25;62:25;63:7;
79:19;99:5;109:20;
111:10;115:7;128:15;
135:4,7,9;139:20;
155:16;157:5,14,20;
161:8;176:3,12,25;
180:5,10,19;200:6,7;
201:15;205:19;
206:18;210:19;211:3;
213:25;228:14
**leave (6)**
20:24;158:13,18,
24;201:23;238:20
**leaves (1)**
176:17
**leaving (6)**
193:9;218:24;
239:22;263:24,25;
264:6
**led (2)**
25:18;282:10
**Lee's (1)**
196:20
**left (23)**
22:21;26:4;46:2;
91:10;93:19;104:2;
109:4;124:18,22;
127:5;203:6;216:2,4;
219:4;228:19;230:16;
231:19;237:11;240:7,
12,25;241:21;251:22
**legal (4)**
9:20;11:11;14:24;
24:25
**length (1)**
175:23
**less (2)**
236:15;265:21
**lesson (1)**
56:13
**letter (9)**
19:24;69:9;82:19;
193:4;196:12;213:25;

222:18;269:5;281:14
**letterhead (5)**
52:23;67:3;271:6;
274:19,25
**letting (1)**
67:15
**level (2)**
65:5,6
**license (13)**
29:5,10,20;30:25;
31:1;42:2,4;166:22;
182:22;213:9;233:8,
13;239:21
**licensed (4)**
26:23;29:3,10;
65:18
**licensure (3)**
69:3;166:19;253:23
**life (4)**
82:25;236:13;
242:7,8
**light (1)**
39:19
**likely (3)**
227:18;272:16;
290:22
**limitation (1)**
70:1
**limitations (2)**
107:23;161:14
**limited (1)**
106:17
**limiting (1)**
173:22
**Linda (1)**
272:7
**line (4)**
76:17;150:8;
190:20;205:7
**lined (1)**
231:19
**lines (1)**
150:8
**lingering (1)**
236:4
**list (30)**
45:4,8,9,11;90:12;
97:13,16;105:19,23;
106:8;107:5;133:9;
154:5,7;171:15;
177:7,21;181:19;
185:23;244:11,12;
245:1,11;273:10;
279:5,15;280:19,23,
25;281:10
**listed (3)**
182:10;243:16;
279:18
**listen (2)**
216:6;259:22
**listened (1)**
239:15
**listing (1)**

185:17
**literally (2)**
113:13;257:8
**little (34)**
16:21,25;24:16;
26:16;29:8;42:1;
43:20;45:6,9,14;
50:22;57:1;61:19;
64:11;65:9;94:25;
108:13;111:23;
148:20;150:7;162:13;
183:12;235:16,17,18;
237:7,21;240:23;
253:18;257:9;259:11;
263:6;264:8;268:1
**live (2)**
83:13;171:4
**lives (1)**
171:5
**living (1)**
236:17
**load (4)**
159:10;160:14;
161:10;178:25
**located (1)**
31:18
**location (1)**
141:4
**location/test (1)**
140:4
**lockbox (1)**
289:18
**locked (2)**
237:4,19
**login (1)**
215:13
**logistical (1)**
164:18
**long (20)**
13:21;30:11;49:13;
58:20;84:8;121:6;
131:17,17;149:1;
180:2;193:14;195:12;
217:24;231:2,19;
239:20;243:25;
245:20;251:22;
286:21
**longer (4)**
22:12;157:11;
232:18,23
**look (45)**
18:14;21:12;25:5,5,
7;29:15;36:11;46:10;
48:16;52:2;53:12,19,
24;67:6,21;74:15,15,
18;77:3,8;112:2,10;
113:2;138:6;140:13;
157:22;179:6;180:13;
183:14;184:15;
188:15;195:9;198:14;
199:13,25;204:15;
212:24;214:19;231:3;
255:5;257:13;272:20;

275:9,23;276:13
**looked (12)**
23:21;36:13;43:10;
55:8;130:20;144:18;
189:3,9,13;190:12;
258:3;263:21
**looking (31)**
21:10;22:18;31:17;
34:20;36:12;52:1;
53:8;76:8;79:10;80:3;
103:16;105:23;111:6;
113:14;114:1,9,14;
123:25;157:15;191:6;
204:17;214:24;
219:23;222:13;
238:14;240:2,7;
257:18,20;281:25;
290:8
**looks (37)**
29:13;35:11,20;
46:23,23;47:24,25;
51:6;52:11;54:2,2;
55:5,13;59:24;67:14;
68:18;70:13,16;
74:21;77:11,20,24;
79:3,14,15;80:7,11;
84:8;149:23;152:5;
192:13;197:24;201:8;
202:25;213:23;214:5;
230:5
**lose (4)**
182:23;218:8;
238:16;239:20
**losing (3)**
98:22;188:14;236:4
**lost (4)**
229:8;233:8,13,21
**lot (8)**
13:5,10;23:23;
27:20,20;84:16;
184:2;231:24
**love (4)**
218:17;219:18;
239:16;240:21
**Lovelace (40)**
32:9;39:7,8,14,20;
40:6;41:5;42:15;
57:23;58:3,13,24;
59:7,18;60:17;61:17;
88:18,22,23;112:14;
133:13;154:24;208:4,
8;209:4,16;210:14,15,
17;211:25;212:11,19;
249:10;277:1,6,9,13,
16;278:6;280:11
**lunch (2)**
87:18;88:14
**lungs (1)**
259:23

**M**

**Ma'am (39)**

9:9;13:13;17:17;
26:15;34:8;35:6,14;
47:10;50:4;51:9;67:1;
68:17;72:1;74:2;77:9;
89:5;92:16;93:8;
95:23;135:3,3;
149:11;150:16;210:8;
212:25;222:8;226:12;
228:2;230:1;233:16;
248:7,11;250:21,25;
251:6;252:2;259:14;
285:2,15
**machine (1)**
258:18
**mail (2)**
189:19;219:23
**mailed (1)**
213:11
**maintained (1)**
29:23
**majority (1)**
29:7
**makes (7)**
38:10,18;81:17;
83:12;97:3;199:24;
226:17
**making (6)**
155:5;169:23;
195:1;242:14,15;
263:24
**malignancy (1)**
116:19
**manage (2)**
235:15,16
**management (5)**
15:24,25;180:13;
203:10;245:15
**manager (2)**
16:6;278:13
**manifests (1)**
284:13
**manner (3)**
204:1;285:2,22
**mannerism (1)**
285:8
**manners (1)**
62:11
**many (21)**
20:22;82:25;84:10;
96:1;107:16;126:20;
127:4,12,14,25;129:8;
169:4,5;176:22;
181:16,22;203:25;
209:18,19,20;210:16
**March (3)**
19:14;82:13;85:6
**mark (2)**
181:9;262:6
**marked (5)**
8:2;192:9;262:5,11;
293:21
**marking (1)**
216:8

**marriage (2)**
171:3;242:7
**married (1)**
282:16
**master's (2)**
29:23;236:11
**match (1)**
124:12
**material (1)**
21:10
**materially (1)**
19:3
**materials (16)**
21:9;46:1;50:5;
52:2,3,9;55:14,20;
74:16;79:15;85:19;
204:4,5,5,7;213:6
**matter (3)**
49:4;89:18;159:6
**mattered (1)**
102:11
**matters (1)**
227:19
**Matula (179)**
8:19,19;9:8,11;
14:21;15:8;16:24;
17:3,10,13,16;26:11,
14;33:24;34:7,11,23;
35:4,9,13;36:15,18;
43:8;46:18,25;47:9;
49:22;50:3,21,25;
51:4;52:19,25;66:22,
25;67:12,13,21,25;
68:14,16;70:10,11;
71:23,25;73:17,22;
74:1;76:23;80:14;
84:12,15,23;85:11;
86:20;87:16;88:2,5,
12;96:12;98:21;
99:15;102:4,6;104:9,
20;105:19;106:2,3;
110:24;111:21;112:4,
6;119:1;132:5;
134:20;135:2,19;
136:4,5,15;137:5,24;
142:9;143:8,10;
145:14;147:7;149:1,
4,10;150:5,11,15,21;
151:1;153:16;157:3;
160:19;162:16,17,25;
163:2;177:25;178:3;
179:7;185:16,21;
186:5;192:8,10;
193:2;195:12,15,18;
196:24;197:3,4;
199:17,21,23;206:2,9;
208:16;210:1,7;
212:16,17;213:16,19;
216:8,15,19,23;
217:22;218:1,23;
224:10,12;225:10,13,
18;226:7,10;227:23;
228:1;234:4,5;

241:24;242:9,24;
243:8,18,24;244:3;
246:10,17;270:10;
276:20;278:23;
279:11,19,22;280:1,
18,20;281:19;282:19;
284:1,4,18;285:7,14;
286:2,4;287:7,12;
293:15,21
**Matula's (1)**
270:19
**may (29)**
26:3;35:21;49:13;
60:7,8,10;72:18;83:1;
110:14;119:8;127:21;
142:21,22,22;145:15,
15;165:7,14;171:23;
175:5;180:4;190:10;
225:14,15;240:16,16;
248:24,25;255:15
**maybe (60)**
20:10;26:2,2;27:25;
46:12;47:16;53:9,19;
56:19;60:15;66:20;
67:22;70:17;72:17;
74:17;75:7;79:18;
93:6;106:22;117:13;
118:10;131:13,13,14,
14;142:18;152:6;
160:10;162:11;
164:21;167:13;183:6;
185:4;187:20;195:5,
6,7;197:14,25;
199:25;201:19,20;
202:14,14;204:18;
205:5;207:1;215:10;
216:6;217:18;223:14;
225:2;237:1,2;238:9;
241:8,13;266:9;
267:24;279:23
**McWhorter (12)**
33:20;71:9;76:5;
78:8;151:11;179:24;
275:5;276:15;280:2,
5;290:5,7
**mean (81)**
12:22;23:14,22;
26:24;27:3;63:8,20,
20;64:23;68:25;69:1;
70:24;71:12,14,17;
75:12;79:14;80:18;
86:24;87:19;95:10;
98:6,8,15,22;102:23;
108:21;111:7;114:19;
117:18;128:9,13;
134:21;139:8;140:21,
23;160:12;166:8;
169:20;170:3;172:1;
178:23;183:17;
184:13;188:19;190:9,
10,25;196:2,3,5;
203:17;204:17;
205:12,18,19;212:12;

219:19;220:24;
221:17;224:25;228:2;
230:4;236:7;239:1,
14,19;240:22;242:13;
251:12,12,14;253:19,
20;257:20;261:11;
263:6;283:10,13;
286:5;288:4
**meaner (1)**
12:25
**meaning (9)**
86:18;114:21;
132:15;138:24;
148:10;175:10,11;
279:23;288:6
**means (3)**
68:11;107:5;108:22
**meant (3)**
34:13;163:21;
285:10
**medical (63)**
26:22;28:14;32:7,
11,24;33:1,8,12,12,
18;39:5;58:7,11;61:9,
10;65:18,19;68:19;
72:20,24;73:13,14;
77:20;119:3,14;
150:3,13;162:24;
163:6;164:9;165:9,
21;166:7,20;167:6;
168:1;170:19;174:23;
203:10;207:18;208:3;
214:14;215:16;231:1;
246:13,19;249:7,8,10;
251:15,20,21,23;
252:19,25;255:2;
256:17;261:22;266:6;
280:11,12;289:19;
293:8
**Medicare (1)**
232:24
**medication (2)**
122:11,12
**medications (2)**
234:23,24
**medicine (1)**
162:22
**Meehan (37)**
57:9,20;78:21;
112:15;130:8,19;
131:1,6;133:23;
134:6;135:15,25;
136:7,24;138:3,18;
139:14;140:1;141:9;
143:12,25;144:17;
145:5;146:7;147:15;
148:14;196:10;197:6;
201:9;202:25;203:24;
221:10;245:8;249:11;
278:5,20;280:9
**Meehan's (4)**
57:4;138:9;148:9;
278:11

**meet (4)**
44:3;131:3;146:25;
147:10
**meeting (34)**
16:7;32:16;89:9,15,
16,19;90:2,13;91:17,
25;92:8;93:10,15,17,
23,25;94:9,10;95:5,
17;96:4;97:18,19;
102:8,10,17;115:20,
25;131:18;147:12,16,
17;148:13;192:17
**meetings (1)**
44:10
**Megan (5)**
238:6,6,6;244:19,
20
**member (5)**
162:20;163:5;
222:2;276:1,6
**members (6)**
24:11;164:8,13,16;
174:23;184:23
**memo (6)**
78:20;89:6;275:24;
290:3,15,16
**Memorandum (3)**
67:3;274:4;275:20
**memorialize (5)**
86:8;89:7;115:25;
155:15;216:25
**memorialized (4)**
96:4;115:8;155:12;
197:22
**memorializing (2)**
21:21;162:3
**memory (4)**
24:8;42:14;69:13;
290:9
**mental (2)**
234:6;258:23
**mention (2)**
85:16;102:3
**mentioned (19)**
24:6;36:5;57:23;
82:14;85:7;93:20;
96:2;101:24;126:21;
133:7,8,9;168:7;
230:14;263:3;266:2,
4;269:1;289:3
**mentioning (2)**
78:23;228:25
**message (12)**
23:5;216:2,5;
217:23;218:25;219:4,
16;221:13;239:15,22;
240:12;241:1
**messing (1)**
170:14
**met (17)**
9:9;32:6,10,23,23;
33:3,11;37:12;43:22;
44:5;57:24;58:13;

60:5;68:3;131:7;
136:9;156:9
**mic (1)**
244:2
**Michael (3)**
248:15,16,16
**middle (6)**
150:6;172:6;
259:15;260:22;
270:24;275:13
**mids (1)**
27:3
**might (30)**
11:23;12:12;21:20;
40:19;43:14;46:2;
54:7;56:21;60:13;
75:22;77:5;94:2;
118:10;131:7;136:21;
137:7;164:17;166:6;
187:19;200:16;
213:17;218:6;225:20;
228:13;236:4,16;
240:14;244:7;246:23;
285:11
**Mike (14)**
8:19;9:10;16:19;
34:9,20;35:3;50:17;
67:10;101:23;150:4;
217:13;280:20;284:3;
287:10
**miles (1)**
72:21
**mind (4)**
160:8;217:23;
236:22;262:8
**mindful (1)**
105:16
**mind's (1)**
64:22
**mine (4)**
135:6;147:13;
217:20,21
**minimum (1)**
24:1
**Minute (3)**
131:19;162:13;
188:21
**minutes (5)**
49:13;131:19;
139:5;161:4,7
**miscommunication (2)**
147:2,5
**mismemory (1)**
113:15
**misread (1)**
143:14
**miss (3)**
218:8,9;221:8
**missed (5)**
71:4;93:7;153:6;
223:15;239:11
**missing (3)**
162:6,8;244:21

**Missouri (32)**
8:13,24;9:14;28:16,
18;29:4,10,14;36:25;
37:19;52:10,22;
55:16;72:4,13,21;
82:20;97:4;173:23;
215:20;222:10;
247:15;266:20;268:4,
7;271:7,22,23;274:5,
20;294:23;295:23
**misspoke (1)**
162:25
**Misstates (1)**
98:19
**mistaken (1)**
253:2
**mistakes (1)**
41:22
**mistreated (2)**
100:7;244:14
**mistrust (1)**
234:22
**misunderstanding (10)**
130:12,17,21;
132:8;145:25;146:1,
15;147:25;148:23;
221:7
**misunderstood (2)**
100:3;204:19
**MOCIS (1)**
215:14
**module (5)**
49:8,10;53:25;54:3;
56:14
**moment (5)**
34:12;38:2;54:1;
64:20;284:19
**monetary (2)**
233:19;234:2
**money (3)**
201:1;234:12;238:3
**monitor (1)**
34:5
**month (7)**
69:7;70:18;107:16;
169:5,5,6,7
**monthly (2)**
169:6;249:23
**months (10)**
26:2,3;71:11;81:22;
108:23;180:6,9,19;
189:2;259:8
**mood (1)**
228:10
**more (47)**
10:2;13:4;16:22;
23:8;24:10;40:10,11,
12,22;53:15;64:22;
65:9;66:15;108:24;
109:25;113:16;
144:22;160:9;164:17;
171:18;172:3;173:25;
176:22;181:15,20;

182:4,18;191:24;
199:20;217:3;220:2;
225:2;231:12;242:10,
11,20;243:1;253:19;
263:6;264:18,18;
265:21;268:1;277:10;
283:25;284:7;293:15
**Morgan (2)**
67:4;274:9;290:4
**morning (9)**
8:6,16;12:7;27:7,
21;37:12;89:24;91:4;
261:18
**mornings (1)**
27:22
**most (8)**
12:6;27:7,22;64:15;
86:16;138:23;141:11;
171:2
**mother (5)**
228:8;229:8;236:5,
8,8
**motion (1)**
171:22
**motivation (2)**
99:22;234:17
**mouth (1)**
187:9
**move (10)**
116:5,8;161:20;
192:5,6;233:7;
259:25;261:24;
266:17;291:12
**moved (3)**
157:24;259:22,23
**movement (1)**
91:11
**moving (4)**
129:25;259:7;
260:5;265:6
**Mrs (4)**
71:9;80:5;185:11;
247:13
**much (18)**
21:4;23:10,13;
27:18;48:14;50:14;
58:2;87:18;88:25;
171:5;175:5;202:22;
203:9;218:16;234:12;
247:19;253:4;257:21
**multiple (3)**
42:18;232:1;264:12
**murmuring (13)**
182:25;184:7,11,
14;185:1,5,17,19;
186:21,22;187:24;
189:1;192:3
**must (6)**
39:11;100:3;
120:11;171:21;189:2;
290:19
**mute (2)**
162:12;225:17

**mutually (1)**
61:6
**myself (4)**
63:16,23;72:13;
182:2

## N

**naive (2)**
63:5;111:20
**name (44)**
8:7,14;9:10;26:6;
32:9;33:6,7,10,21;
76:10;101:18;114:17,
18;120:20;123:24;
124:10,13;153:11,23,
24;172:13,18;182:15;
185:25;186:1,3,3,16;
220:25;244:22,24;
247:13;248:15,16;
251:21;258:24;261:1;
262:23;280:4,13;
282:22;290:8,9,10
**named (2)**
90:4;254:20;290:4
**names (15)**
33:15,17;152:15,
25;164:5;182:18;
184:18,19,22;185:3,
23;256:16;261:23;
276:14;280:14
**narrative (21)**
22:17;36:2;37:18;
39:21,25;66:17;
73:16;74:2;109:11,
20;111:25;112:24;
113:12;124:17;
150:24;157:16;
159:18;161:9;173:24;
177:17;184:25
**Nate (1)**
8:7
**National (1)**
30:1
**nature (14)**
15:17;31:23;43:7;
62:10;114:11,24;
119:2,13;125:3;
127:17;128:6;171:8;
191:13;263:23
**NCC (1)**
29:18
**near (1)**
125:8
**necessarily (6)**
92:7;105:12;
142:14,15;158:21;
264:15
**necessary (5)**
70:4;71:8,9;118:8;
137:11
**need (39)**
11:21,25;12:13,18;

15:16;36:11;40:22;
44:24;50:2;102:23;
104:5,16;117:6;
118:4;119:3,14;
121:17;126:7;142:22;
145:6;158:21;159:14;
163:21;167:13;170:4,
4;178:8;187:9;198:9;
217:11;232:23;237:6;
240:14,16,16;270:20;
288:16;292:23;294:3
**needed (22)**
32:4;36:5;37:6;
40:10,12;41:7;62:21,
23;116:19;136:24;
157:23;159:1;193:12;
231:4;232:18;237:4;
238:23;252:20;
254:15;269:16;
274:24;292:14
**needs (6)**
119:25;120:19;
121:22;123:11;
124:23,23
**negative (3)**
57:19;194:21;
229:18
**negligent (1)**
137:23
**Neither (1)**
293:17
**new (9)**
13:6;43:3,4;143:14;
235:1,1;263:18;
265:7,16
**news (1)**
268:21
**next (27)**
51:17;52:8;53:7;
55:17;66:23;67:6;
68:14;73:18;77:19;
78:1;79:20;124:21;
143:11;144:6;145:19;
146:2;149:13;158:10,
11;168:17;186:25;
192:11;227:2;232:9;
233:13;260:20;275:9
**nice (1)**
108:13
**niece (1)**
59:11;60:1
**night (2)**
122:14;182:23
**nights (3)**
26:24,25;27:3
**nod (1)**
12:11
**Nodding (3)**
200:21;202:15;
216:15
**nonchalant (2)**
157:21;168:13
**nonchalant-type (1)**

156:11
**none (1)**
97:10
**noneconomic (1)**
233:22
**non-nursing (2)**
150:2,12
**nonproblem (1)**
129:9
**nonresponsive (2)**
84:13;143:9
**nonspecific (1)**
40:9
**nonverbal (1)**
103:6
**nonverbally (1)**
82:22
**Noon (1)**
88:8
**nor (1)**
190:20
**normal (4)**
69:25;100:25;
165:19;288:7
**normally (1)**
264:23
**Notary (1)**
295:15
**notation (1)**
246:23
**note (3)**
48:12,13;182:12
**noted (2)**
155:3;184:7
**notes (6)**
21:8,19;22:1,10;
24:6;67:7
**notice (3)**
17:22;168:23;
192:23
**noticed (3)**
169:16;226:24;
257:23
**notification (4)**
37:11;39:12;
272:21;273:1
**notified (2)**
38:25;39:3
**notify (1)**
273:2
**noting (1)**
246:23
**November (2)**
189:6,21
**nowhere (1)**
264:2
**NUGENT (97)**
8:16,17;10:3;14:19;
15:1;17:1;24:24;
34:20;43:1;45:21;
46:14;47:2;76:19;
80:9;86:12;87:7;88:4;
96:9;98:18;99:13;

105:15;110:23;
111:16;118:15;132:1;
134:15,24;135:17;
136:11;137:2;142:8;
145:9;147:1;150:4,
10;153:6,9,11,14;
156:23;160:16;
162:23;177:20;178:2,
11;185:11,15,22;
192:25;195:14;206:1,
7;208:12;212:14;
216:12;217:3,5,20,24;
224:9;227:11;234:3;
241:14;242:4,21;
243:5,15;246:15,18;
247:2,5;255:10,15,20;
269:22;270:7;279:9,
25;280:3,16;281:16;
282:13;283:11;284:3;
285:3,5,13,25;287:9;
290:24;291:7,23;
292:17,21;293:17,24;
294:13
**Number (32)**
8:11;23:9;48:24;
70:12;72:21;89:4;
124:8,8,14,14;138:8;
150:19;159:13;
186:13;200:25;204:8,
11,14,22;217:4,8;
240:3;244:5;252:23;
262:3,11;266:17;
274:1;289:17,20,22,
25
**numbered (14)**
50:23;51:3;54:14;
56:1;67:2;72:2;73:25;
75:8;112:8;196:23,
25;199:17;213:1;
294:5
**numbering (1)**
294:2
**Numbers (10)**
8:2;34:16,17;50:18;
67:11;165:17;199:20;
213:1;226:1;294:9
**numerous (2)**
42:5;63:14
**nurse (37)**
26:22,23;27:12;
28:24;29:3,19;30:2;
45:16;60:25;64:1;
72:4,14;90:4;91:18;
119:10;133:2,15;
149:14;152:7,13,18;
163:19;185:25;
186:11;232:13;245:2;
247:24,25;248:8;
250:1,9;251:2,10;
282:16,17;288:1;
289:11
**nurses (5)**
27:14;125:2;

132:16;189:8;237:3
**nursing (14)**
14:2;29:10;30:3,4,
5,12,13,18;42:2;
90:16;118:18;213:9;
232:11;236:10

**O**

**oath (1)**
47:12
**OB-GYN (1)**
233:4
**object (38)**
14:20;46:15;76:19;
80:9;84:12;86:12;
87:7;96:9;98:18;
111:16;132:1;134:15,
15,24;135:17;136:11;
142:8;143:8;145:9;
147:1;156:23;160:16;
206:8;208:12;224:9;
227:12;234:3;241:14;
242:4,21;243:15;
281:16;282:13;
283:11;285:13,25;
291:23;292:17
**objection (10)**
15:1;46:16;137:3;
227:12,22;243:5;
285:3;286:1;290:24;
291:7
**Objectives (3)**
54:17;55:2,7
**observe (1)**
185:18
**observed (2)**
186:20;228:4
**obtain (5)**
118:18;119:4;
123:19;125:2;236:9
**obtained (5)**
119:9,18,25;
124:17;139:2
**obvious (2)**
259:24;260:1
**obviously (3)**
23:23;92:23;161:17
**occasion (4)**
116:17;128:2;
129:2,5
**occasions (7)**
42:5;63:14;128:15;
167:19;208:10;211:2,
12
**occur (7)**
81:10,11;83:1;
105:7,8;163:22;264:7
**occurred (24)**
23:16;43:24;56:22;
86:1;87:3,12;92:21;
102:13;105:7;108:7,
12,25;110:5,9;

113:10;137:21;
139:15;144:22;
146:14;147:20;
154:23;266:24;
268:16;282:17
**occurrence (1)**
83:24
**occurring (2)**
74:5;76:25
**o'clock (1)**
27:25
**odd (1)**
190:10
**oddly (1)**
189:25
**off (46)**
11:24;17:1,3,5;
23:11;27:6,23;33:7;
34:25;35:20;47:3;
55:6;71:10;81:7;84:2;
88:6;90:24;122:13;
149:5;162:9;178:4;
189:17;209:24;210:1,
2,10,10;216:12,14,16;
230:25;243:23;
246:15;247:4,6;
254:15;269:7,25;
277:21;284:2;289:6;
291:14;292:2,14,23;
293:20
**offender (3)**
213:4;214:15;
222:13
**offensive (1)**
92:24
**offer (2)**
159:20;263:18
**offered (5)**
32:21;33:1;146:2;
147:15;289:1
**offering (1)**
146:8
**offers (1)**
170:18
**office (26)**
8:21;32:2;91:5,18;
109:4;116:23;117:4;
125:22;126:12;130:9,
23;139:16,22;141:3;
169:3;189:8,25;
191:6;198:5;229:3;
260:20;263:15,15;
275:16;276:15;
289:18
**office- (1)**
172:5
**officer (18)**
105:2;172:6,8,11;
173:4,10;176:25;
256:10,10,11,14;
260:20;263:18;
265:15;267:6;273:21;
282:20,24

**officers (20)**
170:18;171:11,18,
21;172:3;176:23;
256:6,9,13,15,16;
257:17;259:9;260:8;
261:18;263:17;
264:13;265:17;
282:16;288:19
**Off-the-record (6)**
17:7;35:8;210:4;
216:18,24;225:12
**often (4)**
260:9;261:13;
264:11;267:14
**oftentimes (4)**
62:10,14;109:2;
286:14
**okaying (1)**
79:20
**Oklahoma (1)**
30:16
**onboard (2)**
121:7;179:25
**onboarding (2)**
49:15;276:19
**Once (12)**
81:11;86:15;
103:10,11;113:9,18;
159:19,23;199:20;
210:20;256:20,20
**one (108)**
12:24;13:5;15:2;
20:9;25:12;26:1;
32:23;34:5,12;35:7;
39:3;50:1;60:7,9;
67:16;68:2;75:5;
81:21;84:21;87:2;
90:22;92:12;93:9;
99:17;109:23,25;
110:5,10;112:5;
114:8;119:17;121:14;
126:21;128:2;129:4;
132:9,16,17;135:20;
142:23;143:23;145:1;
153:5,22;157:16;
159:17;160:13;
164:17;169:1,9;
170:20;171:4,5,20;
176:24,25;182:17;
186:11;189:5,8;
192:9;195:13;199:25;
203:24;205:13,22;
209:18;210:22,24;
211:1;218:16;222:1;
223:5;227:2;228:11,
24;234:19;237:6;
238:10;239:23;
240:15;241:22;
246:13;252:12;
256:10,18;257:24;
258:8,22,22;259:6,21;
263:8,16,17;264:5,10;
265:17,18,21;266:11;

267:7,10,11;279:23;
281:20;282:1,15
**ones (6)**
53:24;115:7;140:4;
184:6;191:17;279:4
**ongoing (1)**
176:7
**online (1)**
31:22
**only (30)**
16:15;34:5;47:21;
85:18;101:8,10;
102:18;104:13;
111:13;115:7;116:15,
16;132:9,10,21;
133:14,15;143:5;
181:3;206:11;215:21;
218:16,16;225:14,19;
241:21;267:7,10,11;
287:16
**onsite (20)**
57:10,15;58:15;
61:9,20,21;62:5;
65:23;72:19,19;73:1,
13;130:24;131:1;
249:7;250:23;251:1,
3,20;280:12
**Oops (2)**
233:10,11
**open (1)**
260:15
**opened (3)**
189:8,12,25
**opened-ended (1)**
233:17
**operations (1)**
57:8
**opportunity (13)**
10:2;19:16;31:8;
88:25;106:11;174:20;
182:10;192:1;218:19;
221:14;227:18;
269:21;270:8
**opposed (2)**
56:22;177:9
**option (1)**
199:9
**oral (1)**
167:1
**orally (1)**
277:25
**order (12)**
40:18;51:2;72:22;
118:17;122:5;138:25,
25;140:9;141:8;
213:8,18;269:24
**ordered (1)**
140:8
**ordering (1)**
117:21
**orders (2)**
138:19,19
**orient (1)**

112:10
**orientation (2)**
49:15;204:4
**original (3)**
30:4,5;255:6
**originally (3)**
17:20;159:11;195:2
**others (7)**
36:24;79:17;91:14;
97:10;234:22;264:19;
268:3
**otherwise (3)**
61:23;192:4;231:13
**ours (1)**
142:21
**out (113)**
9:19,21;10:5;11:5;
20:24;23:11;26:2,3;
27:24;30:16;32:2;
39:25;40:2;45:18,22;
46:3;47:15;51:2;
54:20;57:18;62:9;
71:10;73:18;75:17;
76:14,14;77:12,22;
88:23;91:12;94:5;
100:9;103:6,17;
104:6;108:23,24;
112:2;113:18;116:20;
117:3,14;118:21,23;
121:17;123:20;126:8,
11;127:22;129:8;
136:22;142:22;
152:10,23;154:11;
157:18;160:3;169:9;
179:16;182:5,21;
187:18;188:20;
189:11;192:23;198:6;
200:2;201:9;202:5,7,
21,23;204:6;205:5;
207:11,24;209:22,23;
212:10,18,21;213:16,
17;214:24;216:4;
220:7;225:11;230:6;
232:5;237:7,13;
248:23;257:1,23;
258:2;264:2,4,16;
265:2,8;266:3,6,11;
274:24;278:8,23,24;
281:24;282:12;285:6;
289:24;290:22;291:5
**outing (1)**
60:9
**outright (1)**
82:3
**outs (1)**
80:2
**outset (4)**
49:18;55:22;56:17;
107:14
**outside (7)**
133:6;170:19;
206:19,22;231:24;
259:21;266:14

**over (22)**
10:4;12:24;13:5;
18:14;20:18,19;23:9;
43:5;57:7;94:14;
105:2;143:13;178:25;
208:9;223:2,7;226:4;
230:9;232:24;238:14;
258:23;287:23
**overall (2)**
183:24;289:19
**overblown (1)**
9:17
**overheard (1)**
187:11
**overlap (2)**
27:19,20
**overlapped (1)**
27:18
**overriding (2)**
179:1;183:21
**oversaw (1)**
57:7
**oversee (1)**
72:16
**overt (3)**
83:21;181:3;182:16
**overtly (1)**
82:22
**overwhelmed (1)**
218:15
**own (7)**
49:9;77:7;81:25;
155:5;165:11,14;
217:9

---

**P**

**pace (2)**
235:3;272:23
**Pack (1)**
271:13
**package (1)**
213:7
**packet (5)**
34:14;35:15;43:9;
204:14;270:22
**page (69)**
11:4;18:9;19:8,9;
21:14;34:25;35:18;
36:20;46:10,19;50:9,
22;51:1,2,11;52:11,
17;53:7,11;54:12,21;
55:1,3,24;67:5,10;
74:3;75:7;77:13;
78:25;79:5;109:12,
12;112:24;113:13,25;
114:4,10;138:7,7,7,8;
143:24;149:12,16;
150:6,22,23;163:3;
178:12;196:9,22;
197:1;199:25;200:23;
201:8;213:2;215:4,4;
222:17,24;226:20;

255:23,25;259:14;
274:16;275:10,18;
283:8
**pages (19)**
19:8,23;23:22;35:2;
50:19;51:17;52:8,9;
53:15,24;54:4;55:16;
67:6;112:11,22;
161:8;255:11,14;
274:15
**paid (3)**
254:9;256:25;
258:11
**paint (1)**
108:6
**panel (1)**
94:25
**Pap (1)**
127:20
**paper (9)**
82:7;102:25;
104:17;108:4;111:7;
121:2;160:4;181:22;
202:4
**papers (5)**
17:20;181:22;
194:13;226:13;244:7
**paperwork (10)**
29:9,15;76:9;112:1;
113:14;121:17;122:2;
202:7,12,20;204:6
**paragraph (24)**
36:12,21,24;54:16;
69:19;74:4;82:7;
139:13;149:19;150:7,
9;154:12;162:18;
168:17;178:13;
226:23;227:7;228:14;
255:24;259:7,15;
260:6;272:20;275:24
**parameters (2)**
100:10;108:1
**paraphrasing (1)**
21:17
**Pardon (1)**
30:8
**part (43)**
29:7;32:25;36:3,7;
38:24;47:17;49:12,
14;64:15;72:25;
73:13;74:20;83:18;
97:18;130:14;132:23;
135:1,7,10,11;138:23;
139:3;142:16;145:24;
154:11;158:21;
165:19;203:14;
213:10;232:22,24;
233:20;234:8;238:8;
240:2;241:4,5;
245:21,24;246:5;
284:10;285:9;293:10
**participate (1)**
105:8

**participated (1)**
60:10
**participating (2)**
8:22,25
**particular (35)**
21:13;28:7,10;
35:18;84:9,9;89:19;
94:10;99:1;100:24;
101:19;116:17;
118:19;137:17;158:5;
163:15;168:3;177:11;
182:13;193:13;194:4;
203:23;231:23;
232:22;257:24;
259:16,19;260:12,16;
263:17;278:19;
284:10,20,21;285:9
**particularly (3)**
26:24;98:9;228:11
**parties (3)**
18:16;72:5;294:20
**partnership (1)**
28:12
**parts (2)**
10:20;77:6
**part-time (2)**
66:12;232:13
**pass (2)**
240:4;269:20
**passed (2)**
126:12;228:8
**past (14)**
41:22,24;42:7,8;
43:11;45:7;114:11,
20;115:5,6;127:25;
143:6;148:2;282:25
**path (1)**
235:4
**pathological (1)**
120:24
**pathology (2)**
120:22,24
**patience (3)**
245:19;246:11;
247:19
**patient (40)**
62:24;116:18;
117:23;118:3,19,19;
119:19;122:7;123:10,
12,18;125:14;139:1,
15,22;141:3;158:17,
19,20,20,24;159:10;
160:14;161:10;
165:11,13;166:9,9,10,
11,13;172:7;173:8;
175:18,19;178:25;
237:18;260:2,8,21
**patients (37)**
58:9;72:18,22;
159:11,12,13;160:22;
163:18,19,19;166:20,
21;169:5;175:4,16;
176:20,22;183:21;

190:18;209:6;214:20;
227:3,5;229:5,15;
249:15;251:16,25;
253:4;256:19;259:17;
261:13,14,18;263:14;
288:9,10
**patient's (7)**
116:22;120:20;
123:24;124:10;
254:23;259:23;261:1
**pattern (1)**
115:12
**pause (1)**
47:20
**Pavilion (9)**
13:18;14:9,12,25;
15:4,10,18;16:16;
233:14
**pay (2)**
147:22;199:8
**paycheck (1)**
254:10
**paying (1)**
257:22
**peer (2)**
229:24;230:3
**pen (4)**
91:19,20;92:25;
108:4
**pencil (9)**
92:1,14;93:10;
102:8,13,19;104:14,
22;105:24
**pending (1)**
11:23
**people (64)**
14:3,4;25:5;54:8;
61:19;65:23;79:18;
90:13,21;94:1,13,24;
95:13;96:1;97:17;
99:1;100:3,6,14;
121:18;132:18;133:3,
7,8,9,19;138:10;
149:20;152:22;153:1;
154:5;157:17;167:22;
169:4;171:2,15;
174:1;182:17;183:14,
23;184:1,10;186:19;
189:24;190:11,21;
191:6;203:25;206:23;
207:23;238:22;
241:20;258:16;266:4;
279:15;280:22,23,25;
281:8,22,24;283:16;
284:12;286:15
**per (3)**
71:7,10;83:5
**perceive (1)**
101:8
**perceived (3)**
15:3;111:15;285:11
**percent (7)**
72:23;92:22;145:8;

165:8;249:22;268:18;
282:14
**perception (3)**
95:15;144:5;284:25
**perfect (3)**
35:11;50:24;195:1
**perform (1)**
161:1
**performed (1)**
127:17
**performing (1)**
176:24
**perhaps (4)**
106:23;142:18;
160:23;228:23
**period (5)**
30:9;57:16;192:23;
193:19;254:22
**periodically (1)**
167:23
**permission (1)**
292:3
**perseverance (1)**
203:12
**person (37)**
58:13;59:7;60:6;
62:15;90:22;101:5;
102:16;117:2;118:23;
122:15;125:5;127:21;
130:22;131:3,7,16;
132:22;133:14,15;
136:10;153:24;
164:17;165:11;
166:18;169:1;170:8;
192:18;207:1;218:16,
20;221:15;238:5;
241:11;265:20;
266:19;281:10;
290:20
**personal (8)**
65:6;168:19;
228:18;242:8;265:2;
286:17,18,24
**personalities (2)**
64:11,21
**Personally (7)**
104:7;137:20;
154:18;167:11;257:3;
268:10,11
**personnel (7)**
150:3,13;151:4,15;
152:1;168:19;174:23
**Personnel/Institutional (1)**
276:16
**Personnel/Official (1)**
276:16
**person's (1)**
214:1
**perspective (1)**
141:15
**pertains (2)**
36:3;227:19
**perused (1)**

161:12
**petitions (1)**
225:21
**phone (6)**
31:15;39:12;
130:22;192:18;216:2,
3
**photocopied (1)**
213:15
**photocopy (1)**
213:2
**physically (8)**
31:13;91:13;
120:16;121:16;131:1,
8,16;196:6
**physician (9)**
33:12,20;61:15;
72:12,15,20;152:6,13,
16
**physicians (1)**
280:15
**physician's (1)**
28:24
**pick (1)**
83:2
**picked (1)**
126:4
**picks (1)**
34:25
**picture (4)**
108:6,10;160:10;
184:16
**piece (4)**
74:11;138:1;
181:22;202:4
**piecemeal (1)**
49:23
**pieces (2)**
75:25;233:20
**place (12)**
22:20;25:18;37:6,
10;45:15;50:1;74:22;
157:11;179:3,3,6;
196:1
**places (2)**
84:10;99:21
**Plaintiff (4)**
8:18;21:23;209:23;
294:5
**Plaintiff's (3)**
18:5;34:17;213:1
**plan (11)**
122:5,6,8,22;123:2,
14,17;138:19;191:21;
217:7,13
**planned (1)**
106:13
**plans (1)**
83:5
**play (9)**
99:22;120:4,10;
215:25;217:1,15,16;
218:1;285:11

**playing (1)**
217:10
**pleasant (2)**
158:4;168:14
**please (16)**
8:15;9:2;67:9,10;
68:14;84:24;89:22;
104:21;107:11;
135:18,20;214:2;
229:5;247:21;261:16;
294:13
**pleased (1)**
68:23
**pleasure (1)**
203:14
**plotted (1)**
236:15
**plow (1)**
195:13
**Plus (1)**
196:18
**pm (14)**
88:7,11;149:6,9;
210:3,6;216:17,22;
247:7,10;270:1,5;
293:19;294:15
**point (27)**
10:22;11:21;36:5;
46:14;62:9;68:7;
79:16;95:11;113:6,
18;156:18;158:16;
160:3;178:4;193:17;
198:20;201:18;
209:22;230:16;257:1;
258:2;259:6;265:9;
268:13;269:12,13;
283:6
**pointed (2)**
263:19;265:8
**pointing (2)**
54:20;265:13
**poked (2)**
190:1,11
**policies (6)**
49:5;51:24,25;
270:24;271:1;283:14
**policy (18)**
71:8,10,14,22;
178:20,20,21;179:13;
271:21,23,25;276:1,3,
3;289:5;290:18,22;
291:5
**portion (6)**
19:7;84:25;104:11;
135:21;151:22,23
**position (25)**
12:5;31:16;33:2;
44:20,25;61:2;71:3;
119:4;157:2,24;
159:15;176:11,13,14;
183:19;203:20;
231:23;232:24;
245:15;247:22;

248:13;251:8;287:22;
288:1,5
**positions (1)**
157:6
**positive (2)**
57:18;187:13
**possibility (4)**
212:22;241:7,12;
292:14
**possible (6)**
16:22;23:4;116:19;
201:10,13,15
**possibly (3)**
110:13;197:8;
269:16
**postmarked (1)**
213:24
**potential (1)**
99:18
**potentially (5)**
83:4;162:21;163:5;
164:9;236:17
**pounds (1)**
234:25
**PowerPoint (1)**
53:20
**practical (1)**
26:23
**practice (17)**
29:6;43:23;44:3;
62:21;72:3,3,9,11,16,
18;73:5,9;160:22;
163:25;232:14;233:9;
258:10
**practices (1)**
32:16
**practicing (1)**
72:12
**practitioner (24)**
26:22;28:25;29:19;
30:2;64:1;72:14;90:5;
91:18;118:7;149:14;
152:7,14,18;163:19;
232:13;247:24,25;
248:8;250:1,10;
251:2,10;288:1;
289:12
**practitioners (2)**
163:17;293:8
**pray (2)**
218:17,18
**prayer (2)**
25:9,11
**precise (1)**
23:9
**precision (1)**
164:21
**predecessor (1)**
66:2
**preemployment (1)**
33:4
**preempting (1)**
279:6

**preface (2)**
24:19;44:15
**prefaced (1)**
44:15
**premises (2)**
38:12;230:21
**prepare (5)**
20:4;24:17;25:4;
118:24;126:8
**prepared (11)**
18:22;21:10;42:18;
43:14;82:13;85:5,19;
102:25;103:3,4;
104:18
**preparing (3)**
22:16,19;109:21
**prescribe (1)**
69:21
**presence (2)**
109:4;237:23
**present (4)**
81:16;84:5,9;
273:21
**presentation (1)**
53:20
**presented (5)**
10:21;53:10;64:7;
105:14;243:17
**presently (1)**
29:3
**presentment (1)**
294:21
**preservative (1)**
123:22
**preserve (3)**
95:12;123:22;
217:24
**pressure (1)**
165:15
**Preston (1)**
78:1
**Presumably (1)**
221:2
**presume (1)**
216:3
**pretty (11)**
46:23,24;47:23;
50:14;92:22;161:16;
193:14;202:22;
219:14;239:14;253:4
**prevalent (1)**
87:15
**previous (10)**
30:20,23;47:12;
53:11;91:16;93:21;
114:4,8;188:21;201:7
**previously (7)**
30:14;79:24;
126:21;180:6;217:2;
269:11;293:21
**primarily (1)**
256:17
**print (1)**

122:13
**printed (2)**
189:17;230:25
**printout (5)**
213:3;214:5,7,13;
215:5
**prior (10)**
15:11;45:15,16;
77:4,5;84:21;87:19;
193:3;224:2;248:9
**prison (5)**
28:15;97:5;100:6,
12;287:21
**prisons (1)**
32:17
**private (1)**
232:13
**privately (1)**
167:12
**privilege (1)**
183:3
**privileges (1)**
69:20
**pro (1)**
283:19
**proactively (1)**
212:8
**probable (1)**
10:19
**probably (16)**
63:3;80:1;88:2;
110:4;137:20;183:11;
188:5;189:6;192:9;
199:14,24;203:18,19;
226:5;228:9;279:6
**probation (1)**
48:18
**problem (18)**
40:20;70:24;71:17,
18;73:9;127:7,23;
128:15;129:6;151:21;
157:5;159:7;175:9;
226:5;229:6;241:12;
262:9;285:9
**problems (5)**
71:11;132:19,21,
22;220:3
**procedure (10)**
71:22;118:8;
123:16,19,20;237:5;
273:3,6,7;294:23
**procedures (3)**
123:9;128:7;283:15
**proceeded (2)**
89:23;91:3
**proceeding (1)**
180:17
**proceedings (4)**
9:10;10:22;11:11;
246:5
**process (25)**
10:3;31:5,6;36:4,7;
98:10,13;116:12;

117:7;118:3,23;
123:3;127:19;128:1,
1;132:19,21,22;
141:16;146:16,17;
147:22;195:20;293:1,
5
**processed (2)**
116:19;125:15
**processes (5)**
83:14;121:4,5;
139:6;293:7
**processing (3)**
118:25;120:12;
126:9
**product (1)**
184:11
**production (1)**
217:4
**productive (1)**
143:17
**productivity (1)**
159:14
**profession (2)**
250:6;287:18
**professional (7)**
58:11;65:5;229:14;
239:21,25;240:13;
242:8
**Professionally (2)**
57:21;154:20
**Profile (1)**
214:14
**program (2)**
30:14;103:18
**prohibited (1)**
273:11
**promise (2)**
12:16;106:11
**prompt (1)**
80:8
**pronounce (1)**
8:12
**proper (1)**
203:20
**propose (1)**
199:10
**provide (11)**
40:22;41:12;43:16;
65:18;105:19;155:1;
183:22;191:11,24;
229:14;288:16
**provided (15)**
41:14;52:3;55:21;
56:17;135:14,24;
150:2,12;151:3;
204:7;250:11,18;
252:19;277:12;
294:22
**provider (26)**
27:13;28:17;32:16;
65:18;66:9;89:8;
90:13;93:15;105:3;
119:4,8,18;120:5;

138:19;139:15;140:3;
141:1,2,3,21;142:6;
146:17;166:18;230:3;
233:12;255:2
**providers (16)**
64:4;65:13,17,24;
105:5;132:11,13;
134:12;138:14;
141:21;142:4,13;
144:8,12,18;152:3
**provider's (1)**
119:10
**providing (2)**
185:13;224:5
**public (4)**
290:23;291:5,8;
295:15
**pull (12)**
47:15,19;49:23;
73:18;112:2;204:6;
213:16;214:24;
215:11;225:11;257:5;
270:20
**punch (2)**
76:17;280:19
**purporting (1)**
89:7
**purports (1)**
75:12
**purpose (4)**
23:7;106:16;
225:20;288:16
**purposes (1)**
217:11
**purse (2)**
264:23,24
**purses (2)**
257:14,18
**pursuing (1)**
249:14
**pushed (2)**
119:21;237:12
**put (51)**
19:25;20:7,9;22:16;
23:24;24:1,9;50:5;
51:1;71:12;81:24;
97:9;107:24,25;
108:4;112:7;114:17;
116:21,21,22;118:20;
120:19;122:21;124:9,
10,24;125:4,4,7;
137:18;143:7;146:19;
148:2;152:15;157:1,
15;165:5;181:5;
187:23;191:20;
206:24;236:12;
246:17;251:16;
260:17;265:3;276:24;
277:24;278:7;279:21;
284:23
**puts (2)**
122:15;124:24
**putting (5)**

24:5;161:24;
165:15;171:22;187:9

**Q**

**Q&A (1)**
93:7
**qualification (1)**
11:16
**qualified (2)**
166:7;183:16
**quality (1)**
288:16
**question (68)**
11:2,6,23,24;12:1;
13:6,9;15:7;18:10;
21:14,17,18;25:3;
37:11;41:6,8,9;45:22;
46:11,11,22;47:21;
52:1;84:18,22,24;
85:2;92:17;99:14;
100:19;104:10,13,21;
105:17,18,22;107:11;
112:21;135:18,23;
143:14;144:6;151:2;
152:7;159:19;173:7,
22;186:25;187:11;
194:20;195:2,19;
204:19;206:1;208:15;
212:14;224:11;
233:17;240:9;246:13;
257:22;261:16;
262:16;266:18;
279:22;284:8;285:20;
291:2
**questioned (1)**
183:16
**questioning (3)**
106:14;227:13;
277:14
**Questionnaire (1)**
230:4
**questions (44)**
9:19;11:15;15:3;
19:7;23:19;24:20;
39:1,15;40:7;44:1;
48:25;58:8;62:23;
72:17;73:23;93:2;
113:8;136:18;174:5;
181:25;192:1,11;
217:16;245:21;
246:11,22,24;247:20;
268:25;269:15,24;
270:9,10,17,18;
278:25;280:21;287:1,
4,8,16;293:14,16,22
**question's (1)**
278:23
**quick (1)**
268:24
**quickly (2)**
45:7;226:17
**quinceañera (1)**

59:10
**quit (4)**
195:20,21;199:16;
201:21
**quite (7)**
33:22;92:20;
204:14;230:24;
234:16;256:24;288:4
**quitting (1)**
198:22

**R**

**race (26)**
14:11;16:17;91:24;
96:6;97:3,21;99:21;
100:7;102:11,11;
105:25;115:23,23;
147:9;163:12;174:15;
184:1,12;193:20;
194:17,23;241:13;
244:15;245:17;
262:19,20
**Rachel (20)**
8:23;16:24;33:25;
35:9;36:15;47:19;
49:22;67:21;186:4,8;
196:24;199:18;
225:13;226:8;245:7,
8;247:3,14;255:10;
294:4
**racial (11)**
85:20;99:18;106:9,
17;108:18;111:14;
116:1;191:12;262:25,
25;267:23
**racially (12)**
15:19;74:11;85:17,
22;86:9;87:5,9,21,24;
203:25;207:6;285:22
**racism (8)**
100:20,21;108:11;
183:2;268:8;283:7,9;
286:13
**racist (4)**
98:4,17;285:2;
287:4
**radiology (1)**
154:3
**raise (3)**
94:15;95:19;101:7
**raised (7)**
16:6;89:21;90:24;
91:2,21;94:4;102:17
**raising (6)**
91:25;94:16;95:2,8,
24;115:21
**ran (1)**
118:1
**rapidly (1)**
227:1
**rather (1)**
293:23

reach (2)
104:6;205:5
reached (3)
76:14;212:18;
248:23
reaching (2)
103:17;212:10
reaction (8)
93:19;202:19;
258:4;284:10,20,21;
285:9;286:6
read (26)
85:1;104:9,12;
114:7,8;124:16;
135:19,22;160:15,18;
161:7,16;173:25;
178:5;181:23;199:19;
203:5;214:8;268:2;
272:21,22;275:16;
276:14;294:8,11,13
reading (8)
22:4;37:23;47:25;
48:15;111:11;151:12,
24;294:22
reads (4)
41:12;42:9;111:7,
11
ready (3)
88:15;161:17;
181:23
reaffirmed (1)
268:6
real (3)
81:14;93:6;236:19
realize (1)
47:11
realized (2)
33:25;68:7
really (22)
12:23;25:12;34:1,4;
81:6;101:23;103:14,
25;147:11;160:4;
164:22;169:24;176:5;
182:4;194:3;218:7;
225:2;238:15;239:19;
241:1;284:15,15
Ream (26)
60:23;78:14;
112:14;114:10,20,20;
151:11;154:18;155:7,
10;173:10;189:12;
190:2;192:13,19;
196:10;197:6;200:7,
10;201:5;208:1;
228:17;244:17;269:3;
278:5;280:9
reason (21)
11:3;12:1,5;14:11;
91:25;94:16;132:9,9;
137:3;155:19;185:10;
186:25;190:14;
195:21;240:15;
241:17;251:21;

284:11;290:15;
291:10,21
reasonable (1)
111:11
reasons (3)
190:19;193:7;
200:23
reassured (1)
95:10
recall (34)
40:14,17;41:3,4,8;
94:11;106:25;110:14,
16;126:18;127:24;
131:4,10;155:18;
156:11;173:14;
181:18,18;202:5;
204:7,10,13,17;
209:17;211:1,20,22;
221:11;223:5;245:13;
256:16;260:25;
276:20,24
recap (2)
45:2;247:17
Receipt (2)
50:10;290:16
receive (2)
65:2;205:10
received (13)
31:15;37:11;53:3;
155:7;189:18;213:11;
219:23;223:2,7,11;
249:25;271:18;
275:15
receiving (4)
52:4;53:11;161:2;
230:8
recently (2)
214:3;229:8
recess (3)
47:5;88:8;149:7;
247:8;270:2
recognize (2)
51:8;230:1
recollection (2)
25:17;86:4
record (63)
8:9,15;11:12,24;
12:10,13,14;14:19;
17:2,4,6,9;28:8;
33:15;47:4,7,17;85:1;
88:7,10;93:5;104:12;
107:18;135:22;149:6,
9;161:18;180:1;
209:25;210:1,3,6,9,
10;215:16;216:12,14,
17,20,22;217:10;
222:13;227:12;
243:23;245:22;
246:14,16,18,19;
247:4,7,10;270:1,4;
281:6,7;284:7;
292:11,16;293:20;
294:1,1,4

recorded (1)
200:25
recording (2)
190:11;215:25
records (15)
21:20;22:1,10;24:6;
47:18;50:6;179:13;
180:14,24;181:7;
189:4;214:24;224:6,
7;282:11
record's (2)
213:20;270:22
recounting (1)
197:7
recovery (2)
234:6;243:12
recreate (1)
207:21
recruit (1)
248:23
recruited (3)
248:13,14;288:25
recruiter (7)
31:9,12,16;32:23;
248:17,19,20
rectify (1)
238:23
red-headed (5)
186:2,6,9,15;245:3
redundant (1)
210:12
refer (7)
66:16;74:4;109:12;
115:25;162:19;
173:20;201:10
reference (8)
34:18;51:24;98:13;
187:13,19;239:23;
240:14,17
referenced (1)
272:17
referrals (1)
58:9
referred (6)
21:9;54:1;74:21;
181:21;228:13;
284:19
referring (29)
45:7;51:13;74:10;
75:3;89:13;97:2;
102:23;103:4;104:16;
140:2;152:14;164:10,
13;168:20;184:23;
188:7,10;225:25;
227:10;243:20;255:8,
16;259:13;260:11;
271:1;272:17;283:14;
284:22;290:11
refers (4)
55:1;85:19;161:9;
200:24
refresh (2)
24:8;290:9

**refresher (1)**
  56:19
**refrigerator (4)**
  116:24;124:21;
  125:8;126:1
**refuse (1)**
  143:5
**refused (5)**
  125:18;126:12;
  128:1;143:4;146:18
**regard (29)**
  18:11,21;26:18;
  45:25;57:4;85:17;
  109:10;111:23;
  139:20;155:7;157:5,
  14;162:1;163:10,16;
  168:1;171:10;172:8;
  176:3,9,15;177:12,15;
  184:24;203:23;206:5;
  226:11;239:11;
  241:25
**regarding (17)**
  16:1;41:9;62:24;
  115:2;164:1;177:11;
  209:5;210:25;211:1,
  3,4,10;223:12;
  224:19;278:16;
  280:22;290:4
**regardless (3)**
  111:8;140:25;
  156:13
**regards (1)**
  264:9
**region (2)**
  32:17;57:8
**regional (15)**
  32:7,10;57:6;58:7;
  68:19;207:18,22;
  208:3;249:8,10,12;
  278:4,12;280:10,11
**registered (2)**
  28:24;72:4
**Registration (1)**
  222:11
**regular (2)**
  27:8;72:24
**regularly (3)**
  149:25;258:20,21
**regurgitate (1)**
  279:11
**Rehabilitation (1)**
  13:18
**reiterate (2)**
  147:19;241:4
**relate (7)**
  22:2;112:9;163:11;
  164:2;173:21;177:25;
  225:6
**related (17)**
  9:20;15:3;46:16;
  48:25;85:20;105:20;
  171:2,3;178:6;189:3;
  193:18;206:13;263:2;

  268:4;270:19;271:2;
  274:11
**relates (7)**
  112:2;154:10;
  174:14;175:3,25;
  176:6;231:9
**relating (5)**
  54:6;209:9;213:8;
  223:1,22
**relationship (16)**
  57:22;61:6;62:2,20;
  63:2,4,7;16;64:10,14,
  15;95:13;171:20;
  225:7;261:8,11
**relationships (2)**
  235:1,2
**relevant (4)**
  15:21,22;94:24;
  227:14
**rely (3)**
  11:14;69:12;244:9
**remember (65)**
  31:11,21;32:8;33:3,
  6,7,10,15,17,21;36:8;
  39:4,19;40:5;44:12;
  49:3,8;56:9;57:14;
  70:20;84:18;89:12,
  18;90:11,18,19;91:1;
  93:22;94:8,11,13;
  95:23,25;131:22;
  132:17;144:19;145:2,
  12,16,17,24;146:7;
  148:7,15,18,20,25;
  153:24;156:10;
  165:23;172:12;
  173:12,17;188:23;
  202:2,13,17;220:20;
  228:22;230:8;231:16;
  254:19;258:24;
  261:23;268:15
**remembered (1)**
  223:14
**remind (1)**
  151:9
**reminding (1)**
  12:18
**remotely (1)**
  8:22
**remove (1)**
  237:8
**removed (1)**
  230:21
**removing (1)**
  237:6
**repeat (5)**
  15:7;67:10;135:18;
  247:21;250:13
**rephrase (3)**
  252:18;287:24;
  293:6
**replow (1)**
  115:16
**report (20)**

  54:7;61:12,16;
  167:1;172:13;190:4;
  191:3,8;204:8,22;
  205:23;206:11;
  208:20;249:18,20;
  251:19;258:25;259:1;
  273:17;277:11
**reported (15)**
  76:13;79:18;80:7;
  81:4;166:1,14,25;
  205:13,16;206:6;
  208:18;209:16;
  211:18;238:18;276:7
**reporter (14)**
  8:3;11:13;12:19,23;
  85:1;104:12;135:22;
  209:24;210:9;262:5,
  9,12;272:23;294:11
**reporting (7)**
  49:1;61:20;62:1;
  175:3;190:9;222:12;
  276:1
**representation (2)**
  18:23;24:25
**representing (1)**
  247:15
**represents (2)**
  270:10,11
**reprimand (1)**
  92:2
**reprimanded (1)**
  171:13
**reputation (1)**
  95:12
**Request (8)**
  39:13;79:5,7;198:5;
  202:11;220:1;224:24;
  254:16
**requested (5)**
  40:11,15;84:25;
  104:11;135:21
**requesting (1)**
  118:1
**requests (1)**
  262:1
**required (6)**
  49:9;67:19;215:10;
  231:23;265:1;271:14
**requirement (1)**
  73:12
**requisition (24)**
  117:1,18,19;
  118:22,24;120:3,9,11,
  17;124:4,6,9,11,14,
  23;125:19;126:8;
  127:6,22;128:14;
  130:3;141:17;143:3,4
**requisitions (17)**
  114:25;116:25;
  117:3,17;120:14;
  138:21;140:2;141:11,
  20;142:5,12,23,25;
  143:16;144:9,13,18

**reread (1)**
  84:24
**rescind (2)**
  195:7;202:10
**Research (2)**
  30:6;185:8
**resign (1)**
  201:3
**resignation (19)**
  192:12;193:4,18;
  194:7;195:8,10;
  196:11,15;200:9,9,23;
  202:10,20;212:20;
  219:13;236:2;269:2,
  5;281:14
**resigned (5)**
  216:6;231:11;
  235:12;238:19;269:2
**resigning (6)**
  192:14,19,21;
  193:5;194:15;212:12
**resolve (2)**
  146:23;157:6
**resolved (10)**
  16:2,10,13;37:16;
  40:15;42:12,22;
  157:9;159:7;176:7
**resources (2)**
  79:6,20
**respect (2)**
  262:21,21
**respected (1)**
  61:6
**respectful (1)**
  64:12
**respective (2)**
  72:5;294:20
**respond (4)**
  54:8;155:2;212:5;
  220:17
**responded (4)**
  155:8;211:25;
  212:4;223:6
**response (8)**
  42:15;131:20;
  134:7;168:19;173:13;
  207:2;221:9;222:24
**responses (6)**
  12:13;18:15;45:4;
  261:25;262:15;269:8
**responsibilities (2)**
  57:4;273:14
**responsibility (2)**
  41:23;72:25
**responsible (1)**
  171:15
**rest (5)**
  45:10;47:13;
  103:18;104:4;125:6
**resubmitted (1)**
  31:21
**result (2)**
  222:22;224:4

**results (1)**
  251:16
**resumé (1)**
  31:22
**resuming (1)**
  88:14
**retained (1)**
  217:13
**retaining (1)**
  293:23
**retaliated (4)**
  103:20;162:1;
  262:20;266:22
**Retaliation (16)**
  52:20;56:6;108:19;
  158:6,7;159:16;
  170:16;194:18,23;
  204:23;244:15;263:1;
  271:12,20;272:14;
  273:4
**retaliatory (1)**
  173:19
**retrieve (2)**
  123:17;125:14
**returned (1)**
  31:25
**review (5)**
  72:23;161:5;
  229:24;230:3,13
**reviewed (6)**
  32:17;141:10;
  144:8,13;249:22;
  269:7
**revise (2)**
  20:11;23:2
**revised (1)**
  20:10
**Rex (1)**
  238:6
**RFT (1)**
  79:7
**right (214)**
  11:22;13:2;14:8;
  17:22;19:13;20:16;
  21:6;24:3,14;31:10;
  38:10,15,19,19;39:9,
  18,24;40:16;41:1;
  44:22;46:21;48:8,22;
  50:14,14;51:16;
  53:12;55:22;56:25;
  57:23;60:15;61:23;
  63:24;65:21;66:14;
  67:20;68:1,13;69:11,
  14,15,24;73:15;74:2;
  75:1;76:3,17;77:22;
  78:6,18;80:18;81:13;
  82:10;85:12,14;
  87:19;88:17;89:3,25;
  92:6;95:3;97:7;99:10;
  100:18;102:4;103:8;
  106:19;111:22;
  113:10;114:6;115:10;
  116:5;118:2,13;

119:5,18;121:6,14,18,
25;122:24;123:6;
124:15;126:23;127:1;
128:12;129:6,21,22,
23,24;132:6,24;
133:17;134:22;135:9;
136:4;137:16;138:2,
6,8;139:6;140:13;
141:7;142:10;143:23;
144:21;145:19;146:1,
12,24;147:12;151:2;
154:9;156:7;157:4,
12;158:11;160:14;
161:5;164:20;167:8;
168:5,11;169:17;
171:25;173:9;174:9;
175:2,4,20;176:3,8,
12;177:6,24;179:21;
180:22;186:3;187:22;
188:24;190:8,20;
191:10;192:15,23;
194:3;195:10;196:21;
197:19;198:10;
200:10,20;201:7;
202:18;203:2;204:1;
205:22,23;206:14;
211:15;212:13;
214:12;215:1,3;
216:19;219:3,3;
220:1;222:3,7;223:4,
9;224:14;226:11;
229:17;231:5;234:7;
249:2;250:2;253:16;
254:7,21;255:17,18;
256:3;259:21,21;
260:3;263:20;265:4,
10;267:4;268:21;
269:8;270:19;271:5;
272:25;273:15;
274:15;275:7,18;
276:9,11;277:7,23;
279:20;282:12;
286:10;287:19;289:6;
290:5;291:15;292:11

**ring (1)**
201:23
**road (1)**
240:14
**Rockhurst (1)**
30:6
**role (7)**
57:4,14;60:24;61:7;
63:25;70:5;73:13
**rolled (1)**
84:2
**room (11)**
10:14;90:1,11;
91:19;92:25;94:24;
102:1;146:9;158:13;
172:7;259:21
**root (1)**
236:7
**roughly (6)**

22:25;248:22;
249:2;255:22;260:9;
268:15
**routine (1)**
258:10
**rude (1)**
12:16
**Rule (1)**
294:23
**rules (2)**
10:4;294:23
**run (2)**
140:5;141:5
**running (2)**
97:13;154:5
**rural (3)**
97:5;171:1;183:4

## S

**safely (1)**
82:21
**safety (7)**
94:6;228:19;
266:10,12;290:23;
291:6,8
**salary (6)**
197:17;199:6;
200:23;233:21;
242:14,16
**same (40)**
11:4;15:1;53:25;
56:18,20,21;76:13;
77:22,25;78:21;
79:19;102:10;112:23;
113:13;114:4;139:8,
11;146:9;152:1,2,22;
163:3;167:20;199:6;
201:8;214:21;235:12;
241:19;243:5;255:11;
257:5,7;258:13;
264:2;267:3,9;283:8;
288:20,22;291:7
**sample (14)**
109:18;118:8,10;
119:5,9;120:5;
121:13,14,18,20,25;
122:3;123:5,7
**sat (5)**
32:15;116:23;
124:21;125:22;126:4
**satisfaction (1)**
16:10
**satisfied (5)**
131:24;132:3,25;
144:2,5
**saw (11)**
27:21;29:9;78:10;
184:10;201:11;213:5;
234:15;256:19;
257:17;268:16,20
**saying (36)**
38:1;63:20;78:11;

106:20;107:6;108:10;
110:8;115:4;118:16;
123:8;125:24;136:17;
137:9;138:12;139:10;
145:7;148:15,25;
152:11,20,24;169:10;
171:17;174:6;187:5,
7;210:19;212:5;
218:10,11;220:20;
228:3;239:8;240:19;
246:5;265:7
**scalpel (3)**
237:4,10;279:17
**scalpels (1)**
237:12
**scanner (8)**
256:24;257:8,15,
21,22;264:10,13;
265:4
**scanners (2)**
254:4,7
**scene (1)**
105:3
**schedule (31)**
27:13,17;118:20;
122:15;123:12,12,18,
19;138:24;139:1;
142:16,20;159:10;
162:2;169:2,2,13,14,
15,21,23;170:9,12,14;
172:1;174:18;175:10;
197:15;201:11,13;
254:23
**scheduled (5)**
72:24;149:25;
159:11;227:3,4
**schedule's (1)**
142:16
**scheduling (3)**
197:17;201:15;
254:20
**scheme (1)**
238:9
**school (5)**
30:12,13;42:2,3;
171:3
**scope (2)**
72:18;285:20
**scrambled (1)**
61:19
**scratch (1)**
293:6
**screen (4)**
34:4,15;67:22,24
**scrutinized (1)**
181:17
**se (1)**
83:6
**seat (3)**
91:10;93:20;94:5
**second (35)**
17:4;18:4;21:13;
27:11;35:7;36:23;

109:12,12,23,24,24;
110:1,5,7,15;113:20;
133:10;139:13,13;
149:12,19;150:7,9,23;
178:12;185:12;192:9;
195:9;199:25;200:22;
215:4;216:13;218:20;
221:14;275:23
**secondhand (1)**
86:2
**seconds (1)**
269:23
**secrecy (1)**
182:25
**secretary (1)**
122:14
**section (6)**
17:25;19:9,22,24;
149:13;161:5
**security (4)**
257:15,17;261:15,
17
**seeing (13)**
123:10;139:15,22;
141:3;165:11,13;
169:6;177:13;178:7;
190:17;196:4;240:24;
259:16
**seeking (5)**
178:17;233:19;
234:6;242:1;243:12
**Seem (3)**
10:7;50:6;157:7
**seemed (4)**
11:15;42:22;157:5;
266:8
**seeming (1)**
100:4
**seemingly (1)**
178:6
**Seems (8)**
11:8;23:24;47:21;
173:25;239:14;
240:22;283:20,21
**see-through (1)**
264:25
**segregation (2)**
256:19;259:17
**semiformal (1)**
10:13
**send (3)**
123:23;156:19;
217:5,6;226:4
**sending (1)**
124:1
**sense (8)**
38:10,18;81:17;
83:12;84:5;100:16;
109:6;199:24
**sensitive (1)**
225:1
**sent (14)**
39:21,24;46:1;

74:24;118:24;120:12;
140:24,25;213:7;
215:23;246:19;
277:10;290:3,17
**sentence (10)**
84:14;139:12,14;
140:7;143:11;144:6;
145:20;146:2;267:25;
272:22
**sentences (1)**
48:17
**separate (7)**
49:15,16,25;
136:12,13;167:19;
223:21
**September (2)**
17:21;74:5
**sergeants (1)**
252:13
**series (1)**
192:11
**seriously (1)**
13:4
**serve (4)**
48:1,9;97:10;
151:16
**service (1)**
203:15
**services (1)**
28:18
**serving (1)**
70:5
**set (6)**
87:12;122:1;238:9;
239:20;241:2;256:24
**setting (4)**
10:14;32:20;
238:16;288:13,15,15
**settings (3)**
20:19;250:7;287:19
**seven (1)**
49:13
**several (11)**
19:8;23:25;75:4,5;
79:18;107:17;112:7;
189:2,7;190:11;
280:23
**Shadow (5)**
54:17;55:2,7;252:7,
12
**shall (2)**
240:8;282:5
**Shannon (8)**
26:6,7,10,18,19;
230:14;231:9;283:4
**Shannon's (1)**
27:18
**share (10)**
24:22;34:4,16;
47:20;49:25;136:9;
209:7;221:7;222:1;
243:1
**shared (12)**

31:19;49:6;63:12;
133:19;136:21,25;
138:2;148:7;194:2;
221:9;238:21;283:3
**shares (1)**
131:16
**sharing (7)**
67:22,23;108:25;
110:6,7;181:8;191:22
**sharps (3)**
237:3;241:11;
244:18
**sheet (2)**
179:23,25
**Shelby (4)**
185:25;187:16;
245:9,10
**shift (4)**
27:4,11,11;28:4
**shifts (2)**
27:1;197:16
**shirts (1)**
259:20
**shock (1)**
84:4
**shoes (1)**
83:11
**shop (1)**
64:25
**short (3)**
47:11;72:16;88:13
**shortages (1)**
149:24
**short-circuit (1)**
194:14
**shorten (1)**
163:9
**shortly (5)**
71:3;80:6;156:25;
213:12;268:24
**shoulders (1)**
12:11
**show (4)**
80:1;198:18;222:5;
257:1
**showed (1)**
179:23
**showing (2)**
171:11;265:7
**shows (1)**
179:24
**shrug (1)**
12:11
**shut (1)**
264:5
**sick (8)**
132:16;133:2,15;
170:1,1;185:24;
186:11;245:2
**side (4)**
61:11;62:8;148:5,6
**sidewalk (1)**
264:2

**sign (8)**
271:14;289:6;
291:14;292:2,14,23;
294:12,14
**signature (8)**
35:18;50:11;51:8;
52:11,15;53:2;55:1;
272:4
**signed (9)**
19:25;23:11;35:20;
51:6,12;52:12;70:22;
269:7;277:20
**significant (2)**
68:4;86:8
**signing (1)**
55:6
**similar (7)**
63:12,13;88:21;
114:11,24;126:22;
222:15
**simply (1)**
11:1
**single (5)**
17:24;22:16;23:22;
281:10,11
**singled (1)**
182:21
**single-spaced (5)**
19:9,24;46:16;82:7;
161:9
**singular (1)**
115:5
**sister (1)**
219:1
**sit (2)**
125:23;146:3
**site (15)**
28:15;33:8,11,12,
18,19;117:24;120:21;
123:25;138:14;
141:21;151:7;166:15,
25;292:4
**sites (2)**
28:15;267:23
**Sitting (15)**
12:4;20:9;87:3;
92:3,11;93:8;131:5;
134:5;135:13,23;
148:4;179:8;207:20;
237:13;265:9
**situation (63)**
15:22,23;16:15;
60:22;73:12;74:9,12;
81:6;82:15;85:8,21;
86:11;91:15;93:20;
99:1,9;101:22;102:7,
9;104:2;111:24;
115:18;119:3;121:13,
20;122:25;123:4;
124:5;127:5;129:9;
130:6;133:23;139:3,
21,21;140:2;141:2;
143:2;145:20;146:4,

9;157:10,20;160:6;
161:25;168:24;
173:10;177:11;
182:13,14;205:5,14,
19;207:6;209:14;
221:2;236:14,24;
237:24;238:24;239:1;
240:2;265:19
**situations (18)**
32:20;102:22;
104:15;111:14;
117:15;127:11,13;
151:5,14;160:3;
181:17;191:8;206:18,
19;234:22;235:19,20;
268:2
**six (4)**
71:11;79:18,19;
259:20
**six-inch (1)**
144:9
**skepticism (1)**
178:25
**skin (3)**
101:10;236:18;
241:23
**skip (1)**
51:1
**skipping (1)**
112:5
**sleep (5)**
182:23;188:14;
234:23;235:10;236:1
**slides (4)**
53:19,24;54:6,23
**slip (1)**
54:22
**slow (1)**
117:6
**small (3)**
91:17;171:1;264:24
**smears (1)**
127:21
**Smith (1)**
272:7
**so-and-so (1)**
121:22
**society (2)**
98:2;100:12
**solidified (1)**
148:1
**somebody (9)**
73:8;128:7;162:12;
182:3;186:10;205:16;
240:20;264:1;277:25
**somebody's (1)**
40:24
**somehow (3)**
116:1;217:7;223:14
**someone (54)**
16:4;24:7;27:2;
32:3;44:24;46:3;
65:18;67:15;68:9;

72:22;76:13;77:21;
78:10;82:24;83:21;
84:8;86:2;91:8;92:7;
93:17;94:2,6;98:10;
101:7;127:18;136:24;
137:20;152:8;156:25;
157:2;165:2,10;
166:6;171:24;172:10;
174:6;185:8;189:3;
205:6;206:6;207:13;
215:10;220:6;232:23;
236:18;238:15;251:1;
255:3;257:4;266:2,8;
279:3;282:4;292:3
**someone's (2)**
40:20;237:7
**sometime (1)**
222:5
**sometimes (9)**
57:9;64:6;66:11;
94:23;119:2,16;
149:23;186:23;260:8
**somewhere (4)**
27:25;177:18;
257:4;281:15
**soon (2)**
201:21;218:11
**sorry (46)**
16:19,23;26:9;
32:12;35:3;52:18;
54:13;67:10;70:14;
73:21;78:9;90:9;96:6;
101:23;150:5,20;
153:6;162:10,14,16;
172:23;196:25;197:2;
199:20;209:21,23;
215:4;224:6;225:17,
18;227:4;242:23;
247:3;250:13,25;
251:13;252:17;
255:13,19,24;259:7;
267:21;288:9;289:23;
290:8;293:6
**sort (30)**
14:15;23:14;29:21;
32:18,19;41:25;
45:22;46:3;49:1;65:1;
72:16;81:7;83:11;
84:2;103:2;108:25;
119:8;159:24,24;
160:2;161:12;183:12;
190:8;198:18;228:7;
263:12,12;268:5;
285:22;287:2
**sorts (4)**
48:24;153:3;195:8;
230:5
**sound (5)**
27:17;69:15;78:9;
190:10;192:15
**sounds (18)**
20:18;42:18;43:15;
68:6;119:17;129:9;

151:13;152:6;169:25;
171:17;184:10;216:5;
219:1;220:18;221:17,
18;223:4,16
**source (4)**
21:20;180:23;
181:1,2
**sources (1)**
42:19
**space (1)**
17:24
**spaced (2)**
22:17;23:23
**span (2)**
22:21;23:9
**spares (1)**
17:15
**speak (17)**
16:21;25:12;39:25;
62:14;91:13,14;
101:21;103:3;107:18;
118:8;143:13,16;
209:20;210:25;
245:12;263:9;266:13
**speaker (1)**
16:22
**speakers (1)**
217:18
**speaking (2)**
137:15,19
**speaks (1)**
111:17
**special (3)**
29:14;288:1,5
**specializing (1)**
29:24
**specialty (1)**
62:10
**specific (35)**
41:8;44:8;69:13;
89:18;94:11;106:24;
117:14;136:6;138:1;
154:3;155:19;160:3,
3,5;163:25;165:24;
173:12;179:18,20;
181:15,20;182:1,4;
184:5,9;187:8;189:5;
198:19;211:21;221:4;
236:22;243:19;
273:10;279:5;281:7
**specifically (43)**
26:24;83:10;89:2;
94:12;95:24;97:1;
102:23;104:15;
105:17;126:19;129:4;
137:16;144:17,20;
145:12,16,17;148:16;
153:25;157:10;161:9;
162:19;164:3;167:25;
168:7;173:22;181:21;
184:25;185:17,19;
186:25;187:23;207:4;
209:3;211:1,22;

220:14;255:16;
260:12,25;270:25;
271:5;282:6
**specifics (13)**
40:1,17;41:4,5;
181:19;188:25;
191:11,24;195:25;
211:22;231:12;
242:11,20
**specimen (28)**
109:18;112:18;
117:21,24,25;118:1,
21,22;119:24;120:12,
21,24;123:17,20,25;
124:2,7,10;125:14,21;
126:1,8;139:2,23;
143:6;146:20;148:2;
155:17
**specimens (13)**
114:25;115:3;
118:17;119:16,18;
124:22;127:20;
132:19,21,23;146:16,
17;147:22
**speculate (1)**
137:4
**speculation (3)**
198:24;291:24;
292:18
**spelled (1)**
154:11
**spend (2)**
48:14;251:24
**spent (8)**
22:19;107:8,13,15;
108:10;109:21;
161:17;251:24
**spike (1)**
257:25
**spikes (1)**
258:1
**spoke (18)**
24:11;63:13;103:6;
107:1;134:6;144:7,
12;167:18;173:9;
207:16,17,17,25;
208:2,2;211:2,9;
237:24
**spoken (5)**
25:13;26:3;78:24;
144:1;210:17
**spouse (1)**
24:11
**spying (1)**
259:10
**squeaky (1)**
83:7
**stack (3)**
141:10;144:9,13
**staff (26)**
24:24;27:12,14;
28:13,14;60:25;
103:19;104:4;149:25;

150:1,10,11;162:20;
163:4;164:8,12,16;
168:19;184:20,21,21,
23;231:1;263:5;
276:1,6
**staffed (1)**
176:22
**staffing (4)**
149:24;151:8,15;
176:6
**stamped (1)**
275:13
**Stand (9)**
8:4;17:8;47:6;88:9;
149:8;216:21;231:2;
247:9;270:3
**standard (3)**
27:2;43:23;44:2
**standing (5)**
83:23;105:5;
170:19;260:20;
263:19
**stands (1)**
57:18
**start (16)**
13:6,9;25:2;37:7;
107:5;121:8;122:11;
123:8;143:13;156:7;
165:16;171:11,18;
270:16;274:16;
285:17
**started (16)**
9:10;23:11;28:23;
31:13;34:1;37:8;38:5;
50:14;56:23;59:19;
93:16;121:9;135:9;
249:1;251:7;281:24
**starting (3)**
46:10;150:7;225:18
**starts (7)**
19:9;36:24;149:13;
165:19;170:8,16;
197:5
**state (22)**
8:14;28:16;29:4,4;
46:15;69:19;72:4,13,
21;215:15;222:10,22;
223:1;227:11,17;
262:21;271:7,22;
274:5,20;289:1;
295:19
**state- (1)**
89:21
**stated (4)**
14:20;15:4;292:10,
10
**statement (34)**
9:17;16:1;42:6,18;
43:13;75:17,24;76:4;
77:7,12,13,19,22;
78:6,11;84:6,8;89:21,
23;90:8;91:3;93:11,
12;103:3,4;106:15;

137:22;142:15;
160:23,25;192:20;
223:11;262:24;
286:17
**statements (5)**
74:19;75:5;79:24;
100:4;294:8
**states (7)**
21:24;29:2,6;97:4;
98:16;226:23;290:18
**stating (1)**
227:22
**status (1)**
68:24
**stay (7)**
195:5,22;198:1,8;
199:1;231:20;238:19
**Stayed (2)**
25:24;60:16
**staying (2)**
197:9;198:9
**steal (1)**
35:6
**stem (1)**
238:18
**stems (1)**
98:5
**step (4)**
117:14;146:19;
185:12;198:2
**steps (4)**
31:11;170:6;
208:19;215:9
**Sterling (30)**
60:23,25;61:4;
78:14;112:14;151:11;
154:18,25;155:9;
156:20,20;159:6;
166:15;167:5;173:10;
189:11;190:1;192:13;
196:10;197:6,7,24;
200:7;202:3;208:1;
228:17;244:17;269:3;
278:5;280:9
**Sterling's (3)**
60:23;169:17;
202:18
**sticker (2)**
124:7,9
**sticking (1)**
120:4
**stifle (1)**
83:5
**still (13)**
47:11,12;147:14;
150:22;159:8;201:2;
218:19;221:14;222:4,
4;231:2;239:13;
281:13
**stipulated (1)**
294:19
**stirrups (1)**
172:7

**stop (6)**
11:10;89:25;124:3;
158:9;229:2;285:19
**stopped (1)**
81:13
**stormed (1)**
143:6;148:2
**storms (1)**
203:11
**story (2)**
148:5,7
**strange (1)**
228:16
**street (1)**
171:4
**stress (3)**
234:7;242:1,6
**strike (2)**
91:12;252:17
**strive (1)**
101:3
**strong (1)**
239:15
**structures (1)**
61:21
**struggle (4)**
183:7,8,9,10
**studying (1)**
161:18
**Stuever (11)**
186:4,8,16,17;
245:4,5,6,7,8;282:21,
24
**stuff (4)**
20:20;86:2;92:8;
182:24
**style (1)**
203:10
**subconsciously (2)**
100:22;101:15
**subject (6)**
41:11;50:7;203:4;
210:23;246:23;263:4
**subjected (2)**
262:18,25
**subjects (1)**
106:5
**submit (1)**
41:1
**submitted (17)**
14:15;18:15;19:15;
20:11;22:23;25:8;
35:16,25;37:13;
40:15;41:18;42:11,
17,20;76:4;222:10;
244:7
**submitting (3)**
20:17;75:23;78:11
**Subscribed (1)**
295:10
**subsequent (1)**
274:15
**substance (7)**

24:22;47:22;54:5;
114:1;197:18;240:11;
271:17
**substances (1)**
69:21
**subtle (3)**
108:24;168:18;
182:19
**subtleties (1)**
182:19
**Success (2)**
51:14,23
**sudden (2)**
234:18;264:1
**suddenly (1)**
228:19
**sue (1)**
17:22
**sued (1)**
173:23
**suffer (1)**
234:21
**suffered (3)**
263:4;267:3,23
**Sufficient (3)**
41:13;42:8;243:4
**suggest (2)**
58:11;111:12
**suggested (3)**
73:3,8;213:6
**suggesting (3)**
100:5;229:13;
281:10
**suggestion (1)**
199:4
**suggestive (1)**
108:15
**suit (1)**
86:18
**sum (1)**
156:2
**summarize (1)**
108:9
**summarized (1)**
45:3
**summarizing (2)**
54:5;78:22
**summary (11)**
28:20,21;42:24;
46:5,8;53:17;157:8;
159:24;160:4;213:8,
18
**Summit (1)**
196:20
**superiority-type (1)**
98:4
**superiors (1)**
249:4
**supervisor (2)**
16:6;62:8
**supervisors (2)**
14:16;204:25;
205:4;249:5,15

**supplemental (1)**
56:15
**supplied (2)**
252:22;253:3
**supplies (4)**
237:9;253:3,5,11
**supposedly (3)**
188:15;208:17;
228:17
**sure (83)**
12:9;15:9;19:18;
20:4,12,13,23;21:4;
22:7;23:2,4,17;25:8;
31:3;33:23;37:14;
40:10,11,13;43:21;
44:1,2,5,15,22;47:2;
50:21;65:15;67:12;
79:11,25;92:22;95:9;
96:20;98:12;102:14;
105:16;106:1,22;
107:20;117:9;121:3;
127:9;128:3,4;129:3;
139:10;143:1,9;
145:3,8;146:24;
158:22;161:6;165:8;
171:14;181:16;183:7;
197:21;200:18;202:2;
206:4;207:25;208:19;
210:12,18;212:4;
223:16;226:5;229:9;
230:11;234:16;
240:10;255:11;257:4;
258:10;259:12;
263:24;268:18;
269:24;278:7;282:14;
283:8
**surprised (1)**
173:13
**surprising (1)**
235:6
**surrounding (1)**
171:1
**surveillance (2)**
104:24;106:4
**suspended (1)**
48:17
**suture (1)**
237:5
**sutured (1)**
116:21
**swabs (1)**
253:5
**swear (1)**
9:2
**switch (5)**
21:12;24:15;57:1;
106:5,12
**switching (1)**
24:16
**sworn (5)**
9:4,12,17;10:9;
295:10
**synopsis (1)**

159:24
**system (3)**
100:6;222:14;
283:18
**systematic (1)**
263:4
**systemic (5)**
100:20;268:8;
283:7,9;286:13

**T**

**table (2)**
53:17;172:7
**talk (30)**
12:24;24:7;25:5;
31:5;45:21;64:25;
92:20;94:14;104:5;
111:22;116:8;123:12;
130:5;133:21;146:9;
152:5,21;156:4;
160:21;168:8;182:10;
184:20,21;194:12;
220:6,23;246:15,18;
266:23;267:13
**talked (18)**
80:5;92:4,13;
107:15;134:3;144:18;
146:21;156:20;
157:18;175:23;192:3;
202:19;204:3;231:6;
277:25;279:15,24;
281:11
**talking (45)**
13:5;16:7;19:23;
29:16;34:1;54:19;
65:17;96:1;103:18;
107:2;112:22;142:3;
144:22;149:20;
153:17;158:19;161:5;
163:3;164:22;165:20;
167:14;168:6,17;
175:13,14;176:19;
179:1;184:17;187:1;
188:17,18;194:6;
201:21;206:4;219:17;
221:20;225:8;226:18;
228:5,21;230:9;
255:11;265:21;281:4;
286:6
**talks (2)**
196:11;200:23
**Tammy (5)**
186:1,1,11;244:23;
245:2
**tangible (1)**
81:14
**target (1)**
100:24
**targeted (1)**
284:14
**targeting (3)**
263:4,9,10

taught (1)
101:13
**team (1)**
203:15
**tech (27)**
109:18;112:18;
114:9,16;116:15,16;
125:15,18;138:20;
141:12,17;144:7,12;
145:22;146:23;
147:10,16;154:3;
206:14;207:6;209:12,
14;211:5,10,10;
220:25;241:10
**technically (1)**
228:2
**technician (3)**
142:17;147:21;
255:1
**techs (2)**
116:14;142:7
**telephone (1)**
62:22
**telling (10)**
12:12;27:16;38:22;
93:16;98:15;128:9;
144:19;183:21;
211:20;240:20
**tells (4)**
83:24;93:18;
117:21;183:24
**temporarily (1)**
233:8
**ten (5)**
139:5;159:12;
180:6,9,19
**tendency (1)**
92:20
**tendered (1)**
200:8
**tendering (1)**
193:3
**tenure (1)**
289:8
**Tere- (1)**
33:9
**Teresa (14)**
33:9,19;76:5,14;
78:8,20,23;151:10;
179:24;275:4;276:15;
280:5;290:4,7
**term (7)**
9:16;65:13;185:5;
282:6;283:7,9,13
**terminated (9)**
76:22;80:16;81:12;
86:16;103:12,13,22;
224:20;230:20
**termination (5)**
21:24;22:3;79:5,8;
104:1
**terminology (2)**
65:16;117:8

**terms (40)**
27:18;45:6;49:5;
55:13;61:11,18,21;
65:16,22,23;81:2;
86:9;90:13;100:1;
113:12;151:3,18;
154:4;161:25;184:13;
187:18;188:25;
191:11;193:7;196:2;
206:10,16;216:8;
222:12;232:6;233:23;
235:9;236:1,24;
242:11;243:9,11,13;
270:13;281:20
**Terri (10)**
8:18;9:3;56:4;
144:1;145:21;146:2,
4;201:1;295:5,22
**test (5)**
117:21;118:19;
121:24;122:5;139:16,
23;140:4;141:4,5,8;
251:16
**testified (5)**
9:6;88:17;99:3,7;
279:2
**testify (3)**
9:22;145:5;225:3
**testifying (1)**
10:15
**testimony (36)**
9:12;10:10,12,20;
11:1,14;12:6;17:12;
24:17;25:5;28:6;
45:10;47:10,13;
59:21;88:14;96:3,21;
97:15;98:19;106:7,
19;107:14,14,21;
128:5;142:3;144:16;
145:1,24;161:17;
181:23;204:4;245:24;
280:24;283:6
**tests (2)**
117:25;140:9
**thanking (1)**
276:9
**Thanks (2)**
22:7;218:21
**That'd (1)**
262:7
**thereabout (1)**
91:17
**thereafter (4)**
80:6;130:1;156:25;
236:3
**thick (1)**
204:14
**thinking (6)**
23:20;136:8;
191:18;193:5;201:2;
212:19
**third (11)**
27:4;36:12,20,21;

51:2,11,11;69:18;
75:7;140:7;150:8
**thorough (1)**
137:14
**though (7)**
10:13;11:10;27:17;
106:12;157:7;172:24;
224:2
**thought (21)**
23:24;32:3;48:21;
61:5;63:4;64:18;
70:25;83:14;89:20;
94:2,5;98:10,13;
167:25;204:22;
230:22;238:8,15,22;
240:13;241:1
**thoughts (1)**
23:20
**threatened (2)**
91:22;196:6
**threatening (3)**
91:21;92:24;95:11
**three (14)**
23:22;26:2;60:4;
90:4;94:24;141:21;
150:8;186:15;192:23;
211:3,3,6;231:21;
239:25
**three-page (2)**
17:24;22:16
**threw (3)**
91:19,20;92:14
**thrive (1)**
101:3
**throughout (1)**
189:20
**throw (1)**
92:24
**throwing (6)**
92:1,8;93:10;
102:19;104:14,22
**thrown (1)**
102:8
**tie (2)**
46:2;286:12
**tight (2)**
63:9,11
**tighten (1)**
279:7
**timeline (5)**
74:15;80:4;111:25;
268:15,18
**times (25)**
42:19;60:3;82:25;
85:21;106:16;107:17;
119:7;127:4,12,14,25;
128:10,13;142:22,24;
186:20;195:5;209:20;
210:17;211:3,4,6;
230:15;263:16;
264:12
**time-wise (1)**
21:7

**Timothy (1)**
68:18
**Tipton (1)**
78:5
**tissue (2)**
116:18;123:22
**title (6)**
154:3;247:21;
254:25;271:9;278:11;
280:6
**titled (1)**
19:10
**titles (5)**
33:14,16;152:15;
154:1;279:21
**Today (46)**
8:8;9:10,12,18;
10:5,13,20;11:1,12;
12:4,22;21:6;24:18,
21;25:5;45:10,19;
77:4,14;87:4;92:3,12;
93:8;101:16,16;
106:8;113:9;131:5;
134:5;135:13,23;
148:4;179:8;191:23;
207:21;217:10;224:2;
225:2;235:7,12;
247:14,18,19;281:11;
283:5;284:11
**together (19)**
19:25;24:1,5,9;
26:19,20;50:5;60:10;
63:15;64:5;112:8;
126:25;129:11;146:8;
156:5;171:3;213:15,
21;259:10
**token (2)**
218:20;221:14
**told (51)**
16:4;31:18;32:2;
40:6;86:2;87:3;94:1;
95:6;102:18;104:13;
125:22;126:7;127:11;
130:16;131:25;132:4,
20;133:23;138:21;
144:14;148:10,10;
155:22;156:21;167:8;
172:20,22;179:19,21,
22;180:3;184:3;
193:4,10,24,25;
210:18;211:15;212:8;
221:6,10;229:3;
230:24;232:20;242:3;
268:3;281:7,8,10;
282:15;283:2
**tongue (1)**
84:2
**tonight (1)**
285:21
**took (24)**
15:24,25;20:18;
22:20;25:17;32:25;
37:9;45:15;61:2;

74:22;94:22;112:18,
19;116:23;124:21;
125:14,21;143:6;
154:18;157:7;179:3;
207:12;208:19;282:4
**top (10)**
19:14;33:7;109:11;
112:24;113:25;215:1,
3;255:23;271:6;274:8
**topic (3)**
89:18;97:14;176:15
**topics (1)**
192:5
**Total (6)**
22:15,19;23:8,10,
13;127:4
**touch (2)**
25:24;262:14
**tour (4)**
32:22,25;33:4;
252:13
**toward (2)**
75:6;106:10
**towards (19)**
47:24;54:12,14,21;
119:22;120:1;133:4;
183:25,25;210:21;
221:12;228:17;237:1;
244:14;281:22,25;
284:14;285:2,22
**town (2)**
88:23;183:12
**track (2)**
106:6,13
**Tracking (1)**
199:16
**trained (3)**
97:10;127:18;
251:11
**training (9)**
48:24;49:5;56:16;
166:18;183:20;
236:12;250:11,18;
251:2
**Tran (1)**
8:21
**trans- (1)**
270:18
**transcript (1)**
75:23
**transfer (1)**
270:18
**transpire (1)**
236:16
**transpired (1)**
178:22
**traumatic (1)**
21:24
**travel (2)**
231:24,25
**traveling (1)**
232:5
**travesty (1)**

283:22
**treated (5)**
102:12;154:5;
203:25;236:14;
245:16
**treating (2)**
97:20;99:6
**treatment (12)**
58:10;62:12;105:2;
161:2;211:7;249:14,
18,20;263:5;267:3,8,9
**treatments (1)**
249:16
**trial (2)**
191:22,25
**tried (5)**
107:17;110:25;
160:9;181:25;281:6
**tries (1)**
43:15
**triumph (1)**
203:13
**trouble (1)**
239:22
**true (26)**
18:19;63:2,4;74:12;
76:1,18;87:21,25;
88:1;93:11,12;
101:14;115:8;125:16;
128:16;134:5,23;
135:10;139:24;141:1,
5,6;142:15;144:11;
176:8;201:16
**trust (1)**
235:21
**truth (3)**
9:5,5,6
**try (34)**
15:14;20:20,23;
23:2;24:8;34:2,4,15;
36:16;41:1;50:1;
64:24;66:20;93:6;
101:3;108:5,12;
146:8,22;163:1;
167:24;174:4;185:6,
9;198:21;202:20;
217:16;220:2;234:4;
241:16,18;243:21;
278:24;282:4
**trying (51)**
11:5;12:16;20:25;
23:3;24:25;33:5;40:2,
18;45:18,23;46:4,6;
95:11;98:9,23,25;
99:16,23;100:2,9;
109:8;112:23;113:21;
125:11;127:9,12;
128:4,20;129:7;
136:16;151:21;
167:24;169:8;171:14;
175:4;183:22;184:5;
194:14;197:23;
200:12;202:22;

210:11;216:4;228:23;
235:2;239:5;241:2;
242:25;244:12;
279:19;285:19
**turn (9)**
53:7;202:6;226:20;
236:13;257:8;269:2;
272:13;273:25;275:7
**turned (7)**
196:15;217:19;
219:12;223:2,7;
238:2;269:3
**turning (1)**
212:20
**twenty (1)**
149:3
**Twenty-one (1)**
222:9
**twice (2)**
26:3;211:9
**two (38)**
17:14,17;52:8;
59:25;60:4;66:11;
67:6;105:20;111:13;
112:11;114:23;115:2;
122:10;124:11;
127:11;129:6,13,14,
18,20;130:8;131:19;
132:13;136:12,12;
138:13,14,17;143:18;
144:23;145:1;146:3;
154:12;175:16;211:6;
225:4;239:24;256:18
**tying (1)**
286:16
**type (16)**
14:23;15:9;62:1;
65:8;75:17;95:16;
103:17;107:22;
115:23;117:25;
164:18;181:9;213:4;
220:8,11;261:7
**typed (2)**
120:15;192:20
**types (5)**
21:20;83:4;105:11;
184:24;253:23
**typewritten (4)**
17:25;41:11;75:11;
78:2
**typical (1)**
27:17
**typically (3)**
28:1;123:9;127:16
**typing (2)**
23:11;162:11

**U**

**Uh- (1)**
82:8
**ultimately (1)**
38:11

**umbrella (4)**
257:25;258:3,5;
264:11
**unable (1)**
227:4
**unbeknownst (1)**
237:11
**uncle (1)**
171:7
**unclear (1)**
29:8
**uncomfortable (4)**
73:4;182:21;
190:24;196:5
**uncommon (1)**
83:24
**under (9)**
47:11;138:8;
175:16;180:18;
183:23;198:8;199:1;
264:17;272:21
**under- (2)**
129:16;190:25
**underlying (2)**
105:10,10
**understandably (1)**
229:10
**understands (1)**
270:21
**understood (7)**
16:12;23:5;25:19;
28:5;38:14;71:7;
142:2
**uneasy (1)**
195:22;256:1;259:1
**unexpectedly (1)**
71:5
**unfair (1)**
70:25;229:23
**unfairly (2)**
239:5;245:16
**unfortunate (2)**
83:16;96:18
**unfortunately (8)**
82:25;83:13,15,17;
84:10;97:6;98:3;
109:2
**unique (1)**
217:9
**unit (1)**
256:19
**United (2)**
97:4;98:16
**University (1)**
30:16
**unless (5)**
69:12;100:23,23;
191:20;212:20
**unlicensed (5)**
162:20;163:4;
164:8,12,16
**unnerving (1)**
94:25

**unpack (1)**
264:8
**unpackage (1)**
184:3
**Unprofessional (6)**
52:21;56:6;271:12,
20;272:15;273:4
**unsatisfied (1)**
205:3
**unscheduled (1)**
70:17
**untrained (2)**
150:2,12
**unusual (2)**
226:25;227:5
**unwarranted (1)**
256:2
**unwarrantedly (1)**
256:22
**unwelcomed (7)**
166:2,3,11,12,17,
19,23
**up (67)**
17:4;31:6;34:25;
35:9;36:16;38:2;
44:19,21;47:19;
49:23;58:16;59:1;
63:7;65:22;87:12;
93:24;108:13;117:6,
15;118:20;122:1;
124:24;126:4;127:10;
132:10;138:24;139:2;
150:8;156:2;162:4;
163:10;167:24;
171:11;179:6;188:15;
189:3,13;192:20;
193:15;195:14;212:6;
214:19;215:11;222:5;
231:19;237:4;238:9,
16;239:20;241:2;
243:10;244:11;
252:11;257:1,5;
262:5;263:21;268:23;
272:24;277:6;279:7;
282:5,10;284:7,23;
291:17,22
**upfront (1)**
41:21
**upon (3)**
198:5;252:24;
256:12
**upset (3)**
91:7;93:18;94:1
**upsetting (2)**
188:13,14
**upwards (1)**
107:16
**urban (1)**
221:25
**urine (6)**
118:10;121:24;
122:9,18;125:2,3
**use (12)**

34:12,13;45:10;
46:12;83:22;113:17;
217:20,21;225:19;
252:20;283:9,13
**used (17)**
10:21;20:1;43:15;
65:13;72:10;74:11;
85:22;87:5,9;123:22;
178:15;183:5;215:19;
253:3;267:19;283:6;
294:2
**using (4)**
108:4;117:8;
150:24;185:5
**usually (6)**
27:21;44:14;
142:20;183:13;257:6;
258:12

**V**

**vague (1)**
279:3
**vagueness (1)**
279:7
**Val (3)**
91:6;133:22;230:20
**Vali (1)**
63:24
**Valicia (1)**
112:15
**value (3)**
218:14;235:22;
243:13
**variety (2)**
250:6;287:18
**various (9)**
55:20;75:5;99:20;
138:10;214:20;
233:22;270:24;
273:14;281:21
**vary (1)**
197:17
**vengeful (1)**
98:9
**verbal (5)**
82:3,4;106:17,20;
155:13
**verbalized (1)**
92:23
**verbally (6)**
82:22;101:19;
103:6;105:12;155:20;
180:3
**verbiage (1)**
83:22
**verification (1)**
18:9
**verified (2)**
69:2;169:3
**verify (2)**
249:13,16
**version (2)**

70:14;79:4
**versus (6)**
27:2,3;107:24;
145:2;169:5,6
**via (2)**
21:25;62:21
**victim (1)**
100:23
**video (4)**
8:10;209:22;257:4;
293:20
**VIDEOGRAPHER (27)**
8:4,6;9:1;11:13;
17:5,8;47:3,6;88:6,9;
149:3,5,8;210:2,5;
216:14,16,21;217:18;
243:22;244:1;247:4,
6,9;269:25;270:3;
293:18
**view (1)**
64:22
**viewpoint (1)**
89:17
**Violation (1)**
273:6
**violence (3)**
94:18,19;101:8
**violent (1)**
95:8,9;101:6,7
**violently (1)**
91:12
**visit (9)**
119:5;120:6;
121:15;122:1,6;
123:5,14;139:17,24
**visits (2)**
171:11,19
**vitals (1)**
165:14
**voice (16)**
16:20;89:21;90:25;
91:3,21,25;94:15,17;
95:2,8,19,24;101:7;
102:17;115:21;
218:24
**voicemail (5)**
216:1,1;239:15,22;
240:12
**vs (1)**
295:22

**W**

**W-2 (1)**
294:8
**wages (1)**
234:2
**wait (4)**
13:8;31:1;133:11;
244:25
**waived (1)**
294:24
**wake (1)**

21:24
**walk (5)**
31:10;50:7;109:2;
125:11;149:11
**walked (5)**
81:16;126:11;
189:14;190:12;
266:14
**walking (4)**
261:17;264:2;
265:16;266:3
**wants (1)**
284:6
**warden (28)**
37:12;38:25;39:15,
25;40:7,11,14,20;
41:20;42:16;43:23;
67:4,17;68:10;274:9;
275:17,20;276:20,25;
277:21;290:3;291:14,
22;292:1,3,5,14;293:8
**warning (1)**
260:13
**waste (2)**
44:18;225:1
**wasting (1)**
44:23
**watch (2)**
264:20,21
**watched (4)**
258:14,14;259:1,9
**watchful (2)**
172:3;203:9
**watchfulness (3)**
256:2;263:13;
264:16
**watching (4)**
251:24;256:22;
259:25;266:4
**way (67)**
12:17;16:21;22:6;
25:24;32:19;37:17,
18;40:13,14;41:10;
46:9;48:15;53:8;
65:19;71:13;75:2;
83:9,9;87:11,12,12;
92:12;93:9;96:13,16;
108:5;109:1;110:11;
111:7,11;113:19;
114:7;125:1;129:8;
141:25;146:22;
151:12;152:2,22;
158:10;169:24,25;
176:20;181:8;183:4;
191:20;196:6,12;
203:20;205:11;206:3,
5,17;207:20,21,23;
223:5;226:4;228:14,
22;234:19;235:22;
245:16;247:18;
260:18;278:10;
279:13
**ways (1)**

151:17
**weathered (1)**
203:11
**webdocstatemo (1)**
214:7
**weeds (1)**
15:15
**week (13)**
63:15;64:5;91:16;
93:21;108:23;121:23;
130:8;197:15,17;
200:25;201:13;
256:20,20
**weeks (7)**
19:19;22:25;23:10;
109:21;122:10;130:7;
192:23
**welcome (1)**
222:5
**Wellness (1)**
233:1
**weren't (8)**
136:17;147:9;
149:24;182:17;
205:13;237:13;
250:18;281:9
**what'd (4)**
158:12;173:11;
190:2;202:20
**whatever's (2)**
121:16;244:6
**whatnot (13)**
51:25;55:21;56:16;
59:23;71:1;74:19;
99:11;109:18;112:20;
151:15;162:2;225:25;
233:22
**what's (18)**
34:21;102:1;152:8;
161:24;173:16;
177:20;206:1;208:22;
216:1;218:2;224:16;
233:3;236:20;240:7;
270:12;280:4,4,6
**whatsoever (4)**
91:11;95:16;142:5;
241:8
**wheel (1)**
83:8
**Whenever (4)**
66:4;158:25;
254:15;282:17
**Whereupon (5)**
8:1;84:25;104:11;
135:21;262:10
**wherever (1)**
124:24
**whispering (14)**
182:25;184:7,10,
13,14;185:1,5,18,19;
186:20,21;187:24;
189:1;192:3
**whispering/murmuring (1)**

191:4
white (4)
  183:3;218:20;
  221:14;259:20
whoever's (1)
  122:3
whole (5)
  9:5;44:10;83:17;
  184:16;214:8
Who's (17)
  26:5,16;39:6;57:2;
  83:23;90:1,1;164:10;
  166:6;167:21;169:1,
  19,20,20;170:22,22;
  208:9
whose (6)
  76:10;187:9;
  262:18;271:6,21;
  274:19
willingly (1)
  44:3
withdrawing (1)
  293:24
within (5)
  72:20;76:24;
  149:17;165:9;206:23
without (12)
  11:16;34:1;41:14;
  88:24;172:8,8;176:7;
  217:14;261:2;263:25;
  279:10;294:1
witness (14)
  9:2;28:6;153:8,10,
  13;163:16;177:22;
  185:14;195:17;225:3;
  292:19;293:16,23;
  294:22
witness' (1)
  98:19
witnessed (5)
  81:15;164:7,24;
  257:3;266:25
witnesses (4)
  75:5;266:25;
  269:17;294:3
woman (4)
  94:16;95:2;254:20;
  258:19
women (1)
  225:7
women's (14)
  29:18,24;30:1;
  62:13;149:13;151:16;
  163:24;164:1;165:20;
  215:20,20;233:1,4;
  247:24
wonder (2)
  187:12;191:5
wonderful (1)
  203:13
wonky (1)
  45:6
word (8)

9:17;77:13;143:9;
  159:17;160:13;
  237:24;240:7;282:11
words (12)
  23:11;94:2;101:21;
  110:20;111:6;147:13;
  156:10;173:12;187:9;
  203:16;265:24;
  267:18
work (63)
  13:17;14:4;16:4;
  26:19;37:7,8;38:8;
  45:16;69:5;71:6,16;
  76:25;77:8;86:25;
  112:19;118:5;122:10;
  124:18;132:16;162:1;
  165:12;169:23;
  183:22;190:17;
  192:22;197:15;202:7;
  203:1,13;214:19;
  229:2,4;232:9,10,12,
  25;236:12,16;238:4;
  241:20;249:24;250:6,
  12,15;252:10,16;
  253:22;254:16;257:7;
  261:19;262:19;
  266:23;268:12;
  270:15;277:2,14,20;
  285:12;287:18;288:2;
  292:4,24;293:9
workable (1)
  61:5
worked (35)
  16:16;21:19;26:20,
  24,25;27:4;28:3;
  32:24;61:1;63:15,20;
  64:5;65:5;85:22;
  86:24;87:4;88:20;
  169:24;171:7,7;
  174:6;186:4;196:6;
  204:1;229:19;236:7,
  8;239:13;247:22;
  248:5;249:5;258:23;
  267:2,3,6
workers (1)
  220:4
working (37)
  14:9;27:2;31:13;
  32:20;38:13;49:19,
  20;57:21;61:6;62:20;
  63:9;64:10;77:18;
  81:22;87:20;95:12;
  121:7;126:25;128:5,
  19;129:11;178:4;
  218:9;233:12,24;
  240:19;248:9;249:1;
  250:19;257:13;
  261:11;276:17,21;
  287:21;291:15;292:2,
  15
workplace (2)
  146:23;186:20
works (2)

169:25;208:13
world (1)
  83:13
worse (10)
  104:2;175:9,10;
  178:24;234:16,18,19,
  20;235:11,15
Wound (3)
  196:18;231:18;
  232:8
wrap (1)
  108:13
wrapping (1)
  244:11;268:23
write (7)
  75:16;77:12;
  110:17;114:10;
  154:14,17;160:5
writes (5)
  67:17;138:18;
  139:14;143:12;144:7
writing (6)
  41:19;81:25;
  165:16;206:11,12;
  277:24
written (7)
  12:14;21:9;46:11;
  85:13;102:24;104:17;
  114:2
wrong (4)
  76:8;145:7;218:3;
  244:14
wrote (17)
  23:1;37:18,19;
  77:22;82:5,9;85:2;
  108:5;135:8;144:11;
  148:10;159:23;
  160:24;182:3,3;
  203:16;230:5

**X**

x-ray (5)
  255:1;257:2;
  258:18;263:9;264:17

**Y**

ya (1)
  240:21
yard (2)
  264:4,6
year (8)
  30:9;18;45:8;
  108:24;127:1;128:6,
  19;129:11
years (5)
  30:7;86:25;144:23;
  171:8;236:8
Yep (2)
  35:11;279:25
yes-or-no (1)
  12:18

yesterday (1)
  217:6
YOLANDA (3)
  9:3;295:5,22

**Z**

Zoom (3)
  8:22,25;47:20

**1**

1 (26)
  8:2;17:19;18:22;
  19:2,7;22:18;36:3,19;
  66:15;73:16,21,24;
  74:3;113:25;149:17;
  150:22;163:3;164:21;
  200:25;213:1;215:4,
  4;243:21;255:6,14;
  259:8
10 (5)
  21:14;70:10,12;
  72:23;249:22
10:00 (1)
  17:6
10:07 (1)
  17:9
10:55 (1)
  47:4
11 (3)
  34:22;71:24;72:1
11:14 (1)
  47:8
11:20- (1)
  79:12
11:29 (1)
  79:8
111 (1)
  56:1
12 (7)
  73:24;74:15,20;
  75:1;77:7;79:6;
  108:23
12:14 (1)
  88:7
12:52 (1)
  88:11
12-month (1)
  30:14
12th (3)
  50:13;51:7;55:15
13 (6)
  75:7,9;89:3,5;
  93:17;96:5
13th (3)
  52:12;55:17;272:10
14 (2)
  229:23;230:6
15 (15)
  19:9;36:20;73:25;
  74:3;109:12;112:3,4,
  5,7,25;113:25;

149:17;150:22;
  178:12;255:14
15th (3)
  112:1;113:14;114:1
16 (6)
  21:14;199:18,21;
  266:17;293:22;294:6
17 (4)
  192:9;196:9,22,24
18 (3)
  198:16;199:13,13
19 (10)
  31:1,2,3,4,4;199:18,
  21;200:1;202:24,24
1st (10)
  74:5;162:19;
  163:11;164:7;168:5,
  24;192:15;194:7;
  196:11;200:8

**2**

2 (9)
  18:4,11;21:13;
  46:10,10,19;51:1;
  54:12;186:13
2- (1)
  51:10
2:12 (1)
  149:6
2:23 (1)
  149:9
20 (10)
  112:8;159:11;
  171:8;212:24,25;
  213:10,21;214:1;
  226:23;227:7
2011 (4)
  29:12,21;30:10,10
20120411 (1)
  215:2
2014 (1)
  29:25
2015 (3)
  29:14,22,25
2017 (9)
  28:23;35:21;52:12;
  56:23;70:18;74:22;
  75:13;248:24;249:2
2018 (7)
  31:1;56:5,22;
  124:16;163:4;164:21;
  230:6
2019 (7)
  19:14;25:20;82:14;
  85:6;180:5;226:24;
  235:13
2020 (3)
  8:8;13:24;295:11
20th (1)
  67:3
21 (5)
  143:24;222:7,8

**2-1 (1)**
  200:3
**2-18-2019 (1)**
  214:9
**22 (7)**
  25:20;138:7;222:7,
  8,15,17;228:14
**229 (1)**
  51:3
**22nd (4)**
  194:9;203:1;219:7,
  14
**23 (4)**
  112:11,22;293:22;
  294:7
**231 (1)**
  50:23
**24 (8)**
  112:9,11,23;
  114:10;225:11;
  226:11;227:13;240:3
**2-4-19 (1)**
  200:3
**242 (5)**
  52:7,19;270:25;
  271:5;272:17
**243 (5)**
  52:8;53:8,9;270:25;
  272:13
**25 (5)**
  8:2;159:11;225:11;
  227:13;262:5
**2-5 (1)**
  201:10
**26 (2)**
  262:6,11
**26th (3)**
  68:18;95:18;213:24
**27th (5)**
  93:23,25;95:5;
  97:19;102:11
**29 (2)**
  74:22;75:13
**29th (4)**
  74:18,25;78:2;
  79:16
**2nd (1)**
  192:15

---

**3**

**3 (5)**
  73:25;138:8;213:2;
  293:22;294:4
**3:44 (1)**
  210:3
**30 (5)**
  19:14;79:8;234:25;
  251:24;269:23
**30th (1)**
  228:9
**317 (1)**
  72:2

**335 (1)**
  72:2
**39 (3)**
  34:16;35:1,5

---

**4**

**4 (7)**
  33:24,24;35:21;
  46:11,22;213:17,21
**4:00 (2)**
  27:9;210:6
**4:10 (1)**
  216:17
**4:15 (1)**
  216:22
**4:19-CV-00693-BP (1)**
  8:11
**4-27-18 (1)**
  89:6
**469 (1)**
  68:15
**47 (2)**
  34:17;35:5
**471 (1)**
  89:4
**474 (1)**
  70:12
**478 (4)**
  67:2,12;274:1;
  275:19
**479 (1)**
  275:10
**480 (3)**
  67:2,12;274:1
**4th (1)**
  13:23

---

**5**

**5 (5)**
  34:16,21;35:14;
  79:3;226:20
**5:02 (1)**
  247:7
**5:12 (1)**
  247:10
**5:44 (1)**
  270:1
**5:53 (1)**
  270:4
**50 (1)**
  294:5
**540- (1)**
  51:18
**542 (1)**
  51:19
**550 (1)**
  51:19
**552 (1)**
  51:19
**57.03 (1)**
  294:23

---

**6**

**6 (3)**
  47:15,16;124:16
**6:15 (1)**
  285:21
**6:26 (1)**
  293:19
**6:28 (1)**
  294:15
**638 (1)**
  53:15
**640 (1)**
  54:14
**641 (1)**
  53:16
**67 (1)**
  54:22
**6th (11)**
  113:5,10,15;114:2,
  3,7,21,23;115:6;
  130:1;139:21

---

**7**

**7 (20)**
  19:8,9,23;36:20;
  49:21,24;50:4,9,23;
  51:2;53:14;55:25;
  74:3;204:16;255:8,
  11,12;270:20,22;
  289:4
**728 (1)**
  53:18
**736 (1)**
  53:19

---

**8**

**8 (20)**
  8:8;27:25;66:24;
  67:1,18;78:25;79:1;
  109:12;112:24;
  113:25;149:17;
  150:22;255:12,23,25;
  259:14;262:16;
  270:21;273:25;274:1
**8:00 (1)**
  27:9
**8th (1)**
  228:15

---

**9**

**9 (4)**
  19:23;178:12;
  255:9,12
**9- (1)**
  197:11
**9:50 (2)**
  8:5,9
**95 (1)**

  92:22
**98 (1)**
  92:22
**989 (1)**
  294:6
**991 (3)**
  196:25;197:2,3
**993 (2)**
  196:23;197:6
**994 (2)**
  196:25;197:3
**9999 (1)**
  217:8