**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

**TERRY YOLANDA LABLANCE,**

**Plaintiff,**

**CORIZON HEALTH, INC. AND**
**MISSOURI DEPARTMENT OF**
**CORRECTIONS,**

**Defendants.**

**Case No. 4:19-CV- 00693-BP**

---

**PLAINTIFF TERRY LABLANCE'S OPPOSITION TO**
**DEFENDANT CORIZON HEALTH, INC.'S**
**MOTION FOR SUMMARY JUDGMENT AND SUGGESTIONS IN SUPPORT**

---

Ivan L. Nugent     MO#62148
Krigel & Krigel, P.C.
4520 Main St., Suite 700
Kansas City, MO 64111
Tel: (816) 756-5800
Fax: (816) 756-1999
inugent@krigelandkrigel.com

**ATTORNEYS FOR PLAINTIFF**

1

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES …………………………………….…....……….…5

I.      INTRODUCTION AND SUMMARY OF THE CASE ……………………….6

II.     THE RECORD FACTS ESTABLISH A GENUINE DISPUTE FOR
        TRIAL AS TO PLAINTIFF'S CLAIMS OF A RACE-BASED
        HOSTILE WORK ENVIRONMENT AND RETALIATION-BASED
        TERMINATION CLAIMS ………………………………………………..…….9

        A. Response to Corizon's Statement of Alleged
           Uncontroverted Material Facts ………………………………………….9

        B. Plaintiff's Statement of Additional Material Facts Establishing
           a Genuine Dispute for Trial …………………………………………….16

           *Plaintiff was recruited by Corizon to work as a nurse practitioner
           and was the only African- American employed at the Chillicothe
           facility throughout her tenure………..……………………………………...16*

           *Plaintiff was singled out and treated differently from the outset
           when co-workers illegally accessed Plaintiff's Department of
           Corrections' records and gossiped about her criminal record…………………18*

           *Corizon's management and reporting structure..………………………………19*

           *Corizon's policy is to facilitate a workplace environment
           that is harassment free and comfortable for employees…..……………………20*

           *Overtly racial comments were made to Plaintiff about a
           "nigger rigged" or "Afro-engineered" radio antennae
           within two months of her employment…..……………………………………20*

           *Plaintiff was singled out again and treated differently due to
           her race when she was given a written reprimand and
           perceived as being "violent" for raising her voice to be
           heard in a meeting after being interrupted; a white co-
           worker who actually was violent and threw a pencil was not. ………………22*

           *Plaintiff reported discriminatory conduct by lab tech Judy Harkins
           in June of 2018, who singled her out and treated her differently
           than other providers ……………………………………………………….24*

           *Plaintiff reported a number of other discriminatory actions
           during her employment including discriminatory searches,
           interference with medical advice, reduction in her patient*

   *load, increased watchfulness, and sabotage.* …………………………..27

   *Despite an obligation to do so, no Corizon manager or employee reported anyone accessing Plaintiff's records until Plaintiff notified Dr. Lovelace upon her receipt of the February 26, 2019 letter from Dr. Epperson.  Instead, they gossiped and created a hostile uncomfortable environment for Plaintiff.* ………………………………………………………..29

   *Plaintiff resigned because she felt singled out, uncomfortable, fearful, and worried about her license, among other things*…………………………………………………………..30

   *Plaintiff reached out to Dr. Lovelace to report she had received a letter from Dr. Epperson disclosing that her private D.O.C. records had been accessed, which "started the ball rolling" on a post-separation investigation by Corizon revealing the extent to which co-workers and supervisors alike had illegally accessed Plaintiff's records violating her privacy and creating a hostile environment throughout Plaintiff's employment* ………….………………………………………31

III.  ARGUMENT AND AUTHORITIES ….………………………………………..35

 A. <u>Counts I and II</u>:  Corizon is not entitled to summary judgment because when viewed in context and as a whole, the facts demonstrate an accumulation of abusive conduct establishing a racially hostile work environment resulting in Plaintiff's constructive discharge………………………………………………………… 35

  1. Applicable Legal Principles……….………………………………………..35

  2. Plaintiff Has Established a Prima Facie Case of Hostile Work Environment  ……………..………………………………………37

   a. *Considering Plaintiff's work environment "as a whole" and in context as this Court must do, Plaintiff has easily established that she was subject to unwelcome race-based harassment.* …………….………………………………………37

   b. *Corizon's contention that "post-resignation" events are immaterial to establishing a hostile environment must be rejected upon viewing the entire working environment "as a whole" and in context; the fact that dozens of*

*Corizon and D.O.C. employees accessed Plaintiff's D.O.C. records establishes, among other things, severe and pervasive race-based abuse.* …………………………………41

    c. *Plaintiff has established that she was harassed because of her race.* …………………………………………………42

    d. *The harassment affected a term, condition, or privilege of employment* ...42

    e. *Corizon did not take proper corrective action sufficient to bar Plaintiff's claim.* …………………………………………43

  3. Plaintiff was constructively discharged. ……………………………………44

B. Counts III and IV: Corizon is not entitled to summary judgment on Plaintiff's Retaliation-based claims. …………………………………………45

  1. Applicable Legal Principles …………………………………………………45

  2. Plaintiff has made a prima facie case of retaliation …………………………45

    a. *Plaintiff was constructively discharged and, before that, had a material reduction in her patient load affecting her productivity and ability to do her job.* ……………………………46

    b. *When Plaintiff complained about discriminatory conduct, her workload was materially affected; eventually, the hostile environment resulted in constructive discharge.* ……………………………………46

IV. CONCLUSION ……………………………………………………………47

## TABLE OF AUTHORITIES

Title VII ……………………………………………………………..……..6, 47

42 U.S.C. §1981 …………………………………………………………..……6, 47

*Carter v Chrysler Corp*., 173 F.3d 693, 700 (8th Cir. 1999). ……………………… 35, 36, 42

*Ellis v. Houston*, 742 F.3d 307 (8th Cir. 2014) ……………………………..……35, 3, 42

*Harris v. Forklift Sys., Inc* 510 U.S. 17, 21-22, 114 St. Ct. 367 (1993) …………………35, 36

*Hardage v. CBS Broadcasting, Inc*., 427 F.3d 1177 ( 9th Cir. 2005). …………..……..43, 44

*Hathaway v Runyan*, 132 F.3d 1214, 1222 (8th Cir. 1997) …………………………………..35

*Paasewe v. Action Group, Inc*., 530 Fed. Appx 412, 416 (6th Cir. 2013) …….…………36, 43

*Sowell v. Alumina Ceraminica, Inc*., 251 F.3d 678 (8th Cir. 2001) …………………………45

*Twymon v. Wells Fargo & Co*., 462 F.3d 925, 934 (8th Cir. 2006) ………………….………41

*Ways v City of Lincoln*, 871 F.2d 750, 755 (8th Cir. 1989) …………………….………..35

## **Exhibits**

Exhibit 1 – Deposition of Terry LaBlance (see Corizon's Motion for Summary Judgment)

Exhibit 2 – Deposition of Dr. Jerry Lovelace (see Corizon's Motion for Summary Judgment)

Exhibit 3 – Deposition of Jenny Meehan (see Corizon's Motion for Summary Judgment)

Exhibit A – Deposition of Sterling Ream

Exhibit B – Deposition of T. Christopher

Exhibit C – Deposition of Makisa Upton

Exhibit D – Excerpts from the Employee Success Guide (Lovelace depo. Ex. 26)

Exhibit E – Investigation packet/paper clips – Depo. Ex 12

Exhibit F – 4/27/18 Memo- Depo. Ex. 13

Exhibit G – Audit record (Corizon)

Exhibit H – February 26, 2019 Epperson letter

Exhibit I – Audit Log (D.O.C)

# I.    INTRODUCTION AND SUMMARY OF THE CASE

Plaintiff Terri LaBlance was the sole African-American employee working at the Chillicothe Correctional Center employed by Corizon. Shortly after she began work, she was subjected to overt racial discrimination. Although Corizon promptly terminated the offender, the discrimination and harassment began in earnest and was no longer overtly racial but nevertheless inescapably motivated by race. The accumulation of abusive conduct when viewed in context and as a whole – as the law requires – no doubt establishes a racially hostile work environment that ultimately resulted in Plaintiff's constructive discharge. Based on the record evidence outlined below, Plaintiff is entitled to have a jury decide her claims of racial discrimination in violation of Title VII and 42 U.S.C. §1981, and Corizon is not entitled to summary judgment.

For its defense, Corizon attempts to carve out a few discrete incidents and then claim that because these incidents did not involve any facially racial conduct, Plaintiff cannot establish that her race-based harassment is sufficiently severe or pervasive to satisfy her burden. Corizon unfairly misconstrues the record. Plaintiff has alleged a pattern of discriminatory conduct, supported by facts in the record, which includes the following illustrative incidents:

- Even though Plaintiff's criminal record had been disclosed and fully vetted by credentialling entities and senior Corizon management at hiring, the Health Services Administrator (HSA) thereafter shared private information about Plaintiff's D.O.C. record – which included HIPAA protected medical records – with other employees and encouraged them to access Plaintiff's records. Plaintiff was singled out, ridiculed, and her qualifications and fitness questioned resulting in increased scrutiny of her work and daily interactions.

- Within two months of Plaintiff beginning her work, on August 29, 2017, a Caucasian employee made reference to an antenna being "nigger-rigged." After correction by Plaintiff, the same employee laughed, commented that she says that "all the time," and changed her statement to "Afro-engineered." The employee was promptly terminated, and even though senior management was concerned about the effectiveness of Corizon's sensitivity training given how easy it was for the employee to make that kind of blatant remark in the workplace, no further training or guidance was provided to

6

Plaintiff's co-workers in order to address that continuing problem with the work culture.

• Plaintiff was singled out again and treated differently than the Caucasian providers when she received a written reprimand for raising her voice out of frustration during a meeting where she was continually interrupted. She was told that the others thought she would become violent and hit someone. It alarmed Plaintiff that her co-workers would automatically assume that an African-American woman raising her voice would turn violent. A week or so earlier, the Caucasian nurse practitioner had actually thrown a pen during a meeting (i.e. had been violent) and received no reprimand or any consequence at all.

• On June 6, 2018, the site's only lab technician intentionally and maliciously refused to process a specimen for Plaintiff. This was not the first time. The lab technician not only refused to complete the requisition paperwork requested by Plaintiff, but also took the specimen from the counter, stormed past Plaintiff, and threw it on Plaintiff's desk telling her she should do it in an act of blatant disrespect. The other Caucasian providers told Plaintiff that they did not experience that kind of disrespect from the lab technician. Plaintiff made a formal complaint of discrimination for a second time for this behavior, but Corizon determined that the lab technician did nothing wrong and chalked her behavior up to a "communication issue."

• Plaintiff raised a concern with the HSA and the Regional Medical Director about staff assistants who behaved differently while assisting Plaintiff than they did while assisting the Caucasian providers. These staff assistants interrupted, interjected their own opinions, and gave medical advice (sometimes wrong). After Plaintiff complained, her patient load was reduced from about 20 to 25 patients a day to about 10 per day thereby affecting her productivity and jeopardizing the need for her position.

• D.O.C. personnel began watching Plaintiff's every move and conducting thorough searches of Plaintiff and her belongings while Caucasian employees were not subjected to the same searches.

• Custody officers connected to the staff assistants that Plaintiff had complained about began standing outside Plaintiff's door, and even barged into an exam room during a patient consult.

• A nurse left scalpels – "sharps"- out on Plaintiff's desk claiming Plaintiff did not hear her knock and the exam room door was locked. This was a violation that could result in Plaintiff's termination and potential loss of licensure.

• More Corizon and D.O.C. personnel accessed Plaintiff's D.O.C. records, including Dr. Epperson who shared Plaintiff's private information with other employees in violation of HIPAA and Corizon policies. Dr. Epperson then sent a letter to Plaintiff enclosing the private records about a week after she had left employment telling Plaintiff "not to contact her" again.

- A total of 21 Corizon employees, and 21 D.O.C. employees accessed Plaintiff's private records during her employment.

As a result of the above incidents of race-based harassment creating a hostile environment, Plaintiff left her employment with Corizon because she constantly felt uneasy, singled out, uncomfortable, fearful, "plotted against," and worried for her license and ability to make a living. Plaintiff had worked very hard to turn her life around from what it had been and to earn her nursing license, masters' degree, and advanced certification. Even so, Plaintiff chose to do the right thing and leave gracious parting messages for Dr. Epperson (whom she had worked with closely) and Jenny Meehan.

Plaintiff later learned the extent of the invasion into her privacy and egregious access to her private, HIPAA-protected records by Corizon and D.O.C. employees. She was able to put together more pieces as to why she had been treated this way or that way throughout her employment. It now made even more sense and solidified her feeling that she had been discriminated against and suffered countless indignities due to the color of her skin.

Considering the facts as a whole, it is evident that the accumulation of abusive conduct objectively establishes that a reasonable person would find the environment to be hostile or abusive. At a minimum, a disputed issue of fact remains for the jury to decide. Certainly, Plaintiff subjectively perceived her work environment to be hostile, and justifiably so.

Corizon's Motion for Summary Judgment should be denied.

8

## II. THE RECORD FACTS ESTABLISH A GENUINE DISPUTE FOR TRIAL AS TO PLAINTIFF'S CLAIMS OF A RACE-BASED HOSTILE WORK ENVIRONMENT AND RETALIATION-BASED TERMINATION CLAIMS

### A. Response to Corizon's Statement of Alleged Uncontroverted Material Facts

1.      Defendant Corizon Health Inc. provides healthcare services at correctional facilities in Missouri, including the Chillicothe Correctional Center.  Exhibit 1, LaBlance Dep. 28:9-21.

**Uncontroverted**.

2.      LaBlance, who is African-American, began working as an Advanced Registered Nurse Practitioner at the Corizon Chillicothe facility on June 12, 2017.  LaBlance Amended Pet., ¶¶4, 10; Ex. 1. LaBlance Dep 28:22-29:1.

**Uncontroverted**.

3.      Dr. Karen Epperson worked for Corizon at the Chillicothe facility as the on-site Medical Director; throughout her employment, LaBance thought she had a good relationship with Dr. Epperson and considered her a friend.  Ex. 1, LaBance dep. 61:7-10, 62:25-63:23.

**Controverted, in part**.  **Plaintiff actually testified that she <u>thought</u> she had a good relationship with Dr. Epperson, but that was her "being naïve, probably."  Plaintiff considered herself a friend to Dr. Epperson.  (Ex. 1, 63:3-5, 23).[1]  Plaintiff later learned that Dr. Epperson betrayed her in part by accessing her private D.O.C. records and sharing that information with other employees.  *See* Plaintiff's Statement of Additional Material Facts Establishing a Genuine Dispute for Trial ("Plaintiff's SOF") at ¶¶78, 84, 85, 86, 88**

4.      As with all Corizon employees, LaBlance completed and certified her participaton in Corizon's Discrimination, Harassment, Retaliation and Unprofessional Conduct module training.  Ex. 1, LaBance Dep. 56:3-20.

---

[1] For convenience and to avoid duplication, references to numbered exhibits are to Corizon's summary judgment exhibits.  Plaintiff's exhibits are referred to by letters.

**Controverted in part. Plaintiff testified that she completed the training but did not and cannot attest to whether all employees of Corizon did so.**

5.     On August 29, 2017, a co-worker used the phrase "n-word rigged" while LaBlance was present. Ex. 1, La Balance Dep. 74:9-25; 75;1-13.

**Controverted in part.** *See* **Plaintiff's SOF, ¶¶25-34, incorporated herein by reference.**

6.     Another co-worker, not LaBlance, reported the offending co-worker to Crizon management. Ex. 1, LaBlance Dep. 205:12-17.

**Controverted in part. Plaintiff also reported the incident directly to Dr. Lovelace.** *See* **Plaintiff's SOF, ¶¶25-34, incorporated herein by reference.**

7.     Prior to this incident, LaBlance had never heard any racially inappropriate language at Corizon. Ex. 1, LaBlance Dep. 87:17-22.

**Uncontroverted. This incident was the first overtly racial language that Plaintiff recalls directed at her. It caught her "off guard" particularly since she had just recently started working and knew that employees should have completed sensitivity training. The fact that this co-worker felt privileged to say this kind of blatantly racial and offensive language to Plaintiff with no filter was alarming and was indicative of the racially insensitive and hostile culture that Plaintiff now understood she would be facing during her employment.** *See* **Plaintiff's SOF, ¶¶25-34, incorporated herein by reference.**

8.     The same day, the Health Services Administrator at the time, Theresa McWhorter, investigated the claim and got statements from six employees, including LaBlance, and the offender. Ex. 1, LaBance Dep. 80:16-17.

**Uncontroverted that the incident was investigated. Notably, this "investigation" was led by the same supervisor that instigated rumors, shared private information about Plaintiff's criminal record, and encouraged employees to access Plaintiff's D.O.C. records from the outset of her employment. The matter was not and could not be properly resolved by merely terminating the offending co-worker given the culture at Corizon – a culture that allowed a <u>supervisor</u> to circulate private data intended to ridicule and minimize the only African-American employee, to encourage violation of HIPAA and Corizon policies by those she supervised, and create an environment or culture where an employee felt privileged to spew overtly racist and hate-based language and engage in other offensive conduct.** *See* **Plaintiff's SOF, ¶¶11-15, 25-34, 53-54, 65-66 and incorporated herein by reference.**

9.    The offending employee was terminated within a day of the incident, and according

to LaBlance, "that was the end of it."  Ex. 1, LaBlance Dep. 80:16-17.

> **Controverted.  While Plaintiff testified that terminating the offending employee was "the end of it" for Corizon (but should not have been), she also testified it was only the beginning for Plaintiff who became acutely aware at that point in time of the culture she would be battling going forward.  *See* Response to #8 above; and Plaintiff's SOF, ¶¶25-34, incorporated herein by reference.**

10.    After the incident, LaBlance never again heard any racially inappropriate language

at Corizon.  Ex. 1, LaBlance Dep. 87:23-88:1.

> **Uncontroverted.  Plaintiff testified that she understood that the termination would likely stifle other employees from using overtly racial hate language in front of Plaintiff.  In part because Corizon made no effort to deliver more sensitivity training (which clearly had not been effective), she also felt she was now "on an island" within a culture where it would now be okay to use the racial language so long as someone who looks like Plaintiff was not present.  *See* Plaintiff's SOF, ¶¶25-34, incorporated herein by reference.**

11.    On June 6, 2018, LaBlance emailed Sterling Ream (Health Services

Administrator), Dr. Karen Epperson (Medica Director), Dr. Jerry Lovelace (Regional Medical

Director), Jenny Meehan (Director of Operations), and Valicia Kirby (Nurse Practitioner)

regarding allegations of employee discrimination against a lab technician named Judy Harkins.

> **Uncontroverted**.

12.    LaBance alleged that in order to process specimens that she brought Harkins in the

lab, Harkins required her to fill out requisition paperwork that she did not require of other, non-

African-American medical providers.  Exhibit 3, Meehan Dep. 62:6-12.

> **Controverted, in part.  Plaintiff's allegations of race discrimination focused on the disparate treatment she received vis a vis the other white providers, and specifically Harkins' blatant disrespect and insubordination when she refused to complete requisition paperwork requested by Plaintiff, grabbed a lab specimen Plaintiff had placed on the counter by the refrigerator for processing, stormed past Plaintiff and threw it back on Plaintiff's desk.  The other providers did not have this experience.  This incident was the <u>second</u> incident reported by Plaintiff and ignored.  *See* Plaintiff's SOF, ¶¶43-60, incorporated herein by reference.**

11

13.     Meehan investigated LaBlance's complaint, discussing the allegations with LaBlance, Harkins, and the other non-African American medical providers at the facility.

   **Controverted, in part**.  **Meehan "investigated" the claim, but never discussed it with Plaintiff until she had already concluded that the issue was simply a misunderstanding or a communication issue and that neither LaBlance or Judy Harkins did anything wrong.  *See* Plaintiff's SOF, ¶¶43-60, incorporated herein by reference.**

14.     The other providers at the facility told Meehan that they too were required to complete the requisitions at times, in opposition to LaBlance's allegations that she was the only provider required to complete the forms.  Ex. 3, Meehan Dep. 62:16-21.

   **Controverted, in part.  Meehan missed the point.  She failed to focus on the behavior of Judy Harkins, the only lab technician, and how her reactions and behavior toward Plaintiff differed from when the other white providers requested that she process a specimen for evaluation in the lab.  Meehan didn't think Ms. Harkin's behavior was "important" in evaluating whether race discrimination occurred.  And although Sterling Ream was copied on Plaintiff's complaint as the site administrator, Ms. Meehan was not advised that Ms. Ream had previously accessed Plaintiff's D.O.C. records, that Teresa McWhorter had encouraged numerous others to do so, and that rumors were flying among numerous other employees about Plaintiff's criminal record. Not surprisingly, the other providers advised Plaintiff that they were not treated the way she was treated by Judy Harkins.  *See* Plaintiff's SOF, ¶¶43-60, incorporated herein by reference.**

15.     Meehan confirmed that other providers filled out requisitions by reviewing past requisition forms, some of which had been completed by all three providers, including LaBlance and the other, non-African-American providers.  Ex. 3, Meehan dep. 66:10-16.

   **Uncontroverted**.

16.     Through Meehan's review of the past requisition forms, she also confirmed that every request made by LaBlance had in fact been run by the lab technician in question.  Ex. 3, Meehan Dep. 69:3-6.

**Uncontroverted. But again, Meehan missed the point. See Response to #14; and *See* Plaintiff's SOF, ▯▯43-60, incorporated herein by reference.**

17.     Meehan also noted that Harkins was a difficult personality, who when she believes she is correct about something does not always display the most professional behavior with all members of the team, including non-African-American co-workers. Ex. 3, Meehan Dep. 65:16-19; Exhibit 4, Declaration of Sterling Ream, ▯9.

**Controverted, in part. While Ms. Meehan apparently concluded this "difficult personality" to be a non-discriminatory explanation for Judy Harkins' behavior, Plaintiff disagrees that this conclusion was correct or even reasonable. Again, Sterling Ream failed to disclose her improper access of Plaintiff's D.O.C. record and the rumors "flying" among employees about Plaintiff's criminal history, or that the former HSA had actually encouraged employees to access the records creating a hostile environment for Plaintiff and fostering bad behavior toward her. Ms. Ream participated in spreading the data. Judy Harkins also accessed Plaintiff's D.O.C. record albeit 7 or 8 months later, but unlike the other employees has never been reprimanded. Again, the other white providers did not endure the same level of "difficult personality". *See* Plaintiff's SOF, ▯▯43-60, 65-66, 94 incorporated herein by reference.**

18.     Based on the evidence that LaBlance was not singled out and treated differently by Harkins, as other providers also filled out requisition paperwork, and because Harkins was considered a difficult personality, Meehan concluded that the dispute between LaBlance and Harkins was a communication issue, not a discrimination issue. Ex. 3, Meehan Dep. 65:9-14.

**Controverted. See Response to #17; and Plaintiff's SOF, ▯▯43-60, 65-66, 94 incorporated herein by reference.**

19.     Meehan informed LaBlance of her investigation conclusion, and offered LaBlance the opportunity to sit down with Harkins to discuss the situation, but LaBlance refused. Ex. 1, LaBance Dep. 146:7-11.

**Uncontroverted. Once Corizon concluded that no race discrimination had occurred, and Judy Harkins had done nothing wrong, there was nothing for Plaintiff to discuss with Ms. Harkins. Ms. Harkins was emboldened to continue her behavior within the**

13

culture. It is not incumbent on Plaintiff to eliminate the hostile environment created and nurtured by Corizon. Ex. 1, 147:2-6.

20.    On February 1, 2019, LaBlance tendered her resignation to Corizon, giving three-week's notice. Ex. 1, LaBlance Dep. 12:11-24.

**Uncontroverted**.

21.    LaBlance gave the reason for her resignation as travel related, stating that the long drive between her home in Kansas City and the facility in Chillicothe was too much. Ex. 1, LaBlance Dep. 193:7-12.

**Uncontroverted. But Plaintiff resigned because she felt singled out, uncomfortable, fearful, and worried about her license, among other things. See Plaintiff's SOF, ₱₱81-83 incorporated herein by reference.**

22.    LaBlance also informed Corizon on February 1 that she had accepted another job at the time she turned in her resignation. Ex. 1, LaBlance Dep. 196:9-15.

**Uncontroverted**.

23.    Corizon initiated conversations with LaBlance asking what they would need to do for her to stay at Corizon, and LaBlance provided conditions for which she would consider rescinding her resignation. Ex. 1, LaBlance Dep. 198:5-13.

**Controverted, in part. Plaintiff agrees that Corizon asked her what she would need to consider staying but denies that Corizon made any real effort to engage in a conversation on that issue. Corizon made no response to Plaintiff's conditions other than a perfunctory "we can't do that." The request was merely pretext. See Ex. 1, 198:5-199:12.**

24.    A few days after her resignation, LaBlance called the Health Services Administrator and indicated that she felt she may have made the decision to quit too soon. Ex. 1, LaBlance Dep. 201:16-24.

**Controverted, in part. While Plaintiff did have some discussion with Corizon about a change in schedule and the possibility of taking FMLA leave, ultimately Corizon would not allow her to rescind her resignation. Ex. 1, 201:14-202:10.**

14

25.     LaBlance's last day of work was February 22.  On her last day, she sent an email to Meehan with the subject "Thank You" which read in part, "the endurance, perseverance, and triumph is due to the wonderful individuals who work diligently and it has been a pleasure to be a part of the team and to be of service.  Thank you.  Ex. 1, LaBlance Dep. 203:1-18; Exhibit 5, LaBance E-Mail February 22, 2019.

**Uncontroverted.  Plaintiff testified that although she felt Meehan had been one of the people that had discriminated against her, she believes that email was the "proper way to exit a position."  Ex. 1, 203, 1-22.**

26.     On February 22, LaBance also left a voicemail for Dr. Epperson, her immediate medical supervisor, in which she said in part, "I will miss you.  I will miss working with you and you are a friend.  And so I'm not saying good-bye.  I'm saying I will see you soon and I just appreciate you and I thank you.  You have been a blessing to me…I love you."  Ex. 1, LaBlance Dep. 218:5-22; 219:1-15.

**Controverted, in part**.   **Plaintiff actually testified that she <u>thought</u> she had a good relationship with Dr. Epperson, but that was her "being naïve, probably."  Plaintiff considered herself a friend to Dr. Epperson.  (Ex. 1, 63:3-5, 23).  She would discuss issues of discrimination with Dr. Epperson, and she would agree that "it sounds like discrimination to me" and encourage Plaintiff to make a complaint.  Plaintiff later learned that Dr. Epperson betrayed her in part by accessing her private D.O.C. records and sharing that information with other employees.  *See* Plaintiff's SOF at ¶¶78, 84, 85, 86, 88 incorporated by this reference.**

27.     Between the dates of February 1, 2019, the date of her resignation, and February 22, 2019, her last day of work, LaBlance never mentioned or had any discussions with Corizon regarding race discrimination, harassment, or retaliation.  Ex. 1, LaBlance Dep. 194:22-25.

**Uncontroverted**.

28.      LaBlance was never physically threatened in any way while she worked at Corizon.  Ex. 1, LaBlance dep. 196:2-8.

**Controverted in part.** While Plaintiff testified that she was never threatened with physical violence, she was nevertheless fearful because she did not fully understand where the animosity was coming from. She felt intimidated and watched by the custody officers who stood outside her door, and the security guards that paid close attention to her belongings on the scanner when she entered the facility and did not do the same for white employees. See Plaintiff's SOF, SOF at ¶¶ 67-68, 71, 81-83 incorporated by this reference.

**B. Plaintiff's Statement of Additional Material Facts Establishing a Genuine Dispute for Trial**

In addition to the above, Plaintiff submits the following additional statement of uncontroverted facts that demonstrate Plaintiff has easily met her burden to establish that she was subjected to a racially hostile work environment that ultimately resulted in her constructive discharge. There are disputed issues of fact for the jury precluding summary judgment.

*__Plaintiff was recruited by Corizon to work as a nurse practitioner and was the only African- American employed at the Chillicothe facility throughout her tenure.__*

1.      Plaintiff was hired by Corizon in June of 2017 as a physician's assistant/advanced registered nurse practitioner. (Ex. 1, 28:22-29:1).

2.      Plaintiff was licensed as a nurse in 2011 after completing nursing school at Rockhurst, and then completed a master's specializing in women's health in 2014. She was board certified by the National Certification Committee as a women's health nurse practitioner in 2015. (Ex. 1, 29:20-30:6).

3.      Plaintiff was recruited by Corizon to work at the Chillicothe women's prison facility. She traveled to Jefferson City to interview at the corporate office and then to Chillicothe for a site visit where she took a tour and met the site administrator and site medical director. (Ex. 1, 32:31-33:13).

16

4.      Plaintiff was the only African-American working at the Chillicothe facility throughout her employment.  (Ex. A, Ream depo, 15:15-16:4; Ex. B, T. Christopher depo, 11:7-18; 20:21-21:5).

5.      Dr. Jerry Lovelace is currently, and at all relevant times was, the Regional Medical Director for the State of Missouri.  (Ex. 2, 8:13-19).  Dr. Lovelace participated in the interview process and decision to hire Plaintiff.  (Ex. 2, 20:19-20:23).

6.      While there are a "ton of documents" required to credential a new provider to work at a Department of Corrections (DOC) facility, including a criminal background check (which he was rarely involved in), Dr. Lovelace did discuss Plaintiff's criminal background with her during the interview process.  (Ex. 2, 19:13-23, 20: 19-21:23).

7.      Dr. Lovelace's concern as it related to a prior criminal record was limited to credentialling and determining if Plaintiff was "forthright, that [she] own[ed] whatever it is that is there."  Dr. Lovelace ultimately concluded that Plaintiff had been honest and recommended her for employment with Corizon.  (*Id.*).

8.      Plaintiff testified that she has always been honest and upfront about mistakes she's made taking full responsibility for good and bad decisions.  To that end, she disclosed her criminal history when she decided to go to nursing school, when she went to graduate school, when she applied for a license, and when she applied for boards.  Her explanation each time was sufficient. (Ex. 1, 41:18-42:12).

*__Plaintiff was singled out and treated differently from the outset when co-workers illegally accessed Plaintiff's Department of Corrections' records and gossiped about her criminal record.__*

9.     Tammie Christopher has been employed by Corizon since 2006 (except for a few months in 2017). She served as the Director of Nursing from July of 2018 to July of 2019, which is a site management position. (Ex. B, 11:13-18; 12:8-17; 19:20-22).

10.     Ms. Christopher confirmed that prior to her leaving employment for a few months in September of 2017, she heard conversation between the nurses that Plaintiff "had been in trouble before" and had a criminal record. (Ex. B, 37:10-13; 38:7-10; 38:21-39:2).

11.     When one becomes involved with the D.O.C. by incarceration, probation, or parole, a record is created including a medical record. (Ex. 3, Meehan depo., 96:18-25).

12.     There is no reason for a Corizon employee to access any D.O.C. record, much less any medical record, unless that person is treating the patient. (Ex. B, 40:1-3; Ex. 2, 94:2-13). Doing so, is in violation of Corizon policy and HIPAA. (Ex. C, Upton depo., 72:10-19; Ex. 3, Meehan depo., 24:1-9).

13.     Before she left employment with Corizon for a couple of months in 2017, Ms. Christopher understood that Corizon employees, none of whom were treating Plaintiff, had accessed Plaintiff's D.O.C. records, which included her medical records in violation of HIPAA. (Ex. B, 69:14-20).

14.     In fact, an audit log of the D.O.C. records shows that between June and December of 2017, multiple employees accessed Plaintiff's medical record, including Sterling Ream, Megan Meyer, Carol Holloway, and Deb Ritter. (Ex. C, Upton depo., 62:4-64:22).

15.     It was reported that the HAS Teresa McWhorter, had shared Plaintiff's D.O.C. history with staff. (Ex. 3, 88:22-89:5; 90:20-22).

16.     Plaintiff did not know her co-workers and HSA (her site supervisor) had accessed her D.O.C. medical records at the time.

### *Corizon's management and reporting structure.*

17.     Doctors and nurse practitioners like Plaintiff who are employed at Corizon (called "providers"), reported directly to Dr. Lovelace for all "medical purposes" such as issues with care of a patient.  (Ex. 2, 10:22-12:15; 38:18-39:2).

18.     Plaintiff entered a Collaborative Practice Agreement with Dr. Epperson, which is an agreement required by the State of Missouri between a practicing physician and a nurse practitioner wherein the physician agrees to oversee the nurse practitioner's practice (e.g. reviewing at least 10% of the charts on a regular basis).  (Ex. 1, 72:8-73:1).  Dr. Epperson never had any problem with Plaintiff's work.  (Ex. 1, 73:2-14).

19.     Employees reported to the "operations" side for administrative issues.  So, *e.g*., providers at a particular health services location were to report to the Health Service Administrator (HSA) for that site in relation to administrative issues such as PTO, benefits, and scheduling.  (Ex. 2, 10:22-12:15).

20.     The Director of Operations for the State of Missouri until late 2019 was Rhonda Almanza.  (Ex. 2, 45:21-25).  Jenny Meehan and Cindy Shupp were intermediate supervisors on the operations side with responsibility for the Chillicothe facility.  (*Id*., 46-47).

21.     The HSA at the Chillicothe facility changed over the two years Plaintiff was employed.  Hollie Hild was HSA when Plaintiff was hired (Ex. 2, p. 53).  Theresa McWhorter soon replaced Ms. Hild, and then Sterling Ream took over the position in June of 2018.  (Ex. 3, 84:5-15).

*Corizon's policy is to facilitate a workplace environment that is harassment free and comfortable for employees.*

22.    Corizon's Harassment Policy provides, in relevant part, that it is "committed to providing a work environment that is free of discrimination or harassment…no form of harassment, sexual or otherwise, will be tolerated in the work place."  (Ex. D, Excerpts from the Employee Success Guide, at p. 10).

23.    Dr. Lovelace testified that he, as a manager, is obligated to notify the human resources department of any complaints they receive as soon as possible.  (Ex. 2, 16:12-22).  Dr. Lovelace understood that this requirement of managers was in place "to facilitate a workplace environment being one that is harassment free and comfortable for employees, it's incumbent upon the managers to – you know, if they see something, say something."  (Ex. 2, 17:3-8).

24.    Dr. Lovelace "escalated" at least three complaints that Plaintiff made (Ex. B, 55:1016), and testified that just after she resigned from Corizon he discussed with Plaintiff other concerns she had with her treatment and the racial disparity she encountered and endured while employed and "signs she should have picked up on."  (Ex. 2, 128:4-12).

*Overtly racial comments were made to Plaintiff about a "nigger rigged" or "Afro-engineered" radio antennae within two months of her employment.*

25.    On August 29, 2017, within two months of Plaintiff beginning work, Plaintiff asked a co-worker (Anna Barker) about a paper clip attached to an antenna.  The co-worker described it as "nigger-rigged" for better reception, and after Plaintiff corrected her, Ms. Barker laughed and stated that it was "Afro-engineered."  (Ex. 1, 74-79; and Ex. E, investigation statements (depo. Ex. 12)).

26.    This overt racially charged incident at the outset of Plaintiff's employment caught her "off guard."  It was the "first real tangible incident or behavior – witnessed behavior of the culture that was present that [Plaintiff] had just walked into… Because anyone that would feel this

comfortable to say that around anyone of color or not, says something about the culture that is there." (Ex. 1, 81:2-20).

27.     Plaintiff further explained the culture that she had observed and experienced through the comments of someone who would feel comfortable enough to use racially overt those terms and how she knew that would affect her employment moving forward:

> As someone who has been black all of my life, unfortunately there are many times that things occur that may not be said that I have to be very careful and pick and choose, and decide which fights to fight. Because I can't fight them all, all the time. Those types of things can stifle my career, my employment, my – plans, per se. …
>
> So it was the initial overt event where someone actually felt like it was okay to use that verbiage irregardless of who's standing around, and what that tells me this is not an uncommon occurrence about how you feel and how you do things, because you actually – there was no filter. There was no filter. It just rolled off your tongue, and you know, I – I don't believe that it would have been a shock to anyone there if I had not been present.
>
> It's an inappropriate statement irregardless of who was there, but it's an okay statement as long as someone like me is not present in this particular culture at that particular time.
> (Ex. 1, 82: 17-84:11).

28.     Plaintiff testified that she agreed it was appropriate that Ms. Barker was fired, and that once she was fired she assumed that would deter any further overt racial language. (Ex. 1, 80:23-81:1; 86:14-19).

29.     Terminating Ms. Barker was the end of the matter from the perspective of Corizon, and the end of any overt racial statements made directly to Plaintiff, but it was not the end of the culture creating the conditions for the overt statements to be made. (Ex. 1, 85:14-24; 86:14-19; 82:17-84:11).

30.     Dr. Lovelace testified that Plaintiff called him to discuss the incident, which he characterized as "blatant insensitivity". (Ex. 2, 56:1-9; 60:8-11).

21

31.    Dr. Lovelace, too, was concerned about how easy it was for an employee who had completed sensitivity training to make this kind of blatant racist remark in the workplace.  He stated "[w]e have all had sensitivity training, and you just expect that if we've done that and had those conversations with employees, that employees wouldn't think it was an okay thing to do." (Ex. 2, 61:1-5).

32.    Nevertheless, Corizon did not require or deliver any additional sensitivity training to its employees to address the culture where it was "easy" to make such remarks, but instead considered termination of the offending employee enough.  (Ex. 2, 62:17-24).

33.    Plaintiff felt that the termination of Ms. Barker made her situation worse because Corizon did not reach out to her, talk to the rest of the staff, to ensure that she was not retaliated against.  Plaintiff felt like she was "on an island."  (Ex. 1, 103:8-104:7).

34.    This was further evidenced when an emergency situation arose where Plaintiff was the first provider on the scene and initiated CPR on a custody officer.   When the medical emergency was successfully averted, everyone was congratulating each other except for Plaintiff. She was invisible. (Ex. 1, 105:1-14).

**_Plaintiff was singled out again and treated differently due to her race when she was given a written reprimand and perceived as being "violent" for raising her voice to be heard in a meeting after being interrupted; a white co-worker who actually was violent and threw a pencil was not_**.

35.    On April 27, 2018, Plaintiff was attending a meeting with HSA Hollie Hild, Dr. Epperson, Val Kirby, and the Director of Nursing.  During the meeting, Plaintiff was expressing her viewpoint on the matter up for discussion but kept getting interrupted.  Plaintiff testified that she "raised her voice and asked them to please not interrupt me.  And I proceeded to finish my statement." (Ex. 1, 89:15-23; 90:12-18).

22

36.     The following morning she was called into the administrator's office and there was concern expressed that they had never seen her that upset before and were afraid she would hit someone.  (Ex. 1, 91:1-8).

37.     Plaintiff testified that her supervisor and co-workers telling her they thought she would become violent simply because she raised her voice was alarming to her and reflective of how race made a difference:

> Now, this was alarming to me, as I never left my seat.  I never said anything or indicated – made any movement whatsoever that would indicate that I would strike out violently, physically.  I just wanted to be able to speak and be heard as I have always allowed others to speak and be heard.
>
> And the situation is such that it was alarming to me, because just the previous week – or thereabout, we had a small meeting in the administrator's office, and Nurse Practitioner Kirby threw a pen across the room, she was so frustrated, she threw a pen, but that didn't alarm anyone as being threatening, but when I raised my voice, they felt threatened, so they said, and that was just another indication of –or another time that I would say that race made a difference, that you know, raising my voice is –is reason to have a meeting, but throwing a pencil has no consequences or reprimand or – at all.

(Ex. 1, 91:9-92-2).

38.     At the meeting, Plaintiff felt that she needed to assure her supervisor and co-workers that she was not a violent individual, and that raising her voice did not constitute a violent act, and that she meant nothing threatening in order to preserve her job, her reputation, and working relationship.  (Ex. 1, 95:4-16).

39.     Plaintiff nevertheless received a written reprimand for unprofessional behavior. (Ex. F).

23

40.     Plaintiff summed up her thoughts on why the reprimand she received was because of her race: "…unless you are the target of particular behavior, you won't see it, you won't understand it. …It's not something you had to battle against or try and strive in the face of, or thrive in the face of. …what would make a person automatically think that I'm going to become violent if I raise my voice, but someone else can be violent and they don't perceive it as violence. And the only difference between she and I is the color of our skin." (Ex. 1, 100:19-101:10).

41.     Dr. Lovelace testified that Plaintiff talked to him about the reprimand for unprofessional behavior, and while he could not remember the specific conversation, he chalked it up to a "personality conflict" with the Hollie Hild, the HSA at the time. (Ex. 2, 64:6-65:12).

42.     Even so, Dr. Lovelace understood that all three site providers (Dr. Epperson, Plaintiff, and Val Kirby) had similar complaints about Hollie Hild's management style, but was unaware if either of the other two had a memo or written reprimand placed in their personnel files. (Ex. 2, 66:17-67:3).

### *Plaintiff reported discriminatory conduct by lab tech Judy Harkins in June of 2018, who singled her out and treated her differently than other providers.*

43.     Two months later, and by email dated June 6, 2018, Plaintiff reported discriminatory conduct for the second time by a lab tech who had refused to complete some requisition paperwork for a lab sample that Plaintiff had taken from a patient. (Ex. 2, 72:1-17; Ex. 1, 113:12-20; 114:23-115:3).

44.     Dr. Epperson and HSA Sterling Ream, Plaintiff's direct site supervisors, along with Dr. Lovelace, Jenny Meehan, and Val Kirby were copied on the email. (*Id*.).

45.     Plaintiff testified that on June 6, 2018 (the second "blatant" incident) she had taken a biopsy, put it in a container, sat it on a counter by the refrigerator next to Judy Harkins' desk

24

where the specimens are kept. She asked Ms. Harkins, the lab technician, to complete the requisition and prepare it to be taken to the lab. (Ex. 1, 115:2-3; 124:15-125:6).

46. Instead of completing the paperwork, Plaintiff testified that Ms. Harkins "refused to do the requisition after a directive was given. And not only did she refuse to do it, she took the specimen, stormed past me and went and put it on my desk" in an act of disrespect. (Ex. 1, 143:1-7; 146:7-21).

47. Dr. Lovelace testified that he had a telephone conversation with Plaintiff and understood that she felt she was being "singled out" because the lab tech (Judy Harkins) would "do things for other providers and not her, and she also felt that the lab tech talked to her in an unprofessional way, taking the lab assessment and throwing it on her desk." (Ex. 2, 71:1-10).

48. It was decided that an investigation would be conducted. (Ex. 2, 72:21-24).

49. Jenny Meehan, Director of Operations for the Midwest region, participated in the investigation and understood that Plaintiff had reported the same problem previously with the lab tech, which Plaintiff felt had not been addressed. (Ex. 3, 61:3-17).

50. The focus of the investigation was not on whether the lab tech had treated Plaintiff differently than the white providers by refusing to do the paperwork when asked and throwing the sample back on her desk, but rather whether the white providers had ever filled out their own requisition paperwork. (Ex. 3, 62: 6-21).

51. In other words, the investigation ignored Plaintiff's previous complaint and the lab tech's behavior toward Plaintiff. (Ex. 3, 64:3-7). Ms. Meehan didn't think that behavior was "important" to a claim of racial discrimination (Ex. 3, 70:15-25).

52.     Significantly, HSA Sterling Ream (Plaintiff's site supervisor who had been copied on her June 6, 2018 email) had accessed Plaintiff's D.O.C. records months earlier on December 9, 2017, before she became the site administrator in June of 2018.  (Ex. A, 19:1-18).

53.     Ms. Ream testified that the "rumor" about Plaintiff's criminal record was "flying around" the nurses, and she was concerned, but she didn't know who she would report it to since her boss was the one that told her.  (Ex. A, 27:15-28:1; 29:13-30:6).

54.     Even though Ms. Ream was concerned and didn't know who to report her concerns to, she never told anyone investigating this discrimination complaint about the rumors that she had heard and the number of nurses discussing Plaintiff's D.O.C. record.  (Ex. A, 30: 10-21).

55.     Remarkably (or perhaps predictably), the "investigation" determined that the lab tech had done nothing wrong by refusing to comply with Plaintiff's request, speaking unprofessionally, and throwing the lab specimen on Plaintiff's desk.  Instead, her behavior was discounted in the investigation as a "communication issue" and maybe she had a "bad morning." (Ex. 2, 78:8-14; 79:4-8; 79:12-14).

56.     Despite a finding that no one did anything wrong, Dr. Lovelace nevertheless sent an email to Jenny Meehan, Rhonda Almanza, Heather Dale, Sterling Ream, and Cindy Shupp saying that "I think awareness alone will have a significant benefit.  People tend to behave better when they think someone is watching."  (Ex. 2, 76:18-77:11).

57.     Even so, Dr. Lovelace conceded that if he were faced with the same situation where he asked a lab tech to process a specimen for evaluation, the lab tech refused to do so and instead took the specimen back to his desk while stating "I told you not to set that on my desk," he would consider that "inappropriate" and "unprofessional."    (Ex. 2, 84:9-85:25).

58.     Plaintiff testified that "essentially nothing" came of her two complaints of blatant discriminatory conduct by Judy Harkins.  She was not interviewed as part of the investigation but rather simply told they had finished the investigation and concluded it was a "misunderstanding." (Ex. 1, 129: 13- 130:17).

59.     Plaintiff was not satisfied with the results of the investigation.  "Because that behavior was not a misunderstanding.  It was a blatant insubordinate act, for whatever reason, only one reason I can come up with …the only difference between me and the other providers is that I'm black. I'm African-American."  (Ex. 1, 132:3-13).

60.     Plaintiff spoke with the other providers and asked if any of them had trouble getting specimens processed by Judy Harkins and was told they did not.  She was the only one.  (Ex. 1, 132:7-23).

***Plaintiff reported a number of other discriminatory actions during her employment including discriminatory searches, interference with medical advice, reduction in her patient load, increased watchfulness, and sabotage.***

61.     Plaintiff also raised a concern with her HSA Sterling Ream and Dr. Lovelace about three staff assistants who behaved differently while assisting Plaintiff with patients than they did when assisting the white providers Dr. Epperson and Val Kirby (one of whom included Ana Barker who had been fired after making overt racist remarks).  (Ex. 1, 151-154).

62.     These staff assistants would interrupt, interject incorrect medical advice, or try to explain the medical diagnosis to the point where Plaintiff eventually asked one of them to leave the room even after Plaintiff asked her not to interject her opinion during the exams.  (Ex. 1, 151:12-23; 158:3-22; 165:13-22).

63.     Plaintiff testified that she talked to Sterling Ream again about these problems with staff assistants that had not resolved because her patient load and schedule began to be altered

27

from 20 to 25 patients a day to about 10 patients a day. One of the staff assistants at issue was the one that kept Plaintiff's schedule. (Ex. 1, 159:5-16; 168:14-169:7).

64.     "[T]he number of patients that I see determines my productivity which determines, you know, my need to be in that position to have that job, and so that became an issue and I believe that was retaliation." (Ex. 1, 159:5-16).

65.     Ms. Ream, of course, had accessed Plaintiff's D.O.C. record along with numerous other Corizon and D.O.C. personnel. (Ex. G and Ex. I) When asked why she accessed the records, Ms. Ream testified that: "The current HSA at the time (Teresa McWhorter)...she was walking into the ER and had said something about Terri's criminal record. And, of course, I was surprised. And so curiosity because I just couldn't believe it." (Ex. A, 19: 1-18).

66.     One day in November or December of 2018, Plaintiff recalls that several employees one after another opened her door and looked at her not saying anything. She heard Ms. Ream say "Well, I'll be able to tell," and then Ms. Ream did the same thing. Plaintiff believes that these employees were comparing her face to the printout from her D.O.C. records. (Ex. 1, 189:5-20).

67.     Plaintiff also testified that custody officers became more watchful and began standing outside her door in the medical facility when she was conducting exams because she reprimanded one of the staff assistants. (Ex. 1, 170:13-20; 171:6-13).

68.     Plaintiff identified an instance where a custody officer barged into the exam room while the patient was in stirrups and reported that incident to Sterling Ream and Dr. Epperson. (Ex. 1, 172:3-10, 17-23). Sterling Ream was surprised when Plaintiff told her this had happened. (Ex. 1, 173:9-13).

69.     Another time toward the end of her employment, Plaintiff testified that she needed a scalpel – called "sharps" – to remove a birth control device from a patient's arm. Plaintiff was

required to get the sharps from the nurses because they were locked up. The nurse brought them but left the entire box on her desk pushed back into her books where she could not see them. (Ex. 1, 237:1-14).

70. When Plaintiff returned the box to the nurse, the nurse explained that the door to the exam room was locked and she had tried to knock. Plaintiff says it was not locked. Dr. Epperson commented that "she [Plaintiff] doesn't have a clue." Plaintiff said nothing, but believes that was intentional conduct, and it was the kind of thing that could have gotten her fired and turned into the board thereby jeopardizing her ability to work. (Ex. 1, 237:21-238:4).

71. Plaintiff also testified that more attention was paid to her belongings when she arrived at work and went through the scanner than a white employee that arrived about the same time every day. Essentially, the guard scrutinized her belongings, and paid no attention to the scanner when the white employee passed through. (Ex. 1, 257:3-258:18).

72. Dr. Lovelace testified that Plaintiff discussed at least some of these concerns with him, and her realization that because of her race and status as the only African-American employee, her co-workers felt they could access to her D.O.C. records and gossip about her criminal history with impunity, and treat her with hostility and disrespect. (Ex. 2, 86:1-25).

***Despite an obligation to do so, no Corizon manager or employee reported anyone accessing Plaintiff's records until Plaintiff notified Dr. Lovelace upon her receipt of the February 26, 2019 letter from Dr. Epperson. Instead, they gossiped and created a hostile uncomfortable environment for Plaintiff.***

73. Tammie Christopher testified that in early February of 2019, she accessed Plaintiff's D.O.C. records after someone (who she was unable to identify) handed her a Post-it note with a number on it and told her to "look this up." (Ex. B, 27:1-19; 31:21-25; Ex. I).

29

74.     Ms. Christopher testified that she understood that if she became aware of a HIPAA violation, she was required to report it even if she was the offender. (Ex. B, 53:4-22). She did not report the fact that she accessed Plaintiff's records in violation of HIPAA. (*Id.*).

75.     Ms. Christopher is married to a D.O.C. employee (Case Manager II), who also accessed Plaintiff's criminal record and was ultimately reprimanded for that HIPAA violation. (Ex. B, 15:11-16:10; 8:6-20). Mr. Christopher looked at Plaintiff's records because Val Kirby came into his office in Housing Unit 1 and told him to look up Plaintiff's record. (Ex. B, 68:12-20; and Ex. I, D.O.C. Audit Log.).

76.     In addition to Corizon employees, the private data contained in Plaintiff's D.O.C. record spread throughout D.O.C. personnel, too. (Ex. I, audit log of D.O.C. employees accessing Plaintiff's records).

77.     Even though Jenny Meehan testified that she did not, Judy Harkins, the lab technician who refused to do requisition paperwork and threw a lab specimen back on Plaintiff's desk, accessed Plaintiff's records on February 20, 2019. (Ex. 3, 67:16-8:2; and Ex. G, Audit record).

78.     Val Kirby accessed her D.O.C. record on February 11 and 12, 2019. (Ex. G).

79.     Dr. Epperson accessed Plaintiff's records on February 11, 2019 and again on February 20, 2019. (Ex. G). Ms. Meehan testified that Dr. Epperson explained that "she entered numbers of a patient that she was going to chart on and accidentally Ms. Lablance popped up." (Ex. 3, 78:17-25).

80.     Megan Meyer, Alex Spencer, Rachel Stuver, Carol Holloway, Shannon Burris, Tabitha Johnson, Brandy Baker, Rachel Rempel, Lori Switzer, Brandon Doss, Jessica Frizzell, and Megan Rex also accessed Plaintiff's record while she was still employed. (Ex. G).

81.     Not one of these individuals reported that they or anyone else had accessed Plaintiff's D.O.C. records.

***Plaintiff resigned because she felt singled out, uncomfortable, fearful, and worried about her license, among other things***.

82.     Plaintiff resigned on February 1, 2019.  (Ex. 1, 192:13-16).

83.     Plaintiff felt uneasy and there was an atmosphere and environment – a culture – that made her fearful.  Plaintiff worked hard to earn her certification, she testified that she "put in the time to turn [her] life around from what it had been," and her work environment had become very difficult:

> To be treated less than, to be plotted against, and to fear going to work because of what might transpire that could potentially damage my ability to make a living, because someone doesn't like the color of my skin.  That –that was a real fear.

(Ex. 1, 236:10-19).

84.     She summed up her experience at Corizon and the basis for her leaving by testifying as follows:

> …what Corizon employees did do, they used their access to the Department of Correction's computer to find information …how it got worse with, you know, the skepticism, my patient load, over taking me, overriding my decisions, the blatant disrespect.  All of these things that were taking place, they took place because of – that was a discrimination.  …It was a discrimination when you shoes to make the decision to look this up in the first place.
>
> …in the beginning that overt discrimination was not one of those things that –people weren't going around calling me names.  Okay?  But the more subtle –the subtleties of the behaviors I would characterize as discriminatory, and they made me feel uncomfortable, they made me feel singled out, they made me fear for my license – okay? – they – they cause me to lose sleep at night because I have this stuff happening to me every day, on a daily basis.  The – secrecy, the murmuring, the whispering, the – and—and you know, it's

31

because this is – I will go back to institutional racism. I will
go back to white privilege I will go back to the fact that this
is the way it is in rural America, because they're not used to
me being there.

(Ex. 1, 178: 12-179:6; 182:15-183:8).

***Plaintiff reached out to Dr. Lovelace to report she had received a letter from Dr.
Epperson disclosing that her private D.O.C. records had been accessed, which "started
the ball rolling" on a post-separation investigation by Corizon revealing the extent to
which co-workers and supervisors alike had illegally accessed Plaintiff's records
violating her privacy and creating a hostile environment throughout Plaintiff's
employment.***

85.     Plaintiff received a letter postmarked February 26, 2019 from Dr. Epperson. (Ex.

H, Epperson letter).

86.     Plaintiff reached out to Dr. Lovelace when she received the letter from Dr.

Epperson to report what had happened. Dr. Lovelace testified that Plaintiff felt betrayed by Dr.

Epperson and Val Kirby because she thought they had shared the information in the letter, namely

her D.O.C. records, with other Corizon and D.O.C. staff, which they did. (Ex. 2, 88:10-89:15).

87.     After receipt of the letter, Dr. Lovelace testified that he "started the ball rolling"

with human resources because a HIPAA violation is reportable whether it involves a current

employee or not. (Ex. 2, 89:23-90:7).

88.     Makisa Upton (a human resources manager) took the lead in the investigation

relating to employees accessing Plaintiff's records. (Ex. C, 27:1-19).

89.     The investigation revealed that numerous employees, including Dr. Lovelace, Dr.

Epperson, Sterling Ream, and Val Kirby accessed Plaintiff's D.O.C. records between the time she

was hired and Plaintiff's last day of employment on February 22, 2019. (Ex. G, Audit record).

90.     In fact, although Dr. Lovelace acknowledged his duty to report complaints and

testified that he had "started the ball rolling" on the investigation on March 1, 2019 after Plaintiff

notified him she had received Dr. Epperson's February 26, 2019 letter, he too had accessed Plaintiff's D.O.C. records 15 days earlier on February 11, 2019 for some unexplained reason. (Ex. G; and Ex. C, 74:20-24; 77:2-78:2).

91.     Dr. Lovelace did not admit to accessing the records on February 11, 2019 in his deposition, and instead testified he was the first to discover the problem on March 1, 2019 through Plaintiff's text or email to him. (Ex. 2, 123:12-124:9). Ms. Upton was concerned that he was aware of employees' access to Plaintiff's records before her employment ended and failed to report that fact. (Ex. C, 79: 4-11).

92.     Dr. Lovelace testified that, in his opinion, Plaintiff was justified in feeling violated, and that he did not know what the environment would have looked like for Plaintiff where people were searching her record in the background. (Ex. 2, 125:2-11; 129:1-10).

93.     In relation to performing post-resignation investigation, Ms. Upton had not been provided any historical data regarding Plaintiff's employment, but rather understood that Plaintiff "seemed happy and sent out happy emails and that there had been a couple of incidents that had happened prior to my arrival with Corizon and they were handled swiftly." (Ex. C, 29:20-30:19).

94.     Ms. Upton clarified that Corizon's sworn interrogatory answer identifying that only Dr. Epperson and Val Kirby had accessed Plaintiff's record was inaccurate. (Ex. C, 42:1-20).

95.     Ms. Upton testified that when she made recommendations for discipline of the employees that accessed Plaintiff's record, she somehow "missed" Judy Harkins, the lab technician that Plaintiff had accused of discrimination in June of 2018. (Ex. C, 55:24-57:13).

96.     The sheer number of employees accessing Plaintiff's records (nine between April 30, 2018 and February 22, 2019 on the 2-page audit record she was working from), caused Ms.

Upton concern. (Ex. C, 62: 4-13). Ms. Upton had only been provided two of the four pages of individuals who had accessed Plaintiff's record to perform her investigation. (Ex. C, 71:7-10).

97.     Ms. Upton admitted that she had no information about any prior incidents or allegations of discrimination involving Paintiff, so the timing of the employees' access spanning at least nine months in the audit record she was provided made no impression on her. (Ex. C, 61:20-62:3).

98.     Ms. Upton agreed that every employee has a right to privacy regardless of race. (Ex. C, 73:3-8).

# III. ARGUMENT AND AUTHORITIES

**A. Counts I and II: Corizon is not entitled to summary judgment because when viewed in context and as a whole, the facts demonstrate an accumulation of abusive conduct establishing a racially hostile work environment resulting in Plaintiff's constructive discharge.**

## 1. Applicable Legal Principles

"Employees are entitled to a workplace free from 'discriminatory intimidation, ridicule, and insult" motivated by the employees' membership in a protected class." *Harris v. Forklift Sys., Inc* 510 U.S. 17, 21-22, 114 St. Ct. 367 (1993); *Carter v Chrysler Corp.*, 173 F.3d 693, 700 (8th Cir. 1999).

In order to establish a hostile work environment claim, Plaintiff must demonstrate that she (1) belongs to a protected group; (2) was subjected to unwelcome racial harassment; (3) the harassment was because of her race; and (4) the harassment was sufficiently severe or pervasive so as to effect a "term, condition, or privilege of [her] employment." *Ellis v. Houston*, 742 F.3d 307 (8th Cir. 2014). The fourth element includes both objective and subjective components in that Plaintiff must have subjectively perceived the harassment as severe, and the evidence must objectively show that a reasonable person would find the environment hostile or abusive. *Id.*

The evidence must be viewed "as a whole" and in context. "A [hostile] work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it into a series of discrete incidents." *Id.*, citing *Hathaway v Runyan*, 132 F.3d 1214, 1222 (8th Cir. 1997). The law requires that when a pattern of racial discrimination is alleged, as it is here, examples cited as discriminatory conduct are to be viewed as "examples of the offensive racial incidents" experienced by Plaintiff and not as an "exhaustive litany of every offensive racial slur or incident" which occurred while employed. *Id.*, citing *Ways v City of Lincoln*, 871 F.2d 750,

755 (8th Cir. 1989).   Specific individual acts should be viewed as illustrative rather than isolated incidents.  *Id*.

The magnitude of the harassment is assessed by considering "the frequency and severity of the discriminatory conduct, whether it is physically threatening or humiliating or only an offensive utterance, whether it unreasonably interferes with the employee's work performance, physical proximity to the harasser, and the presence or absence of other people."  *Id*., citing *Carter v Chrysler Corp*., 173 F. 3d 693, 702 (8th Cir. 1999).   The harassment does not have to be so extreme that it produces tangible effects on job performance or psychological well-being to qualify as a change in the terms and conditions of employment.  *Id*.   Instead, the harassment must unreasonably interfere with work performance "by creating an intimidating, hostile, or offensive work environment."  *Paasewe v. Action Group, Inc*., 530 Fed. Appx 412, 416 (6th Cir. 2013)

An inquiry into the alleged harassment is "deeply context dependent," and requires looking at "all the circumstances" to determine if it is objectively hostile. *Ellis*, 741 F.3d at 320-321, citing *Harris v. Forklift Sys., Inc* 510 U.S. 17, 21-22, 114 St. Ct. 367 (1993).  That is, the context of abusive remarks, by whom they are made, the impact on the work environment must all be considered.  "Smoking guns" such as overt racial slurs are "strong evidence" of objective hostility, but the court's "holistic understanding of what turns a workplace into a hostile environment has enabled racial harassment claims to succeed in cases with only a single racial slur but other abusive conduct and racially demeaning language disproportionately directed towards black employees." *Ellis*, 742 F.3d at 321.  Ultimately, "[m]otive may need to be proved by the use of inferences so summary judgment may often not be an appropriate means for resolving this element."  *Chrysler*, 173 F.3d at 701.

## 2. **Plaintiff Has Established a Prima Facie Case of Hostile Work Environment**

*a. Considering Plaintiff's work environment "as a whole" and in context as this Court must do, Plaintiff has easily established that she was subject to unwelcome race-based harassment.*

Corizon first argues that Plaintiff cannot establish that she was subject to unwelcome race-based harassment that was objectively hostile or abusive and that she subjectively perceived as hostile. But instead of considering the record "as a whole" and the abusive conduct in the context of Plaintiff's entire work environment, Corizon carves out two incidents (ignoring many others) and asks the Court to consider them in isolation. That is not how the law is to be applied.

From the outset of Plaintiff's employment, and as the only African-American employee, she was singled out and treated differently than her Caucasian co-workers. Even though Plaintiff's distant criminal history had been fully vetted by credentialling agencies and senior Corizon management (who concluded Plaintiff had been forthright and honest) qualifying her to work as a nurse practitioner at the facility, a lower level site administrator (the HSA) felt privileged to access those private records and share the information with Plaintiff's co-workers. This included Plaintiff's private HIPAA- protected D.O.C. medical record. Plaintiff's SOF, ¶¶7, 9-16. Hurtful rumors and gossip about Plaintiff were circulating amongst Corizon and D.O.C. staff almost from the moment she began working. *Id*.

But perhaps most troubling here is that Plaintiff was hired into a culture where a site administrator – a supervisor – who had completed required HIPAA and sensitivity training still felt she could access and spread a new African-American employee's private information throughout the company with impunity. No one is supposed to be in a D.O.C. medical record unless they are actually treating a patient. To do so is a HIPAA and Corizon policy violation. Plaintiff's SOF, ¶11-12.

In the context of this culture, it is not surprising that within two months of her hiring, a co-worker directed overtly racist language at Plaintiff telling her that she had "nigger-rigged" an antenna for better reception. Even worse, the co-worker laughed when Plaintiff corrected her and stated "I say that all the time," and then changed her statement to "okay, afro-engineered." Plaintiff's, SOF, ¶¶25-34. Although Corizon responded swiftly by terminating the employee, nothing further was done to correct the obvious deficiencies in the sensitivity training administered at Corizon. *Id.*, at ¶ 32. Even Corizon senior management agreed it was concerning that an employee who had completed required sensitivity training could so easily make this kind of racist remark. *Id.*, at ¶31.

Corizon contends that Plaintiff testified that once the offender was terminated that was the "end of it." But that misconstrues Plaintiff's testimony. Instead, she testified that termination of the offender was "end of it" for Corizon, but not for her. Plaintiff felt singled out, isolated, and "on an island." Plaintiff's SOF, ¶33. Plaintiff understood all too well that Corizon's termination of the offender would not change the culture that had allow for overt racist remarks without any further action to address the situation. *Id.* at 27-29.

As it turns out, that was exactly what happened. Plaintiff was once again singled out because of her race when she raised her voice at a meeting out of frustration over being constantly interrupted. The next day, Plaintiff was called in and told that the meeting participants believed when she raised her voice that she might hit someone. Plaintiff was alarmed that they would automatically assume an African-American raising her voice would become violent. She received a written reprimand. *See* Plaintiff's SOF, ¶¶35-42. A week or so earlier, Val Kirby (a Caucasian nurse practitioner) had actually thrown a pen at a meeting becoming violent and never received a reprimand or warning. *Id.*, at ¶37. Plaintiff understood race mattered, and that making a complaint

would be of no use since her supervisor issued the reprimand. It was more important to Plaintiff to assure her supervisor and co-workers that their impression of Plaintiff as violent was incorrect. *Id*. at 38. She did, however, discuss the incident with Dr. Lovelace but instead of comprehending the disparity he, too, just chalked it up to a "personality conflict." *Id*., at 41-42.

Despite the risk of doing so given the past response from Corizon, Plaintiff chose to formally report discriminatory conduct by a lab technician, Judy Harkins, who refused to complete some requisition paperwork for a lab sample Plaintiff had taken from a patient. Plaintiff's SOF, ¶¶43-60. Instead of completing the paperwork as Plaintiff requested, Harkins not only refused but went one step further grabbing the lab sample, storming past Plaintiff, and throwing it onto Plaintiff's desk in an act of disrespect. Plaintiff had asked the Caucasian providers if they had a similar experience with Harkins, and they confirmed they did not. *Id*. at ¶60. This was the second time Plaintiff had complained about a similar incident with Harkins. The "investigation" completed by Corizon concluded that no one had done anything wrong, and not surprisingly, the incident was a "communication issue" or "misunderstanding" rather than race-based discrimination and no action was taken. *Id*., at ¶¶55-58. Plaintiff was understandably unsatisfied with the "investigation" that didn't even involve interviewing Plaintiff about what had happened. Notably, although HSA Sterling Ream was involved initially in the reporting, she failed to recognize the importance of conveying to those conducting the "investigation" of discrimination that employees had been accessing Plaintiff's D.O.C. records and gossiping about Plaintiff's D.O.C. background belittling and minimizing her existence. *Id*., at ¶¶52-55. Ream remained silent.

Once again, Plaintiff was not satisfied with the so-called "investigation" because she knew Harkin's conduct was a blatant show of race-based disrespect. Race mattered, and she was singled

39

out and treated differently from the other white providers and Corizon did nothing. *Id*., at ℙℙ58-60.

More incidents of racial harassment and abuse were reported by Plaintiff and left unresolved. *See* Plaintiff's SOF, at ℙℙ61-72. For example, Plaintiff complained about staff assistants who behaved differently when they assisted Plaintiff than when they assisted the Caucasian providers. *Id*., at ℙ61-65. The staff assistants would interrupt Plaintiff while she was talking to a patient, interject their opinions, question Plaintiff's diagnosis, and offer inaccurate medical advice. *Id*. After reporting these incidents to HSA Sterling Ream (who unbeknownst to Plaintiff had accessed her D.O.C. record), and removing one of the staff assistants from her exam rooms, Plaintiff's patient load and schedule began to be altered from 20-25 patients a week to about 10 per week. This reduction in work determined Plaintiff's productivity, and the need for her to perform her job. Plaintiff understood and believed this was in retaliation for reporting the staff assistants. *Id*. at ℙℙ63-64.

Throughout Plaintiff's employment, in fact right up until the end, literally dozens of Corizon and D.O.C. employees accessed Plaintiff's private D.O.C. records, including her medical records. *See* Plaintiff's SOF, ℙℙ81- 97. The employment culture that allowed for numerous Caucasian employees' to believe that they were all privileged enough to seek out the only African-American employee's private records in violation of HIPAA and Corizon policy and so-called sensitivity training; to gossip about and belittle Plaintiff; deliver overt racial slurs; engage in acts of blatant disrespect and insubordination not directed at Caucasian providers; watch Plaintiff's every move; search her belongings disproportionately; and alter Plaintiff's work schedule and conditions in retaliation for reporting problems – finally – after enduring it for nearly two years, caused Plaintiff to resign. *See* Plaintiff's SOF, ℙℙ81-83. Plaintiff resigned because she was fearful,

felt singled out, humiliated, uncomfortable, and worried about potentially losing the license and certifications she had worked so hard to achieve.  *Id*.

Considered "as a whole" and in the context of Plaintiff's entire work environment, it is nearly impossible to conclude that Plaintiff has not demonstrated an accumulation of abusive conduct sufficient to establish that she was subject to unwelcome race-based harassment

      *b. Corizon's contention that "post-resignation" events are immaterial to establishing a hostile environment must be rejected here viewing the entire working environment "as a whole" and in context; the fact that dozens of Corizon and D.O.C. employees accessed Plaintiff's D.O.C. records establishes, among other things, severe and pervasive race-based abuse.*

Corizon next argues that Plaintiff's reliance on "post-resignation events" is a "red herring." Corizon suggests that because Plaintiff received Dr. Epperson's February 26, 2019 letter after Plaintiff's last day of work, it is "impossible" for what Dr. Epperson did to be relevant to establishing a hostile environment during Plaintiff's employment.  Dr. Epperson, of course, accessed Plaintiff's D.O.C. record along with dozens of other Corizon and D.O.C. personnel and then shared it with other employees.

Plaintiff has explained throughout this brief how dozens of employees accessing Plaintiff's records from the outset of her employment is relevant to establishing a hostile work environment. In short, it establishes the existence of a culture where dozens of white employees actually feel privileged to abuse, minimize, and disrespect a co-employee who is the only African-American employee on site  by accessing her private, HIPAA-protected records, and proceeding to spread the data, and gossip among co-workers.  It establishes severe and pervasive race-based abuse. Plaintiff felt justifiably violated and betrayed by all of her co-workers, and in particular, those she believed at the time were her closest co-workers and friends.

*c. Plaintiff has established that she was harassed because of her race.*

Despite acknowledging that all reasonable inferences are to be made in favor of the non-moving party (*Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006), Corizon argues that Plaintiff has not established that a causal nexus exists between the harassment and Plaintiff's race. But in each illustrative event set out in this brief, there is evidence that Plaintiff was treated differently from Caucasian employees or some other evidence from which a causal nexus to race may be drawn. See subsection b. above.

As pointed previously, "smoking guns" such as overt racial slurs are "strong evidence" of objective hostility, but the court's "holistic understanding of what turns a workplace into a hostile environment has enabled racial harassment claims to succeed in cases with only a single racial slur but other abusive conduct and racially demeaning language disproportionately directed towards black employees." *Ellis,* 742 F.3d at 321. Ultimately, "[m]otive may need to be proved by the use of inferences <u>so summary judgment may often not be an appropriate means for resolving this element</u>." *Chrysler*, 173 F.3d at 701.

Even so, e.g., evidence of the event where Plaintiff received a written reprimand for raising her voice in a meeting and creating fear among her Caucasian co-workers and supervisor that she would become violent is a good example of clearly race-based causal nexus. *See* Plaintiff's SOF, at ¶¶35-42. The evidence is that a week earlier the Caucasian nurse practitioner actually became violent in a meeting by throwing a pen and never received any consequence much less a written reprimand in her personnel file like Plaintiff did for raising her voice.

Plaintiff has sufficiently established the harassment was because of her race.

*d. The harassment affected a term, condition, or privilege of employment.*

Corizon's argument here is that the evidence of race-related abuse – the accumulation of abusive conduct – is not severe or pervasive enough to affect a term, condition, or privilege of employment. Although it does so here, the harassment does not have to be so extreme that it produces tangible effects on job performance or psychological well-being to qualify as a change in the terms and conditions of employment. *Id.* Instead, the harassment must unreasonably interfere with work performance "by creating an intimidating, hostile, or offensive work environment." *Paasewe v. Action Group, Inc.*, 530 Fed. Appx 412, 416 (6th Cir. 2013).

The evidence easily satisfies that test. Even if the Court considered only that dozens of Caucasian D.O.C. and Corizon employees felt privileged enough to access Plaintiff's D.O.C. records throughout her employment, share them, and gossip about Plaintiff, the Court could conclude that the harassment was "severe or pervasive" enough to affect a term, condition or privilege of employment. Plaintiff also testified to direct loss affecting her work assignments when her workload was reduced from 20-25 patients a week to 10 patients. *See* Plaintiff's SOF, 61-64. This put her job in jeopardy. Of course, Plaintiff ultimately resigned – was constructively discharged - because of the pervasiveness and severity of the abuse she endured. She was constantly singled out, uncomfortable, fearful, and worried about conduct that may result in losing her license. *See* Plaintiff's, SOF ¶¶81-83.

Contrary to Corizon's contention, the fact that Plaintiff left gracious closing messages for Dr. Epperson and Jenny Meehan was not reflective of her work environment but were the proper way to exit a position. *See* Responses to Corizon's SOF, ¶¶25, 26.

*e. Corizon did not take proper corrective action sufficient to bar Plaintiff's claim.*

To assert this defense, an employer must take reasonable care to both reasonably prevent and correct any discriminatory behavior. *Hardage v. CBS Broadcasting, Inc*., 427 F.3d 1177 ( 9th Cir. 2005).  On multiple occasions, Corizon failed to take appropriate preventive or corrective action to address workplace discrimination directed against Plaintiff.

 For instance, on the <u>one</u> occasion that Corizon determined racially insensitive remarks had been directed at Plaintiff, terminating the offender who made overtly racist statements was not enough.  Termination of the offending employee did not address the racially insensitive culture existing at Corizon or the deficiencies in its own sensitivity training that were identified in the course of that investigation and allowed for the blatant racist comments to come so easy (Plaintiffs' SOF, ¶¶27-33).

Notably, and despite Plaintiff's belief to the contrary, Corizon did not find any other conduct to be discriminatory so it necessarily took no further corrective action with respect to racial harassment that Plaintiff endured.  None.  The fact that Corizon offered to arrange a meeting for Plaintiff to meet with lab technician Judy Harkins to discuss what Corizon deemed to be "communication issues" between the two women could not be construed as "corrective" action vis a vis discriminatory conduct.  Corizon's position is that there was none.  What was Plaintiff supposed to do? Confront Ms. Harkins with allegations of race discrimination Corizon had already "investigated" and concluded were not?

There is no evidence in the record that Corizon ever took any further preventive action during Plaintiff's employment, and Corizon points to none.

**3.  <u>Plaintiff was constructively discharged.</u>**

To avoid summary judgment on a constructive discharge claim, Plaintiff must show there are triable issues of fact as to whether a reasonable person in Plaintiff's position would have felt

that she was forced to quit because of intolerable and discriminatory conditions. *Hardage*, 427 F.3d at 1184.

Plaintiff has satisfied that test. For all the reasons stated above, the conditions Plaintiff was working under at Corizon were intolerable and discriminatory. By the time Plaintiff resigned, dozens of Corizon and D.O.C. employees had accessed Plaintiff's records, she was being watched, searched, sabotaged, and second-guessed when treating patients, among other conditions.

Corizon's arguments here focus on the fact that Plaintiff left two gracious parting messages when Plaintiff left Corizon, and did not reach out to Corizon to discuss the discrimination she had endured during the three weeks between her resignation and her last day of work.

First, Plaintiff's parting messages were the proper way to leave a position, namely with grace and dignity. *See* Responses to Corizon's SOF, ¶¶25, 26. Her decision to leave a positive message is not reflective of the absence of the discrimination Plaintiff had endured. At every turn, Corizon disputed that Plaintiff had been the victim of discrimination in the workplace. Plaintiff's complaints of discrimination had been consistently discounted as "miscommunication" or a "personality conflict." Why would Plaintiff, or Corizon for that matter, believe that further dialogue on Plaintiff's complaints during the three weeks she worked after she had resigned produce different results? What purpose would have been served and what would Corizon have done to correct what had occurred after Plaintiff had already resigned?

**C. Counts III and IV: Corizon is not entitled to summary judgment on Plaintiff's Retaliation-based claims.**

**1. Applicable Legal Principles**

To prevail on a retaliation claim under Title VII or §1981, Plaintiff must prove: (1) she engaged in protected activity; (2) she suffered an adverse employment action; (3) a causal connection existed between her protected activity and the adverse employment action. *Sowell v.*

45

*Alumina Ceraminica, Inc*., 251 F.3d 678 (8th Cir. 2001). Corizon argues that Plaintiff was not subject to any adverse action at all because she resigned from employment, and even if there were some adverse employment action, there is no evidence of a link between any protected activity and the adverse employment action.

### 2  Plaintiff has made a prima facie case of retaliation

> a. *Plaintiff was constructively discharged and, before that, had a material reduction in her patient load affecting her productivity and ability to do her job.*

Contrary to Corizon's argument, Plaintiff suffered a materially adverse employment actions including constructive discharge for all the reasons stated above. In addition, the evidence is that Plaintiff's workload was materially reduced from about 20-25 patients per day to 10 patients per day after she complained to HSA Sterling Ream about staff assistants behaving differently while assisting Plaintiff than when they assisted the Caucasian providers. (Plaintiff's SOF, ¶¶63-64). There is, at a minimum, a genuine issue of fact for the jury as to whether Plaintiff was constructively discharged, and/or whether a reduction in patient load by more than 50% is a materially adverse employment action. Plaintiff testified that is was, and her productivity as reflected in the number of patients she treated each day would have a negative effect on her ability to retain her job. *Id*.

> b. *When Plaintiff complained about discriminatory conduct, her workload was materially affected; eventually, the hostile environment resulted in constructive discharge.*

Corizon finally argues that even if Plaintiff demonstrated a materially adverse employment action such as constructive discharge or a 50% reduction in patient load, there is no evidence that the adverse action was the result of protected activity. The record, however, establishes that the reduction in patient load is directly and temporally related to Plaintiff asserting a complaint with

HAS Sterling Ream about the discriminatory conduct (protected under Title VII and §1981) by the staff assistants. (Plaintiffs SOF, 61-64).

A material dispute remains for trial.

## IV. CONCLUSION

Plaintiff was the sole African-American employee working at the Chillicothe Correctional Center employed by Corizon. Shortly after she began work, she was subjected to overt racial discrimination. Although Corizon promptly terminated the offender, the discrimination and harassment began in earnest and was no longer overtly racial but nevertheless inescapably motivated by race. The accumulation of abusive conduct when viewed in context and as a whole – as the law requires – no doubt establishes a racially hostile work environment that ultimately resulted in Plaintiff's constructive discharge. Plaintiff is entitled to have a jury decide her claims of racial discrimination in violation of Title VII and 42 U.S.C. §1981, and Corizon is not entitled to summary judgment.

Corizon's Motion for Summary Judgment should be denied.

WHEREFORE, for the foregoing reasons, Plaintiff Terri LaBlance respectfully requests that the Court determine that genuine issues of material fact remain precluding summary judgment under Rule 56, deny Defendant Corizon Health, Inc.'s Motion for Summary Judgment on all claims, award Plaintiff her costs and fees, and for such other and further relief as is just and fair.

Respectfully Submitted,

KRIGEL & KRIGEL, PC

/s/ Ivan L. Nugent
Ivan L. Nugent          MO  #62148
4520 Main St., Suite 700
Kansas City, Missouri 64111
Telephone:     (816) 756-5800
Fax:               (816) 756-1999
inugent@krigelandkrigel.com

ATTORNEYS FOR PLAINTIFF


## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing was served via the court's email delivery system to al parties of record on this 3rd day of December 2020.

/s/ Ivan L. Nugent
Ivan L. Nugent