# EXHIBIT B

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE WESTERN DISTRICT OF MISSOURI

 3                    WESTERN DIVISION

 4

 5   TERRI YOLANDA LABLANCE,   )
                               )
 6          Plaintiffs,        )
     vs.                       )
 7                             )
     MISSOURI DEPARTMENT OF    )Case No. 4:19-cv-00693-BP
 8   CORRECTIONS AND CORIZON   )
     HEALTH,                   )
 9                             )
            Defendants.        )

10

11                   **************

12      VIDEOCONFERENCE DEPOSITION OF TAMMIE CHRISTOPHER

13            TAKEN ON BEHALF OF THE PLAINTIFF

14                   NOVEMBER 4, 2020

15                   **************

16

17

18

19

20

21

22

23

24

25
```

Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 2 of 33

## Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2          FOR THE WESTERN DISTRICT OF MISSOURI
 3                      WESTERN DIVISION
 4
 5     TERRI YOLANDA LABLANCE, )
                              )
 6          Plaintiffs,       )
       vs.                    )
 7                            )
       MISSOURI DEPARTMENT OF )Case No. 4:19-cv-00693-BP
 8     CORRECTIONS AND CORIZON )
       HEALTH,                )
 9                            )
            Defendants.       )
10
11                *************
12     VIDEOCONFERENCE DEPOSITION OF TAMMIE CHRISTOPHER
13          TAKEN ON BEHALF OF THE PLAINTIFF
14               NOVEMBER 4, 2020
15                *************
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1              A P P E A R A N C E S
 2     For the Plaintiffs:
 3        Mr. Ivan Nugent
             Krigel & Krigel, P.C.
 4           4520 Main Street, Suite 700
             Kansas City, MO 64111
 5           tel: (816)756-5800
 6     For Defendant Corizon:
          Mr. Michael L. Matula
 7           Ogletree Deakins
             4520 Main Street, Suite 400
 8           Kansas City, Missouri 64111
             tel: (816)471-1301
 9
       For Department of Corrections:
10        Ms. Rachel Jag
             Assistant Attorney General
11           615 E. 13th Street, Suite 401
             Kansas City, Missouri 64106
12           tel: (816)889-5000
13     Also Present on Zoom: Jenny Meehan
14
15
16
17
18
19
20
       Court Reporter:
21     Joann Renee Richardson
       Alaris Litigation Services
22     711 North Eleventh Street
       St. Louis, MO 63101
23     314) 644-2191
       1-800-280-3376
24
25
```

## Page 2

```
 1           THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF MISSOURI
 2                   WESTERN DIVISION
       TERRI YOLANDA LABLANCE,   )
 3                               )
            Plaintiff,           )
 4                               )
       vs.                       )
 5                               ) Case# 4:19-cv-00693-BP
       MISSOURI DEPARTMENT OF    )
 6     CORRECTIONS AND CORIZON   )
       HEALTH,                   )
 7                               )
            Defendants.          )
 8
           VIDEOCONFERENCE DEPOSITION OF TAMMIE CHRISTOPHER,
 9     produced, sworn and examined on November 4, 2020,
10     between the hours of 8:30 a.m. and 11:20 a.m. of that
11     day, via videoconference, before Joann Renee Richardson,
12     a Certified Court Reporter within and for the State of
13     Missouri, in a certain cause now pending in the United
14     States District Court - Western District, wherein Terri
15     Yolanda LaBlance is the Plaintiff and Missouri
16     Department of Corrections and Corizon Health are the
17     Defendants; taken on behalf of the Plaintiff.
18
19
20
21                *********
22
23
24
25
```

## Page 4

```
 1                 I N D E X
 2     EXAMINATION BY:                    PAGE:
 3     BY MR. NUGENT                        7
 4           *******
 5              E X H I B I T S
 6     EXHIBIT NOS:                  PAGE:
 7     43 - Auditing Log                   30
 8     45 - Corrective Action Form Tammie Christopher  62
 9     (Exhibits retained by counsel, not attached.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1 (Pages 1 to 4)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 3 of 33

## Page 5

1  IT IS HEREBY STIPULATED AND AGREED, by and
2  between counsel for the PLAINTIFF and counsel for the
3  DEFENDANTS that this deposition may be taken in
4  shorthand by Joann Renee Richardson, Certified Court
5  Reporter, and afterwards transcribed into typewriting;
6  and the signature of the witness is expressly reserved.
7           *  *  *  *  *
8         MR. VIDEOGRAPHER:  We are on the record.
9  Today's date is November 4, 2020, and the time is
10  8:47 a.m.  This is the video-recorded deposition of
11  Tammie Christopher in the matter of Terri Yolanda
12  LeBlance vs. the Missouri Department of Corrections and
13  Corizon Health, Case No. 4:19cv00693 in the United
14  States Court for Western District of Missouri, Western
15  Division.  This deposition is being held via WebEx video
16  conference.
17         The reporter's name is Joann Richardson.  My
18  name is Chris Chandler.  I'm the legal videographer.
19  And we are with Alaris Litigation Services.
20         Today's deposition will be held via WebEx
21  with the court reporter not in the room with the
22  deponent.  If all attorneys would now introduce
23  themselves and the parties that they represent and
24  stipulate to those terms, the court reporter will swear
25  in the witness and we may proceed.

## Page 6

1         MR. NUGENT:  Good morning.  Ivan Nugent on
2  behalf of the Plaintiff, Terri LaBlance, and we
3  stipulate to this deposition happening via WebEx.
4         MR. MATULA:  Mike Matula on behalf of
5  Corizon Health.  I also stipulate to this deposition
6  proceeding by WebEx.  I did have one logistical question
7  here, now that I'm fully logged in and looking at the
8  screen.  I just want to make sure we had a record that
9  Jenny Meehan is attending as the Corizon corporate
10  representative.  They've got the one computer there, but
11  I wanted to get a record of everyone who is there.
12         MR. NUGENT:  Hey, Mike, that raises somewhat
13  of an issue for me because I can't see Jenny.
14         MS. MEEHAN:  We can sit closer.
15         MR. MATULA:  Jenny, is there a -- you don't
16  have another device or something you can separately log
17  in, even though you guys are together, so that we could
18  have your own screen or your own window?
19         MS. MEEHAN:  I have my cell phone.  I can
20  log in through that.
21         MR. MATULA:  Would you mind doing that?
22  It'd just be a little bit easier and probably more
23  appropriate just to have the frame on Tammie.  Hopefully
24  you've got a charger or something to keep yourself
25  juiced through the day.  Could you do that?

## Page 7

1         MS. MEEHAN:  Yes, I can.
2         MR. VIDEOGRAPHER:  Are we going to go off
3  the record while she does that?
4         MR. MATULA:  Yeah.
5         MR. VIDEOGRAPHER:  Is that okay, Mr. Nugent?
6         MR. NUGENT:  Sorry.  Yes.
7         MR. VIDEOGRAPHER:  Going off the record.
8  The time is 8:49 a.m.
9           (Off the record.)
10           _____
11           (Back on the record.)
12         MR. VIDEOGRAPHER:  We are back on the
13  record.  The time is 8:59 a.m.
14         MS. JAG:  This is Rachel Jag.  I am
15  representing the Department of Corrections and I
16  stipulate that this deposition is being taken by WebEx.
17         TAMMIE CHRISTOPHER,
18  being first duly sworn, produced and examined, testified
19  as follows:
20           EXAMINATION
21  QUESTIONS BY MR. NUGENT:
22     Q.  Good morning, Tammie.  My name is Ivan Nugent
23  and I represent the Plaintiff, Terri LaBlance, in a
24  case in which she has sued Corizon Health and the
25  Department of Corrections for various allegations

## Page 8

1  related to her employment.  We're here to take your
2  deposition today in that case.  We are all virtual.
3  I believe that you and Jenny Meehan are in the same
4  room; is that accurate?
5     A.  Yes.
6     Q.  And do you understand that you are present
7  today to give testimony in the Terri LaBlance vs.
8  Corizon, et al case?
9     A.  Yes.
10     Q.  I'm going to go over a few sort of
11  housekeeping things before I dive into the questions
12  I have.  First is, if you need a break, will you let
13  me know?
14     A.  Sure.
15     Q.  And, secondly, if you don't understand one of
16  my questions, will you let me know?
17     A.  Yes.
18     Q.  Will you also agree to answer questions on
19  your own accord and not with the assistance of Jenny
20  Meehan?
21     A.  Yes.
22     Q.  And then lastly, you've been sworn in.  Do you
23  understand that you're under oath to tell the truth?
24     A.  Yes.
25     Q.  Will you, in fact, tell the truth today?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 4 of 33

## Page 9

1    A. Yes.
2    Q. All right. Have you ever had your deposition
3  taken before?
4    A. No.
5    Q. What's going to happen is, I'm going to ask
6  you a bunch of questions. I'm hoping that you'll
7  answer them. And then there may be times throughout
8  the day where your attorney, Mr. Mike Matula, may
9  interject and he will have, you know, something to
10  say. He'll say it on the record. And then either
11  he or I will instruct you to answer.
12    If he instructs you not to answer, we may have
13  additional conversations about that. But I just
14  want to make sure you understand the logistics of
15  how this goes?
16    In addition, there is a court reporter who is
17  recording everything that's being said as well as
18  the video itself is being recorded. Do you
19  understand all of that?
20    A. Yes.
21    Q. All right. I do have some documents to show
22  you at some point. There is a feature here that
23  allows me to display them on the screen that you're
24  looking at. My ask is that you let me know if you
25  can't see those documents and also that if there's

## Page 10

1  any confusion about what's there, that we just take
2  the time to get the documents squared away. Do you
3  understand that?
4    A. I do.
5    Q. Okay. Who do you work for?
6    A. Corizon Healthcare.
7    Q. And what do you do for Corizon Healthcare?
8    A. I'm a staff nurse, a registered nurse.
9    Q. Is your title staff nurse?
10    A. Yes. I used to be director of nursing, but
11  then I went to PRN and now I'm a staff nurse full
12  time. Well, 36 hours a week.
13    Q. Okay. Let me ask you this first. What did
14  you do to prepare for today's deposition?
15    A. Well, I had a discussion yesterday with the
16  attorneys from Ogletree Deakins.
17    MR. NUGENT: To clarify, I believe that
18  Ms. Christopher said she had conversations with
19  attorneys from Ogletree Deakins.
20    Q. (By Mr. Nugent) Tammie, I don't want you to
21  tell me anything that you and your attorneys talked
22  about. What I do want to know, though, is, did you
23  review any documents in preparing for today?
24    A. Yes.
25    Q. Okay. What documents did you look at?

## Page 11

1    A. A write-up that I had received in, I believe,
2  2019, and there was a log showing access to a record
3  on the MOCIS system.
4    Q. The log that you reviewed, did it have black
5  lines through it like it had been crossed out?
6    A. I didn't notice, if so.
7    Q. I want to talk a little bit more about the
8  role that you're in now versus the director of
9  nursing role that you were in. Let's start with the
10  timeline. When did you become the director of
11  nursing?
12    A. In July of 2018.
13    Q. Was that your start date with Corizon?
14    A. My original start date was with CMS in 2006
15  and then I left the company -- it turned into
16  Corizon, though, when the companies merged. And
17  then I left in 2017 for several months. And then I
18  came back as DON in July of '18.
19    Q. So your most recent stint of employment
20  started in July of 2018; is that accurate?
21    A. Yes.
22    Q. Okay. And you were hired directly to be the
23  director of nursing; is that accurate?
24    A. Yes.
25    Q. What does CMS stand for?

## Page 12

1    A. Correctional Medical Services.
2    Q. And is that a previous name of Corizon or is
3  that a different company altogether?
4    A. I believe that CMS merged with another company
5  and formed Corizon Health at some point years ago.
6  I don't remember exactly when or what other company
7  it merged with.
8    Q. Okay. And when did you stop being the
9  director of nursing?
10    A. July of 2019.
11    Q. And why did you stop being the director of
12  nursing?
13    A. The stress with management. I went to work at
14  a local hospital for a while and stayed PRN with
15  Corizon.
16    Q. Okay. Are you still employed by Corizon now?
17    A. Yes.
18    Q. And are you PRN status now?
19    A. No. I'm actually 36 hours a week every week
20  now.
21    Q. And your title, I believe, is staff nurse?
22    A. Registered nurse, yeah.
23    Q. Okay. And so in July of '19 you stepped down
24  as the director of nursing. Did you immediately go
25  into PRN status?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 5 of 33

## Page 13

1  A. I did.
2  Q. And what hospital did you then go work for?
3  A. Hedrick Medical Center in Chillicothe.
4  Q. Can you repeat that?
5  A. Hedrick Medical Center. I started there in --
6  I believe it was August.
7  Q. Okay. And can you spell -- is it Hedrick?
8  A. H-E-D-R-I-C-K Medical Center. It's part of
9  the Saint Luke's Health System.
10  Q. Did anyone from Corizon ask you to step down
11  as director of nursing?
12  A. No.
13  Q. I believe that you were reprimanded in March
14  of 2019. Did your reprimand have anything to do
15  with your decision to step down as director of
16  nursing?
17  A. No.
18  Q. When you were hired as the director of nursing
19  in July of 2018, did you receive any training on how
20  to supervise employees?
21  A. There was DON training that I attended and
22  that's where we got our training as far as
23  supervisory, along with guidance from Jenny and Tara
24  Taylor.
25  Q. All right. And when you refer to DON, is that

## Page 14

1  the acronym for director of nursing?
2  A. Yes.
3  Q. Can you tell me what the training consisted of
4  for DON?
5  A. I can't remember everything, honestly. It was
6  a few days. It was different things about CQI,
7  continuous quality improvement. It was different
8  things, like how to do CQI. Just different
9  requirements of the job. Honestly, it's been so
10  long I can't remember everything. But, yeah, just
11  different responsibilities.
12  Q. I believe you said CQI. And does that stand
13  for continuous quality improvement?
14  A. Yes.
15  Q. Okay. Do you recall whether there was any
16  training on how to discipline employees?
17  A. I don't recall specifically.
18  Q. Was there any training on how to conduct
19  investigations into complaints made by employees?
20  A. Not that I remember. Just to contact human
21  resources, go through our chain of command.
22  Q. All right. Can you tell me what your highest
23  level of education is?
24  A. Right now, associate's degree.
25  Q. And have you held any other titles other than

## Page 15

1  staff nurse or director of nursing while employed
2  with Corizon Health?
3  A. When I started in 2006, I was a GPN and I was
4  an LPN. But as far as any other job capacity
5  besides a staff nurse, no. Just staff nurse and
6  DON.
7  Q. All right. What is a GPN?
8  A. Graduate practical nurse.
9  Q. And what is an LPN?
10  A. Licensed practical nurse.
11  Q. Ms. Christopher, are you married?
12  A. Yes.
13  Q. What's your spouse's name?
14  A. Ashton Christopher.
15  Q. And where does he work?
16  A. He works at Chillicothe Correctional Center.
17  Q. How long has he worked there?
18  A. Since 2006.
19  Q. And do you know what his title is?
20  A. Case manager II.
21  Q. And do you know what that means? Have you and
22  he talked about what his role is at Chillicothe
23  Correctional Center?
24  A. I don't fully understand it. I know he was in
25  segregation and now he's over work release, but I

## Page 16

1  don't know what he does day to day.
2  Q. Okay. And do you know whether he was
3  reprimanded shortly after you were with regards to
4  his employment with the DOC?
5  A. He was.
6  Q. And do you know what he was reprimanded for?
7  A. Accessing a face sheet, I believe. I didn't
8  see the paper, but --
9  Q. And do you know whose face sheet he accessed?
10  A. I believe it was Terri's.
11  Q. While you were the director of nursing, was
12  the supervision of other nurses a part of your job
13  requirement or job duties?
14  A. Of nurses, yes, RNs and LPNs.
15  Q. Can you say the last part again?
16  A. Yes. I supervise the RNs and LPNs.
17  Q. All right. And in your supervision of the
18  registered nurses and the LPN nurses, did you
19  provide personnel reviews of those nurses?
20  A. As far as their, like, yearly -- what do you
21  mean by personnel review?
22  Q. Their yearly reviews.
23  A. Sterling and I both did. She usually would do
24  the most part of it, but I would go over it with
25  them.

4 (Pages 13 to 16)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP    Document 67-2    Filed 12/03/20    Page 6 of 33

Page 17

1      Q.  Were you also -- or was a part of your job
2  duty to reprimand the nurses that you supervised, if
3  warranted?
4      A.  Yes.
5      Q.  What are the services that Corizon provides at
6  Chillicothe?
7      A.  Provide healthcare to the offender population.
8      Q.  Okay.  And with regards to the healthcare,
9  does that include medical care?
10     A.  Yes.
11     Q.  Does it include dental care?
12     A.  Yes.
13     Q.  And does it include mental healthcare?
14     A.  They're in a separate building.  But, yes,
15  Corizon provides mental healthcare as well.
16     Q.  Okay.  Are there any other types of medical
17  services that Corizon provides at Chillicothe?
18     A.  We have optometry come in sometimes.  We do
19  X-ray and lab, but that's part of medical care.  So
20  I'm not sure.
21     Q.  You mentioned that mental health is in a
22  different building.  What is in the building that
23  houses the dental and medical care?
24     A.  Everything except mental health.
25     Q.  Okay.  Are the dental providers and the

Page 18

1  medical providers in the same portion of the
2  facility there in Chillicothe?
3      A.  Yes.
4      Q.  So to say it a different way, do you see
5  regularly the dental -- the folks that provide
6  dental care to the inmates?
7      A.  They work in the same building, yes.
8      Q.  Okay.  What about the same wing or hallway of
9  the building?
10     A.  Yes.  They are in the back of the -- we call
11  it the clinical side of the hallway.
12     Q.  So all of the Corizon employees who provide
13  medical care, they all report to the same wing
14  and do their jobs in the same portion of the
15  facility?
16     A.  I mean, they may have separate offices but in
17  the same building.
18     Q.  Okay.
19     A.  We do have a nurse that will go to ad seg or,
20  you know, things like that, but they all are based
21  out of that building.
22     Q.  When you say you have a nurse that'll go to
23  ad seg, tell me what ad seg is.
24     A.  Segregation.  It's a different housing unit
25  where the offenders aren't able to come up to

Page 19

1  medical.
2      Q.  All right.  So the portion of the facility
3  where an inmate might go to receive dental care or
4  to receive medical care is the same portion of the
5  facility?
6      A.  Yes.
7      Q.  When you were the director of nursing from
8  July of '18 to July of '19, were you responsible for
9  supervising Terri LaBlance?
10     A.  No.
11     Q.  Okay.  Did you report to Terri?
12     A.  No.  My immediate supervisor was Sterling
13  Ream.
14     Q.  And what was her title while you were the
15  director of nursing?
16     A.  Health services administrator.
17     Q.  Do you know who Terri LaBlance reported to?
18     A.  I believe clinically it would have been the
19  collaborating physician.
20     Q.  Okay.  Was your position as director of
21  nursing, did you view that as a management position?
22     A.  Yes.  It's considered site management.
23     Q.  When you started July -- when you started in
24  July of 2018, did you receive the harassment policy?
25     A.  I'm sure I did.

Page 20

1      Q.  Have you ever had to do an investigation into
2  workplace harassment or discrimination?
3      A.  No.  I'd just report it to an immediate
4  supervisor if there was any concerns.
5      Q.  Okay.  So if a concern -- let me ask a
6  different way.  Have concerns about workplace
7  harassment or discrimination been brought to you?
8      A.  Not that I recall, no.
9      Q.  I want to go back to the logistics of the
10  medical center.  Do you interact with the dental
11  staff?
12     A.  When I would do rounds.  If I would walk
13  around the building in the morning, I would pop in
14  and say hi and see how it was going.  Otherwise,
15  they may come into our office and visit or talk.
16     Q.  Is that pretty common?
17     A.  I mean, yeah.  People are in and out all day
18  long.
19     Q.  Okay.  Do you know Kelley Chapman?
20     A.  Doesn't ring a bell.
21     Q.  I want to talk a little bit about Terri
22  LaBlance.  During your time as director of nursing,
23  were there any other African Americans employed by
24  Corizon?  And let me clarify the question.  Were
25  there any other African Americans employed by

5 (Pages 17 to 20)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP    Document 67-2    Filed 12/03/20    Page 7 of 33

Page 21

1    Corizon at the Chillicothe facility?
2      A.  Not that I recall.
3      Q.  Okay.  Are there any African Americans that
4    work for Corizon at the Chillicothe facility now?
5      A.  I don't believe so.
6      Q.  I want to ask you if you are familiar with a
7    few events in, I believe, August or September of
8    2017.  There was a racial slur used by an employee
9    of Corizon in a conversation with Ms. LaBlance.  Are
10   you familiar with that set of facts as I've
11   explained them?
12     A.  I heard about it second or thirdhand.  I
13   wasn't there for -- I was at work that day, I
14   believe, but I didn't witness it.
15     Q.  Okay.  And that would have been in 2017.  Were
16   you employed by Corizon in 2017?
17     A.  I believe I didn't leave until September of
18   '17.
19     Q.  Do you recall whether you were interviewed by
20   anyone from human resources about the racial slur
21   that I just referenced?
22     A.  I wasn't, but I didn't witness it.
23     Q.  Do you recall who told you about the racial
24   slur?
25     A.  I don't.  I think I heard it in the lunchroom

Page 22

1    because someone had reported it.
2      Q.  When you say you heard it in the lunchroom,
3    were there other people talking about what had
4    happened?
5      A.  Somebody told me in there.  I don't remember.
6      Q.  What was your response?
7      A.  I was shocked.
8      Q.  Did you do anything after learning about the
9    slur?
10     A.  I know that Sterling reported it as soon as
11   she heard about it, so I knew that it was taken care
12   of.  And I don't believe the other employee came
13   back after that day.  I believe she was terminated,
14   but I'm not sure.  I wasn't in a management position
15   at that time to know exactly what happened.
16     Q.  All right.  In your answer did you identify a
17   name, someone that you talked to?
18     A.  Sterling Ream reported it to management.  She
19   was the management at that time.
20     Q.  All right.  I'm going to ask you if you know a
21   list of names.  And if you do, I'm going to ask you
22   a few follow-ups with regards to the names.  Okay?
23     A.  Okay.
24     Q.  Do you know Brandon Doss?
25     A.  I think he's an officer, but I don't know him,

Page 23

1    like, personally.
2      Q.  You know of him; is that right?
3      A.  Yes, I know of him.
4      Q.  Okay.  Do you know of a Nicholas Koenig?
5      A.  Yes.
6      Q.  What about April Wolf?
7      A.  I believe she's an officer as well.
8      Q.  Dustin Lybarger?
9      A.  He's an officer as well.
10     Q.  Bradley Richards?
11     A.  I think he's a correctional officer as well.
12     Q.  Jeff Parque?  (Phonetic on name.)
13     A.  Yes.  I think he's a correctional officer as
14   well.
15     Q.  Mindy Rhodes?
16     A.  Yes.  She's a correctional officer.
17     Q.  Okay.  And Phillip Bower?
18     A.  Yes.  I believe he is or was an officer.
19     Q.  Of all of those names, are any of them --
20   would you consider any of them friends?
21     A.  I mean, nobody I talk to outside of work.
22   Might have been in passing.
23     Q.  So none of those names are individuals that
24   you socialize with outside of work?
25     A.  I believe Parque was in a fantasy football

Page 24

1    league I was in at some point, but not like close
2    friends, no.
3      Q.  Earlier you referenced a software system and I
4    believe you called it MOCIS.  Is MOCIS M-O-C-I-S?
5      A.  Yes.
6      Q.  Okay.  Is that an acronym?
7      A.  I'm sure it is.  I don't know exactly what it
8    stands for.
9      Q.  Do you know what records are housed in the
10   MOCIS software system?
11     A.  I don't know all of them.  I know the ones
12   that we use in medical, but I don't know what
13   anybody else would use.
14     Q.  All right.  What do you all use -- in the
15   medical department or, you know, in your day-to-day
16   duties, what do you use the MOCIS system for?
17     A.  To document healthcare, look up information.
18     Q.  Do you know if all of the records in that
19   system are HIPAA protected?
20         MR. MATULA:  Object to the form of the
21   question.  Go ahead, Tammie.
22     A.  I believe parts of it are.  The health record.
23     Q.  (By Mr. Nugent) If I understand your
24   testimony, parts of the records in the MOCIS system
25   that you use are protected and parts are not; is

6 (Pages 21 to 24)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 8 of 33

## Page 25

1    that accurate?
2    A. In the MOCIS system, yeah, I believe so.
3    Q. Okay. Do you know one way or the other?
4    A. I mean, anything health-record-related is
5    protected by HIPAA, yes.
6    Q. Can you tell me what the criteria is for a
7    health record?
8    A. A patient's record, medication, demographics.
9    I can't give you the all-inclusive list off the top
10   of my head. I'm sorry.
11   Q. You did mention demographics. Can you tell me
12   what you mean by demographics?
13   A. I would say, like, anything that's not public
14   record maybe, like a social security number or
15   anything like that, but I don't believe that's part
16   of it. I mean, the healthcare part of MOCIS, I
17   can't tell you off the top of my head.
18   Q. When you started with Corizon in July of 2018,
19   did you receive training on how to use the MOCIS
20   system?
21   A. I had previously received training when I
22   started in my previous stint of employment.
23   Q. Okay. So in July of 2018, when you became the
24   director of nursing, is it fair to say that you knew
25   how to use the MOCIS system?

## Page 26

1    A. Yes.
2    Q. Do you use the MOCIS system daily?
3    A. Yes, at work.
4    Q. Right. And then can you access the MOCIS
5    system outside of work?
6    A. No.
7    Q. Why is that?
8    A. I believe it's just on an as-needed basis for
9    people. I'm not sure.
10   Q. Have you tried to access it outside of work?
11   A. No.
12   Q. When you are accessing the MOCIS system in
13   your day-to-day job, are the records that you are
14   accessing records of patients that you're actively
15   treating?
16   A. Yes.
17   Q. Contained within that software, if a patient
18   was treated, let's say, ten years ago, is there
19   information still present?
20   MR. MATULA: Object to the form of the
21   question. Go ahead, Tammie.
22   A. I would assume it would be present. I'm not
23   sure how long the health records are retained in the
24   state.
25   Q. (By Mr. Nugent) Okay. Let me ask it a

## Page 27

1    different way. You accessed Terri LaBlance's
2    records, right?
3    A. I pulled up her face sheet.
4    Q. Okay. And she was not -- Terri LaBlance was
5    not a patient of yours, right?
6    A. No.
7    Q. You knew that Ms. LaBlance had been a patient
8    of the Department of Corrections at some point; is
9    that right?
10   A. Yes.
11   Q. All right. When was the first time you looked
12   at Ms. LaBlance's face sheet?
13   A. I don't remember the date, but somebody had
14   brought in a Post-it note with a number on it and
15   said, "Look this up."
16   Q. Who was that?
17   A. I was trying to think of that. I'm not 100
18   percent sure. I think it may have been either
19   Dr. Epperson or Val Kirby.
20   Q. So if I understand you right, either
21   Dr. Epperson or Val Kirby brought a Post-it note to
22   you with numbers written on it and said, "Look this
23   up."
24   A. I don't know if that's the exact words because
25   it's been a while, but that's the gist of it, yes.

## Page 28

1    Q. All right. How confident are you that it was
2    Val Kirby or Dr. Epperson?
3    A. I can't say 100 percent. It's been -- I think
4    it was them, but I can't say -- I just don't
5    remember for sure enough to say 100 percent that it
6    was one of them.
7    Q. Okay. So is it also safe to say you don't
8    know who brought the Post-it note with the numbers
9    on it?
10   A. I don't know for sure, no.
11   Q. And then, lastly, it could be somebody else
12   other than Dr. Epperson or Val Kirby?
13   A. It could have been.
14   Q. I'm going to read a list of names and I want
15   you tell me if you think it might be one of these
16   people. Okay?
17   A. Okay.
18   Q. Do you think that it was Deborah Ritter?
19   A. I don't believe so.
20   Q. Judy Harkins?
21   A. I don't believe so.
22   Q. Megan Rex?
23   A. I don't believe so.
24   Q. Jessica Frizzell?
25   A. I don't believe so.

Page 29

1    Q. Brandon Doss?
2    A. No.
3    Q. Lori Switzer?
4    A. I don't believe so.
5    Q. Sterling Ream?
6    A. No.
7    Q. Brandy Baker?
8    A. No.
9    Q. Shannon Burris?
10   A. No.
11   Q. Teresa Hamilton?
12   A. I don't believe so.
13   Q. Tabitha Johnson?
14   A. I don't believe so.
15   Q. Rachel Rempel?
16   A. No.
17   Q. Carol Holloway?
18   A. No.
19   Q. Alex Spencer?
20   A. No.
21   Q. Megan Meyer?
22   A. No.
23   Q. Rachel Stuver?
24   A. No.
25   Q. All right.  The person who brought the sticky

Page 30

1    note with the number on it, do you believe that that
2    person was a Corizon employee?
3    A. Yes.
4    Q. Based on records that I have -- I'm just going
5    to pull them up.  That might be the easiest way to
6    do this.  Give me one second.  Tammie, do you see a
7    document in front of you entitled Auditing Logs
8    Search Results?
9    A. Yeah, I can see the title.
10   Q. Okay.  And then at the bottom there's an
11   exhibit sticker that says Exhibit 43.  Do you see
12   that?
13   A. Yes.
14       MR. NUGENT:  I'm going to identify this real
15   quick.  I've submitted to the witness what I'm going to
16   refer to as Deposition Exhibit 43.  It is Bates-labeled
17   MDOC1940 through 1943.
18   Q. (By Mr. Nugent) Ms. Christopher, this is a log
19   that was provided to me by the Department of
20   Corrections.  I'll also represent to you that it was
21   provided to Corizon back in 2019.  I want to --
22       MR. MATULA:  Ivan, I'm just going to object
23   partially about -- that statement, I think, is slightly
24   misstating the record.  But go ahead.
25       MR. NUGENT:  Well, I believe that in

Page 31

1    reviewing the Department of Corrections interrogatory
2    responses -- I'm just simply referring to that.  So if
3    I'm stating it wrong, I guess we can clear that up
4    later.
5        MR. MATULA:  It's not a major thing.  I
6    think there is some issue of the exact form.  There's no
7    dispute that the audit log history was provided.  That's
8    not the problem.  I don't think it's been established
9    exactly the manner it was done at the time.  So other
10   than that, go ahead.
11       MR. NUGENT:  Understood.
12   Q. (By Mr. Nugent) Ms. Christopher, I have zoomed
13   in and I want to make sure that you can see it
14   clearly.  On my screen it looks clear, but if it's
15   not on yours, please tell me.
16   A. I can see it.
17   Q. All right.  And my mouse is at the entry that
18   has what appears to be your name or email address.
19   Do you see that?
20   A. Yes.
21   Q. All right.  Specifically, according to this
22   log, you accessed Ms. LaBlance's charting guide list
23   page on February 7, 2019 at 8:54 a.m.  Do you see
24   that?
25   A. Yes.

Page 32

1    Q. Any reason to dispute that?
2    A. No.
3    Q. What information is on the charting guide list
4    page?
5    A. We call it the "face page."  It's basically
6    just got name and number, a picture, date of birth.
7    And then there's tabs that you can go into the
8    health care record if you click on that.
9    Q. Let me ask the question again,
10   Ms. Christopher.
11   A. Okay.
12   Q. I'm hoping that that will help the court
13   reporter capture your answer.  I believe that the
14   question was, what information can be seen from the
15   charting guide list page?
16   A. Name, number, a picture, date of birth, and
17   then there's tabs that go into the health record.
18   Q. Ms. Christopher, in your opinion, is the
19   charting guide list page HIPAA information?
20   A. In hindsight, yes.
21   Q. Okay.  And when you say "in hindsight," what
22   do you mean?
23   A. Well, when I pulled up the number, I really,
24   honestly, just wasn't thinking.  And then I received
25   the write-up that you mentioned and I did see where

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 33

1    I should not have done that.
2        Q. Okay. When you say you saw the number and you
3    weren't thinking, did the number on the Post-it note
4    have a name attached to it?
5        A. I don't remember.
6        Q. When you looked at the Post-it note, could you
7    identify just from the Post-it note who the record
8    was going to belong to?
9        A. I don't remember if it had a name on it to
10   identify it by looking at it.
11       Q. So after having the Post-it note, did you have
12   to go to the MOCIS record in order to identify who
13   the number belonged to?
14       A. I don't remember if they told me who it was
15   when they handed it to me or not, honestly.
16       Q. Okay. Safe to say, though, that after looking
17   at the record, you knew who it belonged to, right?
18       A. Yeah. After looking at the face sheet, yes.
19       Q. After looking at the face sheet, what did you
20   do?
21       A. I didn't go any further.
22       Q. I understand that. Let me make sure I
23   understand your question. When you say you didn't
24   go any further, are you saying you didn't go any
25   further with regards to the MOCIS software?

## Page 34

1        A. As far as, like, I didn't try to go any deeper
2    into the record.
3        Q. Okay. After looking at the face sheet, did
4    you tell anyone that you looked at the face sheet?
5        A. I believe Sterling Ream was in the room
6    because we shared an office, so she knew.
7        Q. What did you say to Sterling?
8        A. I don't remember what I said exactly because
9    it's been a while.
10       Q. After closing -- I assume you closed out at
11   some point; is that right?
12       A. Uh-huh.
13       Q. Yes?
14       A. Yes.
15       Q. Sterling Ream was in the room with you, so
16   it's safe to say you and her had a conversation
17   about it?
18       A. If we did, I don't remember what it was. I
19   believe that either Dr. Epperson or Val was in the
20   room and talking to her, but I'm not sure. It's
21   been so long I can't remember the details.
22       Q. Well, I guess -- I understand that it's been
23   so long that you can't remember the details, but you
24   were reprimanded over this, right?
25       A. Yes, later.

## Page 35

1        Q. Okay. And is this the only time you've been
2    reprimanded?
3        A. Yes, as far as I remember. As far as a
4    write-up, yes.
5        Q. Outside of being in the room with Sterling
6    Ream and, I think, you said Dr. Epperson, were you
7    present during any other conversations about this
8    face sheet or Ms. LaBlance's records?
9        A. Not that I recall, outside of the conversation
10   in our office with Dr. Epperson and Val.
11       Q. Okay. And so I believe you said you and
12   Sterling Ream shared an office, right?
13       A. Yes.
14       Q. Were both Dr. Epperson and Val Kirby in the
15   office during this conversation?
16       A. I believe so, but I can't say 100 percent.
17   People were in and out all the time.
18       Q. What percent would you say?
19       A. I mean, it's hard to say. I know they were
20   both in there for conversation about it at some
21   point. I just don't know if it was exactly at that
22   time.
23       Q. Okay. What was the tone of the conversation?
24   I understand you are saying you don't remember what
25   was said, but what was the tone of the conversation?

## Page 36

1        A. I just think -- I think it was shock, maybe,
2    or surprise. I'm not sure. It's hard to say what
3    someone's tone means.
4        Q. Well, was the conversation serious in nature?
5        A. I mean, I would say Dr. Epperson, she was
6    surprised that she didn't know because she was her
7    collaborating physician. I remember that.
8        Q. Okay. You just mentioned surprised to know.
9    I would view that as sort of a tone, if you will, of
10   a conversation. Was there any other -- how else
11   would you describe the conversation?
12       A. I can't really think of anything else to
13   describe that conversation at this point. Just
14   surprise.
15       Q. So just surprised? Was there any part of you
16   that felt like you needed to report this
17   conversation or what happened during the
18   conversation to anyone at Corizon?
19       A. Well, my administrator already knew about it
20   because she was in the room. So that's my chain of
21   command.
22       Q. Okay. Did Sterling Ream tell you that she
23   reported the conversation to anyone?
24       A. I didn't ask.
25       Q. So no?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 11 of 33

## Page 37

1    A. She didn't tell me if she did, no, that I
2  recall anyway.
3    Q. Outside of those in the office during this
4  conversation, which are Dr. Epperson, Val Kirby,
5  yourself, and Sterling Ream, do you know whether any
6  other Corizon employees knew about the face sheet?
7       MR. MATULA: Object to the form of the
8  question. Vague.
9    Q. (By Mr. Nugent) You can answer.
10   A. Well, before I left my employment in 2017, I
11  know people had talked about the fact that she had
12  been in trouble before, but I don't remember anyone
13  specifically mentioning that.
14   Q. Okay. I want to come back to that answer, but
15  I want to make sure that I wrap up my question. The
16  conversation you had in the office with Kirby,
17  Epperson, Ream, and yourself was in February of 2018
18  -- I'm sorry -- February of 2019, correct?
19   A. I believe so, judging by that that was when it
20  was pulled up.
21   Q. Okay. And so in and around the time of
22  February 2019, did you have any conversations with
23  anyone else at Corizon about Ms. LaBlance's face
24  sheet?
25   A. Not that I recall.

## Page 38

1    Q. Do you know one way or the other?
2    A. I mean, I don't remember having any, no.
3    Q. Is it possible that you had any other
4  conversations?
5    A. All I can see is if I did, I don't remember.
6  I don't remember having any.
7    Q. Okay. You mentioned that prior to you leaving
8  in 2017 that there was talk of Ms. LaBlance having a
9  record. Remind me -- you left in September of 2017?
10   A. Yes.
11   Q. And do you recall when Ms. LaBlance started at
12  Corizon?
13   A. I don't remember exactly when she started. I
14  was PRN at the time before I left and I worked a lot
15  of evening shifts, so I didn't really see a lot of
16  the staff as much because -- the dayshift staff.
17   Q. Okay. If I told you that Ms. LaBlance started
18  with Corizon in June of 2017, would you have any
19  reason to dispute or doubt that?
20   A. I would say that sounds about right.
21   Q. Do you know who was discussing the fact that
22  Ms. LaBlance had a record in 2017?
23   A. I don't remember. I think there was a
24  conversation with a couple of nurses on evening
25  shift and I don't remember who they were, but that's

## Page 39

1  how I heard about it. But I didn't really think
2  much of it. I was busy.
3    Q. Okay. Was Ms. LaBlance an evening shift
4  nurse?
5    A. She worked during the day, as far as I know,
6  all the time.
7    Q. So when you were working evenings, you weren't
8  working with Ms. LaBlance; is that right?
9    A. We might have crossed -- like I might have
10  came in before she left, but I would stay late after
11  she'd left.
12   Q. Okay. Do you know a Megan Meyer?
13   A. Yes. She used to be our X-ray tech.
14   Q. And is she still employed with Corizon?
15   A. No.
16   Q. Do you know Alex Spencer?
17   A. Yes.
18   Q. What was Alex Spencer's title?
19   A. She was an LPN. I don't remember when she got
20  her RN, but she's an RN now.
21   Q. Is she still employed; do you know?
22   A. No.
23   Q. You're familiar with the LPN and RN job
24  responsibilities; is that right?
25   A. Yes.

## Page 40

1    Q. Any reason why an LPN or an RN would access
2  the face sheet of Terri LaBlance?
3    A. No, not if they weren't providing care.
4    Q. What about an X-ray tech, any reason why an
5  X-ray tech would access the face sheet of Terri
6  LaBlance?
7    A. Not if she wasn't providing care, no.
8    Q. Okay. Are you familiar with Deborah Ritter?
9    A. Yes.
10   Q. Do you know what her job title was?
11   A. LPN.
12   Q. Do you know whether she's still employed with
13  Corizon?
14   A. No.
15   Q. You don't know?
16   A. I don't believe she is.
17   Q. What about Rachel Stuver, do you know what her
18  title is?
19   A. She was an LPN when she was with Corizon.
20   Q. Okay. And do you know whether she's still
21  employed with Corizon?
22   A. I don't believe she is, no.
23   Q. Who is Carol Holloway?
24   A. She was an LPN.
25   Q. And is she -- do you know whether she's still

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 12 of 33

## Page 41

1  employed with Corizon?
2  A. She is not.
3  Q. How about Rachel Rempel?
4  A. She is an RN.
5  Q. Do you know if she's still employed with
6  Corizon?
7  A. Yes, she is.
8  Q. What about Tabitha Johnson?
9  A. She is an LPN.
10  Q. Is she still employed?
11  A. Yes.
12  Q. What about Teresa Hamilton?
13  A. She was an LPN and then she is an RN now.
14  Q. Is she still employed with Corizon?
15  A. Yes.  Yeah, I believe so, as a PRN.
16  Q. What about Shannon Burris?
17  A. She was an LPN.
18  Q. Still employed?
19  A. No.
20  Q. What about Brandy Baker?
21  A. She was an LPN.
22  Q. Is she still employed?
23  A. No.
24  Q. No?
25  A. No.

## Page 42

1  Q. Then if you see the first name on here, on
2  this page, it's Sterling Ream, December 9 of 2017.
3  Do you know what her title was in December of 2017?
4  A. RN.
5  Q. And we know she is still employed; is that
6  right?
7  A. Yes.
8  Q. Do you know Lori Switzer's title?
9  A. LPN.
10  Q. In April of 2018, was she an LPN?
11  A. Yes.
12  Q. Is she still employed?
13  A. Yes.
14  Q. Do you know who Brandon Doss is?
15  A. I believe he is a correctional officer.
16  Q. Okay.  Do you know Jessica Frizzell?
17  A. Yes.
18  Q. What was her title in January of 2019?
19  A. Dental assistant, I believe.
20  Q. Dental assistant?
21  A. Yes.
22  Q. Okay.  Any reason why a dental assistant would
23  access the face sheet of Terri LaBlance in January
24  2019?
25  A. No.

## Page 43

1  Q. What about Megan Rex?
2  A. Dental assistant.
3  Q. Is Megan Rex still employed with Corizon?
4  A. No.
5  Q. What about Jessica Frizzell?
6  A. I believe so.
7  Q. Do you know Jerry Lovelace?
8      MS. JAG:  Can you all hear me?
9      MR. NUGENT:  Yes.
10      MS. JAG:  The hotspot just dropped the
11  computer internet.
12      MR. VIDEOGRAPHER:  Do we want to go off the
13  record and see if we can fix that real quickly?
14      MR. NUGENT:  Yes.
15      MR. VIDEOGRAPHER:  We're going off the
16  record.  The time is 10:04 a.m.
17      (Off the record.)
18      _____
19      (Back on the record.)
20      MR. VIDEOGRAPHER:  We are back on the
21  record.  The time is 10:06 a.m.
22  Q. (By Mr. Nugent) Ms. Christopher, we just had a
23  brief technical difficulty.  I believe the internet
24  connection that you were on dropped.  Can you hear
25  me okay?

## Page 44

1  A. Yes.
2  Q. All right.  I'll just remind you to stay close
3  to the computer so that the court reporter can hear
4  you.
5  A. Okay.
6  Q. I believe the last name I left off with was
7  Megan Rex and Jessica Frizzell.  Are both of those
8  individuals dental assistants?
9  A. Yes, they were.
10  Q. And are both of those individuals still
11  working for Corizon?
12  A. Megan Rex does not anymore.  And I believe
13  Jessica Frizzell still does.
14  Q. Okay.  Right as we had to take that quick
15  break, I asked you if you knew Jerry Lovelace.
16  A. Yeah.  He is a -- he is a medical director
17  physician.
18  Q. And do you know what someone can see if they
19  click on the outside information list page?
20      MR. VIDEOGRAPHER:  We're going off the
21  record.  The time is 10:08 a.m.
22      (Break in proceedings.)
23      MR. VIDEOGRAPHER:  We're back on the record.
24  The time is 10:09 a.m.
25  Q. (By Mr. Nugent) We're going to get through

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 13 of 33

Page 45

1    this one way or another here, so just bear with me.
2    I'm going to try to get through this as quickly as
3    possible.
4        I was asking you about -- if you look here on
5    Exhibit 43 where Jerry Lovelace's entry is on
6    February 11, 2019.  Have you looked at someone's
7    outside information list page before?  You're muted.
8    A.  I'm muted?  Can you hear me?
9    Q.  Yes.  Were you able to hear the last question,
10   Ms. Christopher?
11       MR. NUGENT:  I still think we're having
12   technical difficulties.
13       MR. VIDEOGRAPHER:  Going off the record.
14   The time is 10:11 a.m.
15           (Break in proceedings.)
16       MR. VIDEOGRAPHER:  We are back on the
17   record.  The time is 10:16 a.m.
18   Q.  (By Mr. Nugent) Ms. Christopher, can you hear
19   me okay?
20   A.  Yes.
21   Q.  All right.  Great.  I need to bring this
22   document back up really quick.  Do you see Exhibit
23   43 in front of you?
24   A.  Yes.
25   Q.  I want to draw your attention to the entry

Page 46

1    where Jerry Lovelace is here, February 11, 2019.
2    What I'm asking is, first, have you looked at
3    someone's outside information list page within the
4    MOCIS software?
5    A.  Per patient, yes.
6    Q.  Okay.  And can you describe what information
7    is on the outside information list page?
8    A.  On the list page, it would just probably be a
9    series of dates and maybe -- that's where, like, lab
10   results are found, X-ray results.  If we had outside
11   records from another hospital or something scanned
12   in, that's where they would be listed.
13   Q.  Okay.  Let me ask a different question.
14       If you went to the outside information list
15   page, would you be able to see if anyone else
16   accessed the record on that screen here?  Do you
17   know?
18   A.  If I went to the outside information list
19   page, would I be able to tell if anybody else had
20   went on it?
21   Q.  Yeah, if anyone had looked at this record.
22   A.  I don't believe so.
23   Q.  Okay.  Do you know Judy Harkins' title?
24   A.  She was lab tech.  And then now she's a file
25   clerk.

Page 47

1    Q.  Do you know if she's still employed with
2    Corizon?
3    A.  Yes, she is.
4    Q.  And then what is Deborah Ritter's title?
5    A.  LPN.
6    Q.  Is she still employed?
7    A.  I don't believe so.
8    Q.  I want to ask you about a few of the screens
9    that are in the MOCIS software.  Okay?
10   A.  Okay.
11   Q.  To the best of your recollection, what would
12   you see if you were to log on to a patient's
13   appointments list page?
14   A.  Normally, I believe -- I'm trying to visualize
15   it -- you would see -- well, you have to search a
16   specific date range to see the appointments that
17   would be listed during that range.  And then it
18   would say date and time, I think.  And then you
19   would have to click to go in to what the appointment
20   was for, but it might say who it was for off to the
21   side.  It's hard to visualize it without it being in
22   front of me, but that's --
23   Q.  That's fair.  I understand.
24       Would you consider the information on the
25   appointments list page as HIPAA information?

Page 48

1        MR. MATULA:  Object to the form of the
2    question.  Legal conclusion.  Go ahead.
3    A.  Well, we make appointment, like, dockets that
4    tell the offenders when to come over for
5    appointments that don't have any medical information
6    on them, just where to be and when.  But if you go
7    into it, then it would say what the person is being
8    seen for.  So you could access the HIPAA information
9    through it.
10   Q.  Okay.  So is that a yes?
11   A.  Tell me the question one more time.
12   Q.  Yeah.  And I'm going to ask you a few lead-ups
13   to the question, so let's just sort of break that
14   down here.  You have been a medical professional for
15   how long?
16   A.  Since 2006.
17   Q.  All right.  And you have been educated on what
18   HIPAA is, right?
19   A.  Yes.
20   Q.  In addition to the education you've received,
21   you've also been trained by Corizon on what HIPAA
22   means?
23   A.  Yes.
24   Q.  In addition to your education and your
25   training, would you also say that you have a working

12 (Pages 45 to 48)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 14 of 33

1  understanding of what information is protected by
2  HIPAA?
3      A.  Yes.
4      Q.  All right.  So as it pertains to the
5  information listed on the appointment list page, I
6  believe that you were describing that that's where
7  individuals' appointments are listed; is that right?
8      A.  Yes.
9      Q.  Okay.  And if all you can see are the
10  appointments for a patient, the question to you is,
11  would you consider that to be information protected
12  by HIPAA?
13      A.  Yes, if it's -- if you're not involved in
14  their care, yeah.
15      Q.  I'm going to ask you that same question as to
16  whether the information on a number of these list
17  pages within the MOCIS software is information that
18  you would consider to be protected by HIPAA.  Okay?
19      A.  Yes.
20      Q.  The information listed on the lab X-ray order
21  list page?
22      A.  Yes.
23      Q.  The offender medical summary page?
24      A.  Yes.
25      Q.  Offender military service details page?

1      A.  I don't know what that page consists of.  I
2  don't think I've ever seen it.
3      Q.  So it sounds like your answer is, you don't
4  know one way or the other if the information on that
5  page is --
6      A.  I don't know what information it contains, no.
7      Q.  Provider diagnosis list page?
8      A.  Yes.
9      Q.  Vital sign list page?
10      A.  Yes.
11      Q.  Outside information list page?
12      A.  Yes.
13      Q.  Physicals list page?
14      A.  Yes.
15      Q.  Allergy information list page?
16      A.  Yes.
17      Q.  Charting guide list page?
18      A.  Yes.
19      Q.  And I think we've covered that one already.  I
20  apologize.  What about the medication order list
21  page?
22      A.  Yes.
23      Q.  What about the treatment plan list page?
24      A.  Yes.
25      Q.  What about the lay-in restriction list page?

1      A.  It could, yes.
2      Q.  What about the mental -- I'm sorry, let me
3  start over.  What about the medical mental health
4  service request list page?
5      A.  Yes.
6      Q.  And lastly the provider diagnosis list page?
7      A.  Yes.
8      Q.  I'm going to recap just briefly,
9  Ms. Christopher.  There was one which you did not
10  know and that was the offender military service
11  details page, correct?
12      A.  Yes.
13      Q.  However, all of the others that I listed off
14  and you were answering yes to, it's your testimony
15  that those pages within the MOCIS software would
16  contain information that you would consider
17  protected by HIPAA?
18      A.  Yes, to the best of my knowledge.
19      Q.  I want to pick back up with your
20  discussion that -- or your testimony -- excuse me --
21  that individuals prior to you leaving in September
22  2017 knew of Ms. LaBlance's record.  After reviewing
23  any of the names over the last 30 minutes or so, do
24  you recall conversations between yourself and any of
25  those individuals about Ms. LaBlance and her

1  Department of Correction records?
2      A.  Specific conversations, no, but I remember
3  becoming aware that they said she had a record.  So
4  I don't remember specific conversations from that
5  far back.
6      Q.  Understood.  Do you remember who you were
7  referring to when you say "they"?
8      A.  Not specifically.  Probably the nurses I
9  worked with on evening shift at that time, but I
10  can't say specifically, without a doubt.
11      Q.  Do you recall whether or not anyone mentioned
12  looking at Ms. LaBlance's medical records prior to
13  you leaving in 2017?
14      A.  I don't recall.
15      Q.  What's the procedure for -- let me ask it this
16  way.  If someone accesses an individual's medical
17  records and that person is not treating the
18  individual with the medical records, is that person
19  supposed to self-report their accessing of the
20  medical record?
21      A.  Can you repeat the question?
22      Q.  Yeah.  It's a terrible question.
23      Here's what I'm trying to figure out.  If you
24  access someone's record who's not your patient, are
25  you responsible for self-reporting that you accessed

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 15 of 33

## Page 53

1  their medical record?
2       MR. MATULA: Object to the form of the
3  question. Vague.
4       Q. (By Mr. Nugent) Do you understand the
5  question, Ms. Christopher?
6       A. I do. If you're aware of a HIPAA violation,
7  you're supposed to report it.
8       Q. Okay. And if you're aware of that HIPAA
9  violation and you are the person who committed the
10  violation, are you supposed to report yourself?
11      A. I would believe so.
12      Q. Did you report yourself because of your
13  accessing of Ms. LaBlance's records to anyone?
14      A. Not at the time, but when I received my
15  write-up, I did admit to it. I didn't deny it.
16      Q. Okay. If you know of someone who has accessed
17  someone's medical record, is it also your
18  responsibility to report that person?
19      MR. MATULA: Object to the form of the
20  question.
21      Q. (By Mr. Nugent) You can answer.
22      A. Yes.
23      Q. All right. So let's use a specific example.
24  If you had known that Ms. Epperson or Ms. Kirby had
25  accessed Ms. LaBlance's medical information, in that

## Page 54

1  scenario would it be your obligation to report it?
2       MR. MATULA: Object to the form of the
3  question.
4       Q. (By Mr. Nugent) You can answer.
5       A. Yeah, I would have to make sure my supervisor
6  was aware.
7       Q. Have you ever made a report of someone
8  accessing medical records for -- let me start over.
9       Have you ever reported the inappropriate
10  accessing of a medical record?
11      A. Not that I recall.
12      Q. Are you aware of any reports like that made
13  during your employment at Corizon?
14      A. I mean, aside from the paper that you showed
15  me, no.
16      Q. Is the paper that you're referring to the
17  Exhibit 43 we've been looking at?
18      A. Yes.
19      Q. Okay. Had you seen Exhibit 43 before?
20      MR. MATULA: Object to the form of the
21  question. Vague. Before what?
22      Q. (By Mr. Nugent) Before today.
23      A. I saw it yesterday or something similar. I
24  can't say it's the exact same thing, but it was
25  similar if it wasn't the same.

## Page 55

1       Q. Prior to yesterday, had you seen the document
2  before?
3       A. No.
4       Q. When you accessed Ms. LaBlance's medical
5  record, was there anyone that was looking at your
6  computer screen when you did it?
7       A. No, I don't believe so.
8       Q. Okay. You mentioned that someone from Corizon
9  talked to you about accessing Ms. LaBlance's record
10  and you didn't deny it. Who was it from Corizon
11  that talked to you about accessing Ms. LaBlance's
12  record?
13      A. Initially, I believe Rhonda Almanza had told
14  us that people had, including Sterling and I. My
15  write-up came from Jenny and Sterling as my
16  supervisors.
17      Q. Would you repeat those names, Ms. Christopher?
18      A. My write-u[ -- the first -- Rhonda Almanza,
19  the one that I first -- Rhonda Almanza is the first
20  one that mentioned it. My write-up came from Jenny
21  Meehan and Sterling Ream as my supervisors.
22      Q. Do you know how to spell Rhonda's name,
23  please?
24      A. Rhonda? I think it's R-H-O-N-D-A. And I
25  think her last name is A-L-M -- hang on --

## Page 56

1  A-L-M-O-N-Z-A.
2       Q. Rhonda Almanza. Thank you. Outside of Rhonda
3  Almanza and Jenny Meehan, I think there was a third
4  name. Can you remind me of who that was?
5       A. Sterling Ream.
6       Q. So Sterling Ream sat in on your reprimand?
7       A. She was my immediate supervisor, yes.
8       Q. Do you know whether or not Ms. Ream was
9  reprimanded for the same thing?
10      A. She was.
11      Q. Okay. Outside of those three names, was there
12  anyone else from Corizon who had a conversation with
13  you about your accessing of Ms. LaBlance's records?
14      A. Makisa -- I believe Makisa from HR was also
15  present that day. I don't remember what she said,
16  but she was present.
17      Q. When did you first learn that you were being
18  reprimanded?
19      A. That day. That morning, I believe.
20      Q. Prior to the day that you were reprimanded,
21  did you have any conversations with anyone at
22  Corizon about your accessing Ms. LaBlance's record?
23      A. Not that I recall.
24      Q. Okay. During the conversation in which you
25  were reprimanded, did anyone ask you why you

14 (Pages 53 to 56)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 16 of 33

## Page 57

1  accessed Ms. LaBlance's record?
2      A. I don't recall.  I probably told them what
3  happened before they had a chance.
4      Q. I'll just ask you now.  Why did you access
5  Ms. LaBlance's record?
6      A. I don't know, honestly.  I guess -- I really
7  can't tell you exactly why.  They gave me the
8  number, said, "Look it up."  And I did.  I guess
9  maybe curiosity.  I didn't go any further into it,
10  though.  But I understand now that that was wrong.
11      Q. So I think if I understand you right, the
12  reason why you accessed Ms. LaBlance's record was
13  curiosity?
14      A. Yeah.  I mean, it wasn't -- I can't think of
15  any other word to describe it.
16      Q. Okay.  What were you curious about?
17      A. I really don't know.  I guess just what they
18  were talking about.  I'm not sure.
19      Q. And when you say "they," who is they?
20      A. Epperson and Kirby.
21      Q. Were you aware that Ms. LaBlance made a
22  complaint of discrimination in relation to her
23  interactions with a lab tech?
24      A. No, not at the time.  I didn't know when that
25  was, but I don't believe I was in a manager position

## Page 58

1  then.  I don't know that I even was there.
2      Q. Okay.  Are you aware of that complaint made by
3  Ms. LaBlance as we sit here today?
4      A. Vaguely.
5      Q. Do you know how you became aware of that
6  complaint by Ms. LaBlance?
7      A. I can't remember when I became aware of it,
8  honestly.  I would say it was when I was in
9  management.
10      Q. Okay.  So I understand you don't know the
11  when, but do you know the how, how you became aware
12  of Ms. LaBlance's complaint?
13      A. I would assume Sterling told me.  I think it
14  was something related to Judy with another employee
15  and just discussing Judy's attitude towards people
16  in general.
17      Q. And when you say Judy, are you referring to
18  Judy Harkins?
19      A. Yes.
20      Q. Okay.  And Judy Harkins is one of the
21  individuals who was on Exhibit 43.  Do you remember
22  that?
23      A. Yes.
24      MR. MATULA: Ivan, I know we've had some
25  breaks in here, but we're about two hours-ish, I guess

## Page 59

1  closing on it.  I don't know if you're at a breaking
2  spot or want to just kind of keep going to knock it out
3  since we're running behind or what your thoughts are.
4      MR. NUGENT: I was hoping to keep going and
5  knock it out because of the unplanned breaks we've had.
6  I believe I should be done right at 11, plus or minus
7  five minutes.
8      MR. MATULA: Tammie, are you comfortable
9  with that?  We've been going for a while, but we haven't
10  had a chance to get up.
11      THE WITNESS: Yes.
12      MR. MATULA: Okay.  As long as you're
13  comfortable.
14      Q. (By Mr. Nugent) Ms. Christopher, when you were
15  the director of nursing, what were your hours?
16      A. Usually 8 to 4:30.  It would vary some
17  depending on what was going on.
18      Q. And when you say "vary some," does that mean
19  you would start earlier or work later?
20      A. Either, depending on what was going on.
21      Q. Okay.  Ms. Christopher, have you looked up any
22  medical information for any other non-patients
23  besides Ms. LaBlance?
24      A. Not intentionally.  Occasionally an offender
25  will write a number on a HSR and I'll type it in and

## Page 60

1  it'll pop up.  And as soon as I realize it's not the
2  right person, I'll put in another one or, you know,
3  ask them to clarify their number.  Usually it's a
4  handwriting issue or just I get my numbers
5  transposed.
6      Q. Okay.  Have you ever looked up any other
7  records with the same curiosity that you had for
8  Ms. LaBlance's record?
9      A. Not that I recall.
10      Q. Did anyone from Corizon explain to you why you
11  were not being terminated?
12      A. They didn't explain to me why not.  They
13  explained to me why I was being written up and
14  having corrective action.
15      Q. Are you aware that Ms. Kirby and Dr. Epperson
16  were terminated?
17      A. Yes.
18      Q. Do you know why they were terminated?
19      A. I didn't see any documentation from why, but I
20  believe that it was because they went -- they dug
21  around deeper in the medical record.  But I can't
22  speak for sure to that because I wasn't part of
23  their termination process.
24      Q. On February 7th of 2019, was that the first
25  time you viewed any of Ms. LaBlance's Department of

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 17 of 33

## Page 61

1  Corrections records?
2  A. To the best of my recollection, yes.
3  Q. Was that the last time you viewed
4  Ms. LaBlance's Department of Corrections medical
5  records?
6  A. I believe so.
7  Q. Are you part of the team that hires nurse
8  practitioners?
9  A. No.
10  Q. Are you a part of the team that hires
11  registered nurses?
12  A. I was, when I was director of nursing.
13  Q. Okay. I appreciate that clarification.
14  Just to make the record clear, while you were
15  the director of nursing, were you responsible for
16  hiring registered nurses?
17  A. Registered nurses, yes.
18  Q. While you were the director of nursing, were
19  you responsible for hiring LPN nurses?
20  A. Yes. I wasn't the only one, but I would be in
21  on the interviews.
22  Q. Okay. During the process of hiring nurses,
23  does everyone go through a background check?
24  A. I believe the Department of Corrections does
25  one on everyone.

## Page 62

1  Q. When you were hired as the director of
2  nursing, did that come with an increase in pay from
3  your staff nursing position?
4  A. Yes.
5  Q. I've got another document I want to show you,
6  Ms. Christopher.
7  A. Okay.
8  Q. All right. Do you see a document titled
9  Corrective Action Form?
10  A. Yes.
11  Q. At the bottom I have premarked it as
12  Deposition Exhibit 45. It's Bates-labeled Corizon
13  1005.
14  A. Yes.
15  Q. I'll zoom in so we can sort of talk about it
16  section by section here. Is that your name at the
17  top?
18  A. Yes.
19  Q. At the beginning of your deposition, you
20  mentioned that you reviewed a few documents. Is
21  this one of the documents that you reviewed?
22  A. Yes.
23  Q. And the date of March 24, 2019, is that the
24  date that you were reprimanded?
25  A. I would have to see the bottom to see what day

## Page 63

1  I signed it. It looks like it was the 25th.
2  Q. So you received this reprimand on March 25th;
3  is that accurate?
4  A. Yes.
5  MR. MATULA: Ivan, can you widen it out just
6  a little bit to capture all the text on the right side?
7  MR. NUGENT: If I go that far, Mike, I'm not
8  sure if you can see it, but I'll certainly ask.
9  Q. (By Mr. Nugent) Ms. Christopher, can you see
10  the entire document?
11  A. I can see the whole thing. I can't read it,
12  though, the text.
13  Q. Okay. So I'm going to zoom back in and go
14  over it in parts because I understand you can't see
15  the wording. But to confirm, I was asking -- you
16  received this on March 25th; is that accurate?
17  A. Yes.
18  Q. Ms. Christopher, I want to point your
19  attention to the Details of Current Incident
20  paragraph. Do you see that?
21  A. Yes.
22  Q. And I'm going to read the second sentence. It
23  says, "The HIPAA privacy rule generally requires
24  Corizon Health to take reasonable steps to limit the
25  use and disclosure of PHI." What is PHI?

## Page 64

1  A. Personal health information.
2  Q. "To the minimum amount necessary to accomplish
3  this purpose."
4  Have I read that correctly, Ms. Christopher?
5  A. I believe so.
6  Q. Okay. Do you agree with that statement?
7  A. Yes.
8  Q. Could you lean into the microphone?
9  A. Yes. Sorry.
10  Q. The next sentence says, "Employees shall make
11  a reasonable effort to use and/or disclose only the
12  amount of personal health information which is
13  required to perform the essential job functions. By
14  accessing this patient's record for whom you were
15  not providing treatment, you violated the HIPAA
16  privacy rule."
17  What I'm wondering here, Ms. Christopher, is,
18  you mentioned that you were reprimanded for -- I'm
19  sorry -- that you were not terminated, but they told
20  you why you were reprimanded. Is it your opinion
21  that you have -- that you were reprimanded for
22  violating the HIPAA privacy rules?
23  A. Yes.
24  Q. After your reprimand, were you required to do
25  anything else?

16 (Pages 61 to 64)

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 18 of 33

Page 65

1    A.  Yes.  I had to complete HIPAA training on our
2    learning system, Corizon learning system.
3        Q.  Okay.  Did you complete that training?
4    A.  I did.
5        Q.  Did you complete it by March 31 of 2019?
6    A.  I did.  I don't remember what date it was, but
7    I know I did it before the deadline.
8        Q.  Do you know whether this Corrective Action
9    Form is still in your personnel file?
10   A.  I haven't looked at my personnel file, but I
11   wouldn't know why it wouldn't be.
12       Q.  One second, Ms. Christopher.
13   A.  Okay.
14       Q.  All right.  Ms. Christopher, I have tried to
15   share another document with you.  The first page of
16   it should be horizontal -- vertical on your screen.
17   If you turn it sideways, it's a photocopy of a
18   letter sent to Ms. LaBlance.  Do you have a document
19   on your screen?
20   A.  Yes.
21       Q.  Okay.  There also should be a 20, the number
22   20 in the bottom right-hand corner.  Do you see
23   that?
24   A.  Yes.
25       Q.  All right.  There are a number of pages here.

Page 66

1        My first question is, if we look at what is
2    Bates-numbered LaBlance 2 -- I am going to ignore
3    the handwriting there, but is this what the face
4    sheet looks like?
5    A.  Can you zoom in a little bit?  I believe it
6    is, but I just can't see it very well.  Yes.
7        Q.  I'll represent to you that this was a part of
8    a number of documents mailed to Ms. LaBlance.
9    There's handwriting there that's Dr. Epperson's.  My
10   question is, is this the -- when you accessed
11   Ms. LaBlance's face sheet, is the information that
12   appears here the information that you saw on your
13   computer screen?
14   A.  I would believe so.
15       Q.  Okay.  Were you aware that Ms. Epperson sent a
16   number of documents to Ms. LaBlance through the mail?
17   A.  I was not until later on.  I believe the day
18   that I got the write-up is the day that I was told
19   about that, from what I remember.
20       Q.  Do you recall who told you that?
21   A.  I want to say it was Rhonda Almanza, but I'm
22   not sure.
23       Q.  All right.  Were you surprised to learn that
24   Ms. Epperson had done that?
25   A.  Oh, yes.

Page 67

1        Q.  Why were you surprised?
2    A.  I just didn't know why anybody would do
3    something like that.
4        Q.  I've now moved to the next page in Exhibit 20.
5    It's LaBlance 3.  Does this information also look
6    familiar with regards to the MOCIS system?
7    A.  I don't know where that was -- I haven't seen
8    that.  There may be an additional information tab,
9    but I don't recall ever looking at it.  You just
10   kind of -- we use the same ones over and over, it
11   seems like, and I don't really pay attention to the
12   ones that we don't use on a functional level.
13       Q.  Understood.  Thank you.  Ms. Christopher, I'm
14   going to take just a moment to look through my notes
15   and see if I have anything else.  And also, let's
16   just take a five-minute bio break.
17       MR. VIDEOGRAPHER:  We are going off the
18   record.  The time is 10:59 a.m.
19           (Off the record.)
20       _____
21           (Back on the record.)
22       MR. VIDEOGRAPHER:  We are back on the
23   record.  The time is 11:10 a.m.
24       Q.  (By Mr. Nugent) Can you hear me okay,
25   Ms. Christopher?

Page 68

1    A.  Yes.
2        Q.  I'll just remind you, one, that you're under
3    oath and, two, to make sure you're staying close to
4    the microphone so that the court reporter can hear
5    you.
6        I want to finish up with a few questions.
7    First off, you accessed Ms. LaBlance's record in
8    early February, I belive, February 7th to be exact.
9    Are you aware that your husband, Mr. Christopher,
10   accessed Ms. LaBlance's records after you?
11   A.  Yes.  He told me he got a write-up for that.
12       Q.  Okay.  Did he tell you why he accessed the
13   record?
14   A.  Yes.
15       Q.  What was his response?
16   A.  He told me that Val Kirby came in his office
17   when he was working -- I think he was in Housing
18   Unit 1 -- and told him to look this up.  He just
19   said "told me all about it."  I don't know what she
20   told him, but that's how he found out.
21       Q.  Okay.  Did he say when that happened?
22   A.  No.  I don't remember.  He may have told me at
23   the time, but I don't remember when it was.
24       Q.  Okay.  I want to go back in time to 2017
25   before you left in, I believe, September.  Did you

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 19 of 33

## Page 69

1  have any conversations with the nightshift staff
2  that you felt like they shouldn't be having those
3  conversations about Ms. LaBlance and her prior
4  record at all?  Did you say anything like that?
5      A.  I don't remember.  I don't remember the
6  specific conversations, so I'm not sure.
7      Q.  Did you have any concerns about the fact that
8  your colleagues were talking about Ms. LaBlance's
9  prior criminal record?
10      A.  I mean, obviously, I know that they shouldn't
11  have been, but I didn't get the feeling that they
12  were being malicious about it.  It was just
13  something they'd heard.
14      Q.  Okay.  Did you know whether or not in 2017 if
15  individuals had accessed Ms. LaBlance's medical
16  records?
17      A.  I want to say I think I heard that some did
18  access something.  I don't know exactly what.  But
19  it's so long ago, I don't remember anything
20  specifically.
21      Q.  And was their accessing of Ms. LaBlance's
22  records in 2017 of any concern to you?
23          MR. MATULA:  Object to the form of the
24  question.  Go ahead.
25      A.  I just didn't give it a whole lot of thought,

## Page 70

1  honestly.  I was busy doing what I needed to do.
2      Q.  (By Mr. Nugent) Okay.  Ms. Christopher,
3  throughout this litigation, Corizon has informed me
4  of who has been reprimanded as a result of accessing
5  Ms. LaBlance's records.  I can tell you that they've
6  told me that you have been reprimanded, that
7  Sterling Ream has been reprimanded, Tabitha Johnson,
8  Deborah Ritter, and Jessica Frizzell.  My question
9  to you is, if I pull up Exhibit 43 that we were
10  looking at earlier, as you can see, Judy Harkins was
11  not reprimanded, but yet she accessed information
12  protected by HIPAA.  Does it concern you that you
13  were reprimanded and Judy Harkins was?
14          MR. MATULA:  Object to the form.  Go ahead.
15      A.  I mean, I didn't know that she did.  So I
16  guess up until this point, it wasn't concerning
17  because I don't believe I knew she did.  I don't
18  know why she wasn't and I was.  I don't know.
19      Q.  (By Mr. Nugent) Okay.  Well, I understand that
20  you didn't know up until this point.  Now that you
21  know, does that cause you any concern?
22          MR. MATULA:  Objection, vague.  Go ahead.
23      A.  I guess I'd have to have more detail into the
24  reasons why from the people that made the decision
25  before I could answer that.

## Page 71

1      Q.  (By Mr. Nugent) Okay.  Let me ask you this:
2  When you access MOCIS, what's the first screen that
3  pops up?
4      A.  The sign-in page.
5      Q.  After the sign-in page?
6      A.  I believe -- it's something I do so second
7  nature -- I believe it is just a page where you can
8  type in an offender number.
9      Q.  Sort of like a search page?
10      A.  Yes.
11      Q.  Let's say you type in an offender number and
12  you hit enter, what is then the next page that you
13  see?
14      A.  The face page, I believe.
15      Q.  Would you agree with me that accessing the
16  medication order list page that Ms. Harkins did
17  requires a step further than just putting in the
18  offender number?
19      A.  Yes.
20      Q.  Ms. Christopher, are there any questions of
21  mine that you would like to revisit?
22      A.  Not that I can think of.
23      Q.  Okay.  Have you -- I take it that you've
24  understood all of my questions today because you
25  have not -- or if you did ask, we've covered them.

## Page 72

1      A.  I asked for clarification on anything that I
2  didn't feel I understood, yeah.
3      Q.  Right.  And then, lastly, have you told the
4  truth today?
5      A.  Yes.
6          MR. NUGENT:  Thanks, Ms. Christopher.  I
7  have no further questions.
8          THE WITNESS:  Thank you, sir.
9          MR. MATULA:  Rachel?
10          MS. JAG:  I have no questions for
11  Ms. Christopher.  Thank you, though.
12          MR. VIDEOGRAPHER:  Is that it for everyone?
13  No more questions?
14          MS. JAG:  Yes, sir.  No further questions
15  for the DOC.
16          MR. MATULA:  Correct.  This is Mike Matula.
17  No questions at this time.  I will ask for the witness
18  to read and sign and you can send that through me.
19          MR. VIDEOGRAPHER:  That concludes today's
20  deposition of Tammie Christopher.  We're going off the
21  record.  The time is 11:20 a.m.
22          [The deposition was concluded at 11:20 a.m.]
23
24
25

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 20 of 33

## Page 73

```
 1              CERTIFICATE OF REPORTER
 2        I, Joann Renee Richardson, CCR, for the State of
 3   Missouri, do hereby certify that the deposition of
 4   TAMMIE CHRISTOPHER was held on November 4, 2020, via
 5   videoconference, State of Missouri, and was held on the
 6   time and in the place previously described.
 7
 8        IN WITNESS WHEREOF, I have hereunto set my hand
 9   and seal.
10
11
12              _____
13              Joann Renee Richardson, CCR
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 74

```
 1              ALARIS LITIGATION SERVICES
 2   November 20, 2020
 3   Mr.  Michael L. Matula
     Ogletree Deakins
 4   4520 Main Street, Suite 400
     Kansas City, Missouri 64111
 5
     IN RE: TERRI YOLANDA LABLANCE v. MISSOURI
 6        DEPARTMENT OF CORRECTIONS AND CORIZON HEALTH
 7   Dear Mr. Matula,
 8   Please find enclosed your copies of the deposition of
     TAMMIE CHRISTOPHER taken on November 4, 2020 in the
 9   above-referenced case. Also enclosed is the original
     signature page and errata sheets.
10
11
12   Please have the witness read your copy of the
13   transcript, indicate any changes or corrections
14   desired on the errata sheets, and sign the signature
15   page before a notary public.
16
17   Please return the errata sheets and notarized
18   signature page within 30 days to our office at 711 N
19   11th Street, St. Louis, MO 63101 for filing.
20
21   Sincerely,
22
23
24   Joann Renee Richardson
25
```

## Page 75

```
 1              ERRATA SHEET
     Witness Name: TAMMIE CHRISTOPHER
 2   Case Name: TERRI YOLANDA LABLANCE v. MISSOURI
              DEPARTMENT OF CORRECTIONS AND CORIZON HEALTH
 3   Date Taken: NOVEMBER 4, 2020
 4
 5   Page #_____  Line #_____
 6   Should read: _____
 7   Reason for change: _____
 8
 9   Page #_____  Line #_____
10   Should read: _____
11   Reason for change: _____
12
13   Page #_____  Line #_____
14   Should read: _____
15   Reason for change: _____
16
17   Page #_____  Line #_____
18   Should read: _____
19   Reason for change: _____
20
21   Page #_____  Line #_____
22   Should read: _____
23   Reason for change: _____
24
25   Witness Signature: _____
```

## Page 76

```
 1   STATE OF _____)
 2   COUNTY OF _____)
 3
 4   I, TAMMIE CHRISTOPHER, do hereby certify:
 5        That I have read the foregoing deposition;
 6        That I have made such changes in form
 7   and/or substance to the within deposition as might
 8   be necessary to render the same true and correct;
 9        That having made such changes thereon, I
10   hereby subscribe my name to the deposition.
11        I declare under penalty of perjury that the
12   foregoing is true and correct.
13        Executed this _____ day of _____,
14   20____, at _____.
15
16
17
18        _____
19        TAMMIE CHRISTOPHER
20
21        _____
22        NOTARY PUBLIC
23   My Commission Expires:
24   100180
25
```

19 (Pages 73 to 76)

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 21 of 33

## A

**A-L-M** 55:25
**A-L-M-O-N-Z-A** 56:1
**a.m** 2:10,10 5:10 7:8,13 31:23 43:16,21 44:21 44:24 45:14,17 67:18,23 72:21,22
**able** 18:25 45:9 46:15,19
**above-refere...** 74:9
**access** 11:2 26:4,10 40:1,5 42:23 48:8 52:24 57:4 69:18 71:2
**accessed** 16:9 27:1 31:22 46:16 52:25 53:16,25 55:4 57:1,12 66:10 68:7,10,12 69:15 70:11
**accesses** 52:16
**accessing** 16:7 26:12,14 52:19 53:13 54:8,10 55:9,11 56:13 56:22 64:14 69:21 70:4 71:15
**accomplish** 64:2
**accord** 8:19
**accurate** 8:4 11:20,23 25:1 63:3,16
**acronym** 14:1 24:6
**action** 4:8 60:14 62:9 65:8
**actively** 26:14
**ad** 18:19,23,23

**addition** 9:16 48:20,24
**additional** 9:13 67:8
**address** 31:18
**administrator** 19:16 36:19
**admit** 53:15
**African** 20:23 20:25 21:3
**ago** 12:5 26:18 69:19
**agree** 8:18 64:6 71:15
**AGREED** 5:1
**ahead** 24:21 26:21 30:24 31:10 48:2 69:24 70:14 70:22
**al** 8:8
**Alaris** 3:21 5:19 74:1
**Alex** 29:19 39:16,18
**all-inclusive** 25:9
**allegations** 7:25
**Allergy** 50:15
**allows** 9:23
**Almanza** 55:13 55:18,19 56:2 56:3 66:21
**altogether** 12:3
**Americans** 20:23,25 21:3
**amount** 64:2,12
**and/or** 64:11 74:13 76:7
**answer** 8:18 9:7 9:11,12 22:16 32:13 37:9,14 50:3 53:21 54:4 70:25
**answering** 51:14
**anybody** 24:13

**46:19** 67:2
**anymore** 44:12
**anyway** 37:2
**apologize** 50:20
**appears** 31:18 66:12
**appointment** 47:19 48:3 49:5
**appointments** 47:13,16,25 48:5 49:7,10
**appreciate** 61:13
**appropriate** 6:23
**April** 23:6 42:10
**as-needed** 26:8
**Ashton** 15:14
**aside** 54:14
**asked** 44:15 72:1
**asking** 45:4 46:2 63:15
**assistance** 8:19
**assistant** 3:10 42:19,20,22 43:2
**assistants** 44:8
**associate's** 14:24
**assume** 26:22 34:10 58:13
**attached** 4:9 33:4
**attended** 13:21
**attending** 6:9
**attention** 45:25 63:19 67:11
**attitude** 58:15
**attorney** 3:10 9:8
**attorneys** 5:22 10:16,19,21
**audit** 31:7

**Auditing** 4:7 30:7
**August** 13:6 21:7
**aware** 52:3 53:6,8 54:6 54:12 57:21 58:2,5,7,11 60:15 66:15 68:9

## B

**B** 4:5
**back** 7:11,12 11:18 18:10 20:9 22:13 30:21 37:14 43:19,20 44:23 45:16 45:22 51:19 52:5 63:13 67:21,22 68:24
**background** 61:23
**Baker** 29:7 41:20
**based** 18:20 30:4
**basically** 32:5
**basis** 26:8
**Bates-labeled** 30:16 62:12
**Bates-numbe...** 66:2
**bear** 45:1
**becoming** 52:3
**beginning** 62:19
**behalf** 1:13 2:17 6:2,4
**believe** 8:3 10:17 11:1 12:4 12:21 13:6,13 14:12 16:7,10 19:18 21:5,7,14 21:17 22:12,13

**23**:7,18,25
**24**:4,22 25:2
**25**:15 26:8
**28**:19,21,23
**28**:25 29:4,12
**29**:14 30:1,25
**32**:13 34:5,19
**35**:11,16 37:19
**40**:16,22 41:15
**42**:15,19 43:6
**43**:23 44:6,12
**46**:22 47:7,14
**49**:6 53:11
**55**:7,13 56:14
**56**:19 57:25
**59**:6 60:20
**61**:6,24 64:5
**66**:5,14,17
**68**:25 70:17
**71**:6,7,14
**belive** 68:8
**bell** 20:20
**belong** 33:8
**belonged** 33:13 33:17
**best** 47:11 51:18 61:2
**bio** 67:16
**birth** 32:6,16
**bit** 6:22 11:7 20:21 63:6 66:5
**black** 11:4
**bottom** 30:10 62:11,25 65:22
**Bower** 23:17
**Bradley** 23:10
**Brandon** 22:24 29:1 42:14
**Brandy** 29:7 41:20
**break** 8:12 44:15,22 45:15 48:13 67:16
**breaking** 59:1

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 4:19-cv-00693-BP    Document 67-2    Filed 12/03/20    Page 22 of 33

breaks 58:25
59:5
brief 43:23
briefly 51:8
bring 45:21
brought 20:7
27:14,21 28:8
29:25
building 17:14
17:22,22 18:7
18:9,17,21
20:13
bunch 9:6
Burris 29:9
41:16
busy 39:2 70:1

**C**

C 3:1
call 18:10 32:5
called 24:4
capacity 15:4
capture 32:13
63:6
care 17:9,11,19
17:23 18:6,13
19:3,4 22:11
32:8 40:3,7
49:14
Carol 29:17
40:23
case 1:7 2:5
5:13 7:24 8:2
8:8 15:20
74:9 75:2
cause 2:13
70:21
CCR 73:2,13
cell 6:19
center 13:3,5,8
15:16,23 20:10
certain 2:13
certainly 63:8
CERTIFICATE
73:1
Certified 2:12
5:4

certify 73:3
76:4
chain 14:21
36:20
chance 57:3
59:10
Chandler 5:18
change 75:7,11
75:15,19,23
changes 74:13
76:6,9
Chapman 20:19
charger 6:24
charting 31:22
32:3,15,19
50:17
check 61:23
Chillicothe 13:3
15:16,22 17:6
17:17 18:2 21:1
21:4
Chris 5:18
Christopher 1:12
2:8 4:8 5:11
7:17 10:18 15:11
15:14 30:18
31:12 32:10,18
43:22 45:10
45:18 51:9
53:5 55:17
59:14,21 62:6
63:9,18 64:4
64:17 65:12,14
67:13,25 68:9
70:2 71:20
72:6,11,20
73:4 74:8 75:1
76:4,19
City 3:4,8,11
74:4
clarification
61:13 72:1
clarify 10:17
20:24 60:3
clear 31:3,14
61:14
clearly 31:14

clerk 46:25
click 32:8 44:19
47:19
clinical 18:11
clinically 19:18
close 24:1 44:2
68:3
closed 34:10
closer 6:14
closing 34:10
59:1
CMS 11:14,25
12:4
collaborating
19:19 36:7
colleagues
69:8
come 17:18
18:25 20:15
37:14 48:4
62:2
comfortable
59:8,13
command 14:21
36:21
Commission
76:23
committed 53:9
common 20:16
companies 11:16
company 11:15
12:3,4,6
complaint
57:22 58:2,6
58:12
complaints
14:19
complete 65:1,3
65:5
computer 6:10
43:11 44:3
55:6 66:13
concern 20:5
69:22 70:12
70:21
concerning
70:16

concerns 20:4
20:6 69:7
concluded
72:22
concludes
72:19
conclusion 48:2
conduct 14:18
conference
5:16
confident 28:1
confirm 63:15
confusion 10:1
connection
43:24
consider 23:20
47:24 49:11,18
51:16
considered
19:22
consisted 14:3
consists 50:1
contact 14:20
contain 51:16
Contained
26:17
contains 50:6
continuous 14:7
14:13
conversation
21:9 34:16
35:9,15,20,23
35:25 36:4,10
36:11,13,17,18
36:23 37:4,16
38:24 56:12
56:24
conversations
9:13 10:18
35:7 37:22
38:4 51:24
52:2,4 56:21
69:1,3,6
copies 74:8
copy 74:12
Corizon 1:8 2:6
2:16 3:6 5:13

6:5,9 7:24 8:8
10:6,7 11:13,16
12:2,5,15,16
13:10 15:2 17:5
17:15,17 18:12
20:24 21:1,4,9
21:16 25:18
30:2,21 36:18
37:6,23 38:12
38:18 39:14
40:13,19,21
41:1,6,14 43:3
44:11 47:2
48:21 54:13
55:8,10 56:12
56:22 60:10
62:12 63:24
65:2 70:3
74:6 75:2
corner 65:22
corporate 6:9
correct 37:18
51:11 72:16
76:8,12
Correction 52:1
correctional
12:1 15:16,23
23:11,13,16
42:15
corrections 1:8
2:6,16 3:9
5:12 7:15,25
27:8 30:20
31:1 61:1,4,24
74:6,13 75:2
corrective 4:8
60:14 62:9
65:8
correctly 64:4
counsel 4:9 5:2
5:2
COUNTY 76:2
couple 38:24
court 1:1 2:1,12
2:14 3:20 5:4
5:14,21,24
9:16 32:12

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 23 of 33

44:3 68:4
covered 50:19
  71:25
CQI 14:6,8,12
criminal 69:9
criteria 25:6
crossed 11:5
  39:9
curiosity 57:9
  57:13 60:7
curious 57:16
Current 63:19

_____
        D
_____
D 4:1
daily 26:2
date 5:9 11:13,14
  27:13 32:6,16
  47:16,18
  62:23,24
  65:6 75:3
dates 46:9
day 2:11 6:25
  9:8 16:1,1
  20:17 21:13
  22:13 39:5
  56:15,19,20
  62:25 66:17
  66:18 76:13
day-to-day
  24:15 26:13
days 14:6 74:18
dayshift 38:16
deadline 65:7
Deakins 3:7
  10:16,19 74:3
Dear 74:7
Deborah 28:18
  40:8 47:4
  70:8
December 42:2
  42:3
decision 13:15
  70:24
declare 76:11
deeper 34:1
  60:21

Defendant 3:6
Defendants 1:9
  2:7,17 5:3
degree 14:24
demographics
  25:8,11,12
dental 17:11,23
  17:25 18:5,6
  19:3 20:10
  42:19,20,22
  43:2 44:8
deny 53:15
  55:10
department 1:7
  2:5,16 3:9
  5:12 7:15,25
  24:15 27:8
  30:19 31:1 52:1
  60:25 61:4,24
  74:6 75:2
depending
  59:17,20
deponent 5:22
deposition 1:12
  2:8 5:3,10,15
  5:20 6:3,5
  7:16 8:2 9:2
  10:14 30:16
  62:12,19
  72:20,22 73:3
  74:8 76:5,7,10
describe 36:11
  36:13 46:6
  57:15
described 73:6
describing 49:6
desired 74:14
detail 70:23
details 34:21,23
  49:25 51:11
  63:19
device 6:16
diagnosis 50:7
  51:6
different 12:3
  14:6,7,8,11
  17:22 18:4,24

20:6 27:1
  46:13
difficulties
  45:12
difficulty 43:23
directly 11:22
director 10:10
  11:8,10,23 12:9
  12:11,24 13:11
  13:15,18 14:1
  15:1 16:11 19:7
  19:15,20
  20:22 25:24
  44:16 59:15
  61:12,15,18
  62:1
discipline 14:16
disclose 64:11
disclosure
  63:25
discrimination
  20:2,7 57:22
discussing
  38:21 58:15
discussion
  10:15 51:20
display 9:23
dispute 31:7
  32:1 38:19
District 1:1,2 2:1
  2:1,14,14 5:14
dive 8:11
Division 1:3 2:2
  5:15
DOC 16:4 72:15
dockets 48:3
document 24:17
  30:7 45:22
  55:1 62:5,8
  63:10 65:15,18
documentation
  60:19
documents 9:21
  9:25 10:2,23
  10:25 62:20
  62:21 66:8,16
doing 6:21 70:1

DON 11:18 13:21
  13:25 14:4
  15:6
Doss 22:24
  29:1 42:14
doubt 38:19
  52:10
Dr 27:19,21 28:2
  28:12 34:19
  35:6,10,14
  36:5 37:4
  60:15 66:9
draw 45:25
dropped 43:10
  43:24
dug 60:20
duly 7:18
Dustin 23:8
duties 16:13
  24:16
duty 17:2

_____
        E
_____
E 3:1,1,11 4:1,5
earlier 24:3
  59:19 70:10
early 68:8
easier 6:22
easiest 30:5
educated 48:17
education 14:23
  48:20,24
effort 64:11
either 9:10
  27:18,20
  34:19 59:20
Eleventh 3:22
email 31:18
employed 12:16
  15:1 20:23,25
  21:16 39:14,21
  40:12,21 41:1,5
  41:10,14,18,22
  42:5,12 43:3
  47:1,6
employee 21:8
  22:12 30:2

58:14
employees
  13:20 14:16,19
  18:12 37:6
  64:10
employment 8:1
  11:19 16:4
  25:22 37:10
  54:13
enclosed 74:8
  74:9
enter 71:12
entire 63:10
entitled 30:7
entry 31:17 45:5
  45:25
Epperson 27:19
  27:21 28:2,12
  34:19 35:6,10
  35:14 36:5
  37:4,17 53:24
  57:20 60:15
  66:15,24
Epperson's
  66:9
errata 74:10,14
  74:17 75:1
essential 64:13
established
  31:8
et 8:8
evening 38:15
  38:24 39:3
  52:9
evenings 39:7
events 21:7
exact 27:24
  31:6 54:24
  68:8
exactly 12:6
  22:15 24:7
  31:9 34:8
  35:21 38:13
  57:7 69:18
EXAMINATION
  4:2 7:20
examined 2:9

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 24 of 33

7:18
example 53:23
excuse 51:20
Executed 76:13
exhibit 4:6 30:11
  30:11,16 45:5
  45:22 54:17
  54:19 58:21
  62:12 67:4
  70:9
Exhibits 4:9
Expires 76:23
explain 60:10
  60:12
explained 21:11
  60:13
expressly 5:6

**F**

face 16:7,9 27:3
  27:12 32:5
  33:18,19 34:3
  34:4 35:8
  37:6,23 40:2
  40:5 42:23
  66:3,11 71:14
facility 18:2,15
  19:2,5 21:1,4
fact 8:25 37:11
  38:21 69:7
facts 21:10
fair 25:24 47:23
familiar 21:6,10
  39:23 40:8
  67:6
fantasy 23:25
far 13:22 15:4
  16:20 34:1
  35:3,3 39:5
  52:5 63:7
feature 9:22
February 31:23
  37:17,18,22
  45:6 46:1
  60:24 68:8,8
feel 72:2
feeling 69:11

felt 36:16 69:2
figure 52:23
file 46:24 65:9
  65:10
filing 74:19
find 74:8
finish 68:6
first 7:18 8:12
  10:13 27:11
  42:1 46:2
  55:18,19,19
  56:17 60:24
  65:15 66:1
  68:7 71:2
five 59:7
five-minute
  67:16
fix 43:13
folks 18:5
follow-ups
  22:22
follows 7:19
football 23:25
foregoing 76:5
  76:12
form 4:8 24:20
  26:20 31:6
  37:7 48:1 53:2
  53:19 54:2,20
  62:9 65:9
  69:23 70:14
  76:6
formed 12:5
found 46:10
  68:20
frame 6:23
friends 23:20
  24:2
Frizzell 28:24
  42:16 43:5
  44:7,13 70:8
front 30:7
  45:23 47:22
full 10:11
fully 6:7 15:24
functional 67:12
functions 64:13

further 33:21,24
  33:25 57:9
  71:17 72:7,14

**G**

general 3:10
  58:16
generally 63:23
gist 27:25
give 8:7 25:9
  30:6 69:25
go 7:2 8:10
  12:24 13:2
  14:21 16:24
  18:19,22 19:3
  20:9 24:21
  26:21 30:24
  31:10 32:7,17
  33:12,21,24
  33:24 34:1
  43:12 47:19
  48:2,6 57:9
  61:23 63:7,13
  68:24 69:24
  70:14,22
goes 9:15
going 7:2,7 8:10
  9:5,5 20:14
  22:20,21
  28:14 30:4,14
  30:15,22 33:8
  43:15 44:20
  44:25 45:2,13
  48:12 49:15
  51:8 59:2,4,9
  59:17,20
  63:13,22
  67:14,17 72:20
Good 6:1 7:22
GPN 15:3,7
Graduate 15:8
Great 45:21
guess 31:3
  34:22 57:6,8
  57:17 58:25
  70:16,23
guidance 13:23

guide 31:22
  32:3,15,19
  50:17
guys 6:17

**H**

H 4:5
H-E-D-R-I-C-K
  13:8
hallway 18:8,11
Hamilton 29:11
  41:12
hand 73:8
handed 33:15
handwriting
  60:4 66:3,9
hang 55:25
happen 9:5
happened 22:4
  22:15 36:17
  57:3 68:21
happening 6:3
harassment
  19:24 20:2,7
hard 35:19 36:2
  47:21
Harkins 28:20
  58:18,20
  70:10,13 71:16
Harkins' 46:23
He'll 9:10
head 25:10,17
health 1:8 2:6
  2:16 5:13 6:5
  7:24 12:5 13:9
  15:2 17:21,24
  19:16 24:22
  25:7 26:23
  32:8,17 51:3
  63:24 64:1,12
  74:6 75:2
health-record...
  25:4
healthcare 10:6
  10:7 17:7,8,13
  17:15 24:17
  25:16

hear 43:8,24
  44:3 45:8,9,18
  67:24 68:4
heard 21:12,25
  22:2,11 39:1
  69:13,17
Hedrick 13:3,5,7
held 5:15,20
  14:25 73:4,5
help 32:12
hereunto 73:8
Hey 6:12
hi 20:14
highest 14:22
hindsight 32:20
  32:21
HIPAA 24:19
  25:5 32:19
  47:25 48:8,18
  48:21 49:2,12
  49:18 51:17
  53:6,8 63:23
  64:15,22 65:1
  70:12
hired 11:22 13:18
  62:1
hires 61:7,10
hiring 61:16,19
  61:22
history 31:7
hit 71:12
Holloway 29:17
  40:23
honestly 14:5,9
  32:24 33:15
  57:6 58:8 70:1
Hopefully 6:23
hoping 9:6
  32:12 59:4
horizontal 65:16
hospital 12:14
  13:2 46:11
hotspot 43:10
hours 2:10 10:12
  12:19 59:15
hours-ish 58:25
housed 24:9

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 25 of 33

housekeeping 8:11
houses 17:23
housing 18:24 68:17
HR 56:14
HSR 59:25
human 14:20 21:20
husband 68:9

_____
**I**
identify 22:16 30:14 33:7,10 33:12
ignore 66:2
II 15:20
immediate 19:12 20:3 56:7
immediately 12:24
improvement 14:7,13
inappropriate 54:9
Incident 63:19
include 17:9,11 17:13
including 55:14
increase 62:2
indicate 74:13
individual 52:18
individual's 52:16
individuals 23:23 44:8,10 51:21,25 58:21 69:15
individuals' 49:7
information 24:17 26:19 32:3,14,19 44:19 45:7 46:3,6,7,14,18 47:24,25 48:5

48:8 49:1,5,11 49:16,17,20 50:4,6,11,15 51:16 53:25 59:22 64:1,12 66:11,12 67:5 67:8 70:11
informed 70:3
Initially 55:13
inmate 19:3
inmates 18:6
instruct 9:11
instructs 9:12
intentionally 59:24
interact 20:10
interactions 57:23
interject 9:9
internet 43:11 43:23
interrogatory 31:1
interviewed 21:19
interviews 61:21
introduce 5:22
investigation 20:1
investigations 14:19
involved 49:13
issue 6:13 31:6 60:4
It'd 6:22
it'll 60:1
Ivan 3:3 6:1 7:22 30:22 58:24 63:5

_____
**J**
Jag 3:10 7:14,14 43:8,10 72:10 72:14
January 42:18 42:23
Jeff 23:12

Jenny 3:13 6:9 6:13,15 8:3,19 13:23 55:15 55:20 56:3
Jerry 43:7 44:15 45:5 46:1
Jessica 28:24 42:16 43:5 44:7,13 70:8
Joann 2:11 3:21 5:4,17 73:2,13 74:24
job 14:9 15:4 16:12,13 17:1 26:13 39:23 40:10 64:13
jobs 18:14
Johnson 29:13 41:8 70:7
judging 37:19
Judy 28:20 46:23 58:14 58:17,18,20 70:10,13
Judy's 58:15
juiced 6:25
July 11:12,18,20 12:10,23 13:19 19:8,8,23,24 25:18,23
June 38:18

_____
**K**
Kansas 3:4,8,11 74:4
keep 6:24 59:2 59:4
Kelley 20:19
kind 59:2 67:10
Kirby 27:19,21 28:2,12 35:14 37:4,16 53:24 57:20 60:15 68:16
knew 22:11 25:24 27:7 33:17 34:6

36:19 37:6 44:15 51:22 70:17
knock 59:2,5
know 8:13,16 9:9,24 10:22 15:19,21,24 16:1,2,6,9 18:20 19:17 20:19 22:10,15 22:20,24,25 23:2,3,4 24:7 24:9,11,11,12,15 24:18 25:3 27:24 28:8,10 35:19,21 36:6 36:8 37:5,11 38:1,21 39:5 39:12,16,21 40:10,12,15,17 40:20,25 41:5 42:3,5,8,14,16 43:7 44:18 46:17,23 47:1 50:1,4,6 51:10 53:16 55:22 56:8 57:6,17 57:24 58:1,5 58:10,11,24 59:1 60:2,18 65:7,8,11 67:2 67:7 68:19 69:10,14,18 70:15,18,18,20 70:21
knowledge 51:18
known 53:24
Koenig 23:4
Krigel 3:3,3

_____
**L**
L 3:6 74:3
lab 17:19 46:9 46:24 49:20 57:23
LaBlance 1:5

2:2,15 6:2 7:23 8:7 19:9 19:17 20:22 21:9 27:4,7 38:8,11,17,22 39:3,8 40:2,6 42:23 51:25 57:21 58:3,6 59:23 65:18 66:2,8,16 67:5 69:3 74:5 75:2
LaBlance's 27:1 27:12 31:22 35:8 37:23 51:22 52:12 53:13,25 55:4 55:9,11 56:13 56:22 57:1,5 57:12 58:12 60:8,25 61:4 66:11 68:7,10 69:8,15,21 70:5
lastly 8:22 28:11 51:6 72:3
late 39:10
lay-in 50:25
lead-ups 48:12
league 24:1
lean 64:8
learn 56:17 66:23
learning 22:8 65:2,2
leave 21:17
leaving 38:7 51:21 52:13
LeBlance 5:12
left 11:15,17 37:10 38:9,14 39:10,11 44:6 68:25
legal 5:18 48:2
let's 11:9 26:18 48:13 53:23 67:15 71:11

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 26 of 33

letter 65:18
level 14:23
  67:12
Licensed 15:10
limit 63:24
Line 75:5,9,13
  75:17,21
lines 11:5
list 22:21 25:9
  28:14 31:22
  32:3,15,19
  44:19 45:7
  46:3,7,8,14,18
  47:13,25 49:5
  49:16,21 50:7
  50:9,11,13,15
  50:17,20,23
  50:25 51:4,6
  71:16
listed 46:12
  47:17 49:5,7
  49:20 51:13
litigation 3:21
  5:19 70:3 74:1
little 6:22 11:7
  20:21 63:6
  66:5
local 12:14
log 4:7 6:16,20
  11:2,4 30:18
  31:7,22 47:12
logged 6:7
logistical 6:6
logistics 9:14
  20:9
Logs 30:7
long 14:10 15:17
  20:18 26:23
  34:21,23
  48:15 59:12
  69:19
look 10:25
  24:17 27:15
  27:22 45:4
  57:8 66:1 67:5
  67:14 68:18
looked 27:11

33:6 34:4
  45:6 46:2,21
  59:21 60:6
  65:10
looking 6:7
  9:24 33:10,16
  33:18,19 34:3
  52:12 54:17
  55:5 67:9
  70:10
looks 31:14 63:1
  66:4
Lori 29:3 42:8
lot 38:14,15
  69:25
Louis 3:22
  74:19
Lovelace 43:7
  44:15 46:1
Lovelace's 45:5
LPN 15:4,9 16:18
  39:19,23 40:1
  40:11,19,24
  41:9,13,17,21
  42:9,10 47:5
  61:19
LPNs 16:14,16
Luke's 13:9
lunchroom
  21:25 22:2
Lybarger 23:8

_____

**M**

M-O-C-I-S 24:4
mail 66:16
mailed 66:8
Main 3:4,7 74:4
major 31:5
Makisa 56:14,14
malicious 69:12
management
  12:13 19:21,22
  22:14,18,19
  58:9
manager 15:20
  57:25
manner 31:9

March 13:13
  62:23 63:2,16
  65:5
married 15:11
matter 5:11
Matula 3:6 6:4
  6:4,15,21 7:4
  9:8 24:20
  26:20 30:22
  31:5 37:7 48:1
  53:2,19 54:2
  54:20 58:24
  59:8,12 63:5
  69:23 70:14
  70:22 72:9,16
  72:16 74:3,7
MDOC1940
  30:17
mean 16:21
  18:16 20:17
  23:21 25:4,12
  25:16 32:22
  35:19 36:5
  38:2 54:14
  57:14 59:18
  69:10 70:15
means 15:21
  36:3 48:22
medical 12:1
  13:3,5,8 17:9
  17:16,19,23
  18:1,13 19:1,4
  20:10 24:12,15
  44:16 48:5,14
  49:23 51:3
  52:12,16,18,20
  53:1,17,25
  54:8,10 55:4
  59:22 60:21
  61:4 69:15
medication
  25:8 50:20
  71:16
Meehan 3:13
  6:9,14,19 7:1
  8:3,20 55:21
  56:3

Megan 28:22
  29:21 39:12
  43:1,3 44:7,12
mental 17:13,15
  17:21,24 51:2
  51:3
mention 25:11
mentioned
  17:21 32:25
  36:8 38:7
  52:11 55:8,20
  62:20 64:18
mentioning
  37:13
merged 11:16
  12:4,7
Meyer 29:21
  39:12
Michael 3:6
  74:3
microphone
  64:8 68:4
Mike 6:4,12 9:8
  63:7 72:16
military 49:25
  51:10
mind 6:21
Mindy 23:15
mine 71:21
minimum 64:2
minus 59:6
minutes 51:23
  59:7
Missouri 1:2,7
  2:1,5,13,15 3:8
  3:11 5:12,14
  73:3,5 74:4,5
  75:2
misstating
  30:24
MO 3:4,22
  74:19
MOCIS 11:3
  24:4,4,10,16
  24:24 25:2,16
  25:19,25 26:2
  26:4,12 33:12

33:25 46:4
  47:9 49:17
  51:15 67:6
  71:2
moment 67:14
months 11:17
morning 6:1
  7:22 20:13
  56:19
mouse 31:17
moved 67:4
muted 45:7,8

_____

**N**

N 3:1 4:1 74:18
name 5:17,18
  7:22 12:2
  15:13 22:17
  23:12 31:18
  32:6,16 33:4,9
  42:1 44:6
  55:22,25
  56:4 62:16
  75:1,2 76:10
names 22:21,22
  23:19,23
  28:14 51:23
  55:17 56:11
nature 36:4 71:7
necessary 64:2
  76:8
need 8:12 45:21
needed 36:16
  70:1
Nicholas 23:4
nightshift 69:1
non-patients
  59:22
Normally 47:14
North 3:22
NOS 4:6
notarized 74:17
notary 74:15
  76:22
note 27:14,21
  28:8 30:1 33:3
  33:6,7,11

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 27 of 33

notes 67:14
notice 11:6
November 1:14
2:9 5:9 73:4
74:2,8 75:3
Nugent 3:3 4:3
6:1,1,12 7:5,6
7:21,22 10:17
10:20 24:23
26:25 30:14
30:18,25 31:11
31:12 37:9
43:9,14,22
44:25 45:11,18
53:4,21 54:4
54:22 59:4,14
63:7,9 67:24
70:2,19 71:1
72:6
number 25:14
27:14 30:1
32:6,16,23
33:2,3,13
49:16 57:8
59:25 60:3
65:21,25 66:8
66:16 71:8,11
71:18
numbers 27:22
28:8 60:4
nurse 10:8,8,9
10:11 12:21,22
15:1,5,5,8,10
18:19,22 39:4
61:7
nurses 16:12,14
16:18,18,19
17:2 38:24
52:8 61:11,16
61:17,19,22
nursing 10:10
11:9,11,23 12:9
12:12,24 13:11
13:16,18 14:1
15:1 16:11 19:7
19:15,21 20:22
25:24 59:15

61:12,15,18
62:2,3

_____

O
oath 8:23 68:3
object 24:20
26:20 30:22
37:7 48:1 53:2
53:19 54:2,20
69:23 70:14
Objection
70:22
obligation 54:1
obviously 69:10
Occasionally
59:24
offender 17:7
49:23,25
51:10 59:24
71:8,11,18
offenders 18:25
48:4
office 20:15
34:6 35:10,12
35:15 37:3,16
68:16 74:18
officer 22:25
23:7,9,11,13,16
23:18 42:15
offices 18:16
Ogletree 3:7
10:16,19 74:3
Oh 66:25
okay 7:5 10:5,13
10:25 11:22
12:8,16,23
13:7 14:15 16:2
17:8,16,25
18:8,18 19:11
19:20 20:5,19
21:3,15 22:22
22:23 23:4,17
24:6 25:3,23
26:25 27:4
28:7,16,17
30:10 32:11,21
33:2,16 34:3

35:1,11,23
36:8,22 37:14
37:21 38:7,17
39:3,12 40:8
40:20 42:16
42:22 43:25
44:5,14 45:19
46:6,13,23
47:9,10 48:10
49:9,18 53:8
53:16 54:19
55:8 56:11,24
57:16 58:2,10
58:20 59:12
59:21 60:6
61:13,22 62:7
63:13 64:6
65:3,13,21
66:15 67:24
68:12,21,24
69:14 70:2,19
71:1,23
ones 24:11
67:10,12
opinion 32:18
64:20
optometry 17:18
order 33:12
49:20 50:20
71:16
original 11:14
74:9
outside 23:21
23:24 26:5,10
35:5,9 37:3
44:19 45:7
46:3,7,10,14,18
50:11 56:2,11

_____

P
P 3:1,1
P.C 3:3
page 4:2,6
31:23 32:4,5
32:15,19 42:2
44:19 45:7
46:3,7,8,15,19

47:13,25 49:5
49:21,23,25
50:1,5,7,9,11
50:13,15,17,21
50:23,25 51:4
51:6,11 65:15
67:4 71:4,5,7
71:9,12,14,16
74:10,15,18
75:5,9,13,17,21
pages 49:17
51:15 65:25
paper 16:8
54:14,16
paragraph
63:20
Parque 23:12
23:25
part 13:8 16:12
16:15,24 17:1
17:19 25:15,16
36:15 60:22
61:7,10 66:7
partially 30:23
parties 5:23
parts 24:22,24
24:25 63:14
passing 23:22
patient 26:17
27:5,7 46:5
49:10 52:24
patient's 25:8
47:12 64:14
patients 26:14
pay 62:2 67:11
penalty 76:11
pending 2:13
people 20:17
22:3 26:9
28:16 35:17
37:11 55:14
58:15 70:24
percent 27:18
28:3,5 35:16
35:18
perform 64:13
perjury 76:11

person 29:25
30:2 48:7
52:17,18 53:9
53:18 60:2
personal 64:1
64:12
personally 23:1
personnel 16:19
16:21 65:9,10
pertains 49:4
PHI 63:25,25
Phillip 23:17
phone 6:19
Phonetic 23:12
photocopy
65:17
Physicals 50:13
physician 19:19
36:7 44:17
pick 51:19
picture 32:6,16
place 73:6
Plaintiff 1:13 2:3
2:15,17 5:2
6:2 7:23
Plaintiffs 1:6 3:2
plan 50:23
please 31:15
55:23 74:8,12
74:17
plus 59:6
point 9:22 12:5
24:1 27:8
34:11 35:21
36:13 63:18
70:16,20
policy 19:24
pop 20:13 60:1
pops 71:3
population 17:7
portion 18:1,14
19:2,4
position 19:20
19:21 22:14
57:25 62:3
possible 38:3
45:3

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 28 of 33

Post-it 27:14,21
28:8 33:3,6,7
33:11
practical 15:8,10
practitioners
61:8
premarked
62:11
prepare 10:14
preparing 10:23
present 3:13
8:6 26:19,22
35:7 56:15,16
pretty 20:16
previous 12:2
25:22
previously
25:21 73:6
prior 38:7 51:21
52:12 55:1
56:20 69:3,9
privacy 63:23
64:16,22
PRN 10:11 12:14
12:18,25 38:14
41:15
probably 6:22
46:8 52:8
57:2
problem 31:8
procedure
52:15
proceed 5:25
proceeding 6:6
proceedings
44:22 45:15
process 60:23
61:22
produced 2:9
7:18
professional
48:14
protected 24:19
24:25 25:5
49:1,11,18 51:17
70:12
provide 16:19

17:7 18:5,12
provided 30:19
30:21 31:7
provider 50:7
51:6
providers 17:25
18:1
provides 17:5,15
17:17
providing 40:3
40:7 64:15
public 25:13
74:15 76:22
pull 30:5 70:9
pulled 27:3
32:23 37:20
purpose 64:3
put 60:2
putting 71:17

_____

**Q**

quality 14:7,13
question 6:6
20:24 24:21
26:21 32:9,14
33:23 37:8,15
45:9 46:13
48:2,11,13
49:10,15 52:21
52:22 53:3,5
53:20 54:3,21
66:1,10 69:24
70:8
questions 7:21
8:11,16,18 9:6
68:6 71:20,24
72:7,10,13,14
72:17
quick 30:15
44:14 45:22
quickly 43:13
45:2

_____

**R**

R 3:1
R-H-O-N-D-A
55:24

Rachel 3:10 7:14
29:15,23
40:17 41:3
72:9
racial 21:8,20
21:23
raises 6:12
range 47:16,17
read 28:14 63:11
63:22 64:4
72:18 74:12
75:6,10,14,18
75:22 76:5
real 30:14 43:13
realize 60:1
really 32:23
36:12 38:15
39:1 45:22
57:6,17 67:11
Ream 19:13
22:18 29:5
34:5,15 35:6
35:12 36:22
37:5,17 42:2
55:21 56:5,6
56:8 70:7
reason 32:1
38:19 40:1,4
42:22 57:12
75:7,11,15,19
75:23
reasonable
63:24 64:11
reasons 70:24
recall 14:15,17
20:8 21:2,19
21:23 35:9
37:2,25 38:11
51:24 52:11,14
54:11 56:23
57:2 60:9
66:20 67:9
recap 51:8
receive 13:19
19:3,4,24
25:19
received 11:1

25:21 32:24
48:20 53:14
63:2,16
recollection
47:11 61:2
record 5:8 6:8
6:11 7:3,7,9,11
7:13 9:10 11:2
24:22 25:7,8
25:14 30:24
32:8,17 33:7
33:12,17 34:2
38:9,22 43:13
43:16,17,19,21
44:21,23
45:13,17 46:16
46:21 51:22
52:3,20,24
53:1,17 54:10
55:5,9,12
56:22 57:1,5
57:12 60:8,21
61:14 64:14
67:18,19,21,23
68:7,13 69:4,9
72:21
recorded 9:18
recording 9:17
records 24:9,18
24:24 26:13
26:14,23 27:2
30:4 35:8
46:11 52:1,12
52:17,18 53:13
54:8 56:13
60:7 61:1,5
68:10 69:16
69:22 70:5
refer 13:25
30:16
referenced
21:21 24:3
referring 31:2
52:7 54:16
58:17
regards 16:3
17:8 22:22

33:25 67:6
registered 10:8
12:22 16:18
61:11,16,17
regularly 18:5
related 8:1
58:14
relation 57:22
release 15:25
remember 12:6
14:5,10,20
22:5 27:13
28:5 33:5,9,14
34:8,18,21,23
35:3,24 36:7
37:12 38:2,5,6
38:13,23,25
39:19 52:2,4
52:6 56:15
58:7,21 65:6
66:19 68:22
68:23 69:5,5
69:19
remind 38:9
44:2 56:4
68:2
Rempel 29:15
41:3
render 76:8
Renee 2:11 3:21
5:4 73:2,13
74:24
repeat 13:4
52:21 55:17
report 18:13
19:11 20:3
36:16 53:7,10
53:12,18 54:1
54:7
reported 19:17
22:1,10,18
36:23 54:9
reporter 2:12
3:20 5:5,21
5:24 9:16
32:13 44:3
68:4 73:1

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 29 of 33

reporter's 5:17
reports 54:12
represent 5:23
 7:23 30:20
 66:7
representative
 6:10
representing
 7:15
reprimand 13:14
 17:2 56:6
 63:2 64:24
reprimanded
 13:13 16:3,6
 34:24 35:2
 56:9,18,20,25
 62:24 64:18
 64:20,21 70:4
 70:6,7,11,13
request 51:4
required 64:13
 64:24
requirement
 16:13
requirements
 14:9
requires 63:23
 71:17
reserved 5:6
resources 14:21
 21:20
response 22:6
 68:15
responses 31:2
responsibilities
 14:11 39:24
responsibility
 53:18
responsible
 19:8 52:25
 61:15,19
restriction
 50:25
result 70:4
results 30:8
 46:10,10
retained 4:9

26:23
return 74:17
review 10:23
 16:21
reviewed 11:4
 62:20,21
reviewing 31:1
 51:22
reviews 16:19
 16:22
revisit 71:21
Rex 28:22 43:1
 43:3 44:7,12
Rhodes 23:15
Rhonda 55:13
 55:18,19,24
 56:2,2 66:21
Rhonda's 55:22
Richards 23:10
Richardson 2:11
 3:21 5:4,17
 73:2,13 74:24
right 9:2,21
 13:25 14:22
 14:24 15:7
 16:17 19:2
 22:16,20 23:2
 24:14 26:4
 27:2,5,9,11,20
 28:1 29:25
 31:17,21 33:17
 34:11,24 35:12
 38:20 39:8
 39:24 42:6
 44:2,14 45:21
 48:17,18 49:4
 49:7 53:23
 57:11 59:6
 60:2 62:8
 63:6 65:14,25
 66:23 72:3
right-hand
 65:22
ring 20:20
Ritter 28:18
 40:8 70:8
Ritter's 47:4

RN 39:20,20,23
 40:1 41:4,13
 42:4
RNs 16:14,16
role 11:8,9 15:22
room 5:21 8:4
 34:5,15,20
 35:5 36:20
rounds 20:12
rule 63:23
 64:16
rules 64:22
running 59:3

_____

**S**

S 3:1 4:5
safe 28:7 33:16
 34:16
Saint 13:9
sat 56:6
saw 33:2 54:23
 66:12
saying 33:24
 35:24
says 30:11
 63:23 64:10
scanned 46:11
scenario 54:1
screen 6:8,18
 9:23 31:14
 46:16 55:6
 65:16,19 66:13
 71:2
screens 47:8
seal 73:9
search 30:8
 47:15 71:9
second 21:12
 30:6 63:22
 65:12 71:6
secondly 8:15
section 62:16,16
security 25:14
see 6:13 9:25
 16:8 18:4
 20:14 30:6,9
 30:11 31:13,16

31:19,23
 32:25 38:5,15
 42:1 43:13
 44:18 45:22
 46:15 47:12,15
 47:16 49:9
 60:19 62:8,25
 62:25 63:8,9
 63:11,14,20
 65:22 66:6
 67:15 70:10
 71:13
seen 32:14 48:8
 50:2 54:19
 55:1 67:7
seg 18:19,23,23
segregation
 15:25 18:24
self-report
 52:19
self-reporting
 52:25
send 72:18
sent 65:18
 66:15
sentence 63:22
 64:10
separate 17:14
 18:16
separately 6:16
September 21:7
 21:17 38:9
 51:21 68:25
series 46:9
serious 36:4
service 49:25
 51:4,10
services 3:21
 5:19 12:1 17:5
 17:17 19:16
 74:1
set 21:10 73:8
Shannon 29:9
 41:16
share 65:15
shared 34:6
 35:12

she'd 39:11
sheet 16:7,9
 27:3,12 33:18
 33:19 34:3,4
 35:8 37:6,24
 40:2,5 42:23
 66:4,11 75:1
sheets 74:10,14
 74:17
shift 38:25 39:3
 52:9
shifts 38:15
shock 36:1
shocked 22:7
shorthand 5:4
shortly 16:3
show 9:21 62:5
showed 54:14
showing 11:2
side 18:11 47:21
 63:6
sideways 65:17
sign 50:9 72:18
 74:14
sign-in 71:4,5
signature 5:6
 74:10,14,18
 75:25
signed 63:1
similar 54:23
 54:25
simply 31:2
Sincerely 74:21
sir 72:8,14
sit 6:14 58:3
site 19:22
slightly 30:23
slur 21:8,20,24
 22:9
social 25:14
socialize 23:24
software 24:3
 24:10 26:17
 33:25 46:4
 47:9 49:17
 51:15
somebody 22:5

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 30 of 33

27:13 28:11
someone's
    36:3 45:6
    46:3 52:24
    53:17
somewhat 6:12
soon 22:10 60:1
sorry 7:6 25:10
    37:18 51:2
    64:9,19
sort 8:10 36:9
    48:13 62:15
    71:9
sounds 38:20
    50:3
speak 60:22
specific 47:16
    52:2,4 53:23
    69:6
specifically
    14:17 31:21
    37:13 52:8,10
    69:20
spell 13:7 55:22
Spencer 29:19
    39:16
Spencer's 39:18
spot 59:2
spouse's 15:13
squared 10:2
St 3:22 74:19
staff 10:8,9,11
    12:21 15:1,5,5
    20:11 38:16,16
    62:3 69:1
stand 11:25
    14:12
stands 24:8
start 11:9,13,14
    51:3 54:8
    59:19
started 11:20
    13:5 15:3
    19:23,23
    25:18,22 38:11
    38:13,17
state 2:12

26:24 73:2,5
    76:1
statement
    30:23 64:6
States 1:1 2:1,14
    5:14
stating 31:3
status 12:18,25
stay 39:10 44:2
stayed 12:14
staying 68:3
step 13:10,15
    71:17
stepped 12:23
steps 63:24
Sterling 16:23
    19:12 22:10,18
    29:5 34:5,7,15
    35:5,12 36:22
    37:5 42:2
    55:14,15,21
    56:5,6 58:13
    70:7
sticker 30:11
sticky 29:25
stint 11:19 25:22
stipulate 5:24
    6:3,5 7:16
STIPULATED
    5:1
stop 12:8,11
Street 3:4,7,11
    3:22 74:4,19
stress 12:13
Stuver 29:23
    40:17
submitted
    30:15
subscribe 76:10
substance 76:7
sued 7:24
Suite 3:4,7,11
    74:4
summary 49:23
supervise 13:20
    16:16
supervised 17:2

supervising
    19:9
supervision
    16:12,17
supervisor 19:12
    20:4 54:5
    56:7
supervisors
    55:16,21
supervisory
    13:23
supposed
    52:19 53:7,10
sure 6:8 8:14
    9:14 17:20
    19:25 22:14
    24:7 26:9,23
    27:18 28:5,10
    31:13 33:22
    34:20 36:2
    37:15 54:5
    57:18 60:22
    63:8 66:22
    68:3 69:6
surprise 36:2,14
surprised 36:6
    36:8,15 66:23
    67:1
swear 5:24
Switzer 29:3
Switzer's 42:8
sworn 2:9 7:18
    8:22
system 11:3 13:9
    24:3,10,16,19
    24:24 25:2
    25:20,25
    26:2,5,12
    65:2,2 67:6

———— T ————

T 4:5
tab 67:8
Tabitha 29:13
    41:8 70:7
tabs 32:7,17
take 8:1 10:1

44:14 63:24
    67:14,16 71:23
taken 1:13 2:17
    5:3 7:16 9:3
    22:11 74:8
    75:3
talk 11:7 20:15
    20:21 23:21
    38:8 62:15
talked 10:21
    15:22 22:17
    37:11 55:9,11
talking 22:3
    34:20 57:18
    69:8
Tammie 1:12 2:8
    4:8 5:11 6:23
    7:17,22 10:20
    24:21 26:21
    30:6 59:8
    72:20 73:4
    74:8 75:1 76:4
    76:19
Tara 13:23
Taylor 13:24
team 61:7,10
tech 39:13 40:4
    40:5 46:24
    57:23
technical 43:23
    45:12
tel 3:5,8,12
tell 8:23,25
    10:21 14:3,22
    18:23 25:6,11
    25:17 28:15
    31:15 34:4
    36:22 37:1
    46:19 48:4,11
    57:7 68:12
    70:5
ten 26:18
Teresa 29:11
    41:12
terminated
    22:13 60:11,16
    60:18 64:19

termination
    60:23
terms 5:24
Terri 1:5 2:2,14
    5:11 6:2 7:23
    8:7 19:9,11,17
    20:21 27:1,4
    40:2,5 42:23
    74:5 75:2
Terri's 16:10
terrible 52:22
testified 7:18
testimony 8:7
    24:24 51:14
    51:20
text 63:6,12
Thank 56:2
    67:13 72:8,11
Thanks 72:6
thereon 76:9
they'd 69:13
thing 31:5
    54:24 56:9
    63:11
things 8:11 14:6
    14:8 18:20
think 21:25
    22:25 23:11,13
    27:17,18 28:3
    28:15,18
    30:23 31:6,8
    35:6 36:1,1,12
    38:23 39:1
    45:11 47:18
    50:2,19 55:24
    55:25 56:3
    57:11,14 58:13
    68:17 69:17
    71:22
thinking 32:24
    33:3
third 56:3
thirdhand 21:12
thought 69:25
thoughts 59:3
three 56:11
time 5:9 7:8,13

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 31 of 33

10:2,12 20:22
22:15,19 27:11
31:9 35:1,17
35:22 37:21
38:14 39:6
43:16,21 44:21
44:24 45:14,17
47:18 48:11
52:9 53:14
57:24 60:25
61:3 67:18,23
68:23,24
72:17,21 73:6
timeline 11:10
times 9:7
title 10:9 12:21
15:19 19:14
30:9 39:18
40:10,18 42:3
42:8,18 46:23
47:4
titled 62:8
titles 14:25
today 8:2,7,25
10:23 54:22
58:3 71:24
72:4
today's 5:9,20
10:14 72:19
told 21:23 22:5
33:14 38:17
55:13 57:2
58:13 64:19
66:18,20 68:11
68:16,18,19,20
68:22 70:6
72:3
tone 35:23,25
36:3,9
top 25:9,17
62:17
trained 48:21
training 13:19,21
13:22 14:3,16
14:18 25:19,21
48:25 65:1,3
transcribed 5:5

transcript 74:13
transposed
60:5
treated 26:18
treating 26:15
52:17
treatment
50:23 64:15
tried 26:10
65:14
trouble 37:12
true 76:8,12
truth 8:23,25
72:4
try 34:1 45:2
trying 27:17
47:14 52:23
turn 65:17
turned 11:15
two 58:25 68:3
type 59:25 71:8
71:11
types 17:16
typewriting 5:5

U
Uh-huh 34:12
understand 8:6
8:15,23 9:14
9:19 10:3
15:24 24:23
27:20 33:22
33:23 34:22
35:24 47:23
53:4 57:10,11
58:10 63:14
70:19
understanding
49:1
understood
31:11 52:6
67:13 71:24
72:2
unit 18:24 68:18
United 1:1 2:1,13
5:13
unplanned 59:5

use 24:12,13,14
24:16,25
25:19,25 26:2
53:23 63:25
64:11 67:10,12
usually 16:23
59:16 60:3

V
v 74:5 75:2
vague 37:8
53:3 54:21
70:22
Vaguely 58:4
Val 27:19,21
28:2,12 34:19
35:10,14 37:4
68:16
various 7:25
vary 59:16,18
versus 11:8
vertical 65:16
video 5:15 9:18
video-recorded
5:10
videoconfere...
1:12 2:8,11
73:5
videographer
5:8,18 7:2,5,7
7:12 43:12,15
43:20 44:20
44:23 45:13
45:16 67:17
67:22 72:12
72:19
view 19:21 36:9
viewed 60:25
61:3
violated 64:15
violating 64:22
violation 53:6,9
53:10
virtual 8:2
visit 20:15
visualize 47:14
47:21

Vital 50:9
vs 1:6 2:4 5:12
8:7

W
walk 20:12
want 6:8 9:14
10:20,22 11:7
20:9,21 21:6
28:14 30:21
31:13 37:14,15
43:12 45:25
47:8 51:19
59:2 62:5
63:18 66:2,21
68:6,24 69:17
wanted 6:11
warranted 17:3
wasn't 21:13,22
22:14 32:24
40:7 54:25
57:14 60:22
61:20 70:16,18
way 18:4 20:6
25:3 27:1 30:5
38:1 45:1 50:4
52:16
we're 8:1 43:15
44:20,23,25
45:11 58:25
59:3 72:20
we've 50:19
54:17 58:24
59:5,9 71:25
WebEx 5:15,20
6:3,6 7:16
week 10:12
12:19,19
went 10:11 12:13
46:14,18,20
60:20
weren't 33:3
39:7 40:3
Western 1:2,3
2:1,2,14 5:14
5:14
WHEREOF 73:8

widen 63:5
window 6:18
wing 18:8,13
witness 5:6,25
21:14,22 30:15
59:11 72:8,17
73:8 74:12
75:1,25
Wolf 23:6
wondering
64:17
word 57:15
wording 63:15
words 27:24
work 10:5 12:13
13:2 15:15,25
18:7 21:4,13
23:21,24 26:3
26:5,10 59:19
worked 15:17
38:14 39:5
52:9
working 39:7,8
44:11 48:25
68:17
workplace 20:2
20:6
works 15:16
wouldn't 65:11
65:11
wrap 37:15
write 59:25
write-u 55:18
write-up 11:1
32:25 35:4
53:15 55:15
55:20 66:18
68:11
written 27:22
60:13
wrong 31:3
57:10

X
X 4:1,5
X-ray 17:19
39:13 40:4,5

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 32 of 33

46:10 49:20

**Y**

yeah 7:4 12:22
  14:10 20:17
  25:2 30:9
  33:18 41:15
  44:16 46:21
  48:12 49:14
  52:22 54:5
  57:14 72:2
yearly 16:20,22
years 12:5
  26:18
yesterday 10:15
  54:23 55:1
Yolanda 1:5 2:2
  2:15 5:11 74:5
  75:2

**Z**

zoom 3:13
  62:15 63:13
  66:5
zoomed 31:12

**0**

**1**

1 68:18
1-800-280-33...
  3:23
10:04 43:16
10:06 43:21
10:08 44:21
10:09 44:24
10:11 45:14
10:16 45:17
10:59 67:18
100 27:17 28:3
  28:5 35:16
100180 76:24
1005 62:13
11 45:6 46:1
  59:6
11:10 67:23
11:20 2:10 72:21

72:22
11th 74:19
13th 3:11
17 21:18
18 11:18 19:8
19 12:23 19:8
1943 30:17

**2**

2 66:2
20 65:21,22
  67:4 74:2
  76:14
2006 11:14 15:3
  15:18 48:16
2017 11:17 21:8
  21:15,16 37:10
  38:8,9,18,22
  42:2,3 51:22
  52:13 68:24
  69:14,22
2018 11:12,20
  13:19 19:24
  25:18,23 37:17
  42:10
2019 11:2 12:10
  13:14 30:21
  31:23 37:18
  37:22 42:18
  42:24 45:6
  46:1 60:24
  62:23 65:5
2020 1:14 2:9
  5:9 73:4 74:2
  74:8 75:3
24 62:23
25th 63:1,2,16

**3**

3 67:5
30 4:7 51:23
  74:18
31 65:5
314 3:23
36 10:12 12:19

**4**

4 1:14 2:9 5:9
  73:4 74:8
  75:3
4:19-cv-0069...
  1:7 2:5
4:19cv00693
  5:13
4:30 59:16
400 3:7 74:4
401 3:11
43 4:7 30:11,16
  45:5,23 54:17
  54:19 58:21
  70:9
45 4:8 62:12
4520 3:4,7 74:4

**5**

**6**

615 3:11
62 4:8
63101 3:22
  74:19
64106 3:11
64111 3:4,8 74:4
644-2191 3:23

**7**

7 4:3 31:23
700 3:4
711 3:22 74:18
7th 60:24 68:8

**8**

8 59:16
8:30 2:10
8:47 5:10
8:49 7:8
8:54 31:23
8:59 7:13
816)471-1301
  3:8
816)756-5800
  3:5
816)889-5000
  3:12

**9**

9 42:2

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
Case 4:19-cv-00693-BP   Document 67-2   Filed 12/03/20   Page 33 of 33