# EXHIBIT C

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE WESTERN DISTRICT OF MISSOURI

 3                  WESTERN DIVISION

 4   TERRI YOLANDA LABLANCE,   )
                               )
 5         Plaintiffs,         )
     vs.                       )
 6                             )
     MISSOURI DEPARTMENT OF    )Case No. 4:19-cv-00693-BP
 7   CORRECTIONS AND CORIZON   )
     HEALTH,                   )
 8                             )
           Defendants.         )
 9

10                 **************

11     VIDEOCONFERENCE DEPOSITION OF MAKISA UPTON

12          TAKEN ON BEHALF OF THE PLAINTIFF

13                  NOVEMBER 4, 2020

14                 **************

15

16

17

18

19

20

21

22

23

24

25
```

## Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2         FOR THE WESTERN DISTRICT OF MISSOURI
 3                    WESTERN DIVISION
 4    TERRI YOLANDA LABLANCE, )
                              )
 5         Plaintiffs,        )
                              )
      vs.                     )
 6                            )
      MISSOURI DEPARTMENT OF  )Case No. 4:19-cv-00693-BP
 7    CORRECTIONS AND CORIZON )
      HEALTH,                 )
 8                            )
           Defendants.        )
 9
10              ***************
11     VIDEOCONFERENCE DEPOSITION OF MAKISA UPTON
12          TAKEN ON BEHALF OF THE PLAINTIFF
13               NOVEMBER 4, 2020
14              ***************
15
16
17
18
19
20
21
22
23
24
25
```

## Page 2

```
 1          THE UNITED STATES DISTRICT COURT
 2         FOR THE WESTERN DISTRICT OF MISSOURI
                    WESTERN DIVISION
 3    TERRI YOLANDA LABLANCE,    )
                                 )
 4         Plaintiff,            )
                                 )
      vs.                        )
 5                               ) Case# 4:19-cv-00693-BP
      MISSOURI DEPARTMENT OF     )
 6    CORRECTIONS AND CORIZON    )
      HEALTH,                    )
 7                               )
           Defendants.           )
 8
           VIDEOCONFERENCE DEPOSITION OF MAKISA UPTON,
 9    produced, sworn and examined on November 4, 2020,
10    between the hours of 2:23 p.m. and 4:47 p.m. of that
11    day, via videoconference, before Joann Renee Richardson,
12    a Certified Court Reporter within and for the State of
13    Missouri, in a certain cause now pending in the United
14    States District Court - Western District, wherein Terri
15    Yolanda LaBlance is the Plaintiff and Missouri
16    Department of Corrections and Corizon Health are the
17    Defendants; taken on behalf of the Plaintiff.
18
19
20
21              **********
22
23
24
25
```

## Page 3

```
 1                  A P P E A R A N C E S
 2    For the Plaintiffs:
 3      Mr.  Ivan Nugent
            Krigel & Krigel, P.C.
 4          4520 Main Street, Suite 700
            Kansas City, MO 64111
 5          tel: (816)756-5800
 6    For Defendant Corizon:-
        Mr.  Michael L. Matula
 7          Ogletree Deakins
            4520 Main Street, Suite 400
 8          Kansas City, Missouri 64111
            tel: (816)471-1301
 9
      For Department of Corrections:
10      Ms.  Rachel Jag
            Assistant Attorney General
11          615 E. 13th Street, Suite 401
            Kansas City, Missouri 64106
12          tel: (816)889-5000
13
14    Also Present on Zoom:  Jenny Meehan
15
16
17
18
19
20
      Court Reporter:
21    Joann Renee Richardson
      Alaris Litigation Services
22    711 North Eleventh Street
      St. Louis, MO 63101
23    314) 644-2191
      1-800-280-3376
24
25
```

## Page 4

```
 1                     I N D E X
 2    EXAMINATION BY:                    PAGE:
 3    BY MR. NUGENT                         6
 4              ********
 5                   E X H I B I T S
 6    EXHIBIT NOS:                  PAGE:
 7    12 - Teresa McWhorter email          29
 8    15 - Jerry Lovelace email            31
 9    26 - Employee Success Guide          33
10    33 - Email from Lovelace to Almanza  77
11    36 - Terminated Employee File Checklist  39
12    37 - Defendant Corizon, LLC Answers and   38
13       Objections to Plaintiff's First
14       Interrogatories
15    39 - Email from Makisa Upton         42
16    41 - Document recommending termination   50
17    42 - Auditing Log blacked out        53
18    43 - Auditing Log          51
19    44 - Auditing Log          51
20    45 - Corrective Action Form Tammie Christopher  67
21    46 - Corrective Action Form Sterling Ream    68
22    47 - Corrective Action Form Tabitha Johnson   79
23    48 - Corrective Action Form Deborah Ritter   80
24    49 - Corrective Action Form Jessica Frizzell   81
25    (Exhibits retained by counsel, not attached.)
```

1 (Pages 1 to 4)

## Page 5

1      IT IS HEREBY STIPULATED AND AGREED, by and
2  between counsel for the PLAINTIFF and counsel for the
3  DEFENDANTS that this deposition may be taken in
4  shorthand by Joann Renee Richardson, Certified Court
5  Reporter, and afterwards transcribed into typewriting;
6  and the signature of the witness is expressly reserved.
7      *  *  *  *  *  *
8      MR. VIDEOGRAPHER:  We are on the record.
9  Today's date is November 4, 2020.  And the time is 2:23
10  p.m.  This is the video-recorded deposition of Makisa
11  Upton in the matter of Terri Yolanda LaBlance vs.
12  Missouri Department of Corrections and Corizon Health,
13  Case No. 4:19-cv-00693, in the United States District
14  Court, Western District of Missouri, Western Division.
15  This deposition is being held via WebEx video
16  conference.
17      The reporter's name is Joann Richardson.  My
18  name is Chris Chandler.  I'm the legal videographer.
19  We're here with Alaris Litigation Services.  This
20  deposition is being held via WebEx video conference and
21  the court reporter is not present with the witness.
22      Would the attorneys present please introduce
23  themselves, the parties that they represent, and
24  indicate that they stipulate to the terms of this
25  deposition.

## Page 6

1      MR. NUGENT:  Good afternoon.  Ivan Nugent on
2  behalf of the Plaintiff, Terri LaBlance, and we consent
3  to the deposition via WebEx and the court reporter and
4  witness being in two different locations.
5      MS. JAG:  My name is Rachel Jag and I'm here
6  on behalf of the Department of Corrections.  And we
7  consent and stipulate to this deposition being done by
8  WebEx and the witness and court reporter being in two
9  separate locations.
10      MR. MATULA:  Mike Matula on behalf of
11  Defendant Corizon Healthcare.  We also consent to the
12  deposition proceeding in this fashion.
13      MR. VIDEOGRAPHER:  Thank you.  Will the
14  court reporter please swear in the witness?  And we may
15  proceed.
16      MAKISA UPTON,
17  being first duly sworn, produced and examined, testified
18  as follows:
19      EXAMINATION
20  QUESTIONS BY MR. NUGENT:
21     Q.  Good afternoon, Ms. Upton.  My name is Ivan
22  Nugent and I represent the Plaintiff, Terri
23  LaBlance.  We are here to take your deposition in a
24  case that she has filed against Corizon Health as
25  well as the Department of Corrections.  Is that your

## Page 7

1  understanding as to why you are here today?
2     A.  Yes, sir.
3     Q.  Can you hear me okay?
4     A.  Yes, sir.  It's a little crackly.
5     Q.  I sound a little crackly?
6     A.  Yes.
7     Q.  I have a little bit of a frog in my throat,
8  but I don't know if it's the frog or if it's the
9  sound.
10     A.  I think it's the sound.  I don't think it's
11  the frog.
12     Q.  All right.  I will try to speak loudly.  And
13  if you can't hear me, will you ask that I repeat my
14  question?
15     A.  Absolutely.
16     Q.  If you don't understand a question, will you
17  also let me know so that I can rephrase it for you?
18     A.  Yes, sir.
19     Q.  Is there anyone else in the room with you?
20     A.  No, sir.
21     Q.  Can you tell me where you are?
22     A.  I'm in my home office in Holts Summit,
23  Missouri.
24     Q.  Okay.  And can you give me that address,
25  please?

## Page 8

1     A.  1925 Apartment A, Halifax Road, Holts Summit,
2  Missouri 65043.
3     Q.  Is Holts Summit right outside of Jefferson
4  City?
5     A.  It is.  It's just across the river.
6     Q.  Got it.  Let's see.  Have you had your
7  deposition taken before?
8     A.  No, sir.
9     Q.  I'm going to give you some background
10  information in addition to what I've already said
11  and I think we can get underway here quickly.  If
12  you need a break, will you let me know?
13     A.  Yes, sir.
14     Q.  If you — I think I've covered most of it
15  already, frankly.  I've done this a couple of times
16  today, so forgive me.
17     A.  It's all good.
18     Q.  Oh, you took an oath to tell the truth.  Do
19  you remember that?
20     A.  Yes, sir.
21     Q.  And I assume that you will tell the truth
22  today.
23     A.  Yes, sir.
24     MR. NUGENT:  Let's go off the record for a
25  second.

## Page 9

1    MR. VIDEOGRAPHER: We're going off the
2 record at 2:27 p.m.
3          (Off the record.)
4          _____
5          (Back on the record.)
6    MR. VIDEOGRAPHER: We are back on the
7 record. The time is 2:32 p.m.
8    Q. (By Mr. Nugent) All right, Ms. Upton. After
9 fixing our technical difficulties, I think we can
10 get started now. Okay?
11   A. Yes, sir.
12   Q. Great. And just to recap, you are under oath.
13 And if you can't hear me or there's a technical
14 problem, can I trust that you will stop me so we can
15 get it fixed?
16   A. Yes, sir.
17   Q. Awesome. Who do you work for?
18   A. I work for Corizon Health.
19   Q. How long have you worked for Corizon Health?
20   A. Two years.
21   Q. When did you start?
22   A. October 28th of 2018.
23   Q. Where were you working prior to joining
24 Corizon?
25   A. Napa Auto Parts.

## Page 10

1    Q. And what did you do for Napa?
2    A. I was an HR manager.
3    Q. Did you have the know-how?
4    A. I do, yes.
5    Q. All right. With regard to Corizon, what were
6 you hired to do? What was your job title?
7    A. Human resources business partner.
8    Q. What does that mean?
9    A. So we support our employees and our leaders.
10 We support on every topic from payroll and
11 compensation to benefits to HR allegations that are
12 reported to us.
13   Q. All right. What did you do for Napa?
14   A. Very similar, just at a different level. So I
15 managed HR for a group of employees there.
16   Q. Okay. Was your move to Corizon a step up
17 vertically?
18   A. Yes, sir.
19   Q. Did it come with more pay than you were
20 earning Napa?
21   A. A little bit, yes.
22   Q. Okay. What's your highest level of education?
23   A. I have a bachelor's degree.
24   Q. From where?
25   A. Southwest Baptist University in Bolivar,

## Page 11

1 Missouri.
2    Q. All right. What's that degree in?
3    A. Religious education.
4    Q. How long have you been in HR?
5    A. Oh, gosh, over 13 years.
6    Q. All right.
7    A. In some form. In some form.
8    Q. Can you briefly tell me the different roles
9 within HR that you've held?
10   A. Uh-huh. I've been in recruiting. I've been
11 in benefits. I've been in ethics case management.
12   Q. Okay. And you're in HR for Corizon, correct?
13   A. Yes, sir.
14   Q. And are you more of a generalist, or do you
15 have a particular role like benefits or compensation
16 or recruiting like you just mentioned?
17   A. I'm a generalist.
18   Q. Okay. Prior to COVID-19, did you work in an
19 office?
20   A. Yes, sir.
21   Q. Where was the office that you reported to?
22   A. Jefferson City.
23   Q. How many employees are in the Jefferson City
24 office?
25   A. I've never counted. I would say between 20

## Page 12

1 and 30, just guessing off the top of my head.
2    Q. Thank you. And then do you know approximately
3 how many employees are at the Chillicothe Center?
4    A. Not at that site particularly. I know all of
5 the state, but I don't have them by site yet.
6    Q. Okay. How many are in the state?
7    A. We have around a thousand.
8    Q. Okay. Do you supervise any employees?
9    A. No, sir.
10   Q. Who do you report to?
11   A. I report to Barb Hojer. She's the senior HR
12 VP for Corizon Health.
13   Q. Can you spell the last name, please?
14   A. Absolutely. H-O-J-E-R.
15   Q. And her first name was...
16   A. Barb.
17   Q. Does she go by Barbara?
18   A. She goes by Barb.
19   Q. Is her real name Barbara?
20   A. I have no idea. She's my boss. I'm not
21 asking, not at all.
22   Q. All right. Do you conduct any training for
23 Corizon?
24   A. I do.
25   Q. What trainings do you conduct?

## Page 13

1    A. I have conducted training on civil treatment.
2  I have conducted training on using our HR systems
3  for employee database management. I've conducted
4  trainings for coaching and corrective action. I
5  believe that's all the good ones I can remember off
6  the top of my head.
7    **Q. Okay. And you've been there -- let's see, you**
8  **started in October of '18. So you've been there two**
9  **years, right?**
10    A. Yes, sir.
11    **Q. How many of those trainings have you**
12  **conducted?**
13    A. Oh, goodness. I would say I average at least
14  one training a month.
15    **Q. Okay. And who are you giving those trainings**
16  **to?**
17    A. It varies. Some of our training we are doing
18  for employees. Some we are doing for leaders. So
19  it depends on the training and the type of audience
20  required.
21    **Q. When you say "leaders," are those folks that**
22  **supervise other people?**
23    A. Yes, sir.
24    **Q. Is the training that's given to leaders or**
25  **supervisors different than the training that's given**

## Page 14

1  to employees?
2    A. Usually we give a little more information. Or
3  information related to managing our system would not
4  be something our employees would need. They don't
5  input data, so we wouldn't require them to sit
6  through that.
7    **Q. Understood. Can you tell me or describe to me**
8  **what the content is of the civil training course?**
9    A. Sure. Civil treatment is a course that we
10  provide that covers ADA, FMLA, discrimination, and
11  harassment.
12    **Q. I think I misspoke. It's called civil**
13  **treatment, not civil training.**
14    A. Yes, sir. Uh-huh.
15    **Q. Thank you.**
16    A. Not at all.
17    **Q. And then can you tell me what material is**
18  **covered in the coaching and corrective action**
19  **training?**
20    A. Sure. We review the policies that we have on
21  corrective action, levels, what HR is involved in,
22  what HR does not have to be involved in. And then
23  coaching, we gave guidance on how to do a coaching
24  instead of a corrective action when the behavior
25  warrants that.

## Page 15

1    **Q. Is coaching considered discipline at Corizon?**
2    A. No, sir.
3    **Q. Then, lastly, you talked about database**
4  **management. What type of information is conveyed in**
5  **that training?**
6    A. So that is our system where we put in all of
7  our new-hire or current employee information, such
8  as pay, site that they work at, supervisor name,
9  confidential information.
10    **Q. Any other types of training that you're**
11  **responsible for?**
12    A. Anything that was related to HR if somebody
13  needs something. However, some of our training is
14  already pre-created. So I don't create training. I
15  just deliver.
16    **Q. Understood.**
17    A. So it's an electronic. Sorry. That's the
18  word I was looking for.
19    **Q. Okay. Have you delivered training to Sterling**
20  **Ream?**
21    A. I believe she was in my civil treatment class.
22    **Q. Do you recall how long ago that was?**
23    A. I don't. I have helped conduct trainings
24  across the nation, so...
25    **Q. What about Tammie Christopher, do you recall**

## Page 16

1  whether or not she has participated in civil
2  treatment?
3    A. She would have been in the employee training
4  class at that time and I don't have a list of who's
5  done that yet or not.
6    **Q. And then with regard to the coaching and**
7  **corrective action training, have you delivered that**
8  **to Sterling Ream?**
9    A. No. I delivered that to mental health.
10    **Q. What do you mean when you say you delivered it**
11  **to mental health?**
12    A. Our mental health leadership team.
13    **Q. Okay. Do you know whether the leaders at the**
14  **Chillicothe facility have received coaching and**
15  **corrective action training?**
16    A. I don't know. If they have questions, they
17  come to me. They haven't received it from me.
18    **Q. Understood. Are the materials that are**
19  **delivered electronic or in paper form?**
20    A. A combination.
21    **Q. Do you travel to the sites to provide the**
22  **training, or is it done like we are, over Zoom?**
23    A. It's been a combination of travel, training
24  online, as well as in person.
25    **Q. What type of training have you received**

4 (Pages 13 to 16)

## Page 17

1  yourself in conducting -- excuse me, let me start
2  over.
3      During your two years at Corizon, what
4  training have you received in conducting
5  investigations?
6      A.  My first four to six months, I spent -- oh, in
7  conducting investigations?
8      Q.  Yes.
9      A.  Okay.  That's the right answer.  I spent
10  training with the HR person that I was replacing,
11  who was taking on other roles.  And then I also
12  trained -- actually, that would be it.  That would
13  be it for investigations.
14      Q.  Prior to joining Corizon, had you received
15  training or education on how to conduct
16  investigations?
17      A.  Yes.  I went through a HR training at Napa
18  through Wicklander-Zulawski.
19      Q.  Can you spell that, please?
20      A.  Can I Google it?  Is that okay?
21      Q.  How about you say it slowly so that our court
22  reporter --
23      A.  Wicklander-Zulawski.  And I know it starts
24  Z-U-L-W.  And that's the best I've got for you.
25      Q.  Okay.  Thank you.

## Page 18

1      A.  You're welcome.
2      Q.  After the training that you just referenced
3  prior to joining Corizon and the training you
4  received doing your onboarding at Corizon, do you
5  feel like you are well-versed in how to conduct
6  employment discrimination investigations?
7      A.  Oh, I don't think anyone is ever 100 percent
8  ready, but I think I have a platform to start off of
9  and I have teammates I can reach out to for
10  assistance.
11      Q.  Great.  Can you describe for me the process
12  you take in conducting an investigation when someone
13  at Corizon complains of harassment or
14  discrimination?
15      A.  Sure.  So any time I get an allegation like
16  that, if there's any documentation -- well, first I
17  have to receive the allegation.  Once I have
18  received it, then I reach out to anyone who may have
19  documentation, who may know who was a party to it.
20      I talk to the person that reported it if
21  they're available.  I don't always reach out if
22  they're no longer employees, or if they're on leave
23  of absence.  Of course, legally I have to wait until
24  they return to talk to them.
25      Once I have gathered documentation and any

## Page 19

1  evidence that I can have, I review all that and
2  determine if -- what interviews may need to take
3  place and, if so, where those need to happen:  Can I
4  do them virtually, do they need to see my face, do I
5  need to see their face, can I do it over the phone.
6  You can't always just hop in the car and drive five
7  hours for, you know, a 45-minute-to-an-hour
8  interview.
9      We get statements from any employees that are
10  involved or any DOC officers that may have witnessed
11  anything if they are able to provide.  That's
12  working through DOC.
13      Then we review with the site leader as well as
14  the DO, which is the director of operations for that
15  site, the senior director of operations for the
16  state, and usually the VPO to determine what next
17  steps should be taken.
18      If there are any questions, concerns, then I
19  go out to my senior HR leader, Barb, and ask her for
20  her insight or guidance as well.  If it's a clear
21  policy violation, if documentation supports it, we
22  take action as appropriate.
23      Q.  Thank you.
24      A.  Not at all.
25      Q.  Throughout today, I may refer back to those

## Page 20

1  steps.  And I want to make sure that I have them
2  written down appropriately so that when I refer back
3  to them, you and I are talking about the same step
4  in the investigation process.  Okay?
5      A.  Sure.
6      Q.  The first thing that I heard was, after
7  receiving the complaint, you gather documentation.
8  That documentation can be gathered from those at the
9  site or whoever might have some; is that fair?
10      A.  Yes.
11      Q.  The next step is that you interview persons
12  that are either listed as witnesses and/or the
13  complainant themselves, generally people who are
14  still available to you that are employed at Corizon
15  or the DOC; is that right?
16      A.  I don't talk to DOC employees.
17      Q.  Okay.  Thank you.
18      A.  I only receive written statements, if they
19  provide them.
20      Q.  Okay.  I appreciate that clarification.  Thank
21  you.
22      A.  Not at all.
23      Q.  After receiving documentation and interviewing
24  appropriate persons, you then review what you have
25  heard and seen with the appropriate individuals,

## Page 21

1  whether they are leadership at a site or leadership
2  at the state level.  Is that accurate?
3      A.  It always includes the state-level leadership.
4  To give a little additional clarification, I provide
5  the findings and I support them as they determine a
6  level of corrective action.
7      Q.  Do you make any recommendations with regards
8  to corrective action?
9      A.  I look at historical data and provide that,
10  yes, if there is any.  If there's not, then we'll
11  base it on egregiousness of the behavior or the
12  policy violated.
13      Q.  With regards to looking at the historical
14  data, does that come after you've talked to
15  everybody and you have all of the universe of
16  documents that have been provided?
17      A.  It comes after I have gathered my information,
18  but usually I try to have that before I have that
19  meeting with leadership so that if they ask the
20  question of, I want to go with a very low level of
21  corrective action and somebody hit somebody, we want
22  to give them an appropriate --
23      Q.  Understood.  And does the historical data that
24  you look at come into play with regards to any
25  recommendations that you might give?

## Page 22

1      A.  Absolutely.
2      Q.  And are the leaders that you're discussing
3  your recommendation with, are they aware of the
4  historical data as you are?
5      A.  Uh-huh.  Usually I have to talk to them to get
6  it.  We don't have a database.
7      Q.  Understood.  With regards to Ms. LaBlance, how
8  many investigations did you conduct that involved
9  her either as a witness or a complainant?
10      A.  Only the one I was informed of March 1st.
11      Q.  And that was after Ms. LaBlance's employment
12  had ended?
13      A.  Yes, sir.  That was the first time I heard her
14  name related to a concern.
15      Q.  Thank you.  Had you heard Ms. LaBlance's name
16  prior to March 1st?
17      A.  Only when they asked for approval to backfill
18  her position when she was leaving the company.
19      Q.  And that was the only context?
20      A.  Yes, sir.
21      Q.  Thank you.
22      A.  Not at all.
23      Q.  At some point I'm going to end up showing you
24  documents that are prior to March 1, 2019.  I
25  recognize that, based on your recent answer, you may

## Page 23

1  not have had any involvement, but what I will be
2  looking for is whether or not that information is
3  used in the historical context that you just
4  referenced.  All right?
5      A.  Sure.  Absolutely.
6      Q.  Approximately how many investigations have you
7  conducted while employed with Corizon?
8      A.  That's an excellent question.  I don't know
9  that I could give you an answer.  More than ten, if
10  that helps you.
11      Q.  That really does, big-time.
12      A.  Because we don't have a way of reporting
13  those, so I can't tell you how many I've done.  I
14  don't know.
15      Q.  So when you say you don't have a way of
16  reporting them, is that -- am I to understand that
17  you all do not track the number of investigations
18  conducted?
19      A.  No, sir.  At this time I do not have any
20  tracking for that.
21      Q.  Okay.  In your opinion, should Corizon track
22  the number of investigations they're doing?
23      A.  In my opinion, any company doing
24  investigations would benefit from tracking.
25  However, it's not my decision and I would hesitate

## Page 24

1  to give an opinion for Corizon.
2      Q.  What would the benefit be of tracking those
3  investigations?
4      A.  Well, for one, a much faster historical search
5  rather than calling all HRBPs and asking for
6  guidance.
7      Q.  Having that historical search -- I guess let
8  me ask it a different way.
9          When people leave, do they take the
10  institutional knowledge with them when they leave
11  the employment of Corizon?
12      A.  Oh, absolutely.
13          MR. MATULA:  Object to the form of the
14  question.  Go ahead, Makisa.
15      A.  I'm sorry.  Absolutely.
16      Q.  Did you understand that question?
17      A.  Yes.  You asked if when I leave, I take what I
18  know with me.
19      Q.  As far as you are aware, does Corizon have a
20  process by which they secure that historical data
21  that might be helpful in conducting investigation?
22          MR. MATULA:  Object to the form of the
23  question.
24      A.  So if I understand you correctly, is the data
25  maintained when someone leaves?

## Page 25

1   Q.  (By Mr. Nugent) Yes.
2   A.  Yes, it is.  And it's saved out for us to be
3   able to access if we can find it, if we can find
4   what we're looking for, if we have the right search
5   function, if we know where we're looking or what
6   state we're looking in or things along those lines.
7   I can see Missouri stuff if it's out there.  I can't
8   see the rest of the country for confidentiality.
9   Q.  Understood.  When you say "if it's out there,"
10  what does that mean?
11  A.  If it's stored on our database -- or on our
12  system.  Excuse me.  Not a database, on our system.
13  Q.  Got it.  All right.  I think I'm ready to look
14  at some documents and let's talk more specifically
15  about Ms. LaBlance.  All right?
16  A.  Sure.
17  Q.  Now, Ms. Upton, I'm going to try and get these
18  documents on the screen for you.  There are also
19  going to be times where I am using two documents at
20  a time.  I believe I have some of those side by side
21  already, so if you need me to zoom in or zoom out,
22  you just holler at me.  All right?
23  A.  Sure.
24  Q.  All right.  I believe you mentioned that on
25  March 1st, that's when you became aware of

## Page 26

1   Ms. LaBlance with regards to her complaint of
2   individuals accessing her medical records.
3   A.  Yes, sir.
4   Q.  How did you become aware of that complaint?
5   A.  I received a phone call from our VPO and I was
6   asked to come to her office for a conversation.
7   Q.  What does VPO stand for?
8   A.  Vice president of operations.
9   Q.  And who was the vice president of operations
10  on March 1st?
11  A.  Rhonda Almanza.
12  Q.  Thank you.  When you went to Ms. Almanza's
13  office, what did she say to you?
14  A.  She let me know that we had received
15  communication from Ms. LaBlance that Dr. Epperson
16  had sent her a letter that included a picture of her
17  and some information from our -- oh, excuse me --
18  the DOC's database and that we needed to look into
19  it.
20  Q.  Okay.  And prior to today, what documents did
21  you review in preparing for your deposition?
22  A.  Went back over the documents I had provided
23  with the request for termination.  And then I have
24  been shown the full, unedited version of the audit
25  log.

## Page 27

1   Q.  Okay.  Did Ms. Almanza ask or instruct you to
2   conduct an investigation into Ms. LaBlance's
3   complaint?
4   A.  Well, the first question was what action do we
5   take.  And I explained that we needed to look
6   further into it and find out what had happened.  So
7   we made the decision to go and pull documentation to
8   see what could be seen and to go from there.
9   Q.  Did Ms. Almanza ask you what should be done?
10  Is that what I heard?  I'm sorry.
11  A.  Yes, as far as corrective action.
12  Q.  I see.  I guess let me ask it this way.  Were
13  you instructed to investigate or instructed to
14  provide a recommendation?
15  A.  Well, in the conversation we came to the
16  conclusion to look into it and see what was there.
17  And that's when we pulled the full audit log --
18  well, the DOC pulled it -- and reviewed it and went
19  through all the information.
20  Q.  Who asked the DOC to provide the audit log?
21  A.  I would assume Rhonda did.  I cannot ask for
22  that.
23  Q.  Okay.  When did you start -- let me ask it
24  this way first.  Did you conduct an investigation
25  with regards to Ms. LaBlance's complaint?

## Page 28

1   A.  Yes.  I looked at who had accessed her file
2   and I pulled documentation and it was very clear.
3   Q.  What was very clear?
4   A.  Who had been in her file.
5   Q.  And then after you looked at the documentation
6   that was provided, did you interview any witnesses?
7   A.  No.  At that point the documentation was clear
8   enough that there was no need to do any interviews.
9   It showed very clearly who had been in the file.
10  Q.  Okay.  With regard to who had been in the
11  file, did you make any recommendations as to whether
12  those individuals should be reprimanded or not?
13  A.  Yes.  I stated they all should be reprimanded
14  at some level.
15  Q.  Okay.  And who did you make that
16  recommendation to?
17  A.  So that was a conversation again with the DO,
18  which was Jenny Meehan, Rhonda Almanza.  I believe
19  Cindy Schupp was in the room.  And we were
20  discussing next steps based on what we had found
21  from the audit log.
22  Q.  All right.  In reviewing the data, did you
23  look at any historical information as it pertained
24  to Ms. LaBlance?
25  A.  I don't understand.  What do you mean,

## Page 29

1 historical information?
2     Q. I'm going to try to make this larger. Give me
3 one second.
4     A. Thank you for that.
5     Q. You're welcome. I'm going to start at the
6 very top for identification purposes. This was
7 previously used in depositions and it is marked
8 Exhibit 12. I want to draw your attention to
9 Corizon 8 of Exhibit 12. It's a memo to Heather
10 Dale, Jenny Meehan, Teresa McWhorter on August 29th
11 of 2017. My question is, are you familiar with the
12 contents of this memo? I'll give you a chance to
13 read through?
14     A. I'm not familiar with it. I have not seen it.
15 And it would not have been something that I would
16 have put into the report I received because -- or
17 the investigation on the report I received because
18 the report I received was only about someone
19 accessing her DOC file.
20     Q. And so is it, I guess, your opinion that this
21 is just simply unrelated and not need to be
22 considered in your investigation that was started on
23 March 1st?
24     A. I'm not sure I understand what you're asking.
25 I'm not sure where this behavior in 2017, as

## Page 30

1 inappropriate as it may be, would have had any
2 bearing on two unrelated people looking into
3 someone's DOC file. I guess I'm confused by the
4 question.
5     Q. Understood. That answers the question,
6 actually. Thank you.
7     A. Okay.
8     Q. And to confirm, that was your first time
9 seeing that memo; is that right?
10     A. Yes, sir.
11     Q. Okay. During your investigation in March of
12 2019 into Ms. LaBlance's complaint, did Jenny Meehan
13 tell you about the incident we just looked at?
14     A. The only thing I remember hearing about during
15 the investigation was that when Ms. LaBlance left,
16 she seemed happy and sent out happy emails, and that
17 there had been a couple of incidents that had
18 happened prior to my arrival with Corizon and they
19 were handled swiftly.
20     Q. Okay. Did you know -- who told you that?
21     A. I believe it was Jenny. It may have been
22 Cindy, but I believe it was Jenny because that's her
23 region and we'd worked very closely together,
24 typically.
25     Q. Okay. When you heard that during your

## Page 31

1 investigation in March of 2019, is it your opinion
2 that that information wasn't helpful to the
3 investigation that you were conducting?
4     A. Well, I was conducting an investigation on who
5 looked into someone's file, not on any allegation of
6 any other behavior. So it would not have been
7 pertinent to my investigation at that time.
8     Q. Okay. Give me one second. I want to bring up
9 another document here.
10     A. Okay.
11     Q. All right. And let me identify it for record
12 purposes, Ms. Upton. One second.
13     MR. NUGENT: So I've placed in front of the
14 witness what's been used in previous depositions as
15 Deposition Exhibit 15. It's Bates-labeled Corizon 20
16 through Corizon 24.
17     Q. (By Mr. Nugent) And, Ms. Upton, I'm going to
18 draw your attention to the bottom of Corizon 23 onto
19 the next page, which is Corizon 24. I'm going to
20 try to make it a little bigger for you. I'd like
21 for you to read the email from Terri LaBlance to
22 Sterling Ream, Karen Epperson, Jerry Lovelace, Jenny
23 Meehan, and Valicia Kirby. And I'll scroll to the
24 next page when you're ready.
25     A. Okay. Go ahead. Okay. I've read it.

## Page 32

1     Q. Great. Did anyone make you aware of this
2 complaint lodged by Ms. LaBlance?
3     A. Not until the concern came in -- and, again, I
4 didn't know details or specifics -- not until after
5 the concern came in in March. But it wasn't
6 pertinent to what I was looking into, based on what
7 I was told.
8     Q. Okay.
9     A. And I believe both of these incidents -- and
10 I'm trying to catch a date on this one as well.
11 Yeah, both of these incidents were prior to my
12 employment.
13     Q. You are absolutely right about that.
14 The individual that Ms. LaBlance was
15 complaining about was Judy Harkins. Do you see that
16 there?
17     A. I do.
18     MR. NUGENT: Can we go off the record?
19 Thank you.
20     MR. VIDEOGRAPHER: We're going off the
21 record. The time is 3:08 p.m.
22     (Off the record.)
23     _____
24     (Back on the record.)
25     MR. VIDEOGRAPHER: We are back on the

ALARIS LITIGATION SERVICES
www.alaris.us     Phone: 1.800.280.3376     Fax: 314.644.1334

## Page 33

1  record.  The time is 3:08 p.m.
2      Q. (By Mr. Nugent) I've got a few more documents.
3  Let's look at -- Ms. Upton, I've put in front of you
4  what's been used in depositions previous to today
5  and it's been identified as Deposition exhibit 26.
6  Have you seen -- I'm going to try to scroll through
7  the first couple of pages.  And what I'm wondering
8  is, have you seen this document before?
9      A. I've seen a recent version.  But yes.
10      Q. Okay.  Where would you look to know what
11  version this one is?
12      A. The best way I can tell you is that the front
13  page has changed and the effective date is changed,
14  as we have a new CEO.
15      Q. What is the effective date of the most recent
16  version that you have seen?
17      A. I believe 2019.
18      Q. Okay.  Thank you.
19      A. No problem.
20      Q. With regard to this version, which has an
21  effective date of June 2014, do you recall if this
22  was given to you upon your start of employment with
23  Corizon?
24      A. I had one given.  Again, I think it was a more
25  recent version than this one.  I think there have

## Page 34

1  been a couple changes since then.  But yes.  I have
2  a paper copy of it in the office.
3      Q. All right.  And do you know off the top of
4  your head what the changes are between this version
5  I have in front of you and the one that you're
6  familiar with?
7      A. I'd have to look at the CEO to tell you if
8  that's really what changed.  Other than that, I
9  would not know without a detailed review.
10      Q. Understood.  Thank you.
11      A. Not at all.
12      Q. I want to look at the Corrective Action page,
13  which is Bates-labeled Corizon 560 and looks like it
14  goes to 563.  Would you agree with that?
15      A. Yes.
16      Q. All right.  Sometimes people refer to
17  discipline models as progressive discipline models.
18  Would you characterize Corizon's corrective action
19  plan as a progressive discipline model?
20      A. Yes.  However, we also have the opportunity to
21  skip if necessary, to skip a step.  I believe it's
22  even in the description of the corrective action
23  that it is a progressive counseling plan.
24      Q. Right.  Would written counseling be referred
25  to as the first level of discipline?

## Page 35

1      A. Yes, sir.
2      Q. And the second written counseling as the next
3  step in the discipline chain?
4      A. Yes, sir.
5      Q. And then the next step be a final written
6  warning?
7      A. Yes, sir.
8      Q. And then the last step being a recommendation
9  for termination?
10      A. Yes, sir.
11      Q. Within those four steps, I believe you said
12  that Corizon reserves the right to skip steps.
13      A. Yes.
14      Q. All right.  And then the subsection that's
15  titled Immediate Action and/or Termination, would
16  you describe what this section is?
17      A. Sure.  These are examples for leaders of
18  things would require immediate action leading up to
19  -- anywhere up to final written or termination.
20      Q. Okay.
21      A. It's not all-inclusive, but it does give them
22  a jumping off point.
23      Q. All right.  And are these actions that can be
24  something less than termination?
25      A. Depending on the situation, potentially it

## Page 36

1  could be.
2      Q. Okay.  And then conversely, these are also
3  actions that could lead to termination?
4      A. Again, potentially.  Depending on the
5  situation, it could, yes.
6      Q. Then this next section here that's on Corizon
7  562 -- it's immediately after the Immediate Action
8  and/or Termination -- is a section that kind of
9  looks like it might be related to even more serious
10  acts.  How would you describe this section here?
11      A. The suspension is something that is used in
12  situations where it's an egregious action or it's
13  something that requires investigation and it's best
14  for all involved parties -- for involved parties to
15  be removed from the site temporarily.
16      Q. Okay.  So this section here, managers, I
17  wanted to ask about.  Can you explain why discipline
18  of managers could be different than discipline of
19  employees?
20      A. Well, it could be different based on their
21  knowledge, based on their involvement as a leader
22  and the perception they may create.  It could be
23  many things, but their position holds greater
24  weight.
25      Q. And then what are PRN employees?

## Page 37

1       A.  PRN are employees who work as needed.  So
2   they're ones who might pick up a shift if people are
3   on vacation, out sick.  Or if we're short-staffed
4   for whatever reason that week, they would then come
5   in and pick up.  But they do not work any set hours.
6       Q.  And this section, Probationary and PRN
7   Employees on Corizon 563, it says, "Probationary and
8   PRN employees are subject to a modified corrective
9   action process which may, at the company's
10  discretion, depending on the severity of the issue,
11  only include a first written counseling, final
12  written warning, and/or recommendation for
13  termination."
14      How is that for probationary and PRN employees
15  different than the rest of the discipline
16  conversation for Corizon?
17      A.  Well, the second written counseling is absent
18  from that process.
19      Q.  Okay.  So does that shorten the progressive
20  discipline chain for PRN and probationary employees?
21      A.  It shortens it for probationary.  For PRNs, we
22  may only see them once every 30 to 90 days.  So if
23  you only work two days out of 60 and you have two
24  infractions, that could make it more serious.
25      Q.  And then the last paragraph here,

## Page 38

1   Institutional Action, can you explain what this
2   paragraph is referring to?
3       A.  Absolutely.  Any time the DOC may determine
4   that someone is not going to be permitted into their
5   institutions any longer.  In the event that that
6   happens, it's called a gate lock or a gate stop.
7   And when we receive notice of that, if we cannot
8   allow the person into any other institution and
9   they've lost all their institutional access, then we
10  have to take different steps.  That's not something
11  that I have any control over, but we had to have
12  something in the policy because it does happen.
13      Q.  Okay.  So if the DOC says you can't come in --
14      A.  You can't come in.  Yeah, they're the boss.
15      Q.  Understood.  Thank you.  My next document,
16  Ms. Meehan -- I'm sorry, Ms. Upton.  My apologies.
17      A.  Not at all.  Jenny's great.
18      Q.  Is a document that's been provided by Corizon
19  and its attorneys.  It's been previously used in
20  depositions as well and we've marked it as Exhibit
21  37.  This is titled "Defendant Corizon, LLC's
22  Answers and Objections to Plaintiff's First
23  Interrogatories."  Have you seen this document
24  before?
25      A.  I have.

## Page 39

1       Q.  All right.  Question 1, the abbreviated
2   version says, "Identify all persons who provided
3   information used in answering one or more of
4   Plaintiff's interrogatories to you."  And then it
5   has a couple of subparts there.  One of the answers
6   is your name.  Do you see that there?
7       A.  Yes, sir.
8       Q.  Do you remember which of these you provided
9   information for?
10      A.  Specifically, at this time, no.  It's been a
11  while.
12      Q.  There are a couple that I want to talk about.
13      A.  Sure.
14      Q.  Number 11.  I'll let you read that to
15  yourself.
16      A.  Okay.
17      Q.  My question, my follow-up to No. 11 is -- let
18  me pull up a different document.  Give me one
19  second.
20      Do you see Exhibit 36 in front of you?
21      A.  Yes.
22      Q.  All right.  Exhibit 36 was also previously
23  used in depositions.  It is the Terminated Employee
24  Files Checklist for Terri LaBlance.  Do you see
25  that?

## Page 40

1       A.  I see that.
2       Q.  Did you fill this document out?
3       A.  No, sir.
4       Q.  Okay.  Is this a document that the HR
5   department at Corizon uses?
6       A.  It is a document that the sites use.  Employee
7   files are maintained at the sites.  And then when an
8   employee leaves the company for any reason, this is
9   completed and sent in with their file by the site.
10  So it is not something that myself or other HRBPs
11  use.
12      Q.  So this is put together by Corizon personnel
13  at various sites throughout the state of Missouri?
14      A.  Yes.
15      Q.  If there was an investigation done, would you
16  expect to see initials in the box next to
17  investigation folder?
18      A.  No.  That would not be housed at the site.  If
19  there were documents saved, that would be housed
20  with the HRBP.
21      Q.  Okay.  And who is the HR VP over --
22      A.  BP.  Excuse me.  Business partner, not V.
23      Q.  Thank you.  The HR business partner.  Who is
24  the HR business partner for the Chillicothe Center?
25      A.  I have been since October 2018.

10 (Pages 37 to 40)

## Page 41

1  Q. All right. Thank you. Do you now see
2  Interrogatory 11 in front of you?
3  A. Yes, sir.
4  Q. Did you provide information for the answer of
5  Interrogatory No. 14?
6  A. I believe I did, yes, because I have that data
7  in our employee -- our HR database of employee
8  information.
9  Q. All right. Have you -- do you know whether
10  Kelley Chapman is white?
11  A. I do not.
12  Q. Have you ever spoken to Kelley Chapman?
13  A. No, sir.
14  Q. Do you know whether or not Kelley Chapman is
15  still an employee of Corizon?
16  A. I would have to pull a report.
17  Q. Thank you. Ms. Upton, have you trained on
18  HIPAA by Corizon?
19  A. Yes, sir.
20  Q. I'm going to give you a chance to read over
21  18. Do you recall whether 18 was something that you
22  provided information for?
23  A. I believe I provided some dates and times, but
24  I don't think I provided the entire answer, no. I
25  think that was a collaboration.

## Page 42

1  Q. All right. So if you look at B here under No.
2  18, "Which Corizon staff accessed Plaintiff's
3  records, the dates the records were accessed, and
4  for what purpose." The answer provided says
5  Dr. Karen Epperson and Valicia Kirby. Were there
6  more employees of Corizon than just Epperson and
7  Kirby that accessed Ms. LaBlance's record?
8  A. There were.
9  Q. Okay. Do you know why that information is not
10  present in this answer?
11  A. I do not.
12  Q. Would you agree that those names should be
13  here?
14  A. I'm not an attorney. I'd hate to give an
15  opinion on that.
16  Q. Well, if the question is identify those folks
17  from Corizon who accessed the record and you know
18  that it was more than just Epperson and Kirby, it
19  seems the answer is deficient, right?
20  A. It's an assumption on my part.
21  Q. Okay. The next document, Ms. Upton, has been
22  previously used in depositions and identified as
23  Exhibit 39. It is Corizon 940 and -- I'm sorry,
24  Corizon 490 and 491. Do you see Exhibit 39 in front
25  of you?

## Page 43

1  A. Yes, sir.
2  Q. All right. I want to start with Jenny's email
3  to you, Wednesday, March 13, 2019. She emailed you
4  and says, "For your review and approval." What was
5  for your review and approval?
6  A. HR is required to review and concur with all
7  requests for termination.
8  Q. So was there an attachment to Jenny's email to
9  you?
10  A. Yes. It was the initial -- sorry, I'm getting
11  some feedback. It was the initial Request for
12  Termination document that you see there.
13  Q. And then this is your response in which you
14  add Cindy Schupp and Rhonda Almanza. Do you see
15  that?
16  A. Yes, sir.
17  Q. "I concur with the RFT." What does RFT mean?
18  A. Request for Termination.
19  Q. You also say, "Please use this as the official
20  copy." Were there drafts of the Recommendation for
21  Termination?
22  A. There are drafts that do not have the
23  signatures on them because we have to print it out
24  and have it signed if we're able; however, we can
25  also use the email for concurrence as well. We try

## Page 44

1  to get them signed, but if everybody -- like with
2  COVID, none of us are sitting in the same place, so
3  we use the email.
4  Q. And with there being drafts, did any of the
5  prior drafts have different language in the Details
6  of Current Incident and Reason for Recommending
7  Termination?
8  A. That's a great question that I don't know off
9  the top of my head. It's been too long since I
10  reviewed it.
11  Q. How would I know if there were drafts?
12  A. We would have to look and see if there were
13  any in the emails that were sent in. I'm sure Jenny
14  sent it to me. I don't delete them, so it would be
15  in my email.
16  Q. When this was sent to you, was it already
17  signed?
18  A. No, sir. I get the signatures -- that's my
19  signature on the bottom one there. That's the HR
20  person.
21  Q. Okay. So where it says "HR approval," that's
22  your name?
23  A. That is.
24  Q. And you sent it on March 14th. And whose name
25  is that --

## Page 45

1    A. That's Cindy Schupp, the DO. Rhonda was not
2  in the office. So Cindy is able to assign in her
3  stead. She is one of the three required approvers.
4    **Q. Okay. So your email was sent at 11:20 p.m.**
5  **So at night?**
6    A. Yes, sir.
7    **Q. When did you sign it?**
8    A. I would have signed it that afternoon. My
9  guess would be around 5 or 6 when Cindy and I were
10  still there working together, but I couldn't tell
11  you what time exactly.
12    **Q. All right. Well, her email is 7:42 p.m.**
13    A. Well, there you go. Cindy and I must have
14  been working late together that night, which is not
15  uncommon for us.
16    **Q. Understood. So did you sign it between 7:42**
17  **and 11:20?**
18    A. Yes, sir. I would not send it out without my
19  signature on it.
20    **Q. Understood. Well, your email shows that**
21  **there's an attachment. Do you see that, RFT Valicia**
22  **Kirby?**
23    A. Yes.
24    **Q. Jenny's email does not show that there's an**
25  **attachment. So I guess my confusion is, is there a**

## Page 46

1  version of this without signatures?
2    A. Yes, I have it saved to my computer where I
3  worked on it.
4    **Q. Okay. Did you provide that to your attorneys?**
5    A. I thought we provided everything that they
6  asked me to give them, but it may not be in there.
7  But it's exactly the same. You literally print it
8  and sign it and send it and don't make edits. If an
9  edit is made after, you would have to reprint,
10  resign and date and resend.
11    **Q. Understood. I assume because of your**
12  **signature, you agreed with the recommendation for**
13  **termination; is that accurate?**
14    A. I supported it, yes.
15    **Q. Why did you support it?**
16    A. Based on the policy violation and the behavior
17  that Kirby and Epperson took surrounding
18  Ms. LaBlance leaving, I felt like it was an
19  appropriate action. And speaking with my leadership
20  at the time, they agreed and we moved forward.
21    **Q. When say based on their behavior, what**
22  **behavior did Ms. Kirby take that warranted**
23  **termination?**
24    A. Ms. Kirby looked into multiple pages multiple
25  times and her discussions with Dr. Epperson made

## Page 47

1  this an uncomfortable place. And based on the
2  allegations we received, they were both involved.
3  So when we looked into it and were able to confirm
4  that, we made the decision that termination was
5  appropriate.
6    **Q. When you say made an uncomfortable place, will**
7  **you describe what you mean by uncomfortable place?**
8    A. Sure. They sent an email to the -- I'm sorry.
9  Not an email, a letter. I'm not accustomed to
10  letters anymore. Sent a letter to the former
11  employee and made her feel uncomfortable based on
12  what they said. And I can't remember exactly what
13  was in the letter. Something about, "Please don't
14  contact me." And sent her that information and so
15  made her feel uncomfortable and like she would not
16  be welcome back.
17    **Q. Okay. Do you know whether or not Ms. Kirby**
18  **talks to other employees about Ms. LaBlance's**
19  **Department of Corrections records?**
20    A. I don't. Other than Dr. Epperson, I don't
21  know who she spoke to.
22    **Q. All right. If I understand your testimony,**
23  **you don't know whether Dr. Epperson or Ms. Kirby**
24  **talked to other employees about Ms. LaBlance's**
25  **Department of Corrections records?**

## Page 48

1    A. Right. I only know that they spoke to each
2  other about it.
3    **Q. Did you ask Ms. Kirby in particular -- I'm**
4  **just talking about Ms. Kirby right now. Did you ask**
5  **Ms. Kirby if she talked to anybody?**
6    A. At that point we made the decision to move
7  forward with termination based on the evidence, so
8  there was no need to do interviews with her or
9  Dr. Epperson at that time.
10    **Q. Okay. Did you do interviews with anyone else?**
11    A. No. We determined they would be given a level
12  of corrective action that was appropriate, based on
13  the DO's discussions with them at the time.
14    **Q. What does DOO stand for?**
15    A. Director of operations.
16    **Q. And do you know who the DOO on March 13th was?**
17    A. Jenny Meehan.
18    **Q. Here it says Jenny Meehan was notified on**
19  **March 13, 2019. I'm going to move to a different**
20  **document now.**
21    A. Okay.
22    THE WITNESS: Would this be an appropriate
23  time to take a bio break?
24    MR. NUGENT: Absolutely.
25    THE WITNESS: Thank you.

## Page 49

1    MR. VIDEOGRAPHER:  We are going off the
2  record.  The time is 3:40 p.m.
3    (Off the record.)
4    _____
5    (Back on the record.)
6    MR. VIDEOGRAPHER:  We are back on the
7  record.  The time is 3:48 p.m.
8    Q.  (By Mr. Nugent) All right.  Ms. Upton, you
9  understand you're still under oath, right?
10   A.  Yes, sir.
11   Q.  Do you see 41 front of you?
12   A.  I'm sorry.  Which number?  41, yes.
13   Q.  Okay.  This is a document that was used in
14  previous depositions and I believe it's very similar
15  to the document we just looked at.  This one,
16  however, is in relation to Dr. Epperson; would you
17  agree?
18   A.  Yes, sir.
19   Q.  Approximately the same time Jenny Meehan sends
20  you the email, just like with Ms. Kirby, and then
21  you respond with an attachment that is presumably
22  some version of the page you're looking at right
23  now; is that accurate?
24   A.  Yes, sir.
25   Q.  Okay.  And to orient everyone, we are on,

## Page 50

1  again, Exhibit 41.  The Bates numbers are Corizon
2  485 and Corizon 486.  Is it safe to assume that
3  there's a version of this saved on your hard drive
4  without signatures?
5    A.  Yes, sir.
6    Q.  Okay.  And is that your signature where the HR
7  approvals line is?
8    A.  Yes, sir.
9    Q.  And is that Cynthia Schupp where the DO signs?
10   A.  Yes, sir.
11   Q.  Great.  And this is recommending Ms. -- or
12  Dr. Epperson for termination, right?
13   A.  Yes, sir.
14   Q.  Did you also agree with the recommendation for
15  Dr. Epperson?
16   A.  I supported the termination, yes.
17   Q.  Why did you support it?
18   A.  The same reason I supported for Ms. Kirby, the
19  access and the treatment of Ms. LaBlance after the
20  letter was sent, making it feel as though she might
21  not be welcome to return.
22   Q.  Understood.  Ms. Upton, I have some documents
23  now that I want to show you.  I am going to share my
24  screen with you first.  I have all of these
25  documents opened.  I'm going to try to slide to

## Page 51

1  them.  So I will need for you to confirm that we're
2  looking at the same document.  Okay?
3    A.  Yes, sir.
4    Q.  Do you see a document with the exhibit sticker
5  on the bottom that says 44?
6    A.  No, sir, I see a black screen.
7    Q.  A black screen?
8    A.  Yes, sir.
9    Q.  Do you see an Exhibit 44 now?
10   A.  Yes, sir.
11   Q.  And is that the only document you see?
12   A.  Yes, sir.
13   Q.  Okay.  Great.  This is a document that was
14  produced by the Department of Corrections and it's
15  Bates-labeled MDOC1938 and MDOC1939.  I want you to
16  note, Ms. Upton, that in the bottom corner it says
17  Page 1 of 2.  Do you see that?
18   A.  Yes, sir.
19   Q.  And then the next page is 2 of 2?
20   A.  Yes, sir.
21   Q.  I need to show you something different before
22  we can talk about it.  Give me one second.
23    All right.  Do you see Exhibit 43?
24   A.  Yes, sir.
25   Q.  Exhibit 43 was previously used in the

## Page 52

1  deposition and it is Bates-labeled MDOC1940 through
2  1943.  I'm going to ask you, Ms. Upton, have you
3  seen Exhibit 43 before?
4    A.  Yes, in talking to Mr. Matula.
5    Q.  Okay.  Prior to talking to your attorney, had
6  you seen Exhibit 43?
7    A.  Not that I remember.
8    Q.  All right.
9    A.  Not in its entirety, I should clarify.
10   Q.  Okay.  What parts of Page 43 had you seen?
11   A.  Page 1 and 2.
12   Q.  And who provided to you Pages 1 and 2?
13   A.  Rhonda Almanza.
14   Q.  Okay.  When you received Exhibit 43, did it
15  look like this or did it look different?
16   A.  I believe there was a DOC employee's name on
17  there somewhere that was blacked out.  But other
18  than that, it looked similar to this.
19   Q.  So to confirm, Exhibit 43 is a total of four
20  pages.  At the time Ms. Almanza gave it to you, you
21  had only seen -- you were only given the first two
22  pages; is that accurate?
23   A.  That is as I recall it.
24   Q.  And the version that Ms. Almanza gave you also
25  had a DOC employee's name blacked out; is that

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 53

1 right?
2   A. I believe so. For confidentiality, yes.
3   Q. Okay. In looking at the second page that you
4 were given, which is what we're looking at right
5 now, Page 2 of 4, can you identify the Department of
6 Corrections employee?
7   A. I wouldn't know who it was, no. I would have
8 to look at a list of my employees and do process of
9 elimination.
10   Q. Understood. I'm going to move to a different
11 document. Give me one second. One moment, Ms.
12 Upton. I apologize for further delay.
13   A. No problem.
14   Q. Ms. Upton, do you see two documents side by
15 side in front of you?
16   A. Yes, sir.
17   Q. All right. You should have Exhibit 42 and
18 Exhibit 43. Do you see that?
19   A. Yes, sir.
20   Q. All right. We have established that Exhibit
21 43, the first two pages of it are what you reviewed.
22 However, there was a name blacked out. Exhibit 42
23 was produced by your attorneys and I want to get
24 some understanding as to what I'm looking at. Okay?
25   A. Certainly.

## Page 54

1   Q. So on Exhibit 42 -- and I'm going to zoom in a
2 little bit -- the top of it says, Audit Log Search
3 Results from 1/1/17 to 3/8/2019. Do you see that?
4   A. Yes, sir.
5   Q. And then on the Exhibit 43, Audit Log Search
6 Results from 1/1/2017, to 3/8/2019.
7   A. Yes, sir.
8   Q. Then if you look under search criteria, we
9 have a 20120411 on both 42 and 43. Do you see that?
10   A. Yes, sir.
11   Q. All right. Lastly, if you look at the bottom
12 of 42, Page 1 of 4 and -- sorry, one second -- the
13 second page, Page 2 of 4, do you see that?
14   A. Yes, sir.
15   Q. So at the bottom of Exhibit 42, it looks like
16 that's blacked out. Do you see that?
17   A. Yes, sir.
18   Q. And then there are also other markings on the
19 page. I can't tell whether they are highlighter or
20 blacked out. Do you recall whether when you
21 received it there was this additional information or
22 additional coloring on the document?
23   A. No. That was done later.
24   Q. Okay. Done by who?
25   A. I did that when I put it into the employee

## Page 55

1 files.
2   Q. And is that highlighter or were you blacking
3 it out?
4   A. Epperson was highlighter on Dr. Karen
5 Epperson's lines. The rest is blackout because I
6 was putting confidential information into an
7 employee's file.
8   Q. Okay. Were there other employees outside of
9 Epperson and Kirby that were reprimanded?
10   A. Yes, sir.
11   Q. Is there a copy of this type of report from
12 those employee files?
13   A. Unfortunately, I only got the one paper copy
14 and I made one copy and split it between the two
15 files. In retrospect, I could have handled that a
16 little bit differently. But, no, that is the only
17 copy I had. One of two copies I had, I should say.
18   Q. So if you blacked out everyone here, how do we
19 know who recommended for discipline?
20   A. There is an email from me to Jenny with a list
21 of names that after I had blacked out, I went back
22 and tried to decipher whose names were on the list
23 to send for corrective action.
24   Q. Okay. Do you know whether you missed anyone?
25   A. It is my understanding now that I did miss

## Page 56

1 someone.
2   Q. And how did you come to that understanding?
3   A. In seeing the un-redacted version, I realized
4 that there's an employee that was not given
5 corrective action when I compared that to the list
6 of names that I provided to Jenny.
7   Q. And who was that?
8   A. Judy Harkins, I believe, is her name.
9   Q. Will Judy Harkins be reprimanded?
10   A. I don't have an answer for that. I'm
11 discussing that with my senior leadership and legal
12 and we will handle that as appropriate based on the
13 severity of the action that she took at the time.
14   Q. Do you believe that Judy Harkins should be
15 reprimanded?
16   A. It's not about what I believe. It's about
17 following policy.
18   Q. Okay. Based on the policy, should Judy
19 Harkins be reprimanded?
20   A. She should have been reprimanded at the time,
21 yes.
22   Q. And should she be reprimanded now?
23   A. That's a question for legal and my
24 supervisors.
25   Q. Okay. So you can't answer that?

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334

## Page 57

1     A. I can't answer that. I can tell you that it
2 is going to be discussed with them.
3     Q. If they asked for your recommendation, what
4 would it be?
5     A. My recommendation would be that she violated
6 policy and something needs to be done.
7     Q. What level of reprimand would you recommend?
8     A. Well, having only just found out about this, I
9 haven't researched or looked any further into her
10 access or what she did or any further -- as you
11 might have asked, any historical issues that she may
12 have presented. So I have not had a chance to do
13 that.
14     Q. Prior to your learning that Ms. Harkins had
15 accessed Ms. LaBlance's records, do you know whether
16 or not Ms. Harkins reported to anyone that she had?
17     A. I do not.
18     Q. Is this your handwriting where my cursor is?
19     A. I believe that is actually Rhonda's. I don't
20 write my D's like that.
21     Q. Rhonda who?
22     A. Almanza.
23     Q. Okay. And was that writing on this document
24 when she handed it to you?
25     A. Yes.

## Page 58

1     Q. And what was written under the blacked out
2 portion here?
3     A. I don't remember exactly. I know we went
4 through and identified who else had looked and made
5 notes. I might be able to read -- I'm sure the top
6 three letters are Chillicothe because we were
7 identifying Chillicothe employees. Beyond that, I
8 couldn't tell you.
9     Q. Do you know how you missed Judy Harkins?
10     A. I sent out that corrective action for all the
11 following employees that were not Dr. Epperson and
12 Ms. Kirby after this had been done and was trying to
13 do what you just saw I was trying to do there, which
14 was go back and read and try not to miss anybody.
15 And clearly I missed somebody.
16     Q. Can you see what is written here at the top?
17     A. I can't read it, no, sir.
18     Q. Okay. What about here, either of these two?
19     A. I'm sorry, I cannot read it.
20     Q. So then let's look at the clean version, which
21 should be on the right-hand side. Do you see that?
22     A. Uh-huh.
23     Q. All right. So when you looked at this for the
24 very first time, you only had Pages 1 and 2,
25 correct?

## Page 59

1     A. Yes, sir.
2     Q. And the first -- I'm at the bottom of Page 2,
3 which would be the oldest in time of a Corizon
4 employee who accessed Ms. LaBlance's record. Would
5 you agree?
6     A. Yes, that is my understanding.
7     Q. All right. So based on what you could see
8 back in March of 2019, Lori Switzer on April 30th of
9 2018 accessed the record, right?
10     A. Yes, sir.
11     Q. And if we are looking at it, similarly her
12 name is one of the ones that's blacked out?
13     A. Makes sense.
14     Q. And what I can tell you, Ms. Upton, is, I have
15 all of the reprimands for people and Ms. Switzer was
16 not reprimanded. Do you know why?
17     A. I don't believe she was still employed at the
18 time this took place.
19     Q. Understood. When you were doing your
20 investigation, did you call Ms. Switzer?
21     A. No.
22     Q. Okay. Why not?
23     A. I did not conduct any interviews based on the
24 data I had provided. It was not necessary. It's --
25 they did it.

## Page 60

1     Q. Does it matter to you when someone accessed
2 Ms. LaBlance's record?
3     A. Not to my knowledge, it shouldn't matter.
4     Q. Okay.
5     A. If they were an employee, it shouldn't matter.
6     Q. And so if that person is no longer an
7 employee, but they accessed the record, do you think
8 that that person should be told that Corizon knows
9 that they did access the record?
10     MR. MATULA: Object to the form of the
11 question.
12     Q. (By Mr. Nugent) You can answer, Ms. Upton.
13     A. I'm not sure why I would call an employee who
14 is no longer employed about an investigation that
15 was just discovered.
16     Q. Okay. Even though the investigation is
17 related to HIPAA concerns?
18     A. There's no action I can take against that
19 employee at this time.
20     Q. Are there responsibilities that Corizon has to
21 protect individuals whose medical information has
22 been accessed?
23     A. Yes.
24     Q. Does that protection end once an employee
25 leaves Corizon's employ?

15 (Pages 57 to 60)

## Page 61

1   MR. MATULA:  Object to the form of the
2   question, vague.  And calling for a legal conclusion.
3   Q.  (By Mr. Nugent) Ms. Upton, do you understand
4   the question?
5   A.  I'm not sure I understand what you're asking
6   as far as Corizon's responsibility to contact former
7   employees.
8   Q.  So I'll be a bit more direct with it.  Even
9   though Ms. Switzer wasn't an employee of Corizon at
10  the time that you found out she accessed a medical
11  record, are there any obligations to let Ms. Switzer
12  know that she violated HIPAA, even though she's not
13  an employee?
14  A.  Not to my knowledge would I be required to
15  contact her, no.
16  Q.  Understood.  And would that go for all
17  individuals that are on this list that don't work
18  for Corizon anymore?
19  A.  As far as I understand it, yes.
20  Q.  Okay.  Was it any concern of yours that -- if
21  we see here, Lori Switzer was April 30th of 2018 and
22  that was about nine months prior to Ms. LaBlance's
23  separation from Corizon.  Does that concern you at
24  all?
25  A.  I had nothing reported prior.  I had no

## Page 62

1   knowledge of any issues prior.  So, no, it didn't
2   concern me with the date.  It just concerned me that
3   it happened.
4   Q.  Okay.  On the two pages that you have --
5   A.  Uh-huh.
6   Q.  -- there are nine different Corizon employees
7   between April 30th of 2018 and February 22nd of 2019
8   that accessed Ms. LaBlance's Department of
9   Corrections records.  Did that cause you any concern
10  about the number of employees who accessed the
11  record?
12  A.  It would have, absolutely.  Accessing the
13  record is a concern.
14  Q.  Okay.  My question is related to the number of
15  Corizon employees who accessed it between April of
16  2018 and February of 2019.
17  A.  I'm concerned any time a record is accessed.
18  I don't understand the difference the timeframe
19  makes.
20  Q.  I understand that.  But what I'm talking about
21  is just the sheer number of Corizon employees, not
22  the timeframe.  Does the fact that nine employees,
23  nine different employees, accessed Ms. LaBlance's
24  record cause you any concern?
25  A.  The number of employees, absolutely it causes

## Page 63

1   me concern.  That's why we handled it the way we
2   handled it.
3   Q.  Okay.  Let's look at the two pages you did not
4   receive.  Do you see the Megan Meyer entry June 12th
5   of 2017?
6   A.  Uh-huh.
7   Q.  Yes?
8   A.  Yes, sir.  Sorry.
9   Q.  It's okay.  So that is on Page 4 of 4?
10  A.  Uh-huh.
11  Q.  And then on Page 3 of 4, the last entry is
12  Sterling Ream of December 9, 2017.  Do you see that?
13  A.  Yes, sir.
14  Q.  My confusion is this:  If you were given the
15  first two pages, how did you know to reprimand
16  Sterling Ream?
17  A.  I don't remember exactly how that came about,
18  but what I do remember is that I believe she told us
19  that she had looked at it at some point, when she
20  heard we were doing these corrective actions.
21  Q.  Okay.  Do you remember for certain that's
22  what she did?
23  A.  Not 100 percent.  It's been a long time since
24  we looked at all of this and talked to all these --
25  to the folks we talked to.

## Page 64

1   Q.  Let's see here.  I want you to look at Page 4
2   of 4 here.
3   A.  Okay.
4   Q.  Starts with Carol Holloway and goes down to
5   Megan Meyer.
6   A.  Yes, sir.
7   Q.  And tell me if any of these individuals still
8   work for Corizon, to the best of your knowledge.
9   A.  I would have to pull a report to look, with
10  the exception of Deb Ritter who only recently was
11  let go.
12  Q.  Why was Deb Ritter let go?
13  A.  Policy violation.
14  Q.  What was that policy violation?
15  A.  I would have to go back and look.  I can, but
16  it would take a minute.
17  Q.  So Deb Ritter on June 13th looked at
18  Ms. LaBlance's information.  Do you see that?
19  A.  Yes.  Of 2017.
20  Q.  And then Deb Ritter did it again on February
21  22, 2019?
22  A.  Yes, sir.
23  Q.  Now, Ms. Kirby and Ms. Epperson were
24  terminated.  And remind me why they were terminated.
25  A.  Again, their behavior -- in addition to the

ALARIS LITIGATION SERVICES
www.alaris.us              Phone: 1.800.280.3376              Fax: 314.644.1334

## Page 65

1    number of pages they looked at, their behavior made
2    it to the point that Ms. LaBlance would not feel
3    comfortable coming back.
4       Q.  Did the fact that Ms. Ritter looked at it
5    twice weigh in on the recommendation to discipline
6    her?
7       A.  So I believe if you scroll back down to hers,
8    it was not in something I was given.
9       Q.  Would that have been helpful?
10      A.  All of this information would have been very
11   helpful.
12      Q.  And let's see, in looking at the number of
13   employees that accessed Ms. LaBlance's record from
14   June of 2017 to February of 2019, in addition to her
15   complaint about the racial slur and her complaint
16   about Judy Harkins, having all of that information
17   now, does that impact your opinion of what was going
18   on?
19          MR. MATULA:  Object to the form of the
20   question.  Vague.
21      Q.  (By Mr. Nugent) Do you understand my question?
22      A.  Not 100 percent.  Can you maybe ask it again?
23      Q.  Yeah, I sure can.  When you were given
24   Exhibit 43, you were only given the first two pages,
25   right?

## Page 66

1       A.  Yes, sir.
2       Q.  So today you've now seen additional
3    information that wasn't given to you when you were
4    making your analysis, right?
5       A.  Yes, sir.
6       Q.  And part of your analysis was also to give
7    recommendations?
8       A.  Yes, sir.
9       Q.  In addition, I've shown you now the memo
10   related to a racial slur that was used in front of
11   Ms. LaBlance.  Do you remember that?
12      A.  Yes, sir.
13      Q.  We've also looked at the complaint in email
14   that Ms. LaBlance wrote to Jenny Meehan.  Do you
15   remember that?
16      A.  Yes, sir.
17      Q.  All right.  My question is, when you did this
18   investigation into Epperson and Kirby, earlier you
19   testified you didn't feel a need to have looked at
20   the racial slur investigation packet or the
21   complaint filed by Ms. LaBlance, right?
22      A.  Right.  I wouldn't have known about it.  There
23   would have been nothing to look into.
24      Q.  And my question now is, if you put all this
25   information together, does that impact your opinion

## Page 67

1    on the environment that Ms. LaBlance was working in?
2          MR. MATULA:  Object to the form of the
3    question.  Go ahead.
4       A.  I don't know that that would have played a
5    major part because I don't see any racial contention
6    based on what they're looking at here.  What I see
7    here is someone accessing a file they should not be
8    accessing.  There was no allegation of that.  I do
9    not see a behavior here that would pertain to that.
10   Ms. LaBlance did not report that to me.  She did not
11   come forward to me.
12         So would it have played into the corrective
13   action given to the individuals involved?
14   Potentially, yes.  Would it have changed how I
15   investigated this?  Possibly.  That's retrospect.
16      Q.  Understood.  Thank you.  I've got a couple
17   more documents I want to show you, Ms. Upton.
18      A.  Sure.
19      Q.  Do you see two documents side by side?
20      A.  Yes, sir.
21      Q.  And the one on the left is Exhibit 41.  Do you
22   see that?
23      A.  Yes, sir.
24      Q.  And then on the right.  Exhibit 45?
25      A.  Yes, sir.

## Page 68

1       Q.  Okay.  On the left you have the second page of
2    Exhibit 41, which is Corizon 46?
3       A.  Yes, sir.
4       Q.  Can you see the Details of Current Incident
5    clearly?
6       A.  I can read it mostly.
7       Q.  Okay.  I can try to make it bigger.
8       A.  Just forgive me for being right up in the
9    computer screen.
10      Q.  You're fine.  You're fine.  Here's what I want
11   you to do.  On the left is Dr. Epperson and her
12   recommendation for termination.
13      A.  Yes, sir.
14      Q.  And on the right is Tammie Christopher's first
15   written counseling.  Would you read to yourself the
16   Details of Current Incident paragraphs on both of
17   those?  And I'm going to ask you some questions.
18   Okay?
19      A.  I'm sorry, I'm getting some feedback.  You
20   want me to read both of them?
21      Q.  Yes, to yourself.  And then let me know when
22   you're ready.
23      A.  Thank you.  Okay.
24      Q.  All right.  Were you a part of recommending
25   the written counseling for Tammie Christopher?

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us                                          Fax: 314.644.1334

## Page 69

1    A.  Yes.  I recommended that they receive
2   corrective action and take training.
3    Q.  Okay.  If I'm looking at these two documents,
4   what's the difference between what Karen Epperson
5   did and what Tammie Christopher did?
6    A.  So the difference isn't reflected in what they
7   did in these.  The documents have different purpose.
8    Q.  All right.  What is the different purpose?
9    A.  The purpose of a Recommendation for
10  Termination goes to leadership.  It does not go to
11  the employee to provide any type of correction.  A
12  corrective action is provided to the employee and
13  they are specifically given instruction on how they
14  made an error and how to correct it for the future,
15  as well as any expectations that will be received
16  going forward.
17    So Requests for Terminations are typically
18  extremely brief and to the point, whereas corrective
19  actions, first, second and final are more verbose,
20  for lack of a better word.
21    Q.  Is it important that the reasons for
22  recommending termination are accurate?
23    A.  Yes.
24    Q.  Is it important that the Details of Current
25  Incident that goes to an employee are accurate?

## Page 70

1    A.  Are you speaking on the Request for
2   Termination or on the corrective action?
3    Q.  Frankly, both.
4    A.  The Request for Termination is not provided to
5   the employee.
6    Q.  Is it important that it's accurate?
7    A.  Yes, sir.
8    Q.  And then what about the document that is
9   provided to the employee?
10    A.  Yes, sir.
11    Q.  It's important that it's accurate, too, right?
12    A.  Yes, sir.
13    Q.  All right.  Ms. Upton, you were doing your
14  investigation in March of 2019.  Were you made aware
15  of whether or not Department of Correction officers
16  had accessed Ms. LaBlance's DOC records?
17    A.  Again, the only one I knew was the employee
18  that was blocked off, but I didn't know who for
19  certain or what --
20    Q.  Do you know whether or not someone from
21  Corizon made the Department of Corrections aware
22  that one of their employees had done something also?
23    A.  I do not.
24    Q.  Did you have a conversation with Ms. Almanza
25  about why you only had the first two pages of a

## Page 71

1   report?
2    A.  I was -- I did.  I don't remember exactly how
3   that went.  I just made sure I had what I needed
4   pertinent to the investigation we were conducting.
5    Q.  Okay.  Do you remember what she said?
6    A.  I don't.
7    Q.  Did it cause you any concern that you only had
8   two of four pages?
9    A.  Not at that time, based on what we were
10  looking into.
11    Q.  Looking back on it now, does it cause you any
12  concern that you didn't have those two pages?
13    A.  Now I would very much have liked to have had
14  all four pages.
15    Q.  And why is that?
16    A.  There's information there that could pertain
17  to others who needed to have some training, at the
18  very least, if not corrective action.
19    Q.  Okay.  In our conversations you mentioned that
20  Judy Harkins was somebody that was left off.  I
21  guess my question is this:  When you realized you
22  had blacked out the names but needed to go back and
23  figure out who was there, did you have any concern
24  that you might have left someone off then?
25    A.  At the time I did not.  I thought I had gotten

## Page 72

1   everyone we discussed.
2    Q.  Okay.  One thing I'm wondering, Ms. Upton, is
3   with the number of individuals who accessed
4   LaBlance's records, looking back on it now, do you
5   think it's worth knowing why those individuals were
6   doing it?
7    A.  I'm not sure I understand.  I mean, why they
8   looked at the record or why they found out?  Or what
9   are you asking?
10    Q.  Yeah, why they looked at it.
11    A.  It's a policy violation.  And so at the time
12  and now, it would still be seen as a policy
13  violation if you're looking at it for any reason.  I
14  would handle it as a policy violation unless there
15  was evidence to support an alternative concern.
16    Q.  Do you know whether or not LaBlance was the
17  only African American employee at Chillicothe while
18  she was there?
19    A.  I have been told that since she left.
20    Q.  Okay.  If you add that factor into everything
21  we know now with regards to the four pages of
22  Corizon employees looking at her record, does that
23  cause you any concern?
24    A.  The same amount of concern I would have --
25      THE WITNESS:  I'm sorry.  Go ahead, Mike.

## Page 73

1   MR. MATULA:  Object to the form of the
2   question.  Go ahead.
3     A.  The same amount of concern I would have for
4   any employee whose record was accessed
5   inappropriately.  Every employee has a right to
6   privacy.
7     Q.  (By Mr. Nugent) Regardless of race?
8     A.  Absolutely.
9     Q.  I'm going to go back to the list.  I forgot to
10  ask you something.
11    A.  Sure.
12    Q.  I apologize.
13    A.  It's all right.  It's your meeting.
14    Q.  Do you have Exhibit 43 in front of you?
15    A.  Yes, sir.
16    Q.  Okay.  And we're looking at MDOC1941, which is
17  Page 2 of 4.
18    A.  Uh-huh.
19    Q.  And we know that this is one of the documents
20  that you received from Ms. Almanza, right?
21    A.  Yes, sir.
22    Q.  And this is actually the second of those two
23  pages that you received.  I'm looking at the second
24  entry here.  Do you see Jerry Lovelace?
25    A.  I do.

## Page 74

1     Q.  Now, it says here that Jerry Lovelace accessed
2   Ms. LaBlance's record on February 11, 2019.  Do you
3   see that?
4     A.  I do.
5     Q.  And on the same day, Valicia Kirby accessed
6   it --
7     A.  Yes, sir.
8     Q.  -- six times.
9     A.  Okay.
10    Q.  One -- do you see my mouse?
11    A.  Yes.
12    Q.  So one, two --
13    A.  That's Dr. Epperson.
14    Q.  I'm sorry.  One, two, three, four, five.
15    A.  Five.  Okay.
16    Q.  Five.
17    A.  Five times.
18    Q.  I apologize, I was off.
19    A.  That's all right.
20    Q.  And in addition, Mr. Lovelace looked at it --
21  let's see, after -- so Valicia Kirby looked at it at
22  12:58.  Lovelace looked at it 2:34 p.m.  Do you see
23  that?
24    A.  I do.
25    Q.  Did you talk to Dr. Lovelace about why he

## Page 75

1   looked at in on February 11th?
2     A.  I asked him why he was on the audit log.  It
3   didn't occur to me to ask about the date
4   specifically.  And he stated that he was asked to
5   check and see what he could see.
6     Q.  Okay.  By who?
7     A.  I don't know.  I don't remember.
8     Q.  Well, did you take notes about -- let me ask a
9   different question.
10      Was your conversation with Mr. Lovelace a part
11  of your investigation?
12    A.  Yes, because I asked him what could be seen in
13  the documentation that people were looking at,
14  because I don't have access to the system.
15    Q.  Makes sense.  What was his answer with regards
16  to why he looked at it on February 11th?
17    A.  That he was asked to provide information about
18  what could be seen.
19    Q.  And you didn't follow up with regards to who
20  asked him that?
21    A.  I did not.
22    Q.  Why?
23    A.  I don't have a good answer for that.  I don't
24  know.
25    Q.  Looking back on it, do you feel like you

## Page 76

1   should have?
2     A.  Yes, knowing that there was an email that came
3   in around then now.  Potentially, yes.
4     Q.  And he didn't offer it to you?
5     A.  No, sir.
6     Q.  Looking back on it, in your opinion, do you
7   believe he should have?
8     A.  I wish he would have.  It would have seemed
9   appropriate.
10    Q.  Was Dr. Lovelace reprimanded?
11    A.  No, sir.
12    Q.  Why not?
13    A.  Based on the fact that -- it was my
14  understanding that he was involved in the
15  investigation looking into some issues that I was
16  not aware of at the time.
17    Q.  What issues?
18    A.  That other people had been looking into the
19  record.
20    Q.  So he was doing his own investigation?
21      MR. MATULA:  I'll object to the form of the
22  question.
23    A.  I was not a part of it.  I can't speak to what
24  he was doing.
25      THE WITNESS:  I'm sorry, Mike.  I didn't

## Page 77

1  mean to step on you, Mike.
2      Q. (By Mr. Nugent) Ms. Upton, this is the first
3  I'm hearing about it.  And I guess -- when you did
4  your investigation, did you and Dr. Lovelace compare
5  information?
6      A. We talked.  He was part of the -- well, he
7  brought the actual claim to us because it was sent
8  to him, the concern to us.  Ms. LaBlance texted him
9  a picture of the letter.
10      Q. Do you see an email in front of you on the
11  left-hand side?
12      A. Yes, sir.
13      Q. And at the bottom it says Exhibit 33?
14      A. Yes, sir.
15      Q. All right.  So if I zoom this in, do you see
16  that it's an email from Lovelace to Almanza?
17      A. Yes, sir.
18      Q. And what's the date of that email from
19  Lovelace to Almanza?
20      A. Friday, March 1st.
21      Q. Okay.  So if we go back to Lovelace's entry,
22  when did he look at the record?
23      A. February 11th.
24      Q. So the time that Lovelace reports this is not
25  February 11th; is that right?

## Page 78

1      A. The first time it was reported to me was
2  March 1st.
3      Q. Okay.  And I haven't seen anything that
4  suggests that Mr. Lovelace reported it before this
5  March 1st email.  Are you aware of any report from
6  Mr. Lovelace before March 1st?
7      A. No.  Not from him, no.
8      Q. And is it your testimony that Mr. Lovelace was
9  doing an investigation prior to your investigation?
10      A. Investigation may not be the right word.
11  Looking into a concern.  I don't know.  I wasn't a
12  party to that.  I would hate to be asked to tell you
13  what anyone was doing if I'm not in the room.
14      Q. When Ms. Almanza brought you two of four
15  pages, did she tell you about Mr. Lovelace's looking
16  into anything?
17      A. No, sir.
18      Q. Would you agree that all that information
19  would be relevant to your understanding of what
20  you're looking into?
21      A. Absolutely.
22      Q. I can tell you, Ms. Upton, that as of
23  February 11th, Ms. LaBlance was still an employee of
24  Corizon.  Did you know that?
25      A. Yes, I did know that.

## Page 79

1      Q. Okay.  Do you know when her last day was?
2      A. I believe it was sometime near the end of
3  February, somewhere in the 20s.
4      Q. Do you know whether or not Mr. Lovelace had a
5  conversation with Ms. LaBlance based on whatever it
6  was he was looking into?
7      A. I'm not aware of anything that he did.
8      Q. Did it cause you any concern that Dr. Lovelace
9  was aware of this prior to Ms. LaBlance's employment
10  ending?
11      A. Yes.
12      Q. Do you see Exhibit 46 on the right-hand side?
13      A. Yes, sir.
14      Q. All right.  Exhibit 46 is Sterling Ream's
15  Corrective Action Form from March 24th of 2019.  At
16  the time, Ms. Ream was the HSA; is that right?
17      A. Yes, sir.
18      Q. Do you know what HSA stands for?
19      A. Health services administrator.
20      Q. Okay.  And she was reprimanded, right?
21      A. Yes, sir.
22      Q. For accessing Ms. LaBlance's Department of
23  Correction records, right?
24      A. Yes, sir.
25      Q. The next exhibit you have is 47.  Do you see

## Page 80

1  that on the right-hand side?
2      A. Yes, sir.
3      Q. Do you see manager's signature there?
4      A. Yes.
5      Q. Can you make that out?  Do you know whose
6  signature that is?
7      A. It looks like Sterling's signature.
8      Q. Okay.  Why was Sterling allowed to reprimand
9  employees that did the same thing she did?
10      A. I was not involved in that decision.
11      Q. Does that seem odd to you?
12      A. Unless she was the first one reprimanded and
13  had been corrected, yes.  It would seem odd to me
14  any way you slice it.  But yes.
15      Q. Why would it seem odd to you?
16      A. How can she help them be better if she's not
17  been trained to do better or corrected when she did
18  wrong.
19      Q. The next exhibit you have is 48 and it is
20  Corizon 1002.  Do you see that?
21      A. Yes, sir.
22      Q. This is for Debbie Ritter?
23      A. Okay.
24      Q. On the manager's signature, is that Sterling
25  Ream?

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334

## Page 81

1    A.  Yes, sir.
2    Q.  The next one is Exhibit 49.  It is Corizon
3  1004.
4    A.  Yes, sir.
5    Q.  Under manager's signature, is that Sterling
6  Ream?
7    A.  Yes, sir.
8    Q.  And this is a Corrective Action Form for
9  Jessica Frizzell, right?
10    A.  Yes, sir.
11    Q.  Does it seem odd that Sterling Ream
12  reprimanded those folks?
13        MR. MATULA:  Object to the form of the
14  question.  Go ahead.
15    A.  I mean, yes, it does.  I feel like we've
16  established that.
17    Q.  (By Mr. Nugent) Well, we hadn't established it
18  with the other folks, so I wanted to make sure.
19    A.  Oh, okay.  All right.  I just wanted to be
20  sure.  I just --
21    Q.  I appreciate that you want to make sure.
22        Ms. Upton -- actually, give me one second.
23  Sorry.
24    A.  Sure.
25    Q.  Ms. Upton, during your investigation, were you

## Page 82

1  aware that Val Kirby allegedly told Department of
2  Correction employees that Ms. LaBlance had DOC
3  records?
4    A.  No.
5    Q.  Are you aware that Tammie Christopher is
6  married to a DOC employee?
7    A.  I'm sorry, say that again.
8    Q.  Are you aware that Tammie Christopher is
9  married to a DOC employee?
10    A.  No, sir.
11    Q.  Ms. Upton, have told you the truth today?
12    A.  Yes, sir.
13        MR. NUGENT:  Thanks.  I have nothing
14  further.
15        MS. JAG:  I have no questions for Ms. Upton.
16        THE WITNESS:  Thank you, sir.
17        THE WITNESS:  Thank you.
18        MR. MATULA:  I have no questions at this
19  time.  We'll read and sign.
20        MR. VIDEOGRAPHER:  We are off the record.
21  The time is 4:47 p.m.
22        [Deposition concluded at 4:47 p.m.]
23
24
25

## Page 83

1        CERTIFICATE OF REPORTER
2    I, Joann Renee Richardson, CCR, for the State of
3  Missouri, do hereby certify that the deposition of
4  MAKISA UPTON was held on November 4, 2020, via
5  videoconference, State of Missouri, and was held on the
6  time and in the place previously described.
7
8    IN WITNESS WHEREOF, I have hereunto set my hand
9  and seal.
10
11
12        _____
13          Joann Renee Richardson, CCR
14
15
16
17
18
19
20
21
22
23
24
25

## Page 84

1        ALARIS LITIGATION SERVICES

2  November 20, 2020

3  Mr.  Michael L. Matula
   Ogletree Deakins
4  4520 Main Street, Suite 400
   Kansas City, Missouri 64111

5

6  IN RE: TERRI YOLANDA LABLANCE v. MISSOURI
        DEPARTMENT OF CORRECTIONS AND CORIZON HEALTH

7  Dear Mr. Matula,

8  Please find enclosed your copies of the deposition of
   MAKISA UPTON taken on November 4, 2020 in the
9  above-referenced case. Also enclosed is the original
10  signature page and errata sheets.

11
12  Please have the witness read your copy of the
13  transcript, indicate any changes and/or corrections
14  desired on the errata sheets, and sign the signature
15  page before a notary public.

16
17  Please return the errata sheets and notarized
18  signature page within 30 days to our office at 711 N
    11th Street, St. Louis, MO 63101 for filing.
19
20
21  Sincerely,
22
23
24  Joann Renee Richardson
25

## Page 85

1   ERRATA SHEET
    Witness Name: MAKISA UPTON
2   Case Name: TERRI YOLANDA LABLANCE v. MISSOURI
        DEPARTMENT OF CORRECTIONS AND CORIZON HEALTH
3   Date Taken: NOVEMBER 4, 2020
4
5   Page #_____  Line #_____
6   Should read: _____
7   Reason for change: _____
8
9   Page #_____  Line #_____
10  Should read: _____
11  Reason for change: _____
12
13  Page #_____  Line #_____
14  Should read: _____
15  Reason for change: _____
16
17  Page #_____  Line #_____
18  Should read: _____
19  Reason for change: _____
20
21  Page #_____  Line #_____
22  Should read: _____
23  Reason for change: _____
24
25  Witness Signature: _____

## Page 86

1   STATE OF _____)

2   COUNTY OF _____)

3
4   I, MAKISA UPTON, do hereby certify:
5       That I have read the foregoing deposition;
6       That I have made such changes in form
7   and/or substance to the within deposition as might
8   be necessary to render the same true and correct;
9       That having made such changes thereon, I
10  hereby subscribe my name to the deposition.
11      I declare under penalty of perjury that the
12  foregoing is true and correct.
13      Executed this _____ day of _____,
14  20____, at _____.
15
16
17
18      _____
19          MAKISA UPTON
20
21      _____
22          NOTARY PUBLIC
23  My Commission Expires:
24  100180
25

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## A

abbreviated 39:1
able 19:11 25:3 43:24 45:2 47:3 58:5
above-refere... 84:9
absence 18:23
absent 37:17
absolutely 7:15 12:14 22:1 23:5 24:12,15 32:13 38:3 48:24 62:12 62:25 73:8 78:21
access 25:3 38:9 50:19 57:10 60:9 75:14
accessed 28:1 42:2,3,7,17 57:15 59:4,9 60:1,7,22 61:10 62:8,10 62:15,17,23 65:13 70:16 72:3 73:4 74:1 74:5
accessing 26:2 29:19 62:12 67:7,8 79:22
accurate 21:2 46:13 49:23 52:22 69:22 69:25 70:6,11
accustomed 47:9
action 4:20,21 4:22,23,24 13:4 14:18,21 14:24 16:7,15 19:22 21:6,8 21:21 27:4,11 34:12,18,22

35:15,18 36:7 36:12 37:9 38:1 46:19 48:12 55:23 56:5,13 58:10 60:18 67:13 69:2,12 70:2 71:18 79:15 81:8
actions 35:23 36:3 63:20 69:19
acts 36:10
actual 77:7
ADA 14:10
add 43:14 72:20
addition 8:10 64:25 65:14 66:9 74:20
additional 21:4 54:21,22 66:2
address 7:24
administrator 79:19
African 72:17
afternoon 6:1,21 45:8
ago 15:22
agree 34:14 42:12 49:17 50:14 59:5 78:18
agreed 5:1 46:12,20
ahead 24:14 31:25 67:3 72:25 73:2 81:14
Alaris 3:21 5:19 84:1
all-inclusive 35:21
allegation 18:15 18:17 31:5 67:8
allegations 10:11

47:2
allegedly 82:1
allow 38:8
allowed 80:8
Almanza 4:10 26:11 27:1,9 28:18 43:14 52:13,20,24 57:22 70:24 73:20 77:16,19 78:14
Almanza's 26:12
alternative 72:15
American 72:17
amount 72:24 73:3
analysis 66:4,6
and/or 20:12 35:15 36:8 37:12 84:13 86:7
answer 17:9 22:25 23:9 41:4,24 42:4 42:10,19 56:10 56:25 57:1 60:12 75:15 75:23
answering 39:3
answers 4:12 30:5 38:22 39:5
anybody 48:5 58:14
anymore 47:10 61:18
Apartment 8:1
apologies 38:16
apologize 53:12 73:12 74:18
appreciate 20:20 81:21
appropriate 19:22 20:24 20:25 21:22

46:19 47:5 48:12,22 56:12 76:9
appropriately 20:2
approval 22:17 43:4,5 44:21
approvals 50:7
approvers 45:3
approximately 12:2 23:6 49:19
April 59:8 61:21 62:7,15
arrival 30:18
asked 22:17 24:17 26:6 27:20 46:6 57:3,11 75:2,4 75:12,17,20 78:12
asking 12:21 24:5 29:24 61:5 72:9
assign 45:2
assistance 18:10
Assistant 3:10
assume 8:21 27:21 46:11 50:2
assumption 42:20
attached 4:25
attachment 43:8 45:21,25 49:21
attention 29:8 31:18
attorney 3:10 42:14 52:5
attorneys 5:22 38:19 46:4 53:23
audience 13:19
audit 26:24 27:17,20

28:21 54:2,5 75:2
Auditing 4:17,18 4:19
August 29:10
Auto 9:25
available 18:21 20:14
average 13:13
aware 22:3 24:19 25:25 26:4 32:1 70:14,21 76:16 78:5 79:7,9 82:1,5,8
Awesome 9:17

## B

B 4:5 42:1
bachelor's 10:23
back 9:5,6 19:25 20:2 26:22 32:24 32:25 47:16 49:5,6 55:21 58:14 59:8 64:15 65:3,7 71:11,22 72:4 73:9 75:25 76:6 77:21
backfill 22:17
background 8:9
Baptist 10:25
Barb 12:11,16,18 19:19
Barbara 12:17,19
base 21:11
based 22:25 28:20 32:6 36:20,21 46:16,21 47:1 47:11 48:7,12 56:12,18 59:7 59:23 67:6 71:9 76:13 79:5

Bates 50:1
Bates-labeled
    31:15 34:13
    51:15 52:1
bearing 30:2
behalf 1:12 2:17
    6:2,6,10
behavior 14:24
    21:11 29:25
    31:6 46:16,21
    46:22 64:25
    65:1 67:9
believe 13:5
    15:21 25:20
    25:24 28:18
    30:21,22 32:9
    33:17 34:21
    35:11 41:6,23
    49:14 52:16
    53:2 56:8,14
    56:16 57:19
    59:17 63:18
    65:7 76:7
    79:2
benefit 23:24
    24:2
benefits 10:11
    11:11,15
best 17:24 33:12
    36:13 64:8
better 69:20
    80:16,17
Beyond 58:7
big-time 23:11
bigger 31:20
    68:7
bio 48:23
bit 7:7 10:21
    54:2 55:16
    61:8
black 51:6,7
blacked 4:17
    52:17,25
    53:22 54:16
    54:20 55:18
    55:21 58:1
    59:12 71:22

blacking 55:2
blackout 55:5
blocked 70:18
Bolivar 10:25
boss 12:20
    38:14
bottom 31:18
    44:19 51:5,16
    54:11,15 59:2
    77:13
box 40:16
BP 40:22
break 8:12
    48:23
brief 69:18
briefly 11:8
bring 31:8
brought 77:7
    78:14
business 10:7
    40:22,23,24

—————

C
C 3:1
call 26:5 59:20
    60:13
called 14:12
    38:6
calling 24:5
    61:2
car 19:6
Carol 64:4
case 1:6 2:5
    5:13 6:24 11:11
    84:9 85:2
catch 32:10
cause 2:13 62:9
    62:24 71:7,11
    72:23 79:8
causes 62:25
CCR 83:2,13
Center 12:3
    40:24
CEO 33:14 34:7
certain 2:13
    63:21 70:19
Certainly 53:25

CERTIFICATE
    83:1
Certified 2:12
    5:4
certify 83:3
    86:4
chain 35:3
    37:20
chance 29:12
    41:20 57:12
Chandler 5:18
change 85:7,11
    85:15,19,23
changed 33:13
    33:13 34:8
    67:14
changes 34:1,4
    84:13 86:6,9
Chapman 41:10
    41:12,14
characterize
    34:18
check 75:5
Checklist 4:11
    39:24
Chillicothe 12:3
    16:14 40:24
    58:6,7 72:17
Chris 5:18
Christopher
    4:20 15:25
    68:25 69:5
    82:5,8
Christopher's
    68:14
Cindy 28:19
    30:22 43:14
    45:1,2,9,13
City 3:4,8,11 8:4
    11:22,23 84:4
civil 13:1 14:8,9
    14:12,13 15:21
    16:1
claim 77:7
clarification
    20:20 21:4
clarify 52:9

class 15:21 16:4
clean 58:20
clear 19:20
    28:2,3,7
clearly 28:9
    58:15 68:5
closely 30:23
coaching 13:4
    14:18,23,23
    15:1 16:6,14
collaboration
    41:25
coloring 54:22
combination
    16:20,23
come 10:19
    16:17 21:14,24
    26:6 37:4
    38:13,14 56:2
    67:11
comes 21:17
comfortable
    65:3
coming 65:3
Commission
    86:23
communication
    26:15
company 22:18
    23:23 40:8
company's 37:9
compare 77:4
compared 56:5
compensation
    10:11 11:15
complainant
    20:13 22:9
complaining
    32:15
complains 18:13
complaint 20:7
    26:1,4 27:3,25
    30:12 32:2
    65:15,15 66:13
    66:21
completed 40:9
computer 46:2

68:9
concern 22:14
    32:3,5 61:20
    61:23 62:2,9
    62:13,24 63:1
    71:7,12,23
    72:15,23,24
    73:3 77:8
    78:11 79:8
concerned
    62:2,17
concerns 19:18
    60:17
concluded
    82:22
conclusion
    27:16 61:2
concur 43:6,17
concurrence
    43:25
conduct 12:22
    12:25 15:23
    17:15 18:5
    22:8 27:2,24
    59:23
conducted 13:1
    13:2,3,12 23:7
    23:18
conducting 17:1
    17:4,7 18:12
    24:21 31:3,4
    71:4
conference
    5:16,20
confidential
    15:9 55:6
confidentiality
    25:8 53:2
confirm 30:8
    47:3 51:1
    52:19
confused 30:3
confusion
    45:25 63:14
consent 6:2,7,11
considered 15:1
    29:22

contact 47:14
61:6,15
content 14:8
contention 67:5
contents 29:12
context 22:19
23:3
control 38:11
conversation
26:6 27:15
28:17 37:16
70:24 75:10
79:5
conversations
71:19
conversely
36:2
conveyed 15:4
copies 55:17
84:8
copy 34:2
43:20 55:11,13
55:14,17 84:12
Corizon 1:7 2:6
2:16 4:12 5:12
6:11,24 9:18,19
9:24 10:5,16
11:12 12:12,23
15:1 17:3,14
18:3,4,13
20:14 23:7,21
24:1,11,19 29:9
30:18 31:15,16
31:18,19 33:23
34:13 35:12
36:6 37:7,16
38:18,21 40:5
40:12 41:15,18
42:2,6,17,23
42:24 50:1,2
59:3 60:8,20
61:9,18,23
62:6,15,21
64:8 68:2
70:21 72:22
78:24 80:20
81:2 84:6

85:2
Corizon's 34:18
60:25 61:6
Corizon:- 3:6
corner 51:16
correct 11:12
58:25 69:14
86:8,12
corrected 80:13
80:17
correction 69:11
70:15 79:23
82:2
corrections 1:7
2:6,16 3:9
5:12 6:6,25
47:19,25 51:14
53:6 62:9
70:21 84:6,13
85:2
corrective 4:20
4:21,22,23,24
13:4 14:18,21
14:24 16:7,15
21:6,8,21 27:11
34:12,18,22
37:8 48:12
55:23 56:5
58:10 63:20
67:12 69:2,12
69:18 70:2
71:18 79:15
81:8
correctly 24:24
counsel 4:25
5:2,2
counseling
34:23,24 35:2
37:11,17 68:15
68:25
counted 11:25
country 25:8
COUNTY 86:2
couple 8:15
30:17 33:7
34:1 39:5,12
67:16

course 14:8,9
18:23
court 1:1 2:1,12
2:14 3:20 5:4
5:14,21 6:3,8
6:14 17:21
covered 8:14
14:18
covers 14:10
COVID 44:2
COVID-19 11:18
crackly 7:4,5
create 15:14
36:22
criteria 54:8
current 15:7
44:6 68:4,16
69:24
cursor 57:18
Cynthia 50:9

## D

D 4:1
D's 57:20
Dale 29:10
data 14:5 21:9
21:14,23 22:4
24:20,24
28:22 41:6
59:24
database 13:3
15:3 22:6
25:11,12 26:18
41:7
date 5:9 32:10
33:13,15,21
46:10 62:2
75:3 77:18
85:3
dates 41:23
42:3
day 2:11 74:5
79:1 86:13
days 37:22,23
84:18
Deakins 3:7
84:3

Dear 84:7
Deb 64:10,12,17
64:20
Debbie 80:22
Deborah 4:23
December
63:12
decipher 55:22
decision 23:25
27:7 47:4
48:6 80:10
declare 86:11
Defendant 3:6
4:12 6:11 38:21
Defendants 1:8
2:7,17 5:3
deficient 42:19
degree 10:23
11:2
delay 53:12
delete 44:14
deliver 15:15
delivered 15:19
16:7,9,10,19
department 1:6
2:5,16 3:9
5:12 6:6,25
40:5 47:19,25
51:14 53:5
62:8 70:15,21
79:22 82:1
84:6 85:2
depending
35:25 36:4
37:10
depends 13:19
deposition 1:11
2:8 5:3,10,15
5:20,25 6:3,7
6:12,23 8:7
26:21 31:15
33:5 52:1
82:22 83:3
84:8 86:5,7,10
depositions
29:7 31:14
33:4 38:20

39:23 42:22
49:14
describe 14:7
18:11 35:16
36:10 47:7
described 83:6
description
34:22
desired 84:14
detailed 34:9
details 32:4
44:5 68:4,16
69:24
determine 19:2
19:16 21:5
38:3
determined
48:11
difference
62:18 69:4,6
different 6:4
10:14 11:8
13:25 24:8
36:18,20
37:15 38:10
39:18 44:5
48:19 51:21
52:15 53:10
62:6,23 69:7
69:8 75:9
differently
55:16
difficulties 9:9
direct 61:8
director 19:14,15
48:15
discipline 15:1
34:17,17,19,25
35:3 36:17,18
37:15,20
55:19 65:5
discovered
60:15
discretion 37:10
discrimination
14:10 18:6,14
discussed 57:2

72:1
discussing 22:2
  28:20 56:11
discussions
  46:25 48:13
District 1:1,2 2:1
  2:1,14,14 5:13
  5:14
Division 1:3 2:2
  5:14
DO's 48:13
DOC 19:10,12
  20:15,16 27:18
  27:20 29:19
  30:3 38:3,13
  52:16,25
  70:16 82:2,6
  82:9
DOC's 26:18
document 4:16
  31:9 33:8
  38:15,18,23
  39:18 40:2,4
  40:6 42:21
  43:12 48:20
  49:13,15 51:2
  51:4,11,13 53:11
  54:22 57:23
  70:8
documentation
  18:16,19,25
  19:21 20:7,8
  20:23 27:7
  28:2,5,7 75:13
documents
  21:16 22:24
  25:14,18,19
  26:20,22
  33:2 40:19
  50:22,25
  53:14 67:17,19
  69:3,7 73:19
doing 13:17,18
  18:4 23:22,23
  59:19 63:20
  70:13 72:6
  76:20,24 78:9

78:13
DOO 48:14,16
Dr 26:15 42:5
  46:25 47:20
  47:23 48:9
  49:16 50:12,15
  55:4 58:11
  68:11 74:13,25
  76:10 77:4
  79:8
drafts 43:20,22
  44:4,5,11
draw 29:8 31:18
drive 19:6 50:3
duly 6:17

——————

E
E 3:1,1,11 4:1,5
earlier 66:18
earning 10:20
edit 46:9
edits 46:8
education
  10:22 11:3
  17:15
effective 33:13
  33:15,21
egregious
  36:12
egregiousness
  21:11
either 20:12
  22:9 58:18
electronic 15:17
  16:19
Eleventh 3:22
elimination
  53:9
email 4:7,8,10
  4:15 31:21
  43:2,8,25
  44:3,15 45:4
  45:12,20,24
  47:8,9 49:20
  55:20 66:13
  76:2 77:10,16
  77:18 78:5

emailed 43:3
emails 30:16
  44:13
employ 60:25
employed
  20:14 23:7
  59:17 60:14
employee 4:9,11
  13:3 15:7 16:3
  39:23 40:6,8
  41:7,7,15 47:11
  53:6 54:25
  55:12 56:4
  59:4 60:5,7,13
  60:19,24 61:9
  61:13 69:11,12
  69:25 70:5,9
  70:17 72:17
  73:4,5 78:23
  82:6,9
employee's
  52:16,25 55:7
employees 10:9
  10:15 11:23
  12:3,8 13:18
  14:1,4 18:22
  19:9 20:16
  36:19,25 37:1
  37:7,8,14,20
  42:6 47:18,24
  53:8 55:8
  58:7,11 61:7
  62:6,10,15,21
  62:22,23,25
  65:13 70:22
  72:22 80:9
  82:2
employment
  18:6 22:11
  24:11 32:12
  33:22 79:9
enclosed 84:8
  84:9
ended 22:12
entire 41:24
entirety 52:9
entry 63:4,11

73:24 77:21
environment
  67:1
Epperson 26:15
  31:22 42:5,6
  42:18 46:17
  46:25 47:20
  47:23 48:9
  49:16 50:12,15
  55:4,9 58:11
  64:23 66:18
  68:11 69:4
  74:13
Epperson's
  55:5
errata 84:10,14
  84:17 85:1
error 69:14
established
  53:20 81:16,17
ethics 11:11
event 38:5
everybody
  21:15 44:1
evidence 19:1
  48:7 72:15
exactly 45:11
  46:7 47:12
  58:3 63:17
  71:2
EXAMINATION
  4:2 6:19
examined 2:9
  6:17
examples 35:17
excellent 23:8
exception 64:10
excuse 17:1
  25:12 26:17
  40:22
Executed 86:13
exhibit 4:6 29:8
  29:9 31:15
  33:5 38:20
  39:20,22
  42:23,24 50:1
  51:4,9,23,25

52:3,6,14,19
  53:17,18,20
  53:22 54:1,5
  54:15 65:24
  67:21,24 68:2
  73:14 77:13
  79:12,14,25
  80:19 81:2
Exhibits 4:25
expect 40:16
expectations
  69:15
Expires 86:23
explain 36:17
  38:1
explained 27:5
expressly 5:6
extremely 69:18

——————

F
face 19:4,5
facility 16:14
fact 62:22 65:4
  76:13
factor 72:20
fair 20:9
familiar 29:11,14
  34:6
far 24:19 27:11
  61:6,19
fashion 6:12
faster 24:4
February 62:7
  62:16 64:20
  65:14 74:2
  75:1,16 77:23
  77:25 78:23
  79:3
feedback 43:11
  68:19
feel 18:5 47:11
  47:15 50:20
  65:2 66:19
  75:25 81:15
felt 46:18
figure 71:23
file 4:11 28:1,4,9

MAKISA UPTON  11/4/2020

28:11 29:19
30:3 31:5
40:9 55:7
67:7
filed 6:24 66:21
files 39:24 40:7
55:1,12,15
filing 84:19
fill 40:2
final 35:5,19
37:11 69:19
find 25:3,3 27:6
84:8
findings 21:5
fine 68:10,10
first 4:13 6:17
12:15 17:6
18:16 20:6
22:13 27:4,24
30:8 33:7
34:25 37:11
38:22 50:24
52:21 53:21
63:15 65:24
68:14 69:19
70:25 77:2
78:1 80:12
five 19:6 74:14
74:15,16,17
fixed 9:15
fixing 9:9
FMLA 14:10
folder 40:17
folks 13:21 42:16
63:25 81:12,18
follow 75:19
follow-up 39:17
following 56:17
58:11
follows 6:18
foregoing 86:5
86:12
forgive 8:16
68:8
forgot 73:9
form 4:20,21,22

4:23,24 11:7,7
16:19 24:13,22
60:10 61:1
65:19 67:2
73:1 76:21
79:15 81:8,13
86:6
former 47:10
61:6
forward 46:20
48:7 67:11
69:16
found 28:20
57:8 61:10
72:8
four 17:6 35:11
52:19 71:8,14
72:21 74:14
78:14
frankly 8:15
70:3
Friday 77:20
Frizzell 4:24
81:9
frog 7:7,8,11
front 31:13 33:3
33:12 34:5
39:20 41:2
42:24 49:11
53:15 66:10
73:14 77:10
full 26:24 27:17
function 25:5
further 27:6
53:12 57:9,10
82:14
future 69:14

___ G ___

gate 38:6,6
gather 20:7
gathered 18:25
20:8 21:17
General 3:10
generalist 11:14
11:17
generally 20:13

getting 43:10
68:19
give 7:24 8:9
14:2 21:4,22
21:25 23:9
24:1 29:2,12
31:8 35:21
39:18 41:20
42:14 46:6
51:22 53:11
66:6 81:22
given 13:24,25
33:22,24
48:11 52:21
53:4 56:4
63:14 65:8,23
65:24 66:3
67:13 69:13
giving 13:15
go 8:24 12:17
19:19 21:20
24:14 27:7,8
31:25 32:18
45:13 58:14
61:16 64:11,12
64:15 67:3
69:10 71:22
72:25 73:2,9
77:21 81:14
goes 12:18
34:14 64:4
69:10,25
going 8:9 9:1
22:23 25:17
25:19 29:2,5
31:17,19 32:20
33:6 38:4
41:20 48:19
49:1 50:23,25
52:2 53:10
54:1 57:2
65:17 68:17
69:16 73:9
good 6:1,21 8:17
13:5 75:23
goodness 13:13
Google 17:20

gosh 11:5
gotten 71:25
great 9:12 18:11
32:1 38:17
44:8 50:11
51:13
greater 36:23
group 10:15
guess 24:7
27:12 29:20
30:3 45:9,25
71:21 77:3
guessing 12:1
guidance 14:23
19:20 24:6
Guide 4:9

___ H ___

H 4:5
H-O-J-E-R 12:14
Halifax 8:1
hand 83:8
handed 57:24
handle 56:12
72:14
handled 30:19
55:15 63:1,2
handwriting
57:18
happen 19:3
38:12
happened 27:6
30:18 62:3
happens 38:6
happy 30:16,16
harassment
14:11 18:13
hard 50:3
Harkins 32:15
56:8,9,14,19
57:14,16 58:9
65:16 71:20
hate 42:14
78:12
head 12:1 13:6
34:4 44:9
health 1:7 2:6,16

5:12 6:24 9:18
9:19 12:12 16:9
16:11,12 79:19
84:6 85:2
Healthcare 6:11
hear 7:3,13 9:13
heard 20:6,25
22:13,15 27:10
30:25 63:20
hearing 30:14
77:3
Heather 29:9
held 5:15,20
11:9 83:4,5
help 80:16
helped 15:23
helpful 24:21
31:2 65:9,11
helps 23:10
hereunto 83:8
hesitate 23:25
highest 10:22
highlighter
54:19 55:2,4
HIPAA 41:18
60:17 61:12
hired 10:6
historical 21:9
21:13,23 22:4
23:3 24:4,7
24:20 28:23
29:1 57:11
hit 21:21
Hojer 12:11
holds 36:23
holler 25:22
Holloway 64:4
Holts 7:22 8:1,3
home 7:22
hop 19:6
hours 2:10 19:7
37:5
housed 40:18
40:19
HR 10:2,11,15
11:4,9,12 12:11
13:2 14:21,22

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334

15:12 17:10,17
19:19 40:4,21
40:23,24 41:7
43:6 44:19,21
50:6
**HRBP** 40:20
**HRBPs** 24:5
40:10
**HSA** 79:16,18
**Human** 10:7

_____

**I**

**idea** 12:20
**identification**
29:6
**identified** 33:5
42:22 58:4
**identify** 31:11
39:2 42:16
53:5
**identifying** 58:7
**immediate**
35:15,18 36:7
**immediately**
36:7
**impact** 65:17
66:25
**important** 69:21
69:24 70:6,11
**inappropriate**
30:1
**inappropriately**
73:5
**incident** 30:13
44:6 68:4,16
69:25
**incidents** 30:17
32:9,11
**include** 37:11
**included** 26:16
**includes** 21:3
**indicate** 5:24
84:13
**individual** 32:14
**individuals**
20:25 26:2
28:12 60:21

61:17 64:7
67:13 72:3,5
**information**
8:10 14:2,3
15:4,7,9 21:17
23:2 26:17
27:19 28:23
29:1 31:2 39:3
39:9 41:4,8,22
42:9 47:14
54:21 55:6
60:21 64:18
65:10,16 66:3
66:25 71:16
75:17 77:5
78:18
**informed** 22:10
**infractions**
37:24
**initial** 43:10,11
**initials** 40:16
**input** 14:5
**insight** 19:20
**institution** 38:8
**institutional**
24:10 38:1,9
**institutions**
38:5
**instruct** 27:1
**instructed** 27:13
27:13
**instruction**
69:13
**interrogatories**
4:14 38:23
39:4
**Interrogatory**
41:2,5
**interview** 19:8
20:11 28:6
**interviewing**
20:23
**interviews** 19:2
28:8 48:8,10
59:23
**introduce** 5:22
**investigate**

27:13
**investigated**
67:15
**investigation**
18:12 20:4
24:21 27:2,24
29:17,22 30:11
30:15 31:1,3,4
31:7 36:13
40:15,17
59:20 60:14
60:16 66:18
66:20 70:14
71:4 75:11
76:15,20 77:4
78:9,9,10
81:25
**investigations**
17:5,7,13,16
18:6 22:8
23:6,17,22,24
24:3
**involved** 14:21
14:22 19:10
22:8 36:14,14
47:2 67:13
76:14 80:10
**involvement**
23:1 36:21
**issue** 37:10
**issues** 57:11
62:1 76:15,17
**Ivan** 3:3 6:1,21

_____

**J**

**Jag** 3:10 6:5,5
82:16
**Jefferson** 8:3
11:22,23
**Jenny** 3:14
28:18 29:10
30:12,21,22
31:22 44:13
48:17,18 49:19
55:20 56:6
66:14
**Jenny's** 38:17

43:2,8 45:24
**Jerry** 4:8 31:22
73:24 74:1
**Jessica** 4:24
81:9
**Joann** 2:11 3:21
5:4,17 83:2,13
84:24
**job** 10:6
**Johnson** 4:22
**joining** 9:23
17:14 18:3
**Judy** 32:15 56:8
56:9,14,18
58:9 65:16
71:20
**jumping** 35:22
**June** 33:21 63:4
64:17 65:14

_____

**K**

**Kansas** 3:4,8,11
84:4
**Karen** 31:22
42:5 55:4
69:4
**Kelley** 41:10,12
41:14
**kind** 36:8
**Kirby** 31:23
42:5,7,18
45:22 46:17
46:22,24
47:17,23 48:3
48:4,5 49:20
50:18 55:9
58:12 64:23
66:18 74:5,21
82:1
**knew** 70:17
**know** 7:8,17
8:12 12:2,4
16:13,16 17:23
18:19 19:7
23:8,14 24:18
25:5 26:14
30:20 32:4

33:10 34:3,9
41:9,14 42:9
42:17 44:8,11
47:17,21,23
48:1,16 53:7
55:19,24
57:15 58:3,9
59:16 61:12
63:15 67:4
68:21 70:18
70:20 72:16
72:21 73:19
75:7,24 78:11
78:24,25 79:1
79:4,18 80:5
**know-how** 10:3
**knowing** 72:5
76:2
**knowledge**
24:10 36:21
60:3 61:14
62:1 64:8
**known** 66:22
**knows** 60:8
**Krigel** 3:3,3

_____

**L**

**L** 3:6 84:3
**LaBlance** 1:4
2:2,15 5:11 6:2
6:23 22:7
25:15 26:1,15
28:24 30:15
31:21 32:2,14
39:24 46:18
50:19 65:2
66:11,14,21
67:1,10 72:16
77:8 78:23
79:5 82:2
84:5 85:2
**LaBlance's**
22:11,15 27:2
27:25 30:12
42:7 47:18,24
57:15 59:4
60:2 61:22

62:8,23 64:18 65:13 70:16 72:4 74:2 79:9,22
lack 69:20
language 44:5
larger 29:2
lastly 15:3 54:11
late 45:14
lead 36:3
leader 19:13,19 36:21
leaders 10:9 13:18,21,24 16:13 22:2 35:17
leadership 16:12 21:1,1,3 21:19 46:19 56:11 69:10
leading 35:18
learning 57:14
leave 18:22 24:9,10,17
leaves 24:25 40:8 60:25
leaving 22:18 46:18
left 30:15 67:21 68:1,11 71:20 71:24 72:19
left-hand 77:11
legal 5:18 56:11 56:23 61:2
legally 18:23
let's 8:6,24 13:7 25:14 33:3 58:20 63:3 64:1 65:12 74:21
letter 26:16 47:9,10,13 50:20 77:9
letters 47:10 58:6
level 10:14,22 21:2,6,20

28:14 34:25 48:11 57:7
levels 14:21
liked 71:13
line 50:7 85:5,9 85:13,17,21
lines 25:6 55:5
list 16:4 53:8 55:20,22 56:5 61:17 73:9
listed 20:12
literally 46:7
Litigation 3:21 5:19 84:1
little 7:4,5,7 10:21 14:2 21:4 31:20 54:2 55:16
LLC 4:12
LLC's 38:21
locations 6:4,9
lock 38:6
lodged 32:2
log 4:17,18,19 26:25 27:17 27:20 28:21 54:2,5 75:2
long 9:19 11:4 15:22 44:9 63:23
longer 18:22 38:5 60:6,14
look 21:9,24 25:13 26:18 27:5,16 28:23 33:3,10 34:7 34:12 42:1 44:12 52:15,15 53:8 54:8,11 58:20 63:3 64:1,9,15 66:23 77:22
looked 28:1,5 30:13 31:5 46:24 47:3 49:15 52:18

57:9 58:4,23 63:19,24 64:17 65:1,4 66:13,19 72:8 72:10 74:20 74:21,22 75:1 75:16
looking 15:18 21:13 23:2 25:4,5,6 30:2 32:6 49:22 51:2 53:3,4,24 59:11 65:12 67:6 69:3 71:10,11 72:4 72:13,22 73:16 73:23 75:13 75:25 76:6,15 76:18 78:11,15 78:20 79:6
looks 34:13 36:9 54:15 80:7
Lori 59:8 61:21
lost 38:9
loudly 7:12
Louis 3:22 84:19
Lovelace 4:8,10 31:22 73:24 74:1,20,22,25 75:10 76:10 77:4,16,19,24 78:4,6,8 79:4 79:8
Lovelace's 77:21 78:15
low 21:20

_____
### M

Main 3:4,7 84:4
maintained 24:25 40:7
major 67:5
making 50:20 66:4
Makisa 1:11 2:8

4:15 5:10 6:16 24:14 83:4 84:8 85:1 86:4,19
managed 10:15
management 11:11 13:3 15:4
manager 10:2
manager's 80:3 80:24 81:5
managers 36:16 36:18
managing 14:3
March 22:10,16 22:24 25:25 26:10 29:23 30:11 31:1 32:5 43:3 44:24 48:16,19 59:8 70:14 77:20 78:2,5,6 79:15
marked 29:7 38:20
markings 54:18
married 82:6,9
material 14:17
materials 16:18
matter 5:11 60:1 60:3,5
Matula 3:6 6:10 6:10 24:13,22 52:4 60:10 61:1 65:19 67:2 73:1 76:21 81:13 82:18 84:3,7
McWhorter 4:7 29:10
MDOC1938 51:15
MDOC1939 51:15
MDOC1940 52:1
MDOC1941 73:16
mean 10:8 16:10

25:10 28:25 43:17 47:7 72:7 77:1 81:15
medical 26:2 60:21 61:10
Meehan 3:14 28:18 29:10 30:12 31:23 38:16 48:17,18 49:19 66:14
meeting 21:19 73:13
Megan 63:4 64:5
memo 29:9,12 30:9 66:9
mental 16:9,11 16:12
mentioned 11:16 25:24 71:19
Meyer 63:4 64:5
Michael 3:6 84:3
Mike 6:10 72:25 76:25 77:1
minute 64:16
missed 55:24 58:9,15
Missouri 1:2,6 2:1,5,13,15 3:8 3:11 5:12,14 7:23 8:2 11:1 25:7 40:13 83:3,5 84:4,5 85:2
misspoke 14:12
MO 3:4,22 84:19
model 34:19
models 34:17,17
modified 37:8
moment 53:11
month 13:14
months 17:6 61:22
mouse 74:10

move 10:16
48:6,19 53:10
moved 46:20
multiple 46:24
46:24

**N**

N 3:1 4:1 84:18
name 5:17,18
6:5,21 12:13,15
12:19 15:8
22:14,15 39:6
44:22,24
52:16,25
53:22 56:8
59:12 85:1,2
86:10
names 42:12
55:21,22 56:6
71:22
Napa 9:25 10:1
10:13,20 17:17
nation 15:24
near 79:2
necessary
34:21 59:24
86:8
need 8:12 14:4
19:2,3,4,5
25:21 28:8
29:21 48:8
51:1,21 66:19
needed 26:18
27:5 37:1 71:3
71:17,22
needs 15:13
57:6
never 11:25
new 33:14
new-hire 15:7
night 45:5,14
nine 61:22 62:6
62:22,23
North 3:22
NOS 4:6
notarized 84:17
notary 84:15

86:22
note 51:16
notes 58:5 75:8
notice 38:7
notified 48:18
November 1:13
2:9 5:9 83:4
84:2,8 85:3
Nugent 3:3 4:3
6:1,1,20,22
8:24 9:8 25:1
31:13,17 32:18
33:2 48:24
49:8 60:12
61:3 65:21
73:7 77:2
81:17 82:13
number 23:17
23:22 39:14
49:12 62:10,14
62:21,25 65:1
65:12 72:3
numbers 50:1

**O**

oath 8:18 9:12
49:9
object 24:13,22
60:10 61:1
65:19 67:2
73:1 76:21
81:13
Objections 4:13
38:22
obligations 61:11
occur 75:3
October 9:22
13:8 40:25
odd 80:11,13,15
81:11
offer 76:4
office 7:22 11:19
11:21,24 26:6
26:13 34:2
45:2 84:18
officers 19:10
70:15

official 43:19
Ogletree 3:7
84:3
oh 8:18 11:5
13:13 17:6 18:7
24:12 26:17
81:19
okay 7:3,24
9:10 10:16,22
11:12,18 12:6,8
13:7,15 15:19
16:13 17:9,20
17:25 20:4,17
20:20 23:21
26:20 27:1,23
28:10,15 30:7
30:11,20,25
31:8,10,25,25
32:8 33:10,18
35:20 36:2,16
37:19 38:13
39:16 40:4,21
42:9,21 44:21
45:4 46:4
47:17 48:10,21
49:13,25 50:6
51:2,13 52:5
52:10,14 53:3
53:24 54:24
55:8,24 56:18
56:25 57:23
58:18 59:22
60:4,16 61:20
62:4,14 63:3,9
63:21 64:3
68:1,7,18,23
69:3 71:5,19
72:2,20 73:16
74:9,15 75:6
77:21 78:3
79:1,20 80:8
80:23 81:19
oldest 59:3
onboarding
18:4
once 18:17,25
37:22 60:24

ones 13:5 37:2
59:12
online 16:24
opened 50:25
operations
19:14,15 26:8
26:9 48:15
opinion 23:21
23:23 24:1
29:20 31:1
42:15 65:17
66:25 76:6
opportunity
34:20
orient 49:25
original 84:9
outside 8:3
55:8

**P**

P 3:1,1
P.C 3:3
p.m 2:10,10 5:10
9:2,7 32:21
33:1 45:4,12
49:2,7 74:22
82:21,22
packet 66:20
page 4:2,6
31:19,24 33:13
34:12 49:22
51:17,19 52:10
52:11 53:3,5
54:12,13,13,19
59:2 63:9,11
64:1 68:1 73:17
84:10,15,18
85:5,9,13,17
85:21
pages 33:7
46:24 52:12
52:20,22
53:21 58:24
62:4 63:3,15
65:1,24 70:25
71:8,12,14
72:21 73:23

78:15
paper 16:19
34:2 55:13
paragraph
37:25 38:2
paragraphs
68:16
part 42:20 66:6
67:5 68:24
75:10 76:23
77:6
participated
16:1
particular 11:15
48:3
particularly 12:4
parties 5:23
36:14,14
partner 10:7
40:22,23,24
parts 9:25
52:10
party 18:19
78:12
pay 10:19 15:8
payroll 10:10
penalty 86:11
pending 2:13
people 13:22
20:13 24:9
30:2 34:16
37:2 59:15
75:13 76:18
percent 18:7
63:23 65:22
perception
36:22
perjury 86:11
permitted 38:4
person 16:24
17:10 18:20
38:8 44:20
60:6,8
personnel
40:12
persons 20:11
20:24 39:2

pertain 67:9
71:16
pertained
28:23
pertinent 31:7
32:6 71:4
phone 19:5
26:5
pick 37:2,5
picture 26:16
77:9
place 19:3 44:2
47:1,6,7 59:18
83:6
placed 31:13
Plaintiff 1:12 2:3
2:15,17 5:2
6:2,22
Plaintiff's 4:13
38:22 39:4
42:2
Plaintiffs 1:5 3:2
plan 34:19,23
platform 18:8
play 21:24
played 67:4,12
please 5:22
6:14 7:25
12:13 17:19
43:19 47:13
84:8,12,17
point 22:23
28:7 35:22
48:6 63:19
65:2 69:18
policies 14:20
policy 19:21
21:12 38:12
46:16 56:17,18
57:6 64:13,14
72:11,12,14
portion 58:2
position 22:18
36:23
Possibly 67:15
potentially
35:25 36:4

67:14 76:3
pre-created
15:14
preparing 26:21
present 3:14
5:21,22 42:10
presented
57:12
president 26:8
26:9
presumably
49:21
previous 31:14
33:4 49:14
previously 29:7
38:19 39:22
42:22 51:25
83:6
print 43:23 46:7
prior 9:23 11:18
17:14 18:3
22:16,24
26:20 30:18
32:11 44:5
52:5 57:14
61:22,25 62:1
78:9 79:9
privacy 73:6
PRN 36:25 37:1
37:6,8,14,20
PRNs 37:21
probationary
37:6,7,14,20
37:21
problem 9:14
33:19 53:13
proceed 6:15
proceeding
6:12
process 18:11
20:4 24:20
37:9,18 53:8
produced 2:9
6:17 51:14
53:23
progressive
34:17,19,23

37:19
protect 60:21
protection
60:24
provide 14:10
16:21 19:11
20:19 21:4,9
27:14,20 41:4
46:4 69:11
75:17
provided 21:16
26:22 28:6
38:18 39:2,8
41:22,23,24
42:4 46:5
52:12 56:6
59:24 69:12
70:4,9
public 84:15
86:22
pull 27:7 39:18
41:16 64:9
pulled 27:17,18
28:2
purpose 42:4
69:7,8,9
purposes 29:6
31:12
put 15:6 29:16
33:3 40:12
54:25 66:24
putting 55:6

_____
Q
question 7:14,16
21:20 23:8
24:14,16,23
27:4 29:11
30:4,5 39:1,17
42:16 44:8
56:23 60:11
61:2,4 62:14
65:20,21
66:17,24 67:3
71:21 73:2
75:9 76:22
81:14

questions 6:20
16:16 19:18
68:17 82:16,18
quickly 8:11

_____
R
R 3:1
race 73:7
Rachel 3:10 6:5
racial 65:15
66:10,20 67:5
reach 18:9,18,21
read 29:13 31:21
31:25 39:14
41:20 58:5,14
58:17,19 68:6
68:15,20
82:19 84:12
85:6,10,14,18
85:22 86:5
ready 18:8
25:13 31:24
68:22
real 12:19
realized 56:3
71:21
really 23:11 34:8
Ream 4:21
15:20 16:8
31:22 63:12,16
79:16 80:25
81:6,11
Ream's 79:14
reason 37:4
40:8 44:6
50:18 72:13
85:7,11,15,19
85:23
reasons 69:21
recall 15:22,25
33:21 41:21
52:23 54:20
recap 9:12
receive 18:17
20:18 38:7
63:4 69:1
received 16:14

16:17,25 17:4
17:14 18:4,18
26:5,14 29:16
29:17,18 47:2
52:14 54:21
69:15 73:20
73:23
receiving 20:7
20:23
recognize
22:25
recommend
57:7
recommendat...
22:3 27:14
28:16 35:8
37:12 43:20
46:12 50:14
57:3,5 65:5
68:12 69:9
recommendat...
21:7,25 28:11
66:7
recommended
55:19 69:1
recommending
4:16 44:6
50:11 68:24
69:22
record 5:8 8:24
9:2,3,5,7 31:11
32:18,21,22
32:24 33:1
42:7,17 49:2,3
49:5,7 59:4,9
60:2,7,9 61:11
62:11,13,17,24
65:13 72:8,22
73:4 74:2
76:19 77:22
82:20
records 26:2
42:3,3 47:19
47:25 57:15
62:9 70:16
72:4 79:23
82:3

recruiting 11:10
    11:16
refer 19:25
    20:2 34:16
referenced 18:2
    23:4
referred 34:24
referring 38:2
reflected 69:6
regard 10:5 16:6
    28:10 33:20
**Regardless**
    73:7
regards 21:7,13
    21:24 22:7
    26:1 27:25
    72:21 75:15,19
region 30:23
related 14:3
    15:12 22:14
    36:9 60:17
    62:14 66:10
relation 49:16
relevant 78:19
**Religious** 11:3
remember 8:19
    13:5 30:14
    39:8 47:12
    52:7 58:3
    63:17,18,21
    66:11,15 71:2,5
    75:7
remind 64:24
removed 36:15
render 86:8
**Renee** 2:11 3:21
    5:4 83:2,13
    84:24
repeat 7:13
rephrase 7:17
replacing 17:10
report 12:10,11
    29:16,17,18
    41:16 55:11
    64:9 67:10
    71:1 78:5
reported 10:12

11:21 18:20
    57:16 61:25
    78:1,4
reporter 2:12
    3:20 5:5,21
    6:3,8,14 17:22
    83:1
reporter's 5:17
reporting 23:12
    23:16
reports 77:24
represent 5:23
    6:22
reprimand 57:7
    63:15 80:8
reprimanded
    28:12,13 55:9
    56:9,15,19,20
    56:22 59:16
    76:10 79:20
    80:12 81:12
reprimands
    59:15
reprint 46:9
request 26:23
    43:11,18 70:1,4
requests 43:7
    69:17
require 14:5
    35:18
required 13:20
    43:6 45:3
    61:14
requires 36:13
researched
    57:9
resend 46:10
reserved 5:6
reserves 35:12
resign 46:10
resources 10:7
respond 49:21
response 43:13
responsibilities
    60:20
responsibility
    61:6

responsible
    15:11
rest 25:8 37:15
    55:5
**Results** 54:3,6
retained 4:25
retrospect
    55:15 67:15
return 18:24
    50:21 84:17
review 14:20
    19:1,13 20:24
    26:21 34:9
    43:4,5,6
reviewed 27:18
    44:10 53:21
reviewing
    28:22
**RFT** 43:17,17
    45:21
**Rhonda** 26:11
    27:21 28:18
    43:14 45:1
    52:13 57:21
**Rhonda's** 57:19
**Richardson** 2:11
    3:21 5:4,17
    83:2,13 84:24
right 7:12 8:3
    9:8 10:5,13
    11:2,6 12:22
    13:9 17:9
    20:15 23:4
    25:4,13,15,22
    25:24 28:22
    30:9 31:11
    32:13 34:3,16
    34:24 35:12
    35:14,23 39:1
    39:22 41:1,9
    42:1,19 43:2
    45:12 47:22
    48:1,4 49:8,9
    49:22 50:12
    51:23 52:8
    53:1,4,17,20
    54:11 58:23

59:7,9 65:25
    66:4,17,21,22
    67:24 68:8,14
    68:24 69:8
    70:11,13 73:5
    73:13,20 74:19
    77:15,25 78:10
    79:14,16,20
    79:23 81:9,19
**right-hand**
    58:21 79:12
    80:1
**Ritter** 4:23
    64:10,12,17,20
    65:4 80:22
river 8:5
**Road** 8:1
role 11:15
roles 11:8 17:11
room 7:19 28:19
    78:13

───────
**S**
───────

**S** 3:1 4:5
safe 50:2
saved 25:2
    40:19 46:2
    50:3
saw 58:13
says 37:7 38:13
    39:2 42:4
    43:4 44:21
    48:18 51:5,16
    54:2 74:1
    77:13
**Schupp** 28:19
    43:14 45:1
    50:9
screen 25:18
    50:24 51:6,7
    68:9
scroll 31:23
    33:6 65:7
seal 83:9
search 24:4,7
    25:4 54:2,5,8
second 8:25

29:3 31:8,12
    35:2 37:17
    39:19 51:22
    53:3,11 54:12
    54:13 68:1
    69:19 73:22
    73:23 81:22
section 35:16
    36:6,8,10,16
    37:6
secure 24:20
see 8:6 13:7
    19:4,5 25:7,8
    27:8,12,16
    32:15 37:22
    39:6,20,24
    40:1,16 41:1
    42:24 43:12
    43:14 44:12
    45:21 49:11
    51:4,6,9,11,17
    51:23 53:14,18
    54:3,9,13,16
    58:16,21 59:7
    61:21 63:4,12
    64:1,18 65:12
    67:5,6,9,19,22
    68:4 73:24
    74:3,10,21,22
    75:5,5 77:10
    77:15 79:12,25
    80:3,20
seeing 30:9
    56:3
seen 20:25
    27:8 29:14
    33:6,8,9,16
    38:23 52:3,6
    52:10,21 66:2
    72:12 75:12,18
    78:3
send 45:18 46:8
    55:23
sends 49:19
senior 12:11
    19:15,19 56:11
sense 59:13

75:15
sent 26:16
  30:16 40:9
  44:13,14,16,24
  45:4 47:8,10
  47:14 50:20
  58:10 77:7
separate 6:9
separation
  61:23
serious 36:9
  37:24
services 3:21
  5:19 79:19
  84:1
set 37:5 83:8
severity 37:10
  56:13
share 50:23
sheer 62:21
SHEET 85:1
sheets 84:10,14
  84:17
shift 37:2
short-staffed
  37:3
shorten 37:19
shortens 37:21
shorthand 5:4
show 45:24
  50:23 51:21
  67:17
showed 28:9
showing 22:23
shown 26:24
  66:9
shows 45:20
sick 37:3
side 25:20,20
  53:14,15 58:21
  67:19,19 77:11
  79:12 80:1
sign 45:7,16
  46:8 82:19
  84:14
signature 5:6
  44:19 45:19

46:12 50:6
  80:3,6,7,24
  81:5 84:10,14
  84:18 85:25
signatures
  43:23 44:18
  46:1 50:4
signed 43:24
  44:1,17 45:8
signs 50:9
similar 10:14
  49:14 52:18
similarly 59:11
simply 29:21
Sincerely 84:21
sir 7:2,4,18,20
  8:8,13,20,23
  9:11,16 10:18
  11:13,20 12:9
  13:10,23 14:14
  15:2 22:13,20
  23:19 26:3
  30:10 35:1,4,7
  35:10 39:7
  40:3 41:3,13
  41:19 43:1,16
  44:18 45:6,18
  49:10,18,24
  50:5,8,10,13
  51:3,6,8,10,12
  51:18,20,24
  53:16,19 54:4
  54:7,10,14,17
  55:10 58:17
  59:1,10 63:8
  63:13 64:6,22
  66:1,5,8,12,16
  67:20,23,25
  68:3,13 70:7
  70:10,12 73:15
  73:21 74:7
  76:5,11 77:12
  77:14,17 78:17
  79:13,17,21,24
  80:2,21 81:1,4
  81:7,10 82:10
  82:12,15

sit 14:5
site 12:4,5 15:8
  19:13,15 20:9
  21:1 36:15
  40:9,18
sites 16:21 40:6
  40:7,13
sitting 44:2
situation 35:25
  36:5
situations 36:12
six 17:6 74:8
skip 34:21,21
  35:12
slice 80:14
slide 50:25
slowly 17:21
slur 65:15 66:10
  66:20
somebody
  15:12 21:21,21
  58:15 71:20
someone's
  30:3 31:5
sorry 15:17
  24:15 27:10
  38:16 42:23
  43:10 47:8
  49:12 54:12
  58:19 63:8
  68:19 72:25
  74:14 76:25
  81:23 82:7
sound 7:5,9,10
Southwest
  10:25
speak 7:12
  76:23
speaking 46:19
  70:1
specifically
  25:14 39:10
  69:13 75:4
specifics 32:4
spell 12:13 17:19
spent 17:6,9
split 55:14

spoke 47:21
  48:1
spoken 41:12
St 3:22 84:19
staff 42:2
stand 26:7
  48:14
stands 79:18
start 9:21 17:1
  18:8 27:23
  29:5 33:22
  43:2
started 9:10
  13:8 29:22
starts 17:23
  64:4
state 2:12 12:5
  12:6 19:16 21:2
  25:6 40:13
  83:2,5 86:1
state-level 21:3
stated 28:13
  75:4
statements 19:9
  20:18
States 1:1 2:1,14
  5:13
stead 45:3
step 10:16 20:3
  20:11 34:21
  35:3,5,8 77:1
steps 19:17 20:1
  28:20 35:11,12
  38:10
Sterling 4:21
  15:19 16:8
  31:22 63:12,16
  79:14 80:8,24
  81:5,11
Sterling's 80:7
sticker 51:4
stipulate 5:24
  6:7
STIPULATED
  5:1
stop 9:14 38:6
stored 25:11

Street 3:4,7,11
  3:22 84:4,19
stuff 25:7
subject 37:8
subparts 39:5
subscribe 86:10
subsection
  35:14
substance 86:7
Success 4:9
suggests 78:4
Suite 3:4,7,11
  84:4
Summit 7:22 8:1
  8:3
supervise 12:8
  13:22
supervisor 15:8
supervisors
  13:25 56:24
support 10:9,10
  21:5 46:15
  50:17 72:15
supported
  46:14 50:16,18
supports 19:21
sure 14:9,20
  18:15 20:1,5
  23:5 25:16,23
  29:24,25
  35:17 39:13
  44:13 47:8
  58:5 60:13
  61:5 65:23
  67:18 71:3
  72:7 73:11
  81:18,20,21,24
surrounding
  46:17
suspension
  36:11
swear 6:14
swiftly 30:19
Switzer 59:8,15
  59:20 61:9,11
  61:21
sworn 2:9 6:17

system 14:3
  15:6 25:12,12
  75:14
systems 13:2

---
**T**

T 4:5
Tabitha 4:22
take 6:23 18:12
  19:2,22 24:9
  24:17 27:5
  38:10 46:22
  48:23 60:18
  64:16 69:2
  75:8
taken 1:12 2:17
  5:3 8:7 19:17
  84:8 85:3
talk 18:20,24
  20:16 22:5
  25:14 39:12
  51:22 74:25
talked 15:3
  21:14 47:24
  48:5 63:24
  63:25 77:6
talking 20:3
  48:4 52:4,5
  62:20
talks 47:18
Tammie 4:20
  15:25 68:14
  68:25 69:5
  82:5,8
team 16:12
teammates 18:9
technical 9:9,13
tel 3:5,8,12
tell 7:21 8:18,21
  11:8 14:7,17
  23:13 30:13
  33:12 34:7
  45:10 54:19
  57:1 58:8
  59:14 64:7
  78:12,15,22
temporarily

36:15
ten 23:9
Teresa 4:7
  29:10
terminated 4:11
  39:23 64:24
  64:24
termination 4:16
  26:23 35:9,15
  35:19,24 36:3
  36:8 37:13
  43:7,12,18,21
  44:7 46:13,23
  47:4 48:7
  50:12,16 68:12
  69:10,22 70:2
  70:4
Terminations
  69:17
terms 5:24
Terri 1:4 2:2,14
  5:11 6:2,22
  31:21 39:24
  84:5 85:2
testified 6:17
  66:19
testimony
  47:22 78:8
texted 77:8
Thank 6:13 12:2
  14:15 17:25
  19:23 20:17
  20:20 22:15
  22:21 26:12
  29:4 30:6
  32:19 33:18
  34:10 38:15
  40:23 41:1,17
  48:25 67:16
  68:23 82:15
  82:17
Thanks 82:13
thereon 86:9
thing 20:6
  30:14 72:2
  80:9
things 25:6

35:18 36:23
think 7:10,10
  8:11,14 9:9
  14:12 18:7,8
  25:13 33:24
  33:25 41:24
  41:25 60:7
  72:5
thought 46:5
  71:25
thousand 12:7
three 45:3 58:6
  74:14
throat 7:7
time 5:9 9:7
  16:4 18:15
  22:13 23:19
  25:20 30:8
  31:7 32:21 33:1
  38:3 39:10
  45:11 46:20
  48:9,13,23
  49:2,7,19
  52:20 56:13
  56:20 58:24
  59:3,18 60:19
  61:10 62:17
  63:23 71:9,25
  72:11 76:16
  77:24 78:1
  79:16 82:19,21
  83:6
timeframe
  62:18,22
times 8:15
  25:19 41:23
  46:25 74:8,17
title 10:6
titled 35:15
  38:21
today 7:1 8:16
  8:22 19:25
  26:20 33:4
  66:2 82:11
Today's 5:9
told 30:20 32:7
  60:8 63:18

72:19 82:1,11
top 12:1 13:6
  29:6 34:3
  44:9 54:2
  58:5,16
topic 10:10
total 52:19
track 23:17,21
tracking 23:20
  23:24 24:2
trained 17:12
  41:17 80:17
training 12:2
  13:1,2,14,17,19
  13:24,25 14:8
  14:13,19 15:5
  15:10,13,14,19
  16:3,7,15,22
  16:23,25 17:4
  17:10,15,17
  18:2,3 69:2
  71:17
trainings 12:25
  13:4,11,15
  15:23
transcribed 5:5
transcript 84:13
travel 16:21,23
treatment 13:1
  14:9,13 15:21
  16:2 50:19
tried 55:22
true 86:8,12
trust 9:14
truth 8:18,21
  82:11
try 7:12 21:18
  25:17 29:2
  31:20 33:6
  43:25 50:25
  58:14 68:7
trying 32:10
  58:12,13
twice 65:5
two 6:4,8 9:20
  13:8 17:3
  25:19 30:2

37:23,23
  52:21 53:14,21
  55:14,17 58:18
  62:4 63:3,15
  65:24 67:19
  69:3 70:25
  71:8,12 73:22
  74:12,14 78:14
type 13:19 15:4
  16:25 55:11
  69:11
types 15:10
typewriting 5:5
typically 30:24
  69:17

---
**U**

Uh-huh 11:10
  14:14 22:5
  58:22 62:5
  63:6,10 73:18
un-redacted
  56:3
uncomfortable
  47:1,6,7,11,15
uncommon
  45:15
understand 7:16
  23:16 24:16
  24:24 28:25
  29:24 47:22
  49:9 61:3,5,19
  62:18,20
  65:21 72:7
understanding
  7:1 53:24
  55:25 56:2
  59:6 76:14
  78:19
Understood
  14:7 15:16
  16:18 21:23
  22:7 25:9
  30:5 34:10
  38:15 45:16
  45:20 46:11
  50:22 53:10

59:19 61:16
67:16
underway 8:11
unedited 26:24
Unfortunately
55:13
United 1:1 2:1,13
5:13
universe 21:15
University
10:25
unrelated 29:21
30:2
Upton 1:11 2:8
4:15 5:11 6:16
6:21 9:8 25:17
31:12,17 33:3
38:16 41:17
42:21 49:8
50:22 51:16
52:2 53:12,14
59:14 60:12
61:3 67:17
70:13 72:2
77:2 78:22
81:22,25 82:11
82:16 83:4
84:8 85:1
86:4,19
use 40:6,11
43:19,25 44:3
uses 40:5
usually 14:2
19:16 21:18
22:5

**V**
v 40:22 84:5
85:2
vacation 37:3
vague 61:2
65:20
Val 82:1
Valicia 31:23
42:5 45:21
74:5,21
varies 13:17

various 40:13
verbose 69:19
version 26:24
33:9,11,16,20
33:25 34:4
39:2 46:1
49:22 50:3
52:24 56:3
58:20
vertically 10:17
vice 26:8,9
video 5:15,20
video-recorded
5:10
videoconfere...
1:11 2:8,11 83:5
videographer
5:8,18 6:13 9:1
9:6 32:20,25
49:1,6 82:20
violated 21:12
57:5 61:12
violation 19:21
46:16 64:13,14
72:11,13,14
virtually 19:4
VP 12:12 40:21
VPO 19:16 26:5
26:7
vs 1:5 2:4 5:11

**W**
wait 18:23
want 20:1 21:20
21:21 29:8
31:8 34:12
39:12 43:2
50:23 51:15
53:23 64:1
67:17 68:10
68:20 81:21
wanted 36:17
81:18,19
warning 35:6
37:12
warranted
46:22

warrants 14:25
wasn't 31:2
32:5 61:9
66:3 78:11
way 23:12,15
24:8 27:12,24
33:12 63:1
80:14
we'll 21:10 82:19
we're 5:19 9:1
25:4,5,6
32:20 37:3
43:24 51:1
53:4 73:16
we've 38:20
66:13 81:15
WebEx 5:15,20
6:3,8
Wednesday
43:3
week 37:4
weigh 65:5
weight 36:24
welcome 18:1
29:5 47:16
50:21
well-versed
18:5
went 17:17 26:12
26:22 27:18
55:21 58:3
71:3
Western 1:2,3
2:1,2,14 5:14
5:14
WHEREOF 83:8
white 41:10
Wicklander-Z...
17:18,23
wish 76:8
witness 5:6,21
6:4,8,14 22:9
31:14 48:22
48:25 72:25
76:25 82:15
82:17 83:8
84:12 85:1,25

witnessed 19:10
witnesses
20:12 28:6
wondering 33:7
72:2
word 15:18
69:20 78:10
work 9:17,18
11:18 15:8 37:1
37:5,23 61:17
64:8
worked 9:19
30:23 46:3
working 9:23
19:12 45:10,14
67:1
worth 72:5
wouldn't 14:5
53:7 66:22
write 57:20
writing 57:23
written 20:2,18
34:24 35:2,5
35:19 37:11,12
37:17 58:1,16
68:15,25
wrong 80:18
wrote 66:14

**X**
X 4:1,5

**Y**
Yeah 32:11
38:14 65:23
72:10
years 9:20 11:5
13:9 17:3
Yolanda 1:4 2:2
2:15 5:11 84:5
85:2

**Z**
Z-U-L-W 17:24
zoom 3:14
16:22 25:21,21
54:1 77:15

**0**

**1**
1 22:24 39:1
51:17 52:11,12
54:12 58:24
1-800-280-33...
3:23
1/1/17 54:3
1/1/2017 54:6
100 18:7 63:23
65:22
100180 86:24
1002 80:20
1004 81:3
11 39:14,17 41:2
74:2
11:20 45:4,17
11th 75:1,16
77:23,25
78:23 84:19
12 4:7 29:8,9
12:58 74:22
12th 63:4
13 11:5 43:3
48:19
13th 3:11 48:16
64:17
14 41:5
14th 44:24
15 4:8 31:15
18 13:8 41:21,21
42:2
1925 8:1
1943 52:2
1st 22:10,16
25:25 26:10
29:23 77:20
78:2,5,6

**2**
2 51:17,19,19
52:11,12 53:5
54:13 58:24
59:2 73:17
2:23 2:10 5:9
2:27 9:2

**2:32** 9:7
**2:34** 74:22
**20** 11:25 31:15
  84:2 86:14
**20120411** 54:9
**2014** 33:21
**2017** 29:11,25
  63:5,12 64:19
  65:14
**2018** 9:22
  40:25 59:9
  61:21 62:7,16
**2019** 22:24
  30:12 31:1
  33:17 43:3
  48:19 59:8
  62:7,16 64:21
  65:14 70:14
  74:2 79:15
**2020** 1:13 2:9
  5:9 83:4 84:2
  84:8 85:3
**20s** 79:3
**22** 64:21
**22nd** 62:7
**23** 31:18
**24** 31:16,19
**24th** 79:15
**26** 4:9 33:5
**28th** 9:22
**29** 4:7
**29th** 29:10

————————
**3**
**3** 63:11
**3/8/2019** 54:3,6
**3:08** 32:21 33:1
**3:40** 49:2
**3:48** 49:7
**30** 12:1 37:22
  84:18
**30th** 59:8 61:21
  62:7
**31** 4:8
**314** 3:23
**33** 4:9,10 77:13
**36** 4:11 39:20

  39:22
**37** 4:12 38:21
**38** 4:12
**39** 4:11,15 42:23
  42:24

————————
**4**
**4** 1:13 2:9 5:9
  53:5 54:12,13
  63:9,9,11 64:1
  64:2 73:17
  83:4 84:8
  85:3
**4:19-cv-00693**
  5:13
**4:19-cv-0069...**
  1:6 2:5
**4:47** 2:10 82:21
  82:22
**400** 3:7 84:4
**401** 3:11
**41** 4:16 49:11,12
  50:1 67:21
  68:2
**42** 4:15,17 53:17
  53:22 54:1,9
  54:12,15
**43** 4:18 51:23
  51:25 52:3,6
  52:10,14,19
  53:18,21 54:5
  54:9 65:24
  73:14
**44** 4:19 51:5,9
**45** 4:20 67:24
**45-minute-to-...**
  19:7
**4520** 3:4,7 84:4
**46** 4:21 68:2
  79:12,14
**47** 4:22 79:25
**48** 4:23 80:19
**485** 50:2
**486** 50:2
**49** 4:24 81:2
**490** 42:24
**491** 42:24

————————
**5**
**5** 45:9
**50** 4:16
**51** 4:18,19
**53** 4:17
**560** 34:13
**562** 36:7
**563** 34:14 37:7

————————
**6**
**6** 4:3 45:9
**60** 37:23
**615** 3:11
**63101** 3:22
  84:19
**64106** 3:11
**64111** 3:4,8 84:4
**644-2191** 3:23
**65043** 8:2
**67** 4:20
**68** 4:21

————————
**7**
**7:42** 45:12,16
**700** 3:4
**711** 3:22 84:18
**77** 4:10
**79** 4:22

————————
**8**
**8** 29:9
**80** 4:23
**81** 4:24
**816)471-1301**
  3:8
**816)756-5800**
  3:5
**816)889-5000**
  3:12

————————
**9**
**9** 63:12
**90** 37:22
**940** 42:23