# *EXHIBIT B*

| Plaintiff's Statement of Fact | Defendant's Reply |
|---|---|
| 1. Plaintiff was hired by Corizon in June of 2017 as a physician's assistant/advanced registered nurse practitioner. (Ex. 1, 28:22-29:1). | Uncontroverted. |
| 2. Plaintiff was licensed as a nurse in 2011 after completing nursing school at Rockhurst, and then completed a master's specializing in women's health in 2014. She was board certified by the National Certification Committee as a women's health nurse practitioner in 2015. (Ex. 1, 29:20-30:6). | Uncontroverted. |
| 3. Plaintiff was recruited by Corizon to work at the Chillicothe women's prison facility. She traveled to Jefferson City to interview at the corporate office and then to Chillicothe for a site visit where she took a tour and met the site administrator and site medical director. (Ex. 1, 32:31-33:13). | Uncontroverted |
| 4. Plaintiff was the only African-American working at the Chillicothe facility throughout her employment. (Ex. A, Ream depo, 15:15-16:4; Ex. B, T. Christopher depo, 11:7-18; 20:21-21:5). | Uncontroverted but immaterial. Plaintiff's status as the only African-American working at the Chillicothe facility, absent additional evidence regarding any racial discrimination or harassment, is not sufficient nor relevant to the analysis of Plaintiff's claims. Rather, the proper inquiry is regarding whether Plaintiff experienced any racial discrimination or harassment rising to the level of hostile work environment. *See Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) ("simply being the lone member of an identifiable racial or ethnic minority within a supervisor's chain of command, without more, does not demonstrate racial animus."). |
| 5. Dr. Jerry Lovelace is currently, and at all relevant times was, the Regional Medical Director for the State of Missouri. (Ex. 2, 8:13-19). Dr. Lovelace participated in the interview process and decision to hire Plaintiff. (Ex. 2, 20:19-20:23). | Uncontroverted. |
| 6. While there are a "ton of documents" required to credential a new provider to work at a Department of Corrections (DOC) facility, including a criminal background check (which he was rarely involved in), Dr. Lovelace did discuss Plaintiff's criminal | Uncontroverted. |

| | |
|---|---|
| background with her during the interview process. (Ex. 2, 19:13-23, 20: 19-21:23). | |
| 7. Dr. Lovelace's concern as it related to a prior criminal record was limited to credentialling [sic] and determining if Plaintiff was "forthright, that [she] own[ed] whatever it is that is there." Dr. Lovelace ultimately concluded that Plaintiff had been honest and recommended her for employment with Corizon. (*Id.*). | Uncontroverted. |
| 8. Plaintiff testified that she has always been honest and upfront about mistakes she's made taking full responsibility for good and bad decisions. To that end, she disclosed her criminal history when she decided to go to nursing school, when she went to graduate school, when she applied for a license, and when she applied for boards. Her explanation each time was sufficient. (Ex. 1, 41:16-42:12). | Uncontroverted. |
| 9. Tammie Christopher has been employed by Corizon since 2006 (except for a few months in 2017). She served as the Director of Nursing from July of 2018 to July of 2019, which is a site management position. (Ex. B, 11:13-18; 12:8-17; 19:20-22). | Uncontroverted. |
| 10. Ms. Christopher confirmed that prior to her leaving employment for a few months in September of 2017, she heard conversation between the nurses that Plaintiff "had been in trouble before" and had a criminal record. (Ex. B, 37:10-13; 38:7-10; 38:21-39:2). | Uncontroverted but immaterial. The cited evidence does not create a genuine issue of fact relating to Plaintiff's Title VII and/or her constructive discharge claims, as Plaintiff fails to provide any facts alleging that the motivation behind any alleged conversation about Plaintiff's criminal record was rooted in Plaintiff's race and not just Plaintiff's criminal record alone. Without racial character or purpose, the conduct alleged by LaBlance cannot and should not be considered as part of her race-based hostile work environment claim. *Singletary v. Mo. Det. Of Corrections,* 423 F.3d 886, 893 (8th Cir. 2005). |
| 11. When one becomes involved with the D.O.C. by incarceration, probation, or parole, a record is created including a medical record. (Ex. 3, Meehan depo., 96:18-25). | Uncontroverted. |

| | |
|---|---|
| 12. There is no reason for a Corizon employee to access any D.O.C. record, much less any medical record, unless that person is treating the patient. (Ex. B, 40:1-3; Ex. 2, 94:2-13). Doing so, is in violation of Corizon policy and HIPAA. (Ex. C, Upton depo., 72:10-19; Ex. 3, Meehan depo., 24:1-9). | Uncontroverted but immaterial. Plaintiff cannot rely on events of which she had no knowledge until after her employment ended and such retroactively learned knowledge is irrelevant to the determination of hostile work environment. *See, e.g., Perkins v. Int'l Paper Co.*, 936 F.3d 196, 211 (4th Cir. 2019) ("Following our decisions and those of our sister circuits, we confirm that information about which a plaintiff is unaware cannot, by definition, be part of a plaintiff's work experience. Thus, such information is not proper for consideration in evaluating the severe or pervasive requirement of a hostile work environment claim.") |
| 13. Before she left employment with Corizon for a couple of months in 2017, Ms. Christopher understood that Corizon employees, none of whom were treating Plaintiff, had accessed Plaintiff's D.O.C. records, which included her medical records in violation of HIPAA. (Ex. B, 69:14-20). | Uncontroverted but immaterial. The access of Plaintiff's D.O.C. records has no bearing on Plaintiff's Title VII or constructive discharge claims as Plaintiff fails to provide any facts alleging that the motivation behind any alleged conversations about Plaintiff's criminal record was rooted in Plaintiff's race and not just Plaintiff's criminal record alone. Without racial character or purpose, the conduct alleged by LaBlance cannot and should not be considered as part of her race-based hostile work environment claim. *Singletary v. Mo. Det. Of Corrections*, 423 F.3d 886, 893 (8th Cir. 2005). Rather, the relevant inquiry is whether Plaintiff experienced any racial discrimination or harassment based on her race (not based on her criminal history) rising to the level of a hostile work environment. The evidence LaBlance cites does not reasonably support such an inference. |
| 14. In fact, an audit log of the D.O.C. records shows that between June and December of 2017, multiple employees accessed Plaintiff's medical record, including Sterling Ream, Megan Meyer, Carol Holloway, and Deb Ritter. (Ex. C, Upton depo., 62:4-64:22). | Uncontroverted but immaterial. The access of Plaintiff's D.O.C. records has no bearing on Plaintiff's Title VII or constructive discharge claims as Plaintiff fails to provide any facts alleging that the motivation behind any alleged conversations about Plaintiff's criminal record was rooted in Plaintiff's race and not just Plaintiff's criminal record alone. |

| | |
|---|---|
| | Without racial character or purpose, the conduct alleged by LaBlance cannot and should not be considered as part of her race-based hostile work environment claim. *Singletary v. Mo. Det. Of Corrections*, 423 F.3d 886, 893 (8th Cir. 2005). Rather, the relevant inquiry is whether Plaintiff experienced any racial discrimination or harassment based on her race (not based on her criminal history) rising to the level of a hostile work environment. The evidence LaBlance cites does not reasonably support such an inference. |
| 15. It was reported that the HAS [*sic*] Teresa McWhorter, had shared Plaintiff's D.O.C. history with staff. (Ex. 3, 88:22-89:5; 90:20-22). | Uncontroverted but immaterial. Gossip surrounding Plaintiff's D.O.C. history has no bearing on Plaintiff's Title VII or constructive discharge claims as Plaintiff fails to provide any facts alleging that the motivation behind any alleged conversations about Plaintiff's criminal record was rooted in Plaintiff's race and not just Plaintiff's criminal record alone. Without racial character or purpose, the conduct alleged by LaBlance cannot and should not be considered as part of her race-based hostile work environment claim. *Singletary v. Mo. Det. Of Corrections*, 423 F.3d 886, 893 (8th Cir. 2005). Rather, the relevant inquiry is whether Plaintiff experienced any racial discrimination or harassment based on her race (not based on her criminal history) rising to the level of a hostile work environment. The evidence LaBlance cites does not reasonably support such an inference. |
| 16. Plaintiff did not know her co-workers and HSA (her site supervisor) had accessed her D.O.C. medical records at the time . | Uncontroverted. |
| 17. Doctors and nurse practitioners like Plaintiff who are employed at Corizon (called "providers"), reported directly to Dr. Lovelace for all "medical purposes" such as issues with care of a patient. (Ex. 2, 10:22-12:15; 38:18-39:2). | Uncontroverted. |
| 18. Plaintiff entered a Collaborative Practice Agreement with Dr. Epperson, which is an agreement required by the State of Missouri | Uncontroverted. |

| | |
|---|---|
| between a practicing physician and a nurse practitioner wherein the physician agrees to oversee the nurse practitioner's practice (e.g. reviewing at least 10% of the charts on a regular basis). (Ex. 1, 72:8-73:1). Dr. Epperson never had any problem with Plaintiff's work. (Ex. 1, 73:2-14). | |
| 19. Employees reported to the "operations" side for administrative issues. So, e.g., providers at a particular health services location were to report to the Health Service Administrator (HSA) for that site in relation to administrative issues such as PTO, benefits, and scheduling. (Ex. 2, 10:22-12:15). | Uncontroverted. |
| 20. The Director of Operations for the State of Missouri until late 2019 was Rhonda Almanza. (Ex. 2, 45:21-25). Jenny Meehan and Cindy Shupp were intermediate supervisors on the operations side with responsibility for the Chillicothe facility. (Id., 46-47). | Uncontroverted. |
| 21. The HSA at the Chillicothe facility changed over the two years Plaintiff was employed. Hollie Hild was HSA when Plaintiff was hired (Ex. 2, p. 53). Theresa McWhorter soon replaced Ms. Hild, and then Sterling Ream took over the position in June of 2018. (Ex. 3, 84:5-15). | Uncontroverted. |
| 22. Corizon's Harassment Policy provides, in relevant part, that it is "committed to providing a work environment that is free of discrimination or harassment...no form of harassment, sexual or otherwise, will be tolerated in the work place." (Ex. D, Excerpts from the Employee Success Guide, at p. 10). | Uncontroverted. |
| 23. Dr. Lovelace testified that he, as a manager, is obligated to notify the human resources department of any complaints they receive as soon as possible. (Ex. 2, 16:12-22). Dr. Lovelace understood that this requirement of managers was in place "to facilitate a workplace environment being one that is harassment free and comfortable for employees, it's incumbent upon the managers | Uncontroverted. |

| | |
|---|---|
| to – you know, if they see something, say something." (Ex. 2, 17:3-8). | |
| 24. Dr. Lovelace "escalated" at least three complaints that Plaintiff made (Ex. B, 55:1016), and testified that just after she resigned from Corizon he discussed with Plaintiff other concerns she had with her treatment and the racial disparity she encountered and endured while employed and "signs she should have picked up on." (Ex. 2, 128:4-12). | Controverted in part. This fact states that it is uncontroverted that Plaintiff discussed with Lovelace her newfound beliefs regarding her alleged treatment *after* she resigned from Corizon, which does not create a material fact regarding her employment experience that is relevant to the proper hostile work environment inquiry. *See, e.g., Perkins v. Int'l Paper Co.*, 936 F.3d 196, 211 (4th Cir. 2019) ("Following our decisions and those of our sister circuits, we confirm that information about which a plaintiff is unaware cannot, by definition, be part of a plaintiff's work experience. Thus, such information is not proper for consideration in evaluating the severe or pervasive requirement of a hostile work environment claim.") Furthermore, Lovelace's testified regarding his conversations with LaBlance that "Most of them were about her mother or – or just something that happened on our eleven o'clock call or something. Nothing regarding the environment." (Ex. 2, 127: 7-12). |
| 25. On August 29, 2017, within two months of Plaintiff beginning work, Plaintiff asked a co-worker (Anna Barker) about a paper clip attached to an antenna. The co-worker described it as "nigger-rigged" for better reception, and after Plaintiff corrected her, Ms. Barker laughed and stated that it was "Afro-engineered." (Ex. 1, 74-79; and Ex. E, investigation statements (depo. Ex. 12)). | Uncontroverted but immaterial. It is an undisputed fact that Plaintiff admitted that another co-worker, not herself, reported the incident to Corizon management, sparking the investigation. (See Defendant's SOF ¶6; Ex. 1, 205:12-17) |
| 26. This overt racially charged incident at the outset of Plaintiff's employment caught her "off guard." It was the "first real tangible incident or behavior – witnessed behavior of the culture that was present that [Plaintiff] had just walked into... Because anyone that would feel this comfortable to say that around anyone of color or not, says something about the culture that is there." | Uncontroverted but immaterial. The cited evidence does not create a genuine issue of fact relating to Plaintiff's Title VII and/or her constructive discharge claims. Rather, the relevant inquiry is whether Corizon, once made aware of the incident, took prompt remedial action reasonably calculated to end the harassment, which Plaintiff irrefutably admits. (See Defendant's SOF ¶9, Plaintiff's SOF ¶28). |

| | |
|---|---|
| 27. Plaintiff further explained the culture that she had observed and experienced through the comments of someone who would feel comfortable enough to use racially overt those terms and how she knew that would affect her employment moving forward:<br>"As someone who has been black all of my life, unfortunately there are many times that things occur that may not be said that I have to be very careful and pick and choose, and decide which fights to fight. Because I can't fight them all, all the time. Those types of things can stifle my career, my employment, my – plans, per se. ...<br>So it was the initial overt event where someone actually felt like it was okay to use that verbiage irregardless [*sic*] of who's standing around, and what that tells me this is not an uncommon occurrence about how you feel and how you do things, because you actually – there was no filter. There was no filter. It just rolled off your tongue, and you know, I – I don't believe that it would have been a shock to anyone there if I had not been present.<br>It's an inappropriate statement irregardless of who was there, but it's an okay statement as long as someone like me is not present in this particular culture at that particular time."<br>(Ex. 1, 82: 17-84:11). | Uncontroverted but immaterial. The cited evidence does not create a genuine issue of fact relating to Plaintiff's Title VII and/or her constructive discharge claims. Rather, the relevant inquiry is whether Corizon, once made aware of the incident, "took prompt remedial action reasonably calculated to end the harassment," which Plaintiff irrefutably admits. (See Defendant's SOF ¶9, Plaintiff's SOF ¶28). |
| 28. Plaintiff testified that she agreed it was appropriate that Ms. Barker was fired, and that once she was fired she assumed that would deter any further overt racial language. (Ex. 1, 80:23-81:1; 86:14-19). | Uncontroverted. |
| 29. Terminating Ms. Barker was the end of the matter from the perspective of Corizon, and the end of any overt racial statements made directly to Plaintiff, but it was not the end of the culture creating the conditions for the overt statements to be made. (Ex. 1, 85:14-24; 86:14-19; 82:17-84:11). | Controverted. Plaintiff admits that she did not experience any overt racial statements for the remainder of her employment at Corizon after this incident. Any additional, vague allegations regarding "culture" are unsupported by any evidence in the record, nor does Plaintiff cite to facts in support of the allegation. Rather, the record supports the inference that any overt racial statements made in the environment will be swiftly |

| | investigated and the offender terminated, as occurred in this incident. |
|---|---|
| 30. Dr. Lovelace testified that Plaintiff called him to discuss the incident, which he characterized as "blatant insensitivity". (Ex. 2, 56:1-9; 60:8-11). | Uncontroverted but immaterial. It is an irrefutable fact that Corizon terminated the individual in question, and that Plaintiff admitted that she never heard any overt racial comments during the remainder of her employment. (See Defendant's SOF ¶9, Plaintiff's SOF ¶28). |
| 31. Dr. Lovelace, too, was concerned about how easy it was for an employee who had completed sensitivity training to make this kind of blatant racist remark in the workplace. He stated "[w]e have all had sensitivity training, and you just expect that if we've done that and had those conversations with employees, that employees wouldn't think it was an okay thing to do." (Ex. 2, 61:1-5). | Uncontroverted but immaterial. It is an irrefutable fact that Corizon terminated the individual in question, and that Plaintiff admitted that she never heard any overt racial comments during the remainder of her employment. (See Defendant's SOF Facts ¶9, Plaintiff's SOF 28). Lovelace testified that at the time of the incident following the termination of the employee, "Terri did not voice any other concerns." (Ex. 2, 58:20-21). |
| 32. Nevertheless, Corizon did not require or deliver any additional sensitivity training to its employees to address the culture where it was "easy" to make such remarks, but instead considered termination of the offending employee enough. (Ex. 2, 62:17-24). | Controverted. It is an undisputed fact that employees, including LaBlance, participated in discrimination and harassment training provided by Corizon. (See Defendant's SOF ¶4). The cited evidence does not create a genuine issue of fact relating to Plaintiff's Title VII and/or her constructive discharge claims. Rather, the relevant inquiry is whether Corizon, once made aware of the incident, "took prompt remedial action reasonably calculated to end the harassment," which Plaintiff irrefutably admits. (See Defendant's SOF ¶9, Plaintiff's SOF ¶28). |
| 33. Plaintiff felt that the termination of Ms. Barker made her situation worse because Corizon did not reach out to her, talk to the rest of the staff, to ensure that she was not retaliated against. Plaintiff felt like she was "on an island." (Ex. 1, 103:8-104:7). | Controverted, immaterial. The cited evidence, Plaintiff's self-serving allegations, do not provide a genuine issue of fact regarding any alleged retaliatory actions Plaintiff experienced, nor do any of the actions alleged by Plaintiff constitute an actionable adverse employment action. Moreover, what LaBlance subjectively "felt" or "thought" should have been done is immaterial. There is no evidence to suggest that it was not objectively reasonable for Corizon's remedial |

| | |
|---|---|
| | measures to have been immediate termination of the employee. |
| 34. This was further evidenced when an emergency situation arose where Plaintiff was the first provider on the scene and initiated CPR on a custody officer. When the medical emergency was successfully averted, everyone was congratulating each other except for Plaintiff. She was invisible. (Ex. 1, 105:1-14). | Uncontroverted but immaterial. Plaintiff's cited evidence regarding a facially race-neutral event is not sufficient to sustain Plaintiff's discrimination or retaliation claims without a significant and inappropriate level of speculation as to the motive behind the alleged assertion that Plaintiff was intentionally not congratulated. *See Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006) ("Facially race-neutral statements, without more, do not demonstrate racial animus on the part of the speaker…While we are required to make all reasonable inferences in favor of the nonmoving party in considering summary judgment, we do so without resort to speculation."). This is also immaterial in that not being congratulated (which other employees will dispute) is hardly the type of adverse employment action to be actionable or to otherwise to establish a sufficiently "hostile" work environment. |
| 35. On April 27, 2018, Plaintiff was attending a meeting with HSA Hollie Hild, Dr. Epperson, Val Kirby, and the Director of Nursing. During the meeting, Plaintiff was expressing her viewpoint on the matter up for discussion but kept getting interrupted. Plaintiff testified that she "raised her voice and asked them to please not interrupt me. And I proceeded to finish my statement." (Ex. 1, 89:15-23; 90:12-18). | Uncontroverted but immaterial. Plaintiff's facially race-neutral cited evidence does not provide any genuine issue of fact related to Plaintiff's Title VII or constructive discharge claims. It is immaterial in that being interrupted (which other employees will dispute) is hardly the type of adverse employment action to be actionable or to otherwise to establish a sufficiently "hostile" work environment. |
| 36. The following morning she was called into the administrator's office and there was concern expressed that they had never seen her that upset before and were afraid she would hit someone. (Ex. 1, 91:1-8). Uncontroverted but immaterial. Plaintiff's facially race-neutral cited evidence does not provide any genuine issue of fact related to Plaintiff's Title VII or constructive discharge claims. | Uncontroverted but immaterial. Plaintiff's facially race-neutral cited evidence does not provide any genuine issue of fact related to Plaintiff's Title VII or constructive discharge claims. |

| | |
|---|---|
| 37. Plaintiff testified that her supervisor and co-workers telling her they thought she would become violent simply because she raised her voice was alarming to her and reflective of how race made a difference:<br>Now, this was alarming to me, as I never left my seat. I never said anything or indicated – made any movement whatsoever that would indicate that I would strike out violently, physically. I just wanted to be able to speak and be heard as I have always allowed others to speak and be heard.<br>And the situation is such that it was alarming to me, because just the previous week – or thereabout, we had a small meeting in the administrator's office, and Nurse Practitioner Kirby threw a pen across the room, she was so frustrated, she threw a pen, but that didn't alarm anyone as being threatening, but when I raised my voice, they felt threatened, so they said, and that was just another indication of – or another time that I would say that race made a difference, that you know, raising my voice is –is reason to have a meeting, but throwing a pencil has no consequences or reprimand or – at all.<br>(Ex. 1, 91:9-92-2). | Uncontroverted but immaterial. Plaintiff testified that she did not know whether or not the other Caucasian provider received discipline for the related pencil incident. (Ex. 1, 92:3-18). Furthermore, Plaintiff's facially race-neutral cited evidence does not provide any genuine issue of fact related to Plaintiff's Title VII or constructive discharge claims. See Putman v. Unity Health Sys., 348 F.3d 732, 734 (8th Cir. 2003) (facially race-neutral context is not sufficient to support an assertion of race discrimination). |
| 38. At the meeting, Plaintiff felt that she needed to assure her supervisor and co-workers that she was not a violent individual, and that raising her voice did not constitute a violent act, and that she meant nothing threatening in order to preserve her job, her reputation, and working relationship. (Ex. 1, 95:4-16). | Uncontroverted but immaterial. Plaintiff's cited evidence does not provide any genuine issue of fact related to Plaintiff's Title VII or constructive discharge claims. Without racial character or purpose, the conduct alleged by LaBlance cannot and should not be considered as part of her race-based hostile work environment claim. *Singletary v. Mo. Det. Of Corrections*, 423 F.3d 886, 893 (8th Cir. 2005). |
| 39. Plaintiff nevertheless received a written reprimand for unprofessional behavior. (Ex. F). | Controverted. Plaintiff did not receive a "written reprimand," nor any discipline rising to the level of an adverse employment action. The only documentation was a "memo to file," which did not materially affect Plaintiff's employment in any way. (*See* Exhibit 13 to Ex. 1, LaBlance's Deposition). |

| | |
|---|---|
| 40. Plaintiff summed up her thoughts on why the reprimand she received was because of her race: "...unless you are the target of particular behavior, you won't see it, you won't understand it. ...It's not something you had to battle against or try and strive in the face of, or thrive in the face of. ...what would make a person automatically think that I'm going to become violent if I raise my voice, but someone else can be violent and they don't perceive it as violence. And the only difference between she and I is the color of our skin." (Ex. 1, 100:19-101:10). | Uncontroverted but immaterial. While Plaintiff asserts her perception of the situation, Plaintiff's subjective beliefs that she was reprimanded because of her race are unsupported by evidence or facts in the record, nor does Plaintiff provide any evidence that such discussions were unusual in the course of professional events or was not evenly distributed among all Corizon employees regardless of race. |
| 41. Dr. Lovelace testified that Plaintiff talked to him about the reprimand for unprofessional behavior, and while he could not remember the specific conversation, he chalked it up to a "personality conflict" with the Hollie Hild, the HSA at the time. (Ex. 2, 64:6-65:12). | Uncontroverted that Dr. Lovelace believed it was a non-racial personality conflict and told LaBlance this. |
| 42. Even so, Dr. Lovelace understood that all three site providers (Dr. Epperson, Plaintiff, and Val Kirby) had similar complaints about Hollie Hild's "management style", but was unaware if either of the other two had a memo or written reprimand placed in their personnel files. (Ex. 2, 66:17-67:3). | Uncontroverted but immaterial. The cited evidence does not show that whatever unspecified complaints about Hild's "management style" were sufficiently similar to LaBlance's conduct and otherwise provide factual support for Plaintiff's allegation that Plaintiff was the only one who was spoken to for unprofessional behavior, and Plaintiff testified that she did not know whether or not the other provider was spoken to. (Ex. 1, 92:3-18). Nevertheless, Plaintiff also fails to provide facts to support the contention that any memo to file she received was a result of racial bias rather than a simple consequence for acting in an unprofessional manner during a meeting. |
| 43. Two months later, and by email dated June 6, 2018, Plaintiff reported discriminatory conduct for the second time by a lab tech who had refused to complete some requisition paperwork for a lab sample that Plaintiff had taken from a patient. (Ex. 2, 72:1-17; Ex. 1, 113:12-20; 114:23-115:3). | Controverted in part. Controverted to the extent that LaBlance suggests she had previously reported concerns that the lab tech had been acting in discriminatory manner prior to June 6, 2018. Uncontroverted that LaBlance contends that there had been a previous incident (making two incidents over a course of years they two employees worked together). |

| | |
|---|---|
| 44. Dr. Epperson and HSA Sterling Ream, Plaintiff's direct site supervisors, along with Dr. Lovelace, Jenny Meehan, and Val Kirby were copied on the email. (Id.). | Uncontroverted. |
| 45.Plaintiff testified that on June 6, 2018 (the second "blatant" incident) she had taken a biopsy, put it in a container, sat it on a counter by the refrigerator next to Judy Harkins' desk where the specimens are kept. She asked Ms. Harkins, the lab technician, to complete the requisition and prepare it to be taken to the lab. (Ex. 1, 115:2-3; 124:15-125:6). | Uncontroverted but immaterial. Plaintiff's cited evidence does not create a genuine issue of material fact related to Plaintiff's Title VII or constructive discharge claims as Plaintiff does not point to any facts in the record supporting the assertion that Harkins' action were racially motivated. (*See* Dft's SOF ¶¶15-16). |
| 46. Instead of completing the paperwork, Plaintiff testified that Ms. Harkins "refused to do the requisition after a directive was given. And not only did she refuse to do it, she took the specimen, stormed past me and went and put it on my desk" in an act of disrespect. (Ex. 1, 143:1–7; 146:7-21). | Uncontroverted but immaterial. Plaintiff's cited evidence does not show that the alleged actions by Judy Harkins were motivated by race. |
| 47. Dr. Lovelace testified that he had a telephone conversation with Plaintiff and understood that she felt she was being "singled out" because the lab tech (Judy Harkins) would "do things for other providers and not her, and she also felt that the lab tech talked to her in an unprofessional way, taking the lab assessment and throwing it on her desk." (Ex. 2, 71:1-10). | Uncontroverted but immaterial. Plaintiff's cited evidence is a significant level of personal speculation regarding Harkins' motive, and Plaintiff fails to provide evidence to show that the alleged actions by Harkins were motivated by race. (*See* Dft's SOF ¶¶15-16). |
| 48. It was decided that an investigation would be conducted. (Ex. 2, 72:21-24). | Uncontroverted. |
| 49. Jenny Meehan, Director of Operations for the Midwest region, participated in the investigation and understood that Plaintiff had reported the same problem previously with the lab tech, which Plaintiff felt had not been addressed. (Ex. 3, 61:3-17). | Uncontroverted. |
| 50. The focus of the investigation was not on whether the lab tech had treated Plaintiff differently than the white providers by refusing to do the paperwork when asked and throwing the sample back on her desk, but rather whether the white providers had ever filled out their own requisition paperwork. (Ex. 3, 62: 6-21). | Uncontroverted but immaterial. The Plaintiff's complaint as emailed to Corizon management focused on and alleged that the lab technician asked her to fill out paperwork that she did not make other providers fill out (See Ex. 15 to Ex. 1, LaBlance's Deposition, attached as Exhibit C to Defendant's Reply Brief), which is what the investigation focused on (Ex. 3, 70:17-25). |

| | |
|---|---|
| 51. In other words, the investigation ignored Plaintiff's previous complaint and the lab tech's behavior toward Plaintiff. (Ex. 3, 64:3-7). Ms. Meehan didn't think that behavior was "important" to a claim of racial discrimination (Ex. 3, 70:15-25). | Controverted. Meehan testified that LaBlance did not indicate that the previous issue with the lab technician was racial discrimination. (Ex. 3, 72:9-12). The Plaintiff's complaint as emailed to Corizon management focused on and alleged that the lab technician asked her to fill out paperwork that she did not make other providers fill out (See Ex. 15 to Ex. 1, LaBlance's Deposition, attached as Exhibit C to Defendant's Reply Brief), which is what the investigation focused on (Ex. 3, 70:17-25). |
| 52. Significantly, HSA Sterling Ream (Plaintiff's site supervisor who had been copied on her June 6, 2018 email) had accessed Plaintiff's D.O.C. records months earlier on December 9, 2017, before she became the site administrator in June of 2018. (Ex. A, 19:1-18). | Uncontroverted but immaterial. Sterling Ream was not the subject of Plaintiff's complaint, nor did Sterling Ream participate or lead the investigation of Plaintiff's complaints. It is unclear how what Ms. Ream may have done months earlier regarding LaBlance's D.O.C records (which LaBlance did not know about at the time) creates an inference of racial discrimination with respect to what either the lab tech did, or is otherwise material to how Meehan investigated this incident. |
| 53. Ms. Ream testified that the "rumor" about Plaintiff's criminal record was "flying around" the nurses, and she was concerned, but she didn't know who she would report it to since her boss was the one that told her. (Ex. A, 27:15-28:1; 29:13-30:6). | Uncontroverted but immaterial. Sterling Ream was not the subject of Plaintiff's complaint, nor did Sterling Ream participate or lead the investigation of Plaintiff's complaints. It is unclear how what Ms. Ream may have done months earlier regarding LaBlance's D.O.C records (which LaBlance did not know about at the time) creates an inference of racial discrimination with respect to what either the lab tech did, or is otherwise material to how Meehan investigated this incident. |
| 54. Even though Ms. Ream was concerned and didn't know who to report her concerns to, she never told anyone investigating this discrimination complaint about the rumors that she had heard and the number of nurses | Uncontroverted but immaterial. Sterling Ream was not the subject of Plaintiff's complaint, nor did Sterling Ream participate or lead the investigation of Plaintiff's complaints. It is unclear how what Ms. Ream may have done months earlier regarding |

| | |
|---|---|
| discussing Plaintiff's D.O.C. record. (Ex. A, 30: 10-21). | LaBlance's D.O.C records (which LaBlance did not know about at the time) creates an inference of racial discrimination with respect to what either the lab tech did, or is otherwise material to how Meehan investigated this incident. |
| 55. Remarkably (or perhaps predictably), the "investigation" determined that the lab tech had done nothing wrong by refusing to comply with Plaintiff's request, speaking unprofessionally, and throwing the lab specimen on Plaintiff's desk. Instead, her behavior was discounted in the investigation as a "communication issue" and maybe she had a "bad morning." (Ex. 2, 78:8-14; 79:4-8; 79:12-14). | Controverted. It is an uncontroverted fact that Corizon investigated this situation after notice about from Plaintiff's complaint. Plaintiff's disagreement with Corizon's determination that Plaintiff's allegations could not be corroborated by any other provider interviewed in the course of the investigation does not create a genuine issue of material fact either as to whether the incident was racially motivated or the reasonableness of Corizon's response. |
| 56. Despite a finding that no one did anything wrong, Dr. Lovelace nevertheless sent an email to Jenny Meehan, Rhonda Almanza, Heather Dale, Sterling Ream, and Cindy Shupp saying that "I think awareness alone will have a significant benefit. People tend to behave better when they think someone is watching." (Ex. 2, 76:18-77:11). | Controverted in part. Lovelace's email did not make any reference to race nor does it suggest that any alleged actions were motivated by racial bias. Lovelace testified that their awareness should be heightened, stating "so if they're both talked to, then they're both aware that there's an issue – a communication issue." (Ex. 2, 79: 4-8). Plaintiff's attempt to imply that Lovelace concluded the actions to be race-motivated is an unsupported disingenuous mischaracterization of the testimony. |
| 57. Even so, Dr. Lovelace conceded that if he were faced with the same situation where he asked a lab tech to process a specimen for evaluation, the lab tech refused to do so and instead took the specimen back to his desk while stating "I told you not to set that on my desk," he would consider that "inappropriate" and "unprofessional." (Ex. 2, 84:9-85:25). | Controverted. While considered "inappropriate" and "unprofessional" Lovelace did not testify that the behavior was race-based nor indicative of racial bias and Plaintiff's attempt to imply so is an unsupported disingenuous mischaracterization of the testimony. |
| 58. Plaintiff testified that "essentially nothing" came of her two complaints of blatant discriminatory conduct by Judy Harkins. She was not interviewed as part of the investigation but rather simply told they | Controverted. It is an uncontroverted fact that Corizon launched an investigation into Plaintiff's complaints immediately after she put Corizon on notice of alleged allegation. Plaintiff's personal disagreement with the |

| | |
|---|---|
| had finished the investigation and concluded it was a "misunderstanding." (Ex. 1, 129: 13-130:17). | outcome of the investigation does not create a genuine issue of fact in the face of the uncontroverted fact that the investigation occurred and that Plaintiff's allegations were not corroborated. |
| 59. Plaintiff was not satisfied with the results of the investigation. "Because that behavior was not a misunderstanding. It was a blatant insubordinate act, for whatever reason, only one reason I can come up with ...the only difference between me and the other providers is that I'm black. I'm African-American." (Ex. 1, 132:3-13). | Uncontroverted but immaterial. Plaintiff's personal disagreement with the outcome of the investigation does not create a genuine issue of material fact where there is the irrefutable fact that Corizon launched an immediate investigation into the direct allegations of Plaintiff's complaint that Caucasian providers were not asked to fill out the same paperwork which the lab technician asked Plaintiff to complete. Furthermore, even accepting Plaintiff's beliefs as true, the alleged conduct amounts to no more than Plaintiff's personal speculation on motive and does not rise to the level necessary to support Plaintiff's claims. *See Anderson v. Durham D & M, L.L.C.,* 606 F.3d 513, 519 (8th Cir. 2010) (finding that the plaintiff offered "little more than speculation and conjecture" that supervisor's "nitpicking and ridicule" had anything to do with race). |
| 60. Plaintiff spoke with the other providers and asked if any of them had trouble getting specimens processed by Judy Harkins and was told they did not. She was the only one. (Ex. 1, 132:7-23). | Controverted and but immaterial. The cited evidence does not provide a factual basis for the contention that any behavior witnessed by Plaintiff was motivated on the basis of race. What the other providers purportedly said to LaBlance is inadmissible hearsay if being offered for the truth, and, if not offered for the truth, the evidence is irrelevant/immaterial. Even if that is what the other providers told LaBlance at some point, it is undisputed that is not what they told Meehan during the investigation, which was the basis for Meehan's conclusions. Perhaps if LaBlance had been willing to discuss the matter further with Meehan and the lab tech then she could have reached a better understanding of what happened and why. She refused, having subjectively made up her mind that race must |

| | |
|---|---|
| | have been in play despite what Meehan had been told. Furthermore, even accepting Plaintiff's beliefs as true, the alleged conduct amounts to no more than Plaintiff's personal speculation on motive and does not rise to the level necessary to support Plaintiff's claims. See *Anderson v. Durham D & M, L.L.C.,* 606 F.3d 513, 519 (8th Cir. 2010) (finding that the plaintiff offered "little more than speculation and conjecture" that supervisor's "nitpicking and ridicule" had anything to do with race). |
| 61. Plaintiff also raised a concern with her HSA Sterling Ream and Dr. Lovelace about three staff assistants who behaved differently while assisting Plaintiff with patients than they did when assisting the white providers Dr. Epperson and Val Kirby (one of whom included Ana Barker who had been fired after making overt racist remarks). (Ex. 1, 151-154). | Uncontroverted but immaterial. The cited evidence does not provide a factual basis for the contention that any behavior witnessed by Plaintiff was motivated on the basis of race. Furthermore, even accepting Plaintiff's beliefs as true, the alleged conduct amounts to no more than Plaintiff's personal speculation on motive and does not rise to the level necessary to support Plaintiff's claims. See *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 519 (8th Cir. 2010) (finding that the plaintiff offered "little more than speculation and conjecture" that supervisor's "nitpicking and ridicule" had anything to do with race). |
| 62. These staff assistants would interrupt, interject incorrect medical advice, or try to explain the medical diagnosis to the point where Plaintiff eventually asked one of them to leave the room even after Plaintiff asked her not to interject her opinion during the exams. (Ex. 1, 151:12-23; 158:3-22; 165:13-22). | Uncontroverted but immaterial. The cited evidence does not provide a factual basis for the contention that any behavior witnessed by Plaintiff was motivated on the basis of race. Furthermore, even accepting Plaintiff's beliefs as true, the alleged conduct amounts to no more than Plaintiff's personal speculation on motive and does not rise to the level necessary to support Plaintiff's claims. *See Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 519 (8th Cir. 2010) (finding that the plaintiff offered "little more than speculation and conjecture" that supervisor's "nitpicking and ridicule" had anything to do with race). |
| 63. Plaintiff testified that she talked to Sterling Ream again about these problems | Uncontroverted but immaterial. The cited evidence does not provide a factual basis for |

| | |
|---|---|
| with staff assistants that had not resolved because her patient load and schedule began to be altered from 20 to 25 patients a day to about 10 patients a day. One of the staff assistants at issue was the one that kept Plaintiff's schedule. (Ex. 1, 159:5-16; 168:14-169:7). | the contention that any behavior witnessed by Plaintiff was motivated on the basis of race. Furthermore, even accepting Plaintiff's beliefs as true, the alleged conduct amounts to no more than Plaintiff's personal speculation on motive and does not rise to the level necessary to support Plaintiff's claims. *See Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 519 (8th Cir. 2010) (finding that the plaintiff offered "little more than speculation and conjecture" that supervisor's "nitpicking and ridicule" had anything to do with race). |
| 64. "[T]he number of patients that I see determines my productivity which determines, you know, my need to be in that position to have that job, and so that became an issue and I believe that was retaliation." (Ex. 1, 159:5-16). | Controverted, immaterial. Plaintiff's cited evidence does not provide factual support for her allegation of retaliation, and the suggestion that Plaintiff's job was in jeopardy is directly controverted by the uncontroverted fact that Corizon engaged in discussions with Plaintiff to keep her in her position even after she submitted her resignation. |
| 65. Ms. Ream, of course, had accessed Plaintiff's D.O.C. record along with numerous other Corizon and D.O.C. personnel. (Ex. G and Ex. I) When asked why she accessed the records, Ms. Ream testified that: "The current HSA at the time (Teresa McWhorter)...she was walking into the ER and had said something about Terri's criminal record. And, of course, I was surprised. And so curiosity because I just couldn't believe it." (Ex. A, 19: 1-18). | Uncontroverted but immaterial. Plaintiff did not become aware of Ream accessing her records until after her employment ended, and any events happening after Plaintiff's voluntary resignation cannot be back-dated into influencing Plaintiff's decision to resign when Plaintiff was not made aware of any of the events until after her employment ended. See, e.g., *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 211 (4th Cir. 2019) ("Following our decisions and those of our sister circuits, we confirm that information about which a plaintiff is unaware cannot, by definition, be part of a plaintiff's work experience. Thus, such information is not proper for consideration in evaluating the severe or pervasive requirement of a hostile work environment claim.") Furthermore, Plaintiff's cited evidence does not indicate that any access of her D.O.C. records was motivated by her race. |
| 66. One day in November or December of 2018, Plaintiff recalls that several employees | Uncontroverted but immaterial. The cited evidence does not provide a factual basis for |

| | |
|---|---|
| one after another opened her door and looked at her not saying anything. She heard Ms. Ream say "Well, I'll be able to tell," and then Ms. Ream did the same thing. Plaintiff believes that these employees were comparing her face to the printout from her D.O.C. records. (Ex. 1, 189:5-20). | the contention that any behavior witnessed by Plaintiff was motivated on the basis of race. Furthermore, even accepting Plaintiff's beliefs as true, the alleged conduct does not rise to the level necessary to support Plaintiff's claims. *See Kelleher v. Wal-Mart Stores, Inc.,* 817 F.3d 624, 634 (8th Cir. 2016) (unspecified discriminatory statements, random looks and eye rolls did not constitute adverse employment action). |
| 67. Plaintiff also testified that custody officers became more watchful and began standing outside her door in the medical facility when she was conducting exams because she reprimanded one of the staff assistants. (Ex. 1, 170:13-20; 171:6-13). | Uncontroverted but immaterial. It is an uncontroverted fact that D.O.C. officers were not under the control of Corizon (Ex. 2, 87:8-12). Regardless, even assuming Plaintiff's feelings about the D.O.C. officers to be true, the conduct to which Plaintiff testify falls far short of the level needed for a prima facie case of race discrimination. *See O'Brien v. Dep't of Agric.,* 532 F.3d 805, 809 (8th Cir. 2008) (verbal harassment and increased scrutiny do not rise to the level of affecting the terms or conditions of one's employment). |
| 68. Plaintiff identified an instance where a custody officer barged into the exam room while the patient was in stirrups and reported that incident to Sterling Ream and Dr. Epperson. (Ex. 1, 172:3-10, 17-23). Sterling Ream was surprised when Plaintiff told her this had happened. (Ex. 1, 173:9-13). | Uncontroverted but immaterial. It is an uncontroverted fact that D.O.C. officers were not under the control of Corizon (Ex. 2, 87:8-12). Regardless, even assuming Plaintiff's feelings about the D.O.C. officers to be true, the conduct to which Plaintiff testify falls far short of the level needed for a prima facie case of race discrimination. See O'Brien v. Dep't of Agric., 532 F.3d 805, 809 (8th Cir. 2008) (verbal harassment and increased scrutiny do not rise to the level of affecting the terms or conditions of one's employment). |
| 69. Another time toward the end of her employment, Plaintiff testified that she needed a scalpel – called "sharps" – to remove a birth control device from a patient's arm. Plaintiff was required to get the sharps from the nurses because they were locked up. The nurse brought them but left the entire box | Uncontroverted but immaterial. The cited evidence does not provide a factual basis for the contention that any behavior witnessed by Plaintiff was motivated on the basis of race. Furthermore, even accepting Plaintiff's beliefs as true, the allegations regarding the single incident is not sufficient to rise to the level necessary to support Plaintiff's claims. |

| | |
|---|---|
| on her desk pushed back into her books where she could not see them. (Ex. 1, 237:1-14). | *See Jackman v. Fifth Judicial Dist. Dept. of Correctional Servs.,* 728 F.3d 800, 805 (8th Cir. 2013) (ruling that incidents that were insufficient and conduct that was not severe or pervasive enough to constitute actionable discrimination were not sufficient to support a hostile work environment claim). |
| 70. When Plaintiff returned the box to the nurse, the nurse explained that the door to the exam room was locked and she had tried to knock. Plaintiff says it was not locked. Dr. Epperson commented that "she [Plaintiff] doesn't have a clue." Plaintiff said nothing, but believes that was intentional conduct, and it was the kind of thing that could have gotten her fired and turned into the board thereby jeopardizing her ability to work. (Ex. 1, 237:21-238:4). | Uncontroverted but immaterial. The cited evidence does not provide a factual basis for the contention that any facially race-neutral statements and actions witnessed by Plaintiff were motivated on the basis of race, and Plaintiff's assertion otherwise amounts to no more than Plaintiff's personal speculation regarding motive, which fails to create any genuine issue of fact relevant to summary judgment. *See Twymon v. Wells Fargo & Co.,* 462 F.3d 925, 934 (8th Cir. 2006) ("Facially race-neutral statements, without more, do not demonstrate racial animus on the part of the speaker…While we are required to make all reasonable inferences in favor of the nonmoving party in considering summary judgment, we do so without resort to speculation.") |
| 71. Plaintiff also testified that more attention was paid to her belongings when she arrived at work and went through the scanner than a white employee that arrived about the same time every day. Essentially, the guard scrutinized her belongings, and paid no attention to the scanner when the white employee passed through. (Ex. 1, 257:3-258:18). | Uncontroverted but immaterial. It is an uncontroverted fact that D.O.C. officers were not under the control of Corizon (Ex. 2, 87:8-12) and there is no evidence that LaBlance complained about this alleged behavior or that Corizon management otherwise knew or should have known about it. (Ex. 2, 86: 1-4). It is uncontroverted that LaBlance never mentioned this behavior in connection with her resignation or otherwise gave Corizon an opportunity to look into the issue before she quit. Regardless, even assuming Plaintiff's feelings about the D.O.C. officers to be true, the conduct to which Plaintiff testify falls far short of the level needed for a prima facie case of race discrimination. *See O'Brien v.* |

| | |
|---|---|
| | *Dep't of Agric.,* 532 F.3d 805, 809 (8th Cir. 2008) (verbal harassment and increased scrutiny do not rise to the level of affecting the terms or conditions of one's employment). |
| 72. Dr. Lovelace testified that Plaintiff discussed at least some of these concerns with him, and her realization that because of her race and status as the only African-American employee, her co-workers felt they could access to her D.O.C. records and gossip about her criminal history with impunity, and treat her with hostility and disrespect. (Ex. 2, 86:1-25 ). | Controverted. This is a mischaracterization of Lovelace's testimony, which refers to the letter Plaintiff received from her co-worker Epperson after her employment ended. The letter put Plaintiff on notice that individuals had accessed her record. The testimony, reproduced in full here for context, does not address Plaintiff's unsupported allegation that her co-workers felt that they could access her D.O.C. records because of her race:<br><br>Q: Did Ms. Lablance ever talk to you about the treatment she received at the hands of the 3 department of corrections officers?<br>A.  No.<br>Q.  Okay.  Did she ever talk to you about her experience when she -<br>A.  I'd like to correct that.  I'm sorry.<br>Q.  Yes, please.<br>A.  *After she received the letter*, then she brought up some of the -- some things that had happened.<br>Q.  When you say "after she received the letter" –<br>A.  From Dr. Epperson.<br>Q.  Okay.  So after she received the letter from Dr. Epperson, she brought up some -- what?  I'm sorry.<br>A.  Just some feelings that she had where - that made sense to her now -- you know, Oh, this is why they treated me like this; this is why -- but never before then.<br>Q.  Okay.  So it was almost like *after she got away, all of this stuff sort of came together in her mind*?  Is that what I hear you saying?<br>A.  Yes<br><br>(emphasis added).<br><br>Furthermore, Plaintiff cannot use information learned after her resignation to re-characterize |

| | |
|---|---|
| | her decision to resign. *See, e.g., Perkins v. Int'l Paper Co.,* 936 F.3d 196, 211 (4th Cir. 2019) ("Following our decisions and those of our sister circuits, we confirm that information about which a plaintiff is unaware cannot, by definition, be part of a plaintiff's work experience. Thus, such information is not proper for consideration in evaluating the severe or pervasive requirement of a hostile work environment claim.") Plaintiff's cited evidence also does not indicate that any access of her D.O.C. records was motivated by her race. |
| 73. Tammie Christopher testified that in early February of 2019, she accessed Plaintiff's D.O.C. records after someone (who she was unable to identify) handed her a Post-it note with a number on it and told her to "look this up." (Ex. B, 27:1-19; 31:21-25; Ex. I). | Uncontroverted but immaterial. The access of Plaintiff's D.O.C. records has no bearing on Plaintiff's Title VII or constructive discharge claims as Plaintiff fails to provide any facts alleging that the motivation behind any alleged conversations about Plaintiff's criminal record was rooted in Plaintiff's race and not just Plaintiff's criminal record alone. Without racial character or purpose, the conduct alleged by LaBlance cannot and should not be considered as part of her race-based hostile work environment claim. *Singletary v. Mo. Det. Of Corrections*, 423 F.3d 886, 893 (8th Cir. 2005). Rather, the relevant inquiry is whether Plaintiff experienced any racial discrimination or harassment based on her race (not based on her criminal history) rising to the level of a hostile work environment. The evidence LaBlance cites does not reasonably support such an inference. |
| 74. Ms. Christopher testified that she understood that if she became aware of a HIPAA violation, she was required to report it even if she was the offender. (Ex. B, 53:4-22). She did not report the fact that she accessed Plaintiff's records in violation of HIPAA. (Id.). | Uncontroverted but immaterial. Plaintiff's evidence is not factual support for the Plaintiff's allegation that any access of Plaintiff's record was done on the basis of race, or that Ms. Christopher's alleged failure to report it was because of LaBlance's race, and does not provide any additional facts to support this contention. |

| | |
|---|---|
| 75. Ms. Christopher is married to a D.O.C. employee (Case Manager II), who also accessed Plaintiff's criminal record and was ultimately reprimanded for that HIPAA violation. (Ex. B, 15:11-16:10; 8:6-20). Mr. Christopher looked at Plaintiff's records because Val Kirby came into his office in Housing Unit 1 and told him to look up Plaintiff's record. (Ex. B, 68:12-20; and Ex. I, D.O.C. Audit Log.). | Uncontroverted but immaterial. It is an uncontroverted fact that D.O.C. officers were not under the control of Corizon (Ex. 2, 87:8-12). |
| 76. In addition to Corizon employees, the private data contained in Plaintiff's D.O.C. record spread throughout D.O.C. personnel, too. (Ex. I, audit log of D.O.C. employees accessing Plaintiff's records). | Uncontroverted but immaterial. It is an uncontroverted fact that D.O.C. officers were not under the control of Corizon (Ex. 2, 87:8-12). |
| 77. Even though Jenny Meehan testified that she did not, Judy Harkins, the lab technician who refused to do requisition paperwork and threw a lab specimen back on Plaintiff's desk, accessed Plaintiff's records on February 20, 2019. (Ex. 3, 67:16-8:2; and Ex. G, Audit record). | Uncontroverted but immaterial. The access of Plaintiff's D.O.C. records has no bearing on Plaintiff's Title VII or constructive discharge claims as Plaintiff fails to provide any facts alleging that the motivation behind any alleged conversations about Plaintiff's criminal record was rooted in Plaintiff's race and not just Plaintiff's criminal record alone. Without racial character or purpose, the conduct alleged by LaBlance cannot and should not be considered as part of her race-based hostile work environment claim. *Singletary v. Mo. Det. Of Corrections*, 423 F.3d 886, 893 (8th Cir. 2005). Rather, the relevant inquiry is whether Plaintiff experienced any racial discrimination or harassment based on her race (not based on her criminal history) rising to the level of a hostile work environment. The evidence LaBlance cites does not reasonably support such an inference. |
| 78. Val Kirby accessed her D.O.C. record on February 11 and 12, 2019. (Ex. G). | Uncontroverted but immaterial. The access of Plaintiff's D.O.C. records has no bearing on Plaintiff's Title VII or constructive discharge claims as Plaintiff fails to provide any facts alleging that the motivation behind any alleged conversations about Plaintiff's criminal record was rooted in Plaintiff's race and not just Plaintiff's criminal record alone. Without racial character or purpose, the |

| | |
|---|---|
| | conduct alleged by LaBlance cannot and should not be considered as part of her race-based hostile work environment claim. *Singletary v. Mo. Det. Of Corrections*, 423 F.3d 886, 893 (8th Cir. 2005). Rather, the relevant inquiry is whether Plaintiff experienced any racial discrimination or harassment based on her race (not based on her criminal history) rising to the level of a hostile work environment. The evidence LaBlance cites does not reasonably support such an inference. Furthermore, LaBlance had tendered her resignation on February 1, 2019, weeks before Ms. Kirby accessed the records. |
| 79. Dr. Epperson accessed Plaintiff's records on February 11, 2019 and again on February 20, 2019. (Ex. G). Ms. Meehan testified that Dr. Epperson explained that "she entered numbers of a patient that she was going to chart on and accidentally Ms. Lablance popped up." (Ex. 3, 78:17-25). | Uncontroverted but immaterial. The access of Plaintiff's D.O.C. records has no bearing on Plaintiff's Title VII or constructive discharge claims as Plaintiff fails to provide any facts alleging that the motivation behind any alleged conversations about Plaintiff's criminal record was rooted in Plaintiff's race and not just Plaintiff's criminal record alone. Without racial character or purpose, the conduct alleged by LaBlance cannot and should not be considered as part of her race-based hostile work environment claim. *Singletary v. Mo. Det. Of Corrections*, 423 F.3d 886, 893 (8th Cir. 2005). Rather, the relevant inquiry is whether Plaintiff experienced any racial discrimination or harassment based on her race (not based on her criminal history) rising to the level of a hostile work environment. The evidence LaBlance cites does not reasonably support such an inference. Furthermore, LaBlance had tendered her resignation on February 1, 2019, weeks before Epperson accessed the records. |
| 80. Megan Meyer, Alex Spencer, Rachel Stuver, Carol Holloway, Shannon Burris, Tabitha Johnson, Brandy Baker, Rachel Rempel, Lori Switzer, Brandon Doss, Jessica Frizzell, and Megan Rex also accessed Plaintiff's record while she was still employed. (Ex. G). | Uncontroverted but immaterial. The access of Plaintiff's D.O.C. records has no bearing on Plaintiff's Title VII or constructive discharge claims as Plaintiff fails to provide any facts alleging that the motivation behind any alleged conversations about Plaintiff's criminal record was rooted in Plaintiff's race |

| | |
|---|---|
| | and not just Plaintiff's criminal record alone. Without racial character or purpose, the conduct alleged by LaBlance cannot and should not be considered as part of her race-based hostile work environment claim. *Singletary v. Mo. Det. Of Corrections*, 423 F.3d 886, 893 (8th Cir. 2005). Rather, the relevant inquiry is whether Plaintiff experienced any racial discrimination or harassment based on her race (not based on her criminal history) rising to the level of a hostile work environment. The evidence LaBlance cites does not reasonably support such an inference. |
| 81. Not one of these individuals reported that they or anyone else had accessed Plaintiff's D.O.C. records. | Uncontroverted but immaterial. Plaintiff's evidence is not factual support for the Plaintiff's allegation that any access of Plaintiff's record was done on the basis of race, or that any alleged failure to report it was because of LaBlance's race, and does not provide any additional facts to support this contention. |
| 82. Plaintiff resigned on February 1, 2019. (Ex. 1, 192:13-16). | Uncontroverted. |
| 83. Plaintiff felt uneasy and there was an atmosphere and environment – a culture – that made her fearful. Plaintiff worked hard to earn her certification, she testified that she "put in the time to turn [her] life around from what it had been," and her work environment had become very difficult: "To be treated less than, to be plotted against, and to fear going to work because of what might transpire that could potentially damage my ability to make a living, because someone doesn't like the color of my skin. That –that was a real fear." (Ex. 1, 236:10-19). | Controverted, but immaterial. While Plaintiff testified during her deposition to her retroactive after-the-fact/after-filing-this-lawsuit reasoning for resignation, it is an irrefutable uncontroverted fact that at the time Plaintiff never put Corizon on notice of any concern regarding the environment. And there is otherwise no evidence suggesting that LaBlance actually "feared" going to work at the time. Plaintiff admitted that she gave the reason for her resignation as travel related, and that she informed Corizon that she had accepted another position at the time of her resignation. (See Defendant's SOF ¶¶21-22). Plaintiff's attempt to walk back her resignation motive based on events occurring after her decision to resign are irrelevant to the inquiry. *See, e.g., Perkins v. Int'l Paper Co.*, 936 F.3d 196, 211 (4th Cir. 2019) ("Following our decisions and those of our |

| | sister circuits, we confirm that information about which a plaintiff is unaware cannot, by definition, be part of a plaintiff's work experience. Thus, such information is not proper for consideration in evaluating the severe or pervasive requirement of a hostile work environment claim.") |
|---|---|
| 84.    She summed up her experience at Corizon and the basis for her leaving by testifying as follows: "...what Corizon employees did do, they used their access to the Department of Correction's computer to find information ...how it got worse with, you know, the skepticism, my patient load, over taking me, overriding my decisions, the blatant disrespect. All of these things that were taking place, they took place because of – that was a discrimination. ...It was a discrimination when you shoes to make the decision to look this up in the first place. ...in the beginning that overt discrimination was not one of those things that –people weren't going around calling me names. Okay? But the more subtle –the subtleties of the behaviors I would characterize as discriminatory, and they made me feel uncomfortable, they made me feel singled out, they made me fear for my license – okay? – they – they cause me to lose sleep at night because I have this stuff happening to me every day, on a daily basis. The – secrecy, the murmuring, the whispering, the – and—and you know, it's because this is – I will go back to institutional racism. I will go back to white privilege I will go back to the fact that this is the way it is in rural America, because they're not used to me being there." (Ex. 1, 178: 12-179:6; 182:15-183:8). | Uncontroverted but immaterial. It is undisputed that Plaintiff resigned her position on February 1, 2019, and any events happening after Plaintiff's voluntary resignation cannot be back-dated into influencing Plaintiff's decision to resign when Plaintiff was not made aware of any of the events until after her employment ended. *See, e.g., Perkins v. Int'l Paper Co.,* 936 F.3d 196, 211 (4th Cir. 2019) ("Following our decisions and those of our sister circuits, we confirm that information about which a plaintiff is unaware cannot, by definition, be part of a plaintiff's work experience. Thus, such information is not proper for consideration in evaluating the severe or pervasive requirement of a hostile work environment claim.") |
| 85. Plaintiff received a letter postmarked February 26, 2019 from Dr. Epperson. (Ex. H, Epperson letter). | Uncontroverted but immaterial. Plaintiff's employment ended February 21, 2019, and any events happening after Plaintiff's voluntary resignation cannot be back-dated into influencing Plaintiff's decision to resign when Plaintiff was not made aware of any of the events until after her employment ended. |

| | See, e.g., Perkins v. Int'l Paper Co., 936 F.3d 196, 211 (4th Cir. 2019) ("Following our decisions and those of our sister circuits, we confirm that information about which a plaintiff is unaware cannot, by definition, be part of a plaintiff's work experience. Thus, such information is not proper for consideration in evaluating the severe or pervasive requirement of a hostile work environment claim.") |
|---|---|
| 86. Plaintiff reached out to Dr. Lovelace when she received the letter from Dr. Epperson to report what had happened. Dr. Lovelace testified that Plaintiff felt betrayed by Dr. Epperson and Val Kirby because she thought they had shared the information in the letter, namely her D.O.C. records, with other Corizon and D.O.C. staff, which they did. (Ex. 2, 88:10-89:15). | Uncontroverted but immaterial. Plaintiff's evidence is not factual support for Plaintiff's contention that access of Plaintiff's record was done on the basis of race, and does not provide any additional facts to create a genuine issue of material fact. |
| 87. After receipt of the letter, Dr. Lovelace testified that he "started the ball rolling" with human resources because a HIPAA violation is reportable whether it involves a current employee or not. (Ex. 2, 89:23-90:7). | Uncontroverted, but immaterial. Plaintiff's evidence is not factual support for Plaintiff's contention that access of Plaintiff's record was done on the basis of race, and does not provide any additional facts to create a genuine issue of material fact. |
| 88. Makisa Upton (a human resources manager) took the lead in the investigation relating to employees accessing Plaintiff's records. (Ex. C, 27:1-19). | Uncontroverted, but immaterial. Plaintiff's evidence is not factual support for Plaintiff's contention that access of Plaintiff's record was done on the basis of race, and does not provide any additional facts to create a genuine issue of material fact. |
| 89. The investigation revealed that numerous employees, including Dr. Lovelace, Dr. Epperson, Sterling Ream, and Val Kirby accessed Plaintiff's D.O.C. records between the time she was hired and Plaintiff's last day of employment on February 22, 2019. (Ex. G, Audit record). | Uncontroverted but immaterial. Plaintiff's evidence is not factual support for Plaintiff's allegation that any access of Plaintiff's record was done on the basis of race, and does not provide any additional facts to create a genuine issue of material fact. Furthermore, it is an undisputed fact that Plaintiff was not aware that individuals at Corizon accessed her record until after her employment ended. (See Plaintiff's SOF ¶16). Plaintiff cannot use information learned after her resignation to re-characterize her decision to resign. See, |

| | |
|---|---|
| | e.g., *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 211 (4th Cir. 2019) ("Following our decisions and those of our sister circuits, we confirm that information about which a plaintiff is unaware cannot, by definition, be part of a plaintiff's work earlier experience. Thus, such information is not proper for consideration in evaluating the severe or pervasive requirement of a hostile work environment claim.") |
| 90. In fact, although Dr. Lovelace acknowledged his duty to report complaints and testified that he had "started the ball rolling" on the investigation on March 1, 2019 after notified him she had received Dr. Epperson's February 26, 2019 letter, he too had accessed Plaintiff's D.O.C. records 15 days earlier on February 11, 2019 for some unexplained reason. (Ex. G; and Ex. C, 74:20-24; 77:2-78:2). | Uncontroverted but immaterial. Plaintiff's evidence is not factual support for Plaintiff's allegation that any access of Plaintiff's record was done on the basis of race, and does not provide any additional facts to create a genuine issue of material fact. Furthermore, it is an undisputed fact that Plaintiff was not aware that individuals at Corizon accessed her record until after her employment ended. (See Plaintiff's SOF ¶16). Plaintiff cannot use information learned after her resignation to re-characterize her decision to resign. See, e.g., *Perkins v. Int'l Paper Co.,* 936 F.3d 196, 211 (4th Cir. 2019) ("Following our decisions and those of our sister circuits, we confirm that information about which a plaintiff is unaware cannot, by definition, be part of a plaintiff's work experience. Thus, such information is not proper for consideration in evaluating the severe or pervasive requirement of a hostile work environment claim.").  Furthermore, LaBlance does not even try to explain how Dr. Lovelace—who is African-American—accessing her records somehow creates an inference that this somehow shows that he or anyone else was discriminating against her because she was also African-American. |
| 91. Dr. Lovelace did not admit to accessing the records on February 11, 2019 in his deposition, and instead testified he was the first to discover the problem on March 1, 2019 through Plaintiff's text or email to him. (Ex. 2, 123:12-124:9). Ms. Upton was | Uncontroverted but immaterial. Plaintiff's evidence is not factual support for Plaintiff's allegation that any access of Plaintiff's record was done on the basis of race, and does not provide any additional facts to create a genuine issue of material fact. Furthermore, it |

| | |
|---|---|
| concerned that he was aware of employees' access to Plaintiff's records before her employment ended and failed to report that fact. (Ex. C, 79: 4-11). | is an undisputed fact that Plaintiff was not aware that individuals at Corizon accessed her record until after her employment ended. (See Plaintiff's SOF ¶16). Plaintiff cannot use information learned after her resignation to re-characterize her decision to resign. See, e.g., *Perkins v. Int'l Paper Co.,* 936 F.3d 196, 211 (4th Cir. 2019) ("Following our decisions and those of our sister circuits, we confirm that information about which a plaintiff is unaware cannot, by definition, be part of a plaintiff's work experience. Thus, such information is not proper for consideration in evaluating the severe or pervasive requirement of a hostile work environment claim."). Furthermore, LaBlance does not even try to explain how Dr. Lovelace—who is African-American—accessing her records somehow creates an inference that this somehow shows that he or anyone else was discriminating against her because she was also African-American. |
| 92. Dr. Lovelace testified that, in his opinion, Plaintiff was justified in feeling violated, and that he did not know what the environment would have looked like for Plaintiff where people were searching her record in the background. (Ex. 2, 125:2-11; 129:1-10). | Uncontroverted. It is uncontroverted fact that in the only prior incident involving an overt racial incident, Corizon took prompt action in investigation and termination of the offending employee. (See Defendant's SOF ¶¶ 5-10). |
| 93. In relation to performing post-resignation investigation, Ms. Upton had not been provided any historical data regarding Plaintiff's employment, but rather understood that Plaintiff "seemed happy and sent out happy emails and that there had been a couple of incidents that had happened prior to my arrival with Corizon and they were handled swiftly." (Ex. C, 29:20-30:19). | Uncontroverted. It is uncontroverted fact that in the only prior incident involving an overt racial incident, Corizon took prompt action in investigation and termination of the offending employee. (See Defendant's SOF ¶¶ 5-10). |
| 94. Ms. Upton clarified that Corizon's sworn interrogatory answer identifying that only Dr. Epperson and Val Kirby had accessed Plaintiff's record was inaccurate. (Ex. C, 42:1-20). | Uncontroverted but immaterial. Plaintiff's cited evidence is not factual support for her contention that any access of Plaintiff's record was done on the basis of race, and does not provide any additional facts to create a genuine issue of fact. |

| | |
|---|---|
| 95. Ms. Upton testified that when she made recommendations for discipline of the employees that accessed Plaintiff's record, she somehow "missed" Judy Harkins, the lab technician that Plaintiff had accused of discrimination in June of 2018. (Ex. C, 55:24-57:13). | Uncontroverted but immaterial. Plaintiff's evidence is not factual support for Plaintiff's allegation that any access of Plaintiff's record was done on the basis of race, and does not create any issue of genuine fact. Furthermore, it is an undisputed fact that Plaintiff was not aware that individuals at Corizon accessed her record until after her employment ended. (See Plaintiff's SOF ¶16). Plaintiff cannot use information learned after her resignation to re-characterize her decision to resign. *See, e.g., Perkins v. Int'l Paper Co.,* 936 F.3d 196, 211 (4th Cir. 2019) ("Following our decisions and those of our sister circuits, we confirm that information about which a plaintiff is unaware cannot, by definition, be part of a plaintiff's work experience. Thus, such information is not proper for consideration in evaluating the severe or pervasive requirement of a hostile work environment claim.") |
| 96. The sheer number of employees accessing Plaintiff's records (nine between April 30, 2018 and February 22, 2019 on the 2-page audit record she was working from), caused Ms. Upton concern. (Ex. C, 62: 4-13). Ms. Upton had only been provided two of the four pages of individuals who had accessed Plaintiff's record to perform her investigation. (Ex. C, 71:7-10). | Uncontroverted but immaterial. Plaintiff's evidence is not factual support for Plaintiff's allegation that any access of Plaintiff's record was done on the basis of race, and does not create any issue of genuine fact. Furthermore, it is an undisputed fact that Plaintiff was not aware that individuals at Corizon accessed her record until after her employment ended. (See Plaintiff's SOF ¶16). Plaintiff cannot use information learned after her resignation to re-characterize her decision to resign. *See, e.g., Perkins v. Int'l Paper Co*., 936 F.3d 196, 211 (4th Cir. 2019) ("Following our decisions and those of our sister circuits, we confirm that information about which a plaintiff is unaware cannot, by definition, be part of a plaintiff's work experience. Thus, such information is not proper for consideration in evaluating the severe or pervasive requirement of a hostile work environment claim.") |
| 97. Ms. Upton admitted that she had no information about any prior incidents or | Uncontroverted but immaterial. The cited evidence does not create a genuine issue of |

| | |
|---|---|
| allegations of discrimination involving Paintiff [sic], so the timing of the employees' access spanning at least nine months in the audit record she was provided made no impression on her. (Ex. C, 61:20-62:3). | fact relating to Plaintiff's Title VII and/or her constructive discharge claims, and instead involves events occurring after Plaintiff's employment ended. Rather, the relevant inquiry is whether Corizon, once made aware of any alleged harassment, "took prompt remedial action reasonably calculated to end the harassment," which Plaintiff irrefutably admits. (See Defendant's SOF ¶9, Plaintiff's SOF ¶ 28). |
| 98. Ms. Upton agreed that every employee has a right to privacy regardless of race. (Ex. C, 73:3-8). | Uncontroverted. |

45312187.1